Nos. 22-1465, 22-1466, 22-1467, 22-1549, 22-1550, 22-1551, 22-1552

# United States Court of Appeals for the Federal Circuit

ARBOR GLOBAL STRATEGIES, LLC,
*Appellant*,

v.

SAMSUNG ELECTRONICS CO., LTD., TAIWAN SEMICONDUCTOR MANUFACTURING COMPANY, LTD.,
*Appellees*,

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office
*Intervenor.*

ARBOR GLOBAL STRATEGIES, LLC,
*Appellant*,

v.

XILINX, INC., TAIWAN SEMICONDUCTOR MANUFACTURING CO. LTD.,
*Appellees*,

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office
*Intervenor.*

_____

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2020-01020, IPR2020-01021, IPR2020-01022, IPR2020-01567, IPR2020-01568, IPR2020-01570, IPR2020-01571.

_____

## APPELLANT ARBOR GLOBAL STRATEGIES, LLC'S OPENING BRIEF

Paul J. Andre
Lisa Kobialka
James Hannah
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700

Jeffrey Price
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

***ATTORNEYS FOR ARBOR GLOBAL STRATEGIES, LLC***

# REPRESENTATIVE PATENT CLAIMS

## U.S. Patent No. 6,781,226

13. A processor module comprising:

at least a first integrated circuit die element including a programmable array;
at least a second integrated circuit die element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit die element;

at least a third integrated circuit die element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit die elements respectively; and

means for reconfiguring the programmable array within one clock cycle.

## U.S. Patent No. RE42,035

1.  A processor module comprising:

at least a first integrated circuit die element including a programmable array;

at least a second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element; and

wherein said first and second integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements, and wherein said contact points traverse said die elements through a thickness thereof.

## U.S. Patent No. 7,282,951

1.  A processor module comprising:

at least a first integrated circuit functional element including a programmable array that is programmable as a processing element; and

at least a second integrated circuit functional element stacked with and electrically coupled to said programmable array of said first integrated circuit functional element wherein said first and second integrated circuit functional elements are

electrically coupled by a number of contact points distributed throughout the surfaces of said functional elements and wherein said second integrated circuit includes a memory array functional to accelerate external memory references to the processing element.

**U.S. Patent No. 7,126,214**

1. A programmable array module comprising:

at least a first integrated circuit functional element including a field programmable gate array; and

at least a second integrated circuit functional element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element,

wherein said field programmable gate array is programmable as a processing element, and wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element.

# CERTIFICATE OF INTEREST

Counsel for Arbor Global Strategies, LLC certifies the following:

1.    The full name of every entity represented by us is:

Arbor Global Strategies, LLC.

2.    The name of the real party in interest for the entity. Do not list the real party if it is the same as the entity:

None.

3.    All parent corporations and any other publicly held companies that own 10 percent or more of the stock of the party or amicus curia represented by me are listed below:

Arbor Company LLLP is the parent company.

4.    The names of all law firms, and the partners or associates that have not entered an appearance in the appeal, and (a) appeared for the entity in the lower tribunal; or (b) are expected to appear for the entity in this court:

Jonathan Caplan of Kramer Levin Naftalis & Frankel LLP.

5.    Other than the originating case number(s), the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

*Arbor Global Strategies LLC v. Samsung Electronics Co., Ltd.*, No. 19-cv-00333 (E.D. Tex.).

*Arbor Global Strategies LLC v. Xilinx, Inc.*, No. 19-1986 (D. Del.).

6.    All information required by Fed. R. App. P. 26.1(b) and (c) in criminal cases and bankruptcy cases.

None.

Dated: October 21, 2022          By:   */s/ Paul J. Andre*
                                       Paul J. Andre
                                       Lisa Kobialka
                                       James R. Hannah
                                       KRAMER LEVIN NAFTALIS
                                       & FRANKEL LLP
                                       333 Twin Dolphin Drive, Suite 700
                                       Redwood Shores, CA 94065
                                       Tel: (650) 752-1700
                                       Fax: (650) 752-1800
                                       pandre@kramerlevin.com
                                       lkobialka@kramerlevin.com
                                       jhannah@kramerlevin.com

                                       Jeffrey Price
                                       KRAMER LEVIN NAFTALIS
                                       & FRANKEL LLP
                                       1177 Avenue of the Americas
                                       New York, New York 10036
                                       Tel: (212) 715-9100
                                       Fax: (212) 715-8000
                                       jprice@kramelevin.com

                                       *Attorneys for Appellant*
                                       Arbor Global Strategies, LLC

# TABLE OF CONTENTS

REPRESENTATIVE PATENT CLAIMS ................................................ i

CERTIFICATE OF INTEREST .......................................................... iii

STATEMENT OF RELATED CASES .................................................. xii

JURISDICTIONAL STATEMENT ..................................................... 1

INTRODUCTION .......................................................................... 2

STATEMENT OF THE ISSUES ........................................................ 5

STATEMENT OF THE CASE AND FACTS ...................................... 6

    I.     BACKGROUND OF THE TECHNOLOGY ........................ 6

         A.    Conventional Reconfigurable Processors .................... 6

         B.    Arbor's Patents Describe and Claim a Novel
             Stacked Die Hybrid ("SDH") Reconfigurable
             Processor ...................................................................... 8

    II.    THE IPR PROCEEDINGS ................................................ 11

         A.    The Institution Decisions ........................................... 11

         B.    In Finding the Claimed SDH Reconfigurable
             Processor Obvious, the Board Relied on
             Samsung's and Xilinx's Overly Simplified
             Explanations of Combining Stacked Modules
             Having Thousands of Interconnections with
             Unique FPGAs ........................................................... 14

         C.    The Samsung IPRs ..................................................... 15

             1.    The Asserted References ................................. 15

             2.    Overview of the Parties' Arguments and the
                  Board's FWDs ................................................ 18

         D.    The Xilinx IPRs ......................................................... 21

1.    The Asserted References ...............................................21

2.    Overview of the Parties' Arguments and the Board's FWDs ................................................................23

E.    In Finding the '226 Patent's MPF Limitations Unpatentable, the Board Paired Structure from One Set of Art with Function from Another Set of Art ...........................................................................25

1.    Claim construction of the corresponding structure ...........................................................25

2.    The Parties' arguments and the Board's FWDs ..............................................................26

a)    The IPR2020-01022 Proceeding (Samsung '226 Patent IPR) ..................................26

b)    The IPR2020-01571 Proceeding (Xilinx '226 Patent IPR) .....................................28

SUMMARY OF ARGUMENT ...............................................................30

ARGUMENT ..........................................................................................31

I.    STANDARD OF REVIEW .................................................31

II.    THE BOARD'S OBVIOUSNESS ANALYSIS WAS TAINTED BY PREJUDGMENT BIAS ............................33

A.    The Board Legally Erred in its Application of Means-Plus-Function Black Letter Law ...................33

1.    In the Samsung '226 Patent IPR, the Board erred in finding that Koyanagi's or Bertin's thousands of vertical interconnections corresponds to Cooke's function ....................................35

2.    In the Xilinx '226 Patent IPR, the Board erred in finding that the structure of Zavracky-Chiricescu-Akasaka-Trimberger corresponds to Trimberger's function ...........................37

B.     The FWDs Were Tainted by Hindsight ....................................42

      1.     The Samsung FWDs Were Tainted by Hindsight Bias ..................................................42

      2.     The Xilinx FWDs Were Also Tainted by Hindsight..........................................................47

III.     ALLOWING THE SAME PANEL TO BOTH INSTITUTE AND ADJUDICATE IPRS VIOLATES SECTION 554(d) OF THE APA .......................................52

     A.     The APA Requires a Separate Decisionmaker for Prosecution and Adjudication in Order to Prevent Bias............................................................55

     B.     The APA Provision Applies to IPRs.........................................57

     C.     The *Ethicon* Court Erred in Finding That the APA Provision Does Not Apply to IPRs ...........................................62

     D.     The Structural Bias Inherent in Current IPR Procedure Violates Due Process and Harms Patent Rights ...........................................................67

CONCLUSION ..................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arctic Cat Inc. v. GEP Power Prods., Inc.*,
919 F.3d 1320 (Fed. Cir. 2019) ........................................................32

*Butz v. Economou*,
438 U.S. 478 (1978)..........................................................................56

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) ........................................................60

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016)..................................................................63, 66

*Dell Inc. v. Acceleron, LLC*,
818 F.3d 1293 (Fed. Cir. 2016) ........................................................58

*Ethicon Endo-Surgery, Inc. v. Covidien LP*,
812 F.3d 1023 (Fed. Cir. 2016) ................................54, 62, 64, 65, 66

*Heckler v. Chaney*,
470 U.S. 821 (1985)..............................................................58, 59, 63

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) ...........................................................32

*Martin v. Occupational Safety & Health Review Comm'n*,
499 U.S. 144 (1991)..........................................................................60

*Mathews v. Eldridge*,
424 U.S. 319 (1976)..........................................................................67

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ...................................................34, 36

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017) ...................................................37, 41

*Mobility Workx, LLC v. Unified Pats., LLC*,
15 F.4th 1146 (Fed. Cir. 2021) .........................................................53

viii

*Mylan Lab'ys Ltd. v. Janssen Pharmaceutica, N.V.*,
  989 F.3d 1375 (Fed. Cir. 2021) ............................................................59

*Novartis AG v. Torrent Pharms. Ltd.*,
  853 F.3d 1316 (Fed. Cir. 2017) ............................................................58

*In re NuVasive, Inc.*,
  841 F.3d 966 (Fed. Cir. 2016) ..............................................................58

*Oil States Energy Serv. v. Greene's Energy Grp., LLC*,
  138 S. Ct. 1365 (2018)...........................................................59, 63, 66

*In re Palo Alto Networks Inc.*,
  44 F.4th 1369 (Fed. Cir. 2022) .............................................................61

*Pers. Web Techs., LLC v. Apple, Inc.*,
  848 F.3d 987 (Fed. Cir. 2017) ...........................................31, 32, 51

*In re Ratti*,
  270 F.2d 810 (C.C.P.A. 1959) ..............................................................36

*S. Regis Mohawk Tribe v. Mylan Pharm. Inc.*,
  896 F.3d 1322 (Fed. Cir. 2018) ..................................................59, 63

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018)...........................................................................60

*St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.*,
  749 F.3d 1373 (Fed. Cir. 2014) ............................................................60

*Sung v. McGrath*,
  339 U.S. 33 (1950)............................................................................*passim*

*Surgalign Spine Techs., Inc. v. LifeNet Health*,
  No. 2021-1117, 2022 WL 1073606 (Fed. Cir. Apr. 11, 2022)...........................32

*TQ Delta, LLC v. Cisco Sys., Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019) ...........................................42, 43, 48

*Trivascular, Inc. v. Samuels*,
  812 F.3d 1056 (Fed. Cir. 2016) ............................................................52

*Tumey v. Ohio*,
   273 U.S. 510 (1927)................................................................32, 67, 68

*United States v. Arthrex, Inc.*,
   141 S. Ct. 1970 (2021)................................................................54, 61

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
   721 F.2d 1540 (Fed. Cir. 1983) .........................................................46

*Withrow v. Larkin*,
   421 U.S. 35 (1975)................................................................................68

**State Cases**

*Dussia v. Barger*,
   466 Pa. 152 (1975)................................................................64, 65, 66

**Statutes**

5 U.S.C. § 551 ................................................................................64

5 U.S.C. § 554(d) ......................................................................52, 62

28 U.S.C. § 1295(a) .........................................................................1

35 U.S.C. § 314................................................................54, 58, 59, 66

35 U.S.C. § 318(a) ......................................................................54, 58

America Invents Act ................................................................54, 55, 58

Administrative Procedure Act § 554(d)..........................................*passim*

**Other Authorities**

37 C.F.R. § 42.4(a)..........................................................................54

Administrative Management in the Government of the United States, Report
   of the President's Committee on Administrative Management 37 (1937) .........56

Black's Law Dictionary (6th ed. 1990) ..............................................64

Black's Law Dictionary (11th ed. 2019) ........................................61, 64

Stephan Landsman, The Adversary System: A Description and
    Defense 2 (1984)..............................................................................60, 61

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, counsel for Arbor Global Strategies, LLC ("Arbor") states that:

1.     No appeal other than the current appeal has been taken in or from the United States Patent and Trademark Office, Patent Trial and Appeal Board's decisions in Nos. IPR2020-01020, -01021, -01022, -01567, -01568, -01570, and -01571.

2.     Arbor and Samsung Electronics Co., Ltd. or Xilinx, Inc. are parties to *Arbor Global Strategies LLC v. Samsung Electronics Co.,* No. 19-cv-00333 (E.D. Tex.); *Arbor Global Strategies LLC and Xilinx, Inc.*, No. 19-01986 (D. Del.).

3.     No other cases may be directly affected by the Court's decision in this appeal.

# JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board (the "Board") issued on November 24, 2021, Final Written Decisions ("FWDs") in IPR2020-01020 (Appx1-60), IPR2020-01021 (Appx61-128), IPR2020-01022 (Appx132-180).

The Board issued on March 2, 2022, FWDs in IPR2020-01567 (Appx181-183), IPR2020-01568 (Appx281-393), IPR2020-01570 (Appx393-519), and IPR2020-01571 (Appx520-573).

Arbor timely filed Notices of Appeal.  This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a).

## **INTRODUCTION**

Nobody likes to admit when they are wrong—it's a core characteristic of human behavior. Even when confronted with facts contrary to one's opinion, humans will rationalize and justify the basis for their original opinion and find a way to discount the contradictory facts. The individuals responsible for adjudicating legal disputes carry these normal human characteristics, and that is the reason why the United States justice system separates the prosecutorial and adjudicatory functions. If the prosecutor also served as judge and jury, there would be a much greater likelihood of injustice, so we distinguish these roles and assign different individuals to each role. The Board has decided to flaunt the American system and assigns the same Administrative Patent Law Judges ("APJ") to serve as both prosecutor to determine if a matter needs adjudicating, and then as the adjudicator to determine if their initial decision to prosecute the matter was correct.

The real-world consequences of the Board's inherently biased procedure are that in the vast majority (84%) of matters the Board decided to prosecute (institute an IPR), its adjudicatory final written decisions ("FWD") confirm its initial decisions to prosecute and invalidate the claims. In the present cases before the Court, the Board once again confirmed its initial decision to prosecute and invalidated the claims. In doing so, however, the Board provided stark examples of its hindsight and confirmation bias.

*First*, the tenor of the Board's institution decision leaves no doubt that the Board had already made up its mind that the challenged claims were invalid. Statements like "[p]etitioner sets forth a strong showing of unpatentability" (Appx911) are not statements of a neutral adjudicatory body. Indeed, the only conclusion that can be drawn from these types of statements is that the burden is now on the patent owner to change the Board's mind about the validity of the patents. Putting aside the improper burden shifting with this type of procedure, the more concerning issue is that the Board made a decision about the validity of a patent even before the patent owner had a chance to present its validity evidence. By permitting the same individuals to decide whether or not to institute an IPR (discretion to prosecute), and then have them determine if their initial determination was correct, "bakes-in" confirmation bias to the system.

*Second*, in order to rationalize its initial institution decision, the Board intentionally ignored this Court's established law concerning means-plus-function ("MPF") claim terms. Because the cited prior art did not fit into the Board's initial invalidity determination with respect to the MPF claim terms, it simply ignored the case law and mixed-and-matched "means" from one set of prior art references and the "function" from a different set of references. The Board acknowledged it was improper to do this type of mix-and-matching but did so anyway by using the patent claims as a roadmap (hindsight bias) and without regard to the law.

*Third*, the Board's hindsight bias was put front-and-center when it treated stacking complex semiconductor chips like stacking fungible Lego blocks, and gave the reasonable likelihood of success analysis the back of its hand.  The Board actually relied on figures from the petitioner where it took figures from the prior art, altered the figures to make them look like Arbor's Patents, and then argued that the altered figures support its obviousness challenge.  The inconvenient fact that there was zero evidence that the altered figure chips would even work did not deter the Board's determination that if you can find every piece of the puzzle in the prior art, then putting the puzzle together was obvious.  This type of analysis could be the poster child for hindsight bias.

The hindsight and confirmation bias in these matters is highlighted by the Board's skewed institution decisions and the measures it took to support its decisions to institute.  This comingling the prosecutorial and adjudicatory functions was what Section 554(d) of the Administrative Procedure Act ("APA") was enacted to prohibit.  Administrative legal systems, like the Patent Office, should not be allowed to side-step this important protection just because it would be inconvenient to abide.

## <u>STATEMENT OF THE ISSUES</u>

1.     Whether the Board's misapplication of black letter means-plus-function law demonstrates the level of hindsight bias in its obviousness determination?

2.     Whether the Board's obviousness determinations relied on hindsight to shortcut the reasonable expectation of success inquiry?

3.     Whether assigning the same Administrative Patent Law judges to decide institution and final written decisions violates § 554(d) of the Administrative Procedure Act's prohibition against comingling prosecutorial and adjudicatory functions?

## STATEMENT OF THE CASE AND FACTS

This appeal is taken from FWDs regarding the *inter partes* review ("IPR") of U.S. Patent No. RE42,035 ("the '035 Patent") in IPR2020-01020 and -01570, U.S. Patent No. 7,282,951 ("the '951 Patent") in IPR2020-01021 and -01568, U.S. Patent No. 6,781,226 ("the '226 Patent") in IPR2020-01022 and -01571, U.S. Patent No. 7,126,214 (" the '214 Patent") in IPR2020-01567.[1] The '226, '951, '035, and '214 Patents (collectively, "Arbor's Patents") are part of the same patent family, and each is entitled "Reconfigurable Processor Module Comprising Hybrid Stacked Integrated Circuit Die Elements." Appx680; Appx691; Appx702; Appx714.

In the FWDs, the Board found Claims 1-38 of the '035 Patent, Claims 1, 2, 4-6, and 8-29 of the '951 Patent, Claims 1-30 of the '226 Patent, and Claims 1-6 and 26-31 of the '214 Patent unpatentable.

## I.    BACKGROUND OF THE TECHNOLOGY

### A.    Conventional Reconfigurable Processors

Reconfigurable processors, such as field programmable gate arrays ("FPGAs"), are processors that reconfigure their structure for a given application.

---

[1] Samsung Electronics Co., Ltd. ("Samsung") challenged the '035, '951, and '226 Patents in IPR2020-01020, -01021, and -01022, respectively, with Taiwan Semiconductor Manufacturing Co. Ltd. ("TSM") joining these proceedings. Xilinx, Inc. ("Xilinx") also challenged the '035, '951, and '226 Patents along with the '214 Patent in IPR2020-01570, -01568, -01571, and -01567, respectively, with TSM joining these proceedings as well.

While reconfigurable processors were known that could provide higher throughput than traditional microprocessors, several factors limited their usefulness within the processing application space.  Appx697 at 1:36-40.[2]

*First*, the time it took to reconfigure programmable arrays was on the order of millions of processor clock cycles.  *Id.* at 1:47-61.  Given these lengthy reconfiguration times, a high percentage of conventional reconfigurable processors' time was spent loading configuration data, which cut into time that could have been spent performing compute jobs.  This limited its usefulness to applications that require jobs not to be context-switched to other jobs (because switching context would mean reconfiguring the programmable array again, thereby wasting even more time).  *See id.*

*Second*, operational speed is decreased due to the amount of time it takes to transfer data between the processor and FPGA.  Appx697 at 1:62-2:3.  With reconfigurable processors, data is shared between a processor and an FPGA through a data bus.  *See id.*  Typical data bus rates at the time of the invention were understood to be much slower (around 25% slower) than cache access speeds and meant significant amount of time was spent transporting data from cache memory to the reconfigurable processor.  *See id.*  As such, limiting the reconfigurable

---

[2] Citations to the '226 Patent should be understood to also refer to the same figures and language in the specification of the other Arbor Patents.

processors' usefulness to applications that have their data stored on a processor's cache memory.

**B.    Arbor's Patents Describe and Claim a Novel Stacked Die Hybrid ("SDH") Reconfigurable Processor**

The inventors overcame the limitations of conventional reconfigurable processors by designing an SDH reconfigurable processor, including a processor die stacked with a memory die and a programmable array (*e.g.*, FPGA) interconnected via a wide configuration data port.  Appx698 at 4:34-65.  This novel reconfigurable SDH reconfigurable processor architecture (1) accelerates memory access to a programmable array (allowing for the use in applications that have their data stored elsewhere on the system), and (2) reconfigures the FPGA within one clock cycle (allowing for the use in applications that context switch between jobs).  Appx700 at 7:21-22, 8:16-17; Appx724-725 at 7:62-8:4, 8:26-28, 8:53-55, 9:12-14, 9:33-35, 10:13-14; Appx689 at 7:46-49, 8:23-27, 8:54-57; Appx712-713 at 7:63-67, 8:11-15, 9:48-51, 10:1-5.

The SDH reconfigurable processor module includes a microprocessor die stacked with a memory and an FPGA die (Figure 4 reproduced below), with all three-die interconnected via the wide configuration data port:

8



Fig. 4

Appx695, Fig. 4; Appx698 at 4:34-44. The wide configuration data port interconnects buffer cells of the memory die with the configuration cells of the FPGA, enabling all of the configuration data to be transferred from the memory die to the programmable array in one clock cycle. Appx698 at 4:45-59.

The wide configuration data port accelerates memory access to an FPGA and reconfigures the FPGA (logic cells) within one clock cycle as it updates all of the logic cells in parallel:

> [T]he FPGA 70 **may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel**. As opposed to the conventional implementation of FIG. 3, a wide configuration data port 82 is included to update the various logic cells 84 through an associated configuration memory 86 and buffer cell 88. **The buffer cells 88 are preferably a portion of the memory die 66 (FIG. 4). In this manner, they can be loaded while the FPGA 68 comprising the logic cells 84 are in operation. This then enables the FPGA 68 to be totally reconfigured in one clock cycle with all of it configuration logic cells 84 updated in parallel**.

*Id.* (emphasis added).

In particular, the wide configuration data port enables one-clock cycle reconfiguration through its parallel arrangement of die-area contacts, such as through-silicon vias ("TSVs"), that interconnect buffer cells and FPGA's configuration cells (as Figure 5 reproduced below illustrates). *Id.*; Appx698 at 4:24-33. Accordingly, an integral part of the wide configuration data port are the buffer cells that are loaded while the FPGA is in operation, enabling one-clock cycle reconfiguration as all of the logic cells are updated in parallel. Appx698 at 4:45-59.



Appx696, Fig. 5; Appx698 at 4:45-65.

## II.    THE IPR PROCEEDINGS

### A.    The Institution Decisions

At the institution stage, before any of Arbor's evidence was submitted and weighed, the three-member panel effectively made up its mind that the inventions were unpatentable.[3]  At every step of the analysis, the Board bent over backwards to find in favor of institution of the IPRs.  During its *Fintiv* analysis, the Board recognized that the District Court had already denied petitioner's motion to stay the case (*Fintiv* factor 1 – Likelihood of Stay), and acknowledged that the District Court stated that it would only stay the case under the condition that petitioner "need to show that the Board is likely to invalidate every asserted claim—a showing that may require more than just pointing to a successful petition." Appx910 (citation omitted).  So, in accordance with the District Court's standard, the Board went over the top in its institution decision and stated:

> Because the Board institutes on all three petitions and Petitioner sets forth a strong showing of unpatentability on the challenged claims here, as discussed further below, and in the two other concurrent decisions to institute (IPR2020–01021, Paper 11; IPR2020-01022, Paper 11), the record indicates that, although Petitioner's motion for a stay was denied, the District Court is likely to allow Petitioner to refile a motion for a stay and may grant it under the circumstances presented here. *See* Ex. 2002,

---

[3] The three-member panel in the Samsung IPR proceedings consisted of Judges Karl Easthom, Barbara Benoit, and Sharon Fenick.  Appx1.  That same panel presided over the follow-on IPR challenges by Xilinx.  Appx394 (listing Judges Easthom, Benoit, and Fenick).

> 5–6. Accordingly, *Fintiv* factor 1 weighs slightly in favor of not exercising our discretion to deny institution.

Appx911; *see also* Appx3967; Appx6675.

The Board, in essence acting as an advocate for the petitioner's possible renewed motion to stay, provided the exact language required by the District Court needed to stay the case, and then find *Fintiv* factor 1 in favor of petitioner despite the fact that its first motion was already denied. Moreover, stating that "[p]etitioner has set forth a strong showing of unpatentability on the challenged claims" before receiving all record evidence from Arbor or giving Arbor the opportunity to challenge the veracity of petitioner's evidence demonstrates the Board's initial bias. *See, e.g.*, Appx911; Appx3967; Appx6675.

Then in its analysis of *Fintiv* factor 2 (trial date versus projected date of an FWD), the Board again acknowledged the trial was set eight months before an FWD which would normally weigh in favor of denial. Nonetheless, the Board found the opposite because of its strong initial finding that there a high likelihood that the District Court would not keep the trial date, so the fact that the **actual** trial date was eight months earlier than the FWD was of no moment (the preverbal tail wagging the dog). Appx912.

The analysis of the remaining *Fintiv* factors followed the same theme— because the Board was sure all the claims were invalid at the institution decision,

then all the factors weighed against denial of institution. *See, generally*, Appx913-919.

After the Board finished it contorted *Fintiv* analysis, it then began a merits analysis that relies heavily on petitioner's "annotated" versions of the figures from the prior art. In other words, the petitioner's altered the figures from the prior art, and argued that such made-up figures showed anticipation and/or obviousness, and the Board relied on the figures to institute the IPRs. For example, the Board relied on the "annotated" figure below compared to a figure from the challenged patent to support its obviousness finding.



Appx938.

The problem with the Board's reliance with this annotated figure is that it does not exist in the real world, and there was absolutely no showing that such chip would even function. The fact the Board would provide such a strong conviction

of invalidity at the institution stage with this type of manufactured evidence is telling of the fact that it had already made up its mind.

**B.    In Finding the Claimed SDH Reconfigurable Processor Obvious, the Board Relied on Samsung's and Xilinx's Overly Simplified Explanations of Combining Stacked Modules Having Thousands of Interconnections with Unique FPGAs**

During the IPR trials, Arbor summitted extensive evidence and argument showing patentability.  Arbor showed that Samsung and Xilinx failed to provide any explanation as to how a person of ordinary skill in the art ("POSITA") would have arrived at the novel SDH reconfigurable processor.  *See generally*, Appx981-1032 (Arbor's Response in Samsung IPRs); Appx17564-17628 (Arbor's Response in Xilinx IPRs).  Specifically, Arbor showed that the myriad of asserted references fails to teach or suggest stacking a processor with an FPGA in a manner that is operational to accelerate memory references to the FPGA and achieve one-clock cycle reconfiguration.  Appx998-999, Appx992-996; Appx17579-17590.

Arbor also showed that none of the references teach or even contemplate a wide configuration data port that, through a parallel arrangement of die contacts interconnects buffer cells and logic cells on separated and different stacked die, accelerates memory access to the FPGA and enables one-clock cycle reconfiguration.  Appx998-999, Appx992-996; Appx17579-17590.  In fact, Arbor showed that Cooke (Appx1850-1859) and Trimberger (Appx9920-9926) both teach a single chip FPGA reconfigurable processor that achieves one-clock cycle

reconfiguration—just the opposite of the claimed SDH reconfigurable. Appx996; Appx17589-17590.

Nonetheless, the Board rejected Arbor's evidence and arguments finding in favor of Samsung's and Xilinx's conclusory explanations of how (using Arbor's Patents as a guide) stacked modules with tens of thousands of interconnections would be combined with these types of unique reconfigurable FPGAs. In so doing, the Board concluded that the combinations render obvious: (1) the claimed SDH reconfigurable processor; and (2) the "means for reconfiguring the programmable array within one clock cycle" ("reconfiguring" MPF limitation) and the "means for updating the plurality of configuration logic cells within one clock cycle" ("updating" MPF limitation). *See, e.g.*, Appx29-35, Appx47, Appx49, Appx57; Appx160-164; Appx424-427; Appx565-570.

### C.    The Samsung IPRs

#### 1.    The Asserted References

Samsung relied on Koyanagi (Appx1844-1849) and Bertin (Appx1860-1873) for their "3D integration techniques," depicting generic techniques for stacking dies using vertical interconnections. Appx989; Appx992-995.

Koyanagi discloses stacking a microprocessor die with memory die using "more than $10^5$ [vertical] interconnections:"



Appx747 (citing Appx1845, Fig. 1(a)).

Bertin discloses stacking generic integrated circuit dies using a large number of through-chip conductors (red) and chip-chip connectors (purple).



Appx749 (citing Appx1868, Figs. 21, 22); Appx6557-6559.

Because neither Koyanagi nor Bertin discloses reconfigurable processors, Samsung's obviousness combinations relied further on Cooke and Alexander. Appx762-763, Appx788, Appx6533-6534.

Cooke discloses a single die, including a microprocessor, FPGA, and on-chip memory, that allows "for nearly instantaneous reconfiguration." Appx1850, Abstract, Appx1856 at 1:49-2:2.



FIG._1

Appx1851, Fig. 1.

Alexander proposed forming a 3D FPGA by stacking 2D FPGA chips with vertically adjacent logic cells connected with vertical interconnections. Appx1840-1843. The structure of Alexander's 3D FPGA is illustrated below:



17

Appx1842, Fig. 5.

### 2.   Overview of the Parties' Arguments and the Board's FWDs

Samsung relied on either Koyanagi or Bertin for teaching 3D stacked modules with large number of vertical interconnections, and either Alexander or Cooke for their teaching of FPGA reconfigurable processors.  Samsung argued that stacking an FPGA die over memory and microprocessor dies using Koyanagi's or Bertin's large number of vertical interconnections would have been "obvious to try with a reasonable expectation of success."  Appx761; *see also* Appx763, Appx791. In support of its argument, Samsung altered the figure from the Koyanagi prior art reference and argued to the Board that stacking complex microchips was just as easy as stacking Lego blocks (*e.g.*, substituting in a complex FPGA for DRAM was a simple and normal occurrence):

**Original Koyanagi Figure**          **Altered Koyanagi-Alexander/Cooke Figure**

    

Appx762 ("illustrates the vertical stacking of Alexander's FPGA with memory and microprocessor components according to Koyanagi's teachings"); *see also*

Appx6533 (depicting the same illustration for the Koyanagi-Cooke combination). The Board accepted this simplistic argument without any technical basis to do so.

Samsung manufactured a similar illustration with the figure from Bertin, adding labels to the figure to depict a chip that did not exist and which was not suggested in the art:



Appx790-791 ("This stacking of Cooke's system according to Bertin's 3D integration teachings is illustrated in the annotated version of Bertin's Figure 22").

In response, Arbor submitted extensive evidence and arguments explaining that Samsung's arguments relied on a vast oversimplification of the complicated FPGA reconfigurable technology.    In fact, Samsung's expert, Dr. Shanfield, testified that you "obviously got to have a circuit in mind" as you cannot "just slap . . . together [components] without worrying about what connects to what." Appx1006, Appx1016, Appx1026 (quoting Appx3454-3455 at 81:21-82:10). However, Samsung did just that—casually slapping together a nonspecific FPGA with a stacked module having a large number of interconnections (as depicted

19

above) without worrying about (or even attempt to explain) what connects to what. *Id.* In so doing, Arbor showed that Samsung failed to explain how Cooke or Alexander (Samsung's proposed FPGA reconfigurable processor circuitry) would or could be integrated in a stacked module using tens of thousands of vertical interconnections (as in Koyanagi) or large number of through chip conductors/connectors (as in Bertin) to arrive at an SDH reconfigurable processor. Arbor also showed that a POSITA would not have expected a reasonable expectation of success in the combinations given that Cooke's rapid FPGA reconfiguration relied on a unique single-chip architecture and Alexander did not teach any techniques whatsoever for connecting an FPGA to any other type of chip. *Id*; *see also* Appx1112-1114, Appx1117-1120.

Despite Samsung not having a circuit in mind (*i.e.,* Cooke or Alexander's FPGA circuitry) in its fabricated illustrations, the Board credited these illustrations for allegedly showing how a POSITA would have combined the references to arrive at an SDH reconfigurable processor. Appx32-33; Appx34-35 (finding that a skilled artisan "readily would have been able to connect different die circuits together 'obviously' with 'a circuit in mind'" to create an SDH reconfigurable processor) (quoting Appx3455 at 82:4-19).

**D.    The Xilinx IPRs**

**1.    The Asserted References**

Xilinx relied on Zavracky (Appx9865-9892) for its teaching of connecting stacked die with vertical interconnections.  Appx17315-17316.  Notably, Xilinx admitted that Zavracky only discloses a few vertical interconnections (*i.e.,* buses) that transfer data between the various layers of the multi-processor structure. Appx17316; Appx9886 at 6:43-51, Appx9889 at 12:25-27, Appx9880, Fig 12.

Recognizing that Zavracky only teaches a few vertical interconnections, Xilinx relied on Akasaka (Appx18237-18259) for its teachings of several thousand or several tens of thousands of via holes:



*Akasaka,*
*Ex. 1005 Fig. 4*
*("3-D IC" portion)*

Appx18239, Fig. 4; *see also* Appx17318.

Xilinx also relied on Chiricescu (Appx9893-9896), Trimberger, and Alexander for their teachings of FPGA reconfigurable processors.  Appx17317-17318, Appx17357-17358, Appx17366.

Chiricescu discloses a unique 3-D FPGA having on-chip memory:



**Figure 2.** The layers of our 3-D FPGA architecture.

Appx9893, Fig. 2.  Instead of having the memory and the FPGA on separated and different stacked die, Chiricescu moves the memory from "off-chip" onto the FPGA chip to improve reconfiguration times.  Appx9895.

Trimberger discloses a single chip FPGA reconfigurable processor. Appx9920.  Trimberger, like Chiricescu, discloses "on-chip memory" to improve reconfiguration times.  *Id*.  In fact, Trimberger teaches that its FPGA is reconfigured in one clock cycle by taking advantage of data stored in the FPGA's on-chip memory and the massive connectivity within the chip, with a conventional narrow data port transferring data from user memory to the FPGA.  Appx22095-22099.



Appx22098.

### 2.    Overview of the Parties' Arguments and the Board's FWDs

For its base combination, Xilinx relied on Zavracky for teaching 3D stacked module, Akasaka for teachings tens of thousands of vertical interconnections, and Chiricescu for teaching an FPGA.  *See, e.g.*, Appx17315-17322.  Xilinx stated that a POSITA would have had a reasonable expectation of success in combining Zavracky with Chiricescu and Akasaka because many references allegedly teach stacked dies with thousands of distributed interconnections.  Appx17322.  For support, Xilinx provided overly simplified illustrations of the vertical interconnections that connected nonspecific die:



*Id.*

Xilinx further argued that a POSITA would have been motivated to combine Trimberger or Alexander with the proposed Zavracky-Chiricescu-Akasaka combination with a reasonable expectation of success, allegedly because "it would be applying known engineering design principles." Appx17359; Appx17367.

In response, Arbor submitted extensive arguments and evidence showing that Xilinx's arguments, like Samsung's arguments, rest on a vast oversimplification of the complicated FPGA reconfigurable technology, missing from these arguments was any showing of how the circuity of an FPGA would be laid out, connected to, and operate with tens of thousands of distributed interconnections. In particular, Arbor showed that Xilinx's simplified illustrations fail to show how Akasaka's tens of thousands of distributed contact points interconnect cells on the memory die with the cells of Chiricescu's/Trimberger's/Alexander's FPGA and that there would have had a

reasonable expectation of success in achieving fast FPGA reconfiguration. Appx17609-17614. In fact, Arbor pointed to extensive evidence showing that Xilinx's combination was not feasible because "off-chip access [e.g., off-chip memory separate from the FPGA die] can't be, for example, 100,000 bits wide." Appx17604 (quoting Appx12886 at 71:19-72:1); Appx17716.

Just like in the Samsung proceeding, the Board rejected Arbor's arguments. In concluding that a POSITA would have allegedly known how to combine the references to arrive at an SDH reconfigurable processor with a reasonable expectation of success, the Board relied on art that simply "provid[es] multiple vias in stacked chips." Appx443-445. But as Arbor argued, and the Board completely disregarded, this art does not instruct a POSITA on **how** to interconnect the thousands of distributed connections of a stacked module with the circuitry of FPGA and memory cells on a separated stacked die, let alone with the unique FPGA circuitry of Chiricescu, Trimberger, and Alexander.

### E. In Finding the '226 Patent's MPF Limitations Unpatentable, the Board Paired Structure from One Set of Art with Function from Another Set of Art

#### 1. Claim construction of the corresponding structure

The Board found the function of the "reconfiguring" and "updating" MPF limitations to be "reconfiguring [updating] the programmable array [configuration logic cells] within one clock cycle." Appx152-153; Appx540-542. The Board

construed the corresponding structure as "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element." *Id.*[4]

### 2. The Parties' arguments and the Board's FWDs

#### a) The IPR2020-01022 Proceeding (Samsung '226 Patent IPR)

Samsung relied on either Koyanagi's or Bertin's teaching of a large number of vertical interconnections for the structure and Cooke's single clock cycle FPGA reconfiguration for the function:

Samsung's Koyanagi-Cooke Combination:

| Reference | Relied on Component |
|---|---|
| Koyanagi | **Structure**: stacked memory die and FPGA die interconnected with $10^5$ contact points |
| Cooke | **Function**: "single-clock-cycle reconfiguration capability" |

Appx6539-6540 ("Koyanagi Figure 1M . . . provides the same wide configuration data port . . . formed by stacking memory die . . . and FPGA die . . . , and interconnecting them using . . . $10^5$ [100,000] interconnections"); *see also* Appx6538.

---

[4] The Board construed the term "wide configuration data port" to mean "a configuration data port connecting in parallel cells on one die element to cells on another element." Appx147; Appx537.

Samsung's Bertin-Cooke Combination:

| Reference | Relied on Component |
|-----------|---------------------|
| Bertin | **Structure**: stacked memory die and FPGA die interconnected by a large number of through-chip conductors and chip-to-chip connectors |
| Cooke | **Function**: "single-clock-cycle reconfiguration capability" |

*See* Appx6559-6560.

In response, Arbor provided arguments and evidence showing that the corresponding structure undisputedly does not perform the function. Arbor showed that the function and structure are not both present in the prior art as Samsung relied on Koyanagi or Bertin for the alleged structure while turning to Cooke for the function. *See* Appx6771-6772, Appx6789-6790; Appx6892-6893, Appx6904. Finally, Arbor showed that Samsung's proposed combinations, which involve stacking Cooke's system using Koyanagi's or Bertin's stacked modules, would have destroyed Cooke's principle of operation—a single chip FPGA reconfigurable processor that achieves one-clock cycle reconfiguration. *See* Appx6898, Appx6906; Appx6953-6955.

The Board rejected Arbor's arguments, concluding that Samsung's structure satisfies the corresponding structure. Appx160-165. In coming to this conclusion, the Board credited Samsung's combination that relied on the structure from one

reference and the function from another reference, despite black letter law making clear that structure and function must both be present in the prior art. *Id*.

In crediting Samsung's legally flawed combinations, the Board ignored the evidence showing that Cooke's function corresponds to a single chip FPGA reconfigurable processor with memory and massive connectivity on chip. Appx1856 at 2:1-5 (describing a "reconfigurable FPGA on a single chip"); *see also* Appx1850 (the single chip FPGA achieving "nearly instantaneous reconfiguration.").

### b) The IPR2020-01571 Proceeding (Xilinx '226 Patent IPR)

Xilinx relied on Zavracky-Chiricescu-Akasaka-Trimberger for the structure and Trimberger's one-clock cycle FPGA reconfiguration for the function:

Xilinx's Zavracky-Chiricescu-Akasaka-Trimberger Combination:

| Reference(s) | Relied on Component |
|---|---|
| Zavracky-Chiricescu-Akasaka-Trimberger | **Structure**: Zavracky-Chiricescu with Akasaka's thousands or several tens of thousands of via holes and Trimberger's memory access port interconnected by contact points distributed throughout the dies. |
| Trimberger | **Function**: one clock cycle reconfiguration |

*See* Appx21832-21833.

Arbor advanced similar arguments as those in the Samsung '226 Patent IPR proceeding. *See supra* § II.E.2.a. In particular, arguing, *inter alia*, that (1) Trimberger's memory access port (*i.e.,* a narrow data port) is **not** a wide

configuration data port; (2) there is an impermissible mismatch between the structure as combined from four references and Trimberger's function; and (3) the stacked combination would have destroyed Trimberger's principle of operation, a single chip FPGA reconfigurable processor that achieves one-clock cycle reconfiguration. *See* Appx22094-22114; Appx22220-22221.

Yet again, the Board rejected Arbor's arguments, concluding that the structure of Zavracky-Chiricescu-Akasaka-Trimberger satisfied the corresponding structure. Appx566-569. This time around the Board acknowledged that "a petitioner cannot rely on one reference for the structure and turn to another reference for the function to demonstrate that the prior art is present in both the function and corresponding structure." Appx567. Nonetheless, the Board found no error because Trimberger's memory access port is part of Xilinx's proposed four reference structure that allegedly corresponds to Trimberger's function— therefore, the prior art has present both structure and function. Appx566-569.

In making this nonsensical conclusion, the Board ignored the evidence showing that Trimberger's memory access port plays no role in the FPGA's reconfiguration and does not enable its one-clock-cycle reconfiguration. *See* Appx22096-22097.

## SUMMARY OF ARGUMENT

The Board's mapping of the prior art to the MPF claim terms is incorrect as a matter of law. The Board ignored this Court's well-established case law regarding MPF terms to find the terms obvious. Because no single piece of prior art disclosed both the "means" and the "function" of the challenge MPF terms, the Board improperly used the "means" from one set of prior art and the "function" from a different set of prior art to map the MPF terms to the prior art.

The improper treatment of the MPF terms is indicative of the hindsight bias the Board used to find obvious the non-MPF claims. The Challenged Claims are directed to extremely complex semiconductor chip technology involving a stacked dye hybrid ("SDH") reconfigurable processor that includes a processor die stacked with a memory die and a programmable array (*e.g.*, FPGA) that are interconnected via a wide configuration data port. The Board erred in failing to adequately explain how a POSITA would have combined the references to arrive at the claimed SDH reconfigurable processor and achieve its benefits, *e.g.*, accelerated memory access to the programmable array and one-clock cycle reconfiguration. Instead, the Board oversimplified the technology, and then used the claims as a map to finds examples of each piece of the claim in the prior art and put the pieces together. The evidence showed that there was no basis to believe that putting these

discrete pieces of technology together would be successful, and the Board ignored the evidence.

The Board's highly skewed institution decisions, before Arbor had the opportunity to present its full validity evidence and challenge the petitioners' evidence, is illustrative of the challenges patent owners face when the same panel serves as the prosecutor and judge in IPR proceedings. Any objective reading on these institution decisions lead to the conclusion that the Board had already determined the claims invalid and it was now Arbor's burden to convince the Board to change its mind. Not surprisingly, in the vast majority of institutions the Board does not change its mind. This type of hindsight and confirmation bias can be overcome if the Patent Office was required to abide by Section 554(d) of the Administrative Procedure Act.

## ARGUMENT

## I.    STANDARD OF REVIEW

**Obviousness Standard**:    This Court reviews "the Board's ultimate determination of obviousness de novo and its underlying factual determinations for substantial evidence." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 991 (Fed. Cir. 2017). "The underlying factual findings include findings as to the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, the presence or absence of a

motivation to combine or modify with a reasonable expectation of success, and objective indicia of non-obviousness." *Surgalign Spine Techs., Inc. v. LifeNet Health*, No. 2021-1117, 2022 WL 1073606, at \*5 (Fed. Cir. Apr. 11, 2022) (internal quotation and citation omitted).  In reviewing the factual findings, this Court asks, "whether a reasonable fact finder could have arrived at the agency's decision, which requires examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Pers. Web Techs.,* 848 F.3d at 991 (internal quotations and citations omitted).

**Claim Construction Standard:** Claim construction is "an issue of law" that this Court reviews "de novo . . . where . . . the issue is decided only on the intrinsic evidence." *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1327 (Fed. Cir. 2019) (citations omitted).  This Court reviews any underlying factual findings based on extrinsic evidence for substantial evidence.  *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021).

**Due Process Standard:**  A due process challenge requires a party to show that the decision-making process creates "a possible temptation to the average man as a judge" such that the adjudicator would "not . . . hold the balance nice, clear, and true." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

## II.    THE BOARD'S OBVIOUSNESS ANALYSIS WAS TAINTED BY PREJUDGMENT BIAS

Prejudgment bias irreparably tainted the trial phase of the subject IPR proceedings, with the Board's open prejudgment giving way to shortcuts during the trial phase, including the reliance on hindsight to fill in gaps in the Petitioner's obviousness case and misapplication of black letter law regarding the obviousness MPF claims.

In the Samsung IPRs, the Board instituted all three petitions, citing "[p]etitioner['s] . . . **strong showing of unpatentability on the challenged claims**." *See, e.g.*, Appx911 (emphasis added). Following these institution decisions, the burden of persuasion effectively shifted to Arbor who was tasked with overcoming the Board's initial conclusion that petitioner had made a "strong showing of unpatentability." *Id.*; *see also* Appx1256-1257. Prejudgment bias is not always this evident (which is why the USPTO should structure institution and final decisions to avoid even the appearance of bias), but the Board's language in the institution decisions here, in combination with the corners it cut in the FWDs, leaves no doubt.

### A.    The Board Legally Erred in its Application of Means-Plus-Function Black Letter Law

The most obvious example of the Board's hindsight bias was its use of Arbor's Patents as a roadmap to fill in the gaps in the prior art related to the MPF

33

claim terms. Specifically, it is black letter law that in order to find an MPF claim unpatentable, "the invalidating prior art must disclose not simply *a* means for achieving the desired function, but rather the *particular structure* recited in the written description *corresponding to that function*, or an equivalent thereof." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1361 (Fed. Cir. 2001) (Michel, J. dissenting). Instead of following the law, the Board credited arguments from Samsung and Xilinx that located the structure, *i.e.,* a wide configuration data port, in one reference or set of references (*i.e.,* Koyanagi, Bertin, or Zavracky-Chiricescu-Akasaka-Trimberger) while finding the alleged function, *i.e.,* one-clock-cycle reconfiguration in another reference (*i.e.,* Cooke or Trimberger).

In the Xilinx '226 Patent IPR, the Board acknowledged this legal requirement. Appx567 ("A petitioner cannot rely on one reference for the structure and turn to another reference for the function to demonstrate that the prior art is present in both the function and corresponding structure.'"). The Board's failure to apply this legal principle in the Samsung '226 Patent IPR is sufficient for this Court to find that its analysis there was improper. Further, the Board excused Xilinx's failure to show that the structure corresponding to the function was known in the art on the basis that a portion of Trimberger's structure would be part of the structure corresponding to the means. However, the Board still erred because the portion of Trimberger's system (*i.e.,* the single memory access port) alleged to be

34

part of the means plays no role in its solution for one-clock-cycle FPGA reconfiguration.

### 1. In the Samsung '226 Patent IPR, the Board erred in finding that Koyanagi's or Bertin's thousands of vertical interconnections corresponds to Cooke's function

The Board's findings that either Koyanagi's or Bertin's thousands of interconnections connecting memory and FPGA dies achieves Cooke's function of "nearly instantaneously reconfiguration" cannot stand. Appx155, Appx160-165, Appx172-174. This is because (1) black letter law prohibits mismatching of structure and function; and (2) substantial evidence does not support the Board's finding that replacing Cooke's single chip FPGA reconfiguration structure with a stacked module having thousands of interconnections meets the claimed "wide configuration data port" and corresponds to the claimed "reconfiguring" and "updating" functions.

*First*, Cooke's single FPGA chip achieves its nearly instantaneous reconfiguration. Specifically, the evidence of record demonstrates that Cooke's functional components, *i.e.*, processor, FPGA logic, and memory, are located on a single FPGA reconfigurable processor. Appx6893-6895; *see also* Appx1856 at 1:64-2:8, 2:47-49, Appx1852, Fig. 4. As Cooke explains, the connections between the memory planes and the FPGA planes are formed on-chip using a complex combination of a crossbar matrix, ALUs, and registers. Appx1856-1857 at 2:58-

3:22, 3:58-4:31, Appx1852, Fig. 4.  It is this complex structure, fully located on Cooke's single-die FPGA, that performs the "shift[ing] [of memory planes] into the FPGA function in a single cycle."  Appx1856 at 2:47-49.  Because Cooke's principle of operation explicitly relies on an on-chip connection scheme to perform its function, the structure identified by Samsung as allegedly performing the function is not "the particular structure recited in the written description corresponding to that function." *McGinley*, 262 F.3d at 1361.

*Second,* the Board also failed to explain how or why a POSITA would have destroyed Cooke's single chip FPGA structure by stacking (unidentified) components of Cooke in a stacked module using vertical interconnections and still expected success in achieving its nearly instantaneous FPGA reconfiguration. Appx160-165, Appx172-174.  Indeed, the Board ignored Arbor's argument that it would **not** have been obvious to employ Koyanagi's or Bertin's vertical interconnections in order to achieve Cooke's rapid reconfiguration because doing so would have "require[d] a substantial reconstruction and redesign of the elements shown in [Cooke] as well as a change in the basic principles under which the [Cooke] construction was designed to operate."  *In re Ratti*, 270 F.2d 810, 813 (C.C.P.A. 1959).

*Third,* and as discussed in further detail below, the Board never articulated how Samsung's proposed combinations of Koyanagi/Bertin and Cooke even

facially read on its construction of "wide configuration data port," which requires "connecting in parallel cells on one die element to cells on another die element" to achieve one-clock cycle FPGA reconfiguration. Appx147. For example, neither Samsung nor the Board identify which "cells" of which of Cooke's "components" would be connected in parallel if Cooke's single-chip FPGA were to be cut up and reformed into a stacked module. "Without any explanation as to how or why the references would be combined to arrive at the claimed invention," there is only hindsight. *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017) (citation omitted).

Because the Board did not identify any structure in the prior art corresponding to the functions recited in the MPF claims, its analysis of these claims fails as a matter of law.

### 2. In the Xilinx '226 Patent IPR, the Board erred in finding that the structure of Zavracky-Chiricescu-Akasaka-Trimberger corresponds to Trimberger's function

The Board similarly did not show that the structure corresponding to the means existed in the prior art. Appx565-566 (relying on the Zavracky, Chiricescu, and Akasaka, in combination, to reach the structure while relying on Trimberger for the function). Unlike in the Samsung '226 Patent IPR, however, the Board determined "[p]etitioner presents the structure in combination of Zavracky, Chiricescu, Akasaka, and Trimberger and the function from relevant portions of

Trimberger, with specific reference to the function attributed by Trimberger to the structure included from Trimberger in the asserted combination." Appx568. Critically, however, the "structure included from Trimberger" (*i.e.,* the single memory access port), is not responsible for Trimberger's one-clock cycle reconfiguration, which is achieved instead by co-locating several configuration memory cells next to each logic cell on the same die. Appx22102-22104, Appx22110-22111.

There is no dispute that the "structure" that corresponds to the claimed "means" is "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element." Appx541. Arbor does not dispute that the "wide configuration data port" is "a configuration data port connecting in parallel cells on one die element to cells on another die element." Appx537. There is also no dispute that the combination of Zavracky, Chiricescu, and Akasaka does not perform the claimed functions. Appx564 (Xilinx relying on those three references in combination **with** Trimberger's memory access port as allegedly teaching the structure corresponding to the means).

There is further no dispute that Trimberger achieves the claimed function (*i.e.,* one-clock cycle reconfiguration) by distributing configuration memory **on chip**, "so that the **entire configuration of the FPGA can be changed in a single**

**cycle** of memory." Appx21823 (quoting Appx9920). Critically, therefore, what Trimberger refers to as achieving one-clock cycle reconfiguration is the transfer of data from its on-chip configuration memory into its logic cells, not the transfer of data from off-chip to the FPGA (which is performed by Trimberger's single memory access port), or even the transfer of data from the single memory access port to the configuration memory cells, which (like Cooke) utilizes massive interconnectivity on the chip itself. Appx9920 (The FPGA holds configuration memory planes with each plane having 100,000 bits).

The foregoing illustrates that Trimberger only achieves the claimed function by explicitly eschewing the structure that satisfies 112, ¶ 6, *i.e.,* using on-chip memory **instead of** a wide configuration data port with parallel connections to cells of a stacked memory die. Accordingly, although the Board stated that its decision relied on "the structure included from Trimberger," that structure is mutually exclusive from the proposed combination of Zavracky, Chiricescu, and Akasaka. Appx568 ("Petitioner presents the structure in a combination of Zavracky, Chiricescu, Akasaka, and Trimberger and the function from relevant portions of Trimberger, with specific reference to the function attributed by Trimberger to the structure included from Trimberger in the asserted combination.").

Moreover, in order to reach the conclusion that Trimberger's memory could be moved off-chip, the Board stated that there was "[n]o evidence or rationale cited by [Arbor] show[ing] that the location of Trimberger's on-chip memory is necessary in some way to Trimberger's teachings." Appx569. This is simply not true, as the record is laden with arguments from Xilinx and Arbor, including many citations to Trimberger, all of which are in agreement that Trimberger achieves one-clock-cycle reconfiguration when "**all bits in the logic and interconnect array are updated simultaneously from one memory plane**." Appx21823 (teaching an FPGA wherein "[e]ight configurations of the FPGA are stored in on-chip memory. This inactive on-chip memory is distributed around the chip, and accessible so that the entire configuration of the FPGA can be changed in a single cycle of the memory.") (quoting Appx9920).

Arbor showed that Trimberger's single memory access port is not part of the structure involved in the reconfiguration:

> Trimberger **does not** disclose that the 'single memory access port' is involved in the reconfiguration of the FPGA. It has no role in reconfiguring the FPGA, which involves shifting data from the on-chip configuration memory into the FPGA.

Appx22096 (citing Appx25799-25800, ¶ 96). Notably, Xilinx acknowledged this very fact:

> Trimberger's quick reconfiguration is due to 'massive connectivity *within* the chip' and *not* the memory access port that brings the configuration data into the chip in the first place.

Appx22096-22097 (quoting Appx21827).

This is correct. The only event in Trimberger that occurs in one-clock cycle is the transfer of data from the distributed on-chip memory into the FPGA logic, and the single memory access port has no role in this process. Appx9924; Appx25800 at ¶ 97. Thus, the structure that Xilinx points to as achieving the functionality of these means plus function elements does not actually perform that functionality.

The Board erred in disregarding the record evidence showing that Trimberger achieves one-clock-cycle reconfiguration by storing multiple FPGA configurations in on-chip memory and that the process of shifting information from the on-chip memory into the logic cells has nothing to do with Trimberger's single access memory port, which is responsible for moving data onto the FPGA. Appx9920; Appx22215. Just like in the Samsung '226 Patent IPR, the Board failed to show how or why a POSITA would have abandoned Trimberger's single chip FPGA structure for the stacked structure of Zavracky-Chiricescu-Akasaka-Trimberger and expected success in achieving one-clock cycle reconfiguration. *Metalcraft of Mayville, Inc.*, 848 F.3d at 1367.

**B.    The FWDs Were Tainted by Hindsight**

**1.    The Samsung FWDs Were Tainted by Hindsight Bias**

Samsung did not cite a single reference that suggested stacking a programmable array with any other type of integrated circuit, let alone one that taught a POSITA how to make an SDH that achieves any of the benefits of Arbor's claimed architecture (*e.g.*, one-clock-cycle reconfiguration and accelerated memory access). Instead, Samsung cited references that generically disclose stacking dies (*e.g.*, Koyanagi and Bertin) and references that disclose FPGAs (*e.g.*, Alexander and Cooke). Samsung then asserted, with no further analysis, that "[a] POSITA would have found it obvious to try stacking the components of Cooke as taught by Koyanagi and would have had a reasonable expectation of success doing so because Cooke suggests a stacked system and Koyanagi provides broadly applicable, detailed teachings with regard to stacking different dies." Appx6534; *see also* Appx6555-6556 (advancing a similarly conclusory argument for its proposed combination of Bertin and Cooke).

These bare-bones allegations of reasonable expectation of success are insufficient to support an obviousness determination because they do not explain how the various elements of Koyanagi or Bertin would or could be combined with Cooke to reach the claimed invention. *See TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1360 (Fed. Cir. 2019) (explaining that such conclusory allegations that

a POSITA "could" combine certain references "is not sufficient and is fraught with hindsight bias") (quotation and citations omitted).    Just like in *TQ Delta*, Samsung's "expert failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims." *Id*.

During trial, Arbor explained that "[p]etitioner's argument relies on vast oversimplification of the complicated technology at issue." Appx6775-6776; *see also* Appx6792-6793.  Determining how to interface a programmable array with another type of integrated circuit in a way that achieved the claimed functionality was neither known in art nor obvious even granting a motivation to stack a programmable array with other types of ICs. *Id*.  For example, Arbor's Patents disclose a novel interconnection scheme, the wide configuration data port, that connects explicitly defined elements, in particular ways, to achieve functionality that was not available in the art.  Appx6778-6780.  In one example, Arbor's Patents disclose an embodiment in which the wide configuration data port connects, in parallel, individual buffer cells on a memory die with individual configuration memory cells on an FPGA, a configuration which "enables the FPGA 68 to be totally reconfigured in one clock cycle with all of it configuration logic cells 84 updated in parallel." Appx698 at 4:50-59.

43

Rejecting these arguments, the Board simply stated that a POSITA "readily would have been able to connect different die circuits together 'obviously' with a 'circuit in mind.'"  Appx34; *see also* Appx50.  However, there is no evidence in the record that a POSITA had the claimed "circuit in mind," as evidenced by the fact that Samsung provided no explanation as to how a POSITA would have combined Koyanagi's vertical interconnects with Cooke to achieve Cooke's goal of nearly instantaneous FPGA reconfiguration.  *See* Appx3519 at ¶ 70.

To put a fine point on the matter, the Board construed the term "wide configuration data port" to mean "a configuration data port connecting in parallel cells on one die element to cells on another die element" (Appx147) and then found the claims obvious without ever determining which "cells" of Cooke's FPGA would have been connected to which "cells" of Koyanagi's DRAM memory chip.  Appx29-31; Appx42 (same for the combination of Bertin and Cooke). Instead, the Board pointed to Samsung's manufactured cartoons, stating that the figures "represent[] combined teachings of Koyanagi and Cooke [and] shows how to connect the dies together using a wide configuration data port as challenged claim 1 requires."  Appx162; *see also* Appx47-48 (same for the combination of Bertin and Cooke).  These cartoons, however, do not identify which "cells" of a memory die would be connected in parallel to which "cells" of Cooke's FPGA, per

the Board's construction, let alone provide any motivation from the art to combine

any such elements in a manner that would have achieved the claimed inventions:



Appx6533.



Appx6555.

Notably, Samsung fought against the Board's ultimate construction of "wide configuration data port" in favor of a construction that would remove any reference of the parallel connection of cells on one die element with cells on another die element because Samsung had never showed how that art would have been combined even in that level of detail. Appx6942 ("In short, requiring the cells of one die element to be connected to the cells of another die element is not supported by the specification, and [Samsung] proposes modifying the Board's construction to remove that requirement."). Instead, Samsung fought for a broad construction of the term "wide configuration data port" that matched its vague arguments about connecting two IC die, without specifying which aspects of each die would be connected or why. Appx6940-6942.

Because no art of recorded guided a POSITA to the claimed solutions, it is apparent that the Board, placed in the position of consciously or unconsciously defending its prejudgment decisions, fell victim to the trap of hindsight rather than placing themselves in the position of a POSITA at the time of the invention. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983) (expressing that a panel must "cast the mind back to the time the invention was made" and "occupy the mind of one skilled in the art who is presented only with the references, and who is normally guided by the then-accepted wisdom in the art.").

## 2.    The Xilinx FWDs Were Also Tainted by Hindsight

The Board's conclusion that the Challenged Claims are obvious over Zavracky in view of Chiricescu and Akasaka (with or without Trimberger or Alexander) was similarly tainted by hindsight. *See, e.g.*, Appx517-518; Appx572; Appx392; Appx279. Just as in the Samsung IPRs, neither Xilinx nor the Board identified which cells in a memory die would be connected in parallel to which cells of Chiricescu's FPGA in order to reach the "wide configuration data port" of Arbor's Patents. Nor did the Board identify any disclosures in the art of record that would have suggested such an arrangement. *See, e.g.*, Appx553-554.

Instead, the Board recognized Zavracky's disclosure of connecting a programmable logic device ("PLD") and/or Chiricescu's FPGA to other ICs using a small number of vertical interconnections and Akasaka's disclosure of a large number of vertical interconnections in order to conclude that "the combination teaches or suggests increasing the number of contact points or via holes for electrically coupling FPGA, memory, and processors together." Appx439; Appx553. And while the Board concluded that a POSITA would have been motivated to increase the number of vertical interconnections "to allow for parallel data transfers, speed increases, larger bandwidth, etc.," (Appx553-554) neither the Board nor Xilinx endeavored to show which "cells" of a memory die would be connected to which "cells" of Chiricescu's FPGA in order to reach the "wide

configuration data port" of Arbor's Patents. *See TQ Delta*, 942 F.3d at 1360 (requiring an explanation as to "how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims") (citation omitted).

Accordingly, missing from the petitions was any explanation or showing as to how Akasaka's several tens of thousands of via holes would or even could be interconnected with FPGA circuitry of Chiricescu, Trimberger, or Alexander to arrive at an SDH reconfigurable processor that accelerates memory access and achieves one-clock cycle reconfiguration.   Instead, Xilinx, like Samsung, relied on featureless chips that fail to show any FPGA circuity and how this circuitry is electrically coupled to memory cells of a separated and stacked die using Akasaka's tens of thousands of interconnections:



Appx17322; *see also* Appx17328 (citing Appx18239, Fig. 4).

Exacerbating the Board's improper reliance on facially insufficient explanations about **how** a POSITA would have implemented Akasaka's large number of interconnections in conjunction with the Zavracky-Chiricescu combination, the Board also misinterpreted Xilinx's expert's admission that, at the time of the invention, it was not feasible to have 100,000 interconnections for off-chip memory access. Appx12886 at 71:19-72:1 ("off-chip access [e.g., off-chip memory separate from the FPGA die] can't be, for example, 100,000 bits wide."). In so testifying, Dr. Franzon admitted that the wide configuration data port and associated buffer cells of the claimed SDH reconfigurable processor offers a solution to what Dr. Franzon admitted was infeasible at the time:

> [a] wide configuration data port 82 [that] is included to update various logic cells 84 through an associated configuration memory 86 and buffer cell . . . so the buffer cells 8 are apportioned in the memory die 66, and this is in the context of figure 5.

Appx12892 at 97:6-23; *see also* Appx12879 at 42:21-43:3, Appx12887 at 77:5-15. Thus, recognizing that coupling of circuitry is through the wide configuration data port and its parallel arrangement of interconnections between buffer cells and configuration memory cells on the separate off-chip stacked memory die—it cannot be just slapped together with tens of thousands of interconnections as Xilinx's combinations require.

The Board mischaracterized and minimized Dr. Franzon's testimony on its mistaken belief that "off-chip" means "outside of a *chip stack*." Appx449 n.19; *see also* Appx459, Appx486. It does not. Dr. Franzon testified that the "second integrated circuit die element" of the Challenged Claims is "**off-chip memory**" that is stacked with the separate "first integrated circuit die element including a programmable array die":

> In general, external memory reference could be to memory that's on the same die. However, my understanding of this claim is that it is referring to a memory in a second die that's stacked. So in the totality of the **claim it is referring to an off-chip memory on the second stacked die**.

Appx12879 at 42:15-43:3 (emphasis added). In other words, according to Dr. Franzon, "off-chip memory" die is part of the SDH reconfigurable processor, not outside of the stacked reconfigurable module.

Because the Board's conclusion rested on a mistaken understanding of "off-chip," it erroneously disregarded Dr. Franzon's testimony and the evidence of record that showed a skilled artisan could **not** interconnect tens of thousands of via holes with FPGA circuity of Chiricescu, Trimberger, or Alexander to arrive at the claimed invention, *i.e.*, off-chip memory die interconnected with an FPGA die. *See* Appx449 n.19; *see also* Appx459, Appx467-468, Appx486, Appx508. Given this disregard, the Board did not (and cannot) provide any explanation grounded in evidence showing that interconnecting Akasaka's tens of thousands of connections

between the FPGA and separate off-chip stacked memory die would work as intended such that a POSITA "would have been motivated to make the combination and reasonably expect success in doing so." *Pers. Web Techs.,* 848 F.3d at 992.

Because the Board was under the false premise that off-chip memory is not part of the same stack, it also discredited the evidence of record showing that a POSITA would not have found it obvious to move Chiricescu's or Trimberger's **on-chip** memory from an FPGA to the separate off-chip stacked memory die (*i.e.,* the claimed "second integrated circuit die element"). Appx17711-17712 ("Indeed, this proposed modification would completely change *Chiricescu's* principle of operation because its solution to the problem of 'loading configuration data on an as needed basis from memory-off-chip' was to move that memory on-chip) (citation omitted); Appx17726-17727 ("*Trimberger* attributes its inventive concept of fast FPGA reconfiguration speeds to that of on-chip block memory that allows for *massive connectivity within the FPGA chip*.") (citing Appx9920).

In particular, Trimberger's and Chiricescu's unique FPGAs achieve fast FPGA reconfiguration due to their **on-chip** memory.   Appx17711-17712, Appx17722 (Chiricescu's "significantly improving the reconfiguration time" is based upon on-chip memory that results in "the elimination of loading configuration data"), Appx17726-17727 ("*Trimberger's* inventive concept of on-

chip memory allowing for single cycle FPGA reconfiguration."). Accordingly, each reference teaches that its unique architecture eliminates the loading of configuration data from off-chip memory as needed, as such improving their FPGA reconfiguration times. Accordingly, the evidence of record shows that a POSITA would not have understood that moving on-chip memory to a separate stacked memory die would have (or could have) resulted in the claimed SDH reconfigurable processor and its benefits, *e.g.*, accelerated memory access and one-clock cycle reconfiguration of the FPGA. *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1066 (Fed. Cir. 2016).

## III.    ALLOWING THE SAME PANEL TO BOTH INSTITUTE AND ADJUDICATE IPRS VIOLATES SECTION 554(d) OF THE APA

Reversal is further warranted here because by allowing the same three-member panel of APJs that instituted IPR to also adjudicate, the USPTO violated Section 554(d)(2) of the APA ("the APA provision"). The APA provision states:

> An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings.

5 U.S.C. § 554(d)(2). The APA provision was designed to avoid the very prejudgment bias that resulted here, where the same APJ panel that institutes (*i.e.*, "prosecut[es]") an IPR also decides that IPR. Here, this bias was glaring from the

Board's institution decision stating that there was "strong showing of unpatentability" (Appx911), which it later attempted to confirm in its FWDs despite ultimately lacking evidence or legal support. Because all the IPRs at issue involved the same patentee and related issues, requiring consistent decision-making, this blatant prejudgment infected all of the IPRs. Such bias is contrary to due process and warrants reversal.

Even where this prejudgment bias is not so explicit, it is inherent in having the same panel both prosecute and adjudicate claims. It is simply human nature. In deciding to institute an IPR, APJs are placed in a position to defend that decision when rendering judgment on patentability. As Judge Newman has expressed, there is the "tendency . . . to justify past conduct, especially when that conduct casts doubt on their competence or integrity and is public knowledge." *Mobility Workx, LLC v. Unified Pats., LLC*, 15 F.4th 1146, 1163 (Fed. Cir. 2021) (Newman, J., concurring in part) (citation omitted). However unintentional, APJs have every reason to try to justify after-the-fact a decision to institute IPR—along with the expense and burden to the parties and agency of undergoing the IPR—by confirming that institution was worthwhile because the patents are unpatentable. The proof of the prejudicial effect of this bias is in the statistics, in which the PTAB has found 84% of patents unpatenable (in part or whole) that have gone through IPR. *See* https://usinventor.org/assessing-ptab-invalidity-rates/.

Consistent with the APA provision and its objective to prevent this type of bias, the plain language of the America Invents Act (AIA) specifically identifies separate personnel to perform the discretionary work of instituting IPRs (i.e., prosecution) from the adjudicatory work of conducting trial.  Specifically, the AIA provides:

> The Director may not authorize an inter partes review to be instituted unless ***the Director determines***[5] that the information presented in the petition . . . shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.
>
> <div align="center">***</div>
>
> If an inter partes review is instituted and not dismissed under this chapter, ***the Patent Trial and Appeal Board shall issue a final written decision*** with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d).

35 U.S.C. § 314(a); 35 U.S.C. § 318(a) (emphasis added).

While this Court in *Ethicon* acknowledged in a footnote that the APA provision requires this separation of functions, the Court gave short shrift to this provision based on the incorrect conclusion that both institution and FWDs are "adjudicatory decisions."  *See Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1030 & n.3 (Fed. Cir. 2016) ("However, the APA imposes no

---

[5] "By regulation, the Director has delegated this authority to the PTAB itself." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1977 (2021) (citing 37 C.F.R. § 42.4(a) ("The Board institutes the trial on behalf of the Director.")).

separation obligation as to those involved in preliminary and final decisions."). However, as explained further below, new decisions since *Ethicon*, along with the APA and the policy behind it, the plain language of the AIA and longstanding precedent, all demonstrate that instituting an IPR is quintessentially a prosecutorial function in which there is discretion as to whether or not to enforce an action, which cannot be performed by the same employees responsible for adjudication. To find otherwise allows the USPTO to commingle prosecution and adjudication, which violates the APA and leads to bias that offends due process and damages patent rights. Accordingly, this Court's opinion addressing this issue in *Ethicon* should be overruled, and the Court should find that the prosecutorial function of instituting an IPR must be performed by a separate decisionmaker from the one adjudicating the IPR.

### A. The APA Requires a Separate Decisionmaker for Prosecution and Adjudication in Order to Prevent Bias

Congress enacted the APA provision to ameliorate the judicial bias resulting from the commingling of investigatory or prosecutorial functions with adjudicatory functions. *See Sung v. McGrath*, 339 U.S. 33, 37-38, 46 (1950), *superseded by statute on other grounds*. The bedrock of the APA provision was bifurcation, in which the same decisionmaker could not participate in both the discretionary and adjudicatory work of an agency. *Id.* at 41 (The Committee report "voiced in 1937

the theme which, with variations in language, was reiterated throughout the legislative history of the Act.").

As the Supreme Court explained shortly after the APA was enacted in 1946, the APA arose out of a concern that the adjudicatory power of federal administrative agencies "was not sufficiently safeguarded and sometimes was put to arbitrary and biased use." *Id.* at 37. Specifically, there was "considerable concern that persons hearing administrative cases at the trial level could not exercise independent judgment because they were required to perform prosecutorial and investigative functions as well as their judicial work . . . ." *Butz v. Economou*, 438 U.S. 478, 513-14 (1978) (citation omitted). A fundamental "adminstrative evil[]" that the APA sought to cure was "the practice of embodying in one person or agency the duties of prosecutor and judge," which was a "theme . . . reiterated throughout the legislative history of the Act." *Sung*, 339 U.S. at 41.

So strong was this concern that President Roosevelt's Committee on Administrative Management issued a report that "recommended complete separation of adjudicating functions and personnel from those having to do with investigation or prosecution." *Id.* at 38 (citing the Administrative Management in the Government of the United States, Report of the President's Committee on Administrative Management 37 (1937)). The report explained:

> [T]he independent commission is obliged to carry on judicial functions under conditions which threaten the impartial performance of that judicial work. The discretionary work of the administrator is merged with that of the judge. Pressures and influences properly enough directed toward officers responsible for formulating and administering policy constitute an unwholesome atmosphere in which to adjudicate private rights. But the mixed duties of the commissions render escape from these subversive influences impossible. 'Furthermore, the same men are obliged to serve both as prosecutors and as judges. This not only undermines judicial fairness; it weakens public confidence in that fairness. Commission decisions affecting private rights and conduct lie under the suspicion of being rationalizations of the preliminary findings which the commission, in the role of prosecutor, presented to itself.'

*Sung*, 339 U.S. at 41-42 (citation omitted); *id.* at 44 ("A genuinely impartial hearing, conducted with critical detachment, is psychologically improbable if not impossible, when the presiding officer has at once the responsibility of appraising the strength of the case and of seeking to make it as strong as possible.") (citation and quotations omitted). Only with the bifurcation of these functions, to be performed by different decisionmakers, did the Committee believe that judicial bias would be ameliorated. *Id.* at 38, 46. It is against this backdrop that Congress enacted the APA provision to separate prosecutorial and adjudicatory decision-making within federal agencies.

## B.    The APA Provision Applies to IPRs

It is well-settled that the procedural requirements of the APA apply to IPRs, because IPRs are a form of formal agency adjudication that Congress created under

the AIA. *See, e.g.*, *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1324 (Fed. Cir. 2017) ("In a formal adjudication, such as an IPR, the APA imposes certain procedural requirements on the agency.") (citing *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1301 (Fed. Cir. 2016) ("For a formal adjudication like the inter partes review considered here, the APA imposes particular requirements on the PTO.")); *see also In re NuVasive, Inc.*, 841 F.3d 966, 971 (Fed. Cir. 2016) (citing *Dell*, 818 F.3d at 1301, for the same principle that IPRs are formal adjudications).

Further, the process employed by the USPTO in having the same APJs institute and adjudicate IPRs squarely violates the APA's requirement that the same employees cannot act as prosecutor and adjudicator. Indeed, Congress in the AIA explicitly separated the discretionary work of deciding whether to institute IPR from the adjudicatory work of deciding patentability. 35 U.S.C. § 314(a) (the Director decides whether to institute IPR), § 318(a) (the PTAB renders a judgment on patentability). Just like enforcement actions of other agencies, the USPTO Director (and by delegation, a three-member APJ panel) balances a number of factors in determining whether to enforce an IPR. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency decision not to enforce often involves a complicated balancing of a number of factors" which include "not only assess[ing] whether a violation has occurred, but whether agency resources are best spent on

th[e] violation . . . .").  This decision is an exercise of prosecutorial discretion, which in federal agencies is discretionary and generally unsuitable for judicial review.  *Id.* at 845.

In determining whether to institute IPR, the Director considers whether the petitioner has satisfied its statutory burden of demonstrating a reasonable likelihood that at least one challenged claim is unpatentable.  35 U.S.C. § 314(a).  However, even where the petitioner has met its burden, institution is still discretionary and may depend on whether it best serves administrative efficiency.  *See Mylan Lab'ys Ltd. v. Janssen Pharmaceutica, N.V.*, 989 F.3d 1375, 1382 (Fed. Cir. 2021) ("The Director is permitted, but never compelled, to institute IPR."); *S. Regis Mohawk Tribe v. Mylan Pharm. Inc.*, 896 F.3d 1322, 1327 (Fed. Cir. 2018) (The Director "could deny review for other reasons such as administrative efficiency").  Because instituting an IPR involves balancing a number of factors, the decision is subject to prosecutorial discretion.

If an IPR is instituted, it is because the Director (i.e., APJ panel) has exercised prosecutorial discretion to enforce the IPR based on information supplied by a private party.  *See St. Regis Mohawk Tribe*, 896 F.3d at 1327 ("IPR is more like cases in which an agency chooses whether to institute a proceeding on information supplied by a private party."); *see also Oil States Energy Serv. v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018) (supporting the

conclusion that IPR proceedings are between the government and the patent owner in which a patent grant is reconsidered).  In this way, the Director acts as a gatekeeper to IPRs, quintessentially a prosecutorial function, separate from the adjudication of patentability and the personnel who perform such action.  *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151 (1991) ("[U]nder the Administrative Procedure Act (APA) [an agency] generally must divide enforcement and adjudication between separate personnel . . . .") (citation omitted).

IPR does not begin until it is instituted.  *See In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1272 (Fed. Cir. 2015); *see also St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.*, 749 F.3d 1373, 1375-76 (Fed. Cir. 2014) (An IPR is a two-step process: "[T]he Director's decision whether to institute a proceeding, followed (if the proceeding is instituted) by the Board's conduct of the proceeding and decision with respect to patentability.") (citation omitted).  During IPR, the Board, the adjudicatory body of the USPTO, considers all the evidence of record submitted by the parties and makes the ultimate legal determination of patentability.

In this manner, IPR is an adversarial process as the Board serves as a neutral and passive decision maker in adjudicating patentability after all evidence and arguments have been submitted.  *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) ("Congress opted for a party-directed, adversarial process."); Stephan

Landsman, The Adversary System: A Description and Defense 2 (1984) ("[A]dversary system relies on a neutral and passive decision maker to adjudicate disputes after they have been aired by the adversaries in a contested proceeding."); *Adversary System*, Black's Law Dictionary (11th ed. 2019). The APA provision directly applies to such adversarial proceedings to prevent a decisionmaker from initiating a case against a party and later adjudicating that case. Certainly, a decisionmaker that is both prosecutor and judge cannot exercise independence in rendering judgment, as the adversarial system demands. *Adversary System*, Black's Law Dictionary (11th ed. 2019) (defining "adversary system" as "[a] procedural system . . . involving active and unhindered parties contesting with each other to put forth a case before an independent decisionmaker—Also termed . . . accusatorial system; accusatory procedure."). Thus, Congress unambiguously separated the prosecutorial work of determining whether to enforce an IPR from the adjudicatory work of conducting IPR, to be performed by different decisionmakers—thus ensuring an independent decisionmaker. *Id.*[6]

---

[6] Congress' two decision-maker approach does not necessitate that the Director actually author every institution, just that two separate entities, under the supervision of the Director, perform the separated institution and final written decision functions. *See Arthrex, Inc.*, 141 S. Ct. at 1980, 1977-78 (concluding that the Director delegates institution authority to the PTAB but "controls the decision whether to institute"); *see also In re Palo Alto Networks Inc.*, 44 F.4th 1369, 1375-76 (Fed. Cir. 2022).

61

Accordingly, the APA provision's prohibition against combining prosecutorial and adjudicatory functions plainly applies to IPR proceedings. Combining these functions within a single APJ panel is precisely what the APA provision prohibits, both by its plain language and the policy behind it as reflected in the legislative history.

## C.    The *Ethicon* Court Erred in Finding That the APA Provision Does Not Apply to IPRs

Because instituting an IPR is a prosecutorial function, the *Ethicon* Court erred in finding that the APA provision does not apply to IPRs. The *Ethicon* Court acknowledged that 5 U.S.C. § 554(d) prohibits an employee or agent that performs investigatory or prosecutorial functions from participating in the adjudication. *Ethicon*, 812 F.3d at 1030 n.3. Nevertheless, the Court concluded that the APA provision is not implicated for IPRs because "the APA imposes no separation obligation as to those involved in preliminary and final decisions." *Id.*; *see also id.* at 1030 ("Both the decision to institute and the final decision are adjudicatory decisions and do not involve combining investigative and/or prosecutorial functions with an adjudicatory function."). *Id.* The *Ethicon* Court's conclusions on this point must be revisited because instituting an administrative proceeding, like an IPR, is quintessentially a prosecutorial function that may not be performed by the same personnel responsible for ultimately adjudicating the case. *See*

*Heckler*, 470 U.S. at 845 (the decision on whether to enforce an action is committed to an agency's prosecutorial discretion).

Since the *Ethicon* decision, this Court and the Supreme Court have clarified that deciding to institute an IPR is akin to an agency enforcement action in which the agency is afforded prosecutorial discretion.  For instance, this Court in *Saint Regis Mohawk Tribe* held that deciding institution is akin to "an agency enforcement action," as the Director exercises her prosecutorial discretion in deciding whether to institute IPR.  896 F.3d at 1327-28 (the Director, as a politically accountable officer, has discretion to decide whether to institute IPR).  Similarly, the Supreme Court in *Cuozzo Speed Technologies, LLC v. Lee* articulated that IPRs are like a "specialized agency proceeding" as the USPTO exercises discretion on whether reconsideration of the initial patent grant is warranted.  579 U.S. 261, 263, 279 (2016) (articulating that IPRs like reexaminations both serve the purpose of "reexamine[ing] an earlier agency decision."); *see also Oil States Energy*, 138 S. Ct. at 1371 ("The decision whether to institute inter partes review is committed to the Director's discretion.").

Given the foregoing, *Ethicon* is inconsistent with Supreme Court and Federal Circuit authority recognizing that institution decisions are prosecutorial functions.  *Ethicon*'s conclusion that the "decision to institute . . . [is an]

adjudicatory decision" is also inconsistent with the well-understood meanings of adjudication and prosecution.  812 F.3d at 1030.

Adjudication refers to "[t]he legal process of resolving a dispute; the process of judicially deciding a case," whereas prosecute means "to carry on an action." *Adjudication*, *Prosecute*, Black's Law Dictionary (11th ed. 2019), *Adjudication*, Black's Law Dictionary (6th ed. 1990) ("It contemplates that the claims of all the parties thereto have been considered and set at rest."); *see also* 5 U.S.C. § 551(7) (defining "adjudication" as "agency process for the formulation of an order.").  An institution decision is not an "order" under the APA, which "means the whole or a part of a final disposition."  5 U.S.C. § 551(6).

The decision to institute is not a judgment of patent rights, it does not alter the legal status of a patent, and does not affect any other administrative or judicial proceeding.   Rather, the decision is prosecutorial in nature as the Director decides whether to "carry out [an IPR] action," against a patent owner and reconsider the patent grant.  *prosecute*, Black's Law Dictionary (11th ed. 2019); *see also Sung*, 339 U.S. at 42, 46 (instituting an action is discretionary work).   That is, the Director's decision to institute enforces an IPR challenge against a patent owner, it does not set to rest the parties' claims.

In *Dussia v. Barger*, 466 Pa. 152 (1975), the court determined that the decision to institute an action is fundamentally a prosecutorial function.  *Id.* at 160-

62. Specifically, *Dussia* involved a state police field regulation that commingled the prosecutorial function of deciding whether to institute a disciplinary action with the judicial function of determining guilt or innocence.    *Id.* at 160-61.    In determining that the decision to institute is fundamentally a prosecutorial function that requires separation from adjudication and the personnel charged with such function, the *Dussia* court reasoned that:

> While . . . the Commissioner did not in fact have the responsibility of the entire prosecutorial role . . . . the **decision to institute a prosecution is such a fundamental prosecutorial function** that it alone justifies concluding **a dual capacity where the individual also is charged with the responsibility of making the ultimate determination of guilt or innocence**.

*Id.* at 165 (emphasis added).

Similarly, here, while a Board (which by Director delegation has the authority to make the institution decision) does not have the responsibility of the entire prosecutorial role as it is guided by a petition, deciding whether to institute is "such a fundamental prosecutorial function," *id.*, that it likewise justifies concluding a dual capacity where the same Board is also charged with adjudicating the patentability.

Moreover, the *Ethicon* Court's analogy of IPR institution to a district court's preliminary injunction is misplaced.    *Ethicon*, 812 F.3d at 103 & n.3.    Unlike a district court's preliminary injunction determination that considers and sets to rest

the parties' claims (*i.e.*, adjudicatory) and is appealable, a decision to institute IPR is simply the carrying on of an IPR action (*i.e.*, prosecutorial) that is non-appealable. *Cuozzo*, 579 U.S. at 265 (finding that the "'determination by the [Patent Office] whether to institute an inter partes review under this section shall be *final and non-appealable.*'") (emphasis added) (quoting 35 U.S.C. § 314(d)); *Ethicon*, 812 F.3d at 1039 (Newman, J., dissenting) (preliminary injunction decisions "are immediately subject to appeal.").

Under the USPTO's unitary decision-making structure, a Board is not a neutral and passive decisionmaker because it acts as both prosecutor and adjudicator. Like in *Dussia*, the decision to institute IPR is fundamentally a prosecutorial function (despite the Board not have responsibility of the entire prosecutorial role). *Dussia*, 466 Pa. at 165. A Board must consider **all the evidence** before it renders a judgment, a judgment which is incompatible with providing judicial impartially if that same Board also decides, in the role of prosecutor, to enforce an IPR. *See, e.g.*, *Oil States*, 138 S. Ct. at 1371 (explaining that the Board is the "adjudicatory body within the PTO" that must issue a final written decision).

For these reasons, this Court should overrule these findings in *Ethicon* and hold that the APA provision applies to IPRs and requires separate decision makers for institution and adjudication of IPRs.

**D.    The Structural Bias Inherent in Current IPR Procedure Violates Due Process and Harms Patent Rights**

The USPTO's current procedure for IPRs also violates constitutional due process.  As an initial matter, because the APA provision serves to protect due process by preventing bias in agency decision-making, the USPTO runs afoul of due process simply by its violation of this provision.  Yet even separately from the APA, the USPTO's IPR process directly violates constitutional due process under the factors set forth by the Supreme Court:  *i.e.*, (1) the private interest that will be affected; (2) the risk of an erroneous deprivation of the interest because of the procedures used, and the probable value of additional procedural safeguards; and (3) the government's interest.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Here, the USPTO's IPR procedure unfairly deprives patentees of their patent rights, by inviting biased decision-making by APJs who are inclined to confirm their decision to institute IPR by finding patents unpatentable during the IPR adjudication.  Indeed, the temptation to justify past conduct raises, at the very least, the appearance that a Board's FWD is simply a justification of its initial determination, tipping the balance in favor of additional protections.  *See Tumey*, 273 U.S. at 532 ("Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.").

The risk of erroneous deprivation of patent rights is high. The statistical evidence that shows in practice the actual bias that lurks in the USPTO's unitary structure . *Withrow v. Larkin*, 421 U.S. 35, 54 (1975) (Courts "should be alert to the possibilities of bias that may lurk in the way particular procedures actually work in practice."). Under the USPTO's unitary procedure, the PTAB has invalidated 84% of patents (in part or whole) that have gone through final written decisions. *See* https://usinventor.org/assessing-ptab-invalidity-rates/ ("The net result is 84% [3,000/3,572] of patents that have been fully reviewed by the PTAB are found to be invalid."); https://wjlta.com/2022/01/10/so-you-want-to-invalidate-a-patent-the-ptab-may-be-your-friend/ ("PTAB has turned into a predatory regime with a bias against unsophisticated patentees . . . . [as] patents that have been subject to a PTAB final written decision have an 84% invalidation rate.").

The 84% invalidation rate shows the advanced commitment Boards have to their institution decisions, a commitment which curbs Boards from "hold[ing] the balance nice, clear, and true," *Tumey*, 273 U.S. at 532, between their IPR enforcement position and a patent owner's patentability positions. Accordingly, the USPTO's unitary procedure is as lethal as ever, as it forecloses fair and effective consideration of a patent owner's showing of patentability. https://www.ipwatchdog.com/2020/05/21/ptab-institution-data-analysis-proves-reforms-failed/id=121440/ ("Detailed analysis of the data proves that nothing has

changed at the PTAB which continues to permit abuse and invalidate an astoundingly high percentage of patents.  The 'death squad for patents' is as lethal as ever.") (emphasis omitted).  Additional safeguards are readily available to the USPTO, such as invoking the separation of prosecutorial and adjudicatory functions called for by the APA.

The government has a significant interest in ensuring that its patent system works fairly and that patentees have faith that their innovations are adequately protected by the government.  There is no justification for allowing this bias in IPR proceedings, particularly when there is direct statutory authority prohibiting it.  Any practical advantages gained from allowing the same decisionmaker to institute and adjudicate IPRs are wholly inadequate to warrant the harm to patent rights inherent in this prejudicial process.  *See Sung*, 339 U.S. at 46-47 ("Nor can we accord any weight to the argument that to apply the Act to such hearings will cause inconvenience and added expense to the Immigration Service.  Of course it will, as it will to nearly every agency to which it is applied. But the power of the purse belongs to Congress, and Congress has determined that the price for greater fairness is not too high.").

## <u>CONCLUSION</u>

For at least the foregoing reasons, Arbor respectfully requests that this Court reverse the Board's decisions and hold the Challenged Claims of Arbor's Patents patentable. Alternatively, the Court should reverse and remand to a different panel for further proceedings.

Respectfully submitted,

Dated: October 21, 2022

By:  */s/ Paul J. Andre*
Paul J. Andre
Lisa Kobialka
James R. Hannah
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Tel: (650) 752-1700
Fax: (650) 752-1800
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com

Jeffrey Price
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
jprice@kramelevin.com

*Attorneys for Appellant*
Arbor Global Strategies, LLC

## ADDENDUM – TABLE OF CONTENTS

| Date | Document Description | Appx No. |
|------|---------------------|----------|
| 11/24/2021 | Final Written Decision (IPR2020-01020, IPR2021-00391) | Appx1 |
| 11/24/2021 | Final Written Decision and Errata thereto (IPR2020-01021, IPR2021-00394) | Appx61 |
| 11/24/2021 | Final Written Decision (IPR2020-01022, IPR2021-00393) | Appx132 |
| 02/04/2022 | Order Denying Request for Director Review (IPR2020-01020, -01021, -1022) | Appx181 |
| 03/02/2022 | Final Written Decision (IPR2020-01567, IPR2021-00735) | Appx184 |
| 03/02/2022 | Final Written Decision (IPR2020-01568, IPR2021-00736) | Appx281 |
| 03/02/2022 | Final Written Decision (IPR2020-01570, IPR2021-00737) | Appx394 |
| 03/02/2022 | Final Written Decision (IPR2020-01571, IPR2021-00738) | Appx520 |
|  | U.S. Patent No. RE42,035 | Appx680 |
|  | U.S. Patent No. 6,781,226 | Appx691 |
|  | U.S. Patent No. 7,126,214 | Appx702 |
|  | U.S. Patent No. 7,282,951 | Appx714 |

Trials@uspto.gov                                                    Paper 30
571-272-7822                                        Date:  November 24, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SAMSUNG ELECTRONICS CO., LTD. and
TAIWAN SEMICONDUCTOR MANUFACTURING CO. LTD.,
Petitioner,

v.

ARBOR GLOBAL STRATEGIES LLC,
Patent Owner.

———————

IPR2020-01020[1]
Patent RE42,035 E

———————

Before KARL D. EASTHOM, BARBARA A. BENOIT, and
SHARON FENICK, *Administrative Patent Judges*.

EASTHOM, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

---

[1] Taiwan Semiconductor Manufacturing Co. Ltd. filed a petition in
IPR2021-00391 and has been joined as a party to this proceeding.

IPR2020-01020
Patent RE42,035 E

Samsung Electronics Co., Ltd. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29  (the "challenged claims") of U.S. Patent No. RE42,035 E (Ex. 1001, the "'035 patent").  Petitioner filed a Declaration of Dr. Stanley Shanfield (Ex. 1002) with its Petition.  Arbor Global Strategies LLC ("Patent Owner"), filed a Preliminary Response (Paper 7, "Prelim. Resp.").  The parties also filed authorized preliminary briefing.  Papers 8–11.

After the Institution Decision (Paper 11, "Inst. Dec."), Patent Owner filed a Patent Owner Response (Paper 16, "PO Resp.") and a Declaration of Dr. Krishnendu Chakrabarty (Ex. 2015); Petitioner filed a Reply (Paper 19) and a Reply Declaration of Dr. Stanley Shanfield (Ex. 1030); and Patent Owner filed a Sur-reply (Paper 24, "Sur-reply").  Thereafter, the parties presented oral arguments via a video hearing (September 14, 2021), and the Board entered a transcript into the record.  Paper 29 ("Tr.").

For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner demonstrates by a preponderance of evidence that the challenged claims are unpatentable.

## I.     BACKGROUND

*A.     Real Parties-in-Interest*

As the real parties-in-interest, Petitioner identifies itself, Samsung Electronics America, Inc., and Samsung Semiconductor, Inc.  Pet. 82.  Taiwan Semiconductor Manufacturing Co. Ltd. identifies itself and TSMC North America as real parties-in-interest.  *See* IPR2021-00391, Paper 2, 79.  Patent Owner identifies itself.  Paper 5, 1.

IPR2020-01020
Patent RE42,035 E

B.    *Related Proceedings*

The parties identify *Arbor Global Strategies LLC v. Samsung Electronics Co., Ltd. et al.,* 2:19-cv-00333-JRG-RSP (E.D. Tex.) (filed October 11, 2019) ("District Court" or "District Court") as a related infringement action involving the '035 and two related patents, U.S. Patent No. 7,282,951 B1 and U.S. Patent No. 6,781,226 B2, which contain the same specification as the '035 patent. *See* Pet. 82; Paper 5.

Concurrent with the instant Petition, Petitioner filed petitions challenging claims in the two related patents, respectively IPR2020-01021 and IPR2020-01022.

C.    *The '035 patent*

The '035 patent describes a stack of integrated circuit (IC) die elements including a field programmable gate array (FPGA) on a die, a memory on a die, and a microprocessor on a die. Ex. 1001, code (57), Fig. 4. Multiple contacts traverse the thickness of the die elements of the stack to connect the gate array, memory, and microprocessor. *Id.* According to the '035 patent, this arrangement "allows for a significant acceleration in the sharing of data between the microprocessor and the FPGA element while advantageously increasing final assembly yield and concomitantly reducing final assembly cost." *Id.*

Figure 4 follows:



*Fig. 4*

Figure 4 above depicts a stack of dies including FPGA die 66, memory die 66, and microprocessor die 64, interconnected using metal and "contact points, or holes, 70." Ex. 1001, 4:6–20.

The '035 patent explains that an FPGA provides known advantages as part of a "reconfigurable processor." *See* Ex. 1001, 1:17–32. Reconfiguring the FPGA gates alters the "hardware" of the combined "reconfigurable processor" (e.g., the processor and FPGA) making the processor faster than one that simply accesses memory (i.e., "the conventional 'load/store' paradigm") to run applications. *See id.* A "reconfigurable processor" provides a known benefit of flexibly providing the specific functional units required by an application after manufacture. *See id.*

IPR2020-01020
Patent RE42,035 E

*D.    Illustrative Claims 1 and 10*

The Petition challenges independent claims 1, 9, 17, and 25, and claims 3, 4, 8, 9, 11, 13–16, 19–22, 26, 28, and 29, which ultimately dependent from one of the independent claims.  Claim 1 illustrates the challenged claims at issue:

1. A processor module comprising:

[1.1] at least a first integrated circuit die element including a programmable array;

[1.2] at least a second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element; and

[1.3] wherein said first and second integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements, and wherein said contact points traverse said die elements through a thickness thereof.

Ex. 1001, 6:11–22 (information added by Board to conform to Petitioner's nomenclature); *see* Pet. 17–19 (addressing claim 1).

IPR2020-01020
Patent RE42,035 E

*E.    The Asserted Grounds*

Petitioner challenges claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29 of the '035 patent on the following grounds (Pet. 3):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 5, 7 | 102[2] | Alexander[3] |
| 9, 13, 15 | 103 | APA, Alexander |
| 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, 29 | 103 | Koyanagi,[4] Alexander |
| 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, 29 | 103 | Bertin,[5]  Cooke[6] |

## II. ANALYSIS

Petitioner challenges claims 1, 5, and 7 for anticipation and claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29 for obviousness.  Patent Owner disagrees.

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102, 103.  For purposes of institution, the '035 patent contains a claim with an effective filing date before March 16, 2013 (the effective date of the relevant amendment), so the pre-AIA versions of § 102 and § 103 apply.  The parties describe December 5, 2001 as the earliest effective filing date at issue here.  PO Resp. 4–5; Pet. 9.

[3] M.J. Alexander et al., "Three-dimensional Field-programmable Gate Arrays," Proceedings of Eighth International Application Specific Integrated Circuits Conference, September 18–22, 1995.  Ex. 1006.

[4] M. Koyanagi et al., "Future System-on-silicon LSI Chips," IEEE Micro, Vol. 18, Issue 4, July/August 1998.  Ex. 1007.

[5] Bertin, US 6,222,276 B1, issued Apr. 24, 2001.  Ex. 1009.

[6] Cooke, US 5,970,254, issued Oct. 19, 1999.  Ex. 1008.

IPR2020-01020
Patent RE42,035 E

A.    *Legal Standards*

"Section 103(a) forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)).  Tribunals resolve obviousness on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations.[7]  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  Prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

"In order to render a claimed invention obvious, the prior art as a whole must enable one skilled in the art to make and use the apparatus or method." *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1289, 1297 (Fed. Cir. 2010), *vacated on other grounds*, 374 F. App'x 35 (2010), *reinstated in part*, 649 F.3d 1276. 1296 (2013) (en banc) (reinstating obviousness portion of *Therasense*); *see also In re Kumar*, 418 F.3d 1361, 1368 (Fed. Cir. 2005) (similar holding in the context of examination). However, any "suggestion that [the prior art references] are non-enabled is

---

[7] The Petition states that secondary considerations do not exist.  Pet. 79.  On this record, Patent Owner does not assert secondary indicia of nonobviousness.

IPR2020-01020
Patent RE42,035 E

misplaced, since even '[a] non-enabling reference may qualify as prior art for the purpose of determining obviousness,' *Symbol Tech., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991), and even 'an inoperative device . . . is prior art for all that it teaches,' *Beckman Instruments, Inc. v. LKB Produkter* AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989)." *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1360 n.2 (Fed. Cir. 2015)). Moreover, prior art references carry a presumption of enablement. *See In re Antor Media*, 689 F.3d 1282, 1287–1288 (Fed. Cir. 2012); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003); *Apple Inc. v. Corephotonics, Ltd.*, No. 2020-1438, 2021 WL 2577597, at *4 (Fed. Cir. June 23, 2021) (nonprecedential) (holding that in the context of AIA trial proceedings, "regardless of the forum, prior art patents and publications enjoy a presumption of enablement, and the patentee/applicant has the burden to prove nonenablement for such prior art" and that "[i]t was error for the Board to suggest otherwise").

B.    *Level of Ordinary Skill in the Art*

Relying on the testimony of Dr. Shanfield, Petitioner contends that

> [a] person of ordinary skill in the art ("POSITA") at the time of the alleged invention would have been a person having a Master's degree in Electrical Engineering, Computer Engineering, or Physics with three to five years of industry experience in integrated circuit design, layout, packaging or fabrication. Ex. 1002 ¶¶ 55–58. A greater level of experience in the relevant field may compensate for less education, and vice versa.

Pet. 9.

Patent Owner contends that "a person of ordinary skill in the art . . . would have had a Bachelor's degree in Electrical Engineering or a related and either (1) two or more years of industry experience; and/or (2) an

8

IPR2020-01020
Patent RE42,035 E

advanced degree in Electrical Engineering or related field." PO Resp. 4–5 (citing Ex. 2015 ¶ 33).

We adopt Petitioner's proposed level of ordinary skill in the art as we did in the Institution Decision, which comports with the teachings of the '035 patent and the asserted prior art. *See* Inst. Dec. 19. Patent Owner's proposed level is slightly lower than Petitioner's but it overlaps with Petitioner's proposed level. Even if we adopted Patent Owner's proposed level, the outcome would remain the same.

C. *Claim Construction*

In an *inter partes* review, the Board construes each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2019). Under the same standard applied by district courts, claim terms acquire their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Based on the current record, no terms require explicit construction. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the

controversy'. . . ." (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

D.    *Anticipation, Alexander, Claim 1, 5, and 7*

1.    *Alexander*

Alexander describes "stacking together a number of 2D FPGA bare dies" to form a 3D FPGA.  Ex. 1006, 1.  Alexander explains that "each individual die in our 3D paradigm has vias passing through the die itself, enabling electrical interconnections between the two sides of the die."  *Id.*

Petitioner annotates Alexander's Figure 2 as follows:



Figure 2(a) shows vertical metal connections (red) traversing a chip with a solder pad and bump on top, and Figure 2(b) shows a stack of chips prior to connection by solder bumps.  Ex. 1006, 253.

Alexander explains that stacking bare dies to form a 3D FPGA results in a chip with a "significantly smaller physical space," lower "power consumption," and greater "resource utilization" and "versatility" as compared to conventional layouts.  *Id.*

2.    *Anticipation Analysis, Claims 1, 5, and 7*

Claim 1 follows:

1.  A processor module comprising:

[1.1] at least a first integrated circuit die element including a programmable array;

IPR2020-01020
Patent RE42,035 E

[1.2] at least a second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element; and

[1.3] wherein said first and second integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements, and wherein said contact points traverse said die elements through a thickness thereof.

Petitioner reads the claim limitations on the following annotated Figures 2a and 2b in Alexander (supported by other disclosures therein) (Pet. 18–19):



Figure 2: (a) The solder bump, pad, and vertical via geometry; and (b) stacked 2D FPGA dies.



Petitioner's annotated version of Alexander's Figure 2b above shows the claimed first and second dies, with at least the first die and second die each including the claimed "programmable array" (a "2D FPGA die"), and with the claimed "contact points" represented by the red vertical vias in Alexander's Figure 2a and also connected to the solder bumps in Figure 2b. *See* Pet. 17–19.

IPR2020-01020
Patent RE42,035 E

Quoting from Alexander and citing Dr. Shanfield, Petitioner explains as follows:

> *First*, as shown in Alexander Figure 2(b), the adjacent first (red) and second (blue) dies are electrically coupled by a number of contact points (terminated at solder bumps) distributed throughout the surfaces of the dies. Ex. 1006, 1 ("The 3D FPGA is [] built by stacking multiple dies using solder bumps to implement the *vertical interconnections* between layers (Figure 2(b))."). *Second*, as shown in Alexander Figure 2(a), the contact points include "vertical via[s]" (red) that traverse said die elements through a thickness thereof. Ex. 1006, 1 ("Aside from solder bumps to establish the vertical interconnections, each individual die in our 3D paradigm has vias [red] passing through the die itself, enabling electrical interconnections between the two sides of the die."); Ex. 1002 ¶ 81.

Pet. 19 (quoting Ex. 1006, 1) (emphasis by Petitioner).

Patent Owner argues that "Alexander does not disclose 'at least a second integrated circuit die element stacked with and electrically coupled to said programmable array,' as recited in Claim 1 because Alexander's proposed 3D FPGA is limited to 'at least a first integrated circuit die element *including a programmable array*.'" PO Resp. 10 (quoting claim 1) (emphasis by Patent Owner). According to Patent Owner, "Alexander does not disclose 'at least a second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element.'" *Id.* at 11 (citing Ex. 2015 ¶ 48). Patent Owner reasons that "Alexander discloses modifying the known 2D FPGA architecture to form a single 3D FPGA where each logic block has six immediate neighbors instead of the typical four." *Id.* (citing Ex. 1010, 1). According further to Patent Owner, "because Alexander fails to disclose stacking any integrated die elements with the 3D FPGA, Alexander does not

12

disclose 'at least a second integrated circuit die element stacked with and electrically coupled to the programmable array.'" *Id.* at 12. In its Sur-reply, Patent Owner argues that "even if the claims could be read broadly enough for the term 'first integrated circuit die element including a programmable array' to encompass an array spread over more than a 'first integrated circuit,' Alexander does not disclose any ***other*** (i.e. second) "integrated circuit die element stacked with and electrically coupled to said programmable array." Sur-reply 12.

These arguments do not undermine Petitioner's showing. To the extent Patent Owner's Sur-reply raises the issue, claim 1 does not recite "any other" integrated circuit that requires the first and second integrated circuits to be different types of circuits. As summarized above, including Petitioner's annotated versions of Alexander's figures, Petitioner relies on separate 2D FPGA on each die stack—"a first integrated die element" and a "second integrated die element" in that stack—not the complete 3D stack as "a first integrated die element." Claim 1 recites "*at least* a first integrated circuit die element including a programmable array" and it recites "at least a second integrated circuit die element." Therefore, claim 1 reads on one die element that includes one of Alexander's 2D FPGAs and a second die element that includes another of Alexander's 2D FPGAs, as Petitioner's annotated Figure 2b above portrays.

Stated differently and as Petitioner persuasively argues, claim 1 encompasses Alexander's different 2D FPGA layers that connect together into a 3D FPGA, forming the claimed "processor module." *See* Reply 4–5 ("Alexander's 3D FPGA is formed by stacking multiple '2D FPGA bare dies,' and each 2D FPGA bare die can properly be mapped to either the

claimed first or second die element, as is annotated in Figure 2(b) above, because each includes a 'programmable array' as required by claim 1.").

The '035 patent supports this interpretation of a "processor module," as recited in the preamble of claim 1, as including two 2D FPGA dies. For example, it states that "a particular embodiment" of "a *processor module* with reconfigurable capability may be constructed by *stacking one or more* thinned microprocessor, memory and/*or field programmable gate array ('FPGA') die elements* and interconnecting the same utilizing contacts that traverse the thickness of the die." Ex. 1001, code (57) (emphasis added). As the Petition shows, Alexander discloses "one or more . . . field programmable gate array ('FPGA') die elements . . . interconnect[ed with each other] . . . utilizing contacts that traverse the thickness of the die." *See id.*; Pet. 19. The specification also contemplates 3D stacks with "two or more FPGA die": "[I]nter-cell connections currently limited to two dimensions of a single die may be routed up and down the stack in three dimensions." *Id.* at 5:14–16.

Patent Owner also argues that Alexander is non-enabling (1) because of thermal issues with the designs Alexander describes and (2) "[b]ecause the public was not in possession of Tru-Sci Technologies' wafer-thinning technology for more than one year prior to the claimed invention's filing date." PO Resp. 14, 16.

Initially, Alexander, a prior art reference, carries a presumption of enablement. *Antor Media*, 689 F.3d at 1287–1288; *Amgen,* 314 F.3d at 1355. Patent Owner argues that the presumption does not apply because "for a non-patent publication, such as Alexander, to be presumptively enabling, it must have been "cited by an examiner . . . barring any showing

IPR2020-01020
Patent RE42,035 E

to the contrary by a patent applicant or patentee." PO Resp. 13 (quoting *Antor Media*, 689 F.3d at 1288. Patent Owner also argues that "[w]hile it is true that a '[e]nablement of an anticipatory reference may be demonstrated by a later reference,' the Federal Circuit has made clear that the later reference 'must show that the claimed subject matter was in possession of the public more than one year prior to the applicant's filing date.'" *Id.* at 16 (*quoting Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1379 (Fed. Cir. 2001)).[8]

Petitioner argues that Patent Owner "mispresents the law." As Petitioner argues, '[a] prior art printed publication does not need to have been 'cited by an examiner' to be presumed enabling." Reply 5. In *Corephotonics,* 2021 WL 2577597, at *4 (nonprecedential), in the context of AIA trial proceedings, the court held that "regardless of the forum, prior art patents and publications enjoy a presumption of enablement, and the patentee/applicant has the burden to prove nonenablement for such prior art" and that "[i]t was error for the Board to suggest otherwise."

The 1995 publication date of Alexander antedates the'035 patent's effective filing date of December 5, 2001 by more than six years. *See* Ex. 1006, 1 ("0-7803-2702-1/95 $ 4.00 © IEEE-1995"); PO Resp. 4 (specifying "December 5, 2001" as "the earliest effective filing date of the '035 Patent"); Inst Dec. 20–25 (finding the publication date of Alexander is

---

[8] The "more than one year prior to the applicant's filing date" requirement arises from "anticipation under 35 U.S.C. § 102(b)." *See Bristol-Myers Squibb*, 246 F.3d at 1379.

IPR2020-01020
Patent RE42,035 E

December 5, 2001).[9]  As Petitioner shows, even if wafer thinning is relevant to the claimed invention somehow, Tru-Si Technologies described its wafer-thinning process in 1999, more than one year prior to the effective filing date of the '035 patent.  Reply 8 (citing Ex. 2008, 1–2).  As Petitioner also shows, Koyanagi published in 1998 and describes wafer thinning. Reply 8 (citing Ex. 1007, 19; Ex. 1030 ¶¶ 42–44); Pet. 39.

Moreover, as Petitioner also argues, claims 1, 5, and 7 do not recite wafer thinning.  *See* Reply 8; Pet. 39.  Claim 8 depends from claim 1 and recites "wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements."  *See* Reply 8; Pet. 39.  Claim 8 further indicates that claims 1, 5, and 7 do require wafer thinning.

In other words, contrary to Patent Owner's arguments, Alexander need not enable "wafer-thinning technology," because challenged claims 1, 5, and 7 at issue here do not require that technology.  Even so, the '035 patent admits the "wafer-thinning technology" was known and "developed by Tru-Sci Technologies" prior to the invention.  *See* Ex. 1001, 2:20–30; Prelim. Resp. 18–19 (citing Ex. 1001, 2:20–30; Ex. 2008); *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1379 (Fed. Cir. 2001) ("Enablement of an anticipatory reference may be demonstrated by a later reference").  Accordingly, an artisan of ordinary skill reading Alexander

---

[9] Patent Owner does not challenge this preliminary finding in its Response. After a full review of the record, we incorporate and adopt this finding as supported by a preponderance of the evidence.

16

IPR2020-01020
Patent RE42,035 E

would have considered Alexander enabled for such known technology at the time of the invention.[10]

Patent Owner also contends that Alexander recognizes "[a] number of important issues remain to be addressed . . . including heat dissipation, thermal stress, and physical design considerations." PO Resp. 14 (quoting Ex. 1006, 4). Patent Owner also contends that Alexander "declared that the industry must find ways of 'reducing power consumption in 3D FPGA architectures' in order to mitigate the thermal issues, which remained a major concern that hindered 3D design and development." *Id.* (quoting Ex. 1006, 4). According to Patent Owner because of these thermal issues, "a skilled artisan could not make the claimed invention based on Alexander without undue experimentation." *Id.*

Contrary to this characterization, Alexander states that "each individual die in our 3D paradigm has vias passing through the die itself, enabling electrical interconnections between the two sides of the die." Ex. 1006, 1. Patent Owner contends this is not "sufficient" because Alexander does not employ the same disclosed wafer-thinning process by Tru-Si-Technologies that the patent describes. PO Resp. 15 (citing Ex. 1001, 2:16–

---

[10] In its sur-reply in IPR2020-01021 challenging claims in a related patent, Patent Owner states that "[t]he inventors of the '951 Patent, however, readily admit that they did not invent TSVs [through-silicon vias] or stacking of die elements." IPR2021-01021, Paper 24, 3 (citing U.S. Patent No. 7,282,951 (the "951 patent"), 2:29–40 as "discussing Tru-Si Technologies"). The named inventors of the '951 patent and the '035 patent are the same, John M. Huppenthal and D. James Guzy, and both patents rely on the same effective filing date of December 5, 2001 through the same patent, U.S. Patent No. 6,627,985. *Compare* IPR2021-01021, Ex. 1001, codes (63, 75) (the '951 patent), *with* Ex. 1001, codes (64, 75) (the '035 patent).

30).  However, as noted above, the claims at issue here do not require that wafer-thinning process and even if they do, the process was well-known years before the effective date of the invention.  *See also supra* note 10 (admitting that the named inventors did not invent stacking and TSVs (through-semiconductor vias) and citing Tru-Si Technologies).  Other record references, such as Bertin and Koyanagi, discussed below, show enablement of vias extending through dies at the time of the invention.  As Petitioner also argues, "Koyanagi, published before the Tru-Si paper in 1998, also undisputedly teaches the fabrication of 3D ICs that involves wafer thinning, as detailed in the Petition with regard to claim 8."  Reply 8 (citing Pet. 39; Ex. 1007, 19; Ex. 1030 ¶¶ 42–44).

According further to Petitioner, "Dr. Chakrabarty admits that technologies to fabricate stacked dies using TSVs were available and known before the claimed 2001 priority date of the '035 patent."  Reply 9 (citing Ex. 1035, 310:15–311:14).  Dr. Chakrabarty's cited testimony supports Petitioner:  "Koyanagi's work was '98, '99.  He's generally credited as being the first to convincingly show 3D stacking with these vias.  And then there was the Tru-Si work around the same time."  Ex. 1035, 311:10–14.

Although Alexander describes "important issues" that need to be addressed, Alexander also states that "[t]he manufacturing yield of such parts may be kept at reasonable levels using effective fabrication and testing methodology."  Ex. 1006, 4.  As Petitioner points out, Alexander solves heat problems by eliminating input and output buffers where "large portion of the total power is expended" so that "3D stacking of FPGAs 'tends to significantly reduce the power consumption.'  Reply 6 (quoting Ex. 1006, 4).

IPR2020-01020
Patent RE42,035 E

As Petitioner also shows, Alexander specifically describes "[a] number of thermal-reduction techniques" (Ex. 1006, 3) as including "'thermal bumps in pillars' as heat removing pipes, and the use of thermal gels." Reply 6–7 (quoting Ex. 1006, 3; citing Ex. 1003 ¶¶ 37–39).

Patent Owner also argues that "Alexander proposed a 3D FPGA," but "the authors admitted that it could not fabricate its proposed design." PO Resp. 26. But as Petitioner argues, whether Alexander's authors actually manufactured the disclosed die stack is not determinative, especially here where Alexander lists multiple well-known solutions to any thermal problems. *See* Reply 8 (citing *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (stating that "no 'actual creation or reduction to practice' is required" for a prior art reference to anticipate claims (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1380–81 (Fed. Cir. 2003)))).

Based on the foregoing discussion, Petitioner persuasively shows that Alexander anticipates claim 1. Petitioner also presents a persuasive showing supported by the record with respect to dependent claims 5 and 7. Pet. 20–21. Patent Owner does not address dependent claims 5 and 7 separately from claim 1. *See* PO Resp. 10–16. Accordingly, based on the record, including arguments and cited evidence in Patent Owner's Response and Sur-reply, Petitioner shows by a preponderance of evidence that Alexander anticipates claims 1, 5, and 7.

E.    *Obviousness, Alexander and Admitted Prior Art, Claims 9, 13, and 15*

Claim 9 recites the following:

>    9. A reconfigurable computer system comprising:
>    a processor;
>    a memory;

at least one processor module including at least a first integrated circuit die element having a programmable array and at least a second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element; and

wherein said first and second integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements, and wherein said contact points traverse said die elements through a thickness thereof.

Petitioner reads the last two clauses of claim 9 onto Alexander's 3D processor module. *See* Pet. 21–22. Petitioner contends that with the exception of the specific structure of the claimed processor module as outlined in the last two clauses above (which represent the bulk of claim 9), the other claimed components of the "reconfigurable computer system" (i.e., memory, processor, and programmable array) generally were well known as the '035 patent admits. *See id.* at 10–11, 21–22 (citing Ex. 1001, 3:38–58, Fig. 1); Pet. Prelim. Reply 7.

IPR2020-01020
Patent RE42,035 E

Petitioner reproduces the following annotated version of admitted prior art Figure 1 of the '035 patent along with Alexander's FPGA at Figure 2b to illustrate the proposed ground (Pet. 21):



Petitioner's annotated "APA figure 1" above depicts a known reconfigurable computer system as admitted in '035 patent supplemented by Alexander's 3D FPGA in place of the known FPGA. *See* Pet. 21 (arguing that "the 'prior art reconfigurable computer system' depicted in APA Figure 1 incorporates 'one or more multi-adaptive processing (MAP™) elements 14,' each of which 'may comprise an FPGA'" (quoting Ex. 1001, 3:39–58)). As Petitioner argues, the '035 patent admits that Figure 1 "is a simplified functional block diagram of a portion of a prior art reconfigurable computer system [that] incorporates [] one or more microprocessors 12 [blue], one or more multi-adaptive processing [] elements 14 [red] and an associated system memory 16 [tan]." Pet. 22–23 (quoting Ex. 1001, 3:38–43 and referring to annotated "APA Figure 1").

21

Relying on testimony by Dr. Shanfield and based on teachings in Alexander, Petitioner contends that "[a] POSITA therefore would have been motivated to use Alexander's 3D FPGA in the APA's reconfigurable computer system to save space and increase processing speed." Pet. 22 (citing Ex. 1006, 1; Ex. 1002 ¶ 87). Petitioner explains that Alexander states that its "3D FPGA has a high number of very short vertical interconnections, which 'alleviates the performance degradation inherent in conventional die packaging and printed-circuit board techniques.'" Pet. 22 (quoting Ex. 1006, 1). Petitioner also explains that "[i]ntegrating different components into a 3D stacked module achieves the well-known benefits of 'miniaturization, lower power consumption, and large-scale integration.'" Pet. 27 (citing Ex. 1010, 1712–13; Ex. 1002 ¶ 104).

Patent Owner argues that "neither the APA nor *Alexander* disclose *how* to combine a programmable array, a microprocessor, and a memory die into a 3D IC." PO Resp. 18. As Petitioner argues, however, the Petition does not combine these three claim elements into a 3D IC. Reply 10. Rather, claim 9 "requires (1) a processor, (2) a memory, and (3) a processor module having at least two stacked die elements, one of which includes a programmable array." *Id.* In other words, "[t]he microprocessor (blue) and system memory (tan) of APA Figure 1 are conventional components and not stacked dies, and they are mapped respectively to the claimed processor and memory of claim 9." *Id.* at 11 (citing Pet. 23; Ex. 1030 ¶¶ 45–47).

Petitioner's showing is persuasive. The '035 patent shows that prior art computer systems using FPGAs, microprocessors, and memory, using hybrid or discrete components, generally were known. *See* Ex. 1001, 3:12–15, 37–57. In addition to referring to Figure 1 as prior art (which employs

IPR2020-01020
Patent RE42,035 E

hybrid or discrete components), the '035 patent admits in a related context that "three *known* limiting factors [including data access to and from cache memory] in "hybrid system[s]" that use "discrete microprocessors and FPGAs will only become significant as microprocessor speeds continue to increase." *See* Ex. 1001, 2:1–3 (emphasis added), Fig. 1. This admitted prior knowledge of limiting factors in the prior art APA system and the attempt to improve upon the APA system by improving upon microprocessor speeds implies that the system, including known microprocessors and FGPAs, generally was well known. *See* Ex. 1001, 1:16–18 ("In addition to *current commodity* IC microprocessors, another type of processing element is *commonly referred* to as a reconfigurable or adaptive, processor.") (emphasis added).

In relying on the APA Figure 1, Petitioner quotes the '035 patent to show that "FPGA-based reconfigurable processor systems were well known in the art." *See* Pet. 10 ("Conventionally, the ability for a reconfigurable processor to alter its hardware [] is typically accomplished through the use of some form of field programmable gate array ('FPGA') . . . .") (quoting Ex. 1001, 1:28–33). Similarly, the '035 patent admits that the microprocessors "to execute an application" were well-known system components of a "conventional 'load/store' paradigm," with the "reconfigurable processor" providing benefits over that paradigm. *See id.* at 1:18–27. In context, prior art Figure 1 simply represents a well-known "reconfigurable computer system 10" that includes an FPGA coupled to a

well-known processor and memory in a conventional manner. *See id.* at 3:38–57.[11]

Relying on Figure 5 of the '035 patent, Patent Owner also argues that "Petitioner overlooks that the '035 Patent describes a wide configuration data port that through buffer cells allows the parallel updating of logic cells in the FPGA." PO Resp. 23 (citing Ex. 1001, 4:42–62). Patent Owner also argues that the "'035 Patent greatly improved upon FPGA reconfiguration time, which conventionally took 'millions of processor clock cycles to complete the reconfiguration.'" *Id.* (citing Ex. 1001, 1:42–56). Patent Owner argues that this "[t]his improvement was an important aspect of the '035 Patent's claimed SDH (stacked die hybrid) processor, and, further confirms the challenges that the inventors of the '035 Patent faced when innovating in this space, and illustrates that Petitioner trivializes these challenges to make its obviousness argument." *Id.* at 24 (citing Ex. 2015

---

[11]As indicated in the Institution Decision, which we adopt and incorporate by reference as supported by the full record, Petitioner's use of the admitted prior art comports with the "Treatment of Statements of the Applicant in the Challenged Patent in *Inter Partes* Reviews Under § 311" ("Memorandum") (Ex. 2009), *available* at https://www.uspto.gov/sites/default/files/documents/ signed_aapa_guidance_memo.pdf. *See* Inst. Dec. 31–33. Patent Owner's Response does not contest Petitioner's showing as not complying with the Memorandum. In short, Petitioner employs the admitted prior art as "[s]tatements made in the specification of the patent that is being challenged in an IPR . . . as evidence of . . . general knowledge," in combination with Alexander as "one or more prior art patents or printed publications," employing the admitted prior art "to . . . supply missing claim limitations that were generally known in the art prior to the invention" and "demonstrate the knowledge of the ordinarily-skilled artisan at the time of the invention." *See* Memorandum at 9; Inst. Dec. 31–33.

IPR2020-01020
Patent RE42,035 E

¶ 61).  Patent Owner also argues that "neither the APA nor Alexander disclose how to combine a programmable array, a microprocessor, and a memory die into a 3D IC, which would take undue experimentation." *Id.* at 18.  Patent Owner contends that Dr. Shanfield's deposition testimony acknowledges that "combining different types of chips using TSVs into a 3D IC" "cannot be casually thrown together." *Id.* at 19 (arguing Petitioner "slaps the APA and Alexander's proposed 3D FPGA together without worrying about what connects to what").

Contrary to these arguments, claim 9 does not recite or require a "stacked die hybrid," "buffer cells," any improvements in FPGA reconfiguration times, or a "3D IC."  Claim 9 recites a "reconfigurable computer system" in the preamble, but it does not even recite how the "memory" and "processor" functionally or structurally relate to the "first and second integrated circuit die elements" of the "processor module."

As indicated above, Alexander carries a presumption of enablement as a prior art reference.  *See Antor Media*, 689 F.3d at 1288; *Amgen*, 314 F.3d at 1355.  Alexander employs multi-chip module fabrication techniques "to establish electrical contacts between the interconnect substrate and pads on individual dies."  Ex. 1006, 4.  As to obviousness, Petitioner relies on known systems that include a microprocessor, FPGA, and memory.  Pet. 22–23 (citing "APA Figure 1").  Petitioner persuasively shows that an artisan of ordinary skill readily could have connected the known FPGA module in a processor and memory system  as a substitute for a prior art FPGA, with the system performing as predicted, as evidenced by the block diagram wiring connections in admitted prior art Figure 1 of the '035 patent, in order to save

IPR2020-01020
Patent RE42,035 E

space and increase processing speed with a reasonable expectation of success.  *See* Pet. 10–11, 21–25 (citing Ex. 1002 ¶¶ 85–93).

Patent Owner also alleges thermal issues in Alexander render the claimed combination "inoperable."  PO Resp. 25–28.  Again, however, Patent Owner relies on a module or stack of a "3D FPGA with other power hungry components, such as logic dies including microprocessors" to support its arguments.  *Id.* at 27.  This argument mischaracterizes the breadth of claims 9, 13, and 15, which do not require a stack that includes a 3D FPGA stack with a microprocessor and memory in that stack, as Petitioner shows and as outlined above.

Based on the foregoing discussion, Petitioner shows persuasively that the combined teachings of Alexander and the APA would have rendered claim 9 obvious.  Petitioner also persuasively shows that claims 13 and 15, which depend from claim 9, would have been obvious as adding features that "Alexander also discloses."  Pet. 25.  Patent Owner does not address dependent claims 13 and 15 separately from independent claim 9.  *See* PO Resp. 17–28.  Accordingly, based on the record, including arguments and cited evidence in Patent Owner's Response and Sur-reply, Petitioner shows by a preponderance of evidence that the combined teachings of Alexander and the APA would have rendered claims 9, 13, and 15 obvious.

F.    *Obviousness, Koyanagi and Alexander, Claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29*

Petitioner contends the subject matter of claims 1, 3, 5–9, 13–17, 19–22, 25, 26, 28, and 29 would have been obvious over the combination of Koyanagi and Alexander.  Pet. 17–46.  Patent Owner disputes Petitioner's contentions.  PO Resp. 28–36.

26

IPR2020-01020
Patent RE42,035 E

### 1.    Koyanagi

Koyanagi describes a "three-dimensional integration technology" ("3D") that involves vertically stacking and interconnecting chips using "a high density of vertical interconnections" (Ex. 1007, 17) to "connect[] each layer (*id.* at 18).

Koyanagi explains that its 3D-integration technology "enables a huge number of metal microbumps to form on the top or bottom surfaces of the chips." Ex. 1007, 17–18 ("More than $10^5$ interconnections per chip form in a vertical direction in these 3D . . . chips.")  Koyanagi's system "dramatically increase[s] wiring connectivity while reducing the number of long interconnections." *Id.* at 17.

Koyanagi's Figure 1a follows:



Figure 1a illustrates a stack of chips including dynamic random access memory (DRAM) chips and a synchronous random access memory (SRAM) chip "stacked on a microprocessor" chip. *See* Ex. 1007, 17.  Koyanagi describes "form[ing] as many vertical interconnections as possible" to "remove the generated heat" and form "electrical wirings." *Id.*  According to one embodiment in Koyanagi, "2D image signals move simultaneously in a vertical direction and are processed in parallel." *Id.* at 18.  Koyanagi also describes a variety of uses:  "Typical examples of these new system LSIs

IPR2020-01020
Patent RE42,035 E

include a merged logic memory (MLM) LSI chip as shown in Figure 1 . . . , and a 3D shared memory for parallel processor systems." *Id.* at 17.

    2.    *Obviousness Analysis, Koyanagi and Alexander, Claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28 and 29*

Claim 1's preamble recites "[a] processor module comprising." Petitioner relies on the combined teachings of Koyanagi and Alexander, with Koyanagi disclosing all elements of the processor module except for a "programmable array." *See* Pet. 30–36. Petitioner provides reasons to combine Koyanagi and Alexander as discussed further below. *See id.* at 25–30.

Claim 1 recites limitation 1.1, "at least a first integrated circuit die element including a programmable array," and limitation 1.2, "at least a second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element." Petitioner contends that it would have been obvious to employ Alexander's FPGA as an integrated circuit layer in Koyanagi's stack of integrated circuit layers (dies). *See* Pet. 17–32. Petitioner provides reasons supported by the record to employ FPGAs in Koyanagi's stack: "Alexander explains that FPGAs are particularly useful because of their flexibility and re-usability; they can be flexibly reconfigured to 'implement arbitrary logic' and thus 'provide designers with a faster and more economical design cycle.'" *Id.* at 26 (quoting Ex. 1006, 1; citing Ex. 1002 ¶ 102).

Petitioner provides the following modified version of Koyanagi's Figure 1 in a side-by-side comparison of the '035 patent's Figure 4:

28

IPR2020-01020
Patent RE42,035 E







Koyanagi's Figure 1a on the left, labeled Figure 1M and annotated by Petitioner, shows a stack of dies with Alexander's FPGA die replacing one of Koyanagi's DRAMs. The '035 patent's Figure 4 on the right as annotated by Petitioner shows a similar configuration. *See* Pet. 31. In addition to the rationale noted above, Petitioner explains that "[a] POSITA would have been motivated to combine the teachings of Koyanagi with those of Alexander in order to create a 3D reconfigurable processor module with improved performance and area-efficiency." *Id.* at 25 (citing Ex. 1002 ¶ 97).

To further support this rationale, Petitioner explains that "Koyanagi Figure 1(a) . . . illustrates a 3D stacked module that integrates a microprocessor die, an SRAM die and multiple DRAM dies." Pet. 25–26 (citing Ex. 1007, 17–18). Petitioner explains that "Koyanagi Figure 2 . . . depicts another 3D module formed by stacking other types of dies not shown in the Figure 1(a) chip, including a processor array and output circuit die." *Id.* at 26 (citing Ex. 1007, 17–18). Petitioner also shows that "Koyanagi discloses a universal 3D-integration scheme that is agnostic to the type and functionality of the stacked dies" (Pet. 26), quoting Koyanagi as follows: "We propose ***various kinds*** of new system on-silicon LSI chips (system LSIs) based on this new 3D-integration technology." *Id.* (emphasis by Petitioner) (quoting Ex. 1007, 17; citing Ex. 1002 ¶ 101).

29

IPR2020-01020
Patent RE42,035 E

As indicated above, Petitioner contends that Alexander "explains that FPGAs are particularly useful because of their flexibility and re-usability; they can be flexibly reconfigured to 'implement arbitrary logic' and thus 'provide designers with a faster and more economical design cycle.'" Pet. 26 (quoting Ex. 1006, 1; citing Ex. 1002 ¶ 102). Citing several examples from the prior art, the testimony of Dr. Shanfield, and admissions in the '035 patent, Petitioner explains that "FPGAs are also commonly used with a microprocessor and memories to form a reconfigurable processor system." *Id.* at 26–27 (citing Ex. 1002 ¶ 103; Ex. 1008, code (57) ("A reconfigurable processor chip has a mixture of reconfigurable arithmetic cells and logic cells for higher effective utilization than a standard FPGA. The reconfigurable process includes a standard microprocessor . . . ."); Ex. 1020, Fig. 1B; Pet. § VI.A).[12]

Based on the above and other evidence, Petitioner explains why a person of ordinary skill in the art would have been motivated to combine the teachings of Alexander and Koyanagi to form a die stack with an FPGA die, including increased data speed, lower power, miniaturization, and other benefits:

> A POSITA would have been motivated to apply Koyanagi's universal 3D integration teachings to vertically stack the components of an FPGA-based reconfigurable computer system. Integrating different components into a 3D stacked

---

[12] Section VI.A of the Petition quotes the '035 patent as follows: "Conventionally, the ability for a reconfigurable processor to alter its hardware [] is typically accomplished through the use of some form of field programmable gate array ('FPGA') . . . ." Pet. 10 (quoting Ex. 1001, 1:28–33). The Petition also relies partly on prior art Figure 1 in the '035 patent, which shows FPGA 14, microprocessor 12, and system memory 16, all connected together on a bus. *See id.*

30

IPR2020-01020
Patent RE42,035 E

> module achieves the well-known benefits of "miniaturization, lower power consumption, and large-scale integration." Ex. 1010, 1712–13; Ex. 1002 ¶ 104. This is particularly important because FPGAs are relatively large devices. Ex. 1001, 1:41–46. In addition, Koyanagi's 3D integration solves a well-known problem, which is that prior art FPGA-based systems experienced significant speed degradation due to the long circuit board wirings that interconnect the components of such a system. Ex. 1006, 1 (the flexibility provided by FPGAs "is achieved at the cost of substantial performance penalty, due primarily to interconnect delay"); Ex. 1002 ¶ 105. By contrast, Koyanagi's 3D integration scheme makes use of "a huge number" (e.g., 100,000) of very short through-silicon contacts ("buried interconnections") to interconnect the stacked dies. Ex. 1007, 17, 19; Ex. 1002 ¶ 106. This high density vertical interconnection scheme—which uses through-silicon contacts that are orders of magnitude more abundant and orders of magnitude shorter than circuit board wirings—"dramatically increase[s] wiring connectivity while reducing the number of long interconnections" and significantly improves system speed. [Ex. 1007,] 17.

Pet. 27–28.

Petitioner explains that both references "depict the use of through-silicon contacts . . . that traverse a die to connect to solder bumps" and "both illustrate vertical stacking of integrated circuit dies and depict solder bumps that are distributed throughout the surface of the dies." *Id.* at 28–29 (annotating Ex. 1006, Figs. 2a, 2b; Ex. 1007, Figs. 1A, 5; quoting Ex. 1006, 1 ("One method to build a 3D FPGA entails stacking together a number of 2D FPGA bare dies [and] vertically interconnect adjacent FPGA layers. . . . Aside from solder bumps to establish the vertical interconnections, each individual die in our 3D paradigm has vias passing through the die itself . . . ."); Ex. 1007, 17 ("By vertically stacking and gluing several LSI wafers together, we have created a new 3D-integration technology [in which] we

IPR2020-01020
Patent RE42,035 E

formed as many vertical interconnections as possible in our LSIs."), 19
(describing "buried interconnections" that pass through the circuit dies to
connect to microbumps on the surface of the dies)).

Claim 1 also recites limitation 1.3, "wherein said first and second
integrated circuit die elements are electrically coupled by a number of
contact points distributed throughout the surfaces of said die elements, and
wherein said contact points traverse said die elements through a thickness
thereof." In addition to the showing outlined above, Petitioner's annotated
version of Koyanagi's Figure 1 depicts the contact points relied upon by
Petitioner:



Koyanagi's Figure 1 above as annotated by Petitioner ("Figure 1M") shows
the number of contact points as set forth in limitation [1.3] "distributed
throughout the surfaces of said die elements" and "travers[ing] said die
elements through a thickness thereof." Pet. 33–34. To further support this
showing, Petitioner quotes Koyanagi: "More than $10^5$ interconnections per
chip form in a vertical direction in these 3D LSI chips [to] dramatically
increase wiring connectivity . . . ." *Id.* at 33 (quoting Ex. 1017, 17).

IPR2020-01020
Patent RE42,035 E

Petitioner relies on similar teachings in Alexander, including Alexander's teaching that "each individual die in our 3D paradigm has vias passing through the die itself, enabling electrical interconnections between the two sides of the die." Pet. 34–35 (quoting Ex. 1006, 1; citing Ex. 1002 ¶¶ 118–119); *see supra* Section III.D.1 (Alexander's Figs. 2a, 2b showing vertical vias and solder bumps). Petitioner provides similar motivation to combine Alexander and Koyanagi as summarized above in connection with limitations 1.1 and 1.2. *See* Pet. 25–30 (§ 7C.1: "**Reasons to Combine Koyanagi and Alexander**").

Patent Owner asserts that it would not have been obvious to combine Koyanagi and Alexander because of "significant technical challenges [such] that a POSITA would not have been motivated to attempt this combination." PO Resp. 24. For example, Patent Owner contends that "a POSITA would understand that figuring out *how* to combine an FPGA, memory, and microprocessor into a 3D integrated circuit would require undue experimentation and could not be simply slapped together, as Petitioner's expert recognized and admitted." *Id.* at 29 (citing Ex. 2014, 81:21–82:19). To support this "slapped together" and "undue experimentation" argument, Patent Owner quotes Petitioner's expert as stating that "*you don't just slap it together without worrying about what connects to what*." *Id.* (emphasis by Patent Owner) (quoting Ex. 2014, 81:21–82:19). To further support its argument that it would not have been "obvious to try stacking Alexander's FPGAs on Koyanagi's 3D multichip module," Patent Owner asserts that "Petitioner's alleged combination of Koyanagi's 3D integration of memory chip layers with Alexander's FPGA would only exacerbate the high operating temperatures caused by logic dies and would render the combined

IPR2020-01020
Patent RE42,035 E

device inoperable." *Id.* at 36 (citing Ex. 1035 ¶ 78). Patent Owner presents

a number of arguments that track the arguments outlined above and relate to

asserted technical challenges based on heat dissipation and an alleged failure

by Petitioner to show "what connects to what" (*id.* at 19). *See* PO Resp. 18–

36.

Dr. Shanfield's deposition testimony relied upon by Patent Owner

does not support Patent Owner's argument about "undue experimentation"

with respect to how to combine the teachings of Koyanagi and Alexander to

arrive at the claimed processor module. In the passage containing the quoted

testimony that Patent Owner relies upon, Dr. Shanfield testifies as follows:

> You have obviously got to have a circuit in mind that
> you're wanting to create a system-level circuit, a module-level
> circuit; and so you're going to need to consider which
> connections you want a TSV connecting to something below.
>
> So you don't just slap it together without worrying about
> what connects to what.
>
> On the other hand, the putting together of the -- in Bertin,
> he describes the putting together of these chips and how that can
> be done in detail. And that piece of it is -- I guess you could
> characterize that as something that comes with the process and
> in itself isn't something you think specifically about every one
> of 50,000 connections. They're all done by the process that he
> gives an example of.

Ex. 2014, 82:4–19.[13]

Dr. Shanfield's testimony indicates that artisans of ordinary skill

readily would have been able to connect different die circuits together

"obviously" with "a circuit in mind . . . to create a system-level circuit, [or] a

module-level circuit . . . consider[ing] which [TSV] connections [she]

---

[13] Bertin (Ex. 1009) is employed in the ground discussed below. *See infra*
§ II.G.

IPR2020-01020
Patent RE42,035 E

want[s]." *See id.* As Petitioner similarly argues, "[n]othing in Dr.
Shanfield's testimony, however, suggests that Petitioner 'slap[ped] together'
Koyanagi and Alexander." Reply 14; Ex. 1030 ¶ 79 (testifying that Patent
Owner quotes his testimony "out of context" and that "at the system or
circuit design level, each TSV is an interconnection between specific
circuits").

As Petitioner also persuasively argues, the Petition "provide[s] a
detailed explanation of ***how*** Koyanagi and Alexander would have been
combined to disclose each limitation of the Challenged Claims and ***why*** a
POSITA would have been motivated to combine them—to create a 3D
reconfigurable processor module with improved performance and
area-efficiency." Reply 15 (citing Pet. 25). Claim 1 recites "said first and
second integrated circuit die elements are electrically coupled by a number
of contact points distributed throughout the surfaces of said die elements."
Petitioner's annotated Figure 1M and its other contentions show how to
electrically couple circuits of the dies together using through-vias with as
much detail as challenged claim 1 requires. *See, e.g., supra* Figure 1M.
Petitioner also provides sufficient detail with respect to all of the challenged
claims at issue in this section (i.e., claims 1, 3, 5–9, 11, 13–17, 19-22, 25,
26, 28 and 29). *See* Pet. 25–55.

In addition, the '035 patent provides the same level of detail with
respect to stacking chips using conductive vias as Koyanagi, Alexander, and
the combined teachings of the references as set forth by the Petition. *See*
Pet. 31 (*comparing* "Koyanagi Figure 1M," *with* "'035 Patent Figure 4");
Ex. 1001, Fig 4 (illustrating a die package comprising an FPGA die, memory
die, and processor die, with generic "CONTACT POINTS" on each die).

IPR2020-01020
Patent RE42,035 E

The '035 patent does not portray or particularly describe connections between microprocessor die 64 and the other dies (memory die 66 and FPGA die 68) other than to show generic contacts in Figure 4. This lack of description suggests an artisan of ordinary skill readily knew how to connect FPGA and memory to a microprocessor.

Patent Owner contends that the "inventive SDH processor arranges die-area contacts, such as through-silicon vias ('TSVs'), into a wide configuration data port that not only increases the number and decreases the length of available connections between the SDH [stacked-die hybrid] dies, but also reprograms the programmable array within a single clock cycle." PO Resp. 1–2. But the wide configuration data port as described with respect to Figure 5 does not pertain to the microprocessor die or to any claim limitation.[14] Also, even if somehow the challenged claims require a wide

---

[14] Figure 5 of the '035 patent illustrates a wide configuration data port "functional block diagram" embodiment described as applicable to the more generic Figure 4 embodiment, which (without Figure 5) is "a representative embodiment of the present invention." *See* Ex. 1001, 4:6–11, 5:29–34. Figure 5's block diagram implements a "total reconfigur[ation] in one clock cycle by updating all of the configuration cells in parallel." Ex. 1001, 3:29–32. But Figure 5 only generally indicates connections between memory die 66 buffer cells 88 and FPGA die 68 logic cells 84. Figure 5 does not show any connections to processor die 64. *See* Ex. 1001, Fig. 5, 4:42–61; Ex. 1035, 157:3–17, 158:10–12 (agreeing that "memory die 66" is "to the left of the very wide configuration data port 82 in Figure 5, although not shown" and the "connections" shown in Figure 5 "are formed by the TSVs that are between the memory die [not shown in Figure 5] and the FPGA die" "to the right of Figure 5"). Also, as Petitioner argues, the challenged claims do not require reconfiguration in one clock cycle. Reply 16. Rather, claim 1 requires a "programmable array" without specifying how to program the array. Claim 15 recites that the "programmable array [be] reconfigurable as a processing element," but also does not require reconfiguration in one clock cycle. The '035 patent also describes "an added benefit" relevant to Figure

36

IPR2020-01020
Patent RE42,035 E

data port, that the "very wide configuration data port" 84 in Figure 5 is merely a box without any description in the '035 patent specification further evidences that the inventors of the '035 patent considered its structure and function to be well-known. *See* Ex. 1035, 163:14–17 (testifying that "'[c]onfiguration data port' . . . is a well-known term" and agreeing that "that's just a data port used for configuration, basically").

As Petitioner explains, the "fundamental 3D interconnection technology—which is agnostic to the dies it connects . . . already existed, as amply disclosed in Koyanagi, and provides the motivation to combine with Alexander." Reply 13. In other words, as the Petition shows, Alexander teaches that reconfiguration of FPGAs was well known, and the record shows that it also was well known and admitted in the prior art that FPGAs were employed with microprocessors and memory. *See* Pet. 26–27 (citing Ex. 1006, 1; Ex. 1002 ¶¶ 102–103; Ex. 1008; Ex. 1020, Fig. 1B); *see also* Pet. 22–23 (discussing "APA Figure 1"); Pet. 3–4 (discussing FPGA reconfiguration as well-known).

Petitioner shows that rerouting well-known electrical coupling between FPGAs, memory, and processors using the stacking techniques and through-vias of Koyanagi and Alexander would have been obvious. *See, e.g.*, Pet. 26 ("FPGAs are also commonly used with a microprocessor and memories to form a reconfigurable processor system." (citing Ex. 1008, code (57); Ex. 1002 ¶ 103; Ex. 1020, Fig. 1B)), 31 (noting that "Figure 4 of the

---

4 "[i]n addition to . . . benefits" of reconfiguration in one clock cycle relevant to Figure 5: "Because the various die 64, 66 and 68 (FIG. 4) have very short electrical paths between them. The signal levels can be reduced while at the same time the interconnect clock speeds can be increased." *Id.* at 4:64–66.

IPR2020-01020
Patent RE42,035 E

'035 Patent . . . is the only illustration of a stacked processor module in the '035 Patent" and relying on "Koyanagi Figure 1M" to illustrate vertical coupling as similar to Figure 4 of the '035 patent); Reply 18 (arguing that "the ['035] patent simply asserts that stacking dies reduces power consumption, which was a well-known fact in the art." (citing Ex. 1001, 4:62–67; Ex. 1002 ¶ 41; Ex. 1010, 1712–13)); Pet. 4 (arguing "that stacking dies to form 3D modules were well-known prior to the alleged invention of the '035 patent" and citing known advantages of such modules, including "high packing density," "high speed," "parallel signal processing," and "integration of many functions on a single chip") (quoting Ex. 1010, 1704; citing Ex. 1002 ¶ 41).[15]

As Petitioner also argues, Patent Owner neither disputes that "Alexander teaches stacking FPGA dies" nor that "Koyanagi teaches stacking different types of bare dies using TSVs to form 3D multi-chip modules."  Reply 14 (citing Resp. 5–6; Ex. 1035, 55:17–20; 310:15–311:14; 314:2–5).  At the cited deposition pages, Petitioner quotes Dr. Chakrabarty as admitting that "Koyanagi teaches '3D integration of different types of dies using TSV technology' (*id.* (quoting Ex. 1035, 55:17–20)), and that "Koyanagi has been recognized [as one of] the earliest papers that demonstrated the reliability of 3D stacking through silicon vias" (*id.* (quoting Ex. 1035, 55:17–20)).

---

[15] The cited pages of Akasaka (Ex. 1010) further supports Petitioner's showing based on re-routing of known prior art circuitry by stating that "[t]he first step in 3-D system design . . . begin[s] with the integration of conventional functions already realized in 2-D devices," which results in "miniaturization, low power consumption, and large-scale integration."  Ex. 1010, 1712–13.

38

IPR2020-01020
Patent RE42,035 E

Petitioner explains that Dr. Chakrabarty also "admits that a 'logic chip' as disclosed in Koyanagi (Ex. 1007, 17) may be an FPGA." Reply 15 (citing Ex. 1035, 129:2–7 (admitting that logic includes an FPGA), 86:20–87:10 ("logic chip" includes an FPGA), 220:20–24 (same); Ex. 1030 ¶¶ 17–18). Petitioner further contends that "Koyanagi explains that the use of TSVs allows forming a very large number (in the order of 100,000) of short vertical interconnects, which 'dramatically increase[s] wiring connectivity while reducing the number of long interconnections.'" *Id.* at 14–15 (quoting Ex. 1007, 17; citing Pet. 27–28; Ex. 1035, 254:18–21 (admitting that Koyanagi teaches "hundreds of thousands of TSVs"), 247:3–9 (same); Ex. 1030 ¶¶ 17–18)). As noted above, in addition to saving area, reducing power consumption, and generally improving performance by stacking dies with TSVs (*id.* at 30), Petitioner explains that the "high density vertical interconnection scheme—which uses through-silicon contacts that are orders of magnitude more abundant *and* orders of magnitude shorter than circuit board wirings—'dramatically increase[s] wiring connectivity while reducing the number of long interconnections" and significantly improves system speed.'" Pet. 27–28 (quoting Ex. 1007, 17).

In other words, as Petitioner persuasively shows, the prior art of record, including Koyanagi, provides reasons for stacking different types of integrated circuit dies together, including logic chips, with conductive vias to electrically couple the integrated circuits on the different layers of the dies. The record shows that logic chips include FPGAs, thereby suggesting that Koyanagi in combination with Alexander how to form the processor module of claim 1 with a reasonable expectation of success and without undue experimentation.

Patent Owner argues that "Petitioner's facile attempt to assert that *Koyanagi* discloses a 'logic chip' that ***could*** be a programmable array (*see* Reply at 14–15) fails as a disclosure of a genus is not a disclosure of a species." Sur-reply 3. This argument mischaracterizes Petitioner's showing as one of anticipation and does not address Petitioner's obvious showing based on the combined teachings of Koyanagi and Alexander. Pet. 25–36.

Patent Owner also asserts that "***buffer*** cells in the memory of the wide configuration data port 'enables the FPGA . . . to be totally reconfigured in one clock cycle.'" PO Resp. 24. Therefore, according to Patent Owner, "Petitioner has not demonstrated that any of these details were known in the art or would have been obvious to a POSITA at the time of the invention." *Id.* However, as Petitioner persuasively argues and as noted above, "an improved/shortened reconfiguration time is not claimed in any challenged claim of the '035 patent." Reply 16; *see also supra* note 14 (discussing buffer cells of Figure 5).

In Patent Owner's Sur-reply, Patent Owner argues that Koyanagi relies on CAD tools, and that Dr. Shanfield relies on this disclosure for "***providing*** evidence of a reasonable expectation of success," but "Dr. Shanfield cannot and does not establish that the use of CAD tools when attempting to combine Koyanagi and Alexander would result in the claimed invention." Sur-reply 4 (citing Ex. 2017, 20:3–6, 23:22–25:7; Ex. 1007, 17). Based on these assertions, Patent Owner contends that "Dr. Shanfield does not demonstrate that any CAD tools would have resulted in 'a memory array functional to accelerate external memory references to the processing element' as opposed to any other possible interconnection scheme." *Id.* at 4.

Contrary to these Sur-reply arguments, none of the challenged claims recite "a memory array functional to accelerate external memory references to the processing element." And in any case, Dr. Shanfield's testimony, Koyanagi, and Alexander all show that artisans of ordinary skill would have been able to use routine tools available at the time of the invention, such as CAD tools, and motivated to use them as an aid to establish the desired connections between circuits. *See* Ex. 1007, 17 ("A powerful CAD tool proves indispensable for 3D LSI design, specifically for 3D wiring routing because combining 2D multilevel metallization with vertical interconnections forms this complicated 3D wiring."); Ex. 2017, 20:3–6 (agreeing that it is "a fair understanding that an engineer, when designing 3D architecture, would use some sort of CAD tool in designing the circuitry"), 24:6–21 (testifying that "CAD tools are always used for routing in the design and manufacture of integrated circuits," and "the engineering connected with CAD has been resolved in [Alexander's] description for his particular approach, and he's just simply explaining to the person skilled in the art reading this that this is how he did it, and this is what worked well for him" (discussing "Section 6 of Alexander")). In Section 6, Alexander describes the CAD-based "framework" as "enable[ing] the use of a wide variety of graph-search algorithms to construct routing solutions, and works quite well in practice." Ex. 1006, 4 (citing several documents for "3D FPGA routing"). In other words, the record shows that an artisan of ordinary skill would have readily been able and motivated to use routine tools to route connections vertically in stacked chips. Moreover, the '035 patent does not mention using CAD tools, indicating either that such tools

IPR2020-01020
Patent RE42,035 E

were not needed for the invention or that they were so well-known that
mentioning them was not important for purposes of describing the invention.

Patent Owner also argues that "[b]ecause of the power consumption
by FPGAs, and other logic dies, and the resulting thermal issues, a POSITA
would not have found it obvious to stack logic a programmable array [sic],
such as an FPGA, with other die, let alone . . . microprocessor chips on top
of one another." PO Resp. 34 (citing Ex. 2015 ¶ 76). As Petitioner argues,
however, Patent Owner presents "no evidence that an FPGA consumes any
more power than other logic chips, such as microprocessors, to support PO's
allegation that there are unique power consumption and thermal issues that
'plagued' FPGAs." Reply 16 (citing Ex. 1035, 116:11–117:5). As noted
above, Dr. Chakrabarty admits that Koyanagi discloses a logic chip and an
FPGA is a logic chip. Reply 15 (citing Ex. 1007, 17; Ex. 1035, 129:2–7,
86:20–87:10, 220:20–24; Ex. 1030 ¶¶ 17–18). Patent Owner appears to
agree that FPGAs and other logic chips consume the same (or similar)
amount(s) of power. *See* PO Resp. 34 ("Because of the power consumption
by FPGAs, *and other logic dies*, and the resulting thermal issues . . . ."
(emphasis added)); Reply 16 (citing Ex. 1035, 116:11–117:5 (Dr.
Chakrabarty testifying that he did not analyze or cite articles comparing
power consumption of microprocessors, programmable arrays, and
FPGAs)).

The thrust of Patent Owner's arguments about thermal issues rests on
the undisputed principle that increasing power consumption increases heat
generation. *See* PO Resp. 34; Reply 16–17. For example, Patent Owner
explains that "serious thermal issues" arise because "the power consumption
by logic dies, such as FPGAs and microprocessors, increase the operating

42

Appx42

temperatures." PO Resp. 36. However, as Petitioner argues and as Dr.
Chakrabarty confirms, using many short vertical conductive vias versus long
conductive runs "reduces power consumption and improves heat removal."
*See* Reply 17. For example, as Petitioner points out, Dr. Chakrabarty
acknowledges that

> [w]hat Koyanagi says *is actually obvious* to anybody who is
> skilled in the art. *Anybody who is skilled in the art would know
> that via is conductive. It is a conductor for both electricity and
> for heat.* And therefore, *if you have lots of vias, you're going to
> take out the heat.*

Ex. 1035, 256:9–15 (emphasis added); *see* Reply 17 (quoting Ex. 1035,
256:6–15). Therefore, as Petitioner persuasively argues, "[r]ather than
thermal issues deterring a POSITA from combining Koyanagi and
Alexander, Koyanagi's solution to heat dissipation provides further
motivation to combine them with an expectation that the combination would
be successful." Reply 17–18 (citing Ex. 1030 ¶ 53).

Furthermore, as Petitioner also argues, not only do Koyanagi and
Alexander individually or collectively solve heat problems in stacked dies
with a "high density vertical interconnection scheme" using high numbers of
conductive vias with "orders of magnitude shorter than circuit board
wirings," the combined system "significantly improves system speed" by
decreasing the interconnect delay. *See* Pet. 27–28 (citing Ex. 1002 ¶¶ 105–
106; Ex. 1007, 17, 19; Ex. 1006, 1). This resulting speed increase provides
further motivation for the combination as proposed by Petitioner.

Patent Owner also argues that "FPGAs, and other logic dies, perform
computational operations that result in extensive switching activities that
consume a significant amount of dynamic power." PO Resp. 34 (citing Ex.
2015 ¶ 75). To support this argument, Patent Owner states that "*Alexander*[]

43

notes that a large portion of the power consumption is due to driving I/O buffers." PO Resp. 34 (citing Ex. 1006, 4). Patent Owner adds that the "FPGA use of I/O pins impact[s] the total power requirements since 'considerations like I/O standards used and data rates expected determine how fast the I/Os toggle and how fast the logic must be clocked.'" *Id.* (quoting Ex. 2012, 1; citing Ex. 2015 ¶ 75).

This line of argument fails because as noted above, Koyanagi discloses stacking "other logic dies" (e.g., a microprocessor) with memory, as Dr. Chakrabarty concedes. *See* Reply 15 (citing Ex. 1007, 17; Ex. 1035, 129:2–7, 86:20–87:10 220:20–24; Ex. 1030, ¶¶ 17–18). Also, as Petitioner persuasively argues, "Alexander teaches stacking FPGA dies" (i.e., stacking several logic dies). *Id.* at 14. No dispute exists over the fact that using a sufficient number of TSVs solves any heat problems in stacked dies that include one or more logic dies. *See* Reply 17 (arguing that Koyanagi "solv[es] any heat problem by forming 'as many vertical interconnections as possible' because they 'remove the generated heat'" and that "Dr. Chakrabarty admitted this") (quoting Ex. 1007, 17; citing Ex. 1035, 290:4–7, 256:6–15, 291:16–292:13)). In addition to Koyanagi's solution, Petitioner persuasively notes that "Alexander points out that 3D integration 'using MCM technology' advantageously eliminates input and output buffers where 'a large portion of the total power is expended,' and thus 3D stacking of FPGAs 'tends to significantly reduce power consumption.'" Reply 18 (quoting Ex. 1006, 4).[16] In other words, contrary to Patent Owner's arguments, part of Alexander's chip stacking solution involves using heat

---

[16] An "MCM" is a "multi-chip module." Ex. 1004, 1.

IPR2020-01020
Patent RE42,035 E

conducting vias with the option of eliminating I/O buffers and any heat generating switching associated therewith. *See* Ex. 1006, 4 ("[W]hen chips are interconnected using MCM technology, such I/O buffers are often unnecessary, which tends to significantly reduce the power consumption."). Also, the challenged claims here do not require I/O buffers (or clocking, driving, or switching thereof).

Based on the foregoing discussion, Petitioner persuasively shows that the combination of Koyanagi and Alexander would have rendered claim 1 obvious. Relying partly on its showing with respect to claim 1, Petitioner provides a similar and persuasive showing for independent claims 9, 17, and 25, which largely track the limitations recited in claim 1. *See* Pet. 31–35, 40–44, 47–49, 50–55.

For example, independent claim 25 also recites the limitation "whereby said processor and said programmable array are operational to share data thcrebctween." Similar to its showing with respect to independent claim 1, the Petition relies on "Koyanagi Figure 1M" that shows Alexander's FPGA die in Koyanagi's die stack electrically coupled with DRAM memory and a microprocessor. Pet. 53. The Petition persuasively relies on its motivation with respect to claim 1 and also provides evidence that "FPGAs are commonly configured as hardware accelerators to offload computationally-intensive operations from microprocessors; thus they share data with the microprocessors, for example through shared memory." *Id.* (citing Ex. 1002 ¶ 152; Ex. 1008, 4:32–60 (describing various ways a processor and FPGA of a reconfigurable chip share data, including via registers that are "read or written by either the processor or the FPGA logic"); Ex. 1017, 5:59–67. Patent Owner does not

IPR2020-01020
Patent RE42,035 E

address claim 25 individually.  Based on the record, Petitioner persuasively shows that the combination of Koyanagi and Alexander would have rendered claim 25 obvious.

Claims 8 depends from claim 1 and recites "wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements."  Dependent claims 16 and 22, which depend from claims 9 and 17 respectively, recite materially the same limitation.  Pet. 47, 50 (relying on the showing for claim 8).  Petitioner refers to its showing with respect to claim 1 and further relies on Koyanagi's teaching that the "[f]ormation of buried interconnections, metal microbumps, *wafer thinning*, . . . are key technologies for achieving 3D LSI."  Pet. 39 (emphasis by Petitioner) (quoting Ex. 1007, 19).  Petitioner also relies on Koyanagi's teaching that "each die is thinned 'from [its original] thickness of 270 μm to [a thickness of] 70 μm,' after which 'silicon trench[es] (at a depth of 70 μm-deep)' are created in the thinned die and then 'filled with low resistive polysilicon or CVD tungsten to form the buried interconnection[s] [red].'" *Id.* (quoting Ex. 1007, 19–20).  Patent Owner does not address claims 8, 16, and 22 individually.  Based on the record, Petitioner persuasively shows that the combination of Koyanagi and Alexander would have rendered claims 8, 16, and 22 obvious.

Dependent claims 3, 5–7, 11, 13–15, 19–21, 26, 28 and 29 recite limitations including "a microprocessor," "at least a third integrated circuit die element stacked with and electrically coupled to at least one of said first or second integrated circuit die elements,"  "a memory," "wherein said programmable array is reconfigurable as a processing element," "said die elements are thinned," "whereby said processor and said programmable

IPR2020-01020
Patent RE42,035 E

array are operational to share data," "wherein said memory is operational to at least temporarily store . . . data," and a "memory array."  The Petition shows that Koyanagi discloses these limitations or the recitations of these well-known circuit elements amount to combining "familiar elements according to known methods . . . [to] yield predictable results."  *See KSR*, 550 U.S. at 416; Pet. 36–40, 44–47, 49–50, 54.  Patent Owner does not address these dependent claims separately from claim 1.  *See* PO Resp. 28–36.

Accordingly, based on the record and as summarized above, including arguments and cited evidence in Patent Owner's Response and Sur-reply, Petitioner establishes by a preponderance of evidence that claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29 would have been obvious.

G.   *Obviousness, Bertin and Cooke, Claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29*

Petitioner contends that claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29 would have been obvious over the combination of Bertin and Cooke.  *See* Pet. 55–79.  Similar to Koyanagi, Bertin teaches stacking different types of chips, including logic chips, microprocessors, and controllers to minimize latency and maximize bandwidth and heat dissipation, using through-chip conductors.  *See* Pet. 15–16 (summarizing Bertin), 55–62 (citing Ex. 1009, 1:20–27, 2:61–65, 4:57–60, 6:49–51, 7:16–34, Figs. 18, 22; Ex. 1002 ¶¶ 166–172).

Petitioner's "Annotated Figure 22A," which represents how Petitioner combines relevant teachings of Bertin and Cooke (Pet. 61), follows:

IPR2020-01020
Patent RE42,035 E



**Bertin in view of Cooke**
**Figure 22A**

Annotated Figure 22A above represents how Petitioner employs Cooke's FPGA in place of logic chip 140 in Bertin's stack of chips, which includes Bertin's first (140) and second (146) chips, memory chips (144, 142), microprocessor chips (146, 148), logic chip (140), and contact portions (red) extending through the various chips, including the claimed first and second integrated circuit dies (chips). *See* Pet. 61; Ex. 1009, 7:16–34, Fig. 22.

In other words, Bertin does not disclose an FPGA but discloses "logic chip" or "microprocessor" 140 in the middle or bottom of a "stack of chips" connected together with "high speed chip-to-chip connections through the silicon," as portrayed in Figures 21 and 22. Ex. 1009, 7:16–42 ("FIGS. 21 and 22 illustrate the ability to stack similar chips while providing high speed chip-to-chip connections through the silicon."). Petitioner relies on Bertin's teaching of generally "stack[ing] similar chips" (*id.*) and Cooke's description of FPGAs, microprocessors, and memory planes in a similar stack of circuits. *See* Pet. 48 (citing Ex. 1008, 2:3–11, 2:40–55, 3:13–18, Figs. 1, 2, 8A; Ex. 1002 ¶¶ 162–163). Petitioner contends that it would have been obvious to use Cooke's FPGAs in Bertin's 3D stacks to improve

IPR2020-01020
Patent RE42,035 E

performance, area-efficiency, packing densities, and speed by avoiding interconnect delays.  *See* Pet. 56–58 (citing Ex. 1001, 1:36–2:9; Ex. 1006, 1; Ex. 1009, 2:61–65; Ex. 1002 ¶¶ 160–163).  Petitioner also reads the limitations of challenged claims 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29 on the combined teachings of Bertin and Cooke, providing a detailed showing, supported by the references and expert testimony.  *See id.* at 62–79.

Patent Owner challenges Petitioner's showing.  PO Resp. 37–44. Patent Owner advances similar arguments to those addressed above with respect to the combined teachings of Koyanagi and Alexander.  For example, Patent Owner argues that "[a] POSITA would understand that figuring out *how* to combine an FPGA, memory, and microprocessor into a 3D integrated circuit would require undue experimentation."  PO Resp. 38. To support this "undue experimentation"/"how to combine" argument (*see id.*), Patent Owner relies on the same testimony by Dr. Shanfield addressed above (§ II.F.2) that "you don't just slap [chips] together without worrying about what connects to what."  PO Resp. 39 (quoting Ex. 2014, 81:21–82:19).  Contrary to this argument, however, Dr. Shanfield's testimony does not support Patent Owner for reasons similar to those explained above—i.e., Petitioner and Dr. Shanfield do not propose simply "slap[ping] together" the combined teachings of Bertin and Cooke without considering how to electrically couple the FPGA and "integrated circuit" as claimed and disclosed in the prior art.  *See* Pet. 55–62; Ex. 1030 ¶¶ 72–73; Ex. 1002 ¶¶ 158–165.  In other words, Petitioner provides a detailed mapping showing how to combine the references with factual underpinnings and rationale supported by the record, as summarized above.  *See* Pet. 55–62; Ex. 1030

49

IPR2020-01020
Patent RE42,035 E

¶¶ 72–73; Ex. 1002 ¶¶ 158–165.

The record shows that experimentation would not have been undue in Petitioner's reading of the broad challenged claims onto the specific teachings of the combined references. Patent Owner argues that "Petitioner simply suggests—without any sufficient explanation as to how the references would be combined—that Bertin's through chip connectors would somehow be combined with Cooke's FPGA to achieve the claimed invention." PO Resp. 39–40. Contrary to this argument, as similarly explained above in connection with Koyanagi and Alexander, claim 1 does not require, and the '035 patent does not describe, any more level of granularity regarding the "through chip connectors" in "the claimed invention" than Petitioner provides as summarized above, including by virtue of "Annotated Figure 22A." Also, as the thrust of Dr. Shanfield's testimony and the record shows, an artisan of ordinary skill readily would have been able to couple FPGA, memory, and microprocessor circuits together using vias. *See* Ex. 2014, 81:21–82:19 (testifying that "[y]ou have obviously got to have a circuit in mind that you're wanting to create a system-level circuit, a module-level circuit; and so you're going to need to consider which connections you want a TSV connecting to something below"); Ex. 1030 ¶ 79 (testifying that "at the system or circuit design level, each TSV is an interconnection between specific circuits").

Similar to block diagram forms for connecting circuits together as shown in Cooke, Bertin, and the '035 patent's Figure 4, the long prior art connections similarly represented in block diagram form in prior art Figure 1 of the '035 patent all imply that an artisan of ordinary skill in the art readily would have been able to couple the claimed circuits together based on

50

IPR2020-01020
Patent RE42,035 E

teachings in Bertin and Cooke without undue experimentation in the relatively predictable integrated circuits arts according to the breadth of the claims. *See* Pet. 55–62 (relying on the combined teachings of Bertin and Cooke); Ex. 1001, Fig. 1, Fig. 4; Pet. 10–11 (discussing admitted prior art Figure 1 of the '035 patent as showing a "simplified functional block diagram of a portion of a ***prior art*** reconfigurable computer system 10" (quoting Ex. 1001, 3:38–51)); Ex. 1008, code (57) (describing coupling between reconfigurable FPGA, microprocessor, and memory), Fig. 2 (showing "MEMORY PLANES" stacked over an "FPGA PLANE," Fig 8A (showing a "CONFIGURATION VERTICAL STACK"); Ex. 1009, Fig. 21 (showing chip stack similar to Figure 4 of the '035 patent), Fig. 22 (similar). Similar to the admitted prior art known FPGA, microprocessor and memory circuits, Petitioner persuasively relies on Cooke's teachings of connecting FPGAs to microprocessors and memory. *See* Pet. 56–57 (citing Ex. 1002 ¶ 162; Ex. 1008, 2:3–11, 3:3–13, 2:40–55, Figs. 1, 2, 8A).

Patent Owner also argues that "while Cooke suggests connecting vertically stacked memory to a 2D chip comprising a microprocessor and FPGA, Cooke does not disclose either stacking the vertical memory stack above the FPGA or using die-area interconnects in such an arrangement." PO Resp. 41 (citing Ex. 2014, 74:17–75:6 (contending that Dr. Shanfield "admit[s] that FIG. 2 [of Cooke] is merely a schematic relationship that does not show how the elements are physically configured")). Patent Owner also argues that the claims require "cache memory." *Id.* at 40.

This line of argument does not relate to a claim limitation in a clear fashion. None of the challenged claims require a "cache memory" or "stacking the vertical memory stack *above* the FPGA or using die-area

interconnects *in such an arrangement*." *See* PO Resp. 41 (emphasis added). Moreover, this argument supports Petitioner by showing further that connecting an FPGA to a microprocessor in a memory stack was well-known. In other words, Patent Owner admits that "Cooke suggests connecting vertically stacked memory to a 2D chip comprising a microprocessor and FPGA." PO Resp. 41 (emphasis omitted). To the extent Patent Owner's argument points to Cooke's microprocessor and FPGA as existing on the same plane, this argument attacks Cooke individually rather than addressing the asserted combination. Also, the challenged claims do not preclude stacking Cooke's FPGA and microprocessor plane as a die within Bertin's microprocessor and memory stack, and it does not preclude connecting multiple processors together. *See* Pet. 57–58 (addressing claim 1, employing "Annotated Figure 22A").

Patent Owner's Sur-reply tracks similar arguments in its Response. For example, Patent Owner argues that "*Cooke's* memory planes are located on a single chip along with the processor and reconfigurable FPGA, not on a stacked memory die." Sur-reply 8. Patent Owner also argues that in Cooke, "many different types of interfaces are used to interface between the embedded processor and the reconfigurable portions of the single chip." *Id.* (citing Ex. 1006, 1:67–2:11). Patent Owner contends this "background" shows that Petitioner "does not adequately explain how or why the references would have been combined to arrive at the claimed invention." *See id.* at 9. But this background further shows that artisans of ordinary skill readily knew how to electrically couple the well-known FPGA, microprocessor, and memory circuits together. Also, the challenged claims do not preclude other forms of connections in addition to vias.

IPR2020-01020
Patent RE42,035 E

Petitioner also notes that "in the parallel [D]istrict [C]ourt litigation, Dr. Chakrabarty opined that all the components of Cooke's reconfigurable system are stacked dies." Reply 23 (citing Ex. 1034, 139:4–141:3; *see also* Ex. 1035, 190:10–17, 191:10–17; Ex. 1030 ¶ 75). The record supports Petitioner. For example, Petitioner quotes Dr. Chakrabarty at paragraph 89 of his District Court expert report, which states as follows: "Cooke is directed to a re-configurable processor chip having interconnections around the periphery of the stack die elements." Ex. 1034, 139:17–19. Dr. Chakrabarty also describes Cooke's Figure 2 and states "here is the FPGA plane and memory planes and we are trying to configure the FPGA from the memory planes and *we need a vertical connectivity*." *Id.* at 140:16–19 (emphasis added). A vertical connectivity suggests a stack of circuits. *See* Ex. 1030 ¶ 75 (noting that Dr. Chakrabarty testified that "it seems to be the case" that his "view [] in the Eastern District of Texas case [is] that Cooke teaches a stacked die reconfigurable system but that the interface for configuring is on the periphery of the dies") (quoting Ex. 1035, 191:10–17; citing Ex. 1035, 190:12–21; Ex. 1034, 139:4–141:3). Therefore, even if Cooke discloses a single die with memory, an FPGA, and a microprocessor using "different types of interfaces with the embedded processor," Cooke at least discloses stacks of circuits connected together, including memory planes, a microprocessor and an FGPA plane, thereby suggesting the coupling of an FPGA in Bertin's stack. *See* Ex. 1008, 2:16–18, 6:47–48, Fig. 2 (showing "MEMORY PLANES" stacked over an "FPGA PLANE," Fig 8A (showing a "CONFIGURATION VERTICAL STACK").

As further motivation, Petitioner explains that "Bertin's 3D integration solved well-known problems of prior art FPGA-based computer

IPR2020-01020
Patent RE42,035 E

systems, such as significant speed degradation due to long circuit-board wirings, and long reconfiguration times due to memory bus bandwidth constraint." *See* Reply 23 (citing Pet., 16, 55–56). Also, "Bertin's 3D integration scheme made use of a large number of very short TSVs to interconnect stacked dies, significantly improving system speed and reconfiguration time." *Id.* at 23. In other words, connecting the FPGA using the TSVs instead of Cooke's peripheral connections would have been obvious in view of Bertin to improve speed and increase bandwidth as Petitioner shows. Dr. Chakrabarty's testimony supports Petitioner's showing. *See, e.g.*, Ex. 1034, 140:16–19 (describing Cooke's Figure 2 and stating "here is the FPGA plane and memory planes and we are trying to configure the FPGA from the memory planes and *we need a vertical connectivity*" (emphasis added)). In another instance, Dr. Chakrabarty testifies that an artisan of ordinary skill would not have been motivated to use Cooke's circuitry "in just one corner" and further shows that acceleration occurs by use of many vias:

> The problem is not only about -- not only that your vertical -- you cannot have many vertical vias in just one corner.
> The problem also is the impact on timing because *you will get almost no acceleration because your signal would have to be routed first on the horizontal layer and then it will have to be sent along the vertical layer, the periphery*, to the next layer, and then it has to be routed once again on the other tier horizontally.
> So there is really no motivation. So anybody who understands this technology or is trying to get the advantage of this will not be motivated to implement it like this.

Ex. 1035, 195:9–22 (emphasis added). This testimony further supports Petitioner's showing of the obviousness of coupling Cooke's FPGA circuitry in Bertin's stack using vias throughout the dies to electrically couple the

54

IPR2020-01020
Patent RE42,035 E

FPGA, memory, and microprocessor circuits on different dies to facilitate greater speed between those circuits.

Patent Owner also argues that "a POSITA would not have found the '035 Patent's claimed invention—stacking a *thinned* microprocessor die element, a memory die element, and a FPGA . . . obvious to try with a reasonable expectation of success because of the known thermal issues, which a POSITA would ***not*** have ignored." PO Resp. 43–44 (first emphasis added). Contrary to this argument, none of the challenged claims, except claim 8, require "a thinned microprocessor die element," as addressed further below.

Moreover, Patent Owner correctly points out that a person of ordinary skill "would ***not*** have ignored" "known thermal issues." *Id.* This argument supports Petitioner's showing, because it implies that an artisan of ordinary skill would have addressed known thermal issues and "would have expected the combination of Bertin and Cooke to be successful." Reply 25 (citing Ex. 1002 ¶16). The record shows that such an artisan would have had a reasonable expectation of success based on known via teachings as solving heat problems as admitted by Dr. Chakrabarty. *See id.* at 25–26 (citing Ex. 1035, 247:10–15 (agreeing that "Bertin pays a lot of attention to the thermal issues" and Bertin uses TSVs "as heat pipes")); Ex. 1035, 247:1–248:17 (similar testimony).

As indicated above, claim 8 recites "[t]he processor module of claim 1 wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements." Petitioner contends that "[a] POSITA would have understood that the process of forming through-chip conductors [in Bertin] requires the die elements to be sufficiently thin." Pet.

55

IPR2020-01020
Patent RE42,035 E

66 (citing Ex. 1002 ¶ 180; Ex. 1007). The "are thinned" language in the processor module of claim 8 is a product-by-process step and does not require a disclosure of a process step of thinning, provided the die structure of Bertin is thin enough such that "said contact points traverse said thickness of said die elements." The record shows that Bertin's contacts "traverse said thickness of said die elements." *See* Pet. 65–66 (reproducing Figures 21 And 22 of Bertin); citing Ex. 1002 ¶¶ 179–180); Ex. 1006, Fig. 21, Fig. 22; PO Resp. 43–44.

Dependent claims 16 and 22 recite materially the same limitation and depend from claims 9 and 71, respectively. *See* Pet. 70–71, 74 (relying on the showing for claim 8). Accordingly, Petitioner shows persuasively that claims 8, 16, and 22 would have been obvious over the combined teachings of Bertin and Cooke.

Further regarding the known thermal issues, Patent Owner relies on its arguments with respect to Koyanagi and Alexander, and contends that "a POSITA would understand that Petitioner's alleged combination of Bertin with Cooke's FPGA would only exacerbate the high operating temperatures caused by logic dies and would render the combined device inoperable." PO Resp. 44. According to Patent Owner, "the power consumption by logic dies, such as FPGAs and microprocessors, increase the operating temperatures." *Id.*

This line of argument ignores that Patent Owner agrees that Bertin teaches a "broad invocation of logic chips" (PO Resp. 42), and also agrees that "*Cooke* suggests connecting vertically stacked *memory* to a 2D chip comprising a microprocessor and FPGA" (*id.* at 41). For the reasons discussed above, these patents carry a presumption of enablement. *See*

56

IPR2020-01020
Patent RE42,035 E

*Antor Media*, 689 F.3d at 1287–1288; *Amgen*, 314 F.3d at 1355.  Regarding operability, Petitioner cites Dr. Chakrabarty's admission that "Bertin pays a lot of attention to the thermal issues" and Bertin uses TSVs "as heat pipes." *See* Reply 25 (citing Ex. 1035, 247:10–15, 246:14–247:2).  Accordingly, Petitioner persuasively shows that the combined teachings of Bertin and Cooke "include the heat dissipation features of Bertin such that a POSITA would have expected the combination of Bertin and Cooke to be successful." *Id.* (citing Ex. 1002 ¶ 165).

Patent Owner also argues that Petitioner's assertion that "*Bertin's* 'logic chip' *could* be a programmable array fails," because "disclosure of a genus is not a disclosure of a species."  Sur-reply 9.  This argument mischaracterizes Petitioner's showing as one of anticipation and does not address Petitioner's obvious showing based on the combined teachings of Bertin and Cooke.  *See* Pet. 55–69.

Based on the foregoing discussion, Petitioner persuasively shows that the combination of Bertin and Cooke would have rendered claim 1 obvious. Relying partly on its showing with respect to claim 1, Petitioner provides a similar and persuasive showing for independent claims 9, 17, and 25, which largely track the limitations recited in claim 1, and a persuasive showing supported by the record with respect to dependent claims 3, 5–9, 11, 13–17, 19–22, 25, 26, 28 and 29.  *See id.* at 62–79.  The Petition shows that Bertin discloses these recitations or they involve well-known circuit elements and amount to combining "familiar elements according to known methods . . . [to] yield predictable results."  *See KSR*, 550 U.S. at 416; Pet. 62–79; *supra* § II.F.D (summarizing the added claim limitations).

IPR2020-01020
Patent RE42,035 E

Patent Owner does not address independent claims 9, 17, and 25 or dependent claims 3, 5–9, 11, 13–16, 19–22, 25, 26, 28 and 29 separately from claim 1, other than as discussed above in connection with claims 8, 16, and 22. *See* PO Resp. 37–44.

Accordingly, based on the record and as summarized above, including arguments and cited evidence in Patent Owner's Response and Sur-reply, Petitioner establishes by a preponderance of evidence that the combination of Bertin and Cooke would have rendered obvious claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29. *See* Pet. 55–79.

### III. CONCLUSION

The outcome for the challenged claims of this Final Written Decision follows.[17]   In summary:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatent- able | Claims Not shown Unpatent -able |
|---|---|---|---|---|
| 1, 5, 7 | 102 | Alexander | 1, 5, 7 | |

[17] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01020
Patent RE42,035 E

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatent- able | Claims Not shown Unpatent -able |
|---|---|---|---|---|
| 9, 13, 15 | 103(a) | APA, Alexander | 9, 13, 15 | |
| 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, 29 | 103(a) | Koyanagi, Alexander | 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, 29 | |
| 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, 29 | 103(a) | Bertin, Cooke | 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, 29 | |
| **Overall Outcome** | | | 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, 29 | |

IV. ORDER

In consideration of the foregoing, it is hereby

IPR2020-01020
Patent RE42,035 E

ORDERED that claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29 of the '035 patent are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2

PETITIONER:
F. Christopher Mizzo
Gregory S. Arovas
Bao Nguyen
KIRKLAND & ELLIS LLP
chris.mizzo@kirkland.com
greg.arovas@kirkland.com
bao.nguyen@kirkland.com

James Glass
Ziyong Li
QUINN EMANUEL URQUHART & SULLIVAN LLP
jimglass@quinnemanuel.com
seanli@quinnemanuel.com

PATENT OWNER:
Jonathan S. Caplan
James Hannah
Jeffrey H. Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jcaplan@kramerlevin.com
jhannah@kramerlevin.com
jprice@kramerlevin.com

Trials@uspto.gov                                          Paper 30
571-272-7822                              Date:  November 24, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SAMSUNG ELECTRONICS CO., LTD., and
TAIWAN SEMICONDUCTOR MANUFACTURING CO. LTD.,
Petitioner,

v.

ARBOR GLOBAL STRATEGIES LLC,
Patent Owner.

_____

IPR2020-01021[1]
Patent 7,282,951 B2

_____

Before KARL D. EASTHOM, BARBARA A. BENOIT, and
SHARON FENICK, *Administrative Patent Judges*.

EASTHOM, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

---

[1] Taiwan Semiconductor Manufacturing Co. Ltd. filed a petition in
IPR2021-00394 and has been joined as a party to this proceeding.

IPR2020-01021
Patent 7,282,951 B2

Samsung Electronics Co., Ltd. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1, 4, 5, 8, 10, and 13–15 (the "challenged claims") of U.S. Patent No. 7,282,951 B2 (Ex. 1001, "the '951 patent"). Pet. 1. Petitioner filed a Declaration of Dr. Stanley Shanfield (Ex. 1002) with its Petition. Arbor Global Strategies LLC ("Patent Owner"), filed a Preliminary Response (Paper 7).

After the Institution Decision (Paper 11, "Inst. Dec."), Patent Owner filed a Patent Owner Response (Paper 16, "PO Resp.") and a Declaration of Dr. Krishnendu Chakrabarty (Ex. 2015); Petitioner filed a Reply (Paper 19) and a Reply Declaration of Dr. Stanley Shanfield (Ex. 1030); and Patent Owner filed a Sur-reply (Paper 24, "Sur-reply"). Thereafter, the parties presented oral arguments via a video hearing (September 14, 2021), and the Board entered a transcript into the record. Paper 29 ("Tr.").

For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner demonstrates by a preponderance of evidence that the challenged claims are unpatentable.

## I. BACKGROUND

*A.    Real Parties-in-Interest*

As the real parties-in-interest, Petitioner identifies itself, Samsung Electronics America, Inc., and Samsung Semiconductor, Inc. Pet. 74. Taiwan Semiconductor Manufacturing Co. Ltd. identifies itself and TSMC North America as real parties-in-interest. *See* IPR2021-00394, Paper 2, 71. Patent Owner identifies itself. Paper 5, 1.

*B.    Related Proceedings*

The parties identify *Arbor Global Strategies LLC v. Samsung Electronics Co., Ltd. et al.,* 2:19-cv-00333-JRG-RSP (E.D. Tex.) (filed

IPR2020-01021
Patent 7,282,951 B2

October 11, 2019) ("District Court") as a related infringement action involving the '951 and two related patents, U.S. Patent No. RE42,035 E and U.S. Patent No. 6,781,226 B2, which contain the same specification as the '035 patent. *See* Pet. 74; Paper 5.

Concurrent with the instant Petition, Petitioner filed petitions challenging claims in the two related patents, respectively IPR2020-01020 and IPR2020-01022. Taiwan Semiconductor Manufacturing Co. Ltd. filed petitions in IPR2021-00391 and IPR2021-00393, and the Board joined it as a party to IPR2020-01020 and IPR2020-01022, respectively.

C.    *The '951 patent*

The '951 patent describes a stack of integrated circuit (IC) die elements including a field programmable gate array (FPGA) on a die, a memory on a die, and a microprocessor on a die. Ex. 1001, code (57), Fig. 4. Multiple contacts traverse the thickness of the die elements of the stack to connect the gate array, memory, and microprocessor. *Id.* According to the '951 patent, this arrangement "allows for a significant acceleration in the sharing of data between the microprocessor and the FPGA element while advantageously increasing final assembly yield and concomitantly reducing final assembly cost." *Id.*

IPR2020-01021
Patent 7,282,951 B2

Figure 4 follows:



**Fig. 4**

Figure 4 above depicts a stack of dies including FPGA die 66, memory die 66, and microprocessor die 64, interconnected using metal and "contact points, or holes, 70." Ex. 1001, 4:6–20.

The '951 patent explains that an FPGA provides known advantages as part of a "reconfigurable processor." *See* Ex. 1001, 1:26–41. Reconfiguring the FPGA gates alters the "hardware" of the combined "reconfigurable processor" (e.g., the processor and FPGA) making the processor faster than one that simply accesses memory (i.e., "the conventional 'load/store' paradigm") to run applications. *See id.* A "reconfigurable processor" provides a known benefit of flexibly providing the specific functional units required by an application after manufacture. *See id.*

IPR2020-01021
Patent 7,282,951 B2

D.    *Illustrative Claims 1 and 10*

The Petition challenges independent claims 1, 5, and 10, and claims 4, 8, and 13–15, dependent respectively therefrom. Claims 1 and 10 illustrate the challenged claims at issue.

1. A processor module comprising:

[1.1] at least a first integrated circuit functional element including a programmable array that is programmable as a processing element; and

[1.2] at least a second integrated circuit functional element stacked with and electrically coupled to said programmable array of said first integrated circuit functional element

[1.3] wherein said first and second integrated circuit functional elements are electrically coupled by a number of contact points distributed throughout the surfaces of said functional elements and

[1.4] wherein said second integrated circuit includes a memory array functional to accelerate external memory references to the processing element.

Ex. 1001, 7:58–8:4 (information added by Board to conform to Petitioner's nomenclature); *see* Pet. 23–30 (addressing claim 1).

10. A processor module comprising:

at least a first integrated circuit functional element including a programmable array;

at least a second integrated circuit functional element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit functional element; and

at least a third integrated circuit functional element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit functional elements respectively wherein said memory is functional to accelerate external memory references to said programmable array.

5

IPR2020-01021
Patent 7,282,951 B2

Ex. 1001, 7:58–8:4, 8:42–55.

E.    *The Asserted Grounds*

Petitioner challenges claims of the '951 patent as follows (Pet. 2):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 4, 5, 8, 10, 13–15 | 103[2] | Koyanagi,[3] Alexander[4] |
| 1, 4, 5, 8, 10, 13–15 | 103 | Bertin,[5] Cooke[6] |

## II. ANALYSIS

Petitioner challenges claims 1, 4, 5, 8, 10, 13–15 as obvious.  Patent
Owner disagrees.

A.    *Legal Standards*

"Section 103(a) forbids issuance of a patent when 'the differences
between the subject matter sought to be patented and the prior art are such
that the subject matter as a whole would have been obvious at the time the

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125
Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103.  For purposes of
institution, the '951 patent contains a claim with an effective filing date
before March 16, 2013 (the effective date of the relevant amendment), so the
pre-AIA version of § 103 applies.  The parties describe December 5, 2001 as
the earliest effective filing date at issue here.  PO Resp. 5; Pet. 4.

[3] M. Koyanagi et al., "Future System-on-silicon LSI Chips," IEEE Micro,
Vol. 18, Issue 4, July/August 1998.  Ex. 1007.

[4] M.J. Alexander et al., "Three-dimensional Field-programmable Gate
Arrays," Proceedings of Eighth International Application Specific
Integrated Circuits Conference, September 18–22, 1995.  Ex. 1006.

[5] Bertin, US 6,222,276 B1, issued Apr. 24, 2001.  Ex. 1009.

[6] Cooke, US 5,970,254, issued Oct. 19, 1999.  Ex. 1008.

IPR2020-01021
Patent 7,282,951 B2

invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting 35 U.S.C. § 103(a)). Tribunals resolve obviousness on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations.[7] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

B.    *Level of Ordinary Skill in the Art*

Relying on the testimony of Dr. Shanfield, Petitioner contends that

> [a] person of ordinary skill in the art ("POSITA") at the time of the alleged invention would have been a person having a Master's degree in Electrical Engineering, Computer Engineering, or Physics with three to five years of industry experience in integrated circuit design, layout, packaging or fabrication. Ex. 1002 ¶¶ 55–58. A greater level of experience in the relevant field may compensate for less education, and vice versa.

Pet. 10.

Patent Owner contends that "a person of ordinary skill in the art . . . would have had a Bachelor's degree in Electrical Engineering or a related

---

[7] The Petition states that "Patent Owner vaguely asserted the presence of secondary considerations in the District Court case, but has not provided any evidence sufficient to establish a nexus between the alleged evidence and the Challenged Claims." Pet. 70. On this record, Patent Owner does not assert secondary indicia of nonobviousness.

IPR2020-01021
Patent 7,282,951 B2

and either (1) two or more years of industry experience; and/or (2) an advanced degree in Electrical Engineering or related field." PO Resp. 4 (citing Ex. 2015 ¶ 33).

We adopt Petitioner's proposed level of ordinary skill in the art as we did in the Institution Decision, which comports with the teachings of the '951 patent and the asserted prior art. *See* Inst. Dec. 18–19. Patent Owner's proposed level is slightly lower but it overlaps with Petitioner's proposed level. Even if we adopted Patent Owner's proposed level, the outcome would not change.

C.   *Claim Construction*

In an *inter partes* review, the Board construes each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2019). Under the same standard applied by district courts, claim terms acquire their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Claims 1, 5, and 10 respectively recite "a memory array functional to accelerate external memory external memory references to the processing element," "said memory array is functional to accelerate external memory

IPR2020-01021
Patent 7,282,951 B2

references to the processing element," and "wherein said memory is functional to accelerate external memory references to said programmable array" as recited respectively in claims 1, 5, and 10. In other words, the challenged claims all require the materially same "functional to accelerate" limitation.

In the Institution Decision, we preliminarily determined that the construction of this "functional to accelerate" limitation is "a number of vertical contacts that traverse the memory die in the *internal* periphery of the die and provide contacts on the surface of the memory die." Inst. Dec. 24 (emphasis added). To add context to that construction, we also preliminarily stated that "the 'functional to accelerate' limitations require a number of contacts extending throughout the thickness of the wafers in a vertical direction (vias) *within the periphery* of the die to allow multiple short paths for data transfer between the memory and processor." *Id.* at 25 (emphasis added).

Patent Owner here argues that "the term 'internal periphery' is not described in the specification, and will not add clarity to the meaning of the term." PO Resp. 8 (citing Ex. 2015 ¶ 39).[8] Patent Owner also argues that

---

[8] In a related institution decision also involving challenges to claims 1, 5, and 10 of the '951 patent, Patent Owner similarly argues that "[t]he requirement of an 'internal periphery' . . . excludes embodiments such as the embodiment shown in figure 5 of the '951 Patent, which shows contacts distributed throughout a die, not just in the 'internal periphery' of the die." Id. at 21. IPR2020-01568, Paper 7 (preliminary response), 20–21 (emphasis added). In response, the Board determined that the accelerate limitation means "a number of vertical contacts that traverse the memory die within the periphery of the die and provide contacts on the surface of the memory die." *See* IPR2020-01568, Paper 12 (institution decision), 26.

IPR2020-01021
Patent 7,282,951 B2

"the Board's preliminary construction only adds ambiguity to the meaning of this term because it requires "a number of vertical contacts that . . . provide contacts *on the surface* of the memory die," and further, claim 1 already recites that "'a second integrated circuit functional element' has 'a number of contact points distributed throughout *the surfaces* of said functional element.'" *See id.* at 9 (emphasis added). Therefore, Patent Owner offers the following "suggest[ion]": "To the extent that the Board finds it necessary to mention contacts in the context of the claimed 'memory array,' Patent Owner suggests that the Board use the term '*a number of vertical contacts distributed throughout the surface of and traversing the memory die*.'" PO Resp. 8 (emphasis added). For reasons discussed further below and in the Institution Decision, the record, including the specification, supports Patent Owner's suggestion, and we determine that Patent Owner's claim construction suggestion is materially the same as the preliminary claim construction set forth in the Institution Decision. *See, e.g.*, Ex. 1001, 2:41–44 ("[S]ince these differing die do not require wire bonding to interconnect, *it is now also possible to place interconnect pads throughout the total area of the various die rather than just around their periphery*.") (emphasis added); Inst. Dec. 24–25.

In addition to Patent Owner's suggestion above, Patent Owner also argues that "the term 'a memory array functional to accelerate external memory references to the processing element' means 'a memory array that allows the parallel loading of data *through buffer cells*.'" PO Resp. 6 (emphasis added). Patent Owner asserts that "[i]n its preliminary response, Patent Owner advocated that this term should be accorded its plain and

ordinary meaning." PO Resp. 5. It is not clear if Patent Owner maintains (i.e., in its Response) that the phrase carries its plain and ordinary meaning.[9]

In any event, the record does not support Patent Owner's proposed requirement for "buffer cells" under the plain and ordinary meaning of the "functional to accelerate" clause or under lexicography principles, prosecution history or otherwise, for the reasons advanced by Petitioner and as addressed below. In line with Patent Owner's suggestion and as we similarly determined in the Institution Decision, the "functional to accelerate" limitations require "a number of vertical contacts distributed throughout the surface of and traversing the memory die in a vertical direction (vias) to allow multiple short paths for data transfer between the memory and processor." *See* Ex. 1001, Fig. 4 (showing numerous contact points); Inst. Dec. 25 (materially similar construction); PO Resp. 8 (Patent Owner's suggestion). We adopt and incorporate the claim construction findings in the Institution Decision, much of which we repeat here for completeness. *See* Inst. Dec. 19–25.

Petitioner argues that "[t]he Board correctly construed" the "functional to accelerate" clause in the Institution Decision. Reply 11. According to Petitioner, Patent Owner's new "attempt to read buffer cells into the claims, based on an embodiment in the specification in which buffer

---

[9] In the related *inter partes* case, Patent Owner does maintain in its response there that it "construes all terms in 'accordance with the ordinary and customary meaning of such claim as understood by on of ordinary skill in the art and the prosecution history pertaining to the patent.'" IPR2020-01568, Paper 18 (response), 9 (quoting C.F.R. § 42.100(b)). In its preliminary response in that case, Patent Owner states that the District Court also construed the claims according to their plain meaning. IPR2020-01568, Paper 7 (preliminary response), 19.

IPR2020-01021
Patent 7,282,951 B2

cells are in fact not used for the claimed acceleration, should be rejected."
*Id.* at 7 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed.
Cir. 2004) ("The fact that a patent asserts that an invention
achieves several objectives does not require that each of the claims be
construed as limited to structures that are capable of achieving all of the
objectives.")).  Petitioner also argues that Patent Owner consistently argued
"the plain and ordinary meaning" of "the 'accelerate' claim term" prior to
institution "both to the Board and the district court . . . and never mentioned
'buffer cells'."  *Id.* (citing Ex. 1036 (district court claim construction order),
49).  The record supports Petitioner's argument that Patent Owner shifted its
claim construction position relative to its position in the District Court to
specifically include buffer cells here.  *See* Ex. 1036, 49 (construing the
"functional to accelerate" clause according to its "[p]lain and ordinary
meaning"); Inst. Dec. 19–25 (addressing the parties' arguments).[10]

 Petitioner also persuasively argues that "Dr. Shanfield testifie[s] that
'the specification attributes the claimed acceleration to the stacking of an
FPGA die and a memory die,' where they are interconnected 'using contact
points distributed through the dies.'" Reply 8 (quoting Ex. 1002 ¶ 90; citing
Ex. 1001, 2:33–46, 2:65–3:2).  In the District Court proceeding, as Petitioner
points out, Patent Owner argued that "the short" interconnects "allow[] for
accelerated external memory references."  *Id.* at 6 (quoting Ex. 1028 (Patent
Owner's claim district court construction brief arguing that the claims are
definite), 29).  That is, Patent Owner argued as follows in the District Court
proceeding:

---

[10] Patent Owner is under no obligation in an *inter partes* review to provide
any claim construction (either prior to or after the Institution Decision).

IPR2020-01021
Patent 7,282,951 B2

>The specification teaches in several sections that ***the short interconnects to the memory die allows for accelerated external memory references***, providing additional context for a POSITA to interpret the claims. . . .  For example, the '951 Patent states that in reference to Figures 4 and 5 that acceleration to external memory is performed because "***the FPGA module may employ stacking techniques to combine it with a memory die for accelerating external memory references as well as to expand its on chip block memory***."

Ex. 1028, 29 (citing or quoting the '951 Patent, Figs. 4, 5, 2:56–3:2); Reply 6 (emphasis added by Petitioner) (quoting Ex. 1028, 29).  The parties appear to agree that the numerous "short interconnects" (conductive vias) in Figure 4 enable parallel processing or loading (even though Patent Owner did not argue explicitly in the District Court that the claims require parallel loading (Ex. 1028, 26–29)).[11]  *See* Pet. 4 (arguing that the advantages of die stacking using vias extending through the dies were well-known, and include 'high speed' and 'parallel signal processing'"), 15 (discussing Ex. 1009, 7:16–34 (stacking with through-hole contacts minimizes latency and maximizes bandwidth)); PO Resp. 3 ("The '951 Patent explains how electrical

---

[11] Patent Owner also argued in the District Court that "[f]or example, . . . the specification also discloses . . . a memory array and a *buffer cell which can be* part of the memory die with short interconnects, thus improving the speed of and access to memory in comparison to the prior art." Ex. 1028, 29.  This argument of an example of buffer cells that "can be" used to improve speed is not an argument that the claims *require* buffer cells, especially where Patent Owner relies mainly on the "short interconnects" (vias) to improve speed.

IPR2020-01021
Patent 7,282,951 B2

connections, such as TSVs [through-silicon vias], are used to load configuration data in a parallel fashion . . . .").[12]

"[I]n . . . agreement with" Patent Owner's District Court arguments (*see* Reply 6), as we preliminarily determined in the Institution Decision, the '951 patent specification supports Petitioner in several places by consistently tying data acceleration to stacking techniques that include vias extending through the stacked dies. *See* Ex. 1001, 2:65–3:2 ("[T]he FPGA module may employ stacking techniques to combine it with a memory die for the purpose of accelerating external memory references as well as to expand its on chip block memory."), 2:31–60 (describing how "metal contacts can traverse the thickness of the wafer" to create "a single very compact structure" and ultimately "accelerat[e] the sharing of data between the microprocessor and FPGA"), 2:63–65 ("Further disclosed herein is an FPGA module that uses stacking techniques to combine it with a memory die for the purpose of accelerating external FPGA reconfiguration . . . ."); *see* Pet. 30 (citing Ex. 1001, 2:65–3:2; Ex. 1007, 17, 19; Ex. 1002 ¶ 93). These passages do not rely on buffer cells for data acceleration.

As also preliminarily determined in the Institution Decision, the Petition "shows that the advantages of die stacking using vias extending through the dies were well-known, and include 'high speed' and 'parallel signal processing.'" Inst. Dec. 22 (quoting Ex. 1010, 1704; citing Ex. 1002 ¶ 39; Pet. 4); *see also* Pet. 4 (quoting Ex. 1010, 1704; citing Ex. 1002 ¶ 39). As the record shows, this data speed increase (data acceleration relative to

---

[12] Petitioner's challenges include a showing of short via connections throughout all the dies in the stack of the prior art dies for enabling parallel signal processing. *See infra* §§ II.D, II.E.

the prior art) arises from relatively shorter signal paths using conductive vias extending through dies as opposed to using longer prior art contact runs toward the periphery to ultimately connect dies at the edges thereof. *See* Pet. 15 (discussing Ex. 1009, 7:16–34 (stacking with through-hole contacts minimizes latency and maximizes bandwidth)); Ex. 1006, 1 ("interconnect delay" occurs in prior art non-stacked FGPAs); Ex. 1010, 1704 ("High-speed performance is associated with shorter interconnection delay time and parallel processing. . . .").

The abstract of the '951 patent further supports this interpretation. It specifically ties "stacking . . . die elements and interconnecting the same utilizing contacts that traverse the thickness of the die" to create a "processor module" with the claimed "acceleration": "The processor module disclosed *allows for a significant acceleration in the sharing of data between the microprocessor and the FPGA* element while advantageously increasing final assembly yield and concomitantly reducing final assembly cost." Ex. 1001, code (57) (emphasis added). The abstract, which specifically describes data "acceleration" based on "stacking" and "contacts that traverse the thickness of the die" does not even mention buffer cells. *Id.* Even though the abstract refers to data acceleration "between *the microprocessor and the FPGA* element," and the challenged claims recite "a memory array functional to accelerate external memory external memory references to the processing element," the same principle of using short via connections through the dies to accelerate data transfers applies.

Supporting this interpretation, as noted above and in the Institution Decision, the '951 patent states that "the FPGA module may employ stacking techniques to combine it with a memory die for the purpose of

*accelerating external memory references*." *Id.* at 2:66–3:2 (emphasis added); *see also* Ex. 1001, 5:20–23 ("[S]tacking die 64, 66 and 68 with through-silicon contacts . . . serves . . . . [the] traditional role of *fast access memory*. However, in this new assembly [memory] *is accessible by both the microprocessor 64 and the FPGA 68 with equal speed*."). The recitation in claim 1, "memory array functional to accelerate external memory references to the processing element," and similar recitations in the remaining challenged claims, directly track the specification's language describing this embodiment for "*accelerating external memory references*" *id.* at 2:66–3:2) contrary to Patent Owner's arguments otherwise. *See* Sur-reply 3 (arguing that "Petitioner cannot point to a single distinct embodiment in the '951 Patent that does not use buffer cells to accelerate memory references to the processing element"). And this "accelerating" language is in juxtaposition to other language in the same passage stating that "[f]urther disclosed herein is an FPGA module that uses stacking techniques to combine it with a memory die for the purpose of *accelerating external FPGA reconfiguration*." *Id.* at 2:63–65. These juxtaposed passages illustrate the difference between "*accelerating external FPGA reconfiguration*" (*id.*) which the challenged claims do not recite, and "*accelerating external memory references*" (*id.* at 2:66–3:2), which the challenged claims do recite.

16

Figure 4 of the '951 patent, which follows, also supports this interpretation:



**Fig. 4**

As depicted above, Figure 4 shows a number of contact points (which represent vias) throughout the periphery of the FPGA die, memory die, and microprocessor die. As indicated above, these vias or "contacts . . . traverse the thickness of the die." Ex. 1001, code (57). Similar to the abstract, Figure 4 does not specifically depict (and the related disclosure does not describe) buffer cells. *Id.* at 4:9–44; *compare id., with id.* at 4:54–55 (describing buffer cells are preferably on memory die 66 in the context of Figure 5, which applies as an embodiment of Figure 4).

Nevertheless, Patent Owner relies on Figure 5 of the '951 patent to support its contention that the "functional to accelerate" clause requires

IPR2020-01021
Patent 7,282,951 B2

"buffer cells," i.e., "a memory array that allows the parallel loading of data
through *buffer cells*." *See* PO Response 6–7 (emphasis added). Patent
Owner's annotated version of Figure 5 follows (*id.* at 7):



Figure 5, as annotated by Patent Owner above, shows (blue)
"BUFFER CELL[S]" 88 connected to "CONFIG MEMORY" cells 86, in
turn connected to "LOGIC CELLS" 84, at the output of a "VERY WIDE
CONFIGURATION DATA PORT." The '951 patent states that "FIG. 5 is a

18

corresponding functional block diagram of the configuration cells of the reconfigurable processor module of FIG. 4 wherein the FPGA may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel." Ex. 1001, 4:9–13.

This description of "wherein the FPGA may be totally reconfigured" signifies that Figure 5 represents one embodiment of the generic disclosure of what the Figure 4 embodiment "may" include. In other words, the generic embodiment of Figure 4, like the challenged claims, does not *require* "wherein the FPGA may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel." *See id.* Rather, "FIG. 4 is a simplified, exploded isometric view of a reconfigurable processor module *in accordance with the present invention comprising a hybrid device incorporating a number of stacked integrated circuit die elements.*" *Id.* at 4:5–8 (emphasis added). And even if the claims somehow require the capability of reconfiguring the FPGA in one clock cycle using parallel via connections, the specification does not show that any challenged claims require buffer cells for that purpose, as Petitioner persuasively shows.

In reference to Figure 5, Patent Owner contends that buffer cells 88 allow for acceleration of "memory references" because the "memory array . . . *doesn't need to wait for the FPGA to cease operating*":

> The specification discloses that *the buffer cells 88 (which are associated with the wide configuration data port) can be loaded in parallel with configuration data while the FPGA is in operation.* [Ex. 1001,] 5:29–39. *As a result of the parallel loading of data into the buffer cells while the FPGA and its logic cells are in operation*, the memory array can accelerate memory references to the configuration memory 86 of the FPGA (*because it doesn't need to wait for the FPGA to cease operating*), as compared to a configuration that did not include the disclosed

IPR2020-01021
Patent 7,282,951 B2

> buffer cells. *Id.* at 5:42–44 ("FPGA 68 [can] be totally
> reconfigured in one clock cycle with all of its configuration logic
> cells 84 updated in parallel.").

PO Resp. 8 (citing Ex. 2015 ¶ 38) (emphasis added). Patent Owner's

arguments show that "configuration" or "reconfiguration" through parallel

loading can occur without buffer cells—i.e., reconfiguration in one clock

cycle or otherwise can occur *when the FPGA is not operating.*[13] *See id.*

In its Sur-reply, Patent Owner stresses that "a ***memory array*** is

responsible for the claimed acceleration of data references." Sur-reply 2.

Patent Owner argues that "that the claims require a 'memory array,' not 'a

number of vertical contacts." *Id.* at 1. But Patent Owner's other arguments

contradict this last argument, because Patent Owner otherwise agrees and

argues that the claimed acceleration requires a number of vertical contacts,

specifically TSVs: "[T]he '951 Patent discloses and *claims* an entirely new

arrangement of *TSVs* (i.e., the wide configuration data port) that that

provides parallel connections between a memory die and a programmable

array through buffer cells *and configuration memory*." Sur-reply 3–4

(emphasis removed and added). Under Patent Owner's theory, the claim

construction should also include TSVs (in a wide configuration data port)

and configuration memory as part of the memory array if the memory array

also includes the buffer cells. But Patent Owner does not argue, and the

record does not show, that TSVs or configuration memory (on the right in

Figure 5) are part of the *memory array.* *See* Ex. 1001, Fig. 5; Ex. 1035,

---

[13] The challenged claims each recite a "programmable array," which
includes, but does not require, an FPGA. Nothing in the challenged claims
requires reconfiguring multiple times, reconfiguring in one clock cycle, or
reconfiguring through buffer cells, to satisfy the "programmable" limitation.

IPR2020-01021
Patent 7,282,951 B2

157:3–17, 158:10–12 (agreeing that "memory die 66" is "to the left of the very wide configuration data port 82 in Figure 5, although not shown" and the "connections" shown in Figure 5 "are formed by the TSVs that are between the memory die [not shown in Figure 5] and the FPGA die" "to the right of Figure 5").

For example, Patent Owner also argues that the specification discloses that "the buffer cells 88 are preferably a portion of the *memory die* 66." Sur-reply 2 (emphasis added by Board) (quoting Ex. 1001, 5:38–39). But this specification sentence does not describe buffer cells in the *memory array*— i.e., memory die 66 is simply a type of substrate for a memory array, buffer cells, and other memory circuitry. *See* Ex. 1001, Fig. 4, Fig. 5, 5:38–39. Patent Owner's inclusion of buffer cells in its claim construction, where the disclosed buffer cells are also not part of a memory array, undermines Patent Owner's argument that Petitioner's claim construction is incorrect because it includes vias. Patent Owner's arguments otherwise acknowledge that the claimed acceleration requires numerous vias, as noted above and as explained further below. Patent Owner's suggestion, and other arguments and evidence, support the finding that it is the numerous vias extending through dies like the memory die, to a memory array, which enables the "memory array *functional* to accelerate external memory external memory references to the processing element." *See* Ex. 1001, Fig. 4.

Dr. Chakrabarty, Patent Owner's expert, agrees that the "*large number of connections*, which are obtained through the TSVs, *accelerate the data transfer between the memory and the FPGA*." Ex. 1035, 270:7–11. As Petitioner also persuasively shows, "Dr. Chakrabarty admit[s] that it is the vertical contacts of the memory die that perform the claimed acceleration,"

21

IPR2020-01021
Patent 7,282,951 B2

and "he admit[s] that the buffer cells in Figure 5 of the '951 patent do *not* serve to perform the claimed acceleration, but *to allow the wide configuration data port and the FPGA to operate independently of each other*." Reply 9 (emphasis added) (citing Ex. 1035, 160:11–161:13 (agreeing that buffer cells allow new configuration data to be sent over the configuration data port *while the FPGA is operating under its previous configuration*), 164:22–165:12 (agreeing that buffer cells support an *asynchronous* configuration update and that another "way of" "updat[ing] the configuration" without buffer cells is waiting until the "FPGA is idle"); Ex. 1030 ¶ 28)); *see also* Ex. 1030 ¶¶ 17–21, 28–29 (persuasively testifying that buffer cells support *asynchronous* reconfiguration and the claimed acceleration does not require buffer cells).

Therefore, as Petitioner persuasively argues, "the description of Figure 5 confirms that the purpose of the buffer cells is not to perform the claimed 'acceleration,' but to allow asynchronous updating of the logic cells." Reply 11 (citing Ex. 1001, 5:34–41 (describing that "buffer cells 88" "can be loaded while the FPGA 68 comprising the logic cells 84 are in operation")). As Petitioner also persuasively argues, "[w]ith or without the buffer cells, the large number of TSVs that form the wide configuration data port accelerate data transfer from the memory to the FPGA, as Dr. Chakrabarty admits." *Id.* (citing Ex. 1035, 155:7–22 (agreeing that Figure 4's configuration data port includes TSVs connecting the memory die to the FPGA die ), 157:23–158:3 (agreeing that "the reason it's a very wide configuration data port [in Figure 5] is because it has a lot of connections through these TSVs between the memory die and FPGA die"), 269:24–270:11 (agreeing that the "large number of connections" obtained through

IPR2020-01021
Patent 7,282,951 B2

the TSVs "accelerate the data transfer between the memory and the FPGA" in Figure 5).[14]

In addition, the relied-upon upon passage by Patent Owner pertaining to Figure 5 and buffer cells describes a single clock cycle reconfiguration benefit (which the challenged claims do not require) instead of a more generic data acceleration that includes external memory references. *See* Ex. 1001, 5:29–50. And the specification refers to this reconfiguration benefit as described at column 5 as "[i]n *addition*" to "an *added* benefit of overall reduced power requirements and *increased operating bandwidth*. *Because*

---

[14] In other words, the record shows that a wide (or very wide) configuration data port (*see* Fig. 5) is essentially a known interface that enables a large number of vias to connect the dies for parallel data transfers. *See* PO Resp. 3–4 (urging parallel data transfer in its claim construction); Reply 11; Ex. 1035, 155:7–22 (agreeing that a configuration data port includes many TSVs), 157:23–158:3 (agreeing that configuration data port is wide because "it has a lot of connections through these TSVs"), 163:8–163:21 (agreeing that a "configuration data port" is "just a data port used for configuration" and "data port is just an interface to send data from one place to another"), 269:24–270:11 (agreeing that the "large number of connections" (TSVs) "accelerate the data transfer between the memory and the FPGA" in Figure 5). In comparison to the wide configuration data port of Figure 5, the '951 patent refers to Prior Art Figure 3 in describing loading cells "in a byte serial fashion," "through a *relatively* narrow, for example, 8 bit port that results in the long reconfiguration times." Ex. 1001, 4:54–60 (emphasis added), Fig. 3. In other words, a byte in Figure 3 represents, "for example," 8 bits, and Prior Art Figure 3 represents loading 8 bits (of a byte) in parallel and then loading each such byte serially to successive logic cells during a reconfiguration. *See id.*; *see also* Ex. 1035, 270:6–274:18 (discussing the number of bits in a wide configuration data port versus a narrow port as depending on the context, including "how much parallelism you want" (*id.* at 272:14–15), generally agreeing that a "large number of connections, which are obtained through the TSVs, accelerate the data transfer" (*id.* at 270:6–11)).

23

IPR2020-01021
Patent 7,282,951 B2

*the various die 64, 66 and 68 (FIG. 4) have very short electrical paths between them*, the signal levels can be reduced while at the same time *the interconnect clock speeds can be increased.*" *Id.* at 5:51–56 (emphasis added). As found above, the parties generally agree that the specification describes data acceleration in terms of numerous short via connections to enable parallel data transfers—further enabling increased bandwidth (depending on the clock rate). *See supra* note 13; *infra* note 15. The specification also describes a stack of functional circuits, including a microprocessor, FPGA, and memory, as claimed, without any mention of Figure 5's buffer reconfiguration scheme. *See, e.g.,* Ex. 1001, code (57) (describing "significant acceleration in the sharing of data" due to "stacking" and "contacts that traverse the thickness of the die"), 7:26–29 (describing Figure 11 as depicting "a module . . . wherein three functional elements are fabricated on a single base wafer, including functional elements 100, 106, and 112").

Finally, as noted in the Institution Decision, prosecution history plays an important role in understanding the claims and supports the claim construction. Under *Phillips*, "[l]ike the specification, *the prosecution history provides evidence of how the PTO and the inventor understood the patent.*" *Phillips*, 415 F.3d at 1317 (emphases added). Here, the prosecution history provides some understanding of "wherein said memory array is functional to accelerate external memory references to said processing element." The Examiner indicated allowance of dependent claim 35 (if written in independent form) over Lin (U.S. Patent No. 6,451,626), finding Lin does not teach or suggest this

IPR2020-01021
Patent 7,282,951 B2

"accelerate" limitation. *See* Ex. 1004, 68, 73–74; Pet. 8–9 (discussing prosecution history).

Addressing the prosecution history, Petitioner provides the following figures from Lin:



Petitioner's annotations of Lin's Figures 1D and 2D show that Lin discloses contacts on the sides of dies, instead of a number contact vias extending throughout the periphery and thickness of the dies. *See* Pet. 9 (citing Ex. 1019, Figs. 1D, 2D; Ex. 1004, 73). Accordingly, in light of Lin's teachings and the specification, the prosecution history further supports the understanding that the "functional to accelerate" limitations require a large number of short contacts extending throughout the thickness of the wafers in a vertical direction (i.e., vias) throughout the die to allow multiple short paths for data transfer between the memory and processor. *Compare*, Ex. 1001, Fig. 4 (showing numerous contact points) *and* Ex. 1001, 2:41–44 ("[S]ince these differing die do not require wire bonding to interconnect, *it is now also possible to place interconnect pads throughout the total area of the various die rather than just around*

*their periphery*.") (emphasis added), *with* Ex. 1019, Fig. 1D, 2D (showing peripheral contact points).

Accordingly, for the reasons above, the construction of the "functional to accelerate" limitations is "a number of vertical contacts distributed throughout the surface of and traversing the memory die in a vertical direction (vias) to allow multiple short paths for data transfer between the memory and processor."

Based on the current record, no other terms require explicit construction. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'. . . ." (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

D.    *Obviousness, Koyanagi and Alexander, Claims 1, 4, 5, 8, 10, and 13–15*

Petitioner contends that claims 1, 4, 5, 8, 10, and 13–15 would have been obvious over the combination of Koyanagi and Alexander.  Pet. 17–46. Patent Owner disputes Petitioner's contentions.  PO Resp. 16–30.

1.    *Koyanagi*

Koyanagi describes a "three-dimensional integration technology" ("3D") that involves vertically stacking and interconnecting chips using "a high density of vertical interconnections" (Ex. 1007, 17) to "connect[] each layer" (*id.* at 18).

Koyanagi explains that its 3D-integration technology "enables a huge number of metal microbumps to form on the top or bottom surfaces of the chips."  *Id.* at 17–18 ("More than $10^5$ interconnections per chip form in a vertical direction in these 3D . . . chips.").  Koyanagi's system "dramatically

26

IPR2020-01021
Patent 7,282,951 B2

increase[s] wiring connectivity while reducing the number of long
interconnections." *Id.* at 17.

Koyanagi's Figure 1a follows:



Figure 1a illustrates a stack of chips including dynamic random access
memory (DRAM) chips and a synchronous random access memory (SRAM)
chip "stacked on a microprocessor" chip. *See* Ex. 1007, 17.  Koyanagi
describes "form[ing] as many vertical interconnections as possible" to
"remove the generated heat" and form "electrical wirings." *Id.*  According
to one embodiment in Koyanagi, "2D image signals move simultaneously in
a vertical direction and are processed in parallel within each LSI [large-scale
integration] layer.  As a result, using 3D-image-processing LSIs leads to a
dramatic processing speed improvement of  more than three orders of
magnitude." *Id.*  Koyanagi also describes a variety of uses:  "Typical
examples of these new system LSIs include a merged logic memory (MLM)
LSI chip as shown in Figure 1 . . . , and a 3D shared memory for parallel
processor systems." *Id.* at 17.

In addition to enhancing speed, "[v]ertical interconnections can
remove the generated heat since, in addition to their function as electrical
wirings, they can act as heat pipes.  In fact, some vertical interconnections
act solely as generated heat removers." *Id.*

27

IPR2020-01021
Patent 7,282,951 B2

### 2.    *Alexander*

Alexander describes "stacking together a number of 2D FPGA bare dies" to form a 3D FPGA.  Ex. 1006, 1.  Alexander explains that "each individual die in our 3D paradigm has vias passing through the die itself, enabling electrical interconnections between the two sides of the die."  *Id.*

Petitioner annotates Alexander's Figure 2 as follows:



Figure 2(a) shows vertical metal connections (red) traversing a chip with a solder pad and bump on top, and Figure 2(b) shows a stack of chips prior to connection by solder bumps.  Ex. 1006, 253.

Alexander explains that stacking bare dies to form a 3D FPGA results in a chip with a "significantly smaller physical space," lower "power consumption," and greater "resource utilization" and "versatility" as compared to conventional layouts.  *Id.*

### 3.    *Obviousness Analysis, Koyanagi and Alexander, Claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28 and 29*

Claim 1's preamble recites "[a] processor module comprising." Petitioner relies on the combined teachings of Koyanagi and Alexander, with Koyanagi disclosing all elements of the processor module except a "programmable array."  *See* Pet. 23–24.  Petitioner provides reasons to combine Koyanagi and Alexander as discussed further below.  *See id.* at 17–23.

IPR2020-01021
Patent 7,282,951 B2

Claim 1 recites limitation 1.1, "at least a first integrated circuit functional element including a programmable array that is programmable as a processing element." *See* Pet. 24. Petitioner contends that it would have been obvious to employ Alexander's FPGA as an integrated circuit layers in Koyanagi's stack. *See* Pet. 17–25. Quoting Alexander, Petitioner contends that "[f]ield programmable gate arrays (FPGAs) are *(re)programmable* chips that can implement *arbitrary logic*." *Id.* at 24 (quoting Ex. 1006, 1 (emphasis by Petitioner); citing Ex. 1002 ¶ 84; Ex. 1013, 6 ("The FPGA can be visualized as programmable logic blocks embedded in programmable interconnect []. Unlike ASICs, the logic and interconnect resources are uncommitted, and can be configured to implement different logic functions and connectivity.")).[15]

Petitioner provides the following modified version of Koyanagi's Figure 1 in a side-by-side comparison of the '035 patent's Figure 4:

---

[15] ASICs are application specific integrated circuits. Ex. 1013, 5. Exhibit 1013 is a textbook by Varghese et al., <u>Low-Energy FPGAs—Architecture and Design</u> (2001). Varghese shows the knowledge and the level of ordinary skill in the art at or near the time of the invention in 2001. As noted above, the parties describe December 5, 2001 as the earliest effective filing date at issue here. *Supra* note 2 (citing PO Resp. 5; Pet. 4). Even if we do not consider Varghesee (due to its 2001 publication date) as evidencing the knowledge and level of ordinary skill in the art around the time of the invention, Petitioner's showing is persuasive without it.

IPR2020-01021
Patent 7,282,951 B2



Koyanagi's annotated Figure 1 (labeled 1M by Petitioner) on the left shows a stack of dies, including Alexander's FPGA die, which essentially replaces one of Koyanagi's DRAM dies (*see supra* § II.F.1)), and the '951 patent's Figure 4 on the right shows a similar configuration. *See* Pet. 24.

Petitioner provides evidence that "FPGAs . . . can be flexibly configured and reconfigured to 'implement arbitrary logic' and thus 'provide designers with a faster and more economical design cycle.'" Pet. 18 (quoting Ex. 1006, 1; citing Ex. 1002 ¶ 76). Petitioner provides other reasons why a person of ordinary skill in the art ("POSITA") would have been motivated to employ Alexander's FPGA in a Koyanagi's die stack:

> A POSITA would have been motivated to apply Koyanagi's broadly applicable 3D integration scheme to stack Alexander's FPGA bare die over the memory and microprocessor die of Koyanagi Figure 1(a) to form a compact 3D reconfigurable module to *save area, reduce power consumption, and improve performance*. [Ex. 1002 ¶ 82]. A POSITA would have found it obvious to try such stacking and would have had a reasonable expectation of success doing so because both Alexander and Koyanagi teach the same 3D integration scheme whereby bare dies are stacked and interconnected using distributed through-silicon contacts, and because Koyanagi provides broadly applicable, detailed teachings with regard to stacking different types of dies. *Id.*; Ex. 1002 ¶ 82.

Pet. 22–23 (emphasis added).

IPR2020-01021
Patent 7,282,951 B2

Petitioner provides citations to Koyanagi and Alexander to support the showing that they include "common teachings" involving "the *same* 3D-integration scheme." *See* Pet. 20, 17–23 (citing Ex. 1007, 17, 19, Figs. 1, 5; Ex. 1006, 1; Ex. 1002 ¶¶ 79–82). Petitioner provides evidence that known "speed and power dissipation" and other advantages of stacking dies existed prior to the invention. *Id.* at 19 (noting advantages of a 3D stacking system including "miniaturization, low power consumption, and large-scale integration," and "speed and power dissipation of a total chip") (quoting Ex. 1010, 1712–13)); *see also* Ex. 1002 ¶ 82 ("A POSITA would have been motivated to apply Koyanagi's broadly applicable 3D integration scheme to stack Alexander's FPGA bare die over the memory and microprocessor die of Koyanagi Figure 1(a) to form a compact 3D reconfigurable module to save area, reduce power consumption, and improve performance.").

Claim 1 recites limitation 1.2, "at least a second integrated circuit functional element stacked with and electrically coupled to said programmable array of said first integrated circuit functional element," and limitation 1.3, "wherein said first and second integrated circuit functional elements are electrically coupled by a number of contact points distributed throughout the surfaces of said functional elements."

IPR2020-01021
Patent 7,282,951 B2

Petitioner's annotated version of Koyanagi Figure 1 depicts stacked functional elements electrically coupled by distributed contact points:



Petitioner's Figure 1M is an annotated version of Koyanagi's Figure 1 and shows "the top FPGA die ('first IC FE' [integrated circuit functional element]) and the memory die ('second IC FE') . . . electrically coupled by a large number of contact points distributed throughout the surfaces of the functional elements." Pet. 26. To support this showing, Petitioner quotes Koyanagi: "More than $10^5$ [100,000] interconnections per chip form in a vertical direction in these 3D LSI chips or 3D MCMs. Consequently, we can dramatically increase wiring connectivity while reducing the number of long interconnections"). *Id.* at 26–27 (quoting Ex. 1007, 17; citing Ex. 1002 ¶ 87).

Petitioner relies on similar teachings in Alexander, including that Alexander "describe[s] 'a matrix of 100 x 100 = 10,000 solder bumps' formed over the surface of each die." Pet. 27 (quoting Ex. 1006, 1; citing Ex. 1002 ¶ 88; reproducing Ex. 1006, Figs. 2a, 2bs); *see supra* § II.D.2 (Alexander's Figs. 2a, 2b showing vertical vias and solder bumps). Petitioner provides similar motivation to combine Alexander and Koyanagi

32

IPR2020-01021
Patent 7,282,951 B2

as summarized above in connection with element [1.1].  *See* Pet. 17–23
(§ 7A.1:  "**Reasons to Combine Koyanagi and Alexander**").

Finally, claim 1 recites limitation 1.4, "wherein said second integrated
circuit includes a memory array functional to accelerate external memory
references to the processing element."  Petitioner relies on the combined
teachings of Koyanagi and Alexander to address this claim limitation.
According to Petitioner, the '951 patent "specification attributes the claimed
acceleration to the stacking of an FPGA die and a memory die, whereby a
wide configuration data port interconnects the stacked memory die and the
FPGA using contact points distributed throughout the dies."  Pet. 28
(quoting Ex. 1001, 2:65–3:2 ("[T]he FPGA module may employ stacking
techniques to combine it with a memory die for the purpose of accelerating
external memory references as well as to expand its on chip block
memory"); citing Ex. 1001, 2:33–46).  Petitioner contends that the
combination of Koyanagi and Alexander "renders the claimed acceleration
obvious because this prior art combination discloses the same way to
accelerate external memory references as is described in the '951 Patent
specification."  *Id.* (citing Ex. 1002 ¶ 90).

Petitioner also cites a number of known benefits that an increased
number of vertical contacts provides, including "obtain[ing] more
connections between the die[s]" to mitigate bus bottlenecks common in
conventional 2D layout, and to increase speed by providing more abundant
and shorter circuit board wirings.  *See* Pet. 30 (citing Ex. 1001, 2:65–3:2;
Ex. 1007, 17, 19; Ex. 1002 ¶ 93).  In addition, Petitioner quotes Koyanagi's
bandwidth /speed gains and contends that "[t]he large number of contact
points distributed throughout the dies form vertical interconnections that

IPR2020-01021
Patent 7,282,951 B2

'enable large data bandwidth in vertical data transfer' and thus 'accelerate'
external memory references to the FPGA processing element in the exact
same way discussed in the '951 Patent specification." *Id.* at 29–30 (first
quote quoting Ex. 1007, 17 ("More than $10^5$ [100,000] interconnections per
chip form in a vertical direction. . . . Vertical interconnections enable large
data bandwidth in vertical data transfer."); citing Ex. 1001, 2:41–46
(disclosing placing contacts "throughout the total area of the various die
rather than just around their periphery" to obtain "many more connections
between the die"), 2:65–3:2 (similar); Ex. 1002 ¶ 92)).

Dr. Shanfield credibly testifies that Koyanagi's stacked die module,
which supplies a "large data bandwidth in vertical data transfer," mimics the
'951 patent's wide configuration data port. *See* Ex. 1002 ¶¶ 90–93.[16]  A
large data bandwidth functionally represents a relatively large parallel

---

[16] A large data bandwidth based on the numerous vias is another way of
describing a relatively large parallel transfer of data using the vias
distributed throughout the dies to provide the claimed data acceleration. *See*
Ex. 1002 ¶¶ 90–93 (citing Ex. 1007, 17 ("Vertical interconnections enable
large data bandwidth in vertical data transfer."); Ex. 1007, 17 ("2D image
signals move simultaneously in a vertical direction and are processed in
parallel within each LSI [large-scale integration] layer.  As a result, using
3D-image-processing LSIs leads to a dramatic processing speed
improvement of  more than three orders of magnitude."); Pet. 4 (showing
that "expected advantages of 3D stacks of chips are 'high packing density,'
'high speed,' 'parallel signal processing,' and 'integration of many functions
on a single chip'" (quoting Ex. 1010, 1704).  Dr. Chakrabarty similarly
testifies that a large "number of connections . . . obtained through TSVs[]
accelerate the data transfer," "acceleration is essentially how much
bandwidth you're getting" and "bandwidth is a product of the bit width and
the transfer rate."  Ex. 1035, 270:7–11, 274:6–10.  He also agrees that,
assuming the same clock transfer rate in the systems of Figures 3 and 5, the
"wide configuration data port as in Figure 5 accelerates external memory
references compared to what's in Figure 3."  *Id.* at 274:11–17.

transfer of data using numerous vias distributed throughout the dies to provide the claimed data acceleration. *See supra* notes 14, 16; Ex. 1002 ¶¶ 90–93; Ex. 1007, 17 (quoted above); Pet. 4 (showing that "expected advantages of 3D stacks of chips are 'high packing density,' 'high speed,' 'parallel signal processing,' and 'integration of many functions on a single chip'" (quoting Ex. 1010, 1704)).

Patent Owner relies on its claim construction of "a memory array functional to accelerate external memory references to the processing element" as "a memory array that allows the parallel loading of data through *buffer cells*." PO Resp. 14 (citing Ex. 2015 ¶¶ 50–52). Based on this proposed claim construction, Patent Owner asserts that the combination of Koyanagi and Alexander "does not teach or suggest a memory array functional to accelerate external memory references to the processing element" as recited in claims 1, 5, and 10. *See id.* As Petitioner contends, however, this argument fails because the challenged claims do not require buffer cells to support the accelerate function in the challenged claims. *See* Reply 11–12; *supra* § II.C (Claim Construction). As explained above, and contrary to Patent Owner's argument, the '951 patent does not describe the buffer cells as "necessary for the memory array to accelerate memory references to the processing element." *See id.* at 16 (citing Ex. 2015 ¶ 52); *supra* § II.C (Claim Construction).

As Petitioner argues, the combined Koyanagi and Alexander system mimics the '951 patent's disclosure by employing stacked dies with a "large number of contact points distributed throughout the surfaces of the dies." Pet. 29; *see also supra* notes 14, 16. Petitioner also provides evidence that an artisan of ordinary skill would have known of several advantages in

IPR2020-01021
Patent 7,282,951 B2

stacking 3D chips with multiple vias including "high packing density," "high speed," "parallel signal processing," and "integration of many functions on a single chip." *Id.* at 4 (citing Ex. 1010, 1704; Ex. 1002 ¶ 39). Petitioner points to Koyanagi's "key benefit" as "enab[ling]large data bandwidth in vertical data transfers" (Ex. 1007, 17) to mitigate bus bottlenecks, further showing that multiple vias provide for parallel signal processing and increased processing speed in stacked dies as found above. *See* Pet. 30 (citing Ex. 1007, 17, 19); *supra* § II.C (Claim Construction); *supra* notes 14, 16. In other words, Petitioner shows how the combined teachings of Koyanagi and Alexander teach or suggest to an artisan of ordinary skill the accelerate clause in the challenged claims by providing a large number of short parallel via connections, thereby functionally enabling large data bandwidths and parallel processing, as was well-known at the time of the invention. *See* Pet. 4, 17–23, 28–29; Ex. 1007, 17–18; *supra* notes 14, 16; Reply 15–17; *In re Graves*, 69, F.3d 1147, 1152 (Fed. Cir. 1995)(holding that "Rockwell . . . anticipates claim 4, even if it does not specifically disclose simultaneous monitoring of the output points, if simultaneous or parallel monitoring is within the knowledge of a skilled artisan").

Patent Owner also contends that "[a] POSITA would not have been motivated to combine *Koyanagi* with *Alexander* because neither *Koyanagi* nor *Alexander* disclose how to combine a programmable array, a microprocessor, and a memory die into a 3D IC, which would take undue experimentation to perform without using the '951 Patent as a roadmap." PO Resp. 18. According to Patent Owner, "[a] POSITA would understand that figuring out ***how*** to combine an FPGA, microprocessor, and memory into a 3D integrated circuit that accelerates memory references to the FPGA

36

would require undue experimentation." *Id.* at 19.  Patent Owner also contends that "Petitioner fails to demonstrate not only why a POSITA would have ignored . . . known thermal issues, but also how the POSITA would modify Koyanagi's 3D multichip module with Alexander's FPGAs considering the well-established 3D FPGA thermal issues." *Id.* at 26–27.  Further addressing "how," Patent Owner contends that "the '951 Patent describes that the configuration of the *buffer cells* in the memory array that accelerate the speed at which data travels to the programmable array." *Id.* at 24 (emphasis added).  According further to Patent Owner, "the '951 Patent greatly improved upon FPGA reconfiguration time, which conventionally took 'millions of processor clock cycles to complete the reconfiguration.'" *Id.* (quoting Ex. 1001, 1:52–57).  And "[t]his improvement . . . illustrates that Petitioner trivializes these challenges to make its fallacious obviousness argument." *Id.*

These claim construction arguments that rely on "buffer cells" fail for the reasons noted above, the challenged claims do not require buffer cells. *See supra* § II.C (Claim Construction).  As summarized above, the '951 patent describes in its abstract and other places, including in reference to Figure 4, providing accelerated data transfers and reconfiguration without buffer cells by using numerous short vias to connect circuits in the stacked dies.  *See id.*  As outlined above, Petitioner provides ample motivation supported by the record as to "how and why" an artisan of ordinary skill would have combined the stacked die features of Koyanagi with the similar features of Alexander, to include the well-known FGPA, and it shows how the vertical interconnections employed in both references track the disclosed invention to obtain the claimed acceleration.  *See, e.g.*, Pet. 29 (annotating

IPR2020-01021
Patent 7,282,951 B2

Koyanagi's Figure 1). Wiring similar well-known circuits with short conductive vias instead of long conventional conductors would have been obvious and well-within the ordinary skill of an artisan, motivated by many reasons (for example, speed/bandwidth gains, compactness, power consumption, FPGA design flexibility) as the Petition shows and as Koyanagi and Alexander suggest as discussed above. *See, e.g.,* Ex. 1006, Abstract (describing a "fabrication technology" and "expected manufacturing yield"), 1 (describing "10,000 solder bumps" "to establish the vertical interconnections" and "enabling electrical interconnections between the two sides of the die," by "adapting multi-chip module (MCM) fabrication technology"); Ex. 1007, 17 (similarly describing MCM technology and using 10,000 ($10^5$) "interconnections per chip" to make 3D MCMs "fabricated using our new integration technology"), Fig. 6 (showing "Fabrication sequence of 3D LSI").

Petitioner persuasively shows, and Patent Owner agrees, that "Alexander teaches stacking FPGA dies" and "Koyanagi teaches stacking different types of bare dies using TSVs to form 3D multi-chip modules." *See* Reply 15 (citing PO Resp. 9–11 (describing the teachings of Koyanagi and Alexander); Ex. 1035, 55:17–20; 310:15–311:14; 314:2–5)); PO Resp. 25 ("Alexander proposed stacking several portions of a 2D FPGA to form a single 3D FPGA.") At the cited deposition pages, Petitioner quotes Dr. Chakrabarty as admitting that "Koyanagi teaches '3D integration of different types of dies using TSV technology' (*id.* (quoting Ex. 1035, 55:17–20)), and that "Koyanagi has been recognized [as one of] the earliest papers that demonstrated the reliability of 3D stacking through silicon vias" (*id.* (quoting Ex. 1035, 55:17–20)). Patent Owner's argument that "Alexander

IPR2020-01021
Patent 7,282,951 B2

only teaches a single 3D FPGA" simply glosses over Alexander's teaching of "stacking together a number of 2D FPGA bare dies" to form the 3D FPGA. *See* PO Resp. 20 (quoting Ex. 1006, 1). In other words, Alexander does not restrict stacking a 2D FPGA die to other 2D FPGA dies, even if it teaches stacking such dies and connecting each array together to form a 3D FPGA. Moreover, the challenged claims do preclude multiple layers of 2D FPGAs (i.e., a 3D FPGA) in the stack.

To support its "undue experimentation" argument, Patent Owner contends that Petitioner "slaps *Koyanagi* and *Alexander* together" and quotes Dr. Shanfield as testifying that "***you don't just slap [circuits or modules] together without worrying about what connects to what***." PO Resp. 20 (emphasis by Patent Owner) (quoting Ex. 2014, 81:21–82:19). Patent Owner also argues also argues that "***how*** to combine an FPGA, microprocessor, and memory into a 3D integrated circuit that accelerates memory references to the FPGA would require undue experimentation." *See* PO Resp. 19. Patent Owner also asserts that "Petitioner's alleged combination of Koyanagi's 3D integration of memory chip layers with Alexander's FPGA would only exacerbate the high operating temperatures caused by logic dies and would render the combined device inoperable." *Id.* at 30 (citing Ex. 2015 ¶ 71). Patent Owner presents a number of arguments that track the arguments outlined above and relate to asserted technical challenges based on heat dissipation and (as addressed above) an alleged failure by Petitioner to show "how to combine a programmable array, a microprocessor, and a memory die into a 3D IC" (*id.* at 18). *See* PO Resp. 14–30.

IPR2020-01021
Patent 7,282,951 B2

"In order to render a claimed invention obvious, the prior art as a whole must enable one skilled in the art to make and use the apparatus or method." *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1289, 1297 (Fed. Cir. 2010), *vacated on other grounds*, 374 F. App'x 35 (2010), *reinstated in part*, 649 F.3d 1276. 1296 (2013) (en banc) (reinstating obviousness portion of *Therasense*); *see also In re Kumar*, 418 F.3d 1361, 1368 (Fed. Cir. 2005) (similar holding in the context of examination). However, any "suggestion that [Koyanagi] and [Alexander] are non-enabled is misplaced, since even '[a] non-enabling reference may qualify as prior art for the purpose of determining obviousness,' *Symbol Tech., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991), and even 'an inoperative device . . . is prior art for all that it teaches,' *Beckman Instruments, Inc. v. LKB Produkter* AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989)." *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1360 n.2 (Fed. Cir. 2015)). Moreover, Koyanagi and Alexander, as prior art references, carry a presumption of enablement. *See In re Antor Media*, 689 F.3d 1282, 1287–1288 (Fed. Cir. 2012); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003); *Apple Inc. v. Corephotonics, Ltd.*, No. 2020-1438, 2021 WL 2577597, at *4 (Fed. Cir. June 23, 2021) (nonprecedential) (holding that in the context of AIA trial proceedings, "regardless of the forum, prior art patents and publications enjoy a presumption of enablement, and the patentee/applicant has the burden to prove nonenablement for such prior art" and that "[i]t was error for the Board to suggest otherwise").[17]

---

[17] Petitioner carries the ultimate burden of showing obviousness. *Corephotonics*, No. 2020-1438, 2021 WL 2577597, at *4 states that "the patentee/applicant has the burden to prove non-enablement for . . . prior art" in an anticipation context. *Corephotonics* suggests but does not specify the

IPR2020-01021
Patent 7,282,951 B2

Moreover, Dr. Shanfield's deposition testimony relied upon by Patent Owner does not support Patent Owner's argument that combining the teachings of Koyanagi and Alexander to arrive at the claimed processor module requires "undue experimentation." In the passage that includes the quoted testimony that Patent Owner relies upon, Dr. Shanfield testifies as follows (about another reference of record, Bertin (Ex. 1009)):

> You have obviously got to have a circuit in mind that you're wanting to create a system-level circuit, a module-level circuit; and so you're going to need to consider which connections you want a TSV connecting to something below.
> So you don't just slap it together without worrying about what connects to what.
> On the other hand, the putting together of the -- in Bertin, he describes the putting together of these chips and how that can be done in detail. And that piece of it is -- I guess you could characterize that as something that comes with the process and in itself isn't something you think specifically about every one of 50,000 connections. They're all done by the process that he gives an example of.

Ex. 2014, 82:4–19.

Dr. Shanfield's deposition testimony does not indicate that Petitioner "slaps *Koyanagi* and *Alexander* together without worrying about what connects to what. . . . to arrive at the claimed '3D integrated circuit" or that arriving at the claimed invention would have required "undue experimentation." *See* PO Resp. 19–20. Rather, Dr. Shanfield's deposition testimony indicates that an artisan of ordinary skill readily would have been

---

contours of the enablement burden in an obviousness context in an AIA proceeding. In any event, regardless of which party carries the burden on enablement, Petitioner shows that there is no undue experimentation in arriving at the claim invention, as summarized below.

IPR2020-01021
Patent 7,282,951 B2

able to connect different die circuits together "obviously" with "a circuit in mind . . . to create a system-level circuit, [or] a module-level circuit . . . consider[ing] which [TSV] connections [she] want[s]." *See id.* As Petitioner argues, "[n]othing in Dr. Shanfield's testimony, however, suggests that Petitioner 'slap[ped] together' Koyanagi and Alexander." Reply 14; *see* Ex. 1030 ¶ 84 (testifying that Patent Owner quotes his (Dr. Shanfield's) deposition testimony "out of context," and "at the system or circuit design level, each TSV is designed as an interconnection between specific circuits" and "a TSV that is part of a configuration data port of an FPGA interconnects memory and FPGA circuits located respectively in a memory die and an FPGA die").

As Petitioner also argues and as summarized above, the Petition "provide[s] a detailed explanation of *how* Koyanagi and Alexander would have been combined to disclose each limitation of the Challenged Claims and *why* a POSITA would have been motivated to combine them—'to create a 3D reconfigurable processor module with improved performance and area-efficiency.'" Reply 16 (quoting Pet. 17). By way of example, Petitioner's annotated Figure 1M, which represents combined teachings of Koyanagi and Alexander, shows how to connect the dies together using conductive vias as challenged claim 1 requires. Petitioner also provides persuasive detail with respect to the remaining challenged claims at issue in this section (i.e., claims 4, 5, 8, 10, 13–15). *See* Pet. 31–46. By teaching similar stacking techniques for similar circuits including the use of conductive vias with logic dies including FPGAs, memory, and microprocessors, Koyanagi and Alexander collectively evidence a reasonable expectation of success without undue experimentation in arriving at the claimed invention. *See Otsuka*

*Pharm. Co., v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012) ("The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight. What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art.").  In other words, Petitioner shows that the claimed invention involves a routine combination of familiar elements to yield predictable results, namely combining Alexander's known 2D-FPGA die with Koyanagi's similar die stack, or simply substituting Alexander's known 2D-FPGA die in place of a similar DRAM memory die in the die stack of Koyanagi, with the coupled circuits functioning with processing speed gains and other benefits as expected.  *See* Pet. 27–29; Reply 14 (citing *KSR*, 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.")).

In its Sur-reply, Patent Owner argues that "Koyanagi does not explain how its TSVs would work with a 3D FPGA architecture, which includes configuration memory, configuration logic cells, and programmable switch blocks."  Sur-reply 8.  This argument is not commensurate in scope with the broadly challenged claims, which do not require "configuration memory, configuration logic cells, and programmable switch blocks."  To the extent the claimed programmable array implies logic cells, Alexander discloses a "logic block" with "six immediate neighbors . . . as opposed to four in the 2D case."  Ex. 1006, 1, Fig. 1a (depicting logic cells of the array of a 2D FPGA connected in parallel to those of another 2D FPGA and "enabl[ing] each channel segment to connect to some subset of the channel segments incident on the other five faces of the 3D switch block"); *see* Pet. 12–13, 18–

IPR2020-01021
Patent 7,282,951 B2

19 (relying on Alexander's FPGAs and providing reasons for employing same including flexibility).

The '951 patent does not provide any more specific detail with respect to stacking processor, memory, and FPGA dies to obtain the claimed acceleration using conductive vias than Koyanagi, Alexander, or the combined teachings of the references as set forth by the Petition. *Compare* Ex. 1001, Fig 4 (illustrating a die package comprising an FPGA die, memory die, and processor die, with generic "CONTACT POINTS" on each die), *with* Ex. 1006, Fig. 2 (similar); Ex. 1007, Fig. 1a (similar), *and supra* Fig. 1M (similar). Figure 5 of the '951 patent does not portray any specific via connections between the *three* circuit dies in Figure 4 and the well-known wide data port and simply provides a "functional block diagram" without describing any electrical connections to microprocessor 64.[18] *See* Ex. 1035, 157:3–17, 158:10–12 (agreeing that "memory die 66" is "to the left of the very wide configuration data port 82 in Figure 5, although not shown" and the "connections" shown in Figure 5 "are formed by the TSVs that are between the memory die [not shown in Figure 5] and the FPGA die" "to the right of Figure 5"), 163:14–17 (testifying that "'[c]onfiguration data port' . . . is a well-known term" and agreeing that "that's just a data port used for configuration, basically"). That the "very wide configuration data port" 84 in Figure 5 is merely a box without any description in the '951 patent

---

[18] Figure 5 purports to illustrate "functional block diagram" that includes a wide configuration data port and applies to an embodiment of Figure 4 for implementing a "total reconfigur[ation] in one clock cycle by updating all of the configuration cells in parallel." *See* Ex. 1001, 5:29–32, Fig. 5. But the challenged claims do not require the one clock cycle reconfiguration feature as discussed above. *See supra* § II.C (Claim Construction).

IPR2020-01021
Patent 7,282,951 B2

specification signifies that the inventors of the '951 patent considered its structure and function to be well-known.

As Petitioner argues, "Figure 1M illustrates how a POSITA would have understood Koyanagi and Alexander would be combined . . . ." Reply 17. Similarly, regarding thermal considerations, Petitioner persuasively argues that "the '951 patent is devoid of discussion of thermal considerations," and it "simply asserts that stacking dies reduces power consumption, which was a well-known fact in the art." *Id.* at 18 (citing Ex. 1001, 5:51–53; Ex. 1002 ¶ 78; Ex. 1010, 1712–13)).[19]

The lack of specific circuit connection detail in the '951 patent, Koyanagi, and Alexander reveals that an artisan of ordinary skill would have required minimal experimentation, direction, and guidance to obtain the broadly claimed invention in the relatively predictable art of stacked integrated circuit dies to obtain an operable "processor module" as claimed with a reasonable expectation of success. Also, as the Petition asserts, the '951 patent shows, by way of block diagram of admitted prior art Figure 1, that artisans of ordinary skill readily knew how to electrically connect a microprocessor, system memory, and an FPGA together. *See* Pet. 5 ("[T]he patent admits that it was well-known in the art to combine FPGAs (red), microprocessors (blue), and memory (tan) to form a reconfigurable processor system, as is depicted in Figure 1 ('APA Figure 1') of the '951 Patent below."), 6 (annotating prior art Fig. 1 of the '951 patent). Similarly,

---

[19] The cited pages of Akasaka (Ex. 1010) support Petitioner by stating that "[t]he first step in 3-D system design . . . begin[s] with the integration of conventional functions already realized in 2-D devices," which results in "miniaturization, *low power consumption*, and large-scale integration." Ex. 1010, 1712–13 (emphasis added).

Alexander indicates, by describing its 3D "(re)programmable" FPGAs (Ex. 1006, 253), that an artisan of ordinary skill would have known how to connect well-known circuit dies together using conductive vias for parallel processing as Koyanagi also teaches, instead of using long runs implied by APA Figure 1 of the '951 patent. *See supra* §§ II.D.1, II.D.2, note 19 (Akasaka teaching that "[t]he first step in 3-D system design . . . begin[s] with the integration of conventional functions already realized in 2-D devices"); Pet. 19–20 (showing how the "high density vertical interconnection scheme" in Alexander and Koyanagi teaches eliminating long circuit runs in the prior art).

Petitioner explains that Dr. Chakrabarty "admits that a 'logic chip' as disclosed in Koyanagi (Ex. 1007, 17) may be an FPGA." Reply 15 (citing Ex. 1035, 129:2–7 (admitting that logic includes an FPGA), 86:20–87:10 (same), 220:20–24 (same); Ex. 1030 ¶¶ 35–36).[20] Petitioner further contends that "Koyanagi explains that the use of TSVs allows forming a very large number (in the order of 100,000) of short vertical interconnects, which 'dramatically increase[s] wiring connectivity while reducing the number of long interconnections.'" *Id.* (quoting Ex. 1007, 17; citing Pet. 13; Ex. 1035, 254:18–21 (admitting that Koyanagi teaches "hundreds of thousands of TSVs"), 247:3–9 (same); Ex. 1030 ¶¶ 35–36). As noted above,

---

[20] Koyanagi refers to a 3D MLM (merged logic memory) LSI (large scale integration) die stack with respect to Figure 1a, which portrays microprocessor (logic) dies stacked with DRAM (memory) dies. Ex. 1007, 17–18, Fig. 1a. In other words, logic as disclosed in Koyanagi includes a microprocessor, and Dr. Chakrabarty and Dr. Shanfield agree that a logic chip generally signifies logic chips such as microprocessors, ASICs, and FPGAs, as a limited class of processing chips known to one of ordinary skill in the art. *See* Ex. 1030 ¶ 36 (citing Ex. 1035, 129:2–7).

IPR2020-01021
Patent 7,282,951 B2

in addition to saving area, reducing power consumption, and generally improving performance by stacking dies with TSVs, Petitioner explains that the

> high density vertical interconnection scheme—which uses through-silicon contacts that are orders of magnitude more abundant ***and*** orders of magnitude shorter than circuit board wirings in conventional 2D layout—"dramatically increase[s] wiring connectivity while reducing the number of long interconnections" and significantly improves system speed; in particular, it provides fast memory access and thus serves to "accelerate" external memory references.

Pet. 19–20 (first quotation quoting Ex. 1007, 17; citing *id.* at 19; Ex. 1002 ¶ 93).

In other words, as Petitioner persuasively shows, the prior art of record, including Koyanagi and Alexander, provides well-known benefits and reasons for stacking different types of chips together using conductive vias, including logic chips that include FPGAs, thereby suggesting in combination with Alexander how to form an operable processor module as claim 1 recites with a reasonable expectation of success and without undue experimentation. *See* Pet. 4, 17–23; Reply 11–20.

In Patent Owner's Sur-reply, Patent Owner argues that Koyanagi relies on CAD tools, and that Dr. Shanfield relies on this disclosure for "***providing*** evidence of a reasonable expectation of success," but "Dr. Shanfield cannot and does not establish that the use of CAD tools when attempting to combine Koyanagi and Alexander would result in the claimed invention." Sur-reply 8 (citing Ex. 2017, 20:3–6, 24:22–25:7; Ex. 1007, 17). Based on these assertions, Patent Owner contends that "Dr. Shanfield does not demonstrate that any CAD tools would have resulted in 'a memory array functional to accelerate external memory references to the processing

47

element' as opposed to any other possible interconnection scheme." *Id.*
Patent Owner's Sur-reply arguments, Dr. Shanfield's testimony, Koyanagi,
and Alexander, all show that artisans of ordinary skill would have been able
to use routine tools available at the time of the invention, such as CAD tools,
and motivated to use them as an aid to establish the desired connections
between circuits. *See* Ex. 1007, 17 ("A powerful CAD tool proves
indispensable for 3D LSI design, specifically for 3D wiring routing because
combining 2D multilevel metallization with vertical interconnections forms
this complicated 3D wiring."); Ex. 2017, 20:3–6 (agreeing that it is "a fair
understanding that an engineer, when designing 3D architecture, would use
some sort of CAD tool in designing the circuitry"), 24:6–21 (testifying that
"CAD tools are always used for routing in the design and manufacture of
integrated circuits," and "the engineering connected with CAD has been
resolved in [Alexander's] description for his particular approach, and he's
just simply explaining to the person skilled in the art reading this that this is
how he did it, and this is what worked well for him" (discussing "Section 6
of Alexander")).  In Section 6, Alexander describes the CAD-based
"framework" as "enabl[ing] the use of a wide variety of graph-search
algorithms to construct routing solutions, and works quite well in practice."
Ex. 1006, 4 (citing several documents for "3D FPGA routing").  In other
words, the record shows that an artisan of ordinary skill would have readily
been able and motivated to use routine tools to route connections vertically
in stacked chips.  Moreover, the '951 patent does not mention using CAD
tools, indicating either that such tools were not needed for the invention or
that they were so well-known that mentioning them was not important for
purposes of describing the invention.

Patent Owner also argues that "[b]ecause of the power consumption by FPGAs, and other logic dies, and the resulting thermal issues, a POSITA would not have found it obvious to stack a programmable array, such as an FPGA, with other die[s], let alone a microprocessor." PO Resp. 28 (citing Ex. 2015 ¶ 69). As noted above, Dr. Chakrabarty admits that Koyanagi discloses a logic chip and an FPGA is a logic chip. Reply 15 (citing Ex. 1007, 17; Ex. 1035, 129:2–7, 86:20–87:10, 220:20–24; Ex. 1030 ¶¶ 35–36). Patent Owner argues that FPGAs and other logic chips, such as microprocessors, consume the same (or similar) amount(s) of power. *See* PO Resp. 34 ("Because of the power consumption by FPGAs, *and other logic dies*, and the resulting thermal issues . . . ." (emphasis added)); Ex. 1035, 116:11–117:5 (Dr. Chakrabarty testifying that he did not analyze or cite articles comparing power consumption of microprocessors, programmable arrays, and FPGAs).

Contrary to Patent Owner's arguments, as Petitioner shows, Alexander, a presumptively enabled prior art reference, discloses stacking multiple 2D FPGAs (logic chips) together with solutions to any thermal issues, contradicting Patent Owner's arguments that multiple logic chips present an inoperable device or insurmountable thermal problems or otherwise would have been unobvious. *See* Pet. 19–22 & n. 6 (discussing power and heat considerations, showing a reasonable expectation of success in stacking different dies, and also noting that Koyanagi stacks different types of dies together) (citing Ex. 1006, 1; Ex. 1007, 17; Ex. 1002 ¶¶ 79–81); Reply 19 (arguing that "Alexander also lists conventional thermal-reduction techniques that are also applicable to 3D FPGAs, such as the use of 'thermal bumps and pillars' (illustrated below in Figure 2(b)) as

heat removing pipes—similar to the express teachings of both Koyanagi and Bertin") (citing Ex. 1006, 3; 1007, 17; Ex. 1009, 2:61–65; Ex. 1030 ¶ 60).

The thrust of Patent Owner's thermal challenge arguments rests on the well-known principle that increasing power consumption increases heat generation. *See* PO Resp. 27–28; Reply 16–17 ("***Koyanagi*** explicitly teaches that using TSVs in 3D ICs reduces power consumption and improves heat removal (because TSVs also serve as heat pipes)"); Ex. 1006, 3 ("As the power-to-area/volume increases, *so does the operating temperature sunless heat can be effectively dissipated*) (emphasis added). For example, Patent Owner explains that FPGAs consume substantially more dynamic power than DRAMs resulting in significantly higher temperatures and corresponding heat dissipation problems. PO Resp. 28.

However, as Petitioner argues and as Dr. Chakrabarty confirms, using many short vertical conductive vias (e.g., TSVs) versus long conductive runs "reduces power consumption and improves heat removal (because TSVs also serve as heat pipes)." Reply 17 (citing Ex. 1007, 17). In other words, Dr. Chakrabarty acknowledges that

> [w]hat Koyanagi says *is actually obvious* to anybody who is skilled in the art. *Anybody who is skilled in the art would know that via is conductive. It is a conductor for both electricity and for heat.* And therefore, *if you have lots of vias, you're going to take out the heat*.

Ex. 1035, 256:9–15 (emphasis added); *see* Reply 17 (partially quoting Ex. 1035, 256:9–15). Therefore, as Petitioner persuasively argues, rather than ignoring thermal issues or deterring a person of skill in the art from combining Koyanagi and Alexander, "a POSITA would have been motivated to find a solution to the alleged thermal issues, and would have

recognized that a large number of 3D interconnections between dies contribute to such a solution." *See* Reply 21 (citing Ex. 1030 ¶ 53).

Patent Owner also argues that "the power consumption needs of FPGAs, as well as other logic dies, as opposed to memory, were far greater as they are driven by dynamic power that is based upon the specific use of each resource and is a function of the signals toggling and capacitive loads charging and discharging." PO Resp. 27–28 (citing Ex. 2012, 1; Ex. 2013, 4; Ex. 2015 ¶ 68). To support this argument, Patent Owner states that "*Alexander*[] notes that a large portion of the power consumption is due to driving I/O buffers." *Id.* at 28 (citing Ex. 1006, 4). Patent Owner adds that the FPGA "use of I/O pins impact[s] the total power requirements since 'considerations like I/O standards used and data rates expected determine how fast the I/Os toggle and how fast the logic must be clocked.'" *Id.* (quoting Ex. 2012, 1; citing Ex. 1035 ¶ 68). Patent Owner also asserts that "while Alexander proposed a 3D FPGA, the authors admitted that it could not fabricate its proposed design." *Id.* at 25 (citing Ex. 1006, 4). Advancing similar arguments, Patent Owner concludes that "Petitioner's contention that it would be obvious to try stacking Alexander's FPGAs on Koyanagi's 3D multichip module crumbles under the weight of contradictory evidence." *Id.* at 30.

This line of argument fails because Koyanagi and Alexander individually and collectively teach ready solutions to any heat challenges in stacking "different types of bare dies using TSVs to form 3D multi-chip modules" and "Alexander teaches stacking FPGA dies." *See* Reply 15, 19 (referencing Alexander's conventional thermal-reduction techniques including "thermal bumps and pillars" as similar to Koyanagi's heat pipe

IPR2020-01021
Patent 7,282,951 B2

and/or via teachings (quoting Ex. 1006, 3; citing Ex. 1007, 17)).  No reasonable dispute exists on this record over the fact that using a sufficient number of conductive vias solves any heat problems in stacked dies that include one or more logic dies.  *See id.* at 17 (arguing that Koyanagi "solv[es] any heat problem by forming 'as many vertical interconnections as possible' because they 'remove the generated heat'" and that "Dr. Chakrabarty admitted this") (quoting Ex. 1007, 17; citing Ex. 1035, 290:4–7) (agreeing that "Koyanagi teaches using a lot of these TSVs" "[a]s a way to removing heat")).  In addition to Koyanagi's solution for addressing thermal issues, Petitioner persuasively notes that "Alexander points out that 3D integration 'using MCM technology' advantageously eliminates input and output buffers where 'a large portion of the total power is expended,' and thus 3D stacking of FPGAs 'tends to significantly reduce power consumption.'"  Reply 19 (quoting Ex. 1006, 4).[21]

Given that, similar to Koyanagi, Alexander specifically describes "[a] number of thermal-reduction techniques" as including "thermal bumps in pillars" (Ex. 1006, 3), whether Alexander's authors actually manufactured the disclosed die stack is not determinative.  *See* Reply 19 (citing *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (stating that "no 'actual creation or reduction to practice' is required" for a prior art reference to anticipate claims (quoting *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1380–81 (Fed. Cir. 2003))).  Also, as noted above, Alexander is presumed to be enabled for what it teaches, *see Antor Media*, 689 F.3d at 1287–1288, *Amgen Inc.*, 314 F.3d at 1355; *Corephotonics*, 2021 WL

---

[21] An "MCM" is a "multi-chip module."  Ex. 1006, 1.

IPR2020-01021
Patent 7,282,951 B2

2577597, at *4, namely a die stack of interconnected 2D FPGAs with through-vias that reduce "interconnect delay" and provide "shorter signal propagation delay," wherein the disclosed "3D FPGAs have good implications with respect to power consumption." Ex. 1006, 1.

Therefore, contrary to Patent Owner's arguments, part of Alexander's chip stacking solution involves using known thermal reduction techniques (e.g., such as conductive vias as Koyanagi describes and/or thermal bumps and pillars as Alexander describes) with the added option of eliminating I/O buffers and any heat generating switching associated therewith. *See* Ex. 1006, 4 ("[W]hen chips are interconnected using MCM technology, such I/O buffers are often unnecessary, which tends to significantly reduce the power consumption."). Finally, the challenged claims here do not require I/O buffers (or clocking, driving, or switching thereof).

Furthermore, as Petitioner also argues, not only does Koyanagi and Alexander's method individually or collectively solve heat problems using "a huge number" of short vias in stacked dies, this "high density vertical interconnection scheme" with vias "orders of magnitude shorter than circuit board wirings in conventional 2D layout" "significantly improves system speed" by decreasing the interconnect delay to accelerate external memory references. Pet. 30 (citing Ex. 1002 ¶¶ 92–93; Ex. 1007, 17, 19). This resulting speed increase provides further motivation for the combination as proposed by Petitioner.

Based on the foregoing discussion and a review of the record, including Patent Owner's evidence and arguments as presented in the Response and Sur-reply as summarized above, Petitioner persuasively shows that the combination of Koyanagi and Alexander would have rendered claim

53

1 obvious. Relying partly on its showing with respect to claim 1, Petitioner
provides a similar and persuasive showing for independent claims 5 and 10,
which largely track the limitations recited in claim 1. *See* Pet. 31–44.

Claim 4 depends from claim 1 and recites an "electrically coupled
"third integrated circuit." Claim 8 depends from claim 5 and recites a
similar limitation. Claim 13 depends from claim 10 and recites that the
"memory" comprises a "memory array." Claim 14 depends from claim 10
and recites that the "programmable array" is "reconfigurable." Claim 15
depends from claim 10 and recites that the three "integrated circuit
functional elements are electrically coupled by a number of contact points
distributed throughout the surfaces of said functional elements." The
Petition shows that Koyanagi discloses these well-known circuit elements or
that the recitations thereof amount to combining "familiar elements
according to known methods . . . [to] yield predictable results." *See KSR*,
550 U.S. at 416; Pet. 31, 36–37, 45–46. In summary, the Petition presents a
persuasive showing supported by the record with respect to dependent
claims 4, 8, 13, 14, and 15. *See id.* at 31, 36–37, 45–46. Patent Owner does
not address claims 4, 5, 8, 10, 13, 14, and 15 separately from claim 1. *See*
PO Resp. 14–30.

Accordingly, based on the record and as summarized above, Petitioner
establishes by a preponderance of evidence that claims 1, 4, 5, 8, 10, and 13–
15 would have been obvious.

E.     *Obviousness, Bertin and Cooke, Claims 1, 4, 5, 8, 10, and 13–15*

Petitioner contends claims 1, 4, 5, 8, 10, and 13–15 would have been
obvious over the combination of Bertin and Cooke. *See* Pet. 46–61. Similar
to Koyanagi, Bertin teaches stacking different types of chips, including logic

IPR2020-01021
Patent 7,282,951 B2

chips, microprocessors, and controllers to minimize latency and maximize bandwidth and heat dissipation, using through-chip conductors (vias). *See id.* at 47 (citing Ex. 1009, 1:20–27, 6:49–51, 7:16–34; Ex. 1002 ¶¶ 118–120).

Petitioner's "Annotated Figure 22A," which represents how Petitioner combines relevant teachings of Bertin and Cooke (Pet. 53), follows:



**Bertin in view of Cooke
Figure 22A**

Annotated Figure 22A above represents the combined teachings of Bertin and Cooke, showing Cooke's FPGA in place of logic chip 140 in Bertin's stacked system, which includes Bertin's first (140) and second (146) dies, memory dies (144, 142), microprocessor dies (146, 148), and logic die (140), and contact portions (red) extending through the various dies, including the claimed first and second die. *See* Pet. 50–52 (citing Ex. 1009, 7:16–34 (describing stacking a logic chip with other chips in Figure 22), Fig. 22; Ex. 1002 ¶¶ 127–128; Ex. 1008, 2:58–60 (describing "DP-FPGA" that include arithmetic logic units or ALUs), Figure 1 (depicting DP-FPGA blocks), 1:48–64 (describing "reconfigurable computing" by loading a "specific hardware logic function" into an FPGA at one point and replacing it later).

IPR2020-01021
Patent 7,282,951 B2

In other words, Bertin does not disclose an FPGA but discloses logic chip or processor 140 in the middle or bottom of a "stack of chips" such as the chip stacks of Figures 21 and 22, respectively. Ex. 1009, 7:16–42. Petitioner relies on Bertin's chip stacks in general and Cooke's description of FPGAs, microprocessors, and memory planes in a similar chip or die stack. *See* Pet. 46–52 (citing Ex. 1008, 2:3–11, 2:40–55, 3:13–18, Figs. 1, 2, 8A; Ex. 1009, 6:49–51; Ex. 1002 ¶¶ 118–120). Petitioner contends that it would have been obvious to use Cooke's FPGAs in Bertin's 3D stacks to minimize latency, maximize bandwidth, and improve packing densities, heat efficiency, heat dissipation, and speed by avoiding interconnect delays. *Id.* at 46–50 (citing Ex. 1006, 1; Ex. 1009, 1:20–57, 2:61–65, 7:16–34; Ex. 1002 ¶¶ 119–120). Petitioner also reads the claim limitations of the remaining challenged claims on to the combined teachings of Bertin and Cooke, providing a detailed showing, supported by the references and expert testimony. *See id.* at 58–71.

Patent Owner challenges Petitioner's showing. PO Resp. 30–44. Patent Owner advances similar arguments to those addressed above with respect to the combined teachings of Koyanagi and Alexander. For example, Patent Owner argues that "[a] POSITA would understand that figuring out *how* to combine an FPGA, memory, and microprocessor into a 3D integrated circuit would require undue experimentation." *Id.* at 35. To support this "undue experimentation"/"how to" argument, Patent Owner relies on the same testimony by Dr. Shanfield addressed above that "you don't just slap [circuits] together without worrying about what connects to what." *Id.* at 36 (quoting Ex. 2014, 81:21–82:19). Contrary to this argument, however, Dr. Shanfield's testimony does not support Patent

56

IPR2020-01021
Patent 7,282,951 B2

Owner for reasons similar to those explained above—i.e., Petitioner and Dr. Shanfield do not propose simply "slap[ping] together" the combined teachings. Rather, Petitioner provides a detailed mapping showing how to combine the references with factual underpinnings and rationale supported by the record, as summarized above and as exemplified by Annotated Figure 22A. *See* Pet. 46–52 (citing Ex. 1008, 2:3–11, 2:40–55, 3:13–18, Figs. 1, 2, 8A; Ex. 1009, 6:49–51; Ex. 1002 ¶¶ 118–120).

Patent Owner also does not describe what experimentation would have been undue in Petitioner's reading of claim 1 onto this detailed mapping. Rather, Patent Owner argues that "Petitioner simply suggests— without any explanation as to how—that *Bertin's* through chip connectors would somehow achieve *Cooke's* aspirational goal of instantaneous reconfiguration of FPGAs in a processor chip." PO Resp. 37. Contrary to this argument, Petitioner explains how Cooke's system reconfigures FPGAs. *See* Pet. 48, 52. Petitioner points out that "Cooke discloses a tightly integrated FPGA, microprocessors and a 'vertical stack' of memory planes." *Id.* at 48 (citing Ex. 1008, 2:3–11, 2:40–55, Figs. 2, 8A; Ex. 1002 ¶ 121). The depicted stacks show an interface bus. The fact that Cooke generally describes how to reconfigure an FPGA at this level of detail (similar to the '951 patent's description, *see* Ex. 1001, Figs. 3–5, 5:29–50) suggests that an artisan of ordinary skill readily would have recognized how to reconfigure an FPGA in similar die stacks, such as that of Bertin, to arrive at an operable device with a reasonable expectation of success and without undue experimentation.

Patent Owner also argues that "Petitioner uses the '951 Patent to glean advantages from its instrumental improvement over the art—reconfiguration

IPR2020-01021
Patent 7,282,951 B2

of FPGA in one clock cycle as opposed to the millions of clock cycles it took in the conventional art." *Id.* at 37. Patent Owner stresses that it is the "***buffer cells***" that "greatly improved upon FPGA reconfiguration time," and that "[t]his improvement was the basis for the '951 Patent, and, further confirms the challenges that the inventors of the '951 Patent faced when innovating in this space, and illustrates that Petitioner trivializes these challenges to make its fallacious obviousness argument." *Id.* at 39–40. All of these arguments rely on Patent Owner's unsupported claim construction argument that "the phrase 'a memory array functional to accelerate external memory references to the processing element' means 'a memory array that allows the parallel loading of data through *buffer cells*.'" *Id.* at 30 (emphasis added) ("Petitioner's proposed combination of *Bertin* with *Cooke* does not satisfy this limitation as the combination does not teach or suggest a memory array that uses buffer cells to accelerate memory references to a processing element.").

Contrary to this line of argument, as set forth above with respect to the ground based on Koyanagi and Alexander and the claim construction of the "accelerate" clause, the challenged claims do not require buffers or a reconfiguration in one clock cycle. *See supra* §§ II.C (Claim Construction), II.D. And even if somehow buffers or reconfiguration are claim requirements, Petitioner persuasively shows that "the components of Cooke stacked according to Bertin's teachings ***include tristate buffers*** in the FPGA of Cooke, and those tristate buffers operate for the same purpose as the buffer cells in the '951 patent." Reply 23 (citing Ex. 1035, 160:18–161:1 (showing that Dr. Chakrabarty testifies that buffer cells in '951 patent "decouple[] the loading of the configuration bits through [] the wide

58

IPR2020-01021
Patent 7,282,951 B2

configuration data port [] from the operation of the logic cells under its current configuration.").

As similarly explained above in connection with Koyanagi and Alexander, the challenged claims at issue here only require, in relevant part, generalized circuit connections, namely the general recitation of "electrically coupled" and recitation of the "functional to accelerate." The '951 patent does not describe with any more level of granularity than Petitioner provides in reliance on Cooke and Bertin's teachings as summarized above, including by virtue of "Annotated Figure 22A." Also, as the thrust of Dr. Shanfield's deposition testimony and the record shows, an artisan of ordinary skill readily would have been able to connect the claimed circuits together using conductive vias. *See* Ex. 2014, 82:4–19; Ex. 1002 ¶¶ 124 (testifying that "Bertin provides broadly applicable, detailed teachings with regard to stacking different processors, memories and logic chips such as FPGAs"), 130–136 (addressing the "electrical coupling" and "functional to accelerate" limitations in claim 1); Ex. 1030 ¶ 84 (testifying that "at the system or circuit design level, each TSV is designed as an interconnection between specific circuits" and "a TSV that is part of a configuration data port of an FPGA interconnects memory and FPGA circuits located respectively in a memory die and an FPGA die").

Similar to block diagram forms for connecting circuits together as shown in Cooke, Bertin, and the '951 patent, the long prior art connections similarly represented in block diagram form in admitted prior art Figure 1 of the '951 patent, and the lack of detail with respect to Figures 4 and 5 of the '951 patent, all shows that an artisan of ordinary skill in the art readily would have been able to connect desired circuits together to form an

59

IPR2020-01021
Patent 7,282,951 B2

operable device without undue experimentation. *Compare* Ex. 1001, Fig. 1, Fig. 4, *with* Ex. 1008, Fig. 2, Fig. 8a *and* Ex. 1009, Fig. 21, Fig. 22. Discussing Figures 21 and 22, Bertin states that some of its "connections allow for parallel input/output connections." Ex. 1009, 7:31.

Patent Owner also argues that "while *Cooke* suggests utilizing vertically stacked memory with a single IC die having microprocessor and FPGA functionality, *Cooke* does not disclose either stacking the vertical memory stack above the FPGA or using die-area interconnects in such an arrangement." PO Resp. 41 (citing Ex. 2014, 74:17–75:6 (contending that Dr. Shanfield "admit[s] that FIG. 2 [of Cooke] is merely a schematic relationship that does not show how the elements are physically configured)); *see also* Sur-reply 12 (arguing "*Cooke's* system is made up of a single chip").

This line of argument minimizes the circuit stacking teachings of Cooke and mischaracterizes the testimony of Dr. Shanfield. Dr. Shanfield testifies that Cooke "portray[s] in the schematic drawing, Figure 2, *a vertical stack of memory plane*." Ex. 2014, 74:17–75:6 (emphasis added). Claim 1 does not require "stacking the vertical memory stack *above* the FPGA or using die-area interconnects *in such an arrangement*." *See* PO Resp. 41 (emphasis added). And Patent Owner admits that "*Cooke* suggests utilizing *vertically stacked memory* with a single IC die having microprocessor and FPGA functionality." PO Resp. 41. To the extent Patent Owner argues Cooke does not disclose a die stack because Cooke discloses "a single chip with on-chip components" (Sur-reply 13), Patent Owner's arguments do not address the combined teachings of the references, including Petitioner's reliance on Bertin's die stack benefits and Cooke's FPGA benefits. *See* Pet.

IPR2020-01021
Patent 7,282,951 B2

15–16, 50–57. In addition, claim 1 neither precludes stacking a single logic die that includes Bertin's "microprocessor and FPGA functionality" (*see id.*) with the separate microprocessor die and memory dies of Bertin, nor does it preclude stacking multiple processors. *See* Pet. 57 (Annotated Figure 22A).

The record also does not support Patent Owner's argument that "Cooke never describes that the vertical memory stack is also stacked with the FPGA." PO Resp. 42 (citing Ex. 2015 ¶ 87). Contrary to this argument, as the Petition shows, Cooke's Figure 2 specifically portrays an "FPGA PLANE" stacked with "MEMORY PLANES." Ex. 1007, Fig. 2; Pet. 48 ("As shown in Cooke, Figure 8a and 2 show stacked memory planes and memory planes with an 'FPGA' plane . . . .") (reproducing Ex. 1008, Fig. 2, Fig. 8A, 2:3–11, 3:13–18; citing Ex. 1002 ¶ 121). To support this showing, Petitioner points out that "in the parallel District Court litigation, Dr. Chakrabarty opined that all the components of Cooke's reconfigurable system are stacked dies." Reply 25 (citing Ex. 1034, 139:4–141:3; Ex. 1030 ¶ 79; Ex. 1035, 191:10–17, 190:12–21). At the cited portion of the transcript, Dr. Chakrabarty testifies that in Cooke's Figure 2, "here is the FPGA plane and memory planes . . . and we need vertical connectivity." Ex. 1034, 140:16–19. Vertical connectivity suggests a circuit stack. *See also id.* at 139:17–19 (asserting in a cross-examination question that Dr. Chakrabarty states (in a District Court expert report at paragraph 89) that "Cooke is directed to a re-configurable processor chip having interconnections around the periphery of the stack die elements").

Patent Owner also argues that the Petition's assertion that "supposes that *Bertin* inherently suggests 3D FPGA stacking because it describes logic chips" is "a red herring," because "[t]here are many specific types of ICs,

including microprocessors, graphic processing units ("GPUs"), application specific integrated circuits ("ASICs"), and microcontrollers, that fall under the generic definition of a logic chip." PO Resp. 42. This argument simply does not address the Petition's showing and Dr. Chakrabarty's admission as discussed above that an FPGA is a type of logic chip, so that Bertin's FPGA is a logic chip embraced and suggested by Cooke's logic chip given known properties and advantages of an FPGA. *See, e.g.*, Ex. 1035, 129:1–7 (agreeing that "logic is understood [to] . . . mean[] it could be an FPGA, it could be a ASIC, could be a microprocessor, could be a microcroller").

As to known FPGA advantages and benefits, Petitioner describes FPGA's as providing "arbitrary logic" and "[u]nlike ASICs, the logic and interconnect resources are uncommitted, and can be configured to implement different logic functions and connectivity." Pet. 52 (citing Ex. 1002 ¶ 128; Ex. 1006, 1; Ex. 1013, 6); *see also* Ex. 1006, 1 ("FPGAs" are "(re)programmable chips that can implement arbitrary logic" and "provide designers with a faster and more economical design cycle"). Petitioner also shows that "[r]econfigurable computing blends the benefits of software and ASIC hardware" (Pet. 3 (citing Ex. 1002 ¶ 38)), and that "[t]he '951 Patent admits that FPGA-based reconfigurable processor systems were well-known in the art" (*id.* at 5 (citing Ex. 1001, 1:36–42 ("Conventionally, the ability for a reconfigurable processor to alter its hardware [] is typically accomplished through the use of some form of field programmable gate array ('FPGA') such as those produced by Altera . . . .")).

Therefore, contrary to Patent Owner's characterization of Petitioner's argument as based on "inheren[cy]" (PO Resp. 42), the Petition persuasively relies on obviousness supported by factual underpinnings and rationale. It

follows that contrary to Patent Owner's arguments, Petitioner does not assert that a "disclosure of a genus [logic chip] is . . . necessarily a disclosure" of an FPGA.  *See id.* (quoting *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1285-86 (Fed. Cir. 2017); *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006)) (addition by Board).

Patent Owner also argues that "a POSITA would ***not*** have found the '951 Patent's claimed invention—stacking a *thinned* microprocessor die element, a memory die element, and a FPGA . . . obvious to try with a reasonable expectation of success because of the known thermal issues, which a POSITA would ***not*** have ignored."  PO Resp. 43 (emphasis to "thinned" added).  Contrary to this argument, none of the challenged claims, require "a thinned microprocessor die element."

Patent Owner correctly points out that a person of ordinary skill would have possessed "an understanding of the known thermal issues as recognized by *Alexander* and other skilled artisans."  PO Resp. 43.  This argument supports Petitioner's showing that an artisan would have addressed the known thermal issues, given the teachings of the prior art of record, including those in Bertin and Cooke.  *See* Pet. 46–50 (addressing motivation and known thermal issues including Bertin's teaching of "high performance" and "heat dissipation" (quoting Ex. 1009, 2:61–65)).  And the record shows that such an artisan would have had a reasonable expectation of success based on known via heat conductor solutions as admitted by Dr. Chakrabarty (as discussed above, § II.D.3), and would have been motivated to employ those via and FPGA teachings for myriad beneficial reasons, including speed gains (based on increased bandwidth and short via connections), compactness, and known benefits with the use of FPGAs.  *See* Pet. 4

IPR2020-01021
Patent 7,282,951 B2

(arguing that "expected advantages of 3D stacks of chips are 'high packing density,' 'high speed,' 'parallel signal processing,' and 'integration of many functions on a single chip' (quoting Ex. 1010, 1704; citing Ex. 1002 ¶ 39)), 46–50 (providing evidence that reasons to combine the similar stacked logic chips of Bertin and Cooke include to maximize bandwidth, minimize latency, eliminate performance degradation, improve heat dissipation, and provide high system packing densities and high performance communication, where Bertin's structure generically accommodates different sizes and structures (citing Ex. 1002 ¶¶ 118–124; Ex. 1009, 1:20–57, 2:61–65, 6:49–52, 7:16–34, Figs. 21–22; Ex. 1006, 1; Ex. 1008, 2:3–11, 2:40–55, 3:13–18, Fig. 8A)).

Further regarding the known thermal issues, Patent Owner relies on its arguments with respect to Koyanagi and Alexander, and contends that "a POSITA would understand that Petitioner's alleged combination of Bertin with Cooke's FPGA would only exacerbate the high operating temperatures caused by logic dies and would render the combined device inoperable." PO Resp. 44 (citing Ex. 2015 ¶ 90). According to Patent Owner, "the power consumption by logic dies, such as FPGAs and microprocessors, increase[s] the operating temperatures." *Id.*

This line of argument ignores that Patent Owner agrees that Bertin teaches a "broad invocation of logic chips" (PO Resp. 42), and also agrees that "*Cooke* suggests connecting vertically stacked memory to a 2D chip comprising a microprocessor and FPGA" (*id.* at 41). As noted above, tribunals presume the enablement of these patents for what they disclose. *Antor Media*, 689 F.3d at 1287–1288, *Amgen Inc.*, 314 F.3d at 1355; *Corephotonics*, 2021 WL 2577597, at *4. Regarding operability, Petitioner

IPR2020-01021
Patent 7,282,951 B2

cites Dr. Chakrabarty's admission that "Bertin pays a lot of attention to the thermal issues" and Bertin uses many TSVs "as heat pipes." *See* Reply 25 (quoting Ex. 1035, 247:10–15, 246:14–247:2). Accordingly, Petitioner persuasively shows that

> [a] POSITA would have been motivated to vertically stack the functional components of the FPGA-based reconfigurable computer system described in Cooke according to Bertin's 3D integration teachings—which [are] designed to universally "accommodate different chip sizes and structures" (Ex. 1009, 6:49–52)—to achieve "high packing densities, [as well as] high performance inter-chip and intra-chip communication *and heat dissipation.*"

Pet. 48–49 (emphasis added) (quoting Ex. 1009, 2:61–65). In other words, as Petitioner shows, "Bertin itself addresses the alleged thermal challenges in stacking FPGA" (Reply 27 (citing Ex. 1030 ¶¶ 73–75)), and the record shows ample motivation, a reasonable expectation of success, no undue experimentation, and operability, in combining the teachings of Bertin and Cooke as the Petition persuasively proposes.

Based on the foregoing discussion and a review of the record, including Patent Owner's evidence and arguments as presented in the Response and Sur-reply and as summarized above, Petitioner persuasively shows that the combination of Bertin and Cooke would have rendered claim 1 obvious. Relying partly on its showing with respect to claim 1, Petitioner provides a similar and persuasive showing for independent claims 5 and 10, which largely track the limitations recited in claim 1. *See* Pet. 59–67.

Claim 4 depends from claim 1 and recites an "electrically coupled "third integrated circuit." Claim 8 depends from claim 5 and recites a similar limitation. Claim 13 depends from claim 10 and recites that the "memory" comprises a "memory array." Claim 14 depends from claim 10

IPR2020-01021
Patent 7,282,951 B2

and recites that the "programmable array" is "reconfigurable." Claim 15 depends from claim 10 and recites that the three "integrated circuit functional elements are electrically coupled by a number of contact points distributed throughout the surfaces of said functional elements." The Petition shows that Bertin discloses these well-known circuit elements or the recitations thereof amount to combining "familiar elements according to known methods . . . [to] yield predictable results." *See KSR*, 550 U.S. at 416; Pet. 58, 63, 67–71. In summary, the Petition presents a persuasive showing supported by the record with respect to dependent claims 4, 8, and 13–15. *See* Pet 58, 63, 67–71. Patent Owner does not address claims 4, 5, 8, 10, and 13–15 separately from claim 1. *See* PO Resp. 50–44.

Accordingly, based on the record and as summarized above, Petitioner establishes by a preponderance of evidence that claims that the combination of Bertin and Cooke would have rendered obvious claims 1, 4, 5, 8, 10, and 13–15. *See* Pet. 46–71.

## III. CONCLUSION

The outcome for the challenged claims of this Final Written Decision follows.[22] In summary:

---

[22] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01021
Patent 7,282,951 B2

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatent-able | Claims Not shown Unpatent-able |
|---|---|---|---|---|
| 1, 4, 5, 8, 10, 13–15 | 103(a) | Koyanagi, Alexander | 1, 4, 5, 8, 10, 13–15 | |
| 1, 4, 5, 8, 10, 13–15 | 103(a) | Bertin, Cooke | 1, 4, 5, 8, 10, 13–15 | |
| **Overall Outcome** | | | 1, 4, 5, 8, 10, 13–15 | |

## IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1, 4, 5, 8, 10, and 13–15 the '951 patent are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2

PETITIONER:
F. Christopher Mizzo
Gregory S. Arovas
Bao Nguyen
KIRKLAND & ELLIS LLP
chris.mizzo@kirkland.com
greg.arovas@kirkland.com

IPR2020-01021
Patent 7,282,951 B2

bao.nguyen@kirkland.com

James Glass
Ziyong Li
QUINN EMANUEL URQUHART & SULLIVAN LLP
jimglass@quinnemanuel.com
seanli@quinnemanuel.com


PATENT OWNER:
Jonathan S. Caplan
James Hannah
Jeffrey H. Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jcaplan@kramerlevin.com
jhannah@kramerlevin.com
jprice@kramerlevin.com

Trials@uspto.gov                                                    Paper 33
571-272-7822                                        Date: February 4, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SAMSUNG ELECTRONICS CO., LTD., and
TAIWAN SEMICONDUCTOR MANUFACTURING CO. LTD.,
Petitioner,

v.

ARBOR GLOBAL STRATEGIES LLC,
Patent Owner.

———————

IPR2020-01021[1]
Patent 7,282,951 B2

———————

Before KARL D. EASTHOM, BARBARA A. BENOIT, and
SHARON FENICK, *Administrative Patent Judges*.

EASTHOM, *Administrative Patent Judge*.

ERRATA

———————

[1] Taiwan Semiconductor Manufacturing Co. Ltd. filed a petition in
IPR2021-00394 and has been joined as a party to this proceeding.

IPR2020-01021
Patent 7,282,951 B2

In Paper 30, on pages 11, 25, and 26, "allow multiple short paths for data transfer between the memory and processor" is changed to "allow multiple short paths for data transfer between the memory array/memory and processing element/programmable array."

2

IPR2020-01021
Patent 7,282,951 B2

PETITIONER:

F. Christopher Mizzo
Gregory S. Arovas
Bao Nguyen
KIRKLAND & ELLIS LLP
chris.mizzo@kirkland.com
greg.arovas@kirkland.com
bao.nguyen@kirkland.com

James Glass
Ziyong Li
QUINN EMANUEL URQUHART & SULLIVAN LLP
jimglass@quinnemanuel.com
seanli@quinnemanuel.com

PATENT OWNER:

Jonathan S. Caplan
James Hannah
Jeffrey H. Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jcaplan@kramerlevin.com
jhannah@kramerlevin.com
jprice@kramerlevin.com

3

Trials@uspto.gov                                         Paper 34
571-272-7822                                 Date: November 24, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SAMSUNG ELECTRONICS CO., LTD. and
TAIWAN SEMICONDUCTOR MANUFACTURING CO. LTD.,
Petitioner,

v.

ARBOR GLOBAL STRATEGIES LLC,
Patent Owner.

————————

IPR2020-01022[1]
Patent 6,781,226 B2

————————

Before KARL D. EASTHOM, BARBARA A. BENOIT, and
SHARON FENICK, *Administrative Patent Judges*.

FENICK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

————————

[1] Taiwan Semiconductor Manufacturing Co. Ltd. filed a petition in
IPR2021-00393 and has been joined as a party to IPR2020-01022.

IPR2020-01022
Patent 6,781,226 B2

Samsung Electronics Co., Ltd. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 13, 14, 16–23, and 25–30 (the "challenged claims") of U.S. Patent No. 6,781,226 B2 (Ex. 1001, "the '226 patent"). Petitioner filed a declaration of Dr. Stanley Shanfield (Ex. 1002) with its Petition. Arbor Global Strategies LLC ("Patent Owner"), filed a Preliminary Response (Paper 7). After further briefing regarding discretionary denial of institution under 35 U.S.C. § 314(a), we determined that the information presented in the Petition established that there was a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims and we instituted this proceeding on December 2, 2020, as to all challenged claims and all grounds of unpatentability. Paper 12 ("Dec. on Inst.").

After institution, Patent Owner filed a Patent Owner Response (Paper 17, "PO Resp.") and a declaration of Dr. Krishnedu Chakrabarty in support (Ex. 2009); Petitioner filed a Reply (Paper 20, "Pet. Reply") and a second declaration of Dr. Shanfield in support (Ex. 1030); and Patent Owner filed a Sur-reply (Paper 25, "PO Sur-reply"). Thereafter, the parties presented oral arguments, and the Board entered a transcript into the record. Paper 33 ("Tr."). After the hearing, we issued an order (Paper 30) authorizing additional briefing regarding an issue of claim construction and this additional briefing was submitted by Petitioner (Paper 31, "Pet. Supp. Br.") and Patent Owner (Paper 32, "PO Supp. Br.").

We have jurisdiction under 35 U.S.C. § 6(b)(4). For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner demonstrates by a preponderance of evidence that the challenged claims are unpatentable.

IPR2020-01022
Patent 6,781,226 B2

## I.    BACKGROUND

*A.    Real Parties-in-Interest*

As the real parties-in-interest, Petitioner identifies itself, Samsung Electronics America, Inc., and Samsung Semiconductor, Inc.  Pet. 65. Taiwan Semiconductor Manufacturing Co. Ltd. identifies itself and TSMC North America as real parties-in-interest.  *See* IPR2021-00393, Paper 2, 63. Patent Owner identifies only itself as a real party-in-interest.  Paper 5, 1.

*B.    Related Proceedings*

The parties identify *Arbor Global Strategies LLC v. Samsung Electronics Co., Ltd. et al.*, 2:19-cv-00333-JRG-RSP (E.D. Tex.) (filed October 11, 2019) ("related litigation") and *Arbor Global Strategies LLC v. Xilinx, Inc.*, 1:19-cv-1986 (D. Del.) as related proceedings.  *See* Pet. 65–66; Paper 5, 1.

Concurrent with the instant Petition, Petitioner filed petitions challenging claims in two related patents, respectively IPR2020-01020 (challenging U.S. Patent No. RE42035) and IPR2020-01021 (challenging U.S. Patent No. 7,282,951).

*C.    The '226 Patent*

The '226 patent describes a stack of integrated circuit (IC) die elements including a field programmable gate array (FPGA) on a die, a memory on a die, and a microprocessor on a die.  Ex. 1001, code (57), Fig. 4.  Multiple contacts traverse the thickness of the die elements of the stack to connect the gate array, memory, and microprocessor.  *Id.* According to the '226 patent, this arrangement "allows for a significant acceleration in the sharing of data between the microprocessor and the

3

IPR2020-01022
Patent 6,781,226 B2

FPGA element while advantageously increasing final assembly yield and concomitantly reducing final assembly cost." *Id.*

Figure 4 follows:



Figure 4 above depicts a stack of dies including FPGA die 66, memory die 66, and microprocessor die 64, interconnected using contact holes 70. *Id.* at 4:9–33.

The '226 patent explains that an FPGA provides known advantages as part of a "reconfigurable processor." *See* Ex. 1001, 1:19–35. Reconfiguring the FPGA gates alters the "hardware" of the combined "reconfigurable processor" (e.g., the processor and FPGA), making the processor faster than one that simply accesses memory (i.e., "the conventional 'load/store' paradigm") to run applications. *See id.* A "reconfigurable processor"

4

IPR2020-01022
Patent 6,781,226 B2

provides a known benefit of flexibly providing the specific functional units needed for applications to be executed. *See id.*

D.    *Illustrative Claims 13 and 22*

The Petition challenges independent claims 13 and 22, and claims 14, 16–21, 23, and 25–30, which depend from one of the challenged independent claims either directly or indirectly. Claims 13 and 22, reproduced below with bracketed numbering added for reference, illustrate the challenged claims at issue:

13. A processor module comprising:

[13.1] at least a first integrated circuit die element including a programmable array;

[13.2] at least a second integrated circuit die element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit die element;

[13.3] at least a third integrated circuit die element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit die elements respectively; and

[13.4] means for reconfiguring the programmable array within one clock cycle.

Ex. 1001, 7:9–21.

22. A processor module comprising:

at least a first integrated circuit die element including a programmable array and a plurality of configuration logic cells;

at least a second integrated circuit die element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit die element;

5

IPR2020-01022
Patent 6,781,226 B2

> at least a third integrated circuit die element including a
>   memory stacked with and electrically coupled to said
>   programmable array and said processor of said first and
>   second integrated circuit die elements respectively; and
>
> [22.4] means for updating the plurality of configuration logic
>   cells within one clock cycle.

Ex. 1001, 8:4–17.

E.    *The Asserted Grounds*

    Petitioner challenges claims 13, 14, 16–23, and 25–30 of the '226

patent on the following grounds (Pet. 2):

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 13, 14, 16–23, and 25–30 | 103[2] | Koyanagi[3], Cooke[4] |
| 13, 14, 16–23, and 25–30 | 103 | Bertin[5], Cooke |

II. ANALYSIS

    Petitioner challenges claims 13, 14, 16–23, and 25–30 as obvious

based on the grounds listed above.  Patent Owner disagrees.

---

[2] The Leahy-Smith America Invents Act (AIA), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103.  The '226 patent contains a claim with an effective filing date before March 16, 2013 (the effective date of the relevant amendment), so the pre-AIA version of § 103 applies.

[3] M. Koyanagi et al., "Future System-on-Silicon LSI Chips," IEEE Micro, Vol. 18, Issue 4, July/August 1998. (Ex. 1007).

[4] Cooke, US 5,970,254, issued Oct. 19, 1999 (Ex. 1008).

[5] Bertin, US 6,222,276 B1, issued Apr. 24, 2001 (Ex. 1009).

6

IPR2020-01022
Patent 6,781,226 B2

A.    *Legal Standards*

35 U.S.C. § 103(a) renders a claim unpatentable if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Tribunals resolve obviousness on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations.[6] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

B.    *Level of Ordinary Skill in the Art*

Relying on the testimony of Dr. Shanfield, Petitioner contends that

> [a] person of ordinary skill in the art ("POSITA") at the time of the '226 Patent would have been a person having a Master's degree in Electrical Engineering, Computer Engineering, or Physics with three to five years of industry experience in integrated circuit design, layout, packaging or fabrication. Ex. 1002 ¶¶ 45–48. A greater level of experience in the relevant field may compensate for less education, and vice versa.

Pet. 7–8.

Patent Owner asserts that

> [a] person of ordinary skill in the art ("POSITA") around December 5, 2001 (the earliest effective filing date of the '226

---

[6] No argument or evidence regarding secondary considerations has been presented in this proceeding.

IPR2020-01022
Patent 6,781,226 B2

>Patent) would have had a Bachelor's degree in Electrical
>Engineering or a related field, and either (1) two or more years
>of industry experience; and/or (2) an advanced degree in
>Electrical Engineering or related field.

PO Resp. 5–6 (citing Ex. 2009 ¶¶ 31–34).

As we did in the Decision on Institution, we adopt Petitioner's proposed level of ordinary skill in the art, which comports with the teachings of the '226 patent and the asserted prior art. *See* Dec. on Inst. 18–19. Patent Owner's proposed level is lower but it overlaps with Petitioner's proposed level. Even if we adopted Patent Owner's proposed level, the outcome would remain the same.

*C.    Claim Construction*

In an *inter partes* review, the Board construes each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b). Under the same standard applied by district courts, claim terms take their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Petitioner and Patent Owner each agree that both "means for reconfiguring the programmable array within one clock cycle" (limitation

8

IPR2020-01022
Patent 6,781,226 B2

13.4 in claim 13) and "means for updating the plurality of configuration logic cells within one clock cycle" (limitation 22.4 in claim 22) are means-plus-function limitations and should be construed as per 35 U.S.C. § 112, ¶ 6. Pet. 9; PO Resp. 6–7.

Both of these limitations listed above recite "means" and further recite a function, thus creating a presumption that 35 U.S.C. § 112, ¶ 6 applies. *See* 35 U.S.C. § 112, ¶ 6 ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."); *see also Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc in relevant part) (quoting *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998)) (holding that "use of the word 'means' creates a presumption that § 112, ¶ 6 applies"). We agree with the parties that these limitations are means-plus-function limitations subject to 35 U.S.C. § 112, ¶ 6.

Patent Owner additionally argues that we should construe "wide configuration data port," which appears in challenged claims 14 and 23, and which additionally appears in each party's proposal for the structure of the means-plus-function limitations described above. Pet. 9–12; PO Resp. 7–14. Because of this, we begin with this construction and then discuss construction of the means-plus-function terms.

> ### 1. *"wide configuration data port"*

While neither party proposed construction of this term in pre-institution briefing, Patent Owner did propose its construction in its

IPR2020-01022
Patent 6,781,226 B2

Response, and the parties each briefed the construction before the oral hearing.  PO Resp. 11–14; Pet. Reply 5–11; PO Sur-reply 2–4. Additionally, this term was one subject of our post-hearing order inviting the parties' positions regarding the possible construction of "wide configuration data port" as "a configuration data port connecting in parallel cells on one die element to cells on another die element," and each party submitted a post-hearing brief including a discussion of this possible construction.  Paper 30; PO Supp. Br. 1–4; Pet. Supp. Br. 2–5.

### a. Patent Owner's Position

Patent Owner argues that the term "wide configuration data port" should be construed as "a configuration data port that allows the parallel updating of logic cells in a programmable array through use of buffer cells." PO Resp. 11–14 (citing Ex. 1001, 4:50–65; Ex. 2009 ¶ 43); PO Sur-reply 2; PO Supp. Br. 1.  In support of this construction, Patent Owner cites the '226 patent's disclosure that the wide configuration data port "is included to update the various logic cells 84 through an associated configuration memory 86 and buffer cells 88."  Ex. 1001, 4:51–54 (quoted at PO Resp. 12).  Patent Owner contends that "[t]he specification demonstrates that the buffer cells form a necessary part of the wide configuration data port and enable the port to perform its recited function of reconfiguring the programmable array within one clock cycle."  PO Resp. 12; PO Supp. Br. 1–2.

In the Sur-reply, Patent Owner also indicates that configuration memory cells should also be included in the construction of "wide configuration data port."  PO Sur-reply 2–4.  Citing the same portion of the specification, Patent Owner argues that the '226 patent describes that "the

IPR2020-01022
Patent 6,781,226 B2

wide configuration data port includes not only a large number of die-area contacts that interconnect stacked chips but also the buffer *and configuration memory cells (which update the logic cells)* connected in parallel via those contacts." *Id.* at 2–3 (emphasis added). However, Patent Owner does not explain how configuration memory cells are included in, or why they are absent from, its proposed construction. Patent Owner also argues that "*it is the parallel arrangement of those connections* between the buffer cells and logic cells *(and not merely the connection themselves) that form the wide configuration data port* (and enable one clock cycle reconfiguration of the programmable array)." *Id.* at 4 (emphasis added).

With respect to the possible construction described in the order for post-hearing briefing, Patent Owner responds that a correct construction of wide configuration data port should include buffer cells. PO Supp. Br. 1–3 (arguing in the alternative that should the proposed construction be adopted, a corresponding structure for the means-plus-function claims should include a description of the use of buffer cells).

### b. Petitioner's Position

Petitioner, in its Reply, argues that the term should have its plain and ordinary meaning. Pet. Reply 6. Petitioner further asserts that one of ordinary skill in the art would have understood the term not to encompass the buffer cells, but only an interface used for communication. *Id.* at 6–8 (citing Ex. 1001, 4:7–9, 4:45–54, Figs. 3, 5; Ex. 1002 ¶¶ 50–51; Ex. 1030 ¶¶ 28–30; PO Resp. 8; Ex. 1035 (second Chakrabarty deposition), 163:8–21, 173:12–17; Ex. 1034 (first Chakrabarty deposition), 179:2–24).

Petitioner cites as an admission supporting this contention Patent Owner's description of the '226 patent as solving problems in the prior art

IPR2020-01022
Patent 6,781,226 B2

by "arrang[ing] die-area contacts, such as through-silicon vias ('TSVs'), into a wide configuration data port that . . . reprograms the programmable array within a single clock cycle." PO Resp. 1–2 (cited at Pet. Reply 2, 5). Petitioner additionally cites Dr. Chakrabarty's deposition testimony that a "configuration data port" is a well-known term for "a data port used for configuration." Pet. Reply 6 (quoting Ex. 1035, 163:8–21). Petitioner also cites Dr. Chakrabarty's deposition testimony in the related litigation that a wide configuration data port "is one which is wide enough to do single-cycle configuration." *Id.* at 6 (quoting Ex. 1034, 179:4–6); *see* Ex. 1034, 178:24–185:11.

With respect to the possible construction described in the order for post-hearing briefing, Petitioner contends that rather than "connecting in parallel cells on one die element to cells on another die element," the correct construction should describe connection in parallel "the third integrated circuit die element to logic cells of the first integrated circuit die element." Pet. Supp. Br. 3. Petitioner argues that, in the context of the '226 patent, this clarifies the die elements described as connected in parallel to form the wide connection data port. *Id.* (citing Ex. 1001, 4:10–20, 4:45–65, Figs. 4, 5). Regarding the use of the word "cells" in the construction, Petitioner asserts that the '226 patent does not describe cells on a die element, with the exception of buffer cells (which are "preferably" but not always part of a memory die) and logic cells of a programmable array. *Id.* at 3–4 (citing Ex. 1001, 3:25–28, 3:33–37, 3:67–4:9, 4:45–55, 4:57–59, 5:24–28, claim 22, Figs. 3, 5).

IPR2020-01022
Patent 6,781,226 B2

### c. Analysis and Conclusion

We determine that one of ordinary skill in the art would not understand the ordinary and customary meaning of "wide configuration data port" to include buffer cells or configuration memory cells, and construction in accordance with the prosecution history would likewise not require the inclusion of buffer cells or configuration memory cells. We also note that Patent Owner's proposed construction ("a configuration data port that allows the parallel updating of logic cells in a programmable array through use of buffer cells") contains some ambiguity in not making clear how buffer cells *allow* parallel updating, and we decline to provide a construction including this ambiguity.

The '226 patent does not make extensive use of the term "wide configuration data port." With the exception of the claims, which do not provide additional context, the references in the '226 patent are the labelling of element 82 of Figure 5 as "very wide configuration data port" and the paragraph referencing this figure, cited extensively by both parties, in which the specification describes that:

> With reference additionally now to FIG. 5, a corresponding functional block diagram of the configuration cells 80 of the reconfigurable processor module 60 of the preceding figure is shown wherein the FPGA 70 may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel. As opposed to the conventional implementation of FIG. 3, a wide configuration data port 82 is included to update the various logic cells 84 through an associated configuration memory 86 and buffer cell 88. The buffer cells 88 are preferably a portion of the memory die 66 (FIG. 4). In this manner, they can be loaded while the FPGA 68 comprising the logic cells 84 are in operation. This then enables the FPGA 68 to be totally reconfigured in one clock cycle with all of it configuration logic cells 84 updated in parallel. Other

13

IPR2020-01022
Patent 6,781,226 B2

> methods for taking advantage of the significantly increased
> number of connections to the cache memory die 66 (FIG. 4)
> may include its use to totally replace the configuration bit
> storage on the FPGA die 68 as well as to provide larger block
> random access memory ("RAM") than can be offered within
> the FPGA die 68 itself.

Ex. 1001, 4:45–65 (cited in whole or part at PO Resp. 8, 11–12, 31–33, 48–50; Pet. Reply 5–7, 10; PO Sur-reply 2–3, 6; Pet. Supp. Br. 1, 3–4; PO Supp. Br. 3).

Patent Owner, in focusing on this portion of the '226 patent disclosure, does not adequately explain why buffer cells and configuration memory cells must be included in the proper construction of "wide configuration data port," and seeks to import a functional description of the use of a wide configuration data port ("that *allows parallel updating* of logic cells in a programmable array through use of buffer cells") into the claim construction.  PO Resp. 11–14; PO Sur-reply 2–4.  While the discussion in the '226 patent describes an example of a wide configuration data port used in a specific way that aligns with Patent Owner's proposal (Ex. 1001, 4:45–59), other examples of the use of a wide configuration data port are included (*id.* at 4:59–65), and therefore we do not agree that one of ordinary skill would understand this use to be part of the construction of the term.

We agree with Petitioner that the proper construction of the term does not require buffer cells to be specifically described.  *See* Pet. Reply 6–9.  Rather, we note that the specification of the '226 patent contrasts loading of data to an FPGA in a byte serial fashion through a narrow port, which "results in [] long reconfiguration times," with the use of a wide configuration data port, and therefore we determine that one of ordinary skill would understand the wide configuration data port, in contrast to the byte

14

**Appx145**

IPR2020-01022
Patent 6,781,226 B2

serial "relatively narrow" port, to include parallel connections between cells in the dies.  *See* Ex. 1001, 4:3–9.  This additionally is consistent with certain arguments by Patent Owner, for example in the Patent Owner's Response, which opens with a discussion of the "inventive" processor's arrangement of die-area contacts, such as through-silicon vias, "into a wide configuration data port" and we find that description more consistent with the proper construction of this term.  PO Resp. 1–2; *see also id.* at 8 ("[T]he '226 Patent specifically identifies that the wide configuration data port reconfigures both a programmable array and/or logic cells in one clock cycle because it can communicate with many cells (which form an 'array') in parallel, and is therefore considered 'wide.'")

With respect to the construction for which we requested post-hearing briefing, "a configuration data port connecting in parallel cells on one die element to cells on another die element," the '226 patent describes updating the logic cells of a FPGA in one clock cycle to reconfigure the FPGA by loading associated configuration memory from buffer cells, preferably located on a different die element.  Ex. 1001, 4:45–59.  Additionally, the '226 patent describes that doing this "takes advantage of the significantly increased number of connections to the cache memory die."  *Id.* at 4:59–65.  This construction is supported by the Petitioner's expert's contention that the wide configuration data port can interconnect a memory die and an FPGA die using contact points distributed throughout the dies.  *See, e.g.*, Ex. 1002 ¶¶ 50, 52; Ex. 1030 ¶¶ 28–30.  This construction additionally is supported by Patent Owner's expert's description that "the wide configuration data port loads configuration data into buffer cells 88 in parallel" (implying that the wide configuration data port does not include the buffer cells), though

15

IPR2020-01022
Patent 6,781,226 B2

contradicted by other portions of his testimony asserting that buffer cells should be part of a wide configuration data port. *See* Ex. 2009 ¶ 36. The specification supports a construction of the wide configuration data port as a configuration data port that makes connections between die elements in parallel. Ex. 1001, 3:33–37, 4:45–65; *see also id.* at code (57) ("significant acceleration in the sharing of data between the microprocessor and the FPGA element").

The '226 patent describes the loading of buffer cells, preferably on the memory die, while the FPGA is in operation, with the configuration logic cells then updated in parallel from the buffer cells through the significantly increased number of connections for reconfiguration in one clock cycle. Ex. 1001, 4:45–59. But none of the challenged claims requires configuring or updating while the FPGA is in operation. And the specification shows that the buffer cells are not part of the wide configuration data port. *See id.* at Fig. 5. Therefore, we determine that the specification supports a construction that the parallel connection between die elements are between cells on each die element. This parallel connection implies that cells on one die are connected in parallel to cells on another die, for example, buffer cells or configuration memory cells. *Id.* at 4:50–55, Fig. 5.

For these reasons, we construe "wide configuration data port" as "a configuration data port connecting in parallel cells on one die element to cells on another die element."

### 2. Limitation 13.4 – *"means for reconfiguring the programmable array within one clock cycle"*

The first step in construing a means-plus-function claim element is to identify the recited function in the claim element. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). The

16

IPR2020-01022
Patent 6,781,226 B2

second step is to look to the specification and identify the corresponding structure for that recited function. *Id.*

Petitioner argues that the recited function for limitation [13.4] is "reconfiguring the programmable array within one clock cycle." Pet. 9–10. Patent Owner agrees. PO Resp. 7. We also agree. *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("[35 U.S.C. § 112, ¶ 6] does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim.")

We next review the '226 patent to determine the corresponding structure for the identified function. Petitioner proposes in the Petition that the structure is "[a] wide configuration data port (82) interconnecting a stacked memory die (66) and FPGA die (68) using contact points (70) distributed throughout the die." Pet. 8 (citing Ex. 1001, 4:10–65, Figs. 4, 5).

Our preliminary determination in the Decision on Institution was that the correct corresponding structure would be "a wide configuration data port interconnecting a memory and the programmable array using contact points distributed through the first integrated circuit die element and the third integrated circuit die element." Dec. on Inst. 22–25. We asked the parties, in post-hearing briefing, to address whether the corresponding structure should be "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element." Paper 30.

In Reply, Petitioner agrees with our preliminary determination. Pet. Reply 3–5. In its post-hearing briefing, Petitioner argues that the proper structure should be a wide configuration data port and "contact points formed throughout the areas of the first *and third* integrated circuit die elements." Pet. Supp. Br. 1–2 (emphasis altered). Petitioner describes that

17

the contact points in the third die element (which, as per limitation 13.3 of claim 3, includes a memory) play a role in the claimed function. *Id.* (citing Ex. 1001, 2:34–48, 2:58–64, 4:15–20, 4:59–65; Ex. 1002 ¶¶ 51–52).

Patent Owner proposes that the structure is simply a "wide configuration data port," according to its construction of that term, which includes buffer cells.  PO Resp. 6–11; PO Sur-reply 2–9 ("[T]o the extent that the Board finds that the buffer cells are not part of the wide configuration data port, the Board nonetheless should find that they form part of the structure that performs the functions recited in the [means-plus-function] claims.").  Patent Owner argues that if we did not adopt a construction of "wide configuration data port" that describes the use of buffer cells, we should find the structure to be "a wide configuration data port, wherein buffer cells on one die element are connected in parallel to cells on another die element."  Pet. Supp. Br. 2–4; PO Sur-reply 2–9.

"While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). Conversely, structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308–09, (Fed. Cir. 1998); *see B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.").

Given our construction of wide configuration data port, Patent Owner's argument that the corresponding structure for this limitation must require that buffer cells on one die element are connected in parallel to cells on another die element is based on the description of the use of buffer cells as used in the updating of the FPGA while it is in operation.  PO Supp. Br. 3 (citing Ex. 1001, 4:50–54, Fig. 5).  However, we note that this description is followed by the disclosure that "[t]he buffer cells 88 are preferably a portion of the memory die 66." Ex. 1001, 4:50–54.  It does not appear, therefore, that buffer cells are always a portion of the memory die, or are required when the FPGA is not in operation, and thus we decline to require in the corresponding structure that they be specified to be on a specific separate die element.

Rather, we find that what is disclosed as actually performing the recited function of "reconfiguring the programmable array within one clock cycle" is "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element."  The support for this is found in the '266 patent's comparison of the long reconfiguration times through a narrow port (Ex. 1001, 4:3–9) with the time to reconfigure through a wide configuration data port with a significantly increased number of connections (*id.* at 4:45–65), and the implementation of this in a module that has multiple dies "which have a number of corresponding contact points, or holes, 70 formed throughout the area of the [die] package" (*id.* at 4:9–20).  The use of a wide configuration data port, as per our construction, implicates two die elements. This was reflected in our preliminary claim construction, for which the corresponding structure described "contact points distributed through the

first integrated circuit die element and the third integrated circuit die element." Dec. on Inst. 25.  As the function is "reconfiguring the programmable array within one clock cycle," one of the die elements is the first integrated circuit die element, which includes the programmable array.

We acknowledge that, in the related litigation, the District Court for the Eastern District of Texas has construed this limitation (and limitation 22.4), in an order issued after our Decision on Institution. Ex. 1036.[7]  The District Court construed the function for this limitation identically, and the corresponding structure as "wide configuration data port 82, and contact points formed throughout the area of each die element; and equivalents thereof."  *Id.* at 8–18.  The chief distinction between this construction and the one that we adopt is the inclusion of all three die elements in the District Court claim construction, rather than only the first die element (including the programmable array) and an additional die element in ours.  The parties do not reference the District Court's claim construction in the briefing, except that Petitioner characterizes it as "a similar conclusion" to our construction in the Decision on Institution (Pet. Reply 3–5) and argues that the use of a construction specifying two dies would be "consistent with" the District Court claim construction (Pet. Supp. Br. 2).  Our decision here would be the

---

[7] We additionally acknowledge the construction for certain additional limitations in the challenged claims, which the parties do not address construction of, and which we do not herein construe. Ex. 1036, 18–25 ("processor module"), 25–37 ("programmable array"), 38–44 ('stacked with and electrically coupled to'), 44–49 ("contact points distributed throughout the surfaces of said die elements").  However, our Decision here would be the same were we to explicitly adopt the construction provided by the District Court for those terms.

IPR2020-01022
Patent 6,781,226 B2

same were we to adopt the construction provided by the District Court for the corresponding structure of the means-plus-function limitations.

Patent Owner argues, with reference to our preliminary claim construction, that a construction in which the corresponding structure is more than only a wide configuration data port would violate canons of claim construction by incorporating language from dependent claims and in creating a situation where dependent claim 14 is not narrower than the claim from which it depends. PO Resp. 9–10. Each of these arguments sounds in claim differentiation. Our reviewing court has "long held" that a claim differentiation argument cannot be relied upon "to broaden a means-plus-function limitation beyond those structures specifically disclosed in the invention." *Saffran v. Johnson & Johnson*, 712 F.3d 549, 563 (Fed. Cir. 2013). In addition, the argument that independent claim 13 "will not be narrower than its dependent claims" (*id.* at 10) under our construction is not correct, because claims that depend from claim 13 will carry the same construction as claim 13.

For the reasons discussed above, we determine that, for means-plus-function limitation 13.4 of claim 13, the function is "reconfiguring the programmable array within one clock cycle," and the corresponding structure is "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element."

> ### 3. Limitation 22.4 – "means for updating the plurality of configuration logic cells within one clock cycle"

Petitioner and Patent Owner refer back to or recapitulate their arguments with respect to limitation 13.4 in their arguments for the function and structure of means-plus-function claim limitation 22.4. Pet. 11–12;

21

PO Resp. 6–11; Pet. Reply 4–11; PO Sur-reply 5–9; PO Supp. Br. 1–4; Pet. Supp. Br. 1–2. To support arguments regarding this claim term, the parties cite no additional disclosure other than that previously discussed, and we agree that the previously discussed disclosure supports the construction of claim limitation 22.4. Claim 22 differs from claim 13 in several respects, including the inclusion of a plurality of configuration logic cells in the first integrated circuit die element. Limitation 22.4 differs from limitation 13.4 in its statement of function ("updating the plurality of configuration logic cells" rather than "reconfiguring the programmable array"). The configuration logic cells referenced are included in the first integrated circuit die element, and thus here too, the corresponding structure specifies the first integrated circuit die element is included in the description of the structure. Ex. 1001, 8:4–17.

For the reasons presented above, we find that, for means-plus-function limitation 22.4 of claim 22, the function is "updating the plurality of configuration logic cells within one clock cycle," and the corresponding structure is "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element."

### 4. No additional constructions

No other terms require explicit construction. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'. . . ." (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

IPR2020-01022
Patent 6,781,226 B2

D.    *Obviousness, Koyanagi and Cooke, Claims 13, 14, 16–20, 22, 23, and 25–29*

Petitioner contends the subject matter of claims 13, 14, 16–20, 22, 23, and 25–29 would have been obvious over the combination of Koyanagi and Cooke.  Pet. 17–40.  Patent Owner disputes Petitioner's contentions.  PO Resp. 17–25 (arguments relating to limitation 13.4), 26–39 (arguments relating to the motivation to combine Koyanagi and Cooke).

1.    *Koyanagi*

Koyanagi describes a "three-dimensional integration technology" (3D) that involves vertically stacking and interconnecting chips using "a high density of vertical interconnections" (Ex. 1007, 18) to "connect[] each layer.  Ex. 1007, 17, 18.

Koyanagi explains that its 3D-integration technology "enables a huge number of metal microbumps to form on the top or bottom surfaces of the chips."  *Id.* at 17–18 ("More than $10^5$ interconnections per chip form in a vertical direction in these 3D . . . chips.").  Koyanagi's system "dramatically increase[s] wiring connectivity while reducing the number of long interconnections."  *Id.* at 17.

Koyanagi's Figure 1a follows:



(a)

Figure 1a illustrates a stack of chips including dynamic random access memory (DRAM) chips and a synchronous random access memory (SRAM) chip "stacked on a microprocessor" chip.  *See id.* at 17–18.  Koyanagi

23

describes "form[ing] as many vertical interconnections as possible" to "remove the generated heat" and forming "electrical wirings." *Id.* According to one embodiment in Koyanagi, "2D image signals move simultaneously in a vertical direction and are processed in parallel." *Id.* at 18. Koyanagi also describes a variety of uses: "Typical examples of these new system LSIs include a merged logic memory (MLM) LSI chip as shown in Figure 1 . . . , and a 3D shared memory for parallel processor systems." *Id.* at 17.

### 2.    Cooke

Cooke describes "[a] reconfigurable processor chip" with "a mixture of reconfigurable arithmetic cells and logic cells for higher effective utilization than a standard FPGA." Ex. 1008, code (57). "A configuration memory stack is provided, allowing for nearly instantaneous reconfiguration." *Id.* In Cooke, "[e]ach FPGA has two or more memory planes which can shift into the FPGA function in a single cycle." *Id.* at 2:45–49.

### 3.    Claim 13

#### a. Petitioner's Contentions

Claim 13's preamble recites "[a] processor module comprising." Petitioner relies on the combined teachings of Koyanagi and Cooke, providing evidence that Koyanagi discloses all elements of the claimed processor module, with the exception of the programmable array of limitation 13.1 and limitation 13.4's "means for reconfiguring the programmable array within one clock cycle." *See* Pet. 22–28.

Claim 13 also recites limitation 13.1, "at least a first integrated circuit die element including a programmable array," limitation 13.2, "at least a

IPR2020-01022
Patent 6,781,226 B2

second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element," and limitation 13.3, "at least a third integrated circuit die element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit die elements respectively." Petitioner contends that the combination of Koyanagi and Cooke renders these limitations obvious. Pet. 23–25. Petitioner relies in part on Cooke's FPGA, citing Cooke's teaching of a standard processor and a reconfigurable FPGA on a single chip. *Id.* at 23 (quoting Ex. 1008, 2:1–2).

Petitioner provides the following modified version of Koyanagi's Figure 1(a) (on the left, termed "Figure 1M" by Petitioner) in a side-by-side comparison with the Petitioner-annotated version of the '226 patent's Figure 4 (on the right):



*Id.* at 23. Petitioner's annotated version of Koyanagi's Figure 1 shows a stack of dies with Cooke's FPGA die replacing one of Koyanagi's DRAMs, and the '226 patent's Figure 4 shows a structurally and functionally similar configuration. *Id.* Petitioner contends that in the proposed combination illustrated in the annotated version of Koyanagi's Figure 1, the added FPGA from Cooke (in red) teaches the first integrated circuit die element of

IPR2020-01022
Patent 6,781,226 B2

limitation 13.1, the microprocessor (in blue) teaches the claimed second integrated circuit die element of limitation 13.2, and the DRAM dies teach the claimed third integrated die element of limitation 13.3, with the electrical coupling of the layers (in limitations 13.2 and 13.3) indicated by the vertical lines between layers. *Id.* at 23–26 (citing Ex. 1008 2:1–7; Ex. 1007, 17; Ex. 1002 ¶¶ 74–77). To additionally support this showing, Petitioner quotes Koyanagi: "More than $10^5$ [100,000] interconnections per chip form in a vertical direction in these 3D LSI chips or 3D MCMs. Consequently, we can dramatically increase wiring connectivity while reducing the number of long interconnections." *Id.* at 24 (citing Ex. 1002 ¶ 87).

Petitioner discusses how Cooke provides a tightly integrated FPGA with microprocessors and a "vertical stack" of memory planes. *Id.* at 18–19 (citing Ex. 1008, 2:40–55). Petitioner contends that Koyanagi's 3D integration scheme is "agnostic to the type and functionality of the stacked dies." *Id.* at 18 (citing Ex. 1007, 17; Ex. 1002 ¶ 66). Petitioner provides reasons why a person of ordinary skill in the art (POSITA) would have been motivated to employ Koyanagi's 3D integration teachings to achieve the benefits of vertically stacking the functional components of an FPGA-based reconfigurable computer system, such as the one described in Cooke:

> A POSITA would have been motivated to apply Koyanagi's broadly applicable 3D integration scheme to integrate the FPGA, memory and microprocessor components of Cooke's system into a compact single 3D chip because the stacked chip would save area, reduce power consumption, and improve performance. [Ex. 1002] ¶ 72. A POSITA would have found it obvious to try stacking the components of Cooke as taught by Koyanagi and would have had a reasonable expectation of success doing so because Cooke suggests a stacked system and Koyanagi provides broadly applicable, detailed teachings with regard to stacking different dies. *Id.*

26

Pet. 21–22.

Claim 13 recites element 13.4: "means for reconfiguring the programmable array within one clock cycle." Petitioner relies upon Cooke's disclosure of reconfiguring an FPGA in one clock cycle for the functional portion of limitation 13.4. Pet. 26 (citing Ex. 1002 ¶¶ 78–79; Ex. 1024, code (57); Ex. 1008, code (57), 2:47–48). For the corresponding structure, Petitioner relies on Koyanagi's vertical interconnections between stacked memory and FPGA dies using contact points distributed throughout the dies, and Cooke's disclosure that a large bandwidth allows configuration data from one memory plane to be shifted into the FPGA in a single cycle. *Id.* at 27–28 (citing Ex. 1007, 17, Fig. 1(a); Ex. 1008, code (57), 2:47–48, 8:11–15; Ex. 1002 ¶ 79). Petitioner argues that Koyanagi as modified by Cooke "provides the same wide configuration data port" as described in the '226 patent, and that Cooke teaches how large data bandwidth allows the shift of configuration data in one clock cycle. *Id.* at 26–27 (citing Ex. 1002 ¶ 79).

## b. *Patent Owner's Arguments*

Patent Owner argues that one of ordinary skill in the art would not have combined Koyanagi and Cooke, because such a combination would have taken undue experimentation to perform. PO Resp. 27–33; PO Sur-reply 13–14. Patent Owner cites Petitioner's expert's testimony that to stack chips "you don't just slap it together without worrying about what connects to what" and contends that the asserted combination of Koyanagi and Cooke is such a "slap[ped-]together" combination. PO Resp. 27–33 (citing Ex. 2009 ¶¶ 67, 69–73; quoting Ex. 2014, 81:21–82:19 (Shanfield deposition) (emphasis omitted)). Patent Owner asserts that Petitioner has

IPR2020-01022
Patent 6,781,226 B2

not provided an adequate explanation as to how to combine Koyanagi and Cooke.  PO Resp. 28; PO Sur-reply 17–21.

Patent Owner additionally argues that Petitioner overlooked thermal issues that "plagued" 3D stacked FPGA chips, and that there would not have been a reasonable expectation of success with respect to the proposed combination.  PO Resp. at 33–39.  Patent Owner argues that Cooke does not disclose stacking a vertical memory stack and a FPGA.  *Id.* at 34 (citing Ex. 2009 ¶ 75; Ex. 2014, 74:17–75:6).  Patent Owner discusses the Alexander reference, cited by Petitioner for its discussion of the benefits of FPGAs but also their "substantial performance penalty, due primarily to interconnect delay," which Petitioner asserts would have motivated a configuration including an FPGA but with stacking to minimize interconnect delay.  Pet. 42–43 (quoting Ex. 1006 (Alexander)); PO Resp. 34–35.  Patent Owner contends that Alexander discusses mitigating thermal issues in 3D FPGA architectures, that these issues are "a critical concern in 3D integration," and that such issues were well known and a skilled artisan would not have ignored them and would have been deterred from making the proposed combination by thermal issues.  PO Resp. 34–39 (citing Ex. 1006, 3–4; Ex. 2009 ¶¶ 79–80).  Patent Owner highlights Petitioner's proposed modification to Koyanagi to include an FPGA in the stack, contending that Koyanagi's solution to heat dissipation would not apply to a stack with an FPGA, which would have greater power consumption needs.  *Id.* at 36–37 (citing Ex. 2009 ¶¶ 79–80).

Patent Owner also argues that Petitioner's showing regarding limitation 13.4 is deficient because it does not detail the buffer cells Patent Owner argues are, by construction, required for this limitation, or because of

28

IPR2020-01022
Patent 6,781,226 B2

issues with the location of buffers in Cooke. *Id.* at 18–21; PO Sur-reply 10–12, 15–16. Patent Owner also argues that Petitioner has not identified a structure which corresponds to the identified function in Cooke or Koyanagi. PO Resp. at 21–25; PO Sur-reply 10–13. Petitioner asserts that the structure in Koyanagi constrains, rather than accelerates, the speed of data travelling through its TSVs and was subject to additional issues degrading device performance. PO Resp. at 23–24 (citing Ex. 2009 ¶¶ 59–60). Patent Owner asserts that Petitioner does not allege the corresponding structure in Cooke, and that both structure and function for the means-plus-function limitation must be found in one reference. *Id.* at 24–25.

### c. *Analysis and Conclusions – Claim 13*

We do not find that Petitioner's proposed combination would require undue experimentation. Dr. Shanfield's deposition testimony relied upon by Patent Owner does not support Patent Owner's argument that combining the teachings of Koyanagi and Cooke to arrive at the claimed processor module requires "undue experimentation." In the passage that includes the quoted testimony that Patent Owner relies upon, Dr. Shanfield testifies as follows about Bertin – in response to being asked "[w]hen you're stacking two different type[s] of chips using TSVs, does any thought need to be put into how those TSVs are interconnecting the chips, or is it – is it really just, you know, you can sandwich any kind of chips together and call it a day?":

> You have obviously got to have a circuit in mind that you're wanting to create a system-level circuit, a module-level circuit; and so you're going to need to consider which connections you want a TSV connecting to something below.
>
> So you don't just slap it together without worrying about what connects to what.
>
> On the other hand, the putting together of the -- in Bertin, he describes the putting together of these chips and how that can

IPR2020-01022
Patent 6,781,226 B2

> be done in detail. And that piece of it is -- I guess you could
> characterize that as something that comes with the process and
> in itself isn't something you think specifically about every one
> of 50,000 connections. They're all done by the process that he
> gives an example of.

Ex. 2014, 81:21–82:19.

Dr. Shanfield's deposition testimony does not indicate that Petitioner "slap[s] *Koyanagi* and *Cooke* together without worrying about what connects to what. . . . to arrive at a '3D integrated circuit' integrating 'an FPGA, memory, and microprocessor," or that arriving at the claimed invention would have required "undue experimentation." *See* PO Resp. 28–29. Rather, Dr. Shanfield's deposition testimony indicates that an artisan of ordinary skill readily would have been able to connect different die circuits together "obviously" with "a circuit in mind . . . to create a system-level circuit, [or] a module-level circuit . . . consider[ing] which [TSV] connections [she] want[s]." *See* Ex. 2014, 81:21–82:19. As Petitioner argues, "[n]othing in Dr. Shanfield's testimony, however, suggests that Petitioner 'slap[ped] together' Koyanagi and Cooke." Pet. Reply 18 (second alteration in original); Ex. 1030 ¶¶ 82–83 (testifying that Patent Owner took his (Dr. Shanfield's) deposition testimony "out of context" and "at the system or circuit design level, each TSV is an interconnection between specific circuits").

As Petitioner also argues and as summarized above, the Petition "provide[s] a detailed explanation of *how* Koyanagi and Cooke would have been combined to disclose each limitation of the challenged claims and *why* a POSITA would have been motivated to combine them—'to create a 3D reconfigurable processor module with improved performance and area efficiency.'" Pet. 17–19, 21; Pet. Reply 18–19 (quoting Pet. 17). By way of

example, Petitioner's annotated Figure 1 (Pet. 21), which represents combined teachings of Koyanagi and Cooke, shows how to connect the dies together using a wide configuration data port as challenged claim 1 requires.

By teaching similar stacking techniques for similar circuits, Koyanagi and Cooke collectively evidence a reasonable expectation of success in arriving at the claimed invention. *See Otsuka Pharm. Co., v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012) ("The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight. What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art."). In other words, Petitioner shows that the claimed invention involves a routine combination of familiar elements, namely combining Koyanagi's die stack with Cooke's FPGA replacing a DRAM, maintaining the large bandwidth connection taught by Cooke through the 3D integration with contact points on the surface of the dies, as taught by Koyanagi. *See* Pet. 21–22.

With respect to thermal issues, we agree with Petitioner's contentions that this concern is mooted by Koyanagi's express description that "forming as many vertical interconnections" addresses heat generation issues, and that the vertical interconnections may act as heat pipes to remove generated heat. Pet. Reply 20 (citing Ex. 1007, 17; Ex. 1030 ¶¶ 62–63; Ex. 1035 256:6–15, 190:4–7). Specifically with respect to Alexander's discussion of thermal issues for FPGAs, Petitioner argues persuasively that "Alexander does not suggest that there are any particularly challenging thermal issues with 3D FPGAs, but rather states that heat dissipation is an important consideration in any chip design." Pet. Reply 21 (citing Ex. 1006, 3).

IPR2020-01022
Patent 6,781,226 B2

With respect to the propriety of identifying a structure and a function from different references, we consider what the combined teachings of the references would have suggested to those of ordinary skill in the art. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981). Patent Owner argues that "[i]t is improper for the Petitioner to rely on a function in one prior art system and a structure in a different prior art system without showing that the structure corresponds to the recited function." PO Resp. 18–19, 21–22, 24–25 (citing *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1299 (Fed. Cir. 2009) and *Bennett Marine, Inc. v. Lenco Marine, Inc.*, 549 F. App'x 947, 954 (Fed. Cir. 2013)); PO Sur-reply 11. The relevant portion of *Fresenius* involved a dispute regarding whether claims with means-plus-function limitations were shown to be invalid. *Fresenius*, 582 F.3d at 1293–1294. Our reviewing court found that there was no evidence of what the correct corresponding structure was for certain means-plus-function limitations, and no comparison of structure in the specification to those present in the prior art. *Id.* at 1299–1300. While the Federal Circuit took the opportunity to stress that, for showing invalidity of a claim with a means-plus-function limitation, both the function and the corresponding structure must be found to be present in the prior art, we do not see any indication in this case relating to Patent Owner's assertion of impropriety in finding structure and function in an asserted combination based on the combined teachings of two references. The situation is similar in *Bennett Marine*. In that case, there was a failure to identify corresponding structure in the specification of the challenged patent, and the Federal Circuit confirmed that a means-plus-function limitation is limited to the corresponding structure disclosed in the specification. *Bennett Marine*, 549 F. App'x at 954–955.

IPR2020-01022
Patent 6,781,226 B2

In any case, for this ground of asserted unpatentability, Petitioner identifies the structure as taught in the vertical interconnections of Koyanagi in its stacked die modules and in the large bandwidth interface of Cooke providing shifting into the FPGA function in a single cycle as teaching or suggesting the structure of the wide configuration data port. Pet. 20–21, 27 (citing Ex. 1007, 17, 19; Ex. 1008, code (57), 2:47–48, 8:11–15; Ex. 1002 ¶¶ 68–71, 79); Tr. 91:3–14; *see* Dec. on Inst. 30. Therefore, Patent Owner's argument that Petitioner finds the structure in Koyanagi and the function exclusively in Cooke is not commensurate with the Petition's assertions. *See* Pet. 27–28.

Based on the foregoing discussion and a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Koyanagi and Cooke would have rendered claim 13 obvious.

### 4. Claim 22

Petitioner's showing with respect to claim 22 is similar to its showing with respect to claim 13. Pet. 36–38. Notably, claim 22's first limitation is to "at least a first integrated circuit die element including a programmable array and a plurality of logic configuration cells," which Petitioner describes as being taught or suggested in Cooke's programmable array with logic cells. *Id.* at 36 (citing Ex. 1008, 6:40–42; Ex. 1002 ¶ 90). Otherwise, the showing for this claim is substantially similar to that for claim 13. Pet. 36–38.

Patent Owner presents no separate argument with respect to claim 22. For the reasons given with respect to this first limitation and for the same reasons discussed above, based on a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Koyanagi and Cooke would have rendered claim 22 obvious.

5. *Claims 14 and 23*

Claim 14 depends from claim 13 and specifies that the "reconfiguring means" of claim 13 "comprises a wide configuration data port." Ex. 1001, 7:23–24. Claim 23 depends from claim 22 and specifies that the "updating means" of claim 22 "comprises a wide configuration data port." *Id.* at 8:18–19. Patent Owner presents no separate arguments with respect to these claims.

We have determined that the structure for each means-plus-function limitation described includes a wide configuration data port and discussed above Petitioner's showing that this would have been obvious over the combination of Koyanagi and Cooke.

Therefore, for the reasons discussed above, based on a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Koyanagi and Cooke would have rendered claims 14 and 23 obvious.

IPR2020-01022
Patent 6,781,226 B2

### 6. *Claims 16, 17, 25, and 26*

Claims 16 and 17 depend from claim 13 and specify that the processor of the second integrated circuit die element comprises a microprocessor (claim 16) and that the third integrated circuit die element comprises a memory array (claim 17). Ex. 1001, 7:28–33. Claims 25 and 26 further limit claim 22 in the same way. *Id.* at 8:23–28.

Petitioner argues that Koyanagi teaches a die element that is a microprocessor. Pet. 29 (citing Ex. 1007, 17; Ex. 1002 ¶ 81). Petitioner further argues that Koyanagi teaches a die element that is a DRAM memory die, and that one of ordinary skill in the art would have known this would include a memory array. *Id.* at 29–30 (citing Ex. 1002 ¶ 82). Petitioner further argues that Cooke discloses portions of a memory array from one of its memory planes. *Id.* at 30 (citing Ex. 1008, 2:47–55, 4:20–21, Figs. 7A–7F). Petitioner reiterates these arguments with respect to claims 25 and 26. *Id.* at 38–39.

Patent Owner presents no separate arguments with respect to these claims. We find that Petitioner has shown the additional claim limitations present in the asserted combination.

Therefore, for the reasons discussed above, based on a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Koyanagi and Cooke would have rendered claims 16, 17, 25, and 26 obvious.

35

IPR2020-01022
Patent 6,781,226 B2

### 7. Claims 18 and 27

Claim 18 depends from claim 13 and specifies that the programmable array is configurable as a processing element. Ex. 1001, 7:34–35. Claim 27 further limits claim 22 in the same way. *Id.* at 8:29–30.

Petitioner argues that Cooke teaches configuring and reconfiguring the FPGA used in the asserted Koyanagi/Cooke combination to perform different functions. Pet. 31–33 (citing Ex. 1008, 1:58–67, 2:58–60, 4:66–5:19, Figs. 9A, 9B; Ex. 1002 ¶¶ 84–85). Petitioner reiterates these arguments with respect to claim 27. *Id.* at 39.

Patent Owner presents no separate arguments with respect to these claims. We find that Petitioner has shown the additional claim limitations present in the asserted combination.

Therefore, for the reasons discussed above, based on a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Koyanagi and Cooke would have rendered claims 18 and 27 obvious.

### 8. Claims 19–21 and 28–30

Claim 19 depends from claim 13 and specifies that the first, second, and third integrated circuit die elements "are electrically coupled by a number of contact points distributed throughout the surfaces of the die elements." Ex. 1001, 7:36–39. Claim 20 depends from claim 19 and recites that the contact points "traverse said die elements through a thickness thereof." *Id.* at 7:40–42. Claim 21 depends from claim 20 and specifies that the "die elements are thinned to a point at which said contact points traverse

IPR2020-01022
Patent 6,781,226 B2

the thickness of said die elements." *Id.* at 8:1–3. Claims 28–30 provide

similar limitations (and similar interdependencies) from claim 22. *Id.* at

8:31–40.

Petitioner argues that Koyanagi teaches the further limitations of

claim 19 in its teaching of large numbers of contact points distributed

throughout the surfaces of die elements electrically coupling those die

elements. Pet. 32–33 (citing Ex. 1007, 17; Ex. 1002 ¶ 86). Petitioner further

argues that Koyanagi teaches that the contact points traverse the die

elements throughout their thickness. *Id.* at 33–34 (citing Ex. 1007, 17, Fig.

5; Ex. 1002 ¶ 87). With respect to the thinning of the die elements,

Petitioner further argues that Koyanagi teaches thinning of die elements at

the points where the connections are created, from 270 μm to a thickness of

70 μm. *Id.* at 35 (citing Ex. 1007, 19–20, Fig. 5; Ex. 1002 ¶ 88).

Petitioner reiterates these arguments with respect to claims 28, 29, and

30. *Id.* at 39–40.

Patent Owner presents no separate arguments with respect to these

claims. We find that Petitioner has shown the additional claim limitations

present in the asserted combination.

Therefore, for the reasons discussed above, based on a review of the

record, including a consideration of Patent Owner's evidence and arguments

as presented in the Response, Sur-reply, and Patent Owner's Supplemental

Brief, Petitioner persuasively establishes by a preponderance of the evidence

that the combination of Koyanagi and Cooke would have rendered claims

19–21 and 28–30 obvious.

E.    *Obviousness, Bertin and Cooke 13, 14, 16–23, and 25–30*

      1. *Petitioner's Contentions – Claim 13*

Petitioner contends claims 13, 14, 16–23, and 25–30 would have been obvious over the combination of Bertin and Cooke. *See* Pet. 40–62. Similar to Koyanagi, Bertin teaches stacking different types of chips, including logic chips, microprocessors, and controllers to minimize latency and maximize bandwidth and heat dissipation, using through-chip conductors. *See* Pet. 40–41 (citing Ex. 1009, 1:20–57, 6:49–52, 7:17–34; Ex. 1002 ¶¶ 102–104).

Bertin does not disclose an FPGA. Petitioner relies on Cooke to describe stacking chips, including FPGAs, microprocessors, and memory planes. *See* Pet. 41–42 (citing Ex. 1008, 2:3–12, 2:40–55, 3:13–18, Figs. 1, 2, 8A; Ex. 1002 ¶¶ 105–106). Petitioner contends it would have been obvious to use FPGAs in Bertin's 3D stacks to improve performance, area-efficiency, packing densities, and speed, and avoid interconnect delays. *See* Pet. 42–43 (citing Ex. 1001, 1:36–2:9; Ex. 1006, 1; Ex. 1009, 2:61–65, 6:49–52; Ex. 1002 ¶¶ 106–107). Petitioner also reads the claim limitations of the challenged claims on the combined teachings of Bertin and Cooke, providing a detailed showing, supported by the references and expert testimony. *See id.* at 43–62.

Bertin describes the following:

      FIGS. 21 and 22 illustrate the ability to stack similar chips while providing high speed chip-to-chip connections through the silicon. As seen in FIG. 21, a stack of chips 142, 144, 146 and 148 is mounted directly on device 140, such as a logic chip, carry-card, microprocessor, controller, etc., to minimize latency between the device and chips and to maximize bandwidth.

Ex. 1009, 7:16–22. Petitioner's interpretation of Bertin is that a variety of chips such as the recited logic chip or a microprocessor may be included in

IPR2020-01022
Patent 6,781,226 B2

one stack of chips. *See* Pet. 16; Ex. 1002 ¶ 102. Bertin describes chips that differ, for example, in requiring different heights of chip-to-chip connectors, and it is not clear what similarity is required for the embodiment of Figures 21 and 22 in Bertin. *See* Ex. 1009, 6:49–7:15.

Petitioner argues a combination of the teachings of Cooke with respect to a reconfigurable processor system including a processor, FPGA logic, and memory with Bertin's stacked chips interconnected using through-chip connectors. Pet. 40–41 (citing Ex. 1009, 6:49–52, 7:17–34, Figs. 21, 22; Ex. 1008, 2:3–12, 2:40–55, 3:13–18; Ex. 1002 ¶¶ 101–108). Petitioner argues that one of ordinary skill in the art would have made this combination to achieve the packing densities and high performance inter-chip, the intra-chip communication, and the heat dissipation described in Bertin. Pet. 42 (citing Ex. 1009, 2:61–65). Petitioner argues that one of ordinary skill would have tried this combination and had a reasonable expectation of success in light of Cooke's suggestions regarding a stacked system and Bertin's broadly-applicable teachings with regard to stacking processors, memories, and logic chips. *Id.* at 43 (citing Ex. 1002 ¶ 108).

Petitioner argues that this combination would yield a processor module, as in the preamble of claim 13. Pet. 43–44 (citing Ex. 1009, 7:16–34; Ex. 1002 ¶¶ 109–110). Petitioner further argues, with respect to limitations 13.1, 13.2, and 13.3, that the functional components of Cooke teach such a module including the first, second, and third integrated circuit die elements of claim 13. *Id.* at 45–47 (citing Ex. 1008 2:40–43; Ex. 1009, 7:16–34; Ex. 1002 ¶¶ 111–113). Lastly for claim 13, Petitioner asserts that the combination teaches or suggests limitation 13.4, in its teaching of a wide configuration data port in the large number of contact points distributed

throughout the dies.  Pet. 47–49 (citing Ex. 1008, code (57), 2:47–48, 8:11–15; Ex. 1009, 2:61–65, 4:57–60; Ex. 1002 ¶¶ 114–116); Pet. Supp. Br. 5–6. Petitioner argues that Bertin teaches a very large number of through-chip conductors to provide high performance inter-chip communication.  Pet. 48 (citing Ex. 1009, 2:61–65, 4:57–60; Ex. 1002 ¶ 115).  Petitioner notes that one of ordinary skill would have understood the shifting of configuration data stored in memory into the FPGA in a single cycle using through-chip conductors distributed throughout the surface of a die, with memory cells containing configuration bits would be connected in parallel to the logic cells of the FPGA die using the interconnections.  Pet. 48–49 & n.10 (citing Ex. 1008, code (57), 2:47–48, 8:11–15; Ex. 1002 ¶ 115); Pet. Supp. Br. 7 (citing Ex. 1014, 151–152 (describing cells in a memory)).

### 2.  Patent Owner's Arguments – Claim 13

With respect to Petitioner's arguments regarding the unpatentability of claim 13 over Bertin and Cooke, Patent Owner argues that neither Cooke nor Bertin teaches or suggests the corresponding structure for limitation 13.4. PO Resp. 41–42.  Additionally, Patent Owner argues that Petitioner impermissibly relies on a structure taught in Bertin and a function taught in Cooke.  *Id.* at 42–43.

Patent Owner additionally contends that Petitioner has not shown that one of ordinary skill in the art would have been motivated to combine Bertin and Cooke, recapitulating and at times referencing the arguments Patent Owner presents with respect to the combination of Koyanagi and Cooke.  *Id.* at 44–54.  Patent Owner again argues that Petitioner oversimplifies the technology at issue, "slaps together" the teachings, and does not explain how the combination would be achieved, while asserting that the '226 patent

IPR2020-01022
Patent 6,781,226 B2

provides such detail. *Id.* at 45–50 (citing Ex. 1001, 4:45–65). Patent Owner
also asserts that the combination of Bertin and Cooke would be subject to
the same thermal problems discussed with respect to the combination of
Koyanagi and Cooke. *Id.* at 51–54.

### 3. Analysis and Conclusions – Claim 13

We determine that Petitioner has shown that claim 13 would have
been obvious over Bertin and Cooke. With respect to Patent Owner's
arguments, which are similar to or recapitulate the arguments made with
respect to Koyanagi and Cooke, we refer to our analysis of that ground of
unpatentability, with the following exceptions.

First, with respect to the question of whether Bertin teaches buffer
cells, this argument fails because it is not commensurate with the claim
constructions of "wide configuration data port" and limitation 13.4, which
do not require such buffer cells. *See* II.C.2.

With respect to Patent Owner's repeated argument that it is error to
find structure for a means plus function claim in one reference and function
in a second reference, we reiterate that we consider what the combined
teachings of the references would have suggested to those of ordinary skill
in the art. *Keller*, 642 F2d. at 425. In this case, we agree with Petitioner that
one of ordinary skill in the art would have combined the references as
illustrated in the annotated version of Figure 22 of Bertin. Pet. 43. As
Petitioner argues, the combination would have taught a wide configuration
data port as per our construction of limitation 13.4, and that that wide
configuration data port would perform the function described, that of
reconfiguring the programmable array within one clock cycle. Pet. 47–49

IPR2020-01022
Patent 6,781,226 B2

(citing Ex. 1008, code (57), 2:47–48, 8:11–15; Ex. 1009, 2:61–65, 4:57–60; Ex. 1002 ¶¶ 114–116).

With respect to the assertion that Petitioner's argument is a "vast oversimplification" and that Petitioner has failed to demonstrate how the combination would be effected or used the challenged claims as a roadmap, we reiterate our response to the same argument with respect to the combination of Koyanagi and Cooke, as discussed *supra* Section II.D.3.c. Our determination is that Petitioner has supplied the necessary level of detail, detailing the similarities between the teachings of Bertin and Cook, each describing stacking to create a processor system, and providing an annotated version of Figure 22 of Bertin. *See* Pet. 40–43.

With respect to Patent Owner's arguments asserting thermal issues would have prevented Petitioner's proposed combination of Bertin and Cooke, Patent Owner correctly points out that a person of ordinary skill would have possessed "an understanding of the known thermal issues as recognized by Alexander and other skilled artisans." PO Resp. 53. This supports Petitioner's showing that an artisan would have addressed the known thermal issues, given the teachings of the prior art of record, including those in Bertin and Cooke. *See* Pet. 46–50 (addressing motivation and known thermal issues including Bertin's teaching of "high performance" and "heat dissipation" (quoting Ex. 1009, 2:61–65)). The record shows that such an artisan would have had a reasonable expectation of success based on known via heat conductor solutions as admitted by Dr. Chakrabarty (as discussed above, § II.D.3), and would have been motivated to employ those via and FPGA teachings for myriad beneficial reasons, including speed gains (based on increased bandwidth and short via connections), compactness, and

42

known benefits with the use of FPGAs. *See* Pet. 4 (arguing that "expected advantages of 3D stacks of chips are 'high packing density,' 'high speed,' 'parallel signal processing,' and 'integration of many functions on a single chip' (quoting Ex. 1010, 1704; citing Ex. 1002 ¶ 39)), 40–43 (providing evidence that reasons to combine the similar stacked logic chips of Bertin and Cooke include to maximize bandwidth, minimize latency, eliminate performance degradation, improve heat dissipation, and provide high system packing densities and high performance communication, where Bertin's structure generically accommodates different sizes and structures (citing Ex. 1002 ¶¶ 102–118; Ex. 1009, 1:20–57, 2:61–65, 6:49–52, 7:17–34, Figs. 21–22; Ex. 1006, 1; Ex. 1008, 2:3–11, 2:40–55, 3:13–18, Fig. 8A)).

Further regarding the known thermal issues, Patent Owner's argument ignores that Patent Owner agrees that Bertin teaches a "broad invocation of logic chips." PO Resp. 52. Regarding operability, Petitioner cites Dr. Chakrabarty's admission that "Bertin pays a lot of attention to the thermal issues" and Bertin uses many TSVs "as heat pipes." *See* Pet. Reply 27 (quoting Ex. 1035, 247:10–15, 246:14–247:2). Accordingly, Petitioner persuasively shows that the combination would "provide high system packing densities, [as well as] high performance inter-chip and intra-chip communication and heat dissipation." Ex. 1009, 2:61–65 (quoted at Pet. 17).

Based on the foregoing discussion and a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence

that the combination of Bertin and Cooke would have rendered claim 13 obvious.

### 4. Claim 22

Petitioner's showing with respect to claim 22 is similar to its showing with respect to claim 13. Pet. 57–59. Again, Petitioner describes the first limitation of claim 22 as being taught or suggested in Cooke's programmable array with logic cells. *Id.* at 58 (citing Ex. 1008, 6:40–42; Ex. 1002 ¶ 131). Otherwise, the showing for this claim is substantially similar to that for claim 13. *Id.* at 57–59.

Patent Owner presents no separate argument with respect to claim 22. For the reasons given with respect to this first limitation and for the same reasons discussed above, based on a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Bertin and Cooke would have rendered claim 22 obvious.

### 5. Claims 14 and 23

These dependent claims further specify that the "reconfiguring means" (claim 14) or "updating means" (claim 23) of the respective independent claim from which each depends "comprises a wide configuration data port." Ex. 1001, 7:23–24, 8:18–19. Patent Owner presents no separate arguments with respect to these claims.

We have determined that the structure for each means-plus-function limitation described includes a wide configuration data port and discussed above Petitioner's showing that this would have been obvious over the combination of Bertin and Cooke.

IPR2020-01022
Patent 6,781,226 B2

Therefore, for the reasons discussed above, based on a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Bertin and Cooke would have rendered claims 13 and 23 obvious.

### 6. Claims 16, 17, 25, and 26

For the teaching that the processor of the second integrated circuit die element comprises a microprocessor (claim 16), Petitioner argues that Bertin teaches a stacked chip element that is a microprocessor. Pet. 50 (citing Ex. 1000, 7:16–34; Ex. 1002 ¶ 118).

For the teaching that the memory of the third integrated circuit die element comprises a memory array (claim 17), Petitioner asserts this is taught in Bertin's teaching of a memory comprising a memory array accessed through array lines of a memory chip. *Id.* at 51 (citing Ex. 1009, 6:38–48; Ex. 1002 ¶¶ 119). Petitioner reiterates these arguments with respect to claims 25 and 26. *Id.* at 60.

Patent Owner presents no separate arguments with respect to these claims. We find that Petitioner has shown the additional claim limitations present in the asserted combination.

Therefore, for the reasons discussed above, based on a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Bertin and Cooke would have rendered claims 16, 17, 25, and 26 obvious.

### 7. Claims 18 and 27

For the additional limitations of claims 18 and 27, Petitioner again asserts that Cooke teaches configuring and reconfiguring the FPGA used in the asserted combination to perform different functions. Pet. 52–53 (citing Ex. 1008, 1:58–67, 2:58–60, 4:66–5:18, Figs. 9A, 9B; Ex. 1002 ¶¶ 120–122). Petitioner reiterates these arguments with respect to claim 27. *Id.* at 61.

Patent Owner presents no separate arguments with respect to these claims. We find that Petitioner has shown the additional claim limitations present in the asserted combination.

Therefore, for the reasons discussed above, based on a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Bertin and Cooke would have rendered claims 18 and 27 obvious.

### 8. Claims 19–21 and 28–30

With respect to claim 19's limitation that the integrated circuit die elements be electrically coupled by a number of contact points distributed throughout the surfaces of the die elements, Petitioner argues that Bertin teaches contact points distributed throughout the surfaces of the dies to provide inter-chip communication. Pet. 53–55 (citing Ex. 1009, 2:61–65, 4:57–60, 6:38–48, Figs. 18, 22; Ex. 1002 ¶¶ 124–125).

With respect to claim 20, Petitioner further argues that Bertin teaches that the contact points traverse the die elements throughout their thickness. *Id.* at 33–34 (citing Ex. 1009, Fig. 22; Ex. 1002 ¶ 126). With respect to the

thinning of the die elements to a point at which the contact points traverse the thickness of the die elements, Petitioner argues that one of ordinary skill in the art would know that Bertin's disclosed through-chip conductors, formed by a conventional semiconductor process, would require thin dies, because the aspect ratio of holes that form these conductors is proportional to the thickness of the die element. *Id.* at 56–57 (citing Ex. 1009, 3:21–40, Figs. 3, 4; Ex. 1002 ¶¶ 128–129).

Petitioner reiterates these arguments with respect to claims 28, 29, and 30. *Id.* at 61–62.

Patent Owner presents no separate arguments with respect to these claims. We find that Petitioner has shown the additional claim limitations present in the asserted combination.

Therefore, for the reasons discussed above, based on a review of the record, including a consideration of Patent Owner's evidence and arguments as presented in the Response, Sur-reply, and Patent Owner's Supplemental Brief, Petitioner persuasively establishes by a preponderance of the evidence that the combination of Bertin and Cooke would have rendered claims 19–21 and 28–30 obvious.

## III. CONCLUSION

The outcome for the challenged claims of this Final Written Decision follows.[8] In summary:

---

[8] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg.

IPR2020-01022
Patent 6,781,226 B2

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|--------|-------------|-------------------|----------------------------|-------------------------------|
| 13, 14, 16–23, 25–30 | 103 | Koyanagi, Cooke | 13, 14, 16–23, 25–30 | |
| 13, 14, 16–23, 25–30 | 103 | Bertin, Cooke | 13, 14, 16–23, 25–30 | |
| **Overall Outcome** | | | 13, 14, 16–23, and 25–30 | |

IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 13, 14, 16–23, and 25–30 of the '226 patent are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

48

IPR2020-01022
Patent 6,781,226 B2


For PETITIONER:

F. Christopher Mizzo
Gregory Arovas
Bao Nguyen
KIRKLAND & ELLIS LLP
chris.mizzo@kirkland.com
greg.arovas@kirkland.com
bao.nguyen@kirkland.com

James Glass
Ziyong Li
QUINN EMANUEL URQUHART & SULLIVAN LLP
jimglass@quinnemanuel.com
seanli@quinnemanuel.com

For PATENT OWNER:

Jonathan Caplan
James Hannah
Jeffrey Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jcaplan@kramerlevin.com
jhannah@kramerlevin.com
jprice@kramerlevin.com

Trials@uspto.gov                                                    Paper 32
571.272.7822                                          Entered: February 4, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR OF
THE UNITED STATES PATENT AND TRADEMARK OFFICE

_____

SAMSUNG ELECTRONICS CO., LTD. and
TAIWAN SEMICONDUCTOR MANUFACTURING CO. LTD.,
Petitioners,

v.

ARBOR GLOBAL STRATEGIES LLC,
Patent Owner.

_____

IPR2020-01020 (Patent RE42,035 E)
IPR2020-01021 (Patent 7,282,951 B2)
IPR2020-01022 (Patent 6,781,226 B2)

_____

Before ANDREW HIRSHFELD, *Commissioner for Patents, Performing the
Functions and Duties of the Under Secretary of Commerce for Intellectual
Property and Director of the United States Patent and Trademark Office.*

ORDER

IPR2020-01020 (Patent RE42,035 E)
IPR2020-01021 (Patent 7,282,951 B2)
IPR2020-01022 (Patent 6,781,226 B2)

The Office has received requests for Director review of an issue raised in each of the above-captioned cases. *See, e.g.*, IPR2020-01020, Ex. 3100. The requests were referred to Mr. Hirshfeld, Commissioner for Patents, Performing the Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

It is ORDERED that the request for Director review in each case is denied; and

FURTHER ORDERED that the Patent Trial and Appeal Board's Final Written Decision in each case is the final decision of the agency.

2

IPR2020-01020 (Patent RE42,035 E)
IPR2020-01021 (Patent 7,282,951 B2)
IPR2020-01022 (Patent 6,781,226 B2)

For PETITIONER:

Gregory S. Arovas
Bao Nguyen
KIRKLAND & ELLIS LLP
chris.mizzo@kirkland.com
greg.arovas@kirkland.com
bao.nguyen@kirkland.com


James Glass
Ziyong Li
QUINN EMANUEL URQUHART & SULLIVAN LLP
jimglass@quinnemanuel.com
seanli@quinnemanuel.com

For PATENT OWNER:

Jonathan S. Caplan
James Hannah
Jeffrey H. Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jcaplan@kramerlevin.com
jhannah@kramerlevin.com
jprice@kramerlevin.com

3

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

XILINX, INC.,
Petitioner,

v.

ARBOR GLOBAL STRATEGIES, LLC,
Patent Owner.

_____

IPR2020-01567[1]
Patent 7,126,214 B2

_____

Before KARL D. EASTHOM, BARBARA A. BENOIT, and
SHARON FENICK, *Administrative Patent Judges*.

BENOIT, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

_____

[1] Taiwan Semiconductor Manufacturing Co. Ltd. filed a petition in
IPR2021-00735 and has been joined as a party to IPR2020-01567.

IPR2020-01567
Patent 7,126,214 B2

Xilinx, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–6 and 26–31 (the "challenged claims") of U.S. Patent No. 7,126,214 B2 (Ex. 1001, "the '214 patent"). Pet. 1. Petitioner filed a Declaration of Paul Franzon, Ph.D. (Ex. 1002) with its Petition. Arbor Global Strategies LLC ("Patent Owner") filed a Preliminary Response (Paper 9, "Prelim. Resp."). We determined that the information presented in the Petition established that there was a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims, and on March 5, 2021, we instituted this proceeding as to all challenged claims and all grounds of unpatentability. Paper 13 ("Institution Decision" or "Inst. Dec.").

After institution, Taiwan Semiconductor Manufacturing Co. Ltd. ("TSM") filed a Petition seeking *inter partes* review of the claims challenged in this proceeding and a Motion for Joinder. IPR2021-00735, Papers 1, 3, 5.[2] We instituted an *inter partes* review in IPR2021-00735 and joined TSM as a party to this proceeding. Paper 20.

Subsequently, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp.") and a declaration of Shukri Souri, Ph.D. in support thereof (Ex. 2011); Petitioner filed a Reply (Paper 23, "Pet. Reply") and a supplemental declaration of Dr. Franzon in support thereof (Ex. 1070); and Patent Owner filed a Sur-reply (Paper 27, "PO Sur-reply"). Thereafter, the parties presented oral arguments, and the Board entered a transcript into the record. Paper 33 ("Tr.").

---

[2] The petition in IPR2021-00735 (Paper 1) filed on April 5, 2021 was replaced by a corrected petition (Paper 5), which was accepted by the Board (Paper 7).

IPR2020-01567
Patent 7,126,214 B2

We have jurisdiction under 35 U.S.C. § 6(b)(4). For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner demonstrates by a preponderance of evidence that the challenged claims are unpatentable.

## I. BACKGROUND

### A. Real Parties-in-Interest

As the real parties-in-interest, Petitioner identifies itself (Pet. 48) and TSM identifies itself and TSMC North America (IPR2021-00735, Paper 5, 48). Patent Owner identifies Arbor Global Strategies LLC. Papers 4, 1; 6, 1.

### B. Related Proceedings

The parties identify *Arbor Global Strategies LLC* v. *Xilinx, Inc.,* 1:19-cv-1986-MN (D. Del.) (filed October 18, 2019) as a related proceeding. *See* Pet. 48; Papers 4, 1; 6, 1.

Concurrent with the instant Petition, Petitioner filed petitions challenging claims in three related patents, respectively IPR2020-01568 challenging U.S. Patent No. 7,282,951 ("the '951 patent"), IPR2020-01570 challenging U.S. Patent No. RE42035, and IPR2020-01571 challenging U.S. the 6,781,226 patent. *See, e.g.*, Pet. 48. These three patents also have been challenged by a different petitioner in IPR2020-01020, IPR2020-01021 ("IPR-1021"), and IPR2020-01022. The joined party here (TSM) also was joined as a party to each of those proceedings.

### C. The '214 patent

The '214 patent describes a stack of integrated circuit ("IC") die elements including a field programmable gate array (FPGA) on a die, a

3

IPR2020-01567
Patent 7,126,214 B2

memory on a die, and a microprocessor on a die. Ex. 1001, code (57),

Fig. 4. Multiple contacts traverse the thickness of the die elements of the

stack to connect the gate array, memory, and microprocessor. Ex. 1001,

code (57), Fig. 4. According to the '214 patent, this arrangement "allows for

a significant acceleration in the sharing of data between the microprocessor

and the FPGA element while advantageously increasing final assembly yield

and concomitantly reducing final assembly cost." Ex. 1001, code (57),

Fig. 4.

Figure 4 follows:



Fig. 4

Figure 4 above depicts a stack of dies including FPGA die 68, memory die

66, and microprocessor die 64, interconnected using contact holes 70.

Ex. 1001, 4:59–5:2.

The '214 patent explains that an FPGA provides known advantages as

part of a "reconfigurable processor." *See* Ex. 1001, 1:23–39. Reconfiguring

the FPGA gates alters the "hardware" of the combined "reconfigurable

processor" (e.g., the processor and FPGA) making the processor faster than

4

IPR2020-01567
Patent 7,126,214 B2

one that simply accesses memory (i.e., "the conventional 'load/store' paradigm") to run applications. *See* Ex. 1001, 1:23–39. A "reconfigurable processor" provides a known benefit of flexibly providing the specific functional units needed for applications to be executed. *See* Ex. 1001, 1:23–39.

## D. Illustrative Claim

The Petition challenges claims 1–6 and 26–31, of which claims 1, 2, 26, and 27 are independent claims. Each of the challenged claims are directed toward a programmable array module. *See, e.g.,* Ex. 1001, 7:56 (independent claim 1), 8:2 (independent claim 2), 9:41 (independent claim 26), 9:52. Claim 1, reproduced below with bracketed numbering added for reference, illustrates the challenged claims at issue:

> 1. A programmable array module comprising:
>
> [1.1] at least a first integrated circuit functional element including a field programmable gate array; and
>
> [1.2] at least a second integrated circuit functional element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element
>
> [1.3] wherein said field programmable gate array is programmable as a processing element, and
>
> [1.4] wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element.

Ex. 1001, 7:56–67.

Among the differences recited by the independent claims, independent claims 2 and 27 recite "said first and second integrated circuit functional elements being coupled by a number of contact points distributed throughout

5

IPR2020-01567
Patent 7,126,214 B2

the surfaces of said functional elements." Ex. 1001, 8:1–15, 9:58–61.

Independent claims 26 and 27 recite "wherein said memory array is functional to accelerate external memory references to said processing element." Ex. 1001, 9:49–51, 10:2–4.

*E. The Asserted Grounds*

Petitioner challenges claims 1–6 and 26–31 of the '214 patent on the following grounds (Pet. 1):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1, 2, 4, 6, 26, 27, 29, 31 | 103[3] | Zavracky[4], Chiricescu[5], Akasaka[6] |
| 3, 28 | 103 | Zavracky, Chiricescu, Akasaka, Satoh[7] |

---

[3] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103. For purposes of institution, the '214 patent contains a claim with an effective filing date before March 16, 2013 (the effective date of the relevant amendment), so the pre-AIA version of § 103 applies.

[4] Zavracky, US 5,656,548, issued Aug. 12, 1997 (Ex. 1003).

[5] Silviu M. S. A. Chiricescu and M. Michael Vai, *A Three-Dimensional FPGA with an Integrated Memory for In-Application Reconfiguration Data*, Proceedings of the 1998 IEEE International Symposium on Circuits and Systems, May 1998, ISBN 0-7803-4455-3/98 (Ex. 1004).

[6] Yoichi Akasaka, *Three-Dimensional IC Trends*, Proceedings of the IEEE, Vol. 74, Issue 12, pp. 1703–14, Dec. 1986, ISSN 0018-9219 (Ex. 1005).

[7] Satoh, PCT App. Pub. No. WO00/62339, published Oct. 19, 2000. (Ex. 1008 (English translation)).

6

IPR2020-01567
Patent 7,126,214 B2

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 5, 30 | 103 | Zavracky, Chiricescu, Akasaka, Alexander[8] |

Petitioner contends that each of the asserted references is prior art to each of the challenged claims.  Pet. 1–3.

## II. ANALYSIS

Petitioner challenges claims 1–6 and 26–31 as obvious based on the grounds listed above.  Patent Owner disagrees.

### A. Legal Standards

To prevail in challenging Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable.  35 U.S.C. § 316(e) (2012); 37 C.F.R. § 42.1(d) (2017).  "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring inter partes review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")); *see also* 37 C.F.R. § 42.104(b) (requiring a petition for inter partes review to identify how the challenged claim is to be construed and where each element of the claim is found in the prior art patents or printed publications relied on).

---

[8] Michael J. Alexander et al., *Three-Dimensional Field-Programmable Gate Arrays*, Proceedings of Eighth International Application Specific Integrated Circuits Conference, Sept. 1995 (Ex. 1009).

IPR2020-01567
Patent 7,126,214 B2

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Tribunals resolve obviousness on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations.[9] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

To demonstrate obviousness, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418. More specifically, Petitioner must demonstrate by a preponderance of evidence that "a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *PAR Pharm., Inc. v. TWI Pharm., Inc.*, 773 F.3d 1186, 1193 (Fed. Cir. 2014).

---

[9] No argument or evidence regarding secondary considerations has been presented in this proceeding.

IPR2020-01567
Patent 7,126,214 B2

### B. Level of Ordinary Skill in the Art

The parties dispute the level of ordinary skill in the art. The level of ordinary skill in the art is "a prism or lens through which . . . the Board views the prior art and claimed invention" to prevent hindsight bias. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). In determining the level of ordinary skill, various factors may be considered, including the "types of problems encountered in the art; prior art solutions to those problems; rapidity with which innovation are made; the sophistication of the technology; and educational level of active workers in the field." *In re GPAC Inc.,* 57 F.3d 1573, 1579 (Fed. Cir. 1995) (internal quotation and citation omitted). Generally, it is easier to establish obviousness under a higher level of ordinary skill in the art. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011) ("A less sophisticated level of skill generally favors a determination of nonobviousness . . . while a higher level of skill favors the reverse.").

Relying on the declaration testimony of Dr. Franzon, Petitioner contends that

> [a] person of ordinary skill in the art ("POSITA") at the time of the alleged invention of the '214 patent would have been a person with a Bachelor's Degree in Electrical Engineering or Computer Engineering, with at least two years of industry experience in integrated circuit design, packaging, or fabrication. Ex. 1002 ¶¶ 58–60.

Pet. 7 (citing Ex. 1002 ¶¶ 58–60).

Patent Owner asserts that

> [a] person of ordinary skill in the art ("POSITA") around December 5, 2001 (the earliest effective filing date of the '214 Patent) would have had a Bachelor's degree in Electrical Engineering or a related field, and either (1) two or more years

9

IPR2020-01567
Patent 7,126,214 B2

> of industry experience; and/or (2) an advanced degree in
> Electrical Engineering or related field. Souri Decl., ¶ 25.

PO Resp. 8–9 (citing Ex. 2011 ¶ 25).

We adopt Petitioner's proposed level of ordinary skill in the art as we did in the Institution Decision, which comports with the teachings of the '214 patent and the asserted prior art. *See* Inst. Dec. 7. Patent Owner's proposed level largely overlaps with Petitioner's proposed level while lacking some specificity found in Petitioner's proposed level. Even if we adopted Patent Owner's proposed level, the outcome would remain the same. *See* Pet. Reply 1 (indicating Dr. Franzon confirmed his opinions under Patent Owner's proposed level of ordinary skill).

*C. Claim Construction*

In an *inter partes* review, the Board construes each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b). Under this standard, which is the same standard applied by district courts, claim terms take their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

IPR2020-01567
Patent 7,126,214 B2

In its Petition, Petitioner did not provide an express construction for any claim term. Pet. 13. Nor did Patent Owner in either its Preliminary Response or its Response to the Petition. Prelim. Resp. 5; PO Resp. 9 (quoting 37 C.F.R. § 42.100(b)). In our Institution Decision, we agreed that no terms require explicit construction. Inst. Dec. 11–12 (citing Pet. 13; Prelim. Resp. 4, 5).

In that decision, we also noted and addressed the claim construction issue raised by Patent Owner in its Preliminary Response based on similar terms we construed in instituting trial in IPR-1021. Inst. Dec. 8–11. Specifically, Patent Owner argued the proper scope of the claim terms "said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element" recited in independent claims 1 and 2 and "said memory array is functional to accelerate external memory references to said processing element" recited in independent claims 26 and 27 (collectively, "the functional to accelerate" limitations). Inst. Dec. 8–11. We did not agree with Patent Owner's arguments and noted that the instituted trial would afford both parties an opportunity for further briefing the issue. Inst. Dec. 10–11.

During trial, the parties have disputed the scope of the "the functional to accelerate" limitations in the context of the purported teachings of the prior art and in their respective Reply and Sur-reply. *See, e.g.,* PO Resp. 19, Pet. Reply 2–3; PO Sur-reply 1–2. Patent Owner contends that the plain language of the challenged claims requires "that a memory array is responsible for the claimed acceleration of data references." PO Sur-reply 1. Each of the challenged independent claims recites "said memory array is functional to accelerate" either "reconfiguration of said field programmable

11

gate array as a processing element" (claims 1 and 2) or "external memory references to said processing element" (claims 26 and 27). Ex. 1001, 7:56–67 (claim 1), 8:1–15 (claim 2), 9:41–51 (claim 26), 10:2–4 (claim 27).

Patent Owner further contends that the structure within the memory array responsible for accelerating is the wide configuration data port disclosed in the '214 patent. PO Resp. 19 ("Rather, as the claims themselves require, it is a structure provided *within the memory array* (i.e. the wide configuration data port disclosed in the '214 Patent) that is responsible for accelerating the programmable array's accelerated memory references." (citing Ex. 2011 ¶ 53)); PO Sur-reply 2 (repeats statement that the wide configuration data port is the structure provided *within the memory array* that is responsible for the claimed acceleration (quoting PO Resp. 18–19)). Thus, Patent Owner equates (by using "i.e.") the requisite structure within the memory array to be the wide configuration data port disclosed in the '214 patent.

The challenged claims recite a function of the memory array and that that the memory array structurally is "stacked with and electrically coupled to" the FPGA. Ex. 1001, 7:59–60 (claim 1); *see also* Ex. 1001, 7:56–8:30 (claims 1, 2), 9:41–10:21 (claims 26, 27). None of the claims recite a wide configuration data port or any structure *within* the memory array.

For support, Patent Owner relies on Dr. Souri's declaration testimony. PO Resp. 19 (citing Ex. 2011 ¶ 53 (concluding that "it is the structure provided *within the memory array* (i.e. the wide configuration data port disclosed in the '214 Patent) that is responsible for accelerating the programmable array's accelerated external memory references")). Prior to this conclusion, at the cited paragraph, Dr. Souri quotes a passage from the

IPR2020-01567
Patent 7,126,214 B2

'214 patent specification, but that passage describes nothing about a memory array, and Dr. Souri provides no explanation for how he reaches this conclusory position. *See* Ex. 2011 ¶ 53 (quoting Ex. 1001, 5:16–26).

When explaining that position "[i]n more detail," Dr. Souri describes a wide configuration data port as interconnecting the two elements of a memory die and a programmable array die. Ex. 2011 ¶ 54 (describing the inventors as solving the problem of "unacceptably long reconfiguration times" "*by stacking a memory die with a programmable array die*" and "*by interconnecting those two elements with a 'wide configuration data port'*" that employs through-silicon contacts, with the potential for even further acceleration where the memory die is 'tri-ported.'" (citing Ex. 1001, 5:16–26) (emphasis added here)). As such, Dr. Souri describes the wide configuration data port as *interconnecting a memory die and a programmable array die.* Although Dr. Souri describes the wide configuration data port as interconnecting two dies, Dr. Souri does not describe the wide configuration data port as being *within the memory array*. Because Dr. Souri does not adequately explain how a wide configuration data port *interconnecting a memory die* with another element shows a wide configuration data port *within a memory array*, we give little weight to Dr. Souri's testimony that the claims require a wide configuration data port *within* the memory array.

The weight we accord Dr. Souri's testimony in this regard is further supported by Patent Owner's expert Krishnendu Chakrabarty, Ph.D. who indicates the very wide configuration data port shown in Figure 5 of the '214

13

IPR2020-01567
Patent 7,126,214 B2

patent connects the memory die and FPGA die.[10]  Ex. 1075, 157:23–158:7;
Ex. 1075, 156:7–10[11]; *see* Ex. 1075, 163:8–21 (describing a data port as
"just an interface to send data from one place to another" and a configuration
data port as "just a data port used for configuration")*; see also* Pet. Reply 9
(quoting 1075, 157:23–158:3, 163:8–163:21).  Patent Owner argues its own
prior expert's testimony contradicts the '214 patent description of "the wide
configuration data port *with buffer cells*."  PO Sur-reply 8 (citing Pet. Reply
9; Ex. 1001, 5:27–36) (emphasis added).  For the reasons explained below,
we do not agree that the '214 patent requires a wide configuration data port
*to include buffer cells* and so do not agree with Patent Owner that Dr.
Chakrabarty's description of a wide configuration data port contradicts the
'214 patent.

Furthermore, the disclosure of a wide configuration data port in
Figure 5 of the '214 patent does not support Patent Owner's position that the
claims require such a structure *within* the memory array.  The '214 patent
depicts a "VERY WIDE CONFIGURATION DATA PORT 82" as a "black
box" in Figure 5 and is not clear on its face how the wide configuration data
port 82 in Figure 5 relates structurally to a memory die or memory array.
Ex. 1001, 5:27–37, Fig. 5. Additionally, Figure 5 of the '214 patent includes
structures (specifically, buffer cells) described as preferably being within the

---

[10] Dr. Chakrabarty is Patent Owner's expert in the IPR2020-01020,
IPR2020-01021, and IPR2020-01022 that challenge other patents of Patent
Owner that have a substantially similar written description with regard to the
cited portions of the '214 patent.  *See* IPR2020-01020, Ex. 1001, Figs. 4–5;
IPR2020-01021, Ex. 1001, Figs. 4–5; IPR2020-01022, Ex. 1001, Figs. 4–5.

[11] "Q: So in this system [referencing Fig. 4], the configuration data port has
wires that connect the memory die to the FPGA die. Right?  A: Yes."

IPR2020-01567
Patent 7,126,214 B2

memory die and structures (specifically logic cells) as being part of the FPGA. Thus, Figure 5 of the '214 patent does not depict the wide configuration data port 82 as being *within* a memory array.

Specifically, Figure 5 follows:



*Fig. 5*

Figure 5 shows a very wide configuration data port 82 on the left side of the figure that is connected to each buffer cell depicted to the right of very wide configuration data port 82. *See* Ex. 1001, Fig. 5, 5:33–37. In turn, each buffer cell is connected to an associated configuration memory cell 86, which is adjacent to a logic cell 84. *See* Ex. 1001, Fig. 5, 5:33–37. The '214 patent indicates that "[t]he buffer cells 88 are preferably a portion of the memory die 66 (FIG. 4)" but is silent as to the wide configuration data port's structural relationship to the memory die. Figure 5, however, depicts very wide configuration data port 82 as being separate from the buffer cells. Moreover, the '214 patent indicates that "the FPGA 68 compris[es] the logic

15

cells 84," which are depicted in Figure 5 as being separate from the very wide configuration data port 82.  Ex. 1001, 5:38.

Therefore, the '214 patent in Figure 5 and its corresponding description do not describe the wide configuration data port as being within the memory array.  Ex. 1001, Fig. 5, 5:27–47.  To the extent the claims implicate any portion of a wide configuration data port, it is the numerous via connections associated with that port connected to a memory die that supports a "memory array [] functional to accelerate" data references.  This is consistent with the testimony of Patent Owner's experts Dr. Souri and Dr. Chakrabarty as outlined above.

Moreover, the '214 patent further indicates that Figure 5 is a "functional block diagram of the configuration cells" through which the FPGA 70 shown in Figure 4 is updated "in one clock cycle by updating all of the configuration cells in parallel."[12]  Ex. 1001, 5:27–33.  Notably, the reconfigurable processor module 60 depicted in Figure 4 comprises "a die package 62 to which is coupled a microprocessor die 64, memory die 66 and FPGA die 68, all of which have a number of corresponding contact points,

---

[12] The '214 patent specification also states that "[f]urther disclosed herein is an FPGA module that uses stacking techniques to combine it with a memory die for the purpose of accelerating FPGA reconfiguration."  Ex. 1001, 2:61–63.  This, and other disclosures, indicate that reconfiguration may occur by using the significant number of vias of the stacking technique (i.e., without necessarily requiring any other structure of Figure 5's wide configuration data port (whatever it is)).  *See id.* at 5:41–47 ("Other methods for taking advantage of the significantly increased number of connections to the cache memory die 66 (FIG. 4) may include its use to totally replace the configuration bit storage on the FPGA die 68 as well as to provide larger block random access memory ("RAM" than can be offered within the FPGA die 68 itself.")).

IPR2020-01567
Patent 7,126,214 B2

or holes 70 formed throughout the area of the package 62 and the various die 64, 66, and 68." Ex. 1001, 4:64–5:2. Thus, even in the embodiment describing the wide configuration data port 82 as part of Figure 4's reconfigurable processor module 60 that includes elements outside of memory die 66, the '214 patent does not indicate the wide configuration data port 82 is within a memory array. A wide configuration data port is not otherwise described in the '214 patent.

For these reasons, we find Figure 5's depiction of the wide configuration data port 82 does not support Patent Owner's position that a structure *within* the memory array is responsible for the recited acceleration.

In its Sur-reply, Patent Owner contends that the '214 patent "describes that the memory array is functional to accelerate when it describes a wide configuration data port and 'buffer cells 88 . . . a portion of memory die 66' (a necessary part of the wide configuration data port) that is responsible for the acceleration of reconfiguration data to the field programmable gate array ('FPGA')[sic]." PO Sur-reply 1–2 (citing Ex. 1001, 5:32–41 (discussing Fig. 5)). The Patent Owner appears to be contending that the buffer cells 88 depicted in Figure 5 both (i) are a portion of memory die 66 and (ii) are a necessary part of the wide configuration data port. *See also* PO Resp. 21 (indicating the '214 patent "discloses utilizing a portion of the memory array as a wide configuration data port including buffer cells" (citing Ex. 1001, 5:33–38)); Tr. 53:18–19 (Patent Owner confirming its position that "buffer cells are part of the wide configuration data port.").

For the reasons discussed above, we do not agree that Figure 5 depicts the buffer cells as part of the wide configuration data port. The '214 patent expressly describes the central purpose of the buffer cells: "*they can be*

*loaded while the FPGA 68 comprising the logic cells are in operation*," which "then enables the FPGA 68 to be totally reconfigured in one clock cycle with all of it[s] configuration cells 84 updated in parallel." Ex. 1001, 5:39–43 (emphasis added). None of the challenged claims, however, recite buffer cells or require that the recited FPGA be reconfigured while in operation.

Additionally, Patent Owner's edited quotation omits the qualification that "[t]he buffer cells are *preferably* a portion of the memory die 66" shown in Figure 4, which further undermines Patent Owner's position. Ex. 1001, 5:36–37. Additionally, the buffer cells are only "preferably a portion of the memory die 66" that enables loading the buffer cells while the logic cells are in operation. Ex. 1001, 5:36–39 ("The buffer cells 88 are preferably a portion of the memory die 66 (FIG. 4). In this manner, they can be loaded while the FPGA 68 comprising logic cells 84 are in operation."). None of the challenged claims require loading the FPGA while it is in operation, which further undermines Patent Owner's position.

In sum, the '214 patent does not support Patent Owner's contentions regarding the wide configuration data port.[13] Additionally, Patent Owner's expert, Dr. Souri, describes a wide configuration data port as *interconnecting* "the two elements of a memory die and a programmable array die" rather than *being within* the memory array. Ex. 2011 ¶ 54. Moreover, Patent Owner appears elsewhere to describe the wide configuration data port as the

---

[13] Moreover, during the Oral Hearing, Patent Owner's counsel allowed for buffer cells being on the FPGA. Specifically, Patent Owner's counsel argued that "when the buffer cells are on the FPGA, it then raises the question, okay, well, what's on the memory array, right. And my answer would be probably more buffer cells." Tr. 54:21–24.

"die-area interconnection arrangement with buffer cells," which further supports that the wide configuration data port is not a structure provided within the memory array. PO Sur-reply 2 ("the novel die-area interconnection arrangement with buffer cells (i.e., wide configuration data port) allows the parallel loading of data from the memory die to the programmable array that is responsible for the claimed acceleration").

Furthermore, the '214 patent consistently identifies acceleration with stacking techniques that include contacts throughout the stacked dies, without requiring other structure. For example, the abstract of the '214 patent describes a processor module "constructed by stacking one or more thinned microprocessor, memory and/or . . . FPGA die elements and interconnecting the same utilizing contacts that traverse the thickness of the die." Ex. 1001, code (57). The abstract indicates that this processor module "allows for significant acceleration of the sharing of data between the microprocessor and the FPGA element. . . ." Ex. 1001, code (57). Notably, this description of "significant acceleration" does not include a wide configuration data port or buffer cells.

Additionally, the '214 patent similarly describes stacking techniques as accelerating the sharing of data between the microprocessor and the FPGA and accelerating external memory references, without referring to a wide configuration data port or buffer cells. *See* Ex. 1001, 2:64–66 (describing "a processor module with a reconfigurable capability that may include, for example, a microprocessor, memory and FPGA die stacked in a single block for the purpose of accelerating the sharing of data between the microprocessor and FPGA"), 2:64–66 (indicating "the FPGA module may employ stacking techniques to combine it with a memory die for the purpose

of accelerating external memory references"). The '214 patent indicates that "[b]ecause the various die 64, 66 and 68 (FIG. 4) have very short electrical paths between them, the signal levels can be reduced while at the same time the interconnect clock speeds can be increased." Ex. 1001, 5:50–53 (emphasis added). Similarly, "there is an added benefit of . . . increased operational bandwidth." Ex. 1001, 5:48–50. Notably, the descriptions of shorter electrical paths, increased speed and bandwidth are due to the stacking techniques and are made within the context of Figure 4 without mention of Figure 5's wide configuration data port and buffer cell embodiment. As noted above, even reconfiguration may occur without the specific wide configuration data port embodiment of Figure 5, for example, "[o]ther methods for taking advantage of the significantly increased number of connections to the cache memory die 66 (FIG. 4) may include its use to totally replace the configuration bit storage on the FPGA die 68." Ex. 1001, 5:41–45.

For these reasons, we conclude that the claims do not require a wide configuration data port (with or without buffer cells) *within a memory array* under the ordinary and customary meaning or otherwise.

### D. Asserted Obviousness of Claims 1, 2, 4, 6, 26, 27, 29, and 31

Petitioner contends the subject matter of claims 1, 2, 4, 6, 26, 27, 29, and 31 would have been obvious over the combination of Zavracky, Chiricescu, and Akasaka. Pet. 1, 14–38. Patent Owner disputes Petitioner's contentions. PO Resp. 18–39.

20

IPR2020-01567
Patent 7,126,214 B2

### 1. Summaries of Zavracky, Chiricescu, and Akasaka

#### a. Disclosure of Zavracky

Zavracky describes "a multi-layered structure" including a "microprocessor . . . configured in different layers and interconnected vertically through insulating layers which separate each circuit layer of the structure." Ex. 1003, code (57). Zavracky's "invention relates to the structure and fabrication of very large scale integrated circuits, and in particular, to vertically stacked and interconnected circuit elements for data processing, control systems, and programmable computing." *Id. at* 2:5–10. Zavracky includes numerous types of stacked elements, including "programmable logic devices" stacked with "memory" and "microprocessors." *See id.* at 5:19–23.

Zavracky's Figure 12 follows:



FIG. 12

Figure 12 above illustrates a stack of functional circuit elements, including microprocessor and RAM (random access memory) elements

21

IPR2020-01567
Patent 7,126,214 B2

wherein "buses run vertically through the stack by the use of inter-layer connectors." Ex. 1003, 12:24–26.

### b. Disclosure of Chiricescu

Chiricescu describes a three-dimensional chip, comprising an FPGA, memory and routing layers. Ex. 1004, 232. Chiricescu's FPGA includes a "layer of on-chip random access memory . . . to store configuration information." *Id.* Chiricescu describes and cites the published patent application that corresponds to Zavracky as follows:

> At Northeastern University, the 3-D Microelectronics group has developed a unique technology which allows us to design individual CMOS circuits and stack them to build 3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip [3].

*See* Ex. 1004,232, 235 (citing "[3] P. Zavracky, M. Zavracky, D-P Vu, and B. Dingle, '*Three Dimensional Processor using Transferred Thin Film Circuits*,' US Patent Application # 08-531-177, allowed January 8, 1997").[14]

Chiricescu describes "[a]nother feature of architecture [as] a layer of on-chip random access memory . . . to store configuration information." Ex. 1004, 232. Chiricescu also describes using memory on-chip to "significantly improve[] the reconfiguration time," explaining as follows:

> The elimination of loading configuration data on an as needed basis from memory off-chip significantly improves the reconfiguration time for an on-going application. Furthermore, a management scheme similar to one used to manage cache memory can be used to administer the configuration data.

---

[14] Zavracky lists the same four inventors and "Appl. No. 531,177," which corresponds to the application number cited by Chiricescu.

IPR2020-01567
Patent 7,126,214 B2

*Id.* at 234.

Figure 2 of Chiricescu follows:



**Figure 2.** The layers of our 3-D FPGA architecture.

Figure 2 illustrates three layers in the 3D-FPGA architecture, with the RLB layer including routing and logic blocks in a "sea-of-gates FPGA architecture," a routing layer, and the memory layer (to program the FPGA). *See* Ex. 1004, 232–33.

### c. Disclosure of Akasaka

Akasaka generally describes trends in three-dimensional integrated stacked active layers. Ex. 1005, 1703.[15] Akasaka states that "tens of thousands of via holes" allow for parallel processing in stacked 3-D chips, and the "via holes in 3-D ICs" decrease the interconnection length between IC die elements so that "the signal processing speed of the system will be greatly improved." Ex. 1005, 1705. Akasaka further explains that "high-speed performance is associated with shorter interconnection delay time and parallel processing" so that "twice the operating speed is possible in the best case of 3-D ICs." Ex. 1005,1705.

---

[15] Petitioner refers to pages in Ex. 1005 using the page numbers in the original article (e.g., 1703–1714) rather than the page numbers of the exhibit itself (e.g., 1–23). For convenience we follow Petitioner's practice of citing the page numbers of the original article.

IPR2020-01567
Patent 7,126,214 B2

Also, Akasaka discloses that "input and output circuits . . . consume high electrical power." Ex. 1005, 1705. However, "a 10-layer 3-D IC needs only one set of I/O circuits," so "power dissipation per circuit function is extremely small in 3-D ICs compared to 2-D ICs." Ex. 1005, 1705.

Figure 4 of Akasaka follows:



VIA-HOLE WIRING max 200~250PINS
**Fig. 4.** Wiring for parallel processing in 2-D and 3-D ICs.

Figure 4 compares short via-hole connections in 3-D stacked chips with longer connections in 2-D side-by-side chips.

### 2. Petitioner's Combination of Zavracky, Chiricescu, and Akasaka

Before proceeding through a detailed analysis of Petitioner's and Patent Owner's respective arguments and evidence, we provide some general analysis regarding the limitations of the independent claims to provide context for our detailed analysis.

### a. General Contentions Regarding Independent Claim Limitations

In the main, Petitioner relies on Zavracky's disclosure of a stack of functional circuit elements, including microprocessor and memory elements through which "buses run vertically through the stack by the use of inter-layer connectors." Ex. 1003, 12:24–26. Petitioner points to Zavracky's Figures 12 and 13 as disclosing a PLD (programmable logic device) and memory array in the stack as the recited first and second integrated circuit functional elements and the inter-layer connections (described as "via holes" or "contact holes") as the electrical coupling between the elements. Pet. 23–

IPR2020-01567
Patent 7,126,214 B2

28 (citing, e.g., Ex. 1003, 9:45–45. 12:28–38, 2:1-7, 2:2–6, 5:19–23, 12:12–38, 6:48–50; 5:21–23, 12:33–36, Figs. 12, 13).

With regard to the recited FPGA, Petitioner provides evidence that one of ordinary skill in the art would understand that the PLD 802 at the bottom layer of the stack shown in Figure 13 was a field programmable gate array (FPGA) because a PLD was a type of FPGA. Pet. 24 (citing Ex. 1035, 1:29–30 (stating "a field programmable gate array (FPGA) 100, which is one type of PLD"); Ex. 1037, 1:13–22 (indicating "[o]ne type of PLD, the field programmable gate array (FPGA); Ex. 1038, Abstract (indicating a "programmable logic device (PLD), such as a field programmable gate array (FPGA)"). Petitioner also provides evidence that Zavracky's programmable logic array (also called programmable logic device) 802 is programmable to provide a user-defined communication protocol and, as such, functions as a processing element, as required by the claims. Pet. 28 (citing Ex. 1002 ¶ 302 (citing Ex. 1003, 12:28–38; Ex. 1057, 57; Ex. 1040, 319)).

Petitioner relies on Chiricescu in its combination of Zavracky, Chiricescu, and Akasaka for teaching a memory layer to which configuration data from "off-chip memory" is loaded and from which Chiricescu's FPGA can be reconfigured with that reconfiguration data. Pet. 29–30 (citing Ex. 1004, 232, 234; Ex. 1002 ¶¶ 304–07). Petitioner contends that Chiricescu's memory layer accelerates reconfiguration of Chiricescu's FPGA because reconfiguration data that has already been loaded into the memory array is used to reconfigure the FPGA. Pet. 30. In this way, as Petitioner indicates, Chiricescu addresses the "main bottleneck in the implementation of a high performance configurable computer machine

25

IPR2020-01567
Patent 7,126,214 B2

[which] is the high configuration time of an FPGA." Ex. 1004, 232; *see* Pet.
29–30 (quoting ex. 1004, 232; citing Ex. 1002 ¶ 304–07).

As Petitioner indicates, Chiricescu describes "[t]he architecture of a 3-
dimensional FPGA for reconfigurable computing machines" and this
architecture "is based on a novel 3-D circuit technology developed at
Northeastern University," referring to Zavracky.  Ex. 1004, 232 (Abstract),
235 n.3; Pet. Reply 13.  Chiricescu specifically notes "[a]t Northeastern
University, the 3-D Microelectronics group has developed a unique
technology which allows us to design individual CMOS circuits and stack
them to build 3-D layered FPGAs which can have vertical metal
interconnections (i.e., interlayer vias) placed anywhere on the chip" and cites
Zavracky for this technology.  Ex. 1004, 232, 235 n.3.

Petitioner relies on Chiricescu to bolster Petitioner's position relying
on Zavracky for teaching or suggesting a programmable FPGA.
Specifically, Petitioner relies on Chiricescu's disclosure that one of its "key
features" is "quickly reconfigur[ing]" its FPGA as a processing element to
implement "arbitrary logic."  Petitioner provides evidence in the form of
credible testimony by Dr. Franzon that Chiricescu shows reconfiguring an
FPGA to perform multiplication.  Pet. 29 (citing Ex. 1002 ¶ 303 (describing
Ex. 1004, 234 ("FPGA is reconfigured from performing AxB to AxC or vice
versa") as providing an example of "the multiplication of a 4-bit variable")).

Independent claim 2 additionally requires that the number of contact
points (that electrically couple the first and second integrated circuit
functional elements) be "distributed throughout the surfaces of said
functional elements."  For this limitation, Petitioner relies on Zavracky's
express teaching that "openings or via holes" used for inter-layer

26

connections "can be placed anywhere on the die" of various functional elements, such that the connections "are not limited to placement on the outer periphery." Pet. 32 (quoting Ex. 1003, 6:43–47, 13:43–46, 14:56–63). Petitioner bolsters its position by further relying on Akasaka's disclosure of electrical coupling active layers in 3-D integrated circuits through "via holes" as shown in Akasaka's Figure 4 and Akasaka's statement that "[s]everal thousands or several tens of thousands of via holes are present in these devices." Pet. 32 (quoting Ex. 1005, 1705).

In addition to contesting Petitioner's reasons to combine the references, Patent Owner contests the "memory array functional to accelerate" limitations in each independent claim. Patent Owner throughout its briefing combines specific contentions with Petitioner's contentions regarding "the memory array functional to accelerate" limitations with Patent Owner's overly narrow interpretation—that the claims require a wide configuration data port as Patent Owner interprets Figure 5 of the '214 patent to be and/or that the claims require buffer cells to be present in the wide configuration data port. For the reasons discussed previously in Section II.C (Claim Construction), we do not agree with Patent Owner's position and so do not agree with Patent Owner's many arguments that incorporate Patent Owner's improperly narrow reading of the claims.

Many of Patent Owner's arguments also apply to a misunderstanding of Petitioner's combination. For example, Patent Owner seems unduly focus on Chiricescu's data transfer when loading configuration data *into the memory cells*, whereas Petitioner's combination relies on acceleration of reconfiguring the FPGA using configuration data that *has been* loaded into Chiricescu's memory layer. Patent Owner's arguments such as these that do

IPR2020-01567
Patent 7,126,214 B2

not address Petitioner's combination do not undermine Petitioner's combination.

Patent Owner also at times asserts that Dr. Franzon "admitted" something during his deposition testimony. As described below with respect to specific instances, we do not agree with Patent Owner's characterization where Patent Owner's arguments overgeneralize Dr. Franzon's testimony and do not sufficiently take into consideration the context of Dr. Franzon's testimony. For example, Patent Owner characterized Dr. Franzon's testimony discussing a prior art reference (Trimberger)[16] as "unequivocally stat[ing] that Petitioner's proposed combination was not feasible" and "admitting Chiricescu's 'RLB BUS' that interconnects the memory and RLB layers is the same type of narrow data port distinguished in the '214 Patent." PO Sur-reply 14 (citing Ex. 2012, 71:19–72:1; PO Resp. 29); PO Sur-reply 19–20 (citing Ex. 2012, 80:10–22). We address Patent Owner's challenges to Dr. Franzon's testimony in detail below.

We now turn to addressing Petitioner's contentions and Patent Owner's arguments in detail.

b. *Petitioner's Reasons to Combine Zavracky, Chiricescu, and Akasaka*

In contending the subject matter of claims 1, 2, 4, 6, 26, 27, 29, and 31 would have been obvious over the combination of Zavracky, Chiricescu, and Akasaka, Petitioner provides reasons that one of ordinary skill in the art would have "integrate[d] the disclosures of Zavracky (including a stacked interconnected programmable 3-D module), Chiricescu (including

---

[16] Ex. 1006 (Trimberger) has not been asserted in any of Petitioner's grounds in this proceeding.

accelerated FPGA reconfiguration using stacked memory), and Akasaka (including thousands of distributed interconnections)."  Pet. 18; *see* Pet. 18–19 (citing Ex. 1002 ¶¶ 221–28 (citing Ex. 1004, 234; Ex. 1003, 5:65–66; Ex. 1020, 2; Ex. 1055 [0014]; Ex. 1040, 317)); Pet. 18–22 (discussing integrating Zavracky with Chiricescu and integrating Akasaka with Zavracky and Chiricescu.  Petitioner also includes reasons one of ordinary skill in the art would have had a reasonable expectation of success.  See Pet. 18–22; Pet. 20 ("With these understandings, [one of ordinary skill in the art] would have had a reasonable expectation of success in achieving the Zavracky-Chiricescu combination."); Pet. 20–21 (One of ordinary skill in the art "would have expected success in the combination [] by knowing of successful similar prior art designs.").

*i)  "[F]olding in" Chiricescu's teachings (including using stacked memory to reconfigure the FPGA) with Zavracky's 3D stacks*

Relying on Dr. Franzon's testimony, Petitioner contends that one of ordinary skill in the art would have "been encouraged to fold in Chiricescu's teachings (including using stacked memory to reconfigure the FPGA) with Zavracky's 3D stacks, understanding that it would lead to 'significant[] improvement in the reconfiguration time."  Pet. 18–19 (citing Ex. 1002 ¶ 212); Ex. 1002 ¶ 212 (quoting Ex. 1004, 234 ("The elimination of loading configuration data on an as needed basis from memory off-chip significant improves the reconfiguration time for an on-going application."), ¶ 217 (testifying one of ordinary skill in the art "would readily recognize (because a cache is a building block of computer devices, and used in almost every processor on Earth) the ability to accelerate externa memory references by 'eliminat[ing] loading configuration data on an as needed basis' would, as

29

Chiricescu teaches, 'significant improves the reconfiguration time for an on-going application.'").  Petitioner points out that "Chiricescu, for example, explicitly references and uses the interconnections of Zavracky, as detailed in § VII.A.2" as another reason one of ordinary skill in the art would have folded in Chiricescu's teaching with Zavracky's 3D stacks.  Pet. 18 (noting the explicit citation to and description of Zavracky in Chiricescu); Ex. 1002 ¶ 218 (explaining that (i) Chiricescu and the Zavracky inventors were in the same research group at a university and (ii) "Chiricescu describes and cites the Zavracky patent application in his paper on the first page" (citing Ex. 1004, 232)).

Based on Dr. Franzon's declaration testimony, Petitioner also asserts that one of ordinary skill would have enhanced and expanded Zavracky's programmable logic device within its co-stacked microprocessors and memories to include image and signal processing tasks as Chiricescu suggests by teaching the use of FPGAs to implement arbitrary logic functions.  Pet. 19 (citing Ex. 1002 ¶¶ 229–30; Ex. 1005, 1705; Ex. 1003, 12:25–30; Ex. 1004, 232; Ex. 1058, 41; Ex. 1048); Ex. 1002 ¶ 229 (Dr. Franzon's testifying that image and signal processing were recognized as good applications for 3-D stacked chips that required parallel computation, such as signal processing citing various references for support (including Ex. 1005, 1705; Ex. 1048; Ex. 1003, 12:25–30; Ex. 1004, 232; Ex. 1058, 41)).

Relying on Dr. Franzon's declaration testimony, Petitioner contends that one of ordinary skill in the art would have had a reasonable expectation of success in making this combination because one of ordinary skill in the art "would have viewed Chiricescu with Zavracky as a routine

IPR2020-01567
Patent 7,126,214 B2

modification." Pet. 20 (Ex. 1002 ¶¶ 231–32).  Dr. Franzon's opinion that the combination was a routine modification is supported by Dr. Franzon's credible explanation that "Chiricescu would have actually just be[en] providing what Zavracky is generally describing when Zavracky states that in Figure 13, its programmable logic device 'can be programmed to provide for user-defined communication protocol[s].'"  Ex. 1002 ¶ 231.

Again relying on Dr. Franzon's declaration testimony, Petitioner also contends that one of ordinary skill in the art "would have been familiar with other prior art processor modules including other microprocessor-FPGA-memory combinations."  Pet. 20 (Ex. 1002 ¶¶ 231–32 (citing Ex. 1026)).  Dr. Franzon's well-reasoned testimony is supported by evidence in the form of a reference "that performs exactly that stack" that was described in Dr. Franzon's declaration testimony regarding background art known to one of ordinary skill in the art.  Ex. 1002 ¶ 232 (citing Ex. 1026; referring to Ex. 1002 ¶¶ 125–28).

### ii)  Applying Akasaka's Thousands of Distributed Contact Points

Relying on Dr. Franzon's declaration testimony, Petitioner also contends that it was "a predictable advantage and also suggested by Akasaka itself that applying Akasaka's distributed contact points, e.g., in the 3D stacks of Zavracky or Chiricescu, would increase bandwidth and processing speed through better parallelism and increased connectivity."  Pet. 20 (citing Ex. 1002 ¶ 233; Ex. 1005, 1705).  Petitioner adds that "Zavracky and Chiricescu . . . invited such a combination."  Pet. 20 (citing Ex. 1003, 6:43–47 ("connections . . . can be placed anywhere on the die"); Ex. 1004, 232 (similar); Ex. 1020, 9).  Petitioner further relies on Dr. Franzon's testimony as follows:

31

> [One of ordinary skill in the art] knew of the need for replicated "common data memory" in stacked designs, including as taught in Akasaka, to enable, e.g., multi-processor cache coherence. Ex. 1002 ¶ 236 (citing Ex. 1034, 466–469; Ex. 1005, 1713 & Fig. 25). That structure would be more difficult to accomplish with a limited number of interconnections as in Zavracky. Ex. 1002 ¶ 237. [One of ordinary skill in the art] thus would have been motivated to seek out Akasaka's distributed contact points in order to build a "common data memory." The POSITA's background knowledge, including prior art successes, would have suggested success in this combination. *Id.* (citing Ex. 1005, Ex. 1021).

Pet. 21.

In his declaration testimony cited by Petitioner, Dr. Franzon further explains that the common data memory "still obtain[s] the speed and cost advantages of having an FPGA-based stack (e.g., the FPGA being faster than the software running on a microprocessor, and cheaper than an ASIC)." Ex. 1002 ¶ 237. Dr. Franzon also explains that "the POSITA would have known that the more densely connected communication structure of Akasaka would enable desirable uses of the Zavracky-Chiricescu 3D chip stack," including multi-processor cache coherence. Ex. 1002 ¶ 236 (citing Ex. 1713, Fig. 25; Ex. 1034, 466–469).

Relying on Dr. Franzon's declaration testimony, Petitioner contends that one of ordinary skill in the art would have had an expectation of success in making this combination because one of ordinary skill in the art "would have known many references teaching stacked functional-element dies with thousands of distributed connections, including" depicted stacks (e.g., Figure 4 in Exhibit 1020, Figure 9 in Exhibit 1028, and Figure 1(a) in Ex. 1021). Pet. 21 (referring to Pet. 8–10).

IPR2020-01567
Patent 7,126,214 B2

### c. Patent Owner's Contentions

Patent Owner contends that Petitioner fails to provide the required articulated reasoning to support a conclusion of obviousness. PO Resp. 2–3, 23–39; PO Sur-reply 10–14.

<u>(i) Alleged Misrepresentation of Chiricescu</u>

First, Patent Owner contends that "Petitioner misrepresents Chiricescu to allege motivation to combine Zavracky and Chiricescu." PO Resp. 24–25 (Section VI.A.3(a)). Patent Owner specifically asserts that Chiricescu does not employ Zavracky's principles, does not utilize Zavracky's principles to improve reconfiguration time, and "does not employ Zavracky's die-area vertical interconnections to connect a memory die to an FPGA, and no die-area vertical is involved whatsoever in reconfiguring Chiricescu's FPGA." PO Resp. 24 (citing Pet. 18–19, Ex. 1004, 232 (Exhibit page 1), 234 (Exhibit page 3); Ex. 2011 ¶ 61[17]).

The record does not support this line of argument. Chiricescu's Abstract indicates the paper describes "[t]he architecture of a 3-dimensional FPGA for reconfigurable computing machines" and "is based on a novel 3-D circuit technology developed at Northeastern University." Ex. 1004, 232 (Abstract); *see* Pet. Reply 13. Chiricescu specifically notes "[a]t Northeastern University, the 3-D Microelectronics group has developed a unique technology which allows us to design individual CMOS circuits and stack them to build 3-D layered FPGAs which can have vertical metal

---

[17] Dr. Souri's declaration testimony cited by Patent Owner (Ex. 2011 ¶ 61) is a single-sentence conclusion that provides no more reasoning than that included in the Patent Owner Response to the Petition (Paper 19).

IPR2020-01567
Patent 7,126,214 B2

interconnections (i.e., interlayer vias) placed anywhere on the chip" and citing Zavracky for this technology.  Ex. 1004, 232, 235 n.3.

Moreover, Patent Owner unduly focuses on Chiricescu's use of 'on-chip' memory to mitigate the time it takes to transfer configuration data from 'off-chip'" and contends that Petitioner's combination does not "mak[e] any use of Zavracky's die-area vertical interconnections to transfer configuration data from the 'on-chip' memory into the FPGA."  PO Resp. 24 (citing Ex. 1004, 232, 234).  Patent Owner also argues that "[n]either Zavracky nor Chiricescu even contemplate using die-area inter-layer vertical interconnections to move data between a programmable array and a memory, such as is recited in Claims 1, 2, 26, and 27."  PO Resp. 24 (citing Ex. 2011 ¶ 62); Ex. 2011 ¶ 62 (Dr. Souri's conclusory testimony that contains no more reasoning than in the Patent Owner's Response).

The record does not support this line of argument.  First, Petitioner's combination focuses on Chiricescu for "using stacked memory to reconfigure the FPGA" (Pet. 18–19 (citing Ex. 1004, 232)).  For example, Chiricescu discloses using 3-D layered FPGAs with interlayer vias and describes 3-D hierarchical interconnections between logic blocks as a feature.  *See* Chiricescu, 232 ("Our architecture utilizes an extremely flexible 3-D hierarchical connection scheme in which the interconnections between logic blocks do not affect the use of logic resources.  Another feature of our architecture is that a layer of on-chip random access memory is provided to store configuration information.").

As discussed above, Zavracky's Figure 13 shows that Zavracky contemplates moving data on vertical buses between RAM memory 808 (and RAM memory on processor layer 806) and programmable array 802

IPR2020-01567
Patent 7,126,214 B2

(Ex. 1003, 12:29–39), and Chiricescu's Figure 2 shows that Chiricescu
contemplates moving data on "vertical metal interconnections (i.e.,
interlayer vias) placed anywhere on the chip" (based on Chiricescu's
characterization of Zavracky) between memory layer and the "sea of gates
FPGA" RLB layer (Ex. 1004, 232); *see also* Ex. 1004, 232 § 1 ("Another
feature of our architecture is that a layer of on-chip random access memory
is provided to store configuration information.").

    Also, Petitioner shows persuasively one of ordinary skill in the art
would have recognized that speed improvement emanates partly from
shorter interconnection distances and/or parallel processing using a larger
number of vias (as compared to connections on the same plane). *See* Reply
6 (arguing Zavracky's "approach **accelerates** communication between the
dies in the chip by way of '**smaller delays** and **higher speed** circuit
performance'" (emphasis by Petitioner (quoting Ex. 1003, 3:4–14)), and
arguing that "Zavracky's short interior 'inter-layer connectors' to stacked
'random access memory . . . results in reduced memory access time,
**increasing the speed** of the entire system.' (emphasis by Petitioner (quoting
Ex. 1003, 11:63–12:2)).

    Nor do we agree with Patent Owner's contention that, "because
Chiricescu discloses that the configuration data is stored in on-chip memory,
the approach of Zavracky-Chiricescu would result in a structure in which
data is removed from the microprocessor cache and placed in the FPGA's
on-chip memory, making it **much harder** for the microprocessor to access
memory given that the same type of slow front side bus distinguished in the
'214 Patent would be required for the microprocessor to access the FPGA's
on-chip memory, [which would] result in significantly **decreased** processing

speeds . . ., thus not leading to an improvement in the reconfiguration time." PO Resp. 24–25 (citing Ex. 2011 ¶ 63) (emphasis in PO Resp.); Ex. 2011 ¶ 63 (Dr. Souri's testimony contains no additional reasoning than that in the Patent Owner's Response).  Petitioner's combination "folding in" Chiricescu's teaching does not require configuration data to be stored in on-chip memory, and so Patent Owner's contentions do not address Petitioner's combination.

Moreover, neither Petitioner nor Dr. Souri sufficiently consider Petitioner's more general showing, based on Dr. Franzon's declaration testimony, that one of ordinary skill in the art "would have recognized that the more densely connected communication structure of Akasaka would enable desirable uses of the Zavracky-Chiricescu 3D chip stack."  Pet. 21 (citing Ex. 1002 ¶ 236 (citing Ex. 1034, 466–469; Ex. 1005, 1713, Fig. 25)).

On balance, we find Dr. Franzon's testimony in this regard more credible than Dr. Souri's testimony.  Dr. Franzon's testimony is based on specific descriptions of references consistent with his opinion, whereas Dr. Souri's testimony does not provide evidentiary support.

For these reasons, we do not agree with Patent Owner's position that Petitioner "misrepresents Chiricescu" and so does not provide articulated reasoning to support a conclusion of obviousness.

### (ii) Motivation Alleged to Be Untethered to Claims

Second, Patent Owner also contends that Petitioner's alleged motivation to combine Zavracky and Chiricescu "is untethered to the challenged claims."[18]  PO Resp. 25–26 (Section VI.A.3(b)).  Patent Owner

---

[18] We understand Patent Owner's "untethered" argument to challenge Petitioner's showing as to why "a skilled artisan would have had reason to

IPR2020-01567
Patent 7,126,214 B2

specifically argues that Petitioner does not provide motivation to combine Zavracky and Chiricescu "to reach a memory array functional to accelerate an external memory reference[] or accelerate the reconfiguration of a programmable array, as claimed." PO Resp. 25–26 (citing Ex. 2011 ¶ 64).

The record does not support this line of argument. Petitioner tethers its argued reasons to combine to accelerating external memory references and reconfiguration of a programmable array. For example, Petitioner asserted that one of ordinary skill would have combined "Chiricescu's teachings (including using stacked memory to reconfigure the FPGA) with Zavracky's 3D stacks, understanding that it would lead to 'significant[] improvement in reconfiguration time." Pet. 18 (citing Ex. 1002 ¶¶ 221–28 (citing Ex. 1004, 234; Ex. 1003, 5:65–660; Ex. 1020, 2; Ex. 1055 [0014]; Ex. 1040, 317)); Pet. Reply 14 (citing Pet. 18). Similarly, Chiricescu's technology that acts like cache memory for reconfiguration data results in accelerated access to external memory references (Pet. 30) likewise is tethered to the claimed acceleration provided by Chiricescu's technology to reconfigure the FPGA. Pet. 18–19; *see* Pet. Reply 14–15.

In addition, Petitioner discusses in the context of the programmability of an FPGA recited in each of the challenged claims. As such, and in contrast to Patent Owner's assertion that "Petitioner fails to articulate any reason that Chiricescu's alleged teaching of performing 'arbitrary logic functions' is related to the claimed invention," (PO Resp. 26), Petitioner tethers the description one of Chiricescu's "'key features' is that its FPGA can be 'quickly reconfigured' to implement 'arbitrary logic'" to the recited

---

combine the teaching of the prior art references to achieve the claimed invention." *PAR Pharm.*, 773 F.3d at 1193.

IPR2020-01567
Patent 7,126,214 B2

limitation that "said field programmable gate array is programmable as a processing element." Pet. 28–29. Thus, Petitioner's position that one of ordinary skill in the art "would have taken Chiricescu's suggestion of a FPGA to perform 'arbitrary logic functions'" as a reason to combine the references is tethered to claim language. *See* Pet. 19.

### *(iii) Alleged Major Modifications*

Third, Patent Owner contends that Petitioner's alleged motivation to combine Zavracky and Chiricescu "requires major modifications." PO Resp. 26–29 (Section VI.A.3(c)). Patent Owner argues that Chiricescu's narrow data port, the lack "of the type of wide configuration data port responsible for the accelerating features of the challenged claims," "or to arrange a microprocessor and programmable array such that the two components share data" would necessitate major modifications beyond the level of ordinary skill and neither Zavracky or Chiricescu discloses a structure—"a memory array that achieves the claimed acceleration (i.e. utilizing a portion of the wide configuration data port)" in the '214 patent—to address the problem of reducing the amount of time to move data from a memory die to the programmable array. PO Resp. 28 (citing Ex. 2011 ¶ 68). Dr. Souri explains that the major modification to configure a stacked module to meet the acceleration limitations of the claims requires a "wide configuration data port between the memory and the FPGA" and that such a modification would alter Chiricescu's principle operation, which relies on an entirely different strategy for routing data throughout the FPGA, namely its narrow RLB Bus and its 'routing layer,' which Chiricescu declares 'is of critical importance since it is used for the implementation of the

38

**Appx221**

IPR2020-01567
Patent 7,126,214 B2

interconnection of the non-neighboring RLBs.'" Ex. 2011 ¶ 67 (citing Ex. 1004, 233 (page 2 of exhibit); *see* PO Resp. 27.

As discussed previously (in Section II.C), however, the '214 patent in Figure 5 does not support Patent Owner's contentions that the claims require such a structure *within* the memory array. *See, e.g.,* PO Resp. 19. The '214 patent describes the vertical contacts distributed throughout the surface ("vias") to allow multiple short paths for data transfer between the memory and processing element. As Petitioner also persuasively argues, no "'modifications' are required to Chiricescu at all because the Petition's combination involves 'fold[ing] in Chiricescu's teachings (including using stacked memory to reconfigure[] the FPGA) with Zavracky's 3D stacks." Pet. Reply 15 (quoting Pet. 17–18).

Moreover, even if employing Chiricescu's FPGA structure also suggests implementing its routing layer on a separate layer, Chricescu does not describe its routing layer as a narrow port, contrary to Patent Owner's arguments. Pet. Reply 15–16 (noting that Dr. Franzon did not admit Chiricescu includes a narrow port and citing Dr. Franzon's testimony that on-chip area-wide connections in 3D stacks were well-known (citing Ex. 1002 ¶¶ 47–51; Ex. 1070 ¶¶ 65, 68; Ex. 1020)); *see also* Ex. 1004, 232, Fig. 2 (depicting connections between the memory layer, routing layer, and RLB layer (a "sea-of-gates FGPA structure") with connections that are distinct from the RLB bus); Ex. 1004, 232 (noting that "routing congestion will also be improved by the separation of layers," further suggesting that the routing layer is not part of a narrow port). In addition, Petitioner indicates that "Chiricescu describes 'vertical metal interconnections (i.e., interlayer vias),' and '**three separate layers with metal interconnects**

**between them**.'" Pet. Reply 13 (citing Ex. 1004, 232). Ciricescu's "architecture is based on technology developed by Zavracky at Northeastern University." Pet. Reply 13 (quoting Ex. 1004, 232). And Ciricescu states that Zavracky's architecture provides "3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) *placed anywhere* on the chip." Ex. 1004, 232 (emphasis added). For these reasons, the record does not support a conclusion that Chricescu's principle of operation does not require a narrow port, contrary to Patent Owner's arguments.

*(iv) Akasaka and Common Data Memory*

Fourth, Patent Owner further contends that "Akasaka exacerbates the problems with Petitioner's obviousness combination." PO Resp. 29–33 (Section VI.A.3(d)). According to Patent Owner, "Akasaka's only relevant disclosure is the 'common data memory' concept involved in the Petition, which does not disclose data shared between any processors" but "discloses that each processor in the stack accesses only the memory *in its own layer*." PO Resp. 30 (citing Ex. 1005, 11, Fig. 11; Ex. 2011 ¶ 71).

The record does not support this line of argument. Petitioner's combination relies on Akasaka for teaching "thousands of distributed interconnections." Pet. 18; *see also* Pet. 17–18 (overview of Akasaka). Petitioner uses Akasaka's common data layer to provide a reason that one of ordinary skill in the art would have used Akasaka's "thousands of distributed interconnections" in Petitioner's combination of Zavracky-Chiricescu that includes Zavracky's three-dimensional circuits electrically connected by via holes. Pet. 21; *see, e.g.,* Pet. 26–27 (citing Ex. 1003, 14:51–63, Figs. 12–13).

More specifically, relying on Dr. Franzon's declaration testimony, Petitioner contends that one of ordinary skill in the art would have known

"of the need for replicated 'common data memory' in stacked designs, including as taught in Akasaka, to enable, e.g., multiprocessor cache coherence." Pet. 21 (citing Ex. 1002 ¶ 236 (citing Ex. 1034, 466–69; Ex. 1005, 1713, Fig. 25)).

Dr. Franzon explains that particular technique ("Write Broadcast") ensures multi-processor cache coherency by "broadcast[ing] the new data over the bus [so that] all copies are updated with the new value." Ex. 1002 ¶ 236 (citing Ex. 1034, 466–69 (computer architecture text book)). Dr. Franzon relates this known technique for ensuring multi-processor cache coherency to keeping replicated 'common data memory' in stacked designs consistent. Dr. Franzon points to Akasaka's Figure 25 as illustrating such a broadcast technique to keep the memory data in each independent layer consistent. Ex. 1002 ¶ 236 (discussing Ex. 1005, Fig. 25, 1713). Dr. Franzon further explains that Akasaka's Figure 25 structure implementing the broadcast technique "would be difficult in the design to accomplish with just a limited number of interconnections between dies n Zavracky and certainly would be improved by Akasaka's distributed connections teaching." Ex. 1002 ¶ 237. This explanation supports Dr. Franzon's opinion that one of ordinary skill in the art "would have been motivated to seek out Akasaka's distributed contact points in order to build a 'common data memory,' as taught in Akasaka, while still obtaining the speed and cost advantages of having an FPGA-based stack (e.g., the FPGA being faster than the software running on the microprocessor, and cheaper than an ASIC." Ex. 1002 ¶ 237.

As such, Dr. Franzon's explanation of broadcast techniques to enable 'common data memory' consistency provides a reason that one of ordinary

IPR2020-01567
Patent 7,126,214 B2

skill in the art would include Akasaka's thousands of distributed interconnections (not just the smaller number taught by Zavracky) in Petitioner's combination of Zavracky, Chiricescu, and Akasaka. We do not understand Petitioner's position to require bodily incorporation of Akasaka's Figure 25 into Petitioner's Zavracky-Chiricescu combination, as Patent Owner seems to suggest. "It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012). "What matters in the § 103 nonobviousness determination is whether a person of ordinary skill in the art, having all the teachings of the references before him, is able to produce the structure defined by the claim." *Orthopedic Equip. Co., Inc. v. United States*, 702 F.2d 1005, 1013 (Fed. Cir. 1983). Rather, we understand Petitioner's position to be that one of ordinary skill in the art would included Akasaka's thousands of distributed interconnections, motivated in part by Akasaka's Figure 25 illustration of keeping a common data memory consistent by parallel transfer of data.

Furthermore, Petitioner relies on Dr. Franzon's testimony that accomplishing the "common data memory" desirable for "multi-processor cache coherence" "would be more difficult to accomplish with a limited number of interconnections as in Zavracky." Pet. 21 (citing Ex. 1002 ¶ 237).

For these reasons, we do not agree with Patent Owner's arguments that "Akasaka exacerbates the problems with Petitioner's obviousness combination." PO Resp. 29–33.

IPR2020-01567
Patent 7,126,214 B2

Moreover, Petitioner provides a second independent reason that one of ordinary skill in the art would had have to apply Akasaka's distributed contact points in the 3D stacks of Zavracky or Chiricescu. Petitioner points to advantages "suggested by Akasaka" that using Akasaka's distributed contact points "would increase bandwidth and processing speed through better parallelism and increased connectivity in the stack of Zavracky. Pet. 20 (citing Ex. 1002 ¶ 233 (quoting Ex. 1005, 1705); *see also* Pet. 17–18 (describing Akasaka's benefits). Petitioner relies on Dr. Franzon's declaration testimony that one of ordinary skill in the art would have recognized these benefits and "would have sought out Akasaka's connectivity to improve Zavracky's stacks in applications requiring parallel processing," such as image processing. Pet. 20 (citing Ex. 1002 ¶¶ 233, 235; Ex. 1005, 1705, citing Ex. 1003, 6:43–47; Ex. 1004, 232, Ex. 1020, 9). We find Dr. Franzon's testimony in this regard to provide persuasive explanation and analysis that relies on quotations of specific passages that support his testimony. *See* Ex. 1002 ¶ 233 (explaining two reasons one of ordinary skill in the art would have combined Akasaka's distributed contact points with Petitioner's combination of Zavracky-Chiricescu: "increased parallelism (e.g., the ability . . . to move and process data simultaneously) and increased connectivity (e.g., the ability to access various parts of the chip directly)"; quoting Ex. 1005, 1705 (Akasaka identifying benefits); reproducing Ex. 1005, Fig. 4 (titled "Wiring for parallel processing in 2-D and 3-D ICs and depicting "via-hole wiring").

### *(v) Alleged Lack of Reasonable Expectation of Success*

Fifth, Patent Owner contends that "Petitioner fails to demonstrate how [one of ordinary skill in the art] would have integrated Akasaka's thousands

43

IPR2020-01567
Patent 7,126,214 B2

of via interconnects with Zavracky-Chiricescu's design and circuitry with a reasonable expectation of success." PO Resp. 33 (Section VI.A.3(e)).

Regarding Patent Owner's arguments, first, we do not agree with Patent Owner's characterization of Dr. Franzon and Petitioner's analysis that one of ordinary skill in the art "would have understood the references *could be* combined" and, as such, fail to provide the requisite articulate reason to support a conclusion of obviousness. PO Resp. 36. Rather, Petitioner and Dr. Franzon provides specific reasons why one of ordinary skill in the art *would have* combined the references in the manner proposed by Petitioner. *See* Pet. 18–22 (repeatedly stating "would have been motivated"; "would have been encouraged to"; "would have taken"; "would have recognized"); *see also* Pet. Reply 17 (Petitioner indicating that it did not make a "could be combined" argument).

Turning back to Patent Owner's assertion that Petitioner fails to demonstrate that one of ordinary skill in the art would have a reasonable expectation of success to integrate Akasaka's thousands of via interconnects with Petitioner's combination of Zavracky-Chiricescu (PO Resp. 33–34) and Patent Owner's contention that Petitioner "failed to 'account for a single one of [the alleged] problems' related to TSV (through-silicon vias) interconnections." Petitioner characterizes these issues as "at most normal engineering issues, not problems preventing a combination." Pet. Reply 17 (alteration in Reply). We note, as discussed above, that Petitioner relies on Dr. Franzon's testimony that accomplishing the "common data memory" desirable for "multi-processor cache coherence" "would be more difficult to accomplish with a limited number of interconnections as in Zavracky" than

in using Akasaka's thousands of via interconnects. Pet. 21 (citing Ex. 1002 ¶ 237).

Furthermore, Petitioner relies on Dr. Franzon's testimony that one of ordinary skill in the art's "background knowledge, including prior art successes, would have suggested success in this combination." Pet. 21 (citing Ex. 1002 ¶ 237 (citing Ex. 1005, Ex. 1021, 18)). In addition to Akasaka's description, Dr. Franzon identifies a 1998 IEEE article that, according to Dr. Franzon, describes a "large number of interconnects to SRAMs and DRAMs. Ex. 1002 ¶ 237 (citing Ex. 1021, 18 as "describing the large number of interconnects to SRAMs and DRAMs"). We credit Dr. Franzon's testimony based on additional evidence of what one of ordinary skill in the art would understand. We also note that generally it is easier to establish obviousness under a higher level of ordinary skill in the art. *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011) ("A less sophisticated level of skill generally favors a determination of nonobviousness . . . while a higher level of skill favors the reverse."). Here the level of ordinary skill is a Bachelor's Degree in Electrical Engineering, with at least two years of industry experience. This further supports that one of ordinary skill in the art would have an expectation of success based on prior art successes of implementing a large number of interconnects to connect well-known circuits together such as FPGAs, microprocessor, and memories.

Additionally, many of Patent Owner's arguments seem to suggest bodily incorporation is required and must be explained for Petitioner to prevail. For example, Patent Owner asserts "Petitioner and Dr. Franzon's analysis wholly fails to provide any explanation whatsoever as to how

IPR2020-01567
Patent 7,126,214 B2

Akasaka's thousands of via interconnections would be laid out, connected to, and operate with the various functional blocks of Zavracky-Chiricescu 3-D device circuitry, and therefore necessarily would work." PO Resp. 38. In another example, Patent Owner asserts that

> [a]t the time of the invention, a POSITA was aware of numerous TSV interconnection issues, such as routing congestion, TSV placement, granularity, hardware description language ("HDL") algorithms, which must be considered. Souri Decl., ¶ 78; Ex. 2014 at 85, 87, 89.
>
> Petitioner's combination does not account for a single one of these problems, let alone demonstrate that they could have been solved by a POSITA at the time of the invention with a reasonable expectation of success.

PO Resp. 37.

To the extent that Patent Owner supports its position with a suggestion that bodily incorporation is required, we do not agree with such arguments by Patent Owner. "It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012). "What matters in the § 103 nonobviousness determination is whether a person of ordinary skill in the art, having all the teachings of the references before him, is able to produce the structure defined by the claim."

Nor do we agree with Patent Owner's characterization of Dr. Franzon's testimony as "unequivocally stat[ing] that Petitioner's proposed combination was not feasible." PO Sur-reply 14 (citing Ex. 2012, 71:19–72:1; PO Resp. 29). Rather, Dr. Franzon's testimony indicated that *off-chip access* to a wide configuration data port 100,000 bits wide was not feasible. He testified

IPR2020-01567
Patent 7,126,214 B2

> one of ordinary skill in the art "would understand that you have
> an off-chip access to this wide configuration data port.  That
> off-chip access can't be, for example, 100,000 bits wide.  For
> practical reasons you can't have that number of IO.  And this is
> both in the case of Trimberger and [the challenged patent],
> memory going from the external to the module.

Ex. 2012, 71:19–72:1.

This testimony relates to the previous discussion about using narrow ports to load configuration information, as in Chiricescu, and does not address the feasibility of using such pre-loaded configuration information to reconfigure a FPGA or accelerate external references to memory, both of which happen in the stack using the short vias that connect the layers in the stack.  Here again, Patent Owner conflates the loading of the stack with configuration information with the claimed elements—including the memory array functional to accelerate reconfiguration of a FPGA as a processing element (independent claims 1 and 2) or the memory array functional to accelerate external memory references to said processing element (independent claims 26 and 27).

### 3. Independent Claims 1, 2, 26, and 27

Turning to the independent claims 1, 2, 26, and 27, Petitioner presents various arguments and evidences regarding the prior art purported teaching or suggesting the claimed elements.  *See, e.g.,* Pet. 22–33, 36–38.

### a. Undisputed Limitations of Independent Claims 1, 2, 26, and 27

Claim 1 recites "[a] programmable array module comprising" various elements.  Petitioner contends that one of ordinary skill in the art would have understood Zavracky to be describing a programmable array module from Zavracky's disclosure of (i) "a common module body to perform a combined

function," (ii) a module based on "programmable logic array 802," and (iii) its invention as relating to "the structure [of] vertically stacked and interconnected circuit elements for. . . programmable computing." *See* Pet. 22 (relying on Ex. 1003, 9:42–45, 12:28–38, 2:1–7, Fig. 13; citing Ex. 1002 ¶¶ 282–86). Petitioner further argues that the combination of Zavracky and Chiricescu's "system where the focus of the 3D module is on a FPGA and a memory designed to accelerate external references . . . to the FPGA" "provid[es] a programmable array module," relying on FPGA as a programmable array. Pet. 22–23 (citing Ex. 1004, 234).

Petitioner contends that Zavracky discloses "at least a first integrated circuit functional element including a field programmable gate array" (limitation [1.1]). Pet. 23–26. Petitioner relies on Zavracky's Figure 12 as disclosing "layers that comprise integrated circuit functional elements" that perform specific functions, including being a memory or microprocessor. Pet. 23 (citing Ex. 1003, 2:2–6, 5:19–23, Fig. 12). Petitioner further relies on Zavracky's Figure 13 as disclosing an integrated circuit element that functions as a programmable logic device. Pet. 23.

For the recited "field programmable gate array" (FPGA), Petitioner relies on Zavracky's express disclosure of a programmable logic device (PLD). Pet. 24 (citing Ex. 1003, 5:21–23, Fig. 13). Petitioner cites Dr. Franzon's testimony that one of ordinary skill in the art "would have known that a FPGA is an exemplary PLD" and provides evidence to support its contention. Pet. 24 (quoting Ex. 1002 ¶ 293). Petitioner relies on declaration testimony of Dr. Franzon that, as Petitioner notes, identifies citations to specific passages of prior art references to support his testimony. Pet. 24 (citing Ex. 1002 ¶ 293; quoting Ex. 1035, 1:29–30 ("a field

programmable gate array (FPGA) 100, which is one type of PLD");

Ex. 1036, 4:1–9 ("Thus, in a programmable logic device, such as a field

programmable gate array (FPGA). . ."); Ex. 1037, 1:13–22; Ex. 1038,

Abstract)).

    Additionally, Petitioner cites "Zavracky's description of a PLD for a

'user-defined' communication protocol, Ex. 1003, 12:33–36" and

Dr. Franzon's testimony that this description would have "suggested to [one

of ordinary skill in the art] that a FPGA was [a] type of PLD since the 'user'

would be 'defining' that protocol later in the field."  Pet. 25 (quoting

Ex. 1002 ¶ 294 (citing Ex. 1040; Ex. 1051).  Petitioner also relies on

Dr. Franzon's testimony that one of ordinary skill in the art "would have

been motivated to use a FPGA because a field programmable array was

recognized as the correct programmable logic device for such a 'user-

defined' network device."  Pet. 25 (citing Ex. 1002 ¶ 294).  Dr. Franzon's

testimony is supported by summary of two papers that describe FPGAs used

in that context.  *See* Ex. 1002 ¶ 294 (describing Ex. 1040 (using a FPGA-

based firewall); Ex. 1051 (describing using an FPGA to create an "adaptable

digital network processor)).

    Petitioner also contends that "the combination of Zavracky and

Chiricescu teaches or suggests 'a first integrated circuit functional element

including a field programmable gate array.'"  Pet. 25 (citing Ex. 1002 ¶ 296;

Ex. 1004, 232).  "Chiricescu literally describes Zavracky as teaching

technology 'to build 3-D layered **FPGAs** which can have vertical metal

interconnections (i.e., interlayer vias) placed anywhere on the chip."  Pet. 25

(citing Ex. 1004, 232) (emphasis in Petition); *see* Ex. 1004, 235 n.3 (citing

Ex. 1003).  Petitioner contends that "the Zavracky-Chiricescu combination

yields a modified version of Zavracky's 3D chip stack where Zavracky's 'PLD' layer is implemented as Chiricescu's" FPGA layer.  Pet. 25–26 (citing Pet. VII.A.2 (summary of Chiricescu); *see also* Pet. 16 (describing Chiricescu having an FPGA layer").

Regarding "at least a second integrated circuit functional element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element" (limitation [1.2]), Petitioner again relies on Zavracky's Figures 12 and 13 as disclosing stacked integrated circuit functional elements.  Pet. 26.  Petitioner indicates that Zavracky describes Figure 12 as having a "random access memory array."  Pet. 26 (citing Ex. 1003, Fig. 12, 12:15–28); Ex. 1003, 12:14–15 ("FIG. 12 presents a stacked microprocessor and random access memory array . . .").

Petitioner quotes Zavracky's teaching of vertically stacked and interconnected circuit element layers that are electrically coupled:

> One significant aspect in the formation of three-dimensional circuits involves interconnecting the layered devices. . . .  Via holes are formed through the upper contact areas to gain access to the lower contact areas. . . .  Electrical contact between the upper and lower devices is made by filling the via holes 1022 with an electrically conductive material . . . [.]

Pet. 27 (quoting Ex. 1003, 14:51–63; citing Ex. 1003, 2:18–22, 2:27–35, 10:8–21, 10:61–65, Fig. 6).

Petitioner also contends that Zavracky's PLD (on which Petitioner relies as teaching or suggesting the FPGA of the first integrated circuit functional element) is vertically stacked with and electrically coupled to Zavracky's memory array, such as shown in Figures 12 and 13.  Pet. 27–28 (Ex. 1003, Fig. 12 (annotated), Fig. 13 (annotated)).  Petitioner's annotated

50

IPR2020-01567
Patent 7,126,214 B2

version of Zavracky's Figure 13 depicts stacked functional elements and the
coupled contact points relied upon by Petitioner:



Pet. 27–28.  Zavracky's Figure 13 above as annotated by Petitioner depicts
(highlighted) inter-layer via connections in programmable logic array 802,
which "can be programmed to provide for user-defined communication
protocol between the microprocessor and any off-chip resources."  Ex. 1003,
12:29–37.

Regarding limitation [1.3]—"wherein said field programmable gate
array is programmable as a processing element," Petitioner relies on
Zavracky's disclosure that its "programmable logic array 802" "can be
programmed to provide for user-defined communication protocol" and its
analysis regarding limitation [1.1] that Zavracky's PLD would teach or
suggest the recited FPGA.  Pet. 28.  For support, Petitioner relies on
declaration testimony of Dr. Franzon that one of ordinary skill in the art
would have understood Zavracky's programmable logic array to be

IPR2020-01567
Patent 7,126,214 B2

operating as a processing element. Pet. 28 (summarizing Ex. 1002 ¶ 302). Petitioner, in its citation, notes that Dr. Franzon's declaration testimony relies on evidence to support its conclusion. Pet. 28 ("Ex. 1002 ¶ 302 (citing Ex. 1040)"). Petitioner also asserts that Chiricescu discloses a FPGA that can be quickly reconfigured to implement arbitrary logic. Pet. 29 (citing Ex. 1004, 233–234).

In its combination of Zavracky, Chiricescu, and Akasaka, Petitioner identifies with particularity "Chiricescu's FPGA and memory" with respect to claim 1's acceleration limitation [1.4]—"wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element." Pet. 29–30. According to Petitioner, Chiricescu's solution to the problem of high configuration time of a FPGA is a memory layer storing configuration information to avoid going "off-chip" to load FPGA reconfiguration data. Pet. 29–30 (citing Ex. 1004, 232, 234; Ex. 1002 ¶¶ 304–07). Petitioner asserts Chiricescu teaches that the FPGA-reconfiguration is accelerated by the data already having been loaded into the memory array. Pet. 30 (Ex. 1004, 234; Ex. 1002 ¶¶ 304–07).

To support its contention, Petitioner relies on passages from Chiricescu and four paragraphs of Dr. Franzon's declaration testimony, which provides reasoning with citations to Chiricescu and to a 1999 reference that predates the earliest filing date claimed by the '214 patent (Ex. 1057).[19]  In his declaration testimony cited by Petitioner, Dr. Franzon further explains his conclusion that "Chiricescu's 'cache' memory . . . is

---

[19] In Ex. 1002 ¶ 304 Dr. Franzon quotes Pierre Marchal, *Field-Programmable Gate Arrays*, ACM, Communications of the ACM, Vol. 42, No. 4 (April 1999) (Ex. 1057).

IPR2020-01567
Patent 7,126,214 B2

functional to accelerate reconfiguration of said FPGA as a processing element," as required by claim 1's acceleration limitation.  Ex. 1002 ¶ 307; Pet. 29 (citing Ex. 1002 ¶¶ 304–09); Pet. 30 (citing same).  On this basis, Dr. Franzon expressly concludes that Chiricescu's memory is functional to accelerate as recited in claim 1.

Independent claim 2 includes the same limitations as recited in independent claim 1.  *Compare* Ex. 1001, 7:56–65*, with id.* at 8:1–15.  For those limitations, Petitioner relies on its arguments made with respect to independent claim 1.  Pet. 30–31 (Petitioner's contentions regarding claim 2 referencing analysis regarding same limitations in claim 1).

Independent claim 2 additionally recites "said first and second integrated circuit functional elements being coupled by a number of contact points distributed throughout the surfaces of said functional elements." Ex. 1001, 8:7–10.  For this limitation, Petitioner relies on its combination of Zavracky, Chiricescu, and Akasaka.  Pet. 31.  In its combination for this limitation, Petitioner identifies Akasaka's description of electrical coupling of active layers through via holes and asserts Akasaka's 3D IC (shown in Akasaka's Figure 4) is similar to Figure 4 and corresponding the description in the '214 patent.  Pet. 31–32 (citing Ex. 1001, 4:63–5:1, 5:7–11, 5:16–26, Fig. 4; Ex. 1005, 1705, 1707; Ex. 1002 ¶¶ 327–32).

The record supports Petitioner's position.  We find Akasaka's active circuit layers connected electrically through via holes teach or suggest the recited "integrated circuit functional elements that are coupled by a number of contact points distributed throughout the surfaces of said functional elements."  Akasaka's active layers in its 3D-IC are integrated circuit

53

functional elements. (Ex. 1005, 1705 ("Each layer or set of several active layers can have its own function")).

Akasaka describes "exchang[ing] signals between upper and lower circuit layers through via holes in 3-D ICs" and further specifics that "[e]ach active layer is connected electrically via holes, and signals can be transferred between the layers." Ex. 1005, 1705, 1707; Fig. 4 (showing via-hole connections between two active layers in a 3-D integrated circuit). Akasaka indicates "[s]everal thousands or several tens of thousands of via holes are present in these devices, and many information signals can be transferred from higher to lower layers (or vice versa) through them." Ex. 1005, 1705. That Akasaka uses the term "holes" rather than the recited "contact points." The '214 patent, however, describes "contact points" shown in its Figure 4 also as via holes. Ex. 1001, 4:63–5:1 (describing Fig. 4 as depicting a stack of dies including "microprocessor die 64, memory die 66, and FPGA die 68, all of which have a number of corresponding contact points, or holes 70"); *see* Ex. 1002 ¶ 327 (Dr. Franzon testifying that the '214 patent "describes 'contact points' as 'holes' or through-silicon contacts" (quoting Ex. 1001, 4:63–5:1, 5:7–8, 5:16–17 for support)).[20]

Regarding the requirement that the contact points be "distributed throughout the surfaces of said functional element," we agree with Petitioner that the combination of Zavracky and Akasaka would have taught or suggested this feature. *See* Pet. 32–33 (citing Ex. 1003, 6:43–47, 13:43–47,

---

[20] Dr. Franzon testimony cites to the '035 patent specification and notes that equivalent disclosures exist in the other challenged patents. Ex. 1002 ¶ 327. The '214 patent includes the portions cited by Dr. Franzon at the citations noted above.

14:52–63; Ex. 1005, 1705; Ex. 1002 ¶ 332). More specifically, this feature is at least suggested by Zavracky's teaching of 3D stack elements where "openings or via holes" providing inter-layer connections "can be placed anywhere" and "are not limited to placement on the outer periphery" and Akasaka's teaching of "tens of thousands of via holes." Ex. 1003, 6:43–47, 13:43–47, 14:52–63; Ex. 1005, 1705; *see* Pet. 32 (citing Ex. 1003, 6:43–47, 13:43–47, 14:52–63; Ex. 1005, 1705); *see also* Ex. 1005, Fig. 4 (showing three sets of via holes in active layers, including the center set of via holes placed away from two of the edges of the active layers); Ex. 1002 ¶ 331 (Dr. Franzon describing Akasaka as "teaching that 'tens of thousands of via holes' can be distributed throughout the surface of the stacked elements (as shown in Akasaka's Figure 4)").

We credit Dr. Franzon's testimony in this regard because it is consistent with the descriptions in Zavracky and Akasaka as noted above. Furthermore, Dr. Franzon provides additional citations to prior art references to support his opinion that structures of "stacked [integrated circuit] elements with contact points (e.g., via holes) distributed across the surfaces of elements" were "ubiquitous in the prior art" and that one of ordinary skill in the art "would have been well acquainted with such structures." Ex. 1002 ¶ 332 (citing Ex. 1020, 9–10 ("'through hole vias' provide 'array of contacts [that] are used to provide vertical interconnections'"), Fig. 4; Ex. 1021, Figs. 4, 17 ("more than $10^5$ interconnections per chip"); Ex. 1028, Fig. 9, 1 ("'10,000' vias with enlarged diagram to show structure")). For example, Dr. Franzon included three figures reprinted below:

IPR2020-01567
Patent 7,126,214 B2



Each of the three figures show stacked layers with via holes distributed across the element layers.  *See* Ex. 1020, Fig. 4; Ex. 1021, Fig. 1(a); Ex. 1028, Fig. 2(b).

For these reasons, we find that Petitioner's combination of Zavracky, Chiricescu, and Akasaka teaches or suggests "said first and second integrated circuit functional elements being coupled by a number of contact points distributed throughout the surfaces of said functional elements," as recited in claim 2.

Independent claims 26 and 27 each recite many of the limitations also recited in independent claims 1 and 2.  For example, like claim 2, independent claim 27 recites "said first and second integrated circuit functional elements being coupled by a number of contact points distributed throughout the surfaces of said functional elements."

Independent claims 26 and 27, however, "wherein said memory array is functional to accelerate *external memory references to said processing element*," rather than reciting "functional to accelerate *reconfiguration of said field programmable gate array as a processing element*."

Petitioner relies on its arguments made with respect to independent claims 1 and 2 for the claim limitations recited in independent claims 26 and

56

IPR2020-01567
Patent 7,126,214 B2

27.  Pet. 36–37 (Petitioner's contentions regarding claims 26 and 27 referencing analysis regarding limitations in claims 1 or 2).

### b.  Disputed Limitations in Independent Claims 1, 2, 26 and 27

A central issue in this proceeding is whether Petitioner's combination of Zavracky, Chiricescu, and Akasaka teaches or suggests "the functional to accelerate" limitations recited in the independent claims.

### (i) Petitioner's Contentions

For these limitations, in its combination of Zavracky, Chiricescu, and Akasaka, Petitioner identifies with particularity "Chiricescu's FPGA and memory" used to address the problem of "the high configuration time of an FPGA."  Pet. 29–30.  To address this problem caused by having to load configuration data from off-chip memory, Chiricescu uses a "memory layer" in which "random access memory is provided to store configuration information" to avoid going "off-chip" to load FPGA reconfiguration data. Pet. 29–30 (citing Ex. 1004, 232, 234; Ex.1002 ¶¶ 304–07).  In addition to the numerous short vias of the combination providing acceleration, Petitioner also asserts Chiricescu teaches that the FPGA-reconfiguration is accelerated by the data already having been loaded into the memory array. Pet. 30 (citing Ex. 1004, 234; Ex. 1002 ¶¶ 304–07).

To support its contention, Petitioner relies on passages from Chiricescu and four paragraphs of Dr. Franzon's declaration testimony, which provides reasoning with citations to Chiricescu and to a 1999 reference that predates the earliest filing date claimed by the '214 patent (Ex. 1057).   In his declaration testimony cited by Petitioner, Dr. Franzon further explains his conclusion that "Chiricescu's 'cache' memory . . . is

IPR2020-01567
Patent 7,126,214 B2

functional to accelerate reconfiguration of said FPGA as a processing element," as required by claim 1's "functional to accelerate" limitation. Ex. 1002 ¶ 307; Pet. 29 (citing Ex. 1002 ¶¶ 304–09); Pet. 30 (citing same). Thus, Dr. Franzon expressly concludes that Chiricescu's memory is functional to accelerate as required in claim 1.

As noted previously, Petitioner's combination "fold[s] in Chiricescu's teachings (including using stacked memory to reconfigure a FPGA) with Zavracky's 3D stacks" to lead to significant improvement in reconfiguration time, among other reasons. Pet. 18–19. Thus, as noted above, Chiricescu's stacked memory to reconfigure a FPGA accelerates FPGA reconfiguration because the needed data is already stored in Chiricescu's stacked memory.

Petitioner relies on this analysis for the same limitation in independent claim 2 and for "said memory array is functional to accelerate external memory references to said processing element," as recited in independent claims 26 and 27. Petitioner adds in the context of claims 26 and 27 that the relevant analysis is "discussing acceleration of FPGA reconfiguration through acceleration of external memory references." Pet. 37 (claim 26), 38 (claim 27).

*(ii) Patent Owner's Contentions*

Patent Owner contends that Zavracky, Chiricescu, and Akasaka alone or as combined by Petitioner fail to teach or suggest "wherein said memory array is functional to accelerate *external memory references to said processing element*" recited in claims 26 and 27 and fail to teach or suggest "wherein said memory array is functional to accelerate *reconfiguration of said field programmable gate array as a processing element*," as recited in claims 1 and 2. PO Resp. 18–22 (claims 26 and 27), 22–23 (claims 1 and 2).

IPR2020-01567
Patent 7,126,214 B2

Patent Owner first presents contentions regarding claims 26 and 27 (which Patent Owner argues together). *See PO Resp.* 18–22; PO Sur-reply 2–10. Patent Owner then addresses claims 1 and 2 (which Patent Owner groups together), like Petitioner does, by indicating the arguments addressing claims 26 and 27 also show claims 1 and 2 to be patentable. PO Resp. 22–23; PO Sur-reply 10.

According to Patent Owner, Petitioner's combination fails because the claims require "structure ***provided within the memory array*** *(i.e.* the wide configuration data port disclosed in the '214 Patent) that is responsible for accelerating the programmable array's accelerated external memory references. PO Resp. 18–19 (citing Ex. 2011 ¶¶ 53–54); PO Sur-reply 3 (indicating Petitioner's proposed combination does not "include a wide configuration data port as the claimed invention requires"). For the reasons explained previously (Section II.C), we do not agree with Patent Owner.

Patent Owner correctly notes that the '214 patent "provides accelerated memory references due to its technique of stacking a programmable array with a memory die using through-silicon vias (TSVs)." PO Resp. 18–19 (quoting Ex. 1001, 5:16–26). Patent Owner then contends "Chiricescu's 'RLB BUS' that interconnects the memory and RLB layers is the same type of narrow data port distinguished in the '214 Patent" and "loads the configuration data 'in a byte serial fashion and must configure the cells sequentially.'" PO Resp. 19–20 (citing Ex. 2012, 80:12–17; Ex. 1001, 4:51–58; Ex. 2011 ¶ 55). For these reasons, Patent Owner asserts, that "Chiricescu fails to disclose any technique for accelerating external memory references over the baseline of a narrow configuration data port that loads data 'in a byte serial fashion.'" PO Resp. 20.

IPR2020-01567
Patent 7,126,214 B2

Contrary to Patent Owner's arguments, Petitioner persuasively argues and as summarized above, the Petition relies on the combined teachings of Zavracky, Chiricescu, and Akasaka to teach the "functional to accelerate clause." *See* Pet. Reply 4–7; Pet. 29–30. Patent Owner's arguments unduly focus on Chiricescu alone without sufficiently considering Petitioner's combination of Zavracky, Chiricescu, and Akasaka. *See* Pet. Reply 10–11 (citing Pet. 14–30; Ex. 2012, 29:15–32:15).

Petitioner also persuasively shows that Patent Owner "misrepresents Dr. Franzon's testimony" regarding an alleged narrow port in Chiricescu. *See* Pet. Reply 11 (addressing PO Resp. 19–20). As Petitioner persuasively argues,

> Dr. Franzon's cited testimony: (1) has nothing to do with Chiricescu; (2) was given in response to a question about Trimberger; and (3) was discussing the connection to "an off-chip memory" (80:11). Ex. 2012, 80:10–22.

Pet. Reply 11.

Dr. Franzon's cited deposition testimony supports Petitioner. Specifically, Dr. Franzon's cited deposition testimony refers to Trimberger in the context of "off-chip memory that loads in through the data port," and Dr. Franzon testifies that one of ordinary skill in the art "would interpret figure 5 as [including an undepicted] similar narrow structure on the left of the very wide configuration data port" to load data from an external source." *See* Ex. 2012, 80:3–22. In other words, Dr. Franzon's testimony does not describe Chiricescu's stacked memory layer as using a narrow port to transfer reconfiguration data to the RLB (with FPGA gates) layer from this "on-chip" memory within the 3D stack, as Patent Owner alleges. *See* Ex. 1004, Fig. 2.

IPR2020-01567
Patent 7,126,214 B2

As Petitioner also argues, Patent Owner's "'narrow data port' arguments are contrary to Chiricescu's teachings" and do not address the combined teachings of Chiricescu, Zavracky, and Akasaka.  Pet. Reply 11 (citing PO Resp. 19–20).  Petitioner notes that Zavracky describes "interconnects as being 'placed anywhere on the chip' without restriction." Pet. Reply 11 (emphasis added) (quoting Ex. 1004, 232).  In addition, Petitioner notes that Chiricescu "discloses 'three separate layers with metal interconnects [including a "memory layer"] between them.'"  Pet. Reply 11 (quoting Ex. 1004, 232) (bracketed text added by Petitioner) (emphasis omitted).

In other words, by placing vias anywhere throughout the different dies as Chiricescu and the combined teachings suggest, the combined teachings distinguish over a narrow data port, where Petitioner provides well-known reasons for employing wide data ports, such as allowing for increased bandwidth and parallelism.  *See* Pet. 18–20; Ex. 1001, 5:16–21 (describing "through-die array contacts 70 . . . routed up and down the stack in three dimensions" as "not known to be possible with any other currently available stacking techniques since they all require the stacking contacts to be located on the periphery of the die," so that by placing contacts throughout, "cells that may be accessed within a specified time period is increased") (emphasis added).

As Petitioner also persuasively argues, even if the claims require a wide configuration data port, according to Patent Owner's expert in the IPR2020-01020, IPR2020-01021, and IPR2020-01022, a "configuration data port . . . is . . . just a data port used for configuration . . .  And data port is just an interface to send data from one place to another."  Reply 9 (quoting

IPR2020-01567
Patent 7,126,214 B2

Ex.1075, 163:8–163:21). "And 'the reason it's a very wide configuration data port is because it has a lot of connections through these TSVs between the memory die and the FPGA die.'" Pet. Reply 9 (quoting Ex. 1075, 157:23–158:3 (Dr. Chakrabarty agreeing with this statement).

In other words, under Petitioner's persuasive showing, even if the challenged claims require a wide configuration data port, the combined teachings meet the claims for the reasons noted. Pet. Reply 9 ("The Zavracky, Chiricescu, and Akasaka Combination provides the 'memory . . . accelerate' limitations even under [Patent Owner's] flawed construction" that the wide configuration data port is responsible for accelerating.). Petitioner persuasively shows that the Zavracky-Chiricescu-Akasaka 3D module uses numerous vias throughout the dies to transfer data between the dies—i.e., acting as a wide configuration data port functional to accelerate all manner of data and signals in parallel. *See, e.g.*, Pet. 17 (showing that Akasaka teaches that "'tens of thousands of via holes' permit parallel processing" by utilizing the many interconnections; as a result of this parallel processing, "the signal processing speed of the system will be greatly improved"; and due to "shorter interconnection delay time and parallel processing" made possible from the area-wide interconnects, the processing of data between layers is accelerated such that "twice the operating speed is possible in the best case of 3-D ICs" (quoting Ex. 1005, 1705)), 20 (arguing that "it was a predictable advantage and also suggested by Akasaka itself that applying Akasaka's distributed contact points, e.g., in the 3D stacks of Zavracky or Chiricescu, would increase bandwidth and processing speed through better parallelism and increased connectivity" (citing Ex. 1002 ¶ 233 (quoting Ex. 1005, 1705)). Petitioner also shows that

62

"[i]t was well known that 'interconnect bandwidth, especially memory bandwidth, is often the performance limiter in many computing and communications systems,' and that 'wide buses are very desirable' and were made possible by 3-D stacking." Pet. 12.

Therefore, Petitioner shows that the numerous via connections between the memory die and FPGA connect to the memory array to render the "memory array functional to accelerate memory references to the processing element," as claim 1 requires. *See, e.g.*, Pet. 20–21 (showing that Akasaka's numerous connections would have motivated a POSITA to replicate common data memory, and "increase bandwidth and processing speed through better parallelism and increased connectivity").

Additionally, Patent Owner argues that, because Dr. Franzon did not provide a baseline against which to measure acceleration, Petitioner has not demonstrated "the combination of references 'accelerates external memory references to said processing element' over the baseline of the relatively narrow configuration port distinguished in the '214 Patent (and taught in Chiricescu)." PO Resp. 20–21 (citing Ex. 2012, 25:21–26:23; Ex. 1001, 1:50–55, 4:27–32; Ex. 2011 ¶ 56). Petitioner also persuasively addresses Patent Owner's argument that the claims require acceleration over a "baseline." *See* PO Resp. 20–21; Reply 11–12. Petitioner points to Dr. Franzon's testimony "that the Zavracky-Chiricescu-Akasaka combination provides acceleration compared to the baseline of other prior art with different structural characteristics." Pet. Reply 11–12 (citing Ex. 1002 ¶¶ 212, 215–17, 304–05; Ex. 2012, 29:15–33:15, 28:9–21).

Petitioner also persuasively addresses Patent Owner's argument that "external memory references . . . are not data, but are instructions directed to

IPR2020-01567
Patent 7,126,214 B2

a particular place memory [sic] address in memory." PO Resp. 12 (including

[sic] annotation).  Petitioner quotes Dr. Franzon's declaration testimony:

> Chiricescu is teaching to use that memory as a "cache"… By
> doing so, the FPGA's external memory references… will be
> accelerated because [they] will "hit" in the "cache" and be
> returned from the on-chip memory without having to go off-
> chip. Chiricescu is thus teaching to the POSITA to accelerate
> memory lookups….

Pet. Reply 12 (block quoting Ex. 1002 ¶¶ 215–16; citing Ex. 2012, 42:9–14,

48:6–50:1).

In response to Petitioner's Reply, Patent Owner contends that

Dr. Franzon testified that external memory references could be located on an

off-chip memory die stacked with the programmable array die and,

therefore, Dr. Franzon testified that it is the "off-chip memory on the second

integrated die element [that] is functional to 'accelerate external memory

references to the processing element.'"  PO Sur-reply 7 (block quoting

Ex. 2012, 42:21–43:3).  Patent Owner concludes that Petitioner's

combination of Zavracky, Chiricescu, and Akasaka "does not teach or

suggest the claimed structure under any construction" because Petitioner's

combination of Zavracky, Chiricescu, and Akasaka "does not satisfy a

'memory array [is] functional to accelerate external memory references to

said processing element'" and does not "include a wide configuration data

port as the claimed invention requires."  PO Sur-reply 3.  Patent Owner,

however, misinterprets Dr. Franzon's testimony that concerned the plain and

ordinary meaning of "external memory references" as indicating what

element (i.e., off-chip memory) would be performing an external memory

IPR2020-01567
Patent 7,126,214 B2

reference. *See* Ex. 2012, 4215–44:45.[21]  For this reason, we do not agree with Patent Owner's characterization of Dr. Franzon's deposition testimony.

Patent Owner also argues, in response to Petitioner's Reply, that "[t]he entire point of Chiricescu is that it achieves accelerated FPGA configuration by storing configuration data 'on-chip' so that it does not need to load configuration data from off-chip."  Sur-reply 4-5.  Patent Owner also argues that "all off-chip connections are carried out through a typical narrow configuration data port, that suffers the same problems as the prior art distinguished in the '214 Patent."  PO Sur-reply 5.  Patent Owner then argues that "moving Chiricescu's cache memory off-chip (i.e., into Zavracky's 3D stacked memory die) eliminates the benefit gained from moving the memory on-chip, [so] a POSITA would not have contradicted Chiricescu's fundamental teachings to arrive at Petitioner's proposed combination."  PO Sur-reply 5.

We do not agree with Patent Owner's position.  Patent Owner does not sufficiently address Chiricescu's memory and FPGA layers that are short "interlayer vias" "placed anywhere on the chip" within the same 3D stack and, thus, is not off-chip.  As Petitioner notes, Dr. Franzon described "routine use of on-chip area-wide connections in 3D stacks, including his prior work."  Reply 17–18 (citing Ex. 1002 ¶¶ 47–51; Ex. 1070 ¶ 65; Ex. 1020; *see also* Ex. 1004, Fig. 2, 232 § 1 (describing "on chip random access

---

[21] Ex. 2012, 42:15–43:3 (discussing meaning of "external memory reference" before a break), 43:13:44:3 (characterizing topic before the break as "discussing the plain and ordinary memory of the term 'external memory references'"), 44:4–4 (questioning "what element would be performing this type of memory reference").

IPR2020-01567
Patent 7,126,214 B2

memory . . . provided to store configuration memory"—i.e., the memory layer of Figure 2).

Patent Owner contends that "the movement of *Chiricescu's* on-chip cache memory to *Zavracky's* off-chip memory would throttle" speed gains. Sur-reply 5. We do not agree with Patent Owner. In the context of Chiricescu's teachings and Petitioner's showing, Zavracky includes memory in a stack of chips connected by numerous short vias as Petitioner shows and as discussed above. *See, e.g.*, Pet. 14–16, 23–28. Patent Owner's attempt to conflate Zavracky's modified stack of chips as "off-chip" such that "all off-chip connections are carried out through a typical narrow configuration data port" is not supported. *See* Sur-reply 5. Chiricsescu describes loading configuration data from "memory off-chip" as "significantly" and distinctly slower (Ex. 1004, 234) than loading it from an "on-chip random access memory layer" (*see* Ex. 1004, 232) within the stacked layers of the disclosed 3D FPGA. *See* Ex. 1004, 234, 232, Fig. 2. As Petitioner persuasively shows throughout its briefing, Zavracky's stack of chips connected by numerous vias, as modified by Akasaka's and Chiricescu's teachings, operates just like Chiricescu's "on-chip" circuit layers in a single chip connected by numerous vias in terms of speed and acceleration. *See* Pet. Reply 6 ("Zavracky's short interior 'inter-layer connectors' to stacked 'random access memory . . . results in reduced memory access time, increasing the speed of the entire system,'" and "Chiricescu also teaches the acceleration advantages and 'significantly improve[d FPGA] reconfiguration time' achieved by its interconnected layers, including a memory layer configured as a cache for fast access to 'configuration data… from memory off-chip.'" (quoting Ex. 1003, 11:63–12:2; Ex. 1004, 232)), 7 (noting

Akasaka's "acceleration advantages" based on "teaching, e.g., that '[h]igh-speed performance is associated with shorter interconnection delay time and parallel processing' and that 'shortening of interconnections and signal transfer through vertical via holes in the 3-D configuration provides advantages for the design of large-scale systems.'" (quoting Ex. 1005, 1705)). In other words, as Petitioner shows, in addition to "stacking techniques," "[t]he Zavracky-Chiricescu-Akasaka Combination also discloses the other ways that the '214 patent even arguably implies increases speed—i.e., through caching, the use of short electrical paths, or significantly increased number of connections." Pet. Reply 8 (citing Pet. 14–30).

Patent Owner agrees that "Chricescu says . . . [that] "[t]he elimination of loading configuration data on an as needed basis from memory off-chip significantly improves the reconfiguration time for an on-going application." Sur-reply 4 (quoting Ex. 1004, 234). Patent Owner argues, however, that "Petitioner concocts its hypothetical structure based on its demonstrably false claim that Chiricescu's improved FPGA reconfiguration time is 'achieved by its interconnected layers, including a memory layer configured as a cache for fast access to "configuration data . . . from memory off-chip.'" Sur-reply 4 (quoting Reply 6 (quoting Ex. 1004, 234)). Patent Owner contends that "Chiricescu says just the opposite." PO Sur-reply 4 (citing Ex. 1004, 234).

Contrary to Patent Owner's argument, Petitioner argues that Chiricescu improves FPGA reconfiguration time because Chiricescu's cache pre-stores and holds configuration data on-chip that it obtains from an external source (i.e., off-chip memory)—so that the FPGA need *not* access

that external (off-chip memory) source to load the FPGA through a typical narrow configuration data port during FPGA reconfiguration. *See* Pet. Reply 6 (describing acceleration "achieved by its interconnected layers, including a memory layer configured as a cache for fast access to 'configuration data . . . from memory off-chip'" (quoting Ex. 1004, 232); Ex. 1004, 234 ("The elimination of loading configuration data on an as needed basis from memory off-chip significantly improves the reconfiguration time for an on-going application.")).

Patent Owner additionally contends that Petitioner's combination would improperly alter Chiricescu's principle of operation. PO Resp. 27–28 (arguing Petitioner's combination "would improperly alter Chiricescu's principle of operation, which relies on an entirely different strategy for routing data throughout the FPGA, namely its narrow RLB bus and its 'routing layer'"). As Petitioner notes, Patent Owner's argument is based on a misunderstanding of Petitioner's combination that does not modify Chiricescu but rather "folds in Chiricescu teaching with Zavracky's 3D stacks." Pet. Reply 15 (addressing Patent Owner's principle of operation argument); *see* Pet. 18–19 ("The POSITA would have been encouraged to fold in Chiricescu's teachings (including stacked memory to reconfigure the FPGA) with Zavracky's 3D stacks, understanding it would lead to 'significant[] improvement in the reconfiguration time.'"). In response to Petitioner's Reply, Patent Owner indicates Chiricescu addresses "the problem of 'loading configuration data on an as needed basis from memory off-chip' was to move that memory on-chip." PO Sur-reply 5.

We do not agree with Patent Owner that Petitioner's combination alters Chiricescu's principle of operation because, as discussed throughout

this decision, Petitioner's combination relies on Zavracky's stack of chips connected by numerous vias (as modified by Akasaka's and Chricescu's teachings) that operate in terms of speed and acceleration like Chiricescu's "on-chip" circuit layers in a single chip connected by numerous vias. *See, e.g.,* Pet. 18–22; Pet. Reply 5–6.

Patent Owner further contends that Dr. Franzon "concedes that Akasaka's thousands of connections would not and could not be used in Petitioner's hypothetical structure such that the 'memory array [is] functional to accelerate external memory references to said processing element." PO Sur-reply 5–6 (citing Ex. 2012, 80:10–17).

We do not agree with Patent Owner's characterization of Dr. Franzon's testimony. First, the cited portion of Dr. Franzon's testimony did not address "Akasaka's thousands of connections" as Patent Owner contends. Rather, Dr. Franzon's testimony was made in the context of the implicit similarity of the structure of another reference and in the context of loading data from an external source—Trimberger (Ex. 1006)—and undepicted narrow port implicit "on the left of" Figure 5 of the challenged patent.[22] Ex. 2012, 80:3–6 (Dr. Franzon testifying, "So if there's 100,000 memory circuits in Trimberger, it can't reload all those memory contents within one clock cycle [from an external source]. The same would be true of '226 [patent]. The structure in figure 5 of '226 [patent] does not show anything on the left of the very wide configuration data port."); 80:15–22 (Dr. Franzon testifying, "you wouldn't have thousands of bits wide access

---

[22] Dr. Franzon's testimony concerned his declaration testimony (Ex. 1002) concerning four patents, one of which was the '214 patent. Ex. 2012, 4:14–5:13, 8:4–8. The '214 patent also includes Figure 5 of the '226 patent.

[from an external source] to the DRAM in a normal memory structure in this time frame.  So there would be a similar narrow structure—[one of ordinary skill in the art] would interpret figure 5 as a similar (undepicted) narrow structure *on the left of the very wide configuration data port*" (emphasis added)).

Second, Patent Owner's arguments do not undermine Petitioner's combination of Zavracky, Chiricescu, and Akasaka having multiple vertical vias in the stacked memory chip structure of Zavracky, as modified by the teachings of Chiricescu and Akasaka, to accommodate the memory array operating as a cache memory to accelerate the loading of the reconfiguration data.  *See* Pet. 18–22, 28–32.  Petitioner notes, for example, that Akasaka suggests "that applying Akasaka's distributed contact points, e.g., in the 3D stacks of Zavracky or Chiricescu, would increase bandwidth and processing speed through better parallelism and increased connectivity.'" Pet. 18 (citing 1002 ¶ 233 (quoting Ex. 1005, 1705)).

Patent Owner also responds to Petitioner's Reply by asserting that "Dr. Franzon admits that it is the structure of the wide configuration data port, including buffer cells, that allows for the acceleration of external memory references to the programmable array."  PO Sur-reply 6 (citing Ex. 2012, 77:5–15, 42:21–43:3).  Patent Owner characterizes that testimony as indicating "it is a new and improved configuration (not discussed in any of Petitioner's myriad of references) that allows for the memory array to be functional to accelerate external memory references to the processing element of the programmable array."  PO Sur-reply 6–7.

Here, too, we do not agree with Patent Owner's characterization of Dr. Franzon's cited testimony.  First, Dr. Franzon does not characterize the

structure of the wide configuration data port as including buffer cells. Rather, Dr. Franzon indicates the "exemplary wide configuration data port 82 depicted in figure 5 [of the challenged patent] shows a direct path to every buffer cell." Ex. 2012, 77:7–10. As discussed previously, Figure 5 depicts the wide configuration data port as a "black box" and that depiction does not include the buffer cells as part of the "black box" wide configuration data port 82. *See* Section II.C (Claim Construction) above. Second, Dr. Franzon's testimony at page 77 describes how the wide configuration data port shown in Figure 5 of the challenged patent is able to "store a configuration in the buffer cell and upload it to the logic cell in one clock cycle" and that the same structure is shown in Trimberger. Ex. 2012, 77:5–15. Rather than describing the wide configuration data port of Figure 5 of the challenged patent as "a new and improved configuration (not discussed in any of Petitioner's myriad of references" (as Patent Owner alleges), Dr. Franzon states that it is the "same structure" as shown in a prior art reference (Trimberger, Ex. 1006). Third, Dr. Franzon's cited testimony on pages 42–43 opines that the recited external memory reference is located in off-chip memory. Patent Owner does not sufficiently explain how the *location* of external memory references relates to allowing for the memory array to be functional to accelerate those references.

### 4. Dependent Claims 4, 6, 29, and 31

Petitioner presents evidence that dependent claims 4, 6, 29, and 31 would have been obvious over Zavracky, Chiricescu, and Akasaka. Pet. 34–36, 38. Patent Owner does not present separate arguments for limitations additionally cited by these dependent claims.

IPR2020-01567
Patent 7,126,214 B2

Claim 4 depends from independent claim 2 and additionally recites "further comprising: at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements" for which Petitioner partly relies on Zavracky's Figures 12 and 13.  Pet. 34–35.  Claim 29, depends from independent claim 27, and additionally recites the same limitation as recited in claim 4.  Petitioner's argument regarding dependent claim 29 partly relies on Petitioner's argument for claim 4.  Pet. 38.

For the recited third integrated circuit functional element, Petitioner identifies the microprocessors shown in Zavracky's Figures 12 (microprocessors on their own) and 13 (a multi-layer microprocessor). Pet. 34.  Petitioner's annotated Figures 12 and 13 are depicted below:



IPR2020-01567
Patent 7,126,214 B2

Zavracky's Figure 12 "presents a stacked microprocessor and memory array." Ex. 1003, 12:14–15, Fig. 12. Zavracky describes first microprocessor layer 700 that "shares random access memory 702 on the second layer, [with] another microprocessor 704 located above the random access memory." Ex. 1003, 12:17–20. Zavracky describes "address 720, and data 718 buses [that] run vertically through the stack by the use of inter-layer connectors." Ex. 1003, 12:25–27. Zavracky's Figure 13 depicts "programmable logic array 802 . . . fabricated upon the first layer 800. The second 804 and third 806 layers comprise a multi-layer microprocessor, with random access memory on the fourth layer 808." Ex. 1003, 12: 31–34. Notably, Zavracky indicates programmable logic array 802 "can be formed in any of the layers of a multilayer structure as described elsewhere herein." ex. 1003, 12:37–39.

Claim 6 depends directly from claim 4 and indirectly from independent claim 2. Claim 6 additionally recites "said third integrated circuit functional element includes an I/O controller" for which Petitioner partly relies on Zavracky's controller depicted in Figure 13. Pet. 35–36. Claim 31, depends from independent claim 29, and additionally recites the same limitation as recited in claim 4. Petitioner's argument regarding dependent claim 31 partly relies on Petitioner's argument for claim 6. Pet. 38.

Petitioner identifies controller depicted on multi-layer microprocessor 804 in Figure 13 and also shown and labeled as "CONTROLLER" in Figure 11. Pet. 35. Based on Zavracky's express descriptions of the "controller," Petitioner persuasively argues, with support of Dr. Franzon's testimony, that one of ordinary skill in the art "would have understood

73

Zavracky as describing an I/O controller, which arbitrates the inputs and outputs to a shared communication bus." Pet. 35–36 (quoting Ex. 1003, 5:54–60, 5:49–52, Ex. 1002 ¶¶ 324–25). We find Dr. Franzon's testimony in this regard as credible because he provides persuasive explanation and analysis with comparisons between specific passages of a prior art reference (Ex. 1052) and Zavracky's description. Ex. 1002 ¶¶ 324–25 (citing Ex. 1052, Abstract, 4:65–5:1; Ex. 1003, 5:54–60, 5:49–52 among others).

### 5. Summary

After a full review of the record, including Patent Owner's Response and Sur-reply and evidence, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, and Akasaka would have rendered obvious claims 1, 2, 4, 6, 26, 27, 29, and 31.

### E. Asserted Obviousness of Claims 3 and 28

Petitioner contends claims 3 and 28 would have been obvious over the combination of Zavracky, Chiricescu, Akasaka, and Satoh. *See* Pet. 1, 38–42.

### 1. Disclosure of Satoh

Satoh discloses a semiconductor integrated circuit incorporating a variable logic circuit and specifically a Field Programmable Gate Array (FPGA). Ex. 1008, 46.[23] Satoh also describes testing a semiconductor integrated circuit "incorporating a variable logic circuit (FPGA) for outputting a signal indicating whether or not a circuit is normal and forming

---

[23] We cite to the page numbers in the header of Sato, as is Petitioner's practice.

IPR2020-01567
Patent 7,126,214 B2

a given logic [and] a memory circuit capable of reading and writing data."
Ex. 1008, 46.  Satoh states that "the variable logic circuit (FPGA) performs a
self-test, a memory test circuit is built for testing the memory in accordance
with a specified algorithm with only the basic logic cells exclusive of
defective parts by using information indicating the defective parts obtained
by the self-test, and the memory circuit is tested."  Ex. 1008, 46.

Satoh also describes "configuring in the variable logic circuit a
memory tester circuit that generates a specified test signal and an expected
value signal based on a specified algorithm using only normal basic logic
cells, supplies the test signal to the memory circuit, compares the output
signal obtained as a result from the memory circuit with the expected value
signal."  Ex. 1008, 49.

### 2.  Claims 3 and 28

Claim 3 depends from independent claim 2, and claim 28 depends
from independent claim 27.  Claims 3 and 28 each further recite "wherein
said contact points are further functional to provide test stimulus from said
field programmable gate array to said at least second integrated circuit
functional element."

### a.  Petitioner's Combination

For claims 3 and 28, Petitioner relies on a combination of Zavracky,
Chiricescu, Akasaka, and Satoh.  Pet. 38–39.  Petitioner contends that in the
Zavracky-Chiricescu-Akasaka-Satoh combination, "the test signal is sent
through the contact points between the FPGA of the first IC die element and
the memory of the second IC die element, which is how those elements are
stacked and electrically coupled."  Pet. 41–42 (citing Ex. 1002 ¶¶ 357–59).

IPR2020-01567
Patent 7,126,214 B2

Regarding the requisite reason to combine the references, Petitioner relies on Dr. Franzon's declaration testimony that "[i]t was well-known to test stacked modules in order to avoid the expense and waste of silicon by creating 'dead' chips, and improve yield." Pet. 40 (citing Ex. 1002 ¶ 241; indicating Ex. 1002 ¶ 241 further cites Ex. 1009; Ex. 1043). Petitioner indicates that "Satoh specifically praised the use of an FPGA to test 'memory circuits' for 'improving yield and productivity of the semiconductor integrated circuit.'" Pet. 40 (quoting Ex. 1008, 47:23–27).

Additionally, Petitioner further relies on Dr. Franzon's testimony for other reasons one of ordinary skill in the art would have combined Satoh's testing functionality with the 3D chip of Zavracky-Chiricescu-Akasaka:

> Recognizing the need to test the 3D stack of the Zavracky-Chiricescu-Akasaka Combination, the POSITA would have sought out Satoh's teaching of using a FPGA for testing the co-stacked memory to achieve known predictable benefits: rigorous testing while avoiding a separate testing chip's (1) additional expense, (2) chip real estate, and (3) design complexity. Ex. 1002 ¶242. Moreover, (4) a FPGA is reusable: after being configured for testing in manufacture, the FPGA would then be reconfigured for its normal "in the field" purpose. *Id.* (citing Ex. 1045 ("Another advantage . . . is that after testing is complete, the reconfigurable logic (FPGA 28) can be reconfigured for post-testing adapter card functions."); Ex. 1046).

Pet. 40.

Petitioner also relies on Dr. Franzon's declaration testimony in asserting that one of ordinary skill in the art would have had a reasonable expectation of success:

> It was well known to use a FPGA to test circuitry with 2-D chips as taught by Satoh. Ex. 1002 ¶241 (citing Ex. 1043). The POSITA would have recognized Satoh's teaching would readily

76

IPR2020-01567
Patent 7,126,214 B2

> apply to the 3-D chip elements in the Zavracky-Chiricescu-
> Akasaka Combination.  This includes because such a
> combination would have been a routine use of an FPGA, whose
> testing ability was not dependent on structure.  Ex. 1002 ¶¶242–
> 43.  The result of this combination would have been
> predictable, by known FPGA testing to the 3D stack according
> to known methods to yield a predictable result.  Ex. 1002 ¶244.

Pet. 41.

### b.  Patent Owner's Contentions

Patent Owner relies on the same unavailing arguments it advances
with respect to the challenged claims addressed above.  *See* PO Resp. 39
("Because Petitioner does not contend that Satoh cures any of the
deficiencies of the combination of Zavracky, Chiricescu, and Akasaka, as
discussed above with respect to Ground 1, its reliance on the same rationales
for Ground 3 also fail.").

Patent Owner also argues that "Petitioner's contention that [one of
ordinary skill in the art] would be motivated to make the combination
because it was well-known to test stacked die and Satoh tested memory
elements on the same semiconductor chip (*see* Petition at 40) is divorced
from the claimed invention."  PO Resp. 39–40.  Patent Owner contends that
"Petitioner's generic rationale for using FPGAs for testing is wanting in
particularity as to why a POSITA would combine the references as recited in
the Challenged Claim."  PO Resp. 40.  Patent Owner contends that
Petitioner's rationale fails "as it lacks sufficient explanation of how or why
[one of ordinary skill in the art] would have been motivated to use Satoh's
FPGA for testing with the hypothetical 3-D structure of Zavracky-
Chiricescu-Akasaka 'in the way the claimed invention does.'"  PO Resp. 40.
(quoting *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d

IPR2020-01567
Patent 7,126,214 B2

1312, 1328 (Fed. Cir. 2012)).  Patent Owner contends that "[w]hether the use of Satoh's FPGA is beneficial for testing does not sufficiently explain why a POSITA would have combined the references to yield the claimed invention."  PO Resp. 40–41.

*c. Analysis*

Petitioner provides specific reasons related to specific recitations in the claims as outlined above, including tying Satoh's testing of a memory array using FPGA testing circuitry to the similar claim elements in claims 3 and 28.  Petitioner's arguments are supported by citations to Satoh and Dr. Franzon's declaration testimony that in this regard provides persuasive explanation consistent with specific descriptions of relevant references cited for support.  Pet. 40–41 (citing Ex. 1008, 47:23–27; Ex. 1002 ¶¶ 241–44); *see* Ex. 1002 ¶ 241 (citing Ex. 1020, 12; Ex. 1009, 254; 1043, [36], Ex. 1008, 47:23–27), ¶ 241 (citing Ex. 1045, Ex. 1046), ¶ 243 (citing Ex. 1021, Abstract; Ex. 1003, Abstract, 2:9–13, 3:58–67; Ex.1008, 3); ¶ 244 (citing Ex. 1043).

For example, Petitioner identifies using Satoh's FPGA test circuitry and memory testing teachings to avoid "dead chips"—a specific "beneficial" reason—and ties these teachings specifically to FPGA contact points in the Zavracky-Chiricescu-Akasaka" stack to test memory in that stack.  *See* Pet. Reply 19–20 (reiterating five reasons supplied in the Petition, including, for example, "(1) the known problem of the need to test stacked modules to avoid the expense and waste of silicon by creating 'dead' chips" (citing Ex. 1002 ¶ 241 (citing Ex. 1009; Ex. 1020; Ex. 1043); Pet. 41–42 (explaining that "[i]n the Zavracky-Chiricescu-Akasaka-Satoh Combination, the test signal is sent through the contact points between the FPGA of the

IPR2020-01567
Patent 7,126,214 B2

first IC die element and the memory of the second IC die element, which is how those elements are stacked and electrically coupled" (citing Ex. 1008, 49:32–37; Ex. 1002 ¶¶ 357–59)).

In other words, Petitioner persuasively shows a reasonable expectation of success with specific reasons to combine, all supported by the record, including beneficial testing to avoid dead chips and maintain reliable memory to reconfigure the 3D stack's FPGA post-manufacture, thereby showing how to apply the teachings to the claimed 3D stack as suggested by Zavracky, Chiricescu, and Akasaka. Specifically, claims 3 and 28 each recites "wherein said contact points are further functional to provide test stimulus from said [FPGA] to said at least second integrated circuit die element." Petitioner persuasively applies Satoh's teachings to these contact points in order to avoid dead chips.

Patent Owner advances an argument in its Sur-reply that "[t]he references Petitioner and Dr. Franzon cite do not disclose testing of 3D stacked processor[s] but instead disclose that individual die[s] are tested independently and prior to any 3D packaging." Sur-reply 15. This argument is not relevant to a claim limitation at issue here. Neither claim 3 nor claim 28 recite packaging, and neither precludes "provid[ing] test stimulus from said field programmable gate array to said at least second integrated circuit die element" prior to any packaging.

Patent Owner cites to a single paragraph of Dr. Souri's declaration that is conclusory. PO Resp. (citing Ex. 2011 ¶ 83); Ex. 2011 ¶ 83 (Dr. Souri testifying without citation to references or explanation). We give little weight to Dr. Souri's conclusory and unsupported testimony.

IPR2020-01567
Patent 7,126,214 B2

Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that may overlap with issues in the instant section due to the format of the Response, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, Akasaka, and Satoh would have rendered obvious claims 3 and 28.

### F. Asserted Obviousness of Claims 5 and 30

Petitioner contends claims 5 and 30 would have been obvious over the combination of Zavracky, Chiricescu, Akasaka, and Alexander.  Pet. 42–45.

### 1. Disclosure of Alexander

Alexander describes "stacking together a number of 2D FPGA bare dies" to form a 3D FPGA.  Ex. 1009, 1.[24]  Alexander explains that "each individual die in our 3D paradigm has vias passing through the die itself, enabling electrical interconnections between the two sides of the die."  Ex. 1009, 1.

Alexander's Figure 2 follows:



Figure 2: (a) The solder bump, pad, and vertical via geometry; and (b) stacked 2D FPGA dies.

---

[24] We cite, as Petitioner does, to the exhibit page numbers (rather than to the original page numbers.

IPR2020-01567
Patent 7,126,214 B2

Figure 2(a) shows vertical vias traversing a chip with a solder pad and solder bump on top, and Figure 2(b) shows a stack of chips prior to connection by solder bumps.  Ex. 1009, 1.

Alexander explains that stacking dies to form a 3D FPGA results in a chip with a "significantly smaller physical space," lower "power consumption," and greater "resource utilization" and "versatility" as compared to conventional layouts.  Ex. 1009, 1.

### 2. Claims 5 and 30

Claim 5 depends indirectly from independent claim 2, and claim 30 depends indirectly from independent claim 27.  Claims 5 and 30 each further recite "wherein said third integrated circuit functional element includes another field programmable gate array."

### a. Petitioner's Combination

For claims 5 and 30, Petitioner relies on a combination of Zavracky, Chiricescu, Akasaka, and Alexander.  Pet. 42–45.  In reciting "wherein said third integrated circuit functional element includes another field programmable gate array," claims 5 and 30 each essentially adds another FPGA to claim 27 as addressed above, requiring at least three stacked integrated circuit die elements:  a memory array stacked with "another" FPGA (i.e., a total of two FPGAs), with the "integrated circuit functional elements," which "include[]" the memory array and two FPGAS, electrically coupled together by "a number of contact points distributed through the surfaces of said functional elements," "wherein said memory array is functional to accelerate external memory references to said processing element [one of the  FPGAs]" (as recited in independent claim 2) or

81

IPR2020-01567
Patent 7,126,214 B2

"wherein said memory array is functional to accelerate external memory references to said processing element" (as recited in independent claim 27).

Petitioner relies on Alexander as disclosing "multiple stacked FPGA functional elements in different layers of a 3D package." Pet. 44 (citing Ex. 1009, 1–3, Fig. 2; Ex. 1002 ¶ 321). As such, Petitioner contends that the combination of Zavracky, Chiricescu, Akasaka, and Alexander provides the additional FPGA as required by claims 5 and 30.

Regarding the requisite reason to combine, Petitioner contends as follows:

> [One of ordinary skill in the art] would have known (as Zavracky notes) that multiprocessor systems were needed for "parallel processing applications," for example, "signal processing applications." Ex. 1003, 12:13–28, Fig. 12; Ex. 1002 ¶258. But in this context, [one of ordinary skill in the art] would have appreciated Alexander's teaching of stacked FPGAs as preferable over alternatives, such as (1) general purpose microprocessors running software (too slow), or (2) customized parallel hardware (too expensive and inflexible). *Id.* [One of ordinary skill in the art] would have sought out Alexander's multiple stacked FPGAs to enhance the Zavracky-Chiricescu-Akasaka Combination by upgrading it for this type of application. Ex. 1002 ¶259.

Pet. 43.

Additionally, Petitioner asserts one of ordinary skill in the art "would have had a reasonable expectation of success in integrating Alexander into that existing combination." Pet. 43. More specifically, Petitioner contends that Alexander's similar structure—having multiple stacked FPGAs, as similar to multiple processors stacked with multiple memories of the Zavracky-Chiricescu-Akasaka combination—evidences a reasonable expectation of success of stacking FPGAs with memories, "with multiple

82

functional elements stacked and vertically interconnected including using thousands of contact point vias (holes)." Pet. 43–44. Petitioner also asserts that "[t]he result of this combination would have been predictable, simply combining the extra FPGA of Alexander with the existing 3-D stack according to known methods to yield a predictable result." Pet. 44 (citing Ex. 1002 ¶¶ 260–61).

### b. Patent Owner's Contentions

Patent Owner responds that "Petitioner's only rationale for the combination of all four references . . . merely identifies a generalized benefit without sufficiently linking it to the features of the claimed invention," and so "Petitioner fails to adequately explain how or why Alexander's multiple FPGA dies can and would be combined with Zavracky-Chiricescu-Akasaka to reach the" limitation recited in claims 5 and 30. PO Resp. 42. More specifically, Patent Owner contends that "[w]hether 3D FPGA dies are preferable over general purpose microprocessors or customized parallel hardware have no bearing on whether a POSITA would have been motivated to combine Alexander with Zavracky-Chiricescu-Akasaka to reach a 3-D processor module having 'a third integrated circuit die element [that] includes another field programmable gate array.'" PO Resp. 42–43 (citing Ex. 2011 ¶ 84).

Patent Owner also argues that Petitioner's "conclusory rationale is further discredited by Petitioner's suggestions elsewhere in the Petition that Chiricescu discloses a FPGA application that enhances Zavracky." PO Resp. 43 (citing Pet. 19). More specifically, Patent Owner argues that the Petition elsewhere suggest that a "POSITA would have taken Chiricescu's suggestion of a FPGA to perform 'arbitrary logic functions,' . . . as a cue to

enhance and expand upon the packet processing task performed by the programmable logic device in Zavracky, e.g., to perform image and signal processing tasks that would have taken advantage of co-stacked microprocessors and memories as taught in Zavracky." PO Resp. 43 (quoting Pet. 19). Patent Owner argues that "there is no reason . . . to combine Alexander with Zavracky-Chiricescu-Akasaka," because "Petitioner acknowledges that, Chiricescu, like Alexander, offers FPGAs to enhance parallel processing image and signal tasks of Zavracky's microprocessor." PO Resp. 43 (citing Ex. 2011 ¶ 85).

Patent Owner also contends that Petitioner fails to explain how the combination would be made with a reasonable expectation of success. PO Resp. 43–45. Patent Owner contends that "[n]either Petitioner nor Dr. Franzon provide any analysis of" Alexander's "acknowledgment that '[t]he 3D FPGA model gives rise to a number of new challenges,' including heat dissipation and heat stress (collectively, 'thermal issues')." PO Resp. 44; PO Sur-reply 17–18.

In response to Petitioner's Reply, Patent Owner more specifically contends that Petitioner does not sufficiently explain why or how one of ordinary skill in the art would have combined Alexander's 3D FPGA into the Zavracky-Chiricescu-Akasaka combination when the combination "already includes Chiricescu's FPGA on the first integrated die element and that Alexander's 3D FPGA architecture is disparate from Chiricescu's." PO Sur-reply 16 (reproducing Chiricescu's Fig. 2 "depicting a separate memory, routing, and RLB layers in the FPGA" and Alexander's Fig. 2 "depicting stacked 2D FPGA dies using solder bumps"). Patent Owner argues that Petitioner does not sufficiently address using disparate FPGA architecture in

IPR2020-01567
Patent 7,126,214 B2

the first and third integrated die elements because Petitioner "fails to explain how the circuitry of Alexander's 3D FPGA would be laid out, connected to, and operating with the proposed Zavracky-Chiricescu-Akasaka structure, which already includes Chiricescu's unique FPGA to arrive at the claimed invention." PO Sur-reply 17.

*c. Analysis*

We determine that Petitioner provides sufficient evidence supporting Petitioner's asserted reason to combine. Petitioner contended as follows:

> [One of ordinary skill in the art] would have known (as Zavracky notes) that multiprocessor systems were needed for "parallel processing applications," for example, "signal processing applications." Ex. 1003, 12:13–28, Fig. 12; Ex. 1002 ¶258. But in this context, [one of ordinary skill in the art] would have appreciated Alexander's teaching of stacked FPGAs as preferable over alternatives, such as (1) general purpose microprocessors running software (too slow), or (2) customized parallel hardware (too expensive and inflexible). *Id.* [One of ordinary skill in the art] would have sought out Alexander's multiple stacked FPGAs to enhance the Zavracky-Chiricescu-Akasaka Combination by upgrading it for this type of application. Ex. 1002 ¶259.

Pet. 43. Petitioner's evidence includes reasoning provided by Zavracky based on a plain reading of the cited passage. *See, e.g.,* Ex. 1003, 12:13–17 ("This technology is also useful in the microprocessor environment. FIG. 12 presents a stacked microprocessor and random access memory array which is one potential microprocessor embodiment used in parallel processing applications. The first layer 700 is **a microprocessor** which shares random access memory 702 on the second layer, [with] **another microprocessor** 704 located above the random access memory. . . . This configuration lends itself well to use in signal processing applications." (emphasis added)).

85

IPR2020-01567
Patent 7,126,214 B2

Petitioner's evidence also includes Dr. Franzon's declaration testimony that one of ordinary skill in the art would have used "Alexander's multiple stacked FPGAs to enhance" Petitioner's combination because such stacked FPGA's were preferred because "(1) general purpose microprocessors running software (too slow), or (2) customized parallel hardware (too expensive and inflexible)." Pet. 43 (citing Ex. 1002 ¶ 258). We credit Dr. Franzon's testimony that provides well-reasoned explanation and analysis based on quoted passages from a 2000 IEEE article (Ex. 1058) that examined "processors and FPGAs to characterize and compare their computational capabilities" and another reference describing customized parallel hardware. Ex. 1058, 41[25]; Ex. 1051; *see* Ex. 1002 ¶ 258 (quoting Ex. 1058, 43; quoting Ex. 1051, 3:45–67).

In addition, claims 5 and 30 each recite "said third integrated circuit functional element includes another field programmable gate array" (FPGA). Petitioner's arguments and evidence includes Dr. Franzon's testimony that one of ordinary skill in the art would have used "Alexander's multiple stacked FPGAs" because "stacked FPGA's were preferred." Thus, we do not agree with Patent Owner's assertion that "Petitioner's alleged motivation to combine is untethered to the claimed invention." PO Resp. 42–43.

Furthermore, in contrast to Dr. Franzon's well-supported testimony in this regard, Patent Owner's expert, Dr. Souri, in paragraph 84 provides only conclusory statements. For example, Dr. Souri states, without providing explanation or evidence, "[w]hether 3D FPGA dies are preferable over general purpose microprocessors or customized parallel hardware have no

---

[25] Citation is to original page numbers of article.

IPR2020-01567
Patent 7,126,214 B2

bearing on whether a skilled artisan would have been motivated to combine Alexander with Zavracky-Chiricescu-Akasaka to reach a 3-D processor module having 'a third integrated circuit functional element [that] includes another field programmable gate array.'" Ex. 2011 ¶ 84. The only citations in paragraph 84 are citations to the claims in the challenged patent and to the Petition's assertion that Dr. Souri attempts to rebut. Ex. 2011 ¶ 84 (only citing Ex. 1001, claims 5 and 30; Pet. 43). We give little weight to Dr. Souri's conclusory and unsupported testimony in this regard.

Dr. Souri also testified that "in my opinion there is no reason whatsoever that [one of ordinary skill in the art] would have looked to combine Alexander with Zavracky-Chiricescu-Akasaka" because "Chiricescu, like Alexander, offers FPGAs to enhance parallel processing image and signal tasks of Zavracky's microprocessor." Ex. 2011 ¶ 85. As noted above, however, Dr. Franzon provides specific reasons, supported by evidence and uncontroverted in the record, as to why one of ordinary skill in the art "would have viewed Alexander's teaching of stacked FPGAs as preferable over alternatives" in a multiprocessor system, as Petitioner responds. Pet. Reply 21. Additionally, in Reply, Petitioner cites a patent issued in 1996 that indicates "a stack of 4 FPGA's, for example, would have the potential of being used to performing a digital task having four times the complexity that a single FPGA could perform" that further supports Dr. Franzon's that processing tasks were further improved when multiple FPGAs were stacked together. Pet. Reply 22 (quoting Ex. 1027, 2:58–60).

For these reasons, we determine that, Petitioner has provided sufficient evidence of a reason why one of ordinary skill in the art would

IPR2020-01567
Patent 7,126,214 B2

have combined Alexander with the Zavracky-Chiricescu-Akasaka combination.

Contrary to Patent Owner's argument that Petitioner did not describe how to combine the references, Petitioner also indicated in the Petition that "using multiple dies in the stack at taught by Alexander would work in a straightforward manner similar . . . to stacking multiple memories, or multiple microprocessors, as already taught in the Zavracky-Chiricescu-Akasaka Combination." Pet. Reply 21 (quoting Pet. 44). Petitioner continues in the Petition asserting, "[t]he result of this combination would have been predictable, simply combining the extra FPGA of Alexander with the existing 3-D stack according to known methods to yield a predictable result." Pet. 44 (citing Ex. 1002 ¶¶ 260–61).

The record does not support Patent Owner's assertions that multiple FPGAs would not work in a straightforward manner and one of ordinary skill in the art would not have had a reasonable expectation of success. *See* PO Resp. 43–44. First, Petitioner's combination "simply combin[es] the extra FPGA of Alexander with the existing 3-D stack" of the Zavracky, Chiricescu, and Akasaka combination "according to known methods to yield a predicable result." Pet. 44 (citing Ex. 1002 ¶¶ 260–61). In the words of Dr. Franzon,

> the result of this combination would have been predictable, simply combining the extra FPGA of Alexander . . . with the existing 3-D stack according to known methods (the same methods used to attach the other integrated circuit functional elements) to yield a predictable result (two FPGAs in the stack).

Ex. 1002 ¶ 261. Patent Owner provides no evidence that undermines this persuasive straightforward explanation of how Petitioner proposes to

88

IPR2020-01567
Patent 7,126,214 B2

combine Alexander's FPGA in the Zavracky, Chiricescu, and Akasaka combination.

Turning to Patent Owner's assertion based on Alexander's indication of thermal issue challenges and the need to reduce power consumption to mitigate thermal issues (PO Resp. 44), we agree with Petitioner that one of ordinary skill in the art, in view of Zavracky's teaching of a FPGA with a memory and a microprocessor in Figure 13, "would have understood that combining an FPGA with a memory and another FPGA (as in claims 5 and 30) would **reduce** purported thermal issues, not increase them." Pet. Reply 22 (citing Ex. 1003, 12:29–39, Fig. 13; Ex. 1070 ¶¶ 37–41). Petitioner explains that "FPGAs were more energy-efficient than microprocessors for the same size die, reducing heat." Pet. Reply 22–23 (citing Ex. 1070 ¶¶ 37–41 (citing Ex. 1058, 1082)). We are persuaded by Petitioner's position, which is based on Dr. Franzon's declaration testimony. We credit Dr. Franzon in view of his reasonable explanation and analysis that relies on citations to references that support his testimony. *See* Ex. 1070 ¶¶ 37–41 (citing Ex. 1003, 12:29–39, Fig. 13; Ex. 1058, 43; Ex. 1082).

Petitioner also provides evidence that thermal management was a routine consideration in view of various known ways to address thermal issues. Pet. Reply 23 (citing Ex. 1020, 11 for "describing and citing five 'methods [that] are effective' for thermal management).

For these reasons, we conclude that Petitioner has provided by a preponderance of evidence articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.

Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below

89

IPR2020-01567
Patent 7,126,214 B2

that may overlap with issues in the instant section due to the format of the Response, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, Akasaka, and Alexander would have rendered obvious claims 5 and 30.

### G.  Exhibit 1070

Patent Owner argues that "[p]aragraphs 5–9, 13–41, 59–68, 79–89, and 90–103 from Dr. Franzon's second declaration (Ex. 1070)" in reply to Patent Owner's Response are not sufficiently discussed in the Reply.  PO Sur-reply 18.  Patent Owner contends that "Petitioner provides no substantive discussion of Dr. Franzon's testimony . . . but instead references Dr. Franzon's testimony from the abovementioned paragraphs (collectively spanning over roughly 39 pages) based on citation alone or a cursorily parenthetical."  PO Sur-reply 18–19 (identifying Pet. Reply 7, 8, 10, 16, 17, 19, 22, and 23).

Patent Owner contends that "Dr. Franzon's arguments from his second declaration [Reply Declaration] should not be considered."  PO Sur-reply 19 (citing 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document."); *Gen. Access Sols., Ltd. v. Sprint Spectrum L.P.*, 811 F. App'x 654, 658 (Fed. Cir. 2020) (standing for "upholding the Board's finding of improper incorporation by reference because, *inter alia*" "'playing  archaeologist with the record' is precisely what the rule against incorporation by references was intended to prevent")).

The situation here is different than in *General Access Solutions*, because there, the court noted a problem with identifying a party's substantive arguments *prior to turning to the declaration at issue*: *"To*

*identify GAS's substantive arguments*, the Board was forced to turn to a declaration by Struhsaker, *and further to delve into a twenty-nine-page claim chart attached as an exhibit*." *Gen. Access Sols.*, 811 F. App'x 658 (emphasis added). Here, Patent Owner does not describe or allege any problem with identifying Petitioner's substantive arguments.

In addition, Patent Owner provides a list of Reply Declaration paragraphs and a list of reply pages without identifying with particularity where the identified paragraphs may be found. It appears that not all the paragraphs identified by the Patent Owner are located on any of the identified Reply pages. For example, paragraphs five through nine do not appear to be included in any of the Reply pages identified by Patent Owner. Those paragraphs address the level of ordinary skill in the art. Similarly, Patent Owner identifies paragraphs 59–68 and, of the identified Reply pages, paragraphs 59–66 are referenced on Reply page 19 and paragraphs 65 and 68 are referenced on Reply page 16. Paragraph 67 does not appear to be referenced on any of the Reply pages identified by Patent Owner.

Even setting aside these discrepancies in Patent Owner's Sur-reply, we do not agree with Patent Owner that we should not consider Dr. Franzon's Reply Declaration. Patent Owner makes only general assertions that seem to be based primarily on multiple paragraphs being identified in a citation, which as discussed below we find provide context for Petitioner's arguments. Additionally, Patent Owner does not address the significant overlap in the cited paragraphs with arguments made in the Reply. Moreover, in reaching our decision regarding the patentability of the challenged claims, we exercised judgment as to all the evidence cited by the parties for its relevance, context, and substance, and weighed it accordingly.

We turn now to each page in the Reply identified by Patent Owner as having improperly incorporated arguments.  Regarding Reply page 7, Patent Owner identifies paragraphs 79–89 of the Reply Declaration.  These paragraphs provide opinions in response to our claim construction discussion in the Institution Decision and those paragraphs are referenced on page 7 of the Reply in the section asserting that Petitioner's Zavracky, Chiricescu, and Akasaka combination meets the Board's claim interpretation.  Paragraphs 83 and 84 discuss Zavracky's inter-layer connections, and are substantially similar to Petitioner's arguments on page 5 of the Reply.  Paragraph 85 discusses Chiricescu and is substantially similar to Petitioner's arguments on page 6 of the Reply.  Paragraphs 87 and 88 discuss Akasaka and are substantially similar to Petitioner's arguments on pages 6 and 7 of the Reply. Notably, the arguments in this section of the Reply (pages 5–7) principally rely on the express disclosures of the references.  Petitioner's reference to paragraphs 79–89 of the Reply Declaration serve to confirm the correctness of Petitioner's understanding of the plain language of the references presented within this section of the Reply.

Petitioner's reference on page 8 of the Reply to paragraphs 90–93 of the Reply Declaration follows a similar pattern.  Petitioner on page 8 of the Reply asserts that the Zavracky, Chiricescu, and Akasaka combination increases speed in the same five ways as the challenged patent and identifies five citations to the challenged patent, as does paragraph 91 in the Reply Declaration.  The additional three cited paragraphs provide additional context—including two conclusions (paragraphs 90 and 93) and discussion of testimony by another Patent Owner expert (paragraph 91), which was not necessary for our decision regarding patentability.

IPR2020-01567
Patent 7,126,214 B2

Page 10 of the Reply cites paragraphs 94–103 of the Reply Declaration in asserting the Zavracky, Chiricescu, and Akasaka combination meets "the functional to accelerate" limitations under Patent Owner's proposed interpretation of what structure the claims require in a wide configuration data port.  Pet. Reply 9–10.  The Reply Declaration paragraphs 94 and 95 directly address Petitioner's Reply arguments regarding Patent Owner's expert testimony, including Dr. Chakrabarty[26] regarding the ordinary and custom meaning of a wide configuration data port.  including citing substantially the same portions of the relevant deposition transcript as Petitioner in its Reply.  Pet. Reply 9 (quoting Ex. 1075, 157:23–158:3); Ex. 1070 ¶¶ 94–95 (citing Ex. 1075, 163–64, 157–58).  Paragraph 103 largely overlaps the discussion of Zavracky and Chiricescu on pages 9–10 of the Reply.  Petitioner's Reply is ambiguous as to what portions of the Reply Declaration are cited because the Reply Declaration presents paragraphs 94, 95, and 103, and then presents paragraphs 96–102, which address claim limitations in the '226 patent not at issue here.  Thus, a reasonable inference is that the Reply citation of 94–103 means the sequential pages that include only paragraphs 94, 95, and 103, which largely mirror Petitioner's arguments on pages 9 and 10 of the Reply.

On page 16 of the Reply, Petitioner cites two paragraphs of the Reply Declaration (65 and 68) with a clear parenthetical explanation ("Dr. Franzon

---

[26] Dr. Chakrabarty was Patent Owner's expert in IPR2020-01020, IPR2020-01021, and IPR20220-01020.  Exhibit 1071 in this proceeding is Dr. Chakrabarty's deposition in those cases.  Petitioner uses Dr. Chakrabarty's deposition testimony here to undermine Patent Owner's position regarding a wide configuration data port.  Pet. Reply 9; Ex. 1070 ¶¶ 94–95 (citing Ex. 2011 ¶ 55; citing Ex. 1075, 163–64, 157–58).

IPR2020-01567
Patent 7,126,214 B2

noting the routine use of on-chip area-wide connections in 3D stacks, including his prior work, Ex. 1020").

On page 17 of the Reply, Petitioner cites paragraphs 13–28 with a clear parenthetical explanation ("Dr. Franzon rebutting Dr. Souri's testimony as to each purported issue with citations to evidence."). This supports the prior sentence asserting the "TSV interconnection issues" identified by Patent Owner were "at most normal engineering issues" by asserting that each issue was rebutted by Dr. Franzon. We understand Petitioner in this context to point to these paragraphs, not for the detailed rebuttals, but for the fact that Dr. Franzon analyzed the issues identified by Dr. Souri. Similarly, in note 7 on page 19 of the Reply, Petitioner identifies paragraphs 59–66 in the parenthetical—"Dr. Franzon rebutting Dr. Souri's opinions re: same"—as supporting the assertion that Patent Owner "describes Akasaka's teaching inaccurately." Again on page 23 of the Reply, in the context of Petitioner's contention that thermal issues were a routine consideration, paragraphs 29–41 of Dr. Franzon's Supplemental Declaration are cited with the parenthetical explanation: "Dr. Franzon rebutting Dr. Souri's ipse dixit with evidence of known ways to address thermal issues."

On pages 22 of the Reply, Petitioner references paragraphs 37–41 with a parenthetical explanation: "Dr. Franzon noting that use of a second FPGA die would have reduced any purported thermal issues as compared to a similar stack with a microprocessor." This directly follows and supports Petitioner's contention: "Given this teaching in Zavracky, [one of ordinary skill in the art] would have understood that combining an FPGA with a

94

IPR2020-01567
Patent 7,126,214 B2

memory and another FPGA (as in claims 5 and 30) would reduce purported thermal issues, not increase them."

Accordingly, for these reasons, the examination of the citations identified by Patent Owner in full context, reveals that Petitioner's use of and citation to Dr. Franzon's testimony is not improper.

### III. CONCLUSION

The outcome for the challenged claims of this Final Written Decision follows.[27]   In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatent-able | Claims Not shown Unpatent-able |
|---|---|---|---|---|
| 1, 2, 4, 6, 26, 27, 29, 31 | 103(a) | Zavracky, Chiricescu, Akasaka | 1, 2, 4, 6, 26, 27, 29, 31 | |
| 3, 28 | 103(a) | Zavracky, Chiricescu, Akasaka, Satoh | 3, 28 | |

---

[27] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01567
Patent 7,126,214 B2

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatent- able | Claims Not shown Unpatent -able |
|---|---|---|---|---|
| 5, 30 | 103(a) | Zavracky, Chiricescu, Akasaka, Alexander | 5, 30 | |
| **Overall Outcome** | | | 1–6, 26–31 | |

### IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–6 and 26–31 of the '214 patent are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

96

IPR2020-01567
Patent 7,126,214 B2

PETITIONER:

David M. Hoffman
Kenneth W. Darby Jr.
Jeffrey Shneidman
FISH & RICHARDSON P.C.
hoffman@fr.com
kdarby@fr.com
shneidman@fr.com
ptabinbound@fr.com

James Glass
Ziyong Li
QUINN EMANUEL URQUHART & SULLIVAN LLP
jimglass@quinnemanuel.com
seanli@quinnemanuel.com

For PATENT OWNER:

Jonathan S. Caplan
James Hannah
Jeffrey H. Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jcaplan@kramerlevin.com
jhannah@kramerlevin.com
jprice@kramerlevin.com

97

Trials@uspto.gov                                           Paper 39
571-272-7822                                    Entered:  March 2, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

XILINX, INC.,
Petitioner,

v.

ARBOR GLOBAL STRATEGIES, LLC,
Patent Owner.

————————

IPR2020-01568[1]
Patent 7,282,951 B2

————————

Before KARL D. EASTHOM, BARBARA A. BENOIT, and
SHARON FENICK, *Administrative Patent Judges*.

EASTHOM, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

---

[1] Taiwan Semiconductor Manufacturing Co. Ltd. "TSMC" filed a petition in
IPR2021-00736, and the Board joined it as a party to this proceeding.  *See
also* Paper 38 (order dismissing-in-part TSMC as a party with respect to
claims 1, 4, 5, 8, 10, and 13–15).

IPR2020-01568
Patent 7,282,951 B2

Xilinx, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1, 2, 4–6, and 8–29 (the "challenged claims") of U.S. Patent No. 7,282,951 B2 (Ex. 1001, "the '951 patent"). Petitioner filed a Declaration of Dr. Paul Franzon (Ex. 1002) with its Petition. Arbor Global Strategies, LLC ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.").

After the Institution Decision (Paper 12, "Inst. Dec."), Patent Owner filed a Patent Owner Response (Paper 18, "PO Resp.") and a Declaration of Dr. Shoukri J. Souri (Ex. 2011); Petitioner filed a Reply (Paper 22) and a Reply Declaration of Dr. Paul Franzon (Ex. 1070); and Patent Owner filed a Sur-reply (Paper 26, "Sur-reply"). Thereafter, the parties presented oral arguments via a video hearing (Dec. 3, 2021), and the Board entered a transcript into the record. Paper 32 ("Tr.").

For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner demonstrates by a preponderance of evidence that the challenged claims are unpatentable.

## I.   BACKGROUND

A.    *Real Parties-in-Interest*

Petitioner identifies Xilinx, Inc. as the real party-in-interest. Pet. 68. Patent Owner identifies Arbor Global Strategies LLC. Paper 4, 1. Joined party Taiwan Semiconductor Manufacturing Co. Ltd. is also a real party-in-interest. *See supra* note 1.

B.    *Related Proceedings*

The parties identify *Arbor Global Strategies LLC, v. Xilinx, Inc.*, No. 19-CV-1986-MN (D. Del.) (filed Oct. 18, 2019) as a related infringement action involving the '951 and three related patents, U.S.

2

IPR2020-01568
Patent 7,282,951 B2

Patent No. RE42,035 E (the "'035 patent,"), U.S. Patent No. 6,781,226 B2
(the "'226 patent") and U.S. Patent No. 7,126,214 B2 (the "'214 patent").
*See* Pet. 68–69; Paper 4.  Petitioner "contemporaneously fil[ed] *inter
partes* review (IPR)] petitions challenging claims in each of these patents,"
namely IPR2020-01567 (challenging the '214 patent), IPR2020-01570
(challenging the '035 patent), and IPR2020-01571 (challenging the '226
patent).  *See* Pet. 68.  Final written decisions for these three cases issue
concurrently with the instant Final Written Decision.

The parties also identify *Arbor Global Strategies LLC* v. *Samsung
Electronics Co., Ltd.*, 2:19-cv-00333-JRG-RSP (E.D. Tex.) (filed October
11, 2019) as a related infringement action involving the '035, '951, and '226
patents.  *See* Pet. 69; Paper 4.  Subsequent to the complaint in this district
court case, Samsung Electronics Co., Ltd. ("Samsung") filed petitions
challenging the three patents, and the Board instituted on all challenged
claims, in IPR2020-01020, IPR2020-01021, and IPR2020-01022.  *See*
IPR2020-01020, Paper 11 (decision instituting on claims 1, 3, 5–9, 11, 13–
17, 19–22, 25, 26, 28, and 29 of the '035 patent); IPR2020-01021, Paper 11
(decision instituting on claims 1, 4, 5, 8, 10, and 13–15 the '951 patent);
IPR2020-01022, Paper 12 (decision instituting on claims 13, 14, 16–23, and
25–30 of the '226 patent).

The Board recently issued final written decisions in the three Samsung
cases, determining all challenged claims unpatentable.  *See* IPR2020-01020,
Paper 30 (holding unpatentable claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26,
28, 29 of the '035 patent); IPR2020-01021, Paper 30 (holding unpatentable
claims 1, 4, 5, 8, 10, and 13–15 of the '951 patent); IPR2020-01022, Paper
34 (holding unpatentable claims 13, 14, 16–23, and 25–30 of the '226

3

IPR2020-01568
Patent 7,282,951 B2

patent). The Board joined Taiwan Semiconductor Manufacturing Co. Ltd. as a party in each of the prior proceedings as it did here.

C.    *The '951 patent*

The '951 patent describes a stack of integrated circuit ("IC") die elements including a field programmable gate array ("FPGA") on a die, a memory on a die, and a microprocessor on a die. Ex. 1001, code (57), Fig. 4. Multiple contacts traverse the thickness of the die elements of the stack to connect the gate array, memory, and microprocessor. *Id.* According to the '951 patent, this arrangement "allows for a significant acceleration in the sharing of data between the microprocessor and the FPGA element while advantageously increasing final assembly yield and concomitantly reducing final assembly cost." *Id.*

Figure 4 follows:



*Fig. 4*

4

IPR2020-01568
Patent 7,282,951 B2

Figure 4 above depicts a stack of dies including FPGA die 68, memory die 66, and microprocessor die 64, interconnected using metal and contact holes 70. Ex. 1001, 4:61–5:8.

The '951 patent explains that an FPGA provides known advantages as part of a "reconfigurable processor." *See* Ex. 1001, 1:26–41. Reconfiguring the FPGA gates alters the "hardware" of the combined "reconfigurable processor" (e.g., the processor and FPGA) making the processor faster than one that simply accesses memory (i.e., "the conventional 'load/store' paradigm") to run applications. *See id.* Such a "reconfigurable processor" also provides a known benefit of flexibly providing of different logical units required by an application after manufacture or initial use. *See id.*

D.     *Illustrative Claim 1*

Independent claim 1 illustrates the challenged claims at issue:

1.  A processor module comprising:

[1.1] at least a first integrated circuit functional element including a programmable array that is programmable as a processing element; and

[1.2] at least a second integrated circuit functional element stacked with and electrically coupled to said programmable array of said first integrated circuit functional element [1.3] wherein said first and second integrated circuit functional elements are electrically coupled by a number of contact points distributed throughout the surfaces of said functional elements and [1.4] wherein said second integrated circuit includes a memory array functional to accelerate external memory references to the processing element.

Ex. 1001, 7:58–8:4; *see* Pet. 23–30 (addressing claim 1).

IPR2020-01568
Patent 7,282,951 B2

### E.    *The Asserted Grounds*

Petitioner challenges claims 1, 2, 4–6, and 8–29 of the '951 patent on

the following grounds (Pet. 1):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1, 2, 4–6, 8–24, 27, 29 | 103[2] | Zavracky,[3] Chiricescu,[4] Akasaka[5] |
| 25 | 103 | Zavracky, Chiricescu, Akasaka, Trimberger[6] |
| 26 | 103 | Zavracky, Chiricescu, Akasaka, Satoh[7] |
| 28 | 103 | Zavracky, Chiricescu, Akasaka, Alexander[8] |

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103. For purposes of trial, the '951 patent contains a claim with an effective filing date before March 16, 2013 (the effective date of the relevant amendment), so the pre-AIA version of § 103 applies.

[3] Zavracky et al., US 5,656,548, issued Aug. 12, 1997. Ex. 1003.

[4] Silviu M. S. A. Chiricescu and M. Michael Vai, *A Three-Dimensional FPGA with an Integrated Memory for In-Application Reconfiguration Data*, Proceedings of the 1998 IEEE International Symposium on Circuits and Systems, May 1998, ISBN 0-7803-4455-3/98. Ex. 1004.

[5] Yoichi Akasaka, *Three-Dimensional IC Trends*, Proceedings of the IEEE, Vol. 74, Iss. 12, pp. 1703-1714, Dec. 1986, ISSN 0018-9219. Ex. 1005.

[6] Steve Trimberger, Dean Carberry, Anders Johnson, and Jennifer Wong, *A Time-Multiplexed FPGA*, Proceedings of the 1997 IEEE International Symposium on Field-Programmable Custom Computing Machines, April 1997, ISBN 0-8186-8159-4. Ex. 1006.

[7] Satoh, PCT App. Pub. No. WO00/62339, published Oct. 19, 2000. Ex. 1008 (English translation).

[8] Michael J. Alexander, James P. Cohoon, Jared L. Colflesh, John Karro,

6

## II. ANALYSIS

Petitioner challenges claims 1, 2, 4–6, and 8–29 as obvious based on the grounds listed above.  Patent Owner disagrees.

### A.    *Legal Standards*

35 U.S.C. § 103(a) renders a claim unpatentable if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Tribunals resolve obviousness on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Prior art references must be "considered together with the knowledge of one of ordinary skill in the pertinent art."  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

### B.    *Level of Ordinary Skill in the Art*

Relying on the testimony of Dr. Franzon, Petitioner contends that

> [t]he person of ordinary skill in the art ("POSITA") at the time of the alleged invention of the '951 patent would have been a person with a Bachelor's Degree in Electrical Engineering or Computer Engineering, with at least two years of industry experience in integrated circuit design, packaging, or fabrication.

Pet. 7 (citing Ex. 1002 ¶¶ 58–60).

---

and Gabriel Robins, *Three-Dimensional Field-Programmable Gate Arrays*, Proceedings of Eighth International Application Specific Integrated Circuits Conference, Sept. 1995.  Ex. 1009.

IPR2020-01568
Patent 7,282,951 B2

Relying on the testimony of Dr. Souri, Patent Owner contends that

> [a] person of ordinary skill in the art ("POSITA") around December 5, 2001 (the earliest effective filing date of the '951 Patent) would have had a Bachelor's degree in Electrical Engineering or a related field, and either (1) two or more years of industry experience; and/or (2) an advanced degree in Electrical Engineering or related field.

PO Resp. 8–9 (citing Ex. 2011 ¶ 37).

We adopt Petitioner's proposed level of ordinary skill in the art as we did in the Institution Decision, because it comports with the teachings of the '951 patent and the asserted prior art. *See* Inst. Dec. 20–21. Patent Owner's proposed level largely overlaps with Petitioner's proposed level. Even if we adopted Patent Owner's proposed level, the outcome would not change.

C.    *Claim Construction*

In an *inter partes* review, the Board construes each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2020). Under this standard, which is the same standard applied by district courts, claim terms take their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

IPR2020-01568
Patent 7,282,951 B2

The parties' arguments raise a claim construction issue regarding "a memory array functional to accelerate external memory," "said memory array is functional to accelerate external memory references to the processing element," and "wherein said memory is functional to accelerate external memory references to said programmable array" as recited respectively in claims 1, 5, and 10. Independent claims 16, 18, and 23 similarly recite "wherein said memory is functional to accelerate external memory references to [the/said] processing element." Neither party provides an explicit construction.

In the Institution Decision, we determined that

[t]he parties' arguments raise a claim construction issue regarding "a memory array functional to accelerate external memory," "said memory array is functional to accelerate external memory references to the processing element," and "wherein said memory is functional to accelerate external memory references to said programmable array" as recited respectively in claims 1, 5, and 10. Independent claims 16, 18, and 23 similarly recite "wherein said memory is functional to accelerate external memory references to [the/said] processing element." Neither party provides an explicit construction.

Inst. Dec. 21–22. Tracking the institution decision in related IPR2020-01021 (also challenging the '951 patent), in the Institution Decision here, we preliminarily construed the "'functional to accelerate' limitations [as] requir[ing] a number of contacts extending throughout the thickness of the wafers in a vertical direction (vias) within the periphery of the die to allow multiple short paths for data transfer between the memory and processor." Inst. Dec. 25–26. Likewise, in the final written decision in IPR2020-01021 and in co-pending IPR2020-01570, the Board construed these "functional to accelerate" limitations in materially the same manner. *See* IPR2020-

IPR2020-01568
Patent 7,282,951 B2

01021, Paper 30, 26, Paper 33 (Errata); IPR2020-01570, Paper 40 (final written decision) § II.C.

In particular, the "functional to accelerate" clauses require "a number of contacts extending throughout the thickness of the wafers in a vertical direction (vias) within the periphery of the die to allow multiple short paths for data transfer between the memory array/memory and processing element/programmable array." *See* IPR2020-01021, Paper 30, 26, Paper 33 (Errata). We herein adopt and incorporate the construction and the rationale supporting it from the final written decision of IPR2020-01021.

Petitioner states that "[e]ven beyond the Board's construction, the Petition shows that the Zavracky-Chiricescu-Akasaka Combination provides the 'memory array . . . accelerate' limitations under ***any*** reasonable construction," "even under [Patent Owner's] flawed construction." Reply 7, 9. Patent Owner states that it "construes all terms in 'accordance with the ordinary and customary meaning of such claim as understood by on of ordinary skill in the art and the prosecution history pertaining to the patent.'" PO Resp. 9 (quoting 37 C.F.R. § 42.100(b)).

Patent Owner argues that "the claims require . . . structure provided ***within the memory array*** (i.e. the wide configuration data port disclosed in the '951 Patent) that is responsible for accelerating the programmable array's accelerated external memory references." PO Resp. 20 (citing Ex. 2011 ¶ 55). However, Patent Owner fails to describe the particular structure of a wide configuration data port (WCDP) within a memory array the challenged claims require under "the ordinary and customary meaning" or otherwise. *See* PO Resp. 19–20. The '951 patent does not describe a

10

IPR2020-01568
Patent 7,282,951 B2

WCDP "within the memory array."  Figure 5, for example, depicts "VERY

WIDE CONFIGURATION DATA PORT" 82, but Figure 5's WCDP is a

separate black box from any structure involving memory or memory array.

*Compare* Ex. 1001, Fig. 4 (memory die 66 and vias 70), *with id.* at Fig. 5

(WCDP 82).  *See* Ex. 1001, 5:29–49 (describing Figure 5).

Figure 5 follows:



Fig. 5

Figure 5 above illustrates a "VERY" WCDP 82 on the left connected to

buffer cells 88, and configuration memory cells 88 and logic cells 84, toward

the middle and right.  *See* Ex. 1001, Fig. 5; 5:30–49.  Buffer cells 88

11

("preferably on a portion of the memory die 66" (*see* Fig. 4)), "can be loaded while the FPGA 68 *comprising the logic cells* 84 *are* [sic] *in operation*." *Id.* at 5:38–42 (emphasis added).[9]

Therefore, the central purpose of the buffer cells is "*they can be loaded while the FPGA 68 comprising the logic cells are in operation*," which "then enables the FPGA 68 to be totally reconfigured in one clock cycle with all of it[s] configuration cells 84 updated in parallel." *Id.* at 5:39–43 (emphasis added). But none of the challenged claims require loading the FPGA while it is in operation. Also, configuration cells and the FPGA can be updated in parallel (e.g., in one clock cycle) without the buffer cells. *See id.*; *see also infra* note 10 (disclosure regarding cache memory providing

---

[9] Although the '951 patent states that "[t]he buffer cells 88 are preferably on a portion of the memory die 66 (FIG. 4)" (*id.*) in reference to Figure 5, buffer cells 88 in Figure 5 appear to be near or connected to FPGA logic cells 84 and configuration memory cells 86—perhaps depicting something other than the preferred embodiment describing buffer cells on the memory die. For example, Dr. Chakrabarty testified that the FPGA is to the right of Figure 5's WCDP 82, while memory die 66 (*see* Fig. 4), although undepicted in Figure 5, is to the left of Figure 5's WCDP 82. Ex. 1075, 157:5–158:7; *see also* Reply 9 (quoting 1075, 157:23–158:3). In any event, Figure 5 depicts WCDP 82 as a separate circuit or structure (in black box form) from buffer cells 88 and any memory die or array, and it is not clear how Figure 5's WCDP relates structurally to a memory die or memory array. *See id.* at Fig. 5.

During the Oral Hearing, Patent Owner's arguments further blurred what Figure 5 illustrates. That is, Patent Owner argued that "when the buffer cells are on the FPGA, it then raises the question, okay, well, what's on the memory array, right. And my answer would be *probably* more buffer cells." Tr. 54:21–24 (emphasis added). But there is no disclosure for buffer cells in or on both a memory array and an FPGA die. *See id.* at 55:3–6 (Patent Owner arguing that "I don't think there's anything *that prevents*" buffer cells from being on both dies (emphasis added)).

reconfiguration).  Therefore, the challenged claims do not require buffer cells even by implication.

Regardless of the location of the disclosed but unclaimed buffer cells, Figures 4 and 5 and the disclosure indicate that the numerous connections between memory die 66 (with or without buffer cells 88 thereon) and FPGA die 68 (with our without configuration memory cells 86 thereon) facilitate the claimed "functional to accelerate" limitations, in line with our claim construction.[10]  In other words, to the extent the claims implicate a WCDP, it is the numerous via connections associated with that port connected to a memory or memory array that support the "functional to accelerate" limitations as discussed further below.

Patent Owner correctly notes that "the '951 Patent discloses that loading configuration data through a typical, relatively narrow [i.e., 8 'bit' or single 'byte'] configuration data port [with respect to prior art Figure 3] led to unacceptably long reconfiguration times."  *See* PO Resp. 20 (citing Ex. 1001, 4:47–60); Ex. 1001, 4:54–60 ("Configuration data is loaded through a configuration data port in a *byte serial* fashion and must configure the cells sequentially progressing through the entire array of logic cells 54 and associated configuration memory.  It is the loading of this data through a relatively narrow, for example, *8 bit port* that results in the long

---

[10] The '951 patent implies that configuration memory cells 66 are on FPGA die 68 in one embodiment, but a cache memory provides reconfiguration without them in other embodiments. *See* Ex. 1001, 5:43–50 (stating that "[o]ther methods for taking advantage of the significantly increased number of connections to the cache memory die 66 (FIG. 4) may include its use to totally replace the configuration bit storage on the FPGA die 68 as well as to provide larger block random access memory ('RAM') than can be offered within the FPGA die itself").

reconfiguration times." (emphasis added)).[11]  Patent Owner contends that "[t]he inventors solved this problem not only by stacking a memory die with a programmable array die, but also by *interconnecting those two elements* with a 'wide configuration data port' that employs through-silicon contacts, with the potential for even further acceleration where the memory die is 'tri-ported.'" *Id.* (citing Ex. 1001, 5:18–25) (emphasis added).  This argument itself (which mimics the testimony of Dr. Souri (Ex. 2011 ¶ 56)) shows that any structure associated with the WCDP implicated here simply "interconnect[s] those two [die] elements"—i.e., implicating the numerous vias/contacts 70 as depicted in Figure 4 that connect die elements 66, 66, and 68 together.  Therefore, Patent Owner's argument and Dr. Souri's testimony support our analysis and claim construction.

In addressing Petitioner's allegation of obviousness, Patent Owner argues that Petitioner "does not account for all aspects of the claimed invention," and states "[f]or example, . . . the '951 patent . . . discloses utilizing a portion of the memory array as a wide configuration data port including buffer cells."  PO Resp. 22 (citing Ex. 1001, 5:34–39).  This argument for "buffer cells" differs from Patent Owner's argument on page 20 of its Response, which does not mention "buffer cells" and only mentions

---

[11] This description indicates that 8 bits of the single byte load in parallel to the first 8 bit locations of configuration memory 56, and then in succession (serial) to the other 8 bit configuration memory cells.  In other words, the quoted description about "byte serial" loading and Figure 3 together show that each byte (i.e., 8 bits) loads over a parallel bus into 8 bit blocks (i.e., a byte) of configuration memory cells in succession (i.e., series).  *See* Ex. 1001, Fig. 3 (showing 8 bit configuration data port 52 connected by a bus to a block configuration memory cells $56_{M0}$ and then in serial to successive blocks of configuration memory cells $56_{M1}$–$56_{00}$).

IPR2020-01568
Patent 7,282,951 B2

a "wide configuration data port" as "responsible for accelerating the
programmable array's accelerated external memory references." Again, the
argument does not explain how the '951 patent shows "utilizing a portion of
the memory array as a wide configuration data port."

Based on the specification and claim language as discussed above and
further below, apart from numerous vias 70 as depicted in Figure 4, none of
the "functional to accelerate" clauses at issue here require any structure
associated with a WCDP beyond that included in our construction. In
support of our claim construction, Figure 4 of the '951 patent, depicted next,
illustrates vias 70 throughout each die, 64, 66, and 68:



*Fig. 4*

As depicted above, Figure 4 shows a number of vias 70 throughout
the periphery of each die (i.e., microprocessor die 64, memory die 66, and

15

IPR2020-01568
Patent 7,282,951 B2

FPGA 68 die). According to the abstract as quoted above, these "contacts [i.e., vias] . . . traverse the thickness of the die. The processor module disclosed allows for a *significant acceleration* in the sharing of data between the microprocessor and the FPGA element . . . ." Ex. 1001, code (57) (emphasis added). This description of "*significant acceleration*" does not mention a WCDP or buffer cells.

Moreover, the '951 patent specification consistently ties data acceleration to stacking techniques that include vias throughout the stacked dies without requiring other structure. In addition to the abstract, the '951 patent describes "taking advantage of the significantly increased number of connections to the cache memory die." Ex. 1001, 5:44–46. It describes "an FPGA module that uses *stacking techniques* to combine it with a memory die for the purpose of *accelerating* FPGA *reconfiguration*." *Id.* at 2:64–65 (emphasis added). Similarly, it states that "the FPGA module may employ *stacking techniques* to combine it with a memory die *for the purpose of accelerating external memory references*." *Id.* at 2:65–3:2 (emphasis added). The stacking techniques include and refer to the short multiple through-via interconnections 70 *distributed throughout the dies* as depicted in Figure 4. *Id.* at 2:41–46 ("[S]ince these differing die do not require wire bonding to interconnect, it is now also possible to place interconnect pads throughout the total area of the various die rather than just around their periphery. This then allows for many more connections between the die than could be achieved with any other known technique.").

The '951 patent also explains that "[b]ecause the various die 64, 66 and 68 (FIG. 4) have *very short electrical paths* between them, the signal levels can be reduced while at the same time *the interconnect clock speeds*

IPR2020-01568
Patent 7,282,951 B2

*can be increased*." Ex. 1001, 5:53–56 (emphasis added). Similarly, "there is an added benefit of . . . *increased operational bandwidth*." *Id.* at 5:50–53 (emphasis added). As summarized here, these descriptions of shorter electrical paths, increased speed and bandwidth (leading to data acceleration), and acceleration in general, all because of the disclosed stacking techniques (which include multiple short through-vias), apply generally to such speed increases (i.e., acceleration) in the context of Figure 4 without mention of Figure 5's WCDP and buffer cell embodiment, or any tri-port structure. As noted above, even reconfiguration may occur without the specific black box WCDP embodiment of Figure 5, for example, "[o]ther methods for *taking advantage of the significantly increased number of connections* to the cache memory die 66 (FIG. 4) may include its use to totally replace the configuration bit storage on the FPGA die 68." *Id.* at 5:43–47 (emphasis added); *see also supra* note 10.

Based on the arguments and evidence of record, no reason exists to depart from the claim construction set forth in the final written decision in IPR2020-01021. As Petitioner also argues, Patent Owner did not assert a clear requirement for a WCDP and/or buffer cells for the "functional to accelerate" clauses in related district court litigation. *See* Reply 2–3 (arguing that Patent Owner does not justify incorporating limitations from the specification and "has taken five inconsistent positions on the 'accelerate' terms across co-pending IPRs and litigations") (citing Ex. 1071 (district court claim chart)); Ex. 1071 (listing various claim construction statements by Patent Owner); Ex. 1072, 27). For example, in the district court litigation, Patent Owner argued as follows:

> The specification teaches *in several sections* that *the short interconnects to the memory die allows for accelerated external*

17

IPR2020-01568
Patent 7,282,951 B2

> *memory references*, providing additional context for a POSITA
> to interpret the claims. Darveaux Decl., ¶ 35. For example, the
> '951 Patent states that in reference to Figures 4 and 5 that
> *acceleration* to external memory *is performed because "the*
> *FPGA module may employ stacking techniques to combine it*
> *with a memory die for accelerating external memory references*
> *as well as to expand its on chip block memory*." Ex. 2, '951
> Patent at Figs. 4 and 5, 2:56-3:2 (emphasis added).

Ex. 1072, 29 (emphasis added).

In other words, this passage shows that Patent Owner argued in the district court that "short interconnects" of the disclosed "stacking techniques" improve the speed relative to the prior art—without relying specifically on a WCDP, buffer cells, or parallel processing. *See id.* Therefore, contrary to arguments in the Sur-reply, even though Patent Owner advanced other arguments during the district court litigation, none are clear enough to overcome Patent Owner's broad statements in the district court litigation as quoted above, and Patent Owner has not "taken consistent positions across all IPRs and litigations." *See* Sur-reply 2.

As the Board also preliminarily determined in the Institution Decision, prosecution history of the '951 patent application also plays an important role in understanding the claims and supports the preliminary claim construction. *See* Inst. Dec. 24–25; *accord* Ex. 2006 (institution decision in IPR2020-01021), 24–25. The prosecution history of the '951 patent application further supports our construction.

Specifically, the Examiner indicated allowance of dependent claim 35 of the '951 patent (if written in independent form) over Lin (U.S. Patent No. 6,451,626 B1 (Ex. 1054; Ex. 1107, 67)), finding Lin does not teach or suggest "wherein said memory array is functional to accelerate

18

IPR2020-01568
Patent 7,282,951 B2

external memory references to said processing element." Ex. 1107, 72–73; Inst. Dec. 24–25.

Noting this in our Institution Decision, we pointed to petitioner Samsung's annotation in the IPR1020-01021 proceeding of the following figures from Lin to illustrate the issue:



Ex. 2006, 25; Inst. Dec. 25. Lin's annotated Figures 1D and 2D above show that Lin discloses contacts (red) on the sides of dies, instead of a number contact vias extending throughout the area of each die within the periphery thereof, in line with the Examiner's reasons for allowance. *See id.*; Ex. 1054 (Lin), Figs. 1D, 2D; Ex. 1107, 72–73.

Accordingly, as we noted in the Institution Decision,

in light of Lin's teachings and absent explicit explanation during prosecution by the Examiner, the rejection and reasons for allowance provide further support the understanding that the "functional to accelerate" limitations require a number of contacts extending throughout the thickness of the wafers in a vertical direction (vias) within the periphery of the die to allow multiple short paths for data transfer between the memory and process[ing element].

19

IPR2020-01568
Patent 7,282,951 B2

Inst. Dec. 25–26; *compare*, Ex. 1001, Fig. 4 (showing numerous contact points), *with* Ex. 1054, Figs. 1D, 2D (showing peripheral contact points).

During the Oral Hearing, Patent Owner argued that with respect to a WCDP that "[*t*]*he spec is very clear that what we're talking about is it has enough connections to allow the parallel updating of data.*" Tr. 48:20–22 (emphasis added). When asked to compare the '951 patent's Figure 3 (which depicts a prior art eight bit configuration data port) and Figure 5 (which depicts a WCDP), Patent Owner stated that the WCDP "could be as small as 32 bits . . . if you have a small FPGA, right? If you want to update something in parallel, you could update 32-bit with 32 bits?" Tr. 49:1–9 (answering "yes, . . . if you have a very, . . . small FPGA, the number of bits can be . . . relatively smaller, but what's critical is not the number of bits and . . . . [i]t's not necessarily the number of bits that's in the configuration data port, but how they're arranged"). Patent Owner continued by answering that "parallel connections between cells on the die. . . . get to the heart of what the wide configuration data port is, how it works, and how the interconnections between the die work even absent . . . the data being used to configure the FPGA." *Id.* at 49:11–16. Then, Patent Owner argued that "*we all agree* that the wide configuration data port . . . *at least includes these interconnections between the die.* So, what we're talking about is *moving data from one die to another. That's the use of the wide configuration data port.*" *Id.* at 49:22–50:2 (emphasis added).

These arguments support our construction because our construction "at least includes these interconnections between the die" and allows data movement between dies. In addition, contrary to Patent Owner's arguments in the Sur-reply, our construction implicitly distinguishes over

20

IPR2020-01568
Patent 7,282,951 B2

the small number of connections in the narrow configuration data port of the '951 patent's prior art Figure 3.  *See* Sur-reply 8 (arguing that "Petitioner's . . . interpretation of the wide configuration data port as simply meaning 'a data port used for configuration . . . . [with] a lot of connections though these TSVs' [through silicon vias] . . . . directly contradict[s] the specification [and] . . . also encompasses the conventional 'data port,' which the '951 Patent distinguishes the wide configuration data port from" (quoting Reply 8).

In other words, the "functional to accelerate" clauses require "a number of contacts extending throughout the thickness of the wafers in a vertical direction (vias) within the periphery of the die to allow multiple short paths for data transfer between the memory array/memory and processing element/programmable array."  *See* IPR2020-01021, Paper 30, 26, Paper 33 (Errata).  This construction implicitly represents more vias than prior art Figure 3 of the '951 patent describes (i.e., eight), as supported in view of the specification and prosecution history of the '951 patent.  *See* Ex. 1001, Fig. 3 ("8 BIT CONFIGURATION DATA PORT 52").  In addition, as discussed further below and as Petitioner shows, to the extent any of the "functional to accelerate" claims implicate parallel data transfer, our claim construction *allows for* such parallel data transfers—in line with Patent Owner's arguments.  *See* Tr. 49:13–16 (Patent Owner arguing that "parallel connections between cells on the die . . . . get to the heart of what the wide configuration data port is, how it works, and how the interconnections between the die work"); Sur-reply 2 (arguing that "the novel die-area interconnection arrangement with buffer cells (i.e., wide configuration data port) *allows the parallel*

*loading of data* from the memory die to the programmable array that is responsible for the claimed acceleration" (emphasis added)).

Moreover, Patent Owner concedes that "[t]he '951 Patent makes clear that stacking die and short interconnections are simply 'added benefits' that allow for *increased operational bandwidth and speed*." Sur-reply 6 (citing Ex. 1001, 5:51–66) (emphasis added). But increased speed is acceleration—not merely "an added benefit." So is increased bandwidth in context to the '951 patent, because both benefits of *increase in speed* and bandwidth fall within the "functional to accelerate" limitations at issue here for the reasons discussed above. *See* Ex. 1001, 5:30–50; Tr. 56:11–14 (Patent Owner arguing that "[i]f you have a data port that connects in parallel the cells in the memory array with the FPGA cells, that does massively increase bandwidth. . . . but just increasing bandwidth doesn't get you  parallel connections"). As noted, our claim construction allows for parallel data transfers (i.e., "a number of vertical contacts distributed throughout . . . to allow multiple short paths for data transfer") so that an increase in bandwidth due to such multiple paths (vias and connections) both satisfies and supports the "functional to accelerate" clauses.

Therefore, as indicated above, we construe the "functional to accelerate" limitations as "a number of vertical contacts distributed throughout the surface of and traversing the memory die in a vertical direction (vias) to allow multiple short paths for data transfer between the memory array/memory and processing element/programmable array."

Based on the current record, no other terms require explicit construction. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean*

IPR2020-01568
Patent 7,282,951 B2

*Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'. . . ." (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

D.    *Obviousness, Claims 1, 2, 4–6, 8–24, 27, 29*

Petitioner contends the subject matter of claims 1, 2, 4–6, 8–24, 27, and 29 would have been obvious over the combination of Zavracky, Chiricescu, and Akasaka.  Pet. 18–52.  Patent Owner disputes Petitioner's contentions.  Prelim. Resp. 27–44.

1.    *Zavracky*

Zavracky, titled "Method for Forming Three Dimensional Processor Using Transferred Thin Film Circuits," describes "[a] multi-layered structure" including a "microprocessor . . . configured in different layers and interconnected vertically through insulating layers which separate each circuit layer of the structure."  Ex. 1003, codes (53), (57).  Zavracky's "invention relates to the structure and fabrication of very large scale integrated circuits, and in particular, to vertically stacked and interconnected circuit elements for data processing, control systems, and programmable computing."  *Id.* at 2:5–10.  Zavracky includes numerous types of stacked elements, including "programmable logic device[s]" stacked with "memory" and "microprocessor[s]."  *See id.* at 5:19–23.

23

IPR2020-01568
Patent 7,282,951 B2

Zavracky's Figure 12 follows:



FIG. 12

Figure 12 above illustrates a stack of functional circuit elements, including microprocessor and RAM (random access memory) elements wherein "buses run vertically through the stack by the use of inter-layer connectors." Ex. 1003, 12:24–26.

    2.    *Chiricescu*

Chiricescu, titled "A Three-Dimensional FPGA with an Integrated Memory for In-Application Reconfiguration Data," describes a three-dimensional chip, comprising an FPGA layer, memory layer, and routing layer. Ex. 1004, II-232. Chiricescu's FPGA includes a "layer of on-chip random access memory . . . to store configuration information." *Id.*

24

IPR2020-01568
Patent 7,282,951 B2

Chiricescu describes and cites the published patent application that

corresponds to Zavracky (Ex. 1003) as follows:

> At Northeastern University, the 3-D Microelectronics
> group has developed a unique technology which allows us to
> design individual CMOS circuits and stack them to build 3-D
> layered FPGAs which can have vertical metal interconnections
> (i.e., interlayer vias) placed anywhere on the chip.

*See id.* at II-232, II-235 (citing "P. Zavracky, M. Zavracky, D-P Vu and B.

Dingle, '*Three Dimensional Processor using Transferred Thin Film Circuits*,'

US Patent Application # 08-531-177, allowed January 8, 1997").[12]

Chiricescu describes "[a]nother feature of architecture [as] a

layer of on-chip random access memory . . . to store configuration

information." Ex. 1004, II-232. Chiricescu also describes using memory

on-chip to "significantly improve[] the reconfiguration time," explaining as

follows:

> The elimination of loading configuration data on an as needed
> basis from memory off-chip significantly improves the
> reconfiguration time for an on-going application. Furthermore,
> a management scheme similar to one used to manage cache
> memory can be used to administer the configuration data.

*Id.* at II-234.

---

[12] Zavracky lists the same four inventors and "Appl. No. 531,177," which
corresponds to the application number cited by Chiricescu ("08-531-177").
Ex. 1003, codes (75), (21).

IPR2020-01568
Patent 7,282,951 B2

Figure 2 of Chiricescu follows:



**Figure 2.** The layers of our 3-D FPGA architecture.

Chiricescu's Figure 2 above illustrates three layers in the 3-D-FPGA architecture, with a "routing and logic blocks" (RLB) layer arranged in a "sea-of-gates FPGA structure," a routing layer, and the aforementioned memory layer (to program/reconfigure the FPGA). *See* Ex. 1004, II-232– 233. "[E]ach RLB is connected with the switch-boxes . . . in the routing layer (RL) by means of inter-layer vias. Each RLB can be configured to implement a D-type register and an arbitrary logic function of up to three variables." *Id.* at II-232. Figure 2 also depicts an external ROUTING_BUS to access the 3-D structure with external circuitry to provide configuration data. *Id.* at II-232 ("A routing bus provides the configuration information of the routing layer . . . .").

    3.    *Akasaka*

Akasaka, titled "Three-Dimensional IC Trends" (1986), generally describes trends (several years before the 2001 effective filing date of the invention) in three-dimensional integrated stacked active layers. Ex. 1005, 1703. Akasaka states that "tens of thousands of via holes" allow for parallel processing in stacked 3-D chips, and the "via holes in 3-D ICs" decrease the interconnection length between IC die elements so that "the signal processing speed of the system will be greatly improved." *Id.* at 1705.

26

IPR2020-01568
Patent 7,282,951 B2

Akasaka further explains that "[h]igh-speed performance is associated with shorter interconnection delay time and parallel processing" so that "twice the operating speed is possible in the best case of 3-D ICs." *Id.*

Also, "input and output circuits . . . consume high electrical power." Ex. 1005, 1705. However, "a 10-layer 3-D IC needs only one set of I/O circuits," so "power dissipation per circuit function is extremely small in 3-D ICs compared to 2-D ICs." *Id.*

Figure 4 of Akasaka follows:



VIA-HOLE WIRING    max 200~250PINS

**Fig. 4.** Wiring for parallel processing in 2-D and 3-D ICs.

Figure 4 compares short via-hole connections in 3-D stacked chips with longer connections in 2-D side-by-side chips.

According to Akasaka, "[p]arallel processing is expected to be realized more easily in 3-D structures. Several thousands or several tens of thousands of via holes are present in these devices, and many information signals can be transferred from higher to lower layers (or *vice versa*) through them." Ex. 1005, 1705. As one example, Akasaka describes one 3-D chip as including "a video sensor on the top layer, then an A/D converter, ALU [(arithmetic logic unit)], memory, and CPU in the lower layers to realize and intelligent image processor in a multilayered 3-D structure." *Id.*

    4.    *Petitioner's Showing, Claims 1, 2, 4–6, 8–16, 23, 27, and 29*

Claim 1's preamble recites "[a] processor module comprising." Petitioner relies on the combined teachings of Zavracky, Chiricescu, and

27

IPR2020-01568
Patent 7,282,951 B2

Akasaka, as discussed below, and provides evidence that Zavracky discloses a processor module, including a programmable array, memory (RAM), and microprocessor as part of a layered stack forming a 3-D device. *See* Pet. 23 (reproducing Ex. 1003, 5:19–20, 5:21–23, 12:12–38, Figs. 12–13; citing Ex. 1002 ¶¶ 282–288). Zavracky states that "[e]ach circuit layer can be fabricated in a separate wafer . . . and then transferred onto the layered structure and interconnected." Ex. 1003, code (57).

Claim 1 recites limitation [1.1], "at least a first integrated circuit element including a programmable array that is programmable as a processing element." *See* Pet. 24. Petitioner contends that the combined teachings of Zavracky and Chiricescu render the limitation obvious. *Id.* Petitioner relies on Zavracky's "programmable logic array 802," and notes that Zavracky states "[t]he array can be formed in any of the layers of a multilayer structure as described elsewhere herein." *Id.* at 25 (quoting Ex. 1003, 12:28–38).[13] Even if Zavracky does not disclose "a programmable array . . . programmable as a processing element," Petitioner contends that "Chiricescu teaches reconfiguring the FPGA as such a processing element wherein the 'FPGA is reconfigured from performing AxB to AxC or vice versa.'" *Id.* at 26–27 (quoting Ex. 1002 ¶ 303 (citing Ex. 1004, 234 (the "example shown is the multiplication of a 4-bit

---

[13] Referring to its analysis of claim 2, Petitioner contends that "the POSITA would have understood Zavracky to be describing a programmable array called a field **programmable** gate **array** (F**PGA**), which provides the programmable array element." *See* Pet. 25 n.2 (citing Ex. 1002 ¶¶ 293–299), 34 (contending, *inter alia*, that "Chiricescu literally describes Zavracky as teaching technology 'to build 3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip.'" (quoting Ex. 1004, II-232)).

IPR2020-01568
Patent 7,282,951 B2

variable")).  Petitioner contends that adding such logic to an FPGA would have been obvious because it can be "quickly reconfigured" according to one of Chiricescu's key features.  *See id.* at 26 (citing Ex. 1004, II-233–34).

Petitioner also contends that in view of Akasaka, it would have been obvious to modify Zavracky's programmable array to perform different types of processing, including math calculations, signal processing, or image processing.  *Id.* at 27 (citing Ex. 1005, 1704–05, 1707, 1709; Ex. 1002 ¶¶ 229, 235 (citing Ex. 1048; Ex. 1021)).  Petitioner adds that an artisan or ordinary skill would have been motivated to employ Akasaka's teachings with Zavracky's stacks for various reasons, including predictably providing multiple distributed contact points and parallel processing to implement a common data memory and cache memory system, and generally to increase bandwidth and processing speed.  *See id.* at 20–22 (citing Ex. 1002 ¶¶ 233, 235, 237–239; Ex. 1005, 1705, 1713, Fig. 25).

Claim 1 recites elements [1.2] "at least a second integrated circuit functional element stacked with and electrically coupled to said programmable array of said first integrated circuit functional element" and [1.3]: "wherein said first and second integrated circuit functional elements are electrically coupled by a number of contact points distributed throughout the surfaces of said functional elements."

Petitioner's annotated version of Zavracky's Figure 13 depicts stacked functional elements and the coupled contact points relied upon by Petitioner (Pet. 28):

<div align="center">

29

</div>

IPR2020-01568
Patent 7,282,951 B2



Zavracky's Figure 13 above as annotated by Petitioner portrays (highlighted) inter-layer via connections (buses), one or more second integrated circuit (IC) functional elements (memory 808 (RAM) die, and microprocessor dies 804 and 806), stacked with "programmable logic array 802." *See* Pet. 27–29.

Petitioner provides evidence that "Zavracky teaches that 'openings or via holes'. . . 'can be placed anywhere on the die' of various functional elements, such that the connections 'are not limited to placement on the outer periphery'." *See* Pet. 30–31 (quoting or citing Ex. 1003, 6:43–47, 13:43–46, 14:56–63).

Petitioner quotes Zavracky as teaching vertically stacked and interconnected circuit element layers:

> One significant aspect in the formation of three-dimensional circuits involves interconnecting the layered devices. . . .  Via holes are formed through the upper contact areas to gain access to the lower contact areas. . . .  **Electrical contact** between the

> upper and lower devices is made by filling the via holes 1022
> with an electrically conductive material . . . [.]

Pet. 28 (quoting Ex. 1003, 14:51–63). Petitioner points to Zavracky's teaching that "[i]nstead of running buses along the surface of the wafer, many of these run in a vertical direction (the third dimension) between functional blocks freeing up significant real estate for active circuitry." *See id.* (quoting Ex. 1003, 2:48–53).

Petitioner relies on similar teachings in Akasaka: "Akasaka further teaches the contact points are distributed throughout the surfaces of said functional elements, including through the 'tens of thousands of via holes.'" Pet. 31 (quoting Ex. 1004, 1705). Petitioner quotes Akasaka: "Several thousands or several tens of thousands of via holes are present in these devices, and many information signals can be transferred from higher to lower layers (or vice versa) through them." *Id.* at 30 (quoting Ex. 1004, 1705). Petitioner further notes that in Akasaka, "[t]he contact points on the surface of the IC functional elements are created by 'etching [the] via holes.'" *Id.* (citing Ex. 1004, 1707; citing Ex. 1002 ¶¶ 327–332).

Petitioner provides several reasons to combine the reference teachings to suggest providing numerous via holes between stacked dies or chips. *See* Pet. 18–22. As an example, Petitioner points out that Akasaka teaches that "tens of thousands of via holes' *permit parallel processing*, and that use of the 'via holes in 3-D ICs' *shortens the interconnection length* between IC die elements so that 'the *signal processing speed of the system will be greatly improved*.'" *Id.* at 18 (emphasis added) (quoting Ex. 1004, 1705).

Petitioner also points out that "Chiricescu . . . explicitly references and uses the interconnections of Zavracky." Pet. 18–19 (*see supra* § II.D.2 (noting the explicit citation to and description of Zavracky in Chiricescu)).

31

IPR2020-01568
Patent 7,282,951 B2

Petitioner contends that an artisan of ordinary skill would have understood that combining Zavracky's electrically coupled stacked dies with Chiricescu's teachings of stacked memory for reconfiguring the FPGA (*see* limitation [1.4] below) would significantly improve the reconfiguration time of the FPGA. *See id.* at 18 (citing Ex. 1002 ¶¶ 221–228; Ex. 1004, II-234; Ex. 1003, 5:65–66; Ex. 1020, 2; Ex. 1055 ¶ 14; Ex. 1040, 317). Petitioner adds that an artisan of ordinary skill would have enhanced and expanded Zavracky's programmable logic device within its co-stacked microprocessors and memories to include image and signal processing tasks as Chiricescu's suggests by teaching the use of FPGAs to implement arbitrary logic functions. *See id.* at 19 (citing Ex. 1002 ¶¶ 229–30; Ex. 1005, 1705; Ex. 1003, 12:25–30; Ex. 1004, II-232; Ex. 1058, 41; Ex. 1048).

Petitioner also contends that it was "a predictable advantage and also suggested by Akasaka itself that applying Akasaka's distributed contact points, e.g., in the 3-D stacks of Zavracky or Chiricescu, would increase bandwidth and processing speed through better parallelism and increased connectivity." Pet. 20 (citing Ex. 1002 ¶¶ 233; Ex. 1005, 1705). Petitioner adds that "Zavracky and Chiricescu . . . invited such a combination." *Id.* (citing Ex. 1003, 6:43–47 ("connections . . . can be placed anywhere on the die"); Ex. 1004, 232 (similar)).

Petitioner further reasons as follows:

the POSITA knew of the need for replicated "common data memory" in stacked designs, including as taught in Akasaka, to enable, e.g., multi-processor cache coherence. Ex. 1002 ¶236 (citing Ex. 1034, 466–469; Ex. 1005, 1713 & Fig. 25). *That structure would be more difficult to accomplish with a limited number of interconnections as in Zavracky.* Ex. 1002 ¶237. A POSITA thus would have been motivated to seek out Akasaka's

32

IPR2020-01568
Patent 7,282,951 B2

> distributed contact points in order to build a "common data memory." The POSITA's background knowledge, including prior art successes, would have suggested success in this combination. *Id.* (citing Ex. 1005, Ex. 1021).

Pet. 21 (emphasis added). At the cited passage of Dr. Franzon's declaration, Dr. Franzon further explains that the common data memory "still obtain[s] the speed and cost advantages of having an FPGA-based stack (e.g., the FPGA being faster than the software running on a microprocessor, and cheaper than an ASIC)." Ex. 1002 ¶ 237.[14] Dr. Franzon also explains that "the POSITA would have known that the more densely connected communication structure of Akasaka would enable desirable uses of the Zavracky-Chiricescu 3D chip stack." *Id.* ¶ 236.

Claim 1 also recites limitation [1.4]: "wherein said second integrated circuit includes a memory array functional to accelerate external memory references to the processing element." Petitioner relies partly on its showings above with respect to the second integrated circuit in limitations [1.2] and [1.3], which include Zavracky's memory array in the stack connected via multiple via connection points. *See* Pet. 32 (citing Ex. 1003, 11:63–65 (("memory may be stacked on top of the multi-layer microprocessor."), 12:15–28 ("random access memory array [with] buses run vertical through the stack"), 12:33–35, Figs. 10, 12, 13 (showing RAM memory 808)).

---

[14] In addition to speed, Dr. Franzon explains that the common data memory employs multi-processor cache coherence in a stacked memory processor design as Akasaka discloses to ensure each shared memory obtains the same updated data that the system broadcasts over the parallel bus. *See* Ex. 1002 ¶ 236 (discussing Ex. 1005, 1713, Fig. 25; citing Ex. 1034, 466–469).

IPR2020-01568
Patent 7,282,951 B2

Petitioner adds the RAM "cache memory" array teachings from

Chiricescu further to address the acceleration limitation in limitation [1.4]:

> Chiricescu observes that "[t]he main bottleneck in the implementation of a high performance configurable computing machine is the high configuration time of an FPGA." Ex. 1004 at II-232. This bottlenecking problem is caused in part by having to load configuration data from off-chip memory. Chiricescu's proposed solution used a "memory layer" where the "random access memory is provided to store configuration information." Ex. 1004 at II-232. Rather than having to go "off-chip" each time to load the FPGA reconfiguration data (i.e., load such external memory references each time the data is referenced), Chiricescu's random access memory (i.e., a memory array) acts as a "cache memory" for that reconfiguration data, accelerating access to those external memory references. Ex. 1004, II-234. Therefore, when the FPGA (i.e., the processing element) needs to be reconfigured with new data, access to that data is accelerated by already having been loaded into the memory array. Ex. 1004, II-234. Therefore, the Zavracky-Chiricescu-Akasaka Combination, which includes Chiricescu's FPGA and memory, provides this claim element. Ex. 1002 ¶¶304–307.

Pet. 32–33. As summarized above, Petitioner relies on multiple reasons for

combining the references, including to increase processing speed by stacking

chips with multiple parallel via connections to allow for parallel processing.

*See* Pet. 8–9 (citing Bertin (Ex. 1025) as teaching "a stack of chips . . . to

minimize latency between the device and chips and to maximize bandwidth"

(citing Ex. 1025, 7:18–22, Fig. 22; Ex. 1001 ¶¶ 41–43), 12 ("It was well

known that 'interconnect bandwidth, especially memory bandwidth, is often

the performance limiter in many computing and communications systems,'

and that 'wide buses are very desirable' and were made possible by 3-D

stacking." (citing Ex. 1020, 2–3; Ex. 1002 ¶¶ 53–57)), 18 ("Akasaka further

explains that 'shorter interconnection delay time and parallel processing'

34

means that the processing of data between layers is accelerated such that "twice the operating speed is possible in the best case of 3-D ICs." (quoting Ex. 1005, 1705)), 20 ("[I]t was a predictable advantage and also suggested by Akasaka itself that applying Akasaka's distributed contact points, e.g., in the 3D stacks of Zavracky or Chiricescu, would increase bandwidth and processing speed through better parallelism and increased connectivity." (citing Ex. 1002 ¶ 233 as quoting Ex. 1005, 1705)),18–22 (listing other reasons to combine), 60 ("The POSITA would have known (as Zavracky notes) that multiprocessor systems were needed for 'parallel processing applications,' for example, 'signal processing applications.'" (citing Ex. 1003, 12:13–28, Fig. 12; Ex. 1002 ¶ 258)).

Claim 2 depends from claim 1 and recites "[t]he processor module of claim 1 wherein said programmable array of said first integrated circuit die element comprises an FPGA." Petitioner generally refers to the "[t]he Zavracky-Chiricescu-Akasaka Combination" as it does for claim 1. *See* Pet. 34–35. Citing the testimony of Dr. Franzon and other evidence, Petitioner relies on Zavracky's PLD (programmable logic device) 802 at the bottom of the stack in Figure 13 as an FPGA. *Id.* at 29–31 (citing Ex. 1002 ¶¶ 292–297; Ex. 1035, 1:29–30; Ex. 1036, 4:1–9; Ex. 1037, 1:13–22; Ex. 1038, code (57) (describing "transistors of a programmable logic device (PLD), such as a field programmable gate array (FPGA)").

Petitioner relies on other teachings, including Chiricescu's teachings, including its "sea-of-gates" FPGA layer, and the knowledge of an artisan of ordinary skill, to show that Zavracky's PLD is or at least suggests an FPGA based on Chiricescu's teachings. *See* Pet. 30–31 (citing 1002 ¶¶ 294–297; Ex. 1004, II-232; Ex. 1040; Ex. 1051). Petitioner also generally relies on

35

reasons for combining the references as outlined above with respect to claim 1 to suggest modifying Zavracky's 3-D stack (memory, processor, FPGA) based on Chiricescu's layer/stack teachings (FPGA, memory). *See id.* at 34–35 (citing Pet. §§ VII.A.2, A.4). Petitioner also notes that Chiricescu specifically describes Zavracky's teachings (*see supra* § II.D.2) as useful for providing 3-D FPGA stacks. *See id.* at 34 ("Chiricescu literally describes Zavracky as teaching technology 'to build 3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip'" (quoting Ex. 1004, II-232)).

Claim 4 depends from claim 1 and recites "[t]he processor module of claim 1 further comprising:  at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements." Petitioner relies on its analysis of claims 1 and 2, and explains that "the Zavracky-Chiricescu-Akasaka Combination teaches the stacking of microprocessor and FPGA functional elements, but it also teaches that the memory and FPGA functional elements, are 'stacked with and electrically coupled to' each other, readily providing this element." Pet. 35. Petitioner alternatively relies on "other ways" that Zavracky teaches this element, pointing out that the "'third integrated circuit functional element' is not limited to a particular function in this claim." *Id.* As such, Petitioner relies on Zavracky's disclosure of multilayer electrically coupled stacks, including those illustrated in Figures 10, 12, and 13. *Id.* (citing Ex. 1003, Fig. 10, 11:63–65 ("memory may be stacked on top of the multi-layer microprocessor"), Fig. 12, 12:15–28 ("stacked microprocessor and random access memory array [with] buses run vertical through the stack"), Fig. 13, 12:33–35

IPR2020-01568
Patent 7,282,951 B2

("microprocessor [stacked and electrically coupled] with random access memory"); Ex. 1002 ¶¶ 313–326).

Independent claim 5 is a system claim. As Petitioner contends, "[c]laim 5 takes limitations from claim 1 and combines them with a generic processor and memory." Pet. 36. Specifically, claim 5 recites "[a] reconfigurable computer system comprising: a processor; a memory;" and "at least one processor module" that materially recites the same limitations as the "processor module" of claim 1. The processor module of claim 1 reads on the "Zavracky-Chiricescu-Akasaka Combination" as determined above. Other than at most implying some type of electrical connection through the recitation of "a reconfigurable computer system comprising" in the preamble, claim 5 does not specify any electrical communication between the processor, memory, and "processor module."

Petitioner contends that "Zavracky-Chiricescu-Akasaka Combination in further combination with [general knowledge of the POSITA] renders obvious claim 5." Pet. 36. Petitioner explains that the "the Zavracky-Chiricescu-Akasaka Combination teaches the use of numerous microprocessors and numerous memories – any of which can satisfy the additional requirement for one more processor and one more memory in claim 5, and indeed, the teachings of Figure 13 already shows such a reconfigurable computer system." *Id.* "Beyond this," Patent Owner contends that a person of ordinary skill would have known to connect an FPGA of the Zavracky-Chiricescu-Akasaka Combination in a system with memory and a processor as evidenced by admissions in the '951 patent, including prior art Figure 1, which shows a "prior art 'MAP™' element . . . taught to 'comprise a field programmable gate array "FPGA" [and] read

37

only memory.'" *Id.* at 36–37 (quoting Ex. 1001, 3:22–24; citing *id.* at Fig. 1). Petitioner points out that admitted prior art Figure 1 is one example that evidences the general knowledge of an artisan of ordinary skill, and "[t]he general knowledge of the POSITA would have other examples of reconfigurable computer systems with a processor, memory, and processor module." *Id.* at 37 (citing Ex. 1002 ¶¶ 267–73, 289; Ex. 1026).[15]

Petitioner points out that admitted prior art Figure 1 shows microprocessor 12 and system memory 16 coupled electrically with the MAP™ (which includes an FPGA). Pet. 37 (annotating Ex. 1001, Fig. 1). Petitioner asserts that it would have been obvious to employ the Zavracky-Chiricescu-Akasaka 3-D stack in a system with processor and memory in order to configure the FPGA using off-chip resources during start-up with a reasonable expectation of success where such systems were well-known. *See id.* at 37–39 (citing Ex. 1003, 12:37; Ex. 1002 ¶¶ 272–73; Ex. 1004, II-234 (describing "during the initiation phase of the application . . . loading configuration data . . . from memory off-chip").

Claim 6 depends from claim 5 and recites "the computer system processor module of claim 5 wherein said third integrated circuit die element comprises a memory." Petitioner points to its analysis of claim 2 to address claim 6. Pet. 39. Petitioner's analysis of claim 2 includes an annotated version of Zavracky's Figure 13, which depicts at least three integrated

---

[15] In other words, the admitted prior art evidences the knowledge of the ordinary artisan and does not form the "basis" of the rejection. *Cf. Apple Inc. v. Qualcomm Inc.*, 2022 WL 288013, slip op. at *5 (Fed. Cir. Feb. 1, 2022) (holding that that applicant admitted prior art (AAPA) may not form the "basis of a ground in an *inter partes* review because it is not contained in a document that is a prior art patent or prior art printed publication.").

circuit layers, including memory, a processor, and RAM (random access memory 806). *Id.* at 33.

Claim 8 depends from claim 5 and recites "[t]he computer system of claim 5 further comprising: at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements." Petitioner relies on its analysis of claim 4 to address claim 8. Pet. 39.

Claim 9 depends from claim 8 and recites "[t]he computer system of claim 8 wherein said third integrated circuit functional element comprises a memory." Petitioner refers to its analysis of claims 1 and 4 to address claim 9. Pet. 40. Petitioner also explains that "Zavracky . . . teaches the POSITA an embodiment where multiple IC functional elements, such as the claimed second and third elements, comprise memory." *Id.* (citing Ex. 1002 ¶¶ 318, 322). Petitioner quotes Zavracky as teaching that "[t]his configuration lends itself well to use in signal processing applications." *Id.* (quoting Ex. 1003, 12:27–28).

Independent claim 10 is materially similar to claim 1 but includes at least a third "integrated circuit functional element" in addition to the at least first and second integrated circuit functional elements, with the three functional elements stacked and electrically coupled (without requiring a number of contact points distributed throughout the surfaces of the functional elements and extending through a thickness thereof as recited in claim 1). The three functional elements include a programmable array, processor, and memory. Petitioner primarily relies on its showing for claims 1, 4, and 9 to address claim 10. Pet. 40–42. Referring to, and similar to, its analysis of claim 1, Petitioner explains generally that "Zavracky's 3D stack

IPR2020-01568
Patent 7,282,951 B2

includes multiple IC 'functional elements'," including microprocessor in relation to Figures 12 and 13. *See id.* at 41. Similarly, in its analysis of claim 4, Petitioner states that "Zavracky, for example, describes stacks with at least three layers wherein memory and microprocessor functional elements are stacked and electrically coupled." *Id.* at 35–36 (citing Ex. 1003, Fig. 10, 11:63–65 ("memory may be stacked on top of the multi-layer microprocessor"), Fig. 13 (showing stacked RAM, microprocessor, and PLD/FPGA layers).

Dependent claims 11–15 recite materially the same added limitations addressed above in connection with claims 1, 2, 4, and 10. Petitioner refers to its showing for the latter claims to address claims 11–15. Pet. 43–44.

Independent claim 16 is materially similar to claim 1 but broader, because while, similar to claim 1, it recites "a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element wherein said memory array is functional to accelerate external memory references to the processing element," it does not specifically recite "electrically coupl[ing] by a number of contact points distributed throughout the surfaces of said functional elements," as claim 1 does. Petitioner primarily relies on its showing for claim 1 to address claim 16. Pet. 44–45.

Independent claim 23 is materially the same as claim 1, with claim 1 reciting a "processor module" in its preamble and a programmable array in its body, and claim 23 reciting a "programmable array" in its preamble and reciting an FPGA in its body, with other differences with respect to coupling that Petitioner's showing for claim 1 addresses. Petitioner primarily relies on its showing for claims 1 and 16 to address claim 23. Pet. 49–50.

40

Dependent claim 27 depends from independent claim 23 and recites "at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements."  Dependent claim 29 depends from claim 27 and recites "wherein said third integrated circuit functional element includes an I/O controller."

To address claim 27, Petitioner relies on its analysis of claim 4. Pet. 50.  To address claim 29, Petitioner relies on Zavracky's "'controller' as controlling connections 'to and from the common data bus' and containing 'arbitration logic, hosted in the controller [run] in accordance with [a] bus arbitration protocol.'"  *Id.* at 51 (quoting Ex. 1003, 5:54–60).  According further to Petitioner, Zavracky's Figure 1 and Figure 13 illustrate the same or a similar controller, and Zavracky discloses a bus controller that arbitrates logic under a bus arbitration protocol to communicate with off-chip resources as "a third IC functional element."  *See id.* at 51–52 (citing Ex. 1002 ¶¶ 324–325; Ex. 1003, 6:58–60).  Petitioner alternatively relies on another controller in Zavracky that provides communication protocols between microprocessor and peripheral devices, and contends that "Zavracky teaches that such a programmable I/O controller 'can be formed in any of the layers of a multilayer structure as described elsewhere herein.'" *Id.* at 52 (quoting Ex. 1003, 12:28–38; citing Ex. 1002 ¶¶ 325–326).

We adopt and incorporate Petitioner's showing for claims 1, 2, 4–6, 8–16, 23, 27, and 29, as presented in the Petition and summarized above, as our own. *See* Pet. 7–12, 14–52.

>    *5.     Arguments with Respect to Alleged Obviousness Based on
>    Zavracky, Chiricescu, and Akasaka*

Patent Owner does not argue any of claims 1, 2, 4–6, 8–16, 23, 27, and 29 individually, but groups various claims together in separate arguments, as discussed below.  Sections below address claims 17–22, 25, 26, and 27, although Patent Owner groups some of these claims together with claims 1, 2, 4–6, 8–16, 23, 27, and 29 in generic arguments or more specific arguments.  We address some of the more generic arguments in this section and other more specific arguments below.  *See infra* §§ II.D.6–7; II.E–G.

Patent Owner argues that "[t]he *Zavracky-Chiricescu-Akasaka* combination fails to teach or suggest a 3-D processor module that includes a second integrated die element, separate from a first integrated die element having a programmable array, including a "memory array [that] is functional to accelerate external memory references to said processing element." PO Resp. 19 (listing claims 1, 5, 10, 16, and 23).  *See infra* §§ II.4 (analyzing claims 5, 10, 16, and 23, which materially track the limitations of claim 1 based on the issues raised herein).  Claims 1, 5, 10, 16, and 23 do not recite die elements, so Patent Owner's argument in that respect is not clear.

In any event, on one hand, Patent Owner admits that "[t]he '951 Patent provides accelerated external memory references due to its technique of stacking a programmable array with a memory die using through-silicon vias (TSVs)." *Id.*  On the other hand, Patent Owner contends that "it is not simply stacking of a memory die with a programmable array that accelerates the programmable array's access to memory. . . . [r]ather, as the claims themselves require, it is the structure provided ***within the memory array*** (i.e. the [WCDP] disclosed in the '951 Patent) that is responsible for accelerating

IPR2020-01568
Patent 7,282,951 B2

the programmable array's accelerated external memory references." PO Resp. 20. The latter argument is a claim construction argument, which we discuss above, and it is unavailing for the reasons noted. *Supra* § II.C (Claim Construction)).

Similarly, as also discussed above (§ II.C), Patent Owner argues that the inventors solved the problem of "loading configuration data through a typical, relatively narrow configuration data port [which] led to unacceptably long reconfiguration times," by "stacking a memory die with a programmable array die" and "interconnecting" them "with a 'wide configuration data port' that employs through-silicon contacts, with the potential for even further acceleration where the memory die is 'tri-ported.'" PO Resp. 20 (citing Ex. 1001, 5:18–25). It is not clear how this argument addresses Petitioner's showing or a claim limitation. As summarized above and further below, Petitioner shows how the combined teachings of Zavracky, Chiricescu, and Akasaka satisfy the adopted claim construction, namely "a number of vertical contacts distributed throughout the surface of and traversing the memory die in a vertical direction (vias) to allow multiple short paths for data transfer between the memory array/memory and processing element/programmable array." *See supra* § II.C.

Patent Owner also argues that "Petitioner's expert admits" in his deposition testimony that "Chiricescu's 'RLB BUS' that interconnects the memory and RLB layers is the same type of narrow data port distinguished in the '951 Patent." *Id.* at 21 (citing Ex. 2012, 80:12–17 ("That memory would be narrower because that's the structure of memory, is you access in DRAM; for example, you wouldn't have thousands of bits wide access to the DRAM in a normal memory structure in this time frame.")). According to

IPR2020-01568
Patent 7,282,951 B2

Patent Owner, "even though Chiricescu discloses stacking a memory layer with an RLB, its narrow configuration data port still loads configuration data 'in a byte serial fashion and must configure the cells sequentially.'" *Id.* (citing Ex. 1001, 4:55–60; Ex. 2011 ¶ 57).

As discussed further below, Dr. Zavracky does not admit that Chiricescu describes a narrow port between a memory layer and the FPGA/RLB layer. *See* Reply 11 (explaining that Dr. Zavracky's testimony relates to narrow ports for loading data from an *external* (off-chip) memory source to the FPGA module) (citing Ex. 2012, 80:10–22)). There is no credible evidence to support the argument that Chiricescu transfers data from its on-chip memory layer to its RLB ("sea-of-gates") FPGA layer over a narrow data port or in byte-serial fashion. *See* Ex. 1004, II-232, Fig. 2. Dr. Souri does not cite to any evidence in Chiricescu to support the testimony that "as Dr. Franzon acknowledges, *Chiricescu* discloses only a narrow configuration data port between the RLB and memory layers." Ex. 2011 ¶ 57 (citing Ex. 2012, 80:10–22). Dr. Zavracky credibly testifies that he "did not 'admit' that 'Chiricescu's RLB BUS that interconnects the memory and RLB layers is the same type of narrow data port distinguished in the [challenged patents].'" *See* Ex. 1070 ¶ 68 (testifying "[t]hat is factually an incorrect statement about Chiricescu - Dr. Souri's claim about Chiricescu is not true, and his claim about my testimony is not true"). And in any event, as discussed above and further below, Petitioner relies on the combined teachings of the references as suggesting a large number of vias extending throughout the die areas in contrast to any narrow data port.

Patent Owner also argues that "Petitioner has not demonstrated that its combination of references 'accelerates external memory references to said

IPR2020-01568
Patent 7,282,951 B2

processing element' over the baseline of the relatively narrow configuration port distinguished in the '951 Patent (and taught in *Chiricescu*)." PO Resp. 22. Patent Owner also argues that "[b]ecause Petitioner fails even to allege that any aspect of *Chiricescu's* 'memory layer' itself is functional to accelerate external memory references, it has not even raised a *prima facie* case of obviousness." *Id.* at 23 (citing Ex. 2011 ¶ 59).

These arguments do not address Petitioner's reliance on multiple vertical vias in the stacked memory chip structure of Zavracky, as modified by the combined teachings of Chiricescu and Akasaka, to accommodate the memory array operating as a cache or other memory to accelerate the loading of the reconfiguration data. *See* Pet. 17–22, 27–33. Petitioner notes, for example, that "Akasaka teaches that these 'tens of thousands of via holes' permit parallel processing, and that use of the 'via holes in 3-D ICs' shortens the interconnection length between IC die elements so that 'the signal processing speed of the system will be greatly improved.'" *Id.* at 18 (quoting Ex. 1705, 5). Petitioner also states that "Akasaka further explains that 'shorter interconnection delay time and parallel processing' means that the processing of data between layers is accelerated such that '*twice the operating speed is possible* in the best case of 3-D ICs.'" *Id.* (emphasis added) (quoting Ex. 1705, 5). Petitioner also relies on an article by Dr. Franzon and states that "the POSITA in 2001 was also aware of the many advantages of stacking IC die elements, including accelerated processing of data as compared to 2-D devices." *Id.* at 12 (citing Ex. 1020, 2–3; Ex. 1002 ¶¶ 53–57). Petitioner also relies on vias in a "vertical bus" connecting each of Zavracky's layers, including random access memory array layers, to

45

IPR2020-01568
Patent 7,282,951 B2

microprocessor layers. *Id.* at 32 (citing Ex. 1003, 11:63–65, 12:15–28, 12:33–35, Figs. 12, 13).

Contrary to Patent Owner's claim construction arguments, apart from numerous vias that the parties agree are part of a WCDP, none of the challenged claims require other aspects of a WCDP and/or buffer cells under our claim construction, and the specification does not describe Figure 5's WCDP (depicted as black box) as part of a memory array. *See supra* § II.C; Ex. 1001, Fig. 5. As Petitioner persuasively argues and as summarized above, the Petition relies on the combined teachings of Zavracky, Chiricescu, and Akasaka to teach the "functional to accelerate clause." *See* Reply 4–12. As Petitioner also persuasively argues, even if the claims require other structure of a WCDP, according to Patent Owner's expert in IPR2020-01020, IPR2020-01021, and IPR2020-01022, a "**configuration data port** . . . is . . . just a **data port used for configuration** . . . And **data port is just an interface to send data** from one place to another." Reply 9 (emphasis by Petitioner) (quoting Ex. 1075, 163:8–21). "And 'the reason it's a very wide configuration data port is because it has **a lot of connections** through these TSVs between the memory die and the FPGA die.'" *Id.* (quoting Ex. 1075, 157:23–158:3).

In other words, under Petitioner's persuasive showing, even if the challenged claims require some aspects of a WCDP, the combined teachings meet the claims for the reasons noted. Petitioner persuasively shows that the Zavracky-Chiricescu-Akasaka 3-D module uses numerous vias throughout the dies to transfer data *between* the dies—i.e., functional to accelerate all manner of data and signals in parallel (like a WCDP). *See, e.g.*, Pet. 18 (showing that Akasaka teaches that "'tens of thousands of via holes' permit

parallel processing" by utilizing the many interconnections; as a result of this parallel processing, "the signal processing speed of the system will be greatly improved"; and due to "shorter interconnection delay time and parallel processing" made possible from the area-wide interconnects, the processing of data between layers is accelerated such that "twice the operating speed is possible in the best case of 3-D ICs" (quoting Ex. 1005, 1705)), 20 (arguing that "it was a predictable advantage and also suggested by Akasaka itself that applying Akasaka's distributed contact points, e.g., in the 3-D stacks of Zavracky or Chiricescu, would increase bandwidth and processing speed through better parallelism and increased connectivity" (citing Ex. 1002 ¶ 233; Ex. 1005, 1705)).  Petitioner also shows that "[i]t was well known that 'interconnect bandwidth, especially memory bandwidth, is often the performance limiter in many computing and communications systems,' and that '*wide buses are very desirable*' and were made possible by 3-D stacking." *Id.* at 12 (emphasis added) (quoting Ex. 1020, 12).

Patent Owner argues that "in *Akasaka*, the 3-D chip design that uses vertical interconnections is only mentioned for a flip-chip design and a monolithic design, which means it is fabricated as a single piece of silicon with multiple layers." PO Resp. 16.  Patent Owner argues that "Akasaka explains that among the expected improvements are the use of '[s]everal thousands or tens of thousands of via holes' in monolithic chips to take advantage of parallel processing." *Id.* at 17 (quoting Ex. 1005, 1705).  According to Patent Owner, Akasaka's "flip-chip design is limited . . . in that 'the number of connections are restricted by reliability and bump size constraints.'" *Id.* at 16 (quoting Ex. 1005, 1704).

Contrary to these arguments, Akasaka states that with respect to flip chips, "the number of connections will be greatly increased by this technology." Ex. 1005, 1704. Moreover, Akasaka refers to the flip chip structures in a section titled "3-D IC Structure." *Id.* And contrary to Patent Owner's arguments, Akasaka generally indicates that for all known "3-D structures" at the time, "[s]everal thousands or several tens of thousands of via holes are present in these devices, and many information signals can be transferred from higher to lower layers or vice versa through them." *Id.* at 1705; *see also* Reply 20 n. 6 (showing that 3-D die stacking with numerous chips was well-known known (citing Ex. 1002 ¶¶ 328, 332); *id.* at 21 n. 8 (persuasively showing that Patent Owner "describes Akasaka's teachings inaccurately" (citing 1002 ¶¶ 233–239; Ex. 1070 ¶¶ 59–66); Ex. 1070 ¶¶ 60–61 (disputing Dr. Souri's testimony and stating that Akasaka shows "vertical interconnections between multiple chips and other chip attachment mechanisms," and testifying that "Akasaka does not limit its via fabrication teachings to two layers or a monolithic chip"); Ex. 1002 ¶ 238 (testifying that chip stacking was known and "[t]here were many references teaching stacked dies with thousands of distributed connections, including those discussed in my technology backgrounder above, Section V, and the papers in Section IX"). Akasaka also indicates that even in 1986, about five years before the 2001 date of the invention, artisans of ordinary skill would have mixed flip chip technology and monolithic technology to provide stacked layers: "Mixing of assembly technology with monolithic chip technology can also provide 4 layers or 6 layers from 2-layer or 3-layer stacked monolithic ICs, respectively." Ex. 1005, 1713.

IPR2020-01568
Patent 7,282,951 B2

Therefore, Petitioner shows that the numerous via connections between the memory die and FPGA in the modified stack of Zavracky connect to the memory array to render the "memory array functional to accelerate memory references to the processing element," as the challenged claims require. *See, e.g.*, Pet. 20–21 (showing that Akasaka's numerous connections would have motivated a POSITA to replicate common data memory, and "increase bandwidth and processing speed through better parallelism and increased connectivity"); 32 (relying on Zavracky's "random access memory array [with] buses run vertical through the stack" implemented as a cache memory according to Chiricescu's teachings in order to accelerate access to memory references and reconfigure the FPGA (quoting Ex. 1004, 12:15–28; citing *id.* at 11:63–65, Figs. 12, 13; Ex. 1004, II-232)).

As indicated above, Petitioner also persuasively shows that Patent Owner "misrepresents Dr. Franzon's testimony" regarding an alleged narrow port in Chiricescu.  *See* Reply 11.  As Petitioner persuasively argues, "Dr. Franzon's cited testimony:  (1) has nothing to do with Chiricescu; (2) was given in response to a question about Trimberger; and (3) was discussing the connection to "an **off-chip** memory."  *Id.* (citing Ex. 2012, 80:10–22).

Dr. Franzon's cited deposition testimony supports Petitioner.  Dr. Franzon's cited deposition testimony refers to Trimberger in the context of "off-chip memory that loads in through the data port," and Dr. Franzon testifies "a POSITA would interpret figure 5 [of the '951 patent] as [including an undepicted] similar narrow structure on the left of the very wide configuration data port" to load data from an external source.  *See* Ex. 2012, 80:3–22.  In other words, Dr. Franzon's testimony does not describe

49

IPR2020-01568
Patent 7,282,951 B2

Chiricescu's stacked memory layer as using a *narrow* port to transfer reconfiguration data to the RLB (with FPGA gates) layer from this "on-chip" memory within the 3-D stack. *See* Ex. 1004, Fig. 2; *supra* § II.D.2; Ex. 1070 ¶ 68 (refuting Dr. Souri's testimony and characterization with respect to Chiricescu and Dr. Franzon's testimony about Chiricescu).

As Petitioner also argues, Patent Owner's "'narrow data port' arguments are contrary to Chiricescu's teachings" and do not address the combined teachings of Chiricescu, Zavracky, and Akasaka. Reply 11 (citing PO Resp. 20–21). Petitioner notes that Zavracky describes "interconnects as being '*placed anywhere on the chip*' without restriction." *Id.* (emphasis added) (quoting Ex. 1004, 232). In addition, Petitioner notes that Chiricescu "discloses 'three separate layers with metal interconnects [including a "memory layer"] between them.'" *Id.* (quoting Ex. 1004, 232) (addition by Petitioner) (emphasis omitted). Vias running everywhere throughout the different stacked layers or dies, as Zavracky, Chiricescu, and Akasaka individually and collectively teach, distinguish over any alleged narrow port, and Petitioner provides well-known reasons for employing numerous vias of wide data ports, such as allowing for increased bandwidth and parallelism. *See* Pet. 12, 18, 20 (discussed and quoted above); Ex. 1001, 5:16–21 (describing "through-die array contacts 70 . . . routed up and down the stack in three dimensions" as "not known to be possible with any other currently available stacking techniques *since they all require the stacking contacts to be located on the periphery of the die*," so that by placing contacts throughout, "*cells that may be accessed within a specified time period is increased*") (emphasis added).

With respect to all challenged claims, Patent Owner also argues that "Petitioner and Dr. Franzon fail to explain how a POSITA would have integrated Akasaka's thousands of distributed contact points with Zavracky-Chiricescu's design to achieve the claimed 3-D processor modules and would have had a reasonable expectation of success in doing so." PO Resp. 38 (citing Ex. 2011 ¶ 78). According to Patent Owner, "Petitioner and Dr. Franzon concede that *Zavracky* and *Chiricescu* both disclose only a small number of interconnect paths (e.g., the address and data buses) that provide for vertical communications between functional blocks (such as memory elements, logic unit, etc.) of the multi-layer microprocessor." *Id.* (citing Ex. 1003, 11:62–12:39; Ex. 1004, 1–2). According further to Patent Owner, "Dr. Franzon's analysis, like Petitioner's analysis, seems to say no more than that a POSITA would have understood that the references ***could be*** combined." *Id.* at 40 (citing Ex. 1002 ¶ 239). Patent Owner also asserts that "[a]t the time of the invention, a POSITA was aware of numerous []TSV interconnection issues, such as routing congestion, TSV placement, granularity, hardware description language ("HDL") algorithms, which must be considered." *Id.* at 41 (citing Ex. 2011 ¶ 82; Ex. 2014, 85, 87, 89).

Patent Owner's arguments are unavailing. As discussed above, Petitioner persuasively relies on the knowledge of the artisan of ordinary skill and the combined teachings of Zavracky, Chiricescu, and Akasaka supported by specific reasons and rational underpinning to show how the combination teaches or suggests increasing the number of contact points or via holes for electrically coupling FPGA, memory, and processors together. Petitioner also shows the "why"—to allow for parallel data transfers, speed

IPR2020-01568
Patent 7,282,951 B2

increases, larger bandwidth, etc., all with a reasonable expectation of success.

As indicated above, Zavracky already specifically describes connecting several bus lines (depicting 4 in Fig. 13) from the FPGA/PLD to other circuits, including memory and a processor. *See* Pet. 23–24. Patent Owner contends that "Zavracky proposes using these vertical connections 'for the same reasons any lines otherwise restricted to a single layer are used.'" PO Resp. 10 (quoting Ex.1003, 6:48–49). This argument supports Petitioner, because it shows that an artisan of ordinary skill easily would and could have re-routed connections of known circuitry using vias. Petitioner shows a number of other stacked dies or layers with multiple via connections, including Akasaka (Ex. 1005, Fig. 4), Franzon (Ex. 1020, Fig. 4), Koyanagi (Ex. 1021, Fig. 1(a)), and Alexander (Ex. 1028, Fig. 2(g). *See* Pet. 31. As discussed further below, Trimberger (Ex. 1006) shows parallel loading by "*flash reconfiguring* all [100,000] bits in logic and interconnect array [i.e., an FPGA] . . . simultaneously from one memory plane." *See infra* § II.E.1 (quoting Ex. 1006, 22).[16]

Patent Owner concedes Zavracky and Chiricescu each show how to connect "memory, logic, etc." using "address and data buses," albeit on what Patent Owner describes as "only a small number of interconnect paths." PO Resp. 38  ("*Zavracky* and *Chiricescu* both disclose only a small number of interconnect paths (e.g., the address and data buses) that provide for vertical

---

[16] Petitioner employs Trimberger to address challenged claim 25 as discussed further below (§ II.E), but it is further evidence of a reasonable expectation of success as it relates to connecting several thousands of bit lines in parallel.

IPR2020-01568
Patent 7,282,951 B2

communications between functional blocks (such as memory elements, logic unit, etc.) of the multi-layer microprocessor."). But Patent Owner also agrees that the number of interconnects is not critical to the claimed invention. *See supra* § II.C (discussing Oral Hearing arguments); Tr. 49:1–9 (answering "yes, . . . if you have a very, . . . small FPGA, the number of bits can be . . . relatively smaller, but what's critical is not the number of bits and . . . . [i]t's not necessarily the number of bits that's in the configuration data port, but how they're arranged"). In any event, Petitioner shows that a large number of vias would have been obvious in view of the combined teachings, to enhance speed, allow parallel processing and data transfer, minimize latency, and maximize bandwidth, as noted throughout this Final Written Decision.

Alleging a lack of a reasonable expectation of success, Patent Owner acknowledges that "[a]t the time of the invention, *a POSITA was aware* of numerous []TSV interconnection issues, such as routing congestion, TSV placement, granularity, hardware description language ('HDL') algorithms." PO Resp. 41 (emphasis added) (citing Ex. 2011 ¶ 82; Ex. 2014, 85, 87, 89). Here, the challenged claims are broad and do not specify a minimal number of interconnections, FPGA size, or chip size that would even raise TSV congestion or other issues. The '951 patent says nothing about interconnection issues or congestion. Even if such issues were a consideration and relevant to a reasonable expectation of success given the breadth of the challenged claims, as Petitioner persuasively argues, "[t]he supposed 'TSV interconnection issues' that [Patent Owner] cursorily identifies were at most normal engineering issues, not problems preventing a

IPR2020-01568
Patent 7,282,951 B2

combination." Reply 20 (citing Ex. 1070 ¶¶ 13–28 (Dr. Franzon addressing

Dr. Souri's testimony as to the purported TSV issues)).

> For example, as Dr. Franzon credibly testifies,

> even if routing congestion or TSV placement were an issue, Kim
> gives several solutions that would have been known to POSITA,
> such as to change the TSV "coarseness" or to "increase the chip
> area to address the placement and routing congestion caused by
> TSV insertion." [Ex. 2014 (Kim),  85].  But again, the ['951]
> patent[] and claims are silent on any of these issues; Kim is at
> worst irrelevant, and at best would have actually encouraged the
> combination.

Ex. 1070 ¶ 26.  With respect to alleged HDL (hardware description

language) issues, Dr. Franzon also credibly testifies that

> Alexander (Ex. 1009) has a whole section titled "Placement and
> Routing in 3D" (Ex. 1009, p. 256).  Alexander names then-
> existing CAD tools that performed these functions, including
> DAGmap and Mondrian.  Designing distributed 3D
> interconnects was a routine engineering problem by the time of
> the Huppenthal Patents, and not an impediment to reasonable
> expectation of success in making the Zavracky, Chiricescu,
> Akasaka combination.

Ex. 1070 ¶ 27.

Petitioner provides other evidence that at the time of the invention, an

artisan of ordinary skill would have had a reasonable expectation of success

in combining the references to arrive at multiple vias connecting circuits

(including memory arrays) on stacked chips and to allow for parallel

processing or data transfers. *See, e.g.*, Pet. 8–13 (discussing known wafer

processing technology by artisans of ordinary skill supported by evidence

(citing Ex. 1002 ¶¶ 47–51, 262–266; Ex. 1001, 2:29–35; 5:13–18; Ex. 1009,

Fig. 2; Ex. 1020, 5, 9–12, Fig. 4; Ex. 1021, 17, Fig. 1(a); Ex. 1022; Ex.

1023, Fig. 4(b); Ex. 1025, code (57), 1:59–65, 2:11–13, Fig. 1; Ex. 1027,

54

IPR2020-01568
Patent 7,282,951 B2

code (57); Ex. 1030, 94; Ex. 1031, 70)), 28–29 (pointing to Zavracky's memory as an example vertical integrated circuit on stacked dies connected by via connections including vertical buses "placed anywhere on the die" and providing evidence that "each of the programmable array, microprocessor, and memory are pairwise stacked with and electrically coupled with each other" (citing Ex. 1003, 2:7–8, 2:18–22, 2:27–35, 6:43–7:9, 10:8–21, 11:63–12:2, 12:13–39, 14:51–63, Fig. 13), 25–26 (further relying on Akasaka as teaching thousands of vias to connect upper and lower circuit layers (citing Ex. 1005, 1705, 1707; Ex. 1002 ¶¶ 327–332)). Furthermore, the '951 patent describes "recently available wafer processing techniques" including those developed by "Tru-Si Technologies," indicating, for purposes of institution, that artisans of ordinary skill would have been aware of any such wafer processing techniques for forming vias at the time of the invention. *See* Ex. 1001, 2:19–40. Therefore, Petitioner persuasively shows ample evidence of a reasonable expectation of success.

In addition, as noted above, Patent Owner argued during the Oral Hearing that the number of contacts is not important, depending on the size of the FPGA, provided that the contacts allow for parallel processing. *See supra* § II.C (discussing Tr. 49:1–9 (Patent Owner arguing that the number of vias "could be as small as 32 bits . . . if you have a small FPGA, . . . . [and] [i]f you want to update something in parallel, you could update 32-bit with 32 bits," further stating that "if you have a very . . . small FPGA, the number of bits can be . . . relatively smaller, but what's critical is not the number of bits"). The challenged claims at issue here do not specify an FPGA size.

IPR2020-01568
Patent 7,282,951 B2

In any event, as summarized above, Petitioner provides persuasive motivation with a reasonable expectation of success to explain why a person of ordinary skill would have increased the number of vias using known techniques, relying on teachings that providing multiple vias in stacked chips using conventional via and metallization processing allowed for faster processing speeds and reconfiguration times, shorter latency, higher bandwidth, and  parallel processing, with a known desire for wide buses. *See* Pet. 7–12, 18–22; Ex. 1002 ¶¶ 53–57; 212–239.  Dr. Franzon also shows that the combined teachings of Zavracky and Chiricescu suggest "processing tasks . . . [in] co-stacked microprocessors and memories . . . . as good applications for 3-D stacked chips that required parallel computation."  Ex. 1002 ¶ 229.

As Petitioner also persuasively notes, Zavracky does not limit the number of connections, contrary to Patent Owner's arguments.  For example, Petitioner quotes Zavracky as describing "**inter-layer connections** [that] provide for vertical communication. . . .  [and] [s]uch connections can be placed **anywhere on the die** and therefore are not limited to placement on the outer periphery."  Reply 4–5 (emphasis by Petitioner) (quoting Ex. 1003, 6:43–47) (emphasis by Petitioner).  Petitioner quotes Zavracky as teaching "buses run vertically through the stack by the use of inter-layer connectors" in describing Figures 12 and 13.  *Id.* (quoting Ex. 1003, 12:24–26).  Petitioner persuasively explains that "Zavracky visually shows a number of vertical contacts that traverse the memory die in the internal periphery of the die and provide contacts on the surface of the memory die, just as the Board's construction requires."  *Id.* at 5–6 (annotating Ex. 1003, Figs. 12, 13).

56

Petitioner also persuasively relies on Zavracky's teaching that "this approach **accelerates** communication between the dies in the chip by way of "**smaller delays** and **higher speed** circuit performance." Reply 6 (emphasis by Petitioner) (quoting Ex. 1003, 3:4–14). Petitioner persuasively notes that Chiricescu describes Zavracky's teachings as "allow[ing] us" to build stacked circuit layers on a chip with "vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip." *See id.* (quoting Ex. 1004, 232). Petitioner also persuasively argues that Chiricescu teaches the recited "functional to accelerate" clauses, with "significantly **improved[d FPGA] reconfiguration time**" through its "interconnected layers, including a memory layer configured as a cache for fast access to 'configuration data . . . from memory off-chip.'" *Id.* at 6 (quoting Ex. 1004, 232) (emphasis by Petitioner). Other than disclosing an 8-bit configuration port as prior art with respect to Figure 3, the '951 patent does not specify how many via interconnections the claimed "accelerate" functionality requires. *See id.* at 2:56–3:2 (describing stacking an FPGA with a "memory die" "for the purpose of accelerating FPGA reconfiguration" and "for the purpose of accelerating external memory references" and stacking "a microprocessor, memory and FPGA . . . for the purpose of accelerating the sharing of data"), 5:20–21 (describing cache memory purpose of serving "its traditional role of fast access memory").

Patent Owner restricts Chiricescu teachings as suggesting only "the use of 'on-chip' memory to mitigate the time it takes to transfer configuration data from 'off-chip,' rather than making any use of Zavracky's die-area vertical interconnections to transfer configuration data from the 'on-chip' memory into the FPGA." *See* PO Resp. 29 (citing Ex. 1004, 1, 3).

IPR2020-01568
Patent 7,282,951 B2

Patent Owner also argues that "[n]either *Zavracky* nor *Chiricescu* even contemplate using die-area inter-layer vertical interconnections to move data between a programmable array and a memory, such as is recited in Claims 1, 5, 10, 16, 18, and 23." *Id.* at 29 (citing Ex. 2011 ¶ 66). The record does not support this line of argument. As discussed above, Zavracky's Figure 13 shows that Zavracky contemplates moving data on vertical buses between RAM memory 808 (and RAM memory on processor layer 806) and programmable array 802 (Ex. 1003, 12:29–39), and Chiricescu's Figure 2 shows that Chiricescu contemplates moving data on "vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip" (based on Chiricescu's characterization of Zavracky) between memory layer and the "sea of gates FPGA" RLB layer (Ex. 1004, II-232); *see also* Ex. 1004, II-232 § 1 ("Another feature of our architecture is that a layer of on-chip random access memory is provided to store configuration information.").

Also, Petitioner shows persuasively that an artisan of ordinary skill would have recognized that speed improvement emanates largely from shorter interconnection distances and/or parallel processing using a large number of vias (as compared to long metal connections running on the same plane). *See* Reply 6 (arguing Zavracky's "approach **accelerates** communication between the dies in the chip by way of '**smaller delays** and **higher speed** circuit performance'" (emphasis by Petitioner (quoting Ex. 1003, 3:4–14)), and arguing that "Zavracky's short interior 'inter-layer connectors' to stacked 'random access memory . . . results in **reduced** memory access **time**, **increasing the speed** of the entire system.' (emphasis by Petitioner (quoting 11:63–12:2)).

IPR2020-01568
Patent 7,282,951 B2

Patent Owner's observations support Petitioner.  For example, asserting that "[t]he '951 Patent provides accelerated external memory references due to its technique of stacking a programmable array with a memory die using through silicon vias (TSVs)," Patent Owner quotes the '951 patent as providing "increased" "bandwidth" and providing the "traditional role of fast access memory."  *See* PO Resp. 19–20 (quoting Ex. 1001, 5:18–28).

Patent Owner also argues that "[b]ecause Petitioner does not allege that any 'external memory references' occur in *Chiricescu* (let alone that such references are accelerated), Petitioner cannot have met its burden to establish that Claims 1, 5, 10, 16, and 23 and their dependents are obvious." PO Resp. 23.  According to Patent Owner, "Petitioner misinterprets the term 'external memory references,' suggesting that this term too can be satisfied simply by storing a certain type of data in Chiricescu's memory." *Id.* (citing Pet. 32–33; Ex. 1002 ¶ 307).  Patent Owner also argues that "memory references are not data, but are instructions directed to a particular place memory address [sic] in memory." *Id.* (citing Ex. 2011 ¶ 60; Ex. 2015, 181; Ex. 2012, 49:11–50:1).

These arguments are unavailing.  Dr. Souri's cited declaration testimony does not tie his opinion that "[a] skilled artisan understands that memory references are not data" to the limitations recited in claim 1, 5, 10, 16, and 23 as viewed in light of the '951 patent specification. *See* Ex. 2011 ¶ 60.  In addition to citing the Dr. Franzon's deposition testimony, which does not support Dr. Souri as indicated above, Dr. Souri cites "Ex. 2015 at 181." This particular extrinsic evidence, which includes a single page out of what appears to be a text book, is not helpful because it does not have

59

anything to do with accelerating memory references, and it describes types of "operands," which are not at issue in the '951 patent. *See* Ex. 2015, 181 ("The third type of operand is a memory reference."). In other words, Dr. Souri's testimony is conclusory as it does not address how this extrinsic evidence relates to the recited "functional to accelerate external memory references" clause as recited in the challenged claims and in the context of the cache memory or reconfiguration scheme as set forth in the '951 patent specification. *See* Ex. 2011 ¶ 60 (citing Ex. 2015, 181). Patent Owner and Dr. Souri also do not explain clearly how the cited deposition testimony of Dr. Franzon supports Patent Owner. *See* PO Resp. 23 (citing Ex. 2012, 49:11–50:1; Ex. 2011 ¶ 60); Ex. 2012, 49:11–50:1 (generally testifying that "Chiricescu's FPGA processing element" is "agnostic" as "to what actually is stored in it").

Petitioner persuasively shows that caching external memory references in a stacked cache memory satisfies the "functional to accelerate" limitations relative to loading them from off-chip (outside of the stack), because of "caching" *and* "the use of short electrical paths, or significantly increased number of connections," including "Akasaka's area-wide distributed interconnects." *See* Reply 8 (citing Pet. 13–31, 44–47); *see also id.* at 12 (discussing hitting the cache with external memory references (citing Ex. 1002 ¶¶ 215–216; Ex. 2012, 42:9:14, 48:6–50:1)).

Petitioner also persuasively explains that even under Patent Owner's narrow interpretation of "external memory references" as related to memory addresses, Chiricescu teaches that interpretation because the memory address references will "hit" the cache. *See* Reply 11–12 (citing Ex. 1002

IPR2020-01568
Patent 7,282,951 B2

¶¶ 215–216).  Supporting Petitioner, Dr. Franzon persuasively testifies at the
cited paragraphs of his declaration as follows:

> 215. . . . The POSITA would recognize that what
> Chiricescu is teaching is to use that memory as a "cache" . . . .
> By doing so, the FPGA's external memory references . . . will be
> accelerated because [they] will "hit" in the "cache" and be
> returned from the on-chip memory without having to go off-chip.
> 216.   Chiricescu is thus teaching to the POSITA to
> accelerate memory lookups that are directed to the external chip
> by sending them instead to the on-chip memory, perhaps keeping
> a relevant set of data to the application.  This is what Chiricescu
> means when it says that "a management scheme similar to one
> used to manage cache memory can be used to administer the
> configuration data."

Ex. 1002 ¶¶ 215–216; Reply 12 (quoting part of the same two paragraphs).

As Petitioner also persuasively argues, the '951 patent does not limit
"external memory references" in particular, but it does refer to cache
memory and enhancing reconfiguration speed with such memory.  *See* Reply
12 (citing Ex. 1001, 2:11, 2:25, 4:31, 4:57–58); Ex. 1001, 4:31–36 (referring
to "cache memory 66" as serving its "traditional role of fast access
memory," and also including accessing by "both the microprocessor 64 and
FPGA 68 with equal speed," in the context of "reconfigurable computing
systems").

Patent Owner also argues that "[b]ecause the claims require a
'*memory array* is functional to accelerate external memory references to
said processing element,' Petitioner's focus on the type of data stored in the
array misses the mark."  PO Resp. 23 (citing Ex. 2012, 43:13–44:3,
49:20–50:1).  Contrary to this argument, as discussed above, Petitioner relies
on a cache memory array as combined in a 3-D stack with short via
connections, not the type of data.  As discussed throughout this Final

IPR2020-01568
Patent 7,282,951 B2

Written Decision, the Petition persuasively relies on such short and
numerous distributed vias as structure for the "functional to accelerate"
clauses, because such structure provides shorter path delays and allows for
increased bandwidth and parallel data transfer from a memory in the stack,
including cache memory. *See supra* § II.D.3 (Akasaka's parallel processing
and multiple via teachings); Pet. 7–12, 18–22; Ex. 1002 ¶¶ 53–57, 212–239.
Essentially, the cache memory relied upon by Petitioner carries all of these
advantages because it is within Zavracky's modified 3-D stack with the
FPGA and microprocessor.[17]

---

[17] Throughout its briefing, Patent Owner limits all "on-chip" advantages to a
*single die* and confuses issues by arguing that even chips in the same stack
are "off-chip" relative to each other, such that all "off-chip" vias are part of a
"narrow" data port—even with thousands of vias connecting chips in the
same stack as proposed by Petitioner. On the other hand, Petitioner, like
Zavracky, generally refers to "off-chip resources" to refer to a resource
*outside* of a *chip stack*. *See, e.g.*, Pet. 51 ("The data bus is used to 'provide
communication between logic units or between a logic unit and
off-chip resources.'" (quoting Ex. 1003, 5:49–52)); Ex. 1003, 5:53–54
("Paths which connect off-chip are routed to bonding pads 226 [Fig. 1],
which are bonded to the chip carrier pins."); Ex. 1070 ¶ 44 (Dr. Franzon
noting that "Dr. Souri apparently means 'chip' here as limited to a single
die."). Patent Owner exploits this difference of terminology usage to
confound issues, characterizing, for example, Dr. Franzon's testimony as
follows: "Dr. Franzon's testi[fies] that '*off-chip* access [*e.g.*, *off-chip*
memory separate from the FPGA die] can't be, for example, 100,000 bits
wide." Sur-reply 9 (emphasis added) (second bracketed information by
Patent Owner). As another example, Patent Owner argues that Petitioner
"rel[ies] on Dr. Franzon's discussion that thousands of interconnections for
*off-chip* access of a 3D stacked structure is not feasible." *Id.* (emphasis
added (citing Reply 18)). This conflation is the opposite of Dr. Franzon's
testimony and Petitioner's showing. The thrust of Dr. Franzon's testimony
and Petitioner's showing is that numerous stacked via connections in a stack
of chips (dies) or layers of a single chip are better (faster, shorter, less
congested, etc.) than connections running on the same plane. *See, e.g.*,

In the Sur-reply, Patent Owner argues that "[t]he entire point of *Chiricescu* is that it achieves accelerated FPGA configuration by storing configuration data 'on-chip' so that it does not need to load configuration data from off-chip." Sur-reply 5. Patent Owner also argues that "all off-chip connections are carried out through a typical narrow configuration data port, that suffers the same problems as the prior art distinguished in the '951 Patent." *Id.* Patent Owner then argues that "moving *Chiricescu's* cache memory off-chip (i.e., into *Zavracky's* 3-D stacked memory die) eliminates the benefit gained from moving the memory on-chip, [so] a POSITA would not have contradicted *Chiricescu's* fundamental teachings to arrive at Petitioner's proposed combination." *Id.* at 5–6.

These arguments mischaracterize Petitioner's showing and confuse the issues. *See supra* note 17. Patent Owner essentially conflates narrow ports having large signal delays over long electrical planar paths with "all off-chip connections" as applying to Zavracky's 3-D stack by referring to each separate chip in Zavracky's modified 3-D stack as "off-chip" and ignoring the central fact that each chip in Zavracky directly connects to the other chips in the 3-D stack by numerous short vias. There is no support for this line of argument. Moreover, "Dr Franzon not[ed] the routine use of on-

---

Reply 17–18 (characterizing Dr. Franzon's testimony as "noting the routine use of on-chip area-wide connections in 3D stacks, including his prior work." (citing Ex. 1020; Ex. 1002 ¶¶ 47–51; Ex. 1070 ¶¶ 65, 68)); Ex. 1070 ¶ 44 ("But a POSITA would have recognized that [a] 3D chip that consists of multiple dies would do a better job than the 2D chip and provid[e] fast large connectivity. . . . The point here is that a shorter vertical interconnect allows for a shorter 'longest path' and a faster chip. This was commonly understood in the other art as well. . . . [such as] Akasaka's . . . 3-D 'high speed performance'" (citing Ex. 1005, 1705)).

chip area-wide connections in 3D stacks, including his prior work." Reply
17–18 (citing Ex. 1002 ¶¶ 47–51; Ex. 1070 ¶¶ 65; Ex. 1020; *see also*
Ex. 1004, Fig. 2, II-232 § 1 (describing "on chip random access memory . . .
provided to store configuration memory"—i.e., the memory layer of Figure
2). Patent Owner agrees that Chiricescu discloses "on-chip cache memory"
as a separate layer of an FPGA chip, further suggesting providing a separate
layer in Zavracky's modified stack of layers. *See* Sur-reply 5.

Nevertheless, Patent Owner contends that "the movement of
*Chiricescu's* on-chip cache memory to *Zavracky's* off-chip memory would
throttle" speed gains. Sur-reply 5. For the reasons explained above, this line
of argument confuses issues and mischaracterizes Petitioner's showing. *See
supra* note 17. Chiricescu's teachings bolster Zavracky's FPGA teachings,
and Petitioner shows that in this context, Zavracky describes a memory
layer, microprocessor layer, and FPGA layer in a 3-D stack with each layer
connected by numerous short vias to increase speed and provide other
advantages. *See, e.g.*, Pet. 14–15, 23–33. Patent Owner's attempt to
conflate all "off-chip" narrow port disadvantages to Zavracky's modified
stack of chips by calling chips in that stack "off-chip" is unsupported. As
Petitioner persuasively shows throughout its briefing, Zavracky's stack of
chips, connected by numerous vias, and bolstered by Akasaka's numerous
via and Chiricescu's FPGA teachings, operates just like Chiricescu's "on-
chip" circuit layers in a single chip connected by numerous vias in terms of
speed and acceleration. *See* Reply 6 ("Zavracky's short interior 'inter-layer
connectors' to stacked 'random access memory . . . results in **reduced**
memory access **time**, **increasing the speed** of the entire system,'" and
"Chiricescu also teaches the **acceleration** advantages and 'significantly

**improve[d FPGA] reconfiguration time'** achieved by its interconnected layers, including a memory layer configured as a cache for fast access to 'configuration data . . . from memory off-chip.'" (quoting Ex. 1003, 11:63–12:2; Ex. 1004, 23[4])), 7 (noting Akasaka's "**acceleration** advantages" based on "teaching, e.g., that '[h]igh-speed performance is associated with shorter interconnection delay time and parallel processing' and that 'shortening of interconnections and signal transfer through vertical via holes in the 3-D configuration provides advantages for the design of large-scale systems.'" (quoting Ex. 1005, 1705)).  In other words, as Petitioner shows, in addition to "stacking techniques," "[t]he Zavracky-Chiricescu-Akasaka Combination also discloses the other ways that the '951 patent even arguably implies increases speed—i.e., through caching, the use of short electrical paths, or significantly increased number of connections." *Id.* at 8 (citing Pet. 14–22).

Patent Owner similarly contends that "Dr. Franzon admitted that a wide configuration data port that accelerates a programmable array's external memory references to a stacked memory die as compared with the slow narrow bus disclosed in Chiricescu was not obvious at the time of the invention."  PO Resp. 33 (citing Ex. 1012, 71:19–72:1).  Based on this contention, Patent Owner also argues that "the wide configuration data port of the '951 Patent provides precisely the answer to what Dr. Franzon admits was practically impossible at the time of the invention."  *Id.* at 33–34 (citing Ex. 1012, 71:19–72:1, 80:3–22; Ex. 1011 ¶ 72).  Patent Owner adds that this "skepticism of Petitioner's own expert demonstrates that the challenged claims are patentable."  *Id.* at 34 (citing Ex. 1011¶ 73).  Contrary to this line of argument, similar to the discussion above, Dr. Franzon does not admit

65

that a wide configuration data port was not obvious, and does not admit that
Chiricescu discloses a narrow data bus for transferring data between its
stacked layers. *See* Ex. 1012, 71:19–72:1, 80:3–22; *supra* note 17. Rather,
at the cited deposition testimony, Dr. Franzon testifies that "*off-chip* [i.e.,
external] access can't be, for example, 100,000 bits wide." Ex. 1012, 71:21–
23. Here, in context, Dr. Franzon states that "you can't have that number of
IO. . . . in [the] *case of Trimberger and the '226 patent* [which is related to
the '951 patent, *see* IPR2020-01571] *memory going form the external to the
module*." *Id.* at 71:23–72:1 (emphasis added). Here again, Patent Owner
conflates a narrow data port from a data source "external to the module"
(i.e., external to the claimed 3-D stack) with a wide data port from a memory
*within the stack* to other chips *in that stack*.

Patent Owner argues that "*Chiricescu* says . . . [that] '[t]he elimination
of loading configuration data on an as needed basis from memory off-chip
significantly improves the reconfiguration time for an on-going
application.'" Sur-reply 4–5 (quoting Ex. 1004, 234). Based on this "off-
chip" characterization, Patent Owner argues that "Petitioner concocts its
hypothetical structure based on its demonstrably false claim that
*Chiricescu's* improved FPGA reconfiguration time 'is achieved by its
interconnected layers, including a memory layer configured as a cache for
fast access to "configuration data . . . from memory off-chip."'" *Id.* at 4
(quoting Reply 6; last internal quote quoting Ex. 1004, II-234). Patent
Owner contends that "*Chiricescu* says just the opposite." *Id.* at 5 (citing
Ex. 1004, 234).

Again, contrary to this line of argument, Petitioner's showing is
opposite to how Patent Owner characterizes it. In other words, Petitioner

IPR2020-01568
Patent 7,282,951 B2

argues that Chiricescu improves FPGA reconfiguration time because Chiricescu's cache pre-stores and holds configuration data on-chip that it obtains from an external source (i.e., off-chip memory)—so that the FPGA need not access that external (off-chip memory) source to load the FPGA through a "typical narrow configuration data port" (Sur-reply 5) during FPGA reconfiguration. *See* Reply 6; Ex. 1004, II-234 ("The elimination of loading configuration data on an as needed basis from memory off-chip significantly improves the reconfiguration time for an on-going application."); *see also supra* n.17. In other words, it is because of the numerous short vias within Chiricescu's layered chip that it reconfigures the FPGA/RLB layer from the stacked memory layer more quickly as compared to reconfiguring it through long data lines from an external source. *See* Ex. 1004, II-232, II-234, Fig. 2.

Petitioner also persuasively addresses Patent Owner's argument that the claims require acceleration over a "baseline" and other related arguments. *See* PO Resp. 20–22; Reply 11–12 (persuasively arguing that the combined teachings contribute to acceleration, the combination does not include a "narrow port," and "Dr. Franzon testified in both his declaration and deposition that the Zavracky-Chiricescu-Akasaka combination provides acceleration compared to the baseline of other prior art with different structural characteristics." (citing Ex. Ex. 1002 ¶¶ 212, 215–17, 304–05; Ex. 2012, 28:9–21, 29:15–33:15)); *see also supra* §§ II.C (claim construction in relation to prior art Figure 3's 8-bit narrow port—i.e., one type of baseline). Zavracky by itself, for example, indicates that 32 bit microprocessors were routine in 1993, years before the effective date of the invention, indicating that Zavracky's microprocessor buses at least handled

IPR2020-01568
Patent 7,282,951 B2

32 bits in parallel. *See* Ex. 1003, 1:6–8 (continuity date of 1993), 31–40 (discussing prior art microprocessors). As noted above, Patent Owner indicated during the Oral Hearing that the challenged claims embrace devices transfer data over a port that "could be as small as 32 bits . . . if you have a small FPGA, right? If you want to update something in parallel, you could update 32-bit with 32 bits?" Tr. 49:1–9; *supra* § II.C (claim construction)

Patent Owner also argues that "major modifications would need to be made to the combination of *Zavracky* and *Chiricescu* in order to configure a stacked module to meet the acceleration limitations of Independent Claims 1, 5, 10, 16, and 23." PO Resp. 32. Patent Owner explains that this major modification requires a "wide configuration data port (or other similar structure) between the memory and the FPGA." *Id.* Patent Owner also argues that such a modification would "alter *Chiricescu's* principle operation, which relies on an entirely different strategy for routing data throughout the FPGA, namely its narrow RLB Bus and its 'routing layer,' which *Chiricescu* declares '***is of critical importance*** since it is used for the implementation of the interconnection of the non-neighboring RLBs.'" *Id.* (quoting Ex. 1004, 2) (emphasis by Patent Owner).

Here, Patent Owner concedes that "the '951 Patent discloses a memory array that achieves the claimed acceleration (*i.e.*, utilizing a *portion of the wide configuration data port*), which significantly reduces the amount of time it takes to move data from a memory die into a programmable array." PO Resp. 33 (emphasis added). Patent Owner does not describe what "portion" of the wide configuration data (which Figure 5 of the '951

68

patent depicts as a black box) the claimed "functional to accelerate" limitations require.

With respect to Chiricescu's principle of operation, as Petitioner also persuasively argues, no "'modifications' are required to Chiricescu at all because the Petition's combination involves 'fold[ing] in Chiricescu's teachings (including using stacked memory to reconfigure[] the FPGA) with Zavracky's 3D stacks." Reply 17 (quoting Pet. 19). Even if employing Chiricescu's FPGA structure also suggests implementing its routing layer on a separate layer, contrary to Patent Owner's arguments, Chiricescu does not describe its routing layer as a narrow port. *See id.* (noting that Dr. Franzon did not admit Chiricescu includes a narrow port and citing Dr. Franzon's testimony that on-chip area-wide connections in 3-D stacks were well-known (citing Ex. 1002 ¶¶ 47–51; Ex. 1070 ¶¶ 65, 68)). Also, Chiricescu's Figure 2 depicts connections between the memory layer, routing layer, and RLB layer (a "sea-of-gates FGPA structure") with connections that are distinct from the RLB bus. Ex. 1004, II-232 § 2.1, Fig. 2. Chiricescu notes that "routing congestion will also be improved by the separation of layers," further suggesting that the routing layer is not part of a narrow port and suggesting stacking of separate layers in Zavracky's stack. *Id.* at II-232.

As Petitioner persuasively argues, "Chiricescu describes 'vertical metal interconnections (i.e., interlayer vias),' and '**three separate layers with metal interconnects between them**.'" Reply 15 (citing Ex. 1004, II-232). Chiricescu's "express 'architecture is based on' technology developed by Zavracky at Northeastern University." *Id.* (quoting Ex. 1004, 232). And Chiricescu states that Zavracky's architecture provides "3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) *placed*

*anywhere* on the chip." *Id.* at II-232 (emphasis added). Therefore, contrary to Patent Owner's arguments, Chiricescu's principle of operation does not require a narrow port. *See also* Reply 15 ("The combination involves 'fold[ing] in Chiricescu's teachings (including using stacked memory to reconfigure the FPGA) with Zavracky's 3D stacks.'" (citing Pet. 19)). Increasing via connections based further on Akasaka's teachings would have been obvious by facilitating more connections between well-known available circuits such as memory, FPGA, and processors. *See, e.g.*, Reply 19 ("Zavracky and Chiricescu envision connections 'anywhere on the die.'" (citing Pet. 20–22; Ex. 1002 ¶¶ 41–51, 237–238)); Pet. 22 ("Akasaka's distributed contact points would have been the logical extension to Zavracky and Chiricescu's teaching of connections anywhere, especially in view of the POSITA's background knowledge." (citing Ex. 1002 ¶ 239)).

Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections below that tend to overlap to a certain extent with issues in the instant section due to the format of the Response, Petitioner persuasively shows that claims 1, 2, 4–6, 8–16, 23, 27, and 29 would have been obvious.

6.    *Claims 17 and 24*

As determined above (§ II.D.5), independent claims 16 and 23 are materially the same as claim 1, and Petitioner largely relies on its showing for claim 1 to address those independent claims. Pet. 44–45, 49–50. Claims 17 and 24 respectively depend from independent claims 16 and 23 and recite "wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as said processing element." Petitioner

70

relies on its showing in claim 1, including Chiricescu's disclosure about accelerating FPGA reconfiguration using a memory array.  *See* Pet. 45, 49–50.

Further regarding claims 16 and 23, as discussed above in connection with claim 1, Zavracky discloses a random access memory layer, or memory array, with buses running through the vertical stack that contains a microprocessor, FPGA, and memory.  *See* Pet. 32 (citing Ex. 1003, Figs. 10, 13, 11:63–65, 12:33–35).  Chiricescu describes using a random access memory layer as a cache memory to reconfigure the FPGA as a processing element.  *Id.* (citing Ex. 1004, II-232, II-234).  As also indicated above in connection with claim 1, Petitioner provides multiple reasons to combine Zavracky, Chiricescu, and Akasaka, including to allow for speed and bandwidth gains and parallelism, and minimize reconfiguration and propagation delays, with a well-known desire to increase bus sizes.  *See* Pet. 12, 18, 20; Reply 5–8.  Petitioner also contends it would have been obvious to employ Chiricescu's cache memory teachings in the combined 3-D stack to reconfigure data in order to accelerate access to the external memory references of claim 1.  *See* Pet. 32 ("Therefore, when the FPGA (i.e., the processing element) needs to be reconfigured, with new data, access to that data is accelerated by already having been loaded into the memory array." (citing Ex. 1004, II-234) (emphasis omitted).

Addressing claims 17 and 24, Patent Owner argues that "[t]he *Zavracky-Chiricescu-Akasaka* combination fails to teach or suggest a 3-D processor module that includes a second integrated die element, separate from a first integrated die element having a programmable array, wherein the 'memory array is functional to accelerate reconfiguration of said field

IPR2020-01568
Patent 7,282,951 B2

programmable gate array as a processing element.'" PO Resp. 24. Patent Owner states the "cited references" do not teach or suggest the "functional to accelerate external memory references" and "functional to accelerate reconfiguration" clauses, points to Petitioner's rationale with respect to claim 1 as discussed in the previous section (§ II.D.4), and concludes that claims 17 and 24 "are patentable." *Id.* at 24 (noting that "Petitioner relies on the same rationale for this claim element as it did for the element discussed directly above, i.e. 'memory array is functional to accelerate external memory references to said processing element'").

In other words, Patent Owner does not argue claims 1, 16, 17, 23, and 24 separately in a clear fashion. As noted above, claims 16 and 23 are materially the same as claim 1, and we address arguments with respect to claims 1, 16, and 23 (which Patent Owner groups together) above. *See supra* §§ II.D.4–5.

Patent Owner's argument with respect to claims 17 and 24, which essentially lists the limitations thereof and concludes that Petitioner fails to show obviousness, does not undermine Petitioner's persuasive showing for these claims as summarized herein and also for the reasons discussed in this section and above in connection with claim 1 and other argued claims. As summarized above, Petitioner's showing that external memory references in the combined teachings of include data or other references for reconfiguring the FPGA is persuasive. *See* Pet. 31–33, 44–45, 49–50; *supra* §§ II.D.4–5.

We adopt and incorporate Petitioner's showing for claims 17 and 24, as presented in the Petition and summarized above, as our own. Pet. 7–12, 14–22, 45, 49–50. Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above

and below that tend to overlap to a certain extent with issues in the instant section due to the format of the Response, Petitioner persuasively shows that claims 17 and 24 would have been obvious.

> 7.    *Claims 18–22*

Independent claim 18 is similar to claim 1 and recites a "reconfigurable processor module comprising" at least three integrated circuit elements including "a programmable array including a processing element," a processor electrically coupled thereto, and "a memory stacked with and electrically coupled" to both integrated circuit elements, "whereby said processor and said programmable array are operational to share data therebetween."

Addressing the three integrated circuit elements, Petitioner relies on its similar showing with respect to claims 1, 4 (third integrated circuit), 9 (third integrated circuit is a memory), and 10 (programmable array, processor, and memory electrically coupled with memory functional to accelerate external memory references). *See* Pet. 23–33, 35–36, 40–42, 45–46. Petitioner relies on Zavracky's disclosure of programmable logic array 802 (FPGA) in a stacked 3-D processor module with microprocessor layers 804 and 806 (Ex. 1003, Fig. 13), and Chiricescu's teaching of a 3-D chip comprising FPGA, memory, and routing layers (Ex. 1004, Fig. 2). *See id.* Further relying on Zavracky's Figure 13, Petitioner asserts that "each of the programmable array, microprocessor, and memory IC functional elements are pair-wise stacked with and electrically coupled with each other" through vertical vias and buses. *Id.* at 28–29 (also noting that Zavracky teaches that "[i]nter-layer connections . . . can be placed anywhere on the die" of the functional element(s), meaning the connections "are not limited to

placement on the outer periphery" (quoting Ex. 1003, 6:43–7:9)).  Petitioner also relies on Akasaka's teaching and suggestion that in a 3-D stack, "[e]ach active layer is connected electrically through via holes" (*id.* at 30 (quoting Ex. 1005, 1707)), and on similar motivation as for claim 1 (*see id.* at 18–22, 31–33, 48 (citing Pet. § VII.A.4; Ex. 1002 ¶¶ 233–239, 347–348)).

Addressing the claim 18 limitation "whereby said processor and said programmable array are operational to share data therebetween," Petitioner refers to Akasaka's disclosure of 3-D chips wherein "memory data are kept common by the interlayer (vertical) signal [so that] **each processor can use the common memory data**."  Pet. 49 (emphasis by Petitioner) (quoting Ex. 1005, 1713).  In addition, Petitioner argues that "the POSITA knew of the need for replicated 'common data memory' in stacked designs, including as taught in Akasaka, to enable, e.g., multi-processor cache coherence." *Id.* at 21 (citing Ex. 1002 ¶ 236; Ex. 1034, 466–469; Ex. 1005, 1713, Fig. 25).  Petitioner further explains that "[t]hat structure would be more difficult to accomplish with a limited number of interconnections as in Zavracky," further motivating "[a] POSITA . . . to seek out Akasaka's distributed contact points in order to build a "common data memory." *Id.* at 20 (citing Ex. 1002 ¶ 237).

Petitioner also relies on Akasaka's teaching that that "information signals can be transferred" through "several thousands or tens of thousands of via holes . . . present in these devices" to further suggest employing Akasaka's "thousands of via holes in the context of Zavracky" as further suggesting the claimed data sharing feature.  Pet. 47–48 (first two quotes quoting Ex. 1005, 1705; citing Ex. 1002 ¶¶ 233–239, 347–348).  As noted throughout this Final Written Decision, Petitioner also relies on known

benefits of increased speed, bandwidth, and capability for parallel processing based on well-known teachings, to suggest stacking layers, including memory layers, using numerous vias, to combine the teachings of Zavracky, Chiricescu, and Akasaka. *See id.* at 8–9, 12, 17–22. For example, Petitioner states that "[t]he POSITA would have sought out Akasaka's connectivity to improve Zavracky's stacks in applications requiring parallel processing. Such applications included image processing algorithms [that] run simultaneously over an entire image in memory." *Id.* at 20–21 (Ex. 1002 ¶ 235; Ex. 1048; Ex. 1005; Ex. 1021).

Petitioner explains that Zavracky also teaches that its programmable logic 802 is an FPGA and serves as "an intermediary between 'the microprocessor and any off-chip resources.'" Pet. 47 (citing Ex. 1003, 12:28–36). Petitioner also relies on Zavracky's "[i]nterconnect lines" operating as a "data bus." *Id.* (quoting Ex. 1003, 6:39–42). According to Petitioner, a "POSITA would have recognized that communication between 'the microprocessor and any off-chip resources' via the FPGA (under the Zavracky-Chiricescu-Akasaka Combination as explained in [1.1], [1.2] and [2]) means that data is shared between the microprocessor and the FPGA." *Id.* (citing Ex. 1002 ¶ 342).

Claims 19–22 depend from independent claim 18. Claim 19 recites "wherein said memory is operational to at least temporarily store said data." *See* Pet. 48–49. Petitioner argues that "[t]he POSITA would have understood that memory is—by definition—operational to at least temporarily store data." *Id.* at 48 (citing Ex. 1002 ¶ 308 (citing Ex. 1039 (trade dictionary defining memory)). Petitioner also relies on Akasaka's shared memory as discussed above and further below in connection with

IPR2020-01568
Patent 7,282,951 B2

claim 18. *See id.* (citing Ex. 1005, 1713). Petitioner asserts that the added claim limitations of claims 20–22, which depend from claim 18 and recite an "FPGA," a "microprocessor," and a "memory array," respectively, read on Zavracky's stack as depicted in Figure 13. *See id.* at 49 (relying on the analysis for claims 1, 2, and 10); *supra* § II.D.4 (analyzing claims 1, 2, and 10). In other words, Petitioner relies on its showing with respect to materially the same limitations in claims 1, 2, and 10 to address claims 20–22. Pet. 49. Patent Owner does not challenge claims 19–22 separately.

Addressing claim 18, Patent Owner argues that "[t]he *Zavracky* microprocessor and programmable logic are not operational to ***share*** data, such as might be stored in a stacked memory die, for example." PO Resp. 25 (citing Ex. 2011 ¶ 63). Patent Owner reproduces the following diagram from Dr. Souri's declaration to illustrate its point:



Ex. 1012 ¶ 63. According to Patent Owner, Zavracky's microprocessor on the left does not share data with the FPGA (PLD) on the right, because "it is the output of Zavracky's microprocessor that is sent to the FPGA." PO Resp. 25 (citing Ex. 1012 ¶ 63).

Patent Owner attempts to distinguish "sharing" data and "transferring" data by arguing that "[t]he claims require more than a processor transferring data to a field programmable gate array." *See* PO Resp. 25–26. Neither the '951 patent specification nor claim 18 requires this distinction.

IPR2020-01568
Patent 7,282,951 B2

Nevertheless, Patent Owner argues that shared data "might be stored in a stacked memory die, for example." PO Resp. 25. Grouping claims 18–22 together, Patent Owner similarly argues in its Sur-reply that "[a] POSITA would recognize that this data on the stacked memory die is literally 'data shared between a microprocessor and an FPGA.'" Sur-reply 11–12 (citing Ex. 2011 ¶ 64; Ex. 1001, 2:1–9, 2:56–60, 5:18–29).

 Contrary to this line of argument, claims 18–22 do not require a "stacked memory die" to hold data to support the recited shared data functionality. Although claim 19 recites "wherein said memory is operational to at least temporarily store said data," claim 19 is broad enough to read on Zavracky's modified memory (which is operational to store the shared data) *after* the microprocessor and FPGA (are operational to) share it per claim 18. *See* Pet. 48 (arguing that "[t]he POSITA would have understood that memory is—by definition—operational to at least temporarily store data" (citing Ex. 1002 ¶ 308 (citing Ex. 1039 (trade dictionary defining memory)).[18]

Moreover, even under Dr. Souri's diagram of Zavracky's process, Zavracky's microprocessor processes the input data to create the shared output data, and then transfers that shared output data onto the data bus and then to the FPGA. *See* Reply 13–14 (citing Ex. 1070 ¶¶ 73–74; Ex. 1083); Ex. 1070 ¶ 73 (quoting Ex. 1083, 1:26–34 (describing computers "shar[ing] data" by "transfer[ing] data")); Pet. 47–48 (citing Ex. 1002 ¶¶ 343–349). As

---

[18] As indicated herein, Patent Owner does not address Petitioner's persuasive showing for claim 19 separately from claim 18. Petitioner also persuasively relies on Akasaka's shared memory for claims 18–22 as discussed further below. *See* Pet. 47–50 (citing Ex. 1005, 1713).

IPR2020-01568
Patent 7,282,951 B2

discussed further below, Petitioner also persuasively explains how Zavracky's microprocessor and FPGA share and process the same data from off-chip resources to implement a user-defined protocol.  *See* Pet. 47.

Patent Owner also argues that Petitioner's theory based on Akasaka's teaching and suggestion to share "'common memory data' does not cure this fundamental deficiency in *Zavracky* because it also does not involve any processing of data shared between a microprocessor and an FPGA (or any other type of chip)."  PO Resp. 26.  Claims 18–22 do not require "processing of [shared] data," but even if the claims imply that interpretation, the combined teachings suggest it, as Petitioner persuasively shows as discussed next.

To support its point, Patent Owner reproduces *Akasaka's* Figure 25 as follows:



(c)

**Fig. 25.**  New concept of 3-D IC. (a) 3-D PLA model (by Prof. T. Nanya of the Tokyo Institute of Technology). (b) Integration of CAM RAM in the same chip (by T. Ogura of NTT). (c) Common memory data system for 3-D memory chip (by Prof. M. Hirose of Hiroshima University).

PO Resp. 27.  Figure 25(c) above depicts a "[c]ommon memory data system for a "3-D memory chip" wherein processors 1, 2, n (on the left) share data

on memory layers 1, 2, n (on the right).  Ex. 1005, 11.  Akasaka states that "memory in each chip belongs to corresponding independent microprocessors in the same layer, *and the memory data are kept common by the interlayer (vertical signal) transfer*."  *Id.* (emphasis added).

Patent Owner argues that "although *Akasaka* proposes that memory data is 'kept common by the interlayer (vertical) signal transfer,' the individual microprocessors do not process any shared data because each only processes the data in its corresponding memory."  PO Resp. 27.  This argument misses the mark, because Akasaka's system transfers the same data between the memories so that each processor is operational to process the same data.  Stated differently, Akasaka contradicts Patent Owner's argument that transferring the same data at one memory location (the "common" data in Akasaka) to another memory location shows a lack of data sharing—i.e., Akasaka describes the data as "common."  *See* Ex. 1005, 11.

As to sharing data between a processor and an FPGA, Petitioner relies on Akasaka's teaching as suggesting the sharing of common data through vertical data transfers in the combined 3-D structure of Zavracky, Chiricescu, and Akasaka, instead of relying on a bodily incorporation of the processor memory layer scheme of Akasaka.  *See* Pet. 47–48; Reply 14 (arguing that Patent "attacks the physical die-stacking technique in Akasaka—but Zavracky already teaches stacked memories that are interconnected to other dies in the stack, and also teaches memories can be at any layer" (citing Ex. 1003, 11:63–12:2, Figs. 10, 12)).  Claims 18–22 are agnostic as to how the FPGA and microprocessor share data—i.e., with or without a separate memory in each layer—i.e., claim 18 recites "whereby

IPR2020-01568
Patent 7,282,951 B2

said processor and said programmable array are operational to share data therebetween" without reference to the "memory" recited earlier in the claim.

As proposed by Petitioner, it would have been obvious for the FPGA and microprocessor of Zavracky-Chiricescu, based on Akasaka's teachings, to share data using numerous (e.g., thousands) of vertical vias to implement the data transfer and thereby increase processing speeds and bandwidth. *See* Pet. 47–48 (citing Pet. § VII.A.4 (reasons to combine the references); Ex. 1002 ¶¶ 233–239; 347–348). For example, as Petitioner shows, using Akasaka's teachings, including its memory teachings to share data using thousands of vertical vias would have "increase[d] bandwidth and processing speed through better parallelism and increased connectivity." *See* Pet. 20 (citing Ex. 1002 ¶ 233; Ex. 1005, 1705); Reply 6–7 (citing known advantages of numerous vertical vias). Petitioner also persuasively shows that skilled artisans would have recognized that using Akasaka's memory teachings and dense via structure allows for increases in processing speed and improved parallelism and ensures cache coherency in the modified stack of Zavracky. *See id.* at 20–21 (citing Ex. 1002 ¶¶ 236–237; Ex. 1005, 1705, 1713).

Patent Owner's arguments do not address Petitioner's more general showing that a "POSITA would have recognized that communication between 'the microprocessor and any off-chip resources' via the FPGA (under the Zavracky-Chiricescu-Akasaka Combination as explained in [1.1], [1.2] and [2]) means that data is shared between [and processed by] the microprocessor and the FPGA." *See* Pet. 47 (citing Ex. 1002 ¶¶ 342–346). In other words, Dr. Souri's diagram above only refers to data *from* the PLD

(FPGA) as "DATA SENT TO THE OUTSIDE WORLD," but this analysis does not address Petitioner's persuasive showing that data from the outside world (off-chip) passes through the FPGA as an intermediary to the microprocessor. *See* Pet. 48–49 (quoting citing Ex. 1003, 12:28–36). At the cited passage, prior to describing Figure 13, Zavracky states that "[p]rogrammable logic arrays can be used to provide communication between a multi-layered microprocessor and the outside world." Ex. 1003, 12:29–31. Zavracky also states that "programmable logic array 802 [an FPGA in Figure 13] can be programmed to provide for user-defined communications protocol between the microprocessor and any off-chip resources." *Id.* at 12:36–37. Figure 13 shows bus connections on the PLD 802 (FPGA) to the outside world, with bus connections from PLD 802 to microprocessor 804/806 and memory 808. *See* Ex. 1003, Fig. 13, 12:29–39. Therefore, as Petitioner argues, Zavracky shows that communication occurs between the microprocessor and the FPGA, thereby teaching the sharing of data between the two (in at least one of the two directions). *See* Pet. 48–49.

In addition, in advancing another argument, Patent Owner admits that the combination teaches data sharing: "[T[he approach of Zavracky-Chiricescu would result in a structure in which *data is removed from the microprocessor cache and placed in the FPGA's on-chip memory*," and "*data . . . might be shared* between *Chiricescu's* FPGA and *Zavracky's* microprocessor." PO Resp. 29 (emphasis added).

Patent Owner also argues that "to modify the *Zavracky-Chiricescu* system with *Akasaka*, . . . the **stacked** memory layer of *Chiricescu* would need to be moved into its RLB layer because *Akasaka* requires each memory layer to be located on the same layer as its associated processor," thereby

IPR2020-01568
Patent 7,282,951 B2

requiring a "major modification" of Chiricescu.  PO Resp. 37.  Patent Owner

similarly argues that implementing the combination requires "adding ***more***

structure to *Chiricescu's* RLB layer, in the form of *Akasaka's* memory,

destroys *Chiricescu's* principle of operation, which relies on moving as

much structure ***out of*** the RLB layer as possible."  *Id.*

    This line of argument incorrectly assumes that Petitioner must show

how to bodily incorporate the common memory teachings of Akasaka into

Chiricescu's structure as part of its obviousness showing.  This argument is

unavailing, because Petitioner relies on Zavracky's 3-D stack structure,

including its memory as a separate layer and on Akasaka's thousands of via

holes, informed by the common memory teachings of Akasaka, without any

modification to Chiricescu's FPGA teachings required.  The common

memory teachings of Akasaka are agnostic as to the memory location.

    That is, Akasaka does not "require[] each memory layer to be located

on the same layer as its associated processor."  *See* PO Resp. 37.  Even

though Figure 25 of Akasaka shows a stack of processors and memory, with

a processor and memory on the same layer, nothing in Akasaka states that

the memory cannot be elsewhere in the stack on a separate layer.  Rather,

Figure 25 shows all memories connected together electrically with each

memory connected electrically to its respective processor.  *See* Ex. 1005,

Fig. 25.  These electrical connections suggest to an artisan of ordinary skill

that the memory layer's location is less important than the electrical

connections.  *See id.*  Moreover, Petitioner relies on Zavracky's separate

layer for each memory in a stack with via connections to enhance speed, as

the combination suggests.  *See* Reply 14 ("Zavracky already teaches stacked

memories that are interconnected to other dies in the stack, and also teaches

memories can be at any layer" (citing Ex. 1003, Figs. 10, 12, 11:63–12:2 ("[A]n additional layer or several layers of random access memory may be stacked . . . .  This configuration results in reduced memory access time, increasing the speed of the whole system")).

We adopt and incorporate Petitioner's showing for claims 18–22, as presented in the Petition and summarized above, as our own.  Pet. 7–12, 14–22, 46–49.  Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that may overlap with issues in the instant section due to the format of the Response, Petitioner persuasively shows that claims 18–22 would have been obvious.

    8.    *Summary*

After a full review of the record, including Patent Owner's Response and Sur-reply and evidence, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, and Akasaka would have rendered obvious claims 1, 2, 4–6, 8–24, 27, 29.

E.    *Obviousness, Claim 25*

    1.    *Trimberger*

Trimberger, titled "A Time-Multiplexed FPGA" (1997), describes an FPGA with on-chip memory distributed around the chip.  Ex. 1006, 22.  Trimberger teaches that the memory "can also be read and written by on-chip [FPGA] logic, giving applications access to a single large block of RAM."  *Id.*  Trimberger teaches this "storage [can] be used as a block memory efficiently."  *Id.* at 28.

Trimberger's Figure 1 follows:

IPR2020-01568
Patent 7,282,951 B2



Figure 1. Time-Multiplexed FPGA Configuration Model

Figure 1 of Trimberger above depicts eight planes of SRAM (static random
access memory) for an FPGA. *See* Ex. 1006, 22–23. "The configuration
memory is distributed throughout the die . . . . This distributed memory can
be viewed as eight *configuration memory planes* (figure 1). Each plane is a
very large word of memory (100,000 bits in a 20x20 device)." *Id.* at 22.

Trimberger also teaches accessing each plane of memory as one
simultaneous parallel transfer of 100,000 memory data bits to reconfigure
the FPGA quickly: "When the device is *flash reconfigured* all bits in logic
and interconnect array are updated simultaneously from one memory plane.
This process takes about 5ns. After flash reconfiguration, about 24ns is
required for signals in the design to settle." Ex. 1006, 22.

2.    *Claim 25*

Dependent claim 25 recites "[t]he programmable array module of
claim 23 wherein said memory array is functional as block memory for said
processing element." Petitioner contends that claim 25 would have been

84

IPR2020-01568
Patent 7,282,951 B2

obvious over the combination of Zavracky, Chiricescu, Akasaka, and Trimberger.  Pet. 52–55.

Petitioner relies on Trimberger's block memory teachings to address claim 25.  *See* Pet. 58–60.  According to Petitioner,

> Trimberger teaches that its co-located "memory is **accessible as block RAM** for applications," that are running in the FPGA, i.e., that the memory "can also be read and written by on-chip [FPGA] logic, giving applications access to a single large block of RAM."  Ex. 1006, 22.  Trimberger teaches that "the configuration storage to be used **as a block memory efficiently**."  [*Id.* at 28].

Pet. 55 (emphasis by Petitioner) (quoting Ex. 1006, 22, 28).  Petitioner contends that it would have been obvious to employ Trimberger's block memory to support fast local memory in FPGA applications like that in the combined teachings of Zavracky, Chiricescu, and Akasaka, with "the memory stacked and electrically coupled nearby."  *See id.* at 53–55 (citing Ex. 1002 ¶¶ 247–256; Ex. 1020; Ex. 1048).  Petitioner also contends that "[t]he POSITA would have known that FPGAs have limited programmable logic space, and that for certain tasks it would be more cost efficient and silicon-efficient to use the FPGA for reconfigurable processing and to use a separate task-dedicated memory element for block memory."  *Id.* at 54 (citing Ex. 1002 ¶ 247).  Petitioner advances other reasons for the combination.  *See id.* at 54–55 (characterizing Trimberger's on-chip block memory as faster relative to off-chip memory).

Patent Owner argues that "[d]ependent [c]laim 25 requires the "the 'block memory' and 'field programmable gate array' to be on *different* chips."  PO Resp. 44.  According to Patent Owner "*Trimberger* . . . teaches away from having its block memory and FPGA on different chips as

IPR2020-01568
Patent 7,282,951 B2

it attributes its quick FPGA reconfiguration to the massive connectivity *within* the chip." *Id.* (citing Ex. 1006, 22; Ex. 2011 ¶ 88); *see also id.* at 50–51 (same argument (citing Ex. 2011 ¶ 97)). Patent Owner primarily relies on this "within the chip" or "on-chip memory" argument as the basis for its allegations of lack of motivation, lack of reasonable expectation of success, teaching away, requirement for major modifications, and other related arguments. *See id.* at 43–51.

For example, Patent Owner argues that "implementing Trimberger's FPGA structure in Xilinx's combination would result in a complete redesign of the hypothetical 3-D stacked structure of the *Zavracky-Chiricescu-Akasaka* Combination," because "the block memory is no longer stacked with the FPGA, but instead located on *Trimberger's* FPGA die as on-chip memory." PO Resp. 49 (citing Ex. 2011 ¶ 95). Patent Owner explains that "*Trimberger's* FPGA structure requires that its configuration memory planes are located on the same die as the FPGA's logic cells, so that the FPGA can quickly switch between different configurations." *Id.* at 50 (citing Ex. 2011 ¶ 97). Patent Owner asserts that "Petitioner admits this." *Id.* (citing Pet. 53 (characterizing the Petition as stating that Trimberger teaches a time multiplexed FPGA with on-chip memory distributed around the chip)). Based on these assertions, Patent Owner contends that evidence lacks as to "how or why a POSITA would have had a reasonable expectation of success in making the combination." *Id.* at 45; *see also id.* at 49–51 (similar arguments).

Petitioner persuasively shows that Trimberger does not teach away or support Patent Owner's related arguments based on the single-chip theory, including hypothetical re-designs, and lack of a reasonable expectation of

86

IPR2020-01568
Patent 7,282,951 B2

success and motivation. Petitioner does not admit that Trimberger "*requires that its configuration memory planes are located on the same die as the FPGA's logic cells.*" *See* PO Resp. 50 (citing Pet. 53); Pet. 53 (describing Trimberger's on-chip memory without characterizing it as a requirement).

Petitioner persuasively points out that Trimberger does not "criticize, discredit, or otherwise discourage investigation into the invention claimed," merely because it discloses embodiments having block memory and an FPGA within the same chip. Reply 22 (quoting *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009)). Petitioner persuasively argues that Patent Owner's "'massive connectivity' observations about Trimberger confirm that the POSITA would have been further encouraged to make the combination." *Id.* at 23 (citing Ex. 1070 ¶¶ 44–45); *see* PO Resp. 50 (arguing Trimberger's block memory includes "massive connectivity" with the FPGA).

Petitioner's response, supported by Dr. Franzon's testimony, is persuasive. Trimberger's Figure 1 shows eight different memory planes on a single chip. Ex. 1006, 22. Trimberger states that "[t]he entire configuration of the FPGA can be loaded from this on-chip memory in 30ns." *Id.* Trimberger does not teach, and Dr. Souri does not testify, that Trimberger's "on-chip memory" *requires* each memory plane to be on *the same layer* as the FPGA of a chip, such as a multi-layered chip or stack of chips. *See id.*; Ex. 2011 ¶ 97 (describing Trimberger as employing "massive connectivity *within* the chip").

Dr. Franzon explains credibly that "Trimberger's one-cycle teachings would be **improved** by applying its teaching to a 3D chip." Ex. 1070 ¶ 44. Dr. Franzon explains that Trimberger's reconfiguration clock cycle "(i.e., the

IPR2020-01568
Patent 7,282,951 B2

delay in Trimberger) is set [by] determin[ing] the length of the longest path after routing." *Id.* (quoting Ex. 1006, 27). Then, Dr. Franzon testifies that "[t]he point here is that a shorter vertical interconnect allows for a shorter 'longest path' and a faster chip" and "[t]his was commonly understood in the other art." *Id.* (noting that "Akasaka taught that 3-D 'high speed performance' was enhanced because '[i]n 2-D ICs, the longest signal interconnection length becomes several to ten millimeters, but in 3-D ICs the length between upper and lower layers is on the order of 1–2 μm.'" (quoting Ex. 1005, 1705); also noting that Zavracky teaches that **"[i]n the proposed approach, shorter busses will result in smaller delays and higher speed circuit performance**" (quoting Ex. 1003, 3:4–14) (emphasis by Dr. Franzon)).

This testimony goes hand-in-hand with Petitioner's showing as summarized above in connection with the challenged claims discussed above. That is, Petitioner shows persuasively that the combined teachings of Zavracky, Chiricescu, and Akasaka suggest short conductor runs using numerous distributed vias of a 3-D multi-layer chip to increase speed and bandwidth, decrease path delays, and facilitate parallel processing. *See supra* § II.D.4–7; Pet. 7–9, 17–22 (background knowledge of an artisan of ordinary skill includes stacking chips with multiple distributed vias to minimize latency, interconnection delay, and reconfiguration times, allow for parallel processing, and increase operating speed, etc.). The Petition also persuasively points to a "concern[] with the speed of access between the FPGA and the block of memory" as a reason to use Trimberger's "block memory . . . combined with Zavracky-Chiricescu-Akasaka's teaching of having the memory stacked and electrically coupled nearby." Pet. 54.

88

IPR2020-01568
Patent 7,282,951 B2

Supported by Dr. Franzon's testimony, Petitioner also persuasively responds that arranging a block memory on a separate layer from an (FPGA) processing element is not a major modification and the evidence shows how to do it would have been well within the level of ordinary skill. *See* Reply 23–24; Ex. 1070 ¶ 46 ("Dr. Souri does not understand the combination being made. The Zavracky, Chiricescu, Akasaka combination already has a memory and an FPGA. It is already connected via a wide-area distributed set of interconnections as taught in Akasaka.").

Petitioner persuasively points to the Petition as stating that "[t]he POSITA would have sought Trimberger's teaching of using memory as a block memory and combined that with Zavracky-Chiricescu-Akasaka's teaching of **having the memory stacked and electrically coupled nearby**." Reply 23 (citing Pet. 54). In other words, Petitioner does not propose "'***moving***' *Trimberger's* on chip memory" to the same layer as the FPGA in Zavracky-Chiricescu-Akasaka's 3-D stack, contrary to Patent Owner's argument. *See* PO Resp. 50; Sur-reply 20. Rather, Petitioner proposes modifying the existing memory of Zavracky's modified 3-D stack to function as a block memory according to Trimberger's teachings. *See* Pet. 54; Reply 24. Moreover, Trimberger's eight plane memory design suggests different layers at least for each plane of memory, and challenged claim 25 does not require more than one of Trimberger's block memory planes. *See* Pet. 54 (describing "us[ing] a separate task-dedicated memory element for block memory"); Ex. 1006, Fig. 1 (showing eight different time multiplexed memory planes); Ex. 1070 ¶ 45 (testifying that in Trimberger's Figure 1 (*see supra* § II.E.1), "the fat arrow with a line in the traditional representation of 'many signals' – i.e., this is suggesting an architecture where different

89

IPR2020-01568
Patent 7,282,951 B2

'planes of memory' (i.e., layers of a die in a stack) are transferred from the configuration SRAMs to the FPGA").[19]

In any event, claim 25 does not preclude eight separate memory layers in a stack, or all eight memory planes on the same layer in the stack, or a multiplexor to select the different memory planes. Patent Owner essentially argues that an artisan of ordinary skill can connect eight memory planes to an FPGA on a single layer, but cannot do the same with vias on separate layers with a reasonable expectation of success. The record shows otherwise, for the reasons outlined above.

Petitioner persuasively points to testimony by Dr. Franzon cited in the Petition, who in turn relies credibly on evidence of record, to show a reasonable expectation of success, showing that implementing block memory with an FPGA was well-known in the prior art. *See* Reply 24 (citing Pet. 57; Ex. 1002 ¶ 145, 248; Ex. 1003, Figs. 12, 13; Ex. 1003, 11:63–12:2; Ex. 1002 ¶145); Ex. 1002 ¶ 145 (testifying that "Cooke also discloses that the 'memory planes not being used for configuration may be used as memory,' i.e., an extra memory block for use by the FPGA" (citing Ex. 1032), ¶ 144 (testifying that Casselman shows connecting "memory . . . directly to FPGA . . . through address and data busses." (citing Ex. 1026)).

_____

[19] As summarized above, each memory plane in Trimberger contains 100,000 bits of memory. *Supra* § II.E.1. Also, "[w]hen the device is *flash reconfigured* all bits in logic and interconnect array are updated simultaneously *from one memory plane. Id.*; Ex. 1006, 22 (emphasis added). Contrary to Patent Owner's arguments in connection with claims 1 and 23– 25 discussed above, Trimberger provides another example of the prior art showing the connection of a large plane of memory (block memory) directly to an FPGA for reconfiguration in one cycle.

90

IPR2020-01568
Patent 7,282,951 B2

As discussed above in connection with challenged claims 1, 2, 4–6, 8–24, 27, and 29, Petitioner persuasively outlines several good reasons to combine related teachings from the references to arrive at a 3-D stack that includes memory, FPGA, and a processor, reasons that apply to Trimberger's block memory. *See supra* § II.D.4–7; Pet. 7–9, 17–22, 55–57. For example, Petitioner notes that Trimberger teaches a block memory to provide access to a "single large block of RAM" such that memory "can . . . be read and written by on-chip [FPGA] logic." Pet. 56 (quoting Ex. 1006, 22). Petitioner also states that implementing Trimberger's block memory teachings with the 3-D chip combination as suggested by Zavracky's "stack [of] memories together with processors or the programmable array" addresses "concern[s] *with the speed of access* between the FPGA and the block memory." *See id.* at 57 (emphasis added). Petitioner notes that "FPGAs have limited programmable logic space" suggesting "a separate task-dedicated memory element for block memory." *Id.* Petitioner also persuasively argues that applying Trimberger as a separate layer (or layers) of memory in the 3-D stack of Zavracky, Chiricescu, and Akasaka "would have merely been a combination of prior art elements according to known methods to yield a predictable result" and "would have been a well-known use of a memory," showing a reasonable expectation of success in "improv[ing] on the memory options of the FPGA." *Id.* As outlined above, the record supports Petitioner.

Patent Owner repeats or repackages its arguments addressed above, by arguing that "Trimberger does not cure any of the aforementioned deficiencies," "*Chiricescu* does not employ *Zavracky's* interconnections to connect a memory die to an FPGA die," and Petitioner does not show why

91

IPR2020-01568
Patent 7,282,951 B2

or how "the modification would have been achieved with any reasonable expectation of success." *See* PO Resp. 46. Contrary to these arguments, as outlined above, Petitioner relies on the combined teachings of the references and the knowledge of an artisan of ordinary skill, and Trimberger provides more and persuasive evidence as to how and why an artisan of ordinary skill would have employed block memory as a single plane or several planes as separate layers in a 3-D stack, including to enhance reconfiguration speeds between a large block of memory and FPGA by facilitating a large parallel data transfer of 100,000 bits in one clock cycle.

We adopt and incorporate Petitioner's showing for claim 25, as presented in the Petition and summarized above, as our own. Pet. 7–12, 14–22, 52–55. Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that may overlap with issues in the instant section due to the format of the Response, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, Akasaka, and Trimberger would have rendered obvious claim 25.

F.     *Obviousness, Claim 26*

1.     *Satoh*

Satoh, titled "Semiconductor Integrated Circuit, Method for Testing the Same, and Method for Manufacturing the Same," describes using an FPGA to generate test stimuli to test memory elements on the same chip. Ex. 1008, code (54). In one embodiment, Satoh describes

> a method for testing this semiconductor integrated circuit is such that, in a semiconductor integrated circuit incorporating a variable logic circuit (FPGA) for outputting a signal indicating whether or not a circuit is normal [wherein] . . . a memory test circuit is built for testing the memory circuits in accordance with

92

IPR2020-01568
Patent 7,282,951 B2

> a specified algorithm . . . without using an external high-performance tester.

Ex. 1008, 46.[20]

Satoh also describes a "memory array" and testing DRAMs (dynamic random access memory arrays) such that "a test circuit . . . for testing the DRAMs 150 to 180 is formed in the portion of the FPGA 120 . . . , and the DRAMs 150 to 180 are tested in succession." *See* Ex. 1008, 15, Fig. 7.

### 2.    *Claim 26*

Dependent claim 26 recites "[t]he programmable array module of claim 23 wherein said contact points are further functional to provide test stimulus from said field programmable gate array to said at least second integrated circuit functional element."  Petitioner contends claim 26 would have been obvious over the combination of Zavracky, Chiricescu, Akasaka, and Satoh.  *See* Pet. 60–63.

Petitioner contends that "[i]t was well-known to test stacked modules in order to avoid the expense and waste of silicon by creating 'dead' chips, and improve yield."  Pet. 57 (citing Ex. 1002 ¶ 241; Ex. 1009; Ex. 1043). Petitioner states that "Satoh specifically praised the use of an FPGA to test 'memory circuits' for 'improving yield and productivity of the semiconductor integrated circuit.'"  *Id.* (quoting Ex. 1008, 47:23–27).

Petitioner explains that Satoh describes an FPGA that "generates a specified test signal [and] supplies the test signal to the memory circuit." Pet. 58 (citing Ex. 1002 ¶¶ 350–359; Ex. 1008, 5:1–28, 49:32–37). Petitioner maintains that Satoh's test signal suggests a "test stimulus" to a second integrated circuit memory array to evoke a response therefrom.  *See*

---

[20] Page citations refer to original page numbers.

93

IPR2020-01568
Patent 7,282,951 B2

*id.* (citing Ex. 1008, 49:32–37; Ex. 1002 ¶ 358). Based on Satoh's teaching, Petitioner explains that "[i]n the Zavracky-Chiricescu-Akasaka-Satoh Combination," it would have been obvious to implement "the test signal . . . through the contact points between the FPGA of the first IC functional element and the memory of the second IC functional element," because that "is how those elements are stacked and electrically coupled." *See id.* (citing Ex. 1002

¶ 359).

In addition to avoiding "dead chips," Petitioner cites other reasons to combine Satoh's testing functionality with the 3-D chip of Zavracky-Chiricescu-Akasaka:

> Recognizing the need to test the 3D stack of the Zavracky-Chiricescu-Akasaka Combination, the POSITA would have sought out Satoh's teaching of using a FPGA for testing the co-stacked memory to achieve known predictable benefits: rigorous testing while avoiding a separate testing chip's (1) additional expense, (2) chip real estate, and (3) design complexity. Ex. 1002 ¶242. Moreover, (4) a FPGA is reusable: after being configured for testing in manufacture, the FPGA would then be reconfigured for its normal "in the field" purpose. *Id.* (citing Ex. 1045 ("Another advantage . . . is that after testing is complete, the reconfigurable logic (FPGA 28) can be reconfigured for post-testing adapter card functions."); Ex. 1046).

Pet. 57.

Petitioner also relies on the following evidence and rationale to support a reasonable expectation of success:

> It was well known to use a FPGA to test circuitry with 2-D chips as taught by Satoh. Ex. 1002 ¶241 (citing Ex. 1043). The POSITA would have recognized Satoh's teaching would readily apply to the 3-D chip elements in the Zavracky-Chiricescu-Akasaka Combination. This includes because such a combination would have been a routine use of an FPGA, whose

94

IPR2020-01568
Patent 7,282,951 B2

> testing ability was not dependent on structure. Ex. 1002 ¶¶242–
> 43. The result of this combination would have been predictable,
> by known FPGA testing to the 3D stack according to known
> methods to yield a predictable result. Ex. 1002 ¶244.

Pet. 57–58.

Patent Owner relies on the same unavailing arguments it advances with respect to the challenged claims addressed above. *See* PO Resp. 51–52 ("Because Petitioner does not contend that *Satoh* cures any of the deficiencies of the combination of *Zavracky*, *Chiricescu,* and *Akasaka,* as discussed above with respect to Ground 1, its reliance on the same rationales for Ground 3 also fail.").

Patent Owner also argues that "Petitioner's contention that a POSITA would be motivated to make the combination because it was well-known to test stacked die and *Satoh* tested memory elements on the same semiconductor chip (*see* Petition at 57) is divorced from the claimed invention." PO Resp. 52. Patent Owner contends that "Petitioner's generic rationale for using FPGAs for testing is wanting in particularity as to why a POSITA would combine the references as recited in the Challenged Claim." *Id.* Patent Owner contends that "[w]hether the use of *Satoh's* FPGA is beneficial for testing does not sufficiently explain why a POSITA would have combined the references to yield the claimed invention." *Id.* at 53. Patent Owner contends that Petitioner's rationale fails "as it lacks sufficient explanation of how or why a POSITA would have been motivated to use *Satoh's* FPGA for testing with the hypothetical 3-D structure of *Zavracky-Chiricescu-Akasaka* 'in the way the claimed invention does.'" *Id.* (quoting *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012)).

IPR2020-01568
Patent 7,282,951 B2

Patent Owner's arguments appear to accept Petitioner's showing that applying Satoh's testing structure and technique in "the hypothetical 3-D structure of *Zavracky-Chiricescu-Akasaka*" would have been "beneficial" and "predictable." *See* PO Resp. 52–53. That is, Patent Owner characterizes the rationale as "generic" without disputing it. *See id.*

In any event, Petitioner provides specific reasons related to specific recitations in the claims as outlined above, including tying Satoh's testing of a memory array using FPGA testing circuitry to the similar claim elements in claim 26. For example, using Satoh's FPGA test circuitry and memory testing teachings to avoid "dead chips" is a specific "beneficial" reason, and tying these teachings to FPGA contact points in the Zavracky-Chiricescu-Akasaka stack to test memory in that stack also is specific. *See* Reply 24–25 (re-listing reasons supplied in the Petition, including, for example, "the known problem of the need to test stacked modules to avoid the expense and waste of silicon by creating 'dead' chips" (citing Ex. 1002 ¶ 241; Ex. 1009; Ex. 1020; Ex. 1043); Pet. 63 (explaining that "[i]n the Zavracky-Chiricescu-Akasaka-Satoh Combination, the test signal is sent through the contact points between the FPGA of the first IC functional element and the memory of the second IC functional element, which is how those elements are stacked and electrically coupled" (citing Ex. 1002 ¶ 359)). As Dr. Franzon also credibly explains, Satoh's use of generating a test signal "*within* an FPGA" to test a memory array is agnostic "to the particular way in which the FPGA is stacked." *See* Ex. 1002 ¶ 245 ("The POSITA would thus have realized that Satoh could be used to solve the existing need (which was also recognized by Ex. 1043, for example) to achieve the benefits discussed above.").

IPR2020-01568
Patent 7,282,951 B2

In other words, Petitioner persuasively shows a reasonable expectation of success with specific reasons to combine, all supported by the record, including beneficial testing to avoid dead chips and maintain reliable memory to reconfigure the 3-D stack's FPGA post-manufacture, thereby showing how to apply the teachings to the claimed 3-D stack as suggested by Zavracky, Chiricescu, and Akasaka. Specifically, claim 26 recites "wherein said contact points are further functional to provide test stimulus from said [FPGA] to said at least second integrated circuit die element," and Petitioner persuasively applies Satoh's teachings to these contact points in order to avoid dead chips. Another set of specific and persuasive reasons to combine is "using a FPGA for testing the co-stacked memory to achieve known predictable benefits: rigorous testing while avoiding a separate testing chip's (1) additional expense, (2) chip real estate, and (3) design complexity." Pet. 57.

As Petitioner also persuasively argues, Petitioner's "evidence-backed assertions are uncontroverted, specific to relevant teachings of the references, and explain why a POSITA would have sought the Zavracky-Chiricescu-Akasaka-Satoh Combination to reach the '951 patent's claims." Reply 25 (citing Ex. 1070 ¶¶ 76–77).

Patent Owner advances a new (unresponsive) argument in its Sur-reply that "[t]he references Petitioner and Dr. Franzon cite do not disclose testing of 3D stacked processor but instead disclose that individual die are tested independently and prior to any 3D packaging." Sur-reply 22. This argument is not relevant to a claim limitation at issue here. Claim 26, a device claim, does not recite packaging, and it does not preclude

"provid[ing] test stimulus from said field programmable gate array to said at least second integrated circuit die element" prior to any packaging.

We adopt and incorporate Petitioner's showing for claim 26, as presented in the Petition and summarized above, as our own. Pet. 7–12, 14–22, 55–58. Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that may overlap with issues in the instant section due to the format of the Response, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, Akasaka, and Satoh would have rendered obvious claim 26.

## G.    *Obviousness, Claim 28*

### 1.    *Alexander*

Alexander, titled "Three-Dimensional Field-Programmable Gate Arrays" (1995), describes "stacking together a number of 2D FPGA bare dies" to form a 3-D FPGA. Ex. 1009, 253. Alexander explains that "each individual die in our 3D paradigm has vias passing through the die itself, enabling electrical interconnections between the two sides of the die." *Id.*

Alexander's Figure 2 follows:



Figure 2: (a) The solder bump, pad, and vertical via geometry; and (b) stacked 2D FPGA dies.

Figure 2(a) shows vertical vias traversing a chip with a solder pad and solder bump on top, and Figure 2(b) shows a stack of chips prior to connection by solder bumps.  Ex. 1009, 253.

Alexander explains that stacking dies to form a 3-D FPGA results in a chip with a "significantly smaller physical space," lower "power consumption," and greater "resource utilization" and "versatility" as compared to conventional layouts.  Ex. 1009, 253.

### 2.    *Claim 28*

Dependent claim 28 depends from dependent claim 27, which depends from independent claim 23, and recites "[t]he programmable array module of claim 27 wherein said third integrated circuit functional element includes another field programmable gate array."  As noted above, independent claim 23 is materially the same as independent claims 1 and 16. *Supra* § II.D.4; Pet. 49–50 (relying on its analysis for claims 1 and 16 to address claim 23).  Dependent claim 27 involves materially the same analysis as claim 4 (also analyzed above), and recites "[t]he programmable array module of claim 23 further comprising:  at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements."  *See* § II.D.5; Pet. 50 (relying on the showing for claim 4 to address claim 27).

Accordingly, claim 28 essentially adds another FPGA to claims 23 and 27 as addressed above, requiring at least three stacked integrated circuit die elements:  a memory array stacked with "another" FPGA (i.e., a total of two FPGAs), with the "integrated circuit functional elements," which "include[]" the memory array and two FPGAS, electrically coupled together by "a number of contact points distributed through the surfaces of said

IPR2020-01568
Patent 7,282,951 B2

functional elements," "wherein said memory array is functional to accelerate external memory references to said processing element [one of the FPGAs]" (as recited in independent claim 23).

Petitioner contends that claim 28 would have been obvious over the combination of Zavracky, Chiricescu, Akasaka, and Alexander. *See* Pet. 59–61. Addressing the two stacked FPGAs, Petitioner relies on Alexander's teaching of stacked FPGAs in a 3-D package, and contends as follows:

> The POSITA would have known (as Zavracky notes) that multiprocessor systems were needed for "parallel processing applications," for example, "signal processing applications." Ex. 1003, 12:13–28, Fig. 12; Ex. 1002 ¶258. But in this context, the POSTIA would have appreciated Alexander's teaching of stacked FPGAs as preferable over alternatives, such as (1) general purpose microprocessors running software (too slow), or (2) customized parallel hardware (too expensive and inflexible). The POSITA would have sought out Alexander's multiple stacked FPGAs to enhance the Zavracky-Chiricescu-Akasaka Combination by upgrading it for this type of application. Ex. 1002 ¶259.

Pet. 60.

Petitioner contends that Alexander's similar structure of multiple stacked FPGAs, as similar to multiple processors stacked with multiple memories of the Zavracky-Chiricescu-Akasaka Combination, evidences a reasonable expectation of success of stacking FPGAs with memories, "with multiple functional elements stacked and vertically interconnected including using thousands of contact point vias (holes)." *See* Pet. 60. Petitioner also asserts that "[t]he result of this combination would have been predictable, simply combining the extra FPGA of Alexander with the existing 3-D stack according to known methods to yield a predictable result." *Id.* at 61 (citing Ex. 1002 ¶¶ 260–261).

Patent Owner responds that "[w]hether 3D FPGA dies are preferable over general purpose microprocessors or customized parallel hardware have no bearing on whether a POSITA would have been motivated to combine *Alexander* with *Zavracky-Chiricescu-Akasaka* to reach a 3-D processor module having 'a third integrated circuit functional element [that] includes another field programmable gate array.'" PO Resp. 54–55 (citing Ex. 2011 ¶ 100). This argument appears to accept Petitioner's showing that FPGAs are preferable to processors in a 3-D stack. Petitioner's unchallenged showing of faster FPGAs relative to general purpose processors in the 3-D stack of Zavracky-Chiricescu-Akasaka, where Zavracky contemplates multiple layers of processors, memory layers, and an FPGA, is a persuasive reason for the combination. *See* Ex. 1003, Fig. 12 (stacked multiple processor and memory layers/chips), Fig. 13 (stacked processor, memory, and PLA/FPGA layers/chips).

Patent Owner also argues that Petitioner's "conclusory rationale is further discredited by Petitioner's suggestions elsewhere in the Petition that *Chiricescu* discloses a FPGA application that enhances *Zavracky*." PO Resp. 55 (citing Pet. 19). In particular, Patent Owner argues that the Petition elsewhere suggest that a "POSITA would have taken Chiricescu's suggestion of a FPGA to perform 'arbitrary logic functions,' . . . as a cue to enhance and expand upon the packet processing task performed by the programmable logic device in *Zavracky*, e.g., to perform image and signal processing tasks that would have taken advantage of co-stacked microprocessors and memories as taught in *Zavracky*." *Id.* (quoting Pet. 18). Patent Owner argues that "there is no reason . . . to combine *Alexander* with *Zavracky-Chiricescu-Akasaka*," because "Petitioner acknowledges that,

*Chiricescu*, like *Alexander*, offers FPGAs to enhance parallel processing image and signal tasks of *Zavracky's* microprocessor." *Id.* (citing Ex. 2011 ¶ 101).

Patent Owner's arguments are unavailing. For example, Patent Owner concedes that "*Chiricescu*, like *Alexander*, offers FPGAs to enhance parallel processing image and signal tasks of *Zavracky's* microprocessor." PO Resp. 55. Claim 28 does not preclude employing a microprocessor, because it is open-ended and recites "comprising" and "at least" a "first," "second," and "third" "integrated circuit functional element." Petitioner specifically and persuasively argues that "[t]he POSITA would have known (as Zavracky notes) that *multiprocessor* systems were needed for 'parallel processing applications,' for example, 'signal processing applications.'" Pet. 60 (citing Ex. 1003, 12:13–28, Fig. 12; Ex. 1002 ¶ 258). And Petitioner repeatedly points to Zavracky's microprocessor in Figure 13 to address claim 1, and refers to this showing in addressing claim 23. *See* Pet. 23–24 (reproducing and annotating Zavracky's Figs. 12 and 13), 27 (addressing limitation [1.2], stating that "Figure 13 shows memory 808 and microprocessor 804 and 806 stacked above the programmable array"); Pet. 50 (addressing claim 23 and referring to "analysis in [1.2]"). Therefore, Patent Owner's characterization that Chiricescu and Alexander "offer[] FPGAs to enhance parallel processing image and signal tasks of *Zavracky's* microprocessor" and Petitioner's argument that Chiricescu suggests FPGAs for performing arbitrary logic functions and expanding packet processing tasks with microprocessors, are specific and persuasive reasons to employ FPGAs in the stack of Zavracky-Chiricescu-Akasaka-Alexander. PO Resp.

IPR2020-01568
Patent 7,282,951 B2

55; Pet. 19.  So too is simply replacing one or more of Zavracky's microprocessors with one or more preferable FPGAs for speed reasons.

In other words, as Petitioner persuasively argues, "[a]s to the 'why,' the Petition shows that (i) the POSITA would have been prompted to pursue a 'multiprocessor system' to facilitate 'parallel processing applications'; and (ii) the POSITA would have viewed Alexander's 'stacked FPGAs as preferable over alternatives' for achieving such a system."  Reply 26 (quoting Pet. 60–61; Ex. 1002 ¶¶ 257–61).  "And as to the 'how,' the Petition explains that 'the POSITA would have realized that using multiple FPGA dies in the stack as taught by Alexander would work in a straightforward manner similar manner to stacking multiple memories, or multiple microprocessors, as already taught in the Zavracky-Chiricescu-Akasaka Combination.'"  *Id.* (quoting Pet. 60–61).

Patent Owner also alleges that the Petition fails to explain how to combine the references with a reasonable expectation of success.  PO Resp. 55–57.  Patent Owner alleges that "other sections of *Alexander* . . . [that] Petitioner wholly ignores . . . . do not suggest . . . that using multiple FPGA dies would work in a straightforward manner, let alone in Petitioner's proposed combination, so as to have a reasonable expectation of success."  *Id.* at 56.  Patent Owner provides little support for this argument.  *See id.* Contradicting Patent Owner, Alexander itself states that using multiple FPGAs in a stack results in a chip with "significantly smaller physical space," lower "power consumption," "shorter signal propagation delay," and "greater resource utilization and versatility" due to the "increased number of logic block neighbors" as "compared with a circuit-board-based 2D FPGA implementation."  Ex. 1009, 253.  In other words, Alexander suggests that

103

stacked FPGAs implement the same circuitry of well-known single layer FPGAs, with numerous advantages.

Patent Owner also refers to sections in Alexander that describe thermal issues.  PO Resp. 56.  Patent Owner also argues that "Petitioner's threadbare argument that the combination is based on known methods to yield a predictable result (*see* Petition at 60–61) is . . . untethered to the features of the claimed invention." *Id.* at 57.

Contrary to these arguments, the Petition tethers the claimed stacking of two FPGAs to several reasons to combine the references.  Patent Owner itself cites these reasons offered by Petitioner, including "offer[ing] FPGAs to enhance parallel processing image and signal tasks of *Zavracky's* microprocessor," and similarly "perform[ing] 'arbitrary logic functions,' . . . as a cue to enhance and expand upon the packet processing task performed by the programmable logic device in *Zavracky*," as noted above.  *See* PO Resp. 55 (citing Pet. 19).

As Petitioner also argues, Patent Owner does not dispute that "Zavracky already taught combining an FPGA with a memory and microprocessor."  Reply 27 (citing Ex. 1003, 12:29–39, Figure 13).  Adding another FPGA layer in place of one of Zavracky's microprocessors (Ex. 1003, Figs. 12, 13) therefore would have reduced thermal problems, "because FPGAs were more energy-efficient than microprocessors for the same size die, reducing heat." *Id.* (citing Ex. 1070 ¶¶ 37–41; Ex. 1058; Ex. 1082).  Dr. Franzon's testimony includes an excerpt from DeHon (Ex. 1058) and Scrofano (Ex. 1082), which support Dr. Franzon's testimony that "FPGAs needed less power to get the same level of computing capability" as a processor.  *See* Ex. 1070 ¶¶ 37–38 (citing Ex. 1058, 43).

IPR2020-01568
Patent 7,282,951 B2

Similar to Alexander's teaching that "3D FPGAs have good implications with respect to power consumption" (Ex. 1009, 263), the '951 patent also evidences that 3D stacks "overall reduced power requirements" (Ex. 1001, 4:63). Reduced power translates to less heat, as was well-known and as Petitioner shows. *See infra* note 21.

> Describing dual layer FPGA stacks, the '951 patent states as follows:
>
> It should be noted that although a single FPGA die 68 has been illustrated, *two or more FPGA die 68 may be included in the reconfigurable module 60. Through the use of the through-die area array contacts 70*, inter-cell connections *currently limited to two dimensions of a single die*, may be routed up and down the stack in three dimensions. *This is not known to be possible with any other currently available stacking techniques since they all require the stacking contacts to be located on the periphery of the die.* In this fashion, the number of FPGA die 68 cells that may be accessed within a specified time period is increased by up to 4 VT/3, where "V" is the propagation velocity of the wafer and "T" is the specified time of propagation.

Ex. 1001, 6:1–13 (emphasis added). Here, the '951 patent offers no description of any specific connection scheme between the two FPGA dies. It simply describes vias throughout the periphery of each die (instead of just at the periphery thereof) as a new technique (which is not correct), without any mention of heat problems associated with stacking two FPGAs. The '951 patent's lack of description and focus on vias throughout the whole die as a solution (providing speed gains) further evidences a reasonable expectation of success and supports Petitioner's showing.

As Petitioner also argues, thermal issues were a routine consideration, with known viable options to address the issues. Reply 27–28 (citing Ex. 1020, 11; Ex. 1070 ¶¶ 29–41; Ex. 1020; Ex. 1012; Ex. 1009; Ex. 1058;

IPR2020-01568
Patent 7,282,951 B2

Ex. 1082).  Dr. Franzon credibly lists known ways to dissipate heat, including use of low thermal resistance substrates, forced fluid coolants, thermal vias, and thermally conductive adhesives.  Ex. 1070 ¶ 32.

The record also supports Dr. Franzon's testimony that "Alexander itself noted that thermal concerns were standard in any multi-chip design." *Id.* ¶ 36 (citing Ex. 1009, 256 (teaching that reducing power by eliminating I/O buffers, which Dr. Franzon states mitigates thermal issues (*see* Ex. 1070 ¶ 37 n.2)).[21]  In addition to mitigating heat concerns by eliminating I/O buffers (or "restrict[ing] I/O to one layer and plac[ing] it close to the heat sink," Ex. 1009, 256 § 5), in the same section, Alexander further supports Dr. Franzon's testimony, stating that "[a] number of . . . thermal-reduction techniques (i.e., thermal bumps and pillars . . ., thermal gels . . ., etc.) may also be applicable for 3D FPGAs."  Ex. 1009, 255 § 5 ("Thermal Issues"). Alexander also states that "[a]s the power-to-area/volume ratio increases, so does the operating temperature unless heat can be effectively dissipated." *Id.*

As Petitioner also persuasively reasons, Patent Owner's arguments about heat dissipation concerns here do not undermine Petitioner's showing of a reasonable expectation of success, because a reasonable expectation of success "does not require a certainty of success."  Reply 28 (quoting *Medichem v. Rolabo S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006)).  As found above, Alexander promotes using multiple FPGAs in a module stack, and

---

[21] Testimony from footnote 2 of Dr. Franzon's declaration follows:  "It would have been well known to the POSITA that in a chip, an increase in power usage generally translated to an increase in heat.  For example, a processor using more power to perform computations will put off more heat than when the processor is using less power."

IPR2020-01568
Patent 7,282,951 B2

myriad additional evidence further supports a reasonable expectation of success. *See id.* (citing Ex. 1002 ¶¶ 44–45 (listing prior art showing FPGA stacks or FPGA stacks with microprocessors and memory), ¶¶ 260–261; Ex. 1009, 1).

Finally, none of the challenged claims, including claim 28, specifies the size of the claimed 3-D modules or FPGAs or a corresponding amount of computing power. Therefore, the breadth of claim 28 encompasses a 3-D stack operable on a minimal power basis (and without any limit on the area of each element, further dissipating heat as the chip area increases), rendering heat concerns nonexistent or at least well within the bounds of a reasonable expectation of success. *See supra* note 21; Ex. 1009, 255–256 § 5 (discussed above, e.g., as power per unit area decreases, so does temperature).

We adopt and incorporate Petitioner's showing for claim 28, as presented in the Petition and summarized above, as our own. Pet. 7–12, 14–22, 58–61. Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that may overlap with issues in the instant section due to the format of the Response, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, Akasaka, and Alexander would have rendered obvious claim 28.

## H.    *Exhibit 1070*

Patent Owner argues that "[p]aragraphs 5–9, 13–28, 29–41, 44, 45, 59–66, 68, 73, 74, 76, 77, and 94–103 from Dr. Franzon's [Reply D]eclaration (Ex. 1070) addressing Petitioner's alleged obviousness grounds are not sufficiently discussed in the Reply" at pages 10, 13, 20, 21, 22, 25,

IPR2020-01568
Patent 7,282,951 B2

and 27 of the Reply. Sur-reply 25. Patent Owner contends that the noted paragraphs are "not discussed in the Reply, but instead incorporated by citation or a cursorily parenthetical." *Id.* Patent Owner further contends that "the Board should not and cannot play archeologist with the record to search for the arguments" and "should not . . . consider[] Dr. Franzon's arguments." *Id.* (citing 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document.").

Patent Owner also cites *General Access Solutions, Ltd. v. Sprint Spectrum L.P.*, 811 F. App'x 654, 658 (Fed. Cir. 2020), as showing that the Board "cannot 'play[] archaeologist with the record." Sur-Reply 25. The situation here is different than in *Sprint Spectrum*, because there, the court noted a problem with identifying a party's substantive arguments *prior to turning to the declaration at issue*: "*To identify GAS's substantive arguments*, the Board was forced to turn to a declaration by Struhsaker, *and further to delve into a twenty-nine-page claim chart attached as an exhibit*." *Id.* (emphasis added).

Here, Patent Owner does not describe or allege any problem with identifying Petitioner's substantive arguments. In context, except as discussed below, the cited paragraphs of Dr. Franzon's Reply Declaration (Ex. 1070) properly support Petitioner's substantive arguments at the pages of the Reply identified by Patent Owner.

Regarding the first citation, page 10 of the Reply cites paragraphs 94–103 of Dr. Franzon's Reply Declaration, and discusses how, even if the "functional to accelerate" clauses require "a wide configuration data port," the combination of Zavracky, Chiricescu, and Akasaka teaches it. *See* Reply 9–10 (citing Ex. 1070 ¶¶ 94–103). This citation is a misprint or oversight by

IPR2020-01568
Patent 7,282,951 B2

Petitioner, because Dr. Franzon's Reply Declaration does not include paragraphs 96–102. Therefore, any issue with respect to those paragraphs is moot. The remaining cited paragraphs of Dr. Franzon's Reply Declaration on page 10 of the Reply directly relate to what a "wide configuration data port" constitutes. Also, paragraph 95 reproduces some of the same testimony by Dr. Chakrabarty (Patent Owner's expert in IPR2020-01021) that the Reply discusses and reproduces on page 10 of the Reply.

Regarding the second citation, page 13 of the Reply cites two paragraphs with a parenthetical as follows: "Ex. 1070¶¶73–74 (citing Ex. 1083, an example of common usage of 'share data' as 'transfer data')." Prior to the citation, the Reply addresses the plain meaning of "share," tracking the parenthetical. *See* Reply 13. Notwithstanding that Patent Owner generally implies that citation is one of several examples of "a cursorily parenthetical" (Sur-reply 25), the parenthetical is clear as to how Dr. Franzon's cited testimony supports Petitioner's Reply argument.

Regarding the third citation, page 19 of the Reply (citing Ex. 1070 ¶¶ 13–28), Petitioner's argument merely responds to a summary argument by Patent Owner about four different "TSV interconnection issues." *See* PO Resp. 41 ("At the time of the invention, a POSITA was aware of numerous []TSV interconnection issues, such as routing congestion, TSV placement, granularity, hardware description language ('HDL') algorithms, which must be considered." (citing Ex. 2011 ¶ 82; Ex. 2014, 85, 87, 89); Reply 19 ("The supposed 'TSV interconnection issues' that [Patent Owner] cursorily identifies were at most normal engineering issues, not problems preventing a combination. Ex. 1070 ¶¶ 13–28 (Dr. Franzon rebutting Dr. Souri's testimony as to every purported issue with citations to evidence)." Here,

IPR2020-01568
Patent 7,282,951 B2

Petitioner's parenthetical generally informs the reader that Dr. Franzon's testimony responds to Dr. Souri's "cursor[y]" summary alleging "TSV interconnection issues." *See* Reply 20; PO Resp. 41.

Paragraphs 13–20 of Dr. Franzon's Reply Declaration provide background context leading to thrust of paragraphs 21–28, which directly support Petitioner's Reply argument that TSV issues were normal engineering issues in the context of combining the references. Therefore, we consider cited paragraphs 13–20 only as background information and context.

In comparison, providing his testimony about the TSV issues, Dr. Souri's support for TSV issues is a citation to "Ex. 2014 at 85, 97, 90." Ex. 2011 ¶ 82. Patent Owner provides the same citation without any explanation of the citation. PO Resp. 41. This amounts to the same type of incorporation-by-reference of pages of evidence that Patent Owner attributes to Petitioner. Also, the cited three pages of Exhibit 2014 are in the middle of an industry article, and the pages are densely packed two-column pages that facially appear to have at least the same number of words in some of the complained-about citations to multiple paragraphs that Petitioner provides to Dr. Souri's Reply Declaration. Here, Patent Owner leaves it to the Board to dig into the cited pages of Exhibit 2014 to find the alleged TSV interconnection issues and place it in context to the background information in the whole article. In reaching our decision, we exercised judgment as to all the evidence cited by the parties for its relevance, context, and substance, and weighed it accordingly.

Finally, an examination of the other citations identified by Patent Owner in full context, reveals (like the citations addressed above) that

IPR2020-01568
Patent 7,282,951 B2

Petitioner's use of and citation to Dr. Souri's testimony is not improper. In summary, the remaining pages of the Reply identified by Patent Owner include citations with a clear sentence preceding the citation and/or clear parenthetical informing the reader clearly how the cited testimony supports the sentence. *See* Reply 21 n.8 (clear parenthetical and preceding sentence) (citing Ex. 1070 ¶¶ 59–66), 22 (clear preceding sentence (citing Ex. 1070 ¶¶ 44–45)), 25 (clear preceding sentence (citing Ex. 1070 ¶¶ 76–77)), 27 (clear parentheticals and preceding sentences (citing Ex. 1070 ¶¶ 37–41 and Ex. 1070 ¶¶ 29–41)).

## III. CONCLUSION

The outcome for the challenged claims of this Final Written Decision follows.[22]   In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatent-able | Claims Not shown Unpatent-able |
|---|---|---|---|---|
| 1, 2, 4–6, 8–24, 27, 29 | 103(a) | Zavracky, Chiricescu, Akasaka | 1, 2, 4–6, 8–24, 27, 29 | |

---

[22] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01568
Patent 7,282,951 B2

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatent-able | Claims Not shown Unpatent-able |
|---|---|---|---|---|
| 25 | 103(a) | Zavracky, Chiricescu, Akasaka, Trimberger | 25 | |
| 26 | | Zavracky, Chiricescu, Akasaka, Satoh | 26 | |
| 28 | | Zavracky, Chiricescu, Akasaka, Alexander | 28 | |
| **Overall Outcome** | | | 1, 2, 4–6, 8–29 | |

## IV. ORDER

Accordingly, it is

In consideration of the foregoing, it is hereby

ORDERED that claims 1, 2, 4–6, and 8–29 of the '951 patent are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

112

IPR2020-01568
Patent 7,282,951 B2

PETITIONER:

David M. Hoffman
Kenneth W. Darby Jr.
Jeffrey Shneidman
FISH & RICHARDSON P.C.
hoffman@fr.com;
k.darby@fr.com;
shneidman@fr.com
IRP42653-00301IP1@fr.com;
ptabinbound@fr.com

James M. Glass
Zyong Li
QUINN EMANUEL URQUHART & SULLIVAN LLP
jimglass@quinnemanuel.com
seanli@quinnemanuel.com

PATENT OWNER:
Jonathan S. Caplan
James Hannah
Jeffrey H. Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jcaplan@kramerlevin.com
jhannah@kramerlevin.com
jprice@kramerevin.com

Trials@uspto.gov                                          Paper 40
571-272-7822                                 Entered:  March 2, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

XILINX, INC.,
Petitioner,

v.

ARBOR GLOBAL STRATEGIES, LLC,
Patent Owner.

———————

IPR2020-01570[1]
Patent RE42,035 E

———————


Before KARL D. EASTHOM, BARBARA A. BENOIT, and
SHARON FENICK, *Administrative Patent Judges*.

EASTHOM, *Administrative Patent Judge*.


JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*


---

[1] Taiwan Semiconductor Manufacturing Co. Ltd. ("TSMC") filed a petition
in IPR2021-00737, and the Board joined it as a party to this proceeding. *See
also* Paper 39 (order dismissing-in-part TSMC as a party with respect to
claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29).

IPR2020-01570
Patent RE42,035 E

Xilinx, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–38 (the "challenged claims") of U.S. Patent No. RE42,035 B2 (Ex. 1001, the "'035 patent"). Pet. 1. Petitioner filed a Declaration of Dr. Paul Franzon (Ex. 1002) with its Petition. Arbor Global Strategies LLC ("Patent Owner") filed a Preliminary Response (Paper 8, "Prelim. Resp.").

After the Institution Decision (Paper 13, "Inst. Dec."), Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp.") and a Declaration of Dr. Shukri J. Souri (Ex. 2011); Petitioner filed a Reply (Paper 23) and a Reply Declaration of Dr. Paul Franzon (Ex. 1070); and Patent Owner filed a Sur-reply (Paper 27). Thereafter, the parties presented oral arguments via a video hearing (Dec. 3, 2021), and the Board entered a transcript into the record. Paper 33 ("Tr.").

For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner demonstrates by a preponderance of evidence that the challenged claims are unpatentable.

## I.   BACKGROUND

*A.    Real Parties-in-Interest*

Petitioner identifies Xilinx, Inc. as the real party-in-interest. Pet. 72. Patent Owner identifies Arbor Global Strategies LLC. Paper 5, 1. Joined party Taiwan Semiconductor Manufacturing Co. Ltd. is also a real party-in-interest. *See supra* note 1.

*B.    Related Proceedings*

The parties identify *Arbor Global Strategies LLC, v. Xilinx, Inc.*, No. 19-CV-1986-MN (D. Del.) (filed Oct. 18, 2019) as a related infringement action involving the '035 patent and three related patents,

IPR2020-01570
Patent RE42,035 E

U.S. Patent No. 7,282,951 B2 (the "'951 patent"), U.S. Patent No. 6,781,226 B2 (the "'226 patent") and U.S. Patent No. 7,126,214 B2 (the "'214 patent"). *See* Pet. 72–73; Paper 5.  Petitioner "contemporaneously fil[ed] *inter partes* review (IPR)] petitions challenging claims in each of these patents," namely IPR2020-01567 (challenging the '214 patent), IPR2020-01568 (challenging the '951 patent), and IPR2020-01571 (challenging the '226 patent). *See* Pet. 72.  Final written decisions for these three cases issue concurrently with the instant Final Written Decision.

The parties also identify *Arbor Global Strategies LLC* v. *Samsung Electronics Co., Ltd.*, 2:19-cv-00333-JRG-RSP (E.D. Tex.) (filed October 11, 2019) as a related infringement action involving the '035, '951, and '226 patents.  Subsequent to the complaint in this district court case, Samsung Electronics Co., Ltd. ("Samsung") filed petitions challenging the three patents, and the Board instituted on all challenged claims, in IPR2020-01020, IPR2020-01021, and IPR2020-01022.  *See* IPR2020-01020, Paper 11 (decision instituting on claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, and 29 of the '035 patent); IPR2020-01021, Paper 11 (decision instituting on claims 1, 4, 5, 8, 10, and 13–15 the '951 patent); IPR2020-01022, Paper 12 (decision instituting on claims 13, 14, 16–23, and 25–30 of the '226 patent).

The Board recently issued final written decisions in the three Samsung cases, determining all challenged claims unpatentable.  *See* IPR2020-01020, Paper 30 (holding unpatentable claims 1, 3, 5–9, 11, 13–17, 19–22, 25, 26, 28, 29 of the '035 patent); IPR2020-01021, Paper 30 (holding unpatentable claims 1, 4, 5, 8, 10, and 13–15 of the '951 patent); IPR2020-01022, Paper 34 (holding unpatentable claims 13, 14, 16–23, and 25–30 of the '226

IPR2020-01570
Patent RE42,035 E

patent). The Board joined Taiwan Semiconductor Manufacturing Co. Ltd.
as a party in each of the prior proceedings as it did here.

C.    *The '035 patent*

The '035 patent describes a stack of integrated circuit ("IC") die
elements including a field programmable gate array ("FPGA") on a die, a
memory on a die, and a microprocessor on a die. Ex. 1001, code (57), Fig.
4. Multiple contacts traverse the thickness of the die elements of the stack to
connect the gate array, memory, and microprocessor. *Id.* According to the
'035 patent, this arrangement "allows for a significant acceleration in the
sharing of data between the microprocessor and the FPGA element while
advantageously increasing final assembly yield and concomitantly reducing
final assembly cost." *Id.*

Figure 4 follows:



Fig. 4

4

IPR2020-01570
Patent RE42,035 E

Figure 4 above depicts a stack of dies including FPGA die 66, memory die 66, and microprocessor die 64, interconnected using contact holes 70. Ex. 1001, 4:6–20.

The '035 patent explains that an FPGA provides known advantages as part of a "reconfigurable processor." *See* Ex. 1001, 1:17–32. Reconfiguring the FPGA gates alters the "hardware" of the combined "reconfigurable processor" (e.g., the processor and FPGA) making the processor faster than one that simply accesses memory (i.e., "the conventional 'load/store' paradigm") to run applications. *See id.* Such a "reconfigurable processor" also provides a known benefit of flexibly providing different types of different logical units required by an application after manufacture or initial use. *See id.*

D.    *Illustrative Claims 1 and 23*

Independent claims 1 and 23 illustrate the challenged claims at issue:

1. A processor module comprising:

[1.1] at least a first integrated circuit die element including a programmable array;

[1.2] at least a second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element; and

[1.3] wherein said first and second integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements, and

[1.4] wherein said contact points traverse said die elements through a thickness thereof.

Ex. 1001, 6:11–22.

23. A programmable array module comprising:

[23.1] at least a first integrated circuit die element including a field programmable gate array;

[23.2] at least a second integrated circuit die element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit die element; and

[23.3] wherein said field programmable gate array is programmable as a processing element, and

[23.4] wherein said memory array is functional to accelerate external memory references to said processing element.

Ex. 1001, 7:38.

E.    *The Asserted Grounds*

Petitioner challenges claims 1–38 of the '035 patent as follows (Pet. 1):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–30, 33, 36, 38 | 103[2] | Zavracky,[3] Chiricescu,[4] Akasaka[5] |
| 31, 32, 34 | 103 | Zavracky, Chiricescu, Akasaka, |

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103. For purposes of trial, the '035 patent contains a claim with an effective filing date before March 16, 2013 (the effective date of the relevant amendment), so the pre-AIA version of § 103 applies.

[3] Zavracky et al., US 5,656,548, issued Aug. 12, 1997. Ex. 1003.

[4] Silviu M. S. A. Chiricescu and M. Michael Vai, *A Three-Dimensional FPGA with an Integrated Memory for In-Application Reconfiguration Data*, Proceedings of the 1998 IEEE International Symposium on Circuits and Systems, May 1998, ISBN 0-7803-4455-3/98. Ex. 1004.

[5] Yoichi Akasaka, *Three-Dimensional IC Trends*, Proceedings of the IEEE, Vol. 74, Iss. 12, pp. 1703-1714, Dec. 1986, ISSN 0018-9219. Ex. 1005.

6

IPR2020-01570
Patent RE42,035 E

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| | | Trimberger[6] |
| 35 | 103 | Zavracky, Chiricescu, Akasaka, Satoh[7] |
| 37 | 103 | Zavracky, Chiricescu, Akasaka, Alexander[8] |

## II. ANALYSIS

*A.    Legal Standards*

35 U.S.C. § 103(a) renders a claim unpatentable if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Tribunals resolve obviousness on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary

---

[6] Steve Trimberger et al., *A Time-Multiplexed FPGA*, Proceedings of the 1997 IEEE International Symposium on Field-Programmable Custom Computing Machines, April 1997, ISBN 0-8186-8159-4.

[7] Satoh, PCT App. Pub. No. WO00/62339, published Oct. 19, 2000. Ex. 1008 (English translation).

[8] Michael J. Alexander, James P. Cohoon, Jared L. Colflesh, John Karro, and Gabriel Robins, *Three-Dimensional Field-Programmable Gate Arrays*, Proceedings of Eighth International Application Specific Integrated Circuits Conference, Sept. 1995. Ex. 1009.

IPR2020-01570
Patent RE42,035 E

considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Prior art references must be "considered together with the knowledge of one

of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480

(Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

B.    *Level of Ordinary Skill in the Art*

Relying on the testimony of Dr. Franzon, Petitioner contends that

> [t]he person of ordinary skill in the art ("POSITA") at the
> time of the alleged invention of the '035 patent would have been
> a person with a Bachelor's Degree in Electrical Engineering or
> Computer Engineering, with at least two years of industry
> experience in integrated circuit design, packaging, or fabrication.

Pet. 7 (citing Ex. 1002 ¶¶ 58–60).

Relying on the testimony of Dr. Souri, Patent Owner contends that

> [a] person of ordinary skill in the art ("POSITA") around
> December 5, 2001 (the earliest effective filing date of the '035
> Patent) would have had a Bachelor's degree in Electrical
> Engineering or a related field, and either (1) two or more years
> of industry experience; and/or (2) an advanced degree in
> Electrical Engineering or related field.

PO Resp. 8–9 (citing Ex. 2011 ¶ 25).

We adopt Petitioner's proposed level of ordinary skill in the art as we

did in the Institution Decision, because it comports with the teachings of the

'035 patent and the asserted prior art. *See* Inst. Dec. 20–21.  Patent Owner's

proposed level largely overlaps with Petitioner's proposed level.  Even if we

adopted Patent Owner's proposed level, the outcome would not change.

C.    *Claim Construction*

In an *inter partes* review, the Board construes each claim "in

accordance with the ordinary and customary meaning of such claim as

understood by one of ordinary skill in the art and the prosecution history

pertaining to the patent."  37 C.F.R. § 42.100(b) (2020).  Under this

8

IPR2020-01570
Patent RE42,035 E

standard, which is the same standard applied by district courts, claim terms take their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

In the Institution Decision, we determined that

> [t]he parties' arguments raise a claim construction issue regarding "wherein said memory array is functional to accelerate external memory references to said processing element" (claims 23 and 33) and "said memory array is functional to accelerate external memory references to the processing element," and "wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element" (claims 24, 30, and 32). Neither party provides an explicit construction.

Inst. Dec. 21–22. Tracking the institution decision in related IPR2020-01021 (challenging related U.S. Patent No. 7,282,951 B2), in the Institution Decision here, we preliminarily construed the "'functional to accelerate' limitations [as] requir[ing] a number of contacts extending throughout the thickness of the wafers in a vertical direction (vias) within the periphery of the die to allow multiple short paths for data transfer between the memory

9

IPR2020-01570
Patent RE42,035 E

and processor." Inst. Dec. 25.[9]  Likewise, in the final written decision in
IPR2020-01021 and in co-pending IPR2020-01568, the Board construed
these "functional to accelerate" limitations in materially the same
manner.  IPR2020-01021, Paper 30, 26, Paper 33 (Errata); IPR2020-
01568, Paper 39 (final written decision) § II.C.

In particular, the "functional to accelerate" clauses require "a
number of contacts extending throughout the thickness of the wafers in a
vertical direction (vias) within the periphery of the die to allow multiple
short paths for data transfer between the memory array/memory and
processing element/programmable array."  *See* IPR2020-01021, Paper 30,
26, Paper 33 (Errata).  We herein adopt and incorporate the construction
and the rationale supporting it from the final written decision of
IPR2020-01021.

Petitioner states that "[e]ven beyond the Board's construction, the
Petition shows that the Zavracky-Chiricescu-Akasaka Combination provides
the 'memory array . . . accelerate' limitations under ***any*** reasonable
construction," "even under [Patent Owner's] flawed construction."  Reply 8–
9.  Patent Owner states that it "construes all terms in 'accordance with the
ordinary and customary meaning of such claim as understood by on of

---

[9] The two relevant patent specifications (i.e., for U.S. Patent No. 7,282,951
B2 and the '035 patent) include the same material disclosure for claim
construction purposes.  The application leading to U.S. Patent No. 7,282,951
B2 is a continuation of an application leading to US. Pat. No. 7,126,214 B2,
which is a  continuation-in-part an application leading to U.S. Pat. No.
6,781,226 B1, which is a continuation-in-part of the application leading to
U.S. Patent No. 6,627,985 B2, from which the '035 patent reissued.  *See*
Ex. 1001, codes (21), (64); IPR20-01021, Ex. 1001, codes (21), (63).

IPR2020-01570
Patent RE42,035 E

ordinary skill in the art and the prosecution history pertaining to the patent.'"
PO Resp. 9 (quoting 37 C.F.R. § 42.100(b)).

Patent Owner argues that "the claims require . . . structure provided **within the memory array** (i.e. the wide configuration data port disclosed in the '035 Patent) that is responsible for accelerating the programmable array's accelerated external memory references."  PO Resp. 20 (citing Ex. 2011 ¶ 55).  Contrary to this argument, Patent Owner fails to describe what particular structure of a wide configuration data port (WCDP) within a memory array the challenged claims require under "the ordinary and customary meaning" or otherwise.  *See id.* at 9.  The '035 patent does not describe a WCDP "within the memory array."  Figure 5, for example, depicts "VERY WIDE CONFIGURATION DATA PORT" 82, but Figure 5's WCDP is a separate black box from any structure involving memory or a memory array.  *Compare* Ex. 1001, Fig. 4 (memory die 66 and vias 70), *with id.* at Fig. 5 (WCDP 82).

IPR2020-01570
Patent RE42,035 E

Figure 5 follows:



**Fig. 5**

Figure 5 above illustrates a "VERY" WCDP 82 on the left connected to
buffer cells 88, and configuration memory cells 88 and logic cells 84, toward
the middle and right of the WCDP. *See* Ex. 1001, Fig. 5; 4:50–56. Buffer
cells 88 ("preferably on a portion of the memory die 66" (*see* Fig. 4)), "can
be loaded while the FPGA 68 *comprising the logic cells* 84 *are* [sic] *in
operation*." *Id.* at 4:51–53 (emphasis added). [10]

---

[10] Although the '035 patent states that "[t]he buffer cells 88 are preferably on
a portion of the memory die 66 (FIG. 4)" in reference to Figure 5, the buffer
cells 88 in Figure 5 appear to be near or connected to FPGA logic cells 84
and configuration memory cells 86—perhaps depicting something other than
the preferred embodiment describing buffer cells on the memory die. For
example, Dr. Chakrabarty (Patent Owner's expert in related IPR1020-

12

Therefore, the central purpose of the buffer cells is "*they can be loaded while the FPGA 68 comprising the logic cells are in operation*," which "then enables the FPGA 68 to be totally reconfigured in one clock cycle with all of it[s] configuration cells 84 updated in parallel." *Id.* at 4:53–53 (emphasis added). But none of the challenged claims require loading the FPGA while it is in operation. Also, configuration cells and the FPGA can be updated in parallel (e.g., in one clock cycle) without the buffer cells. *See id.*; *see also infra* note 11 (cache memory provides reconfiguration). Therefore, the claims do not require buffer cells even by implication.

Regardless of the location of the disclosed but unclaimed buffer cells, Figures 4 and 5 and the disclosure indicate that the numerous connections between memory die 66 (with or without buffer cells 88 thereon) and FPGA die 68 (with our without configuration memory cells 86 thereon) facilitate the claimed "functional to accelerate" limitations, in line with our claim

---

01021) testified that FPGA die 68 is to the right of Figure 5's WCDP 82, while memory die 66 (*see* Fig. 4), although undepicted in Figure 5, is to the left of Figure 5's WCDP 82. Ex. 1075, 157:5–158:7; *see also* Reply 9 (quoting 1075, 157:23–158:3). In any event, Figure 5 depicts WCDP 82 as a separate circuit or structure (in black box form) from buffer cells 88 and any memory die or array, and it is not clear how Figure 5's WCDP relates structurally to a memory die or memory array. *See id.* at Fig. 5.

During the Oral Hearing, Patent Owner's arguments further blurred what Figure 5 illustrates. That is, Patent Owner argued that "when the buffer cells are on the FPGA, it then raises the question, okay, well, what's on the memory array, right. And my answer would be *probably* more buffer cells." Tr. 54:21–24 (emphasis added). But there is no disclosure for buffer cells in or on both a memory array and an FPGA die. *See id.* at 55:3–6 (Patent Owner arguing that "I don't think there's anything *that prevents*" buffer cells from being on both dies (emphasis added)).

Appx406

construction.[11]  In other words, to the extent the claims implicate a WCDP, it is the numerous via connections associated with that port connected to a memory or memory array that support the "functional to accelerate" limitations as discussed further below.

Patent Owner correctly notes that "the '035 Patent discloses that loading configuration data through a typical, relatively narrow [i.e., '8 bit' or single 'byte'] configuration data port [with respect to prior art Figure 3] led to unacceptably long reconfiguration times." *See* PO Resp. 20 (citing Ex. 1001, 3:66–4:5); Ex. 1001, 3:66–4:5 ("Configuration data is loaded through a configuration data port in a *byte serial* fashion and must configure the cells sequentially progressing through the entire array of logic cells 54 and associated configuration memory.  It is the loading of this data through a relatively narrow, for example, *8 bit port* that results in the long reconfiguration times." (emphasis added)).[12]  Patent Owner contends that

---

[11] The '035 patent implies that configuration memory cells 66 are on FPGA die 68 in one embodiment, but a cache memory provides reconfiguration without them in other embodiments.  *See* Ex. 1001, 4:56–61 (stating that "[o]ther methods for taking advantage of the significantly increased number of connections to the cache memory die 66 (FIG. 4) may include its use to totally replace the configuration bit storage on the FPGA die 68 as well as to provide larger block random access memory ('RAM') than can be offered within the FPGA die itself").

[12] This description indicates that 8 bits of the single byte load in parallel to the first 8 bit locations of configuration memory 56, and then in succession (serial) to the other configuration memory cells.  In other words, the quoted description about "byte serial" loading and Figure 3 together show that each byte (i.e., 8 bits) loads over a parallel bus into successive 8 bit blocks (i.e., a byte) of configuration memory cells in succession (i.e., series).  *See* Ex. 1001, Fig. 3 (showing 8 bit configuration data port 52 connected by a bus to

14

IPR2020-01570
Patent RE42,035 E

"[t]he inventors solved this problem not only by stacking a memory die with a programmable array die, but also *by interconnecting those two elements* with a 'wide configuration data port' that employs through-silicon contacts, with the potential for even further acceleration where the memory die is 'tri-ported.'" *Id.* (citing Ex. 1001, 4:31–38) (emphasis added). This argument itself (which mimics the testimony of Dr. Souri (Ex. 2011 ¶ 56)) shows that any structure of a WCDP implicated here simply "interconnect[s] those two [die] elements"— i.e., implicating the numerous vias/contacts 70 as depicted in Figure 4 that connect die elements 64, 66, and 68 together. Therefore, Patent Owner's argument and Dr. Souri's testimony support our analysis and claim construction.

In another argument addressing Petitioner's allegation of obviousness, Patent Owner argues that Petitioner "does not account for all aspects of the claimed invention," and states "[f]or example, . . . the '035 patent . . . discloses utilizing a portion of the memory array as a wide configuration data port including buffer cells." PO Resp. 22 (citing Ex. 1001, 4:47–52). Note that this argument for "buffer cells" differs from Patent Owner's argument on page 20 of its Response, which does not mention "buffer cells" and only mentions a "wide configuration data port" as "responsible for accelerating the programmable array's accelerated external memory references." Again, the argument does not explain how the '951 patent shows "utilizing a portion of the memory array as a wide configuration data port."

---

a block of configuration memory cells $56_{M0}$ and then in serial to successive blocks of configuration memory cells $56_{M1}$–$56_{00}$).

IPR2020-01570
Patent RE42,035 E

Based on the specification and claim language as discussed above and further below, apart from numerous vias 70 as depicted in Figure 4, none of the "functional to accelerate" clauses at issue here require any other structure associated with a WCDP.

In support of our claim construction, Figure 4 of the '035 patent, depicted next, illustrates vias 70 throughout each die, 64, 66, and 68:



Fig. 4

As depicted above, Figure 4 shows a number of vias 70 throughout the periphery of each die (i.e., microprocessor die 64, memory die 66, and FPGA 68 die). According to the abstract as quoted above, these "contacts [i.e., vias] . . . traverse the thickness of the die. The processor module disclosed allows for a *significant acceleration* in the sharing of data between the microprocessor and the FPGA element . . . ." Ex. 1001, code (57) (emphasis added). This description of "*significant acceleration*" does not mention a WCDP or buffer cells.

Moreover, the '035 patent specification consistently ties data acceleration to stacking techniques that include vias throughout the stacked dies without requiring other structure. In addition to the abstract, the '035 patent describes "taking advantage of the significantly increased number of connections to the cache memory die." Ex. 1001, 4:56–58. It describes "an FPGA module that uses *stacking techniques* to combine it with a memory die *for the purpose of accelerating* FPGA *reconfiguration*." *Id.* at 2:55–57 (emphasis added). Similarly, it states that "the FPGA module may employ *stacking techniques* to combine it with a memory die *for the purpose of accelerating external memory references*." *Id.* at 2:59–60 (emphasis added). The stacking techniques include and refer to the short multiple through-via interconnections 70 *distributed throughout the dies* as depicted in Figure 4. *Id.* at 2:31–35 ("[S]ince these differing die do not require wire bonding to interconnect, it is now also possible to place interconnect pads throughout the total area of the various die rather than just around their periphery. This allows for many more connections between the die than could be achieved with any other known technique.").

The '035 patent also explains that "[b]ecause the various die 64, 66 and 68 (FIG. 4) have *very short electrical paths* between them, the signal levels can be reduced while at the same time *the interconnect clock speeds can be increased*." Ex. 1001, 4:64–66 (emphasis added). Similarly, "there is an added benefit of . . . *increased operational bandwidth*." *Id.* at 4:62–63 (emphasis added). As summarized here, these descriptions of shorter electrical paths, increased speed and bandwidth (leading to data acceleration), and acceleration in general, all because of the disclosed stacking techniques (which include multiple short through-vias), apply

17

IPR2020-01570
Patent RE42,035 E

generally to such speed increases (i.e., acceleration) in the context of Figure 4 without mention of Figure 5's WCDP and buffer cell embodiment, or any tri-port structure. As noted above, even reconfiguration may occur without the specific black box WCDP embodiment of Figure 5, for example, "[o]ther methods for taking advantage of *the significantly increased number of connections* to the cache memory die 66 (FIG. 4) may include its use to totally replace the configuration bit storage on the FPGA die 68." *Id.* at 4:56–61 (emphasis added); *see supra* note 11.

Based on the arguments and evidence of record, no reason exists to depart from the claim construction set forth in the final written decision IPR2020-01021. As Petitioner also argues, Patent Owner did not assert a clear requirement for a WCDP and/or buffer cells for the "functional to accelerate" in related district court litigation. *See* Reply 2–3 (arguing that Patent Owner does not justify incorporating limitations from the specification and "has taken five inconsistent positions on the 'accelerate' terms across co-pending IPRs and litigations") (citing Ex. 1071 (district court claim chart)); Ex. 1071 (listing various claim construction statements by Patent Owner); Ex. 1072, 27).

For example, in the district court litigation, Patent Owner argued as follows:

> The specification teaches *in several sections* that *the short interconnects to the memory die allows for accelerated external memory references*, providing additional context for a POSITA to interpret the claims. Darveaux Decl., ¶ 35. For example, the '951 Patent states that in reference to Figures 4 and 5 that *acceleration* to external memory *is performed because "the FPGA module may employ stacking techniques to combine it with a memory die for accelerating external memory references*

IPR2020-01570
Patent RE42,035 E

> *as well as to expand its on chip block memory*." Ex. 2, '951
> Patent at Figs. 4 and 5, 2:56-3:2 (emphasis added).

Ex. 1072, 29 (emphasis added).

In other words, this passage shows that Patent Owner argued in the
district court that "short interconnects" of the disclosed "stacking
techniques" improve the speed relative to the prior art—without relying
specifically on a WCDP, buffer cells, or parallel processing. *See id.*
Therefore, contrary to arguments in the Sur-reply, even though Patent
Owner advanced other arguments during the district court litigation, none
are clear enough to overcome Patent Owner's broad statements in the district
court litigation as quoted above, and Patent Owner has not "taken consistent
positions across all IPRs and litigations." *See* Sur-reply 2.

As the Board also preliminarily determined in the Institution Decision,
prosecution history of the related '951 patent application also plays an
important role in understanding the claims and supports the preliminary
claim construction. *See* Inst. Dec. 24; *accord* Ex. 2009 (institution decision
in IPR2020-1021), 24–25. The prosecution history of the '951 patent
application further supports our construction of the materially similar
accelerate clauses involved in the '951 patent claims and the '035 patent
claims.

Specifically, the Examiner indicated allowance of dependent claim
35 of the '951 patent (if written in independent form) over Lin (U.S.
Patent No. 6,451,626 B1 (Ex. 1054; Ex. 1107, 67)), finding Lin does not
teach or suggest "wherein said memory array is functional to accelerate
external memory references to said processing element." Ex. 1107, 72–
73; Inst. Dec. 24–25.

Noting this in our Institution Decision, we pointed to petitioner Samsung's annotation in the IPR1020-01021 proceeding of the following figures from Lin to illustrate the issue:



Ex. 2009, 25; Inst. Dec. 25.  Lin's annotated Figures 1D and 2D above show that Lin discloses contacts (red) on the sides of dies, instead of a number contact vias extending throughout the area of each die within the periphery thererof, in line with the Examiner's reasons for allowance. *See id.*; Ex. 1054 (Lin), Figs. 1D, 2D; Ex. 1107, 72–73.

> Accordingly, as we noted in the Institution Decision,
>
> in light of Lin's teachings and absent explicit explanation during prosecution by the Examiner, the rejection and reasons for allowance provide further support the understanding that the "functional to accelerate" limitations require a number of contacts extending throughout the thickness of the wafers in a vertical direction (vias) within the periphery of the die to allow multiple short paths for data transfer between the memory and process[ing element].

Inst. Dec. 25–26; *compare*, Ex. 1001, Fig. 4 (showing numerous contact points), *with* Ex. 1054, Figs. 1D, 2D (showing peripheral contact points).

IPR2020-01570
Patent RE42,035 E

During the Oral Hearing, Patent Owner argued that with respect to a WCDP that *"[t]he spec is very clear that what we're talking about is it has enough connections to allow the parallel updating of data*." Tr. 48:20–22 (emphasis added).  When asked to compare the '035 patent's Figure 3 (which depicts a prior art eight bit configuration data port) and Figure 5 (which depicts a WCDP), Patent Owner stated that the WCDP "could be as small as 32 bits . . . if you have a small FPGA, right?  If you want to update something in parallel, you could update 32-bit with 32 bits?"  Tr. 49:1–9 (answering "yes, . . . if you have a very, . . . small FPGA, the number of bits can be . . . relatively smaller, but what's critical is not the number of bits and . . . . [i]t's not necessarily the number of bits that's in the configuration data port, but how they're arranged").  Patent Owner continued by answering that "parallel connections between cells on the die. . . . get to the heart of what the wide configuration data port is, how it works, and how the interconnections between the die work even absent . . . the data being used to configure the FPGA."  *Id.* at 49:13–16.  Then, Patent Owner argued that *"we all agree* that the wide configuration data port . . . *at least includes these interconnections between the die*.  So, what we're talking about is *moving data from one die to another*.  *That's the use of the wide configuration data port*."  *Id.* at 49:22–50:4 (emphasis added).

These arguments support our construction because our construction "at least includes these interconnections between the die" and allows data movement between dies.  In addition, contrary to Patent Owner's arguments in the Sur-reply, our construction implicitly distinguishes over the small number of connections in the narrow configuration data port of the '035 patent's prior art Figure 3.  *See* Sur-reply 8 (arguing that

21

IPR2020-01570
Patent RE42,035 E

"Petitioner's . . . interpretation of the wide configuration data port as simply meaning 'a data port used for configuration . . . . [with] a lot of connections though these TSVs' [through silicon vias] . . . . directly contradict[s] the specification [and] . . . also encompasses the conventional 'data port,' which the '035 Patent distinguishes the wide configuration data port from" (quoting Reply 8).

In other words, the "functional to accelerate" clauses require "a number of contacts extending throughout the thickness of the wafers in a vertical direction (vias) within the periphery of the die to allow multiple short paths for data transfer between the memory array and processing element." *See* IPR2020-01021, Paper 30, 26, Paper 33 (Errata). This implicitly represents more vias than prior art Figure 3 of the '035 patent describes (i.e., eight), as supported in view of specification and the prosecution history of the related '951 patent. *See* Ex. 1001, Fig. 3 ("8 BIT CONFIGURATION DATA PORT 52"). In addition, as discussed further below and as Petitioner shows, to the extent any of the "functional to accelerate" claims implicate parallel data transfer, our claim construction *allows for* such parallel data transfers—in line with Patent Owner's arguments. *See* Tr. 49:13–16 (Patent Owner arguing that "parallel connections between cells on the die. . . . get to the heart of what the wide configuration data port is, how it works, and how the interconnections between the die work"); Sur-reply 2 (arguing that "the novel die-area interconnection arrangement with buffer cells (i.e., wide configuration data port) *allows the parallel loading of data* from the memory die to the programmable array that is responsible for the claimed acceleration" (emphasis added)).

IPR2020-01570
Patent RE42,035 E

Moreover, Patent Owner concedes that "[t]he '035 Patent makes clear that stacking die and short interconnections are simply 'added benefits' that allow for *increased operational bandwidth and speed*." Sur-reply 6 (citing Ex. 1001, 4:62–67) (emphasis added). But increased speed is acceleration—not merely "an added benefit." So is increased bandwidth in context to the '035 patent, because both benefits of *increase in speed* and bandwidth fall within the "functional to accelerate" limitations at issue here for the reasons discussed above. *See* Ex. 1001, 4:42–66; Tr. 56:11–14 (Patent Owner arguing that "[i]f you have a data port that connects in parallel the cells in the memory array with the FPGA cells, that does massively increase bandwidth. . . . but just increasing bandwidth doesn't get you parallel connections"). As noted, our claim construction allows for parallel data transfers (i.e., "a number of vertical contacts distributed throughout . . . to allow multiple short paths for data transfer") so that an increase in bandwidth due to such multiple data paths (vias and connections) both satisfies and supports the "functional to accelerate" clauses.

Therefore, as indicated above, we construe the "functional to accelerate" limitations as "a number of vertical contacts distributed throughout the surface of and traversing the memory die in a vertical direction (vias) to allow multiple short paths for data transfer between the "memory array/memory and processing element/programmable array."

Based on the current record, no other terms require explicit construction. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the

23

IPR2020-01570
Patent RE42,035 E

controversy'. . . ." (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

D.    *Obviousness, Claims 1–30, 33, 36, and 38*

Petitioner contends the subject matter of claims 1–30, 33, 36, and 38 would have been obvious over the combination of Zavracky, Chiricescu, and Akasaka.  Pet. 13–55.  As discussed below, Patent Owner disputes Petitioner's contentions.  *See generally* PO Resp.; Sur-reply.

1.    *Zavracky*

Zavracky, titled "Method for Forming Three Dimensional processor Using Transferred Thin Film Circuits," describes "[a] multi-layered structure" including a "microprocessor . . . configured in different layers and interconnected vertically through insulating layers which separate each circuit layer of the structure."  Ex. 1003, code (57).  Zavracky's "invention relates to the structure and fabrication of very large scale integrated circuits, and in particular, to vertically stacked and interconnected circuit elements for data processing, control systems, and programmable computing."  *Id.* at 2:5–10.  Zavracky includes numerous types of stacked elements, including "programmable logic device[s]" stacked with "memory" and "microprocessor[s]."  *See id.* at 5:19–23.

24

IPR2020-01570
Patent RE42,035 E

Zavracky's Figure 12 follows:



FIG. 12

Figure 12 above illustrates a stack of functional circuit elements, including microprocessor and RAM (random access memory) elements wherein "buses run vertically through the stack by the use of inter-layer connectors." Ex. 1003, 12:24–26.

2.  *Chiricescu*

Chiricescu, titled "A Three-Dimensional FPGA with an Integrated Memory for In-Application Reconfiguration Data," describes a three-dimensional chip, comprising an FPGA, memory, and routing layers. Ex. 1004, II-232. Chiricescu's FPGA includes a "layer of on-chip random access memory . . . to store configuration information." *Id.* at II-232 § 1.

IPR2020-01570
Patent RE42,035 E

Chiricescu describes and cites the published patent application that

corresponds to Zavracky (Ex. 1003) as follows:

> At Northeastern University, the 3-D Microelectronics group has developed a unique technology which allows us to design individual CMOS circuits *and stack them to build 3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip.*

*See id.* at II-232; *see also id.* at II-235 (citing "P. Zavracky, M. Zavracky, D-

P Vu and B. Dingle, '*Three Dimensional Processor using Transferred Thin*

*Film Circuits*,' US Patent Application # 08-531-177, allowed January 8,

1997") (emphasis added).[13]

Chiricescu describes "[a]nother feature of architecture [as] a

layer of on-chip random access memory . . . to store configuration

information." Ex. 1004, II-232 § 1. Chiricescu also describes using

memory on-chip to "significantly improve[] the reconfiguration time,"

explaining as follows:

> The elimination of loading configuration data on an as needed basis from memory off-chip significantly improves the reconfiguration time for an on-going application. Furthermore, a management scheme similar to one used to manage cache memory can be used to administer the configuration data.

*Id.* at II-234.

---

[13] Zavracky lists the same four inventors and "Appl. No. 531,177," which corresponds to the application number cited by Chiricescu. Ex. 1003, codes (75), (21).

Figure 2 of Chiricescu follows:



**Figure 2.** The layers of our 3-D FPGA architecture.

Chiricescu's Figure 2 above illustrates three layers in the 3-D-FPGA architecture, with a "routing and logic blocks" (RLB) layer arranged in a "sea-of-gates FPGA structure," a routing layer, and the aforementioned memory layer (to program/reconfigure the FPGA). *See* Ex. 1004, II-232–233. "[E]ach RLB is connected with the switch-boxes . . . in the routing layer (RL) by means of inter-layer vias. Each RLB can be configured to implement a D-type register and an arbitrary logic function of up to three variables." *Id.* at II-232. Figure 2 also depicts an external "ROUTING_BUS" to access the 3-D structure with external circuitry to provide configuration data. *Id.* at II-232 ("A routing bus provides the configuration information of the routing layer . . . .").

### 3. *Akasaka*

Akasaka, titled "Three-Dimensional IC Trends" (1986), generally describes trends (several years before the 2001 effective filing date of the invention) in three-dimensional integrated stacked active layers. Ex. 1005, 1703. Akasaka states that "tens of thousands of via holes" allow for parallel processing in stacked 3-D chips, and the "via holes in 3-D ICs" decrease the interconnection length between IC die elements so that "the signal processing speed of the system will be greatly improved." *Id.* at 1705.

27

IPR2020-01570
Patent RE42,035 E

Akasaka further explains that "[h]igh-speed performance is associated with shorter interconnection delay time and parallel processing" so that "twice the operating speed is possible in the best case of 3-D ICs." *Id.*

Also, "input and output circuits . . . consume high electrical power." Ex. 1005, 1705. However, "a 10-layer 3-D IC needs only one set of I/O circuits," so "power dissipation per circuit function is extremely small in 3-D ICs compared to 2-D ICs." *Id.*

Figure 4 of Akasaka follows:



**Fig. 4.** Wiring for parallel processing in 2-D and 3-D ICs.

Figure 4 compares short via-hole connections in 3-D stacked chips with longer connections in 2-D side-by-side chips.

According to Akasaka, "[p]arallel processing is expected to be realized more easily in 3-D structures. Several thousands or several tens of thousands of via holes are present in these devices, and many information signals can be transferred from higher to lower layers (or *vice versa*) through them." Ex. 1005, 1705. As one example, Akasaka describes one 3-D chip as including "a video sensor on the top layer, then an A/D converter, ALU [(arithmetic logic unit)], memory, and CPU in the lower layers to realize and intelligent image processor in a multilayered 3-D structure." *Id.*

28

IPR2020-01570
Patent RE42,035 E

>    4.    *Petitioner's Showing, Claims 1–22, 36, and 38*

Claim 1's preamble recites "[a] processor module comprising." Petitioner relies on the combined teachings of Zavracky, Chiricescu, and Akasaka as discussed below, and provides evidence that Zavracky discloses a processor module, including a programmable array, memory (RAM), and microprocessor as part of a layered 3-D stacked die structure. *See* Pet. 21 (citing Ex. 1003, 5:19–23, 12:12–38, Figs. 12–13; citing Ex. 1002 ¶¶ 282–288).

Claim 1 recites limitation [1.1], "at least a first integrated circuit die element including a programmable array." *See* Pet. 22. Petitioner contends that the combined teachings of Zavracky and Chiricescu render the limitation obvious. *Id.* at 22–24. Petitioner relies on Zavracky's "programmable logic array 802" and notes that Zavracky states "[t]he array can be formed in any of the layers of a multilayer structure." *Id.* (quoting Ex. 1003, 12:28–38; 1002 ¶¶ 290–299).[14] Petitioner also quotes Zavracky as stating "[t]he present invention relates to the structure and fabrication of very large scale integrated circuits, and in particular, . . . vertically stacked and interconnected circuit elements for . . . programmable computing." *Id.* at 24–25 (quoting Ex. 1003, 2:2–6). Zavracky states that "[e]ach circuit layer can be fabricated in a separate wafer . . . and then transferred onto the layered structure and interconnected." Ex. 1003, code (57).

---

[14] Referring to its analysis of claim 2, Petitioner contends that "the POSITA would have understood Zavracky to be describing a **programmable** array called a field **programmable** gate **array** (F**P**G**A**), which provides the programmable array element." *See* Pet. 23 & n.3 (citing Ex. 1002 ¶¶ 290–99).

IPR2020-01570
Patent RE42,035 E

Even if Zavracky does not disclose "a programmable array . . . programmable as a processing element," Petitioner contends that "Chiricescu explicitly cites and characterizes Zavracky as teaching a way that 'allows us to design individual CMOS circuits and stack them to build 3-D layered FPGAs.'"  Pet. 23–24 (emphasis omitted) (citing Ex. 1004, II-232).  According to Petitioner, "Chiricescu then describes a 3-D chip comprising FPGA, memory, and routing layers.  A FPGA, or field programmable gate array, provides "a programmable array."  *Id.* at 24.

Noting that Zavracky's teaches that the array (FPGA) can be in any layer (*see* Pet. 23 (citing Ex. 1003, 12:28–38)), Petitioner also quotes Zavracky as teaching that "[i]nter-layer connections . . . can be placed anywhere on the die and therefore are not limited to placement on the outer periphery . . . .  Inter-layer connection is achieved with a minimal loss of die space."  *Id.* at 22 (quoting Ex. 1003, 6:43–65).  Petitioner contends that "Chiricescu's teachings, suggestions, and motivations of reconfiguring a FPGA with a stacked memory to accelerate processing and reconfiguration of the FPGA would have prompted a POSITA to pursue a combination with Zavracky."  *Id.* at 17 (citing Ex. 1002 ¶¶ 212–232).  Petitioner explains that "[i]ntegrating the FPGA structure and reconfiguration scheme from Chiricescu would have produced the result forecast by Zavracky, wherein the programmable logic device "can be programmed to provide for userdefined communication protocol[s]."  *Id.* at 20 (citing Ex. 1003, 12:29–39; Ex. 1002 ¶ 231).

Petitioner also contends that "Chiricescu . . . explicitly references and uses the interconnections of Zavracky."  *Id.* (citing Pet. § VII.A.2); *see supra* § II.D.2 (noting that Chiricescu cites and discuses Zavracky).  Petitioner also

30

contends that "[a] POSITA's background knowledge in 2001 included knowing to stack various types of die elements together to form 3-D stacked ICs using vertical interconnects," and would have known that stacking chips with such interconnects would "minimize latency between the device and chips and . . . maximize bandwidth." *Id.* at 7–8 (citing Ex. 1025, 7:18–25, Fig. 22; Ex. 1002 ¶¶ 41–43).

Claim 1 recites elements [1.2] "at least a second integrated circuit functional die element with and electrically coupled to said programmable array of said first integrated circuit die element" and [1.3]: "wherein said first and second integrated circuit functional elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements."

Petitioner's annotated version of Zavracky's Figure 13 depicts stacked functional elements and the coupled contact points relied upon by Petitioner (*see* Pet. 22):



IPR2020-01570
Patent RE42,035 E

Zavracky's Figures 12 and 13 above as annotated by Petitioner portray (highlighted) inter-layer via connections and one or more second integrated circuit (IC) functional elements, respectively microprocessors 704, 706 and memory 702, and memory 808 (RAM) die, and microprocessor dies 804 and 806, stacked above programmable logic array 802 (FPGA). *See* Pet. 22–25.

As noted above, Petitioner provides evidence that "Zavracky teaches that 'openings or via holes' inter-layer connections 'can be placed anywhere on the die and therefore are not limited to placement on the outer periphery.'" *See* Pet. 26–27 (citing Ex. 1003, 6:43–47, 13:43–46, 14:56–63). For example, Petitioner quotes Zavracky as teaching "integrated circuits, and in particular, to vertically stacked and interconnected circuit elements," "a multitude of individual dies"; and "connections placed anywhere on the die." *See id.* at 24 (citing Ex. 1003, 2:2–6, 4:63–67, 6:46–47).

Petitioner also relies on and quotes similar teachings in Akasaka:

> Akasaka, in terms similar to the '035 patent, describes electrical coupling by contact points distributed throughout the surfaces of die elements: "It is possible to exchange signals between upper and lower active circuit layers through via holes in 3-D ICs." Ex. 1005, 1705. "Each active layer is connected electrically through via holes." *Id.*, 1707.

Pet. 26.

Petitioner quotes Akasaka further: "Several ***thousands or several tens of thousands of via holes*** are present in these devices, and many information ***signals can be transferred from higher to lower layers*** (or vice versa) through them." Pet. 26 (quoting Ex. 1005, 1705) (emphasis by Petitioner). Petitioner further contends that in Akasaka, "[t]he contact points

on the surface of the die are created by 'etching [the] via holes.'" *Id.* (citing Ex. 1005, 1707; citing Ex. 1002 ¶¶ 327–332).

Petitioner provides several reasons to combine the reference teachings to suggest providing numerous via holes between stacked dies or chips according to Zavracky, Chiricescu, and Akasaka. *See* Pet. 16–20. For example, Petitioner describes Akasaka's vertical via connections as resulting in "greatly improved" "processing speed" due "parallel processing" and "shorter interconnection delay time":

> Akasaka teaches that these "tens of thousands of via holes" permit parallel processing by utilizing the many interconnections. [Ex. 1005, 1705.] As a result of this parallel processing, "the signal processing speed of the system will be greatly improved." [*Id.*] Due to "shorter interconnection delay time" arising from stacking and "parallel processing" made possible from the area-wide interconnects, Akasaka states that "twice the operating speed is possible in the best case of 3D ICs" as compared to conventional designs. *Id.*

*Id.* at 16.

Petitioner also points out that Akasaka teaches that "tens of thousands of via holes' permit parallel processing, and that use of the 'via holes in 3-D ICs' shortens the interconnection length between IC die elements so that 'the signal processing speed of the system will be greatly improved.'" Pet. 16 (quoting Ex. 1004, 1705). In addition, Petitioner argues that "the POSITA knew of the need for replicated 'common data memory' in stacked designs, including as taught in Akasaka, to enable, e.g., multi-processor cache coherence." *Id.* at 19–20 (citing Ex. 1002 ¶ 236; Ex. 1034, 466–469; Ex. 1005, 1713, Fig. 25).

Petitioner generally relies on the "Zavracky-Chiricescu-Akasaka Combination" as "provid[ing] . . . the first and second IC die elements."

Pet. 25.  As noted above, Petitioner points out that "Chiricescu explicitly references and builds on Zavracky." *Id.* at 18 (citing Pet. § VII.A.2.); *see supra* § II.D.2 (noting the explicit citation to and description of Zavracky in Chiricescu).  Petitioner also contends "that applying Akasaka's distributed contact points, e.g., in the 3D stacks of Zavracky or Chiricescu, would increase bandwidth and processing speed through better parallelism and increased connectivity." *Id.* at 19 (citing Ex. 1002 ¶ 233; Ex. 1005, 1705). Petitioner also contends that "[t]he POSITA would have sought out Akasaka's connectivity to improve Zavracky's stacks in applications requiring parallel processing.  Such applications included image processing algorithms run simultaneously over an entire image in memory." *Id.* (citing Ex. 1002 ¶ 235; Ex. 1048; Ex. 1005; Ex. 1021).

Claim 1 also recites limitation [1.4]: "wherein said contact points traverse said die elements through a thickness thereof."  Petitioner refers to its showing with respect to limitation [1.3].  Pet. 28.  Petitioner similarly relies on Zavracky's stacked chips interconnected by vias as portrayed in Figures 12 and 13, and further relies on Zavracky's etching teachings for forming via holes:

> Zavracky describes connections made by "[v]ia holes [that] are formed through the upper contact areas to gain access to the lower contact areas.  [E]tching [is used] to form the via holes[.]"[] Ex. 1003, 14:58–62.  The POSITA would have understood this "etching" created a hole through the thickness of the die to permit busses that "run vertically through the stack"; that is, permit thru-silicon electrical contact.  Ex. 1002 ¶¶333–34 (citing Ex. 1003, 12:26; Ex. 1020 ("vertical interconnections are formed using vias etched through the entire wafer").  Zavracky further teaches a continuous connection traversing through the dies, as shown in Figures 12, 13 and other figures . . . .  These teachings by Zavracky would have been understood by a

IPR2020-01570
Patent RE42,035 E

> POSITA as providing for holes—which the '035 patent describes
> as "contact points"—that "traverse said die elements through a
> thickness thereof." *Id.*

Pet. 28. Petitioner also relies on the combined teachings of Zavracky,
Chiricescu, and Akasaka, based on its reasons to combine as summarized
above. *See* Pet. 28–29 (citing Ex. 1005, 1704–07; Ex. 1004, II-232, Fig. 1;
Ex. 1002 ¶ 334).

Claim 2 depends from claim 1 and recites "wherein said
programmable array of said first integrated circuit die element comprises an
FPGA." Petitioner generally refers to the "[t]he Zavracky-Chiricescu-
Akasaka Combination" as it does for claim 1. *See* Pet. 30. Citing the
testimony of Dr. Franzon and other evidence, Petitioner relies on Zavracky's
PLD (programmable logic device) 802 at the bottom of the stack in Figure
13 as an FPGA. *Id.* at 29–31 (citing Ex. 1002 ¶¶ 292–297; Ex. 1035, 1:29–
30; Ex. 1036, 4:1–9; Ex. 1037, 1:13–22; Ex. 1038, code (57) (describing
"transistors of a programmable logic device (PLD), such as a field
programmable gate array (FPGA)").

Petitioner relies on other teachings, including Chiricescu's teachings,
including its "sea-of-gates" FPGA layer, and the knowledge of an artisan of
ordinary skill, to show that Zavracky's PLD is or at least suggests an FPGA
based on Chiricescu's FGPA teachings. *See* Pet. 30 (citing 1002 ¶¶ 294–
297; Ex. 1004, II-232; Ex. 1040; Ex. 1051). Petitioner also generally relies
on reasons for combining the references as outlined above with respect to
claim 1 to suggest modifying Zavracky's 3-D stack (memory, processor,
FPGA) based on Chiricescu's layer/stack teachings (FPGA, memory). *See
id.* at 30–31 (citing Pet. §§ VII.A.2, VII.A.4). Petitioner also notes that
Chiricescu specifically describes Zavracky's teachings (*see supra* § II.D.2)

35

as useful for providing 3-D FPGA stacks. *See id.* at 30 ("Chiricescu literally describes Zavracky as teaching technology 'to build 3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip'" (quoting Ex. 1004, II-232)).

Claim 3 depends from claim 1 and recites "[t]he processor module of claim 1 wherein said second integrated circuit die element comprises a microprocessor." Petitioner relies on its showing with respect to claim 1, which relies on Zavracky's examples of microprocessors with "each microprocessor on its own die element (Figure 12) or using a multi-layer microprocessor (Figure 13)." Pet. 31.

Claim 4 depends from claim 1 and recites "[t]he processor module of claim 1 wherein said second integrated circuit die element comprises a memory." Petitioner refers to its showing for claim 1 and contends that "Zavracky's Figure[] 12 and Figure 13 describe[] layers (comprising integrated circuit die elements per analysis in [1.1]) that comprise a memory, including by describing: 'random access **memory** on the fourth layer 808' also referred to as a 'memory array.'" Pet. 32 (citing Ex. 1003, Fig. 10, 11:63–65 ("memory may be stacked on top of the multi-layer microprocessor."), Fig. 12, 12:15–28 ("random access memory array"), Fig. 13, 12:33–35).

Claim 5 depends from claim 1 and recites "[t]he processor module of claim 1 further comprising: at least a third integrated circuit die element stacked with and electrically coupled to at least one of said first or second integrated circuit die elements." Petitioner refers to its showing for claims 1, 3, and 4, and explains that "the Zavracky-Chiricescu-Akasaka Combination provides that the microprocessor, memory, and programmable array die

elements, are 'stacked with and electrically coupled to' each other, providing the additional limitation[s]." In particular, Zavracky describes stacks with at least three layers wherein the die elements are stacked and electrically coupled." Pet. 33 (citing Ex. 1002 ¶¶ 313–326; Ex. 1003, Fig. 13). In other words, Petitioner's showing for claim 5 summarizes the added limitations recited in claims 3, 4, and 6 by reference primarily to the memory, FPGA, and processor stack as depicted in Zavracky's Figure 13. *See id.* at 31–33.

Claim 6 depends from claim 5 and recites Petitioner "[t]he processor module of claim 5 wherein said third integrated circuit die element comprises a memory." Petitioner refers to its showing with respect to claims 4 and 5, as summarized above. Pet. 33 (citing Ex. 1003, Fig. 13.; Ex. 1002 ¶¶ 318, 322) .

Claim 7 depends from claim 1 and recites "[t]he processor module of claim 1 wherein said programmable array is reconfigurable as a processing element." Petitioner relies on Zavracky's statement that the "**programmable** logic array 802 . . . can be **programmed** to provide for **user-defined** communication protocol." Pet. 33 (citing Ex. 1003, 12:28–38). Petitioner explains that

> [a] POSITA would have understood that Zavracky's programmable array—when programmed (or reconfigured) according to the user-defined communication protocol—functions as a processing element. In this configuration, as the POSITA would have understood, the programmable array processes data received from the microprocessor or "off-chip resources" into and out of the user-defined protocol.

Pet. 33–34 (citing Ex. 1002 ¶ 302; Ex. 1040, 319).

Petitioner also relies on one of Chiricescu's touted "key features," namely "that its FPGA can be 'quickly reconfigured' to implement 'arbitrary

37

logic.'" *Id.* at 34 (quoting Ex. 1004, II-234 § 3). Petitioner also relies on Chiricescu's teaching for "reconfiguring the FPGA" wherein the "FPGA is reconfigured from performing AxB to AxC or vice versa." *Id.* (citing Ex. 1002 ¶ 303; Ex. 1004, 234 (the "example shown is the multiplication of a 4-bit variable")). Citing § VII.A.4 (motivation for combining references) of the Petition, Petitioner contends that "for multiple reasons the POSITA would have been motivated to modify Zavracky's programmable array to do more than process communication data, including to perform math calculations (e.g., multiplication operations in signal processing or image processing, such as taught in Akasaka." *Id.* (citing Ex. 1005, 1704–05, 1707, 1709; Ex. 1002 ¶¶ 229, 235; Ex. 1048; Ex. 1021).

Claim 8 recites "[t]he processor module of claim 1 wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements." Petitioner relies on "[t]he Zavracky-Chiricescu-Akasaka Combination" as its basis, supplemented by the general knowledge of the artisan of ordinary skill, as evidenced by an admission in the '035 patent. *See* Pet. 34–37.

The relied-upon admission from the '035 patent follows:

Tru-Si Technologies of Sunnyvale, Calif. (http://www.trusi.com) has developed a process wherein semiconductor wafers may be thinned to a point where metal contacts can traverse the thickness of the wafer . . . [.] By using a technique of this type in the manufacture of microprocessor, cache memory and FPGA wafers, all three die, or combinations of two or more of them…

*Id.* at 35 (quoting Ex. 1001, 2:19–30).

Petitioner also points to evidence in the "the '035 original patent's file wrapper" as disclosing this known wafer thinning technique. *Id.* (citing Ex. 1012, 88 (teaching "thru-silicon . . . vias [wherein] the wafer is thinned

IPR2020-01570
Patent RE42,035 E

. . . carefully exposing the deep thru-silicon vias."), 108 ("[T]he wafer is simply thinned until the contacts are exposed.")).  In other words, Petitioner relies on the knowledge of the ordinarily skilled artisan as evidenced by the admission in the '035 patent and Exhibit 1012 such an artisan would have been aware of the technique of thinning die elements as recited in claim 8. Petitioner lists several reasons to employ this general knowledge to Zavracky's modified 3-D stack, including to allow "many die element layers to fit within a standard size package."  *See id.* at 36–37.[15]  Petitioner provides evidence of predictability and a reasonable expectation of success based on this general knowledge supplemented by the testimony of Dr. Zavracky.  *See id.* (citing Ex. 1002 ¶¶ 262–66; Ex. 1012, 107 ("It is now mandatory to thin . . . to fit chip stacks inside standard-size 3-D packages"), 104 ("The goal of the technology . . . is to create a stack of 10 wafers equal to the height of a single wafer."); Ex. 1020)).  Petitioner also explains that Zavracky "suggest[s] . . . a need for thin stacks and contact point traversal," which "would have motivated the POSITA to employ the general knowledge of thinning to expose thru-silicon vias."  *Id.* at 36 (citing Ex. 1002 ¶ 265; Ex. 1003, 13:55–60).[16]

---

[15] The admitted prior art here evidences the knowledge of the ordinary artisan and does not form the "basis" of the rejection.  *Cf. Apple Inc. v. Qualcomm Inc.*, 2022 WL 288013, slip op. at *5 (Fed. Cir. Feb. 1, 2022) (holding that that applicant admitted prior art (AAPA) may not form the "basis of a ground in an *inter partes* review because it is not contained in a document that is a prior art patent or prior art printed publication.").

[16] On its face, claim 8 recites a product-by-process limitation and reads on the combination of Zavracky, Chiricescu, and Akasaka as evidenced by Petitioner's showing with respect to claim 1.  That is, "said contact points [of the Zavracky-Chiricescu-Akasaka stack] traverse said thickness of said die elements."  *See* Ex. 1005, Fig. 4 (vias traversing die elements); Ex. 1003,

IPR2020-01570
Patent RE42,035 E

Independent claim 9 is a system claim. As Petitioner contends, "[c]laim 9 takes limitations from claim 1 and combines them with a generic processor and memory." Pet. 37. Specifically, claim 9 recites "[a] reconfigurable computer system comprising: a processor; a memory;" and "at least one processor module" that materially recites the same limitations as the "processor module" of claim 1. The processor module of claim 1 reads on the "Zavracky-Chiricescu-Akasaka Combination" as determined above. Other than at most implying some type of electrical connection through the recitation of "a reconfigurable computer system comprising" in the preamble, claim 9 does not specify any electrical communication between the processor, memory, and "processor module."

Petitioner contends that "Zavracky-Chiricescu-Akasaka Combination in further combination with general knowledge of the POSITA renders obvious claim [9]." Pet. 37. Petitioner explains that the "the Zavracky-Chiricescu-Akasaka Combination teaches the use of numerous microprocessors and numerous memories – any of which can satisfy the additional requirement for one more processor and one more memory in claim 9, and indeed, the teachings of Figure 13 already shows such a reconfigurable computer system." *Id.* "Beyond this," Patent Owner contends that a person of ordinary skill would have known to connect an FPGA of the Zavracky-Chiricescu-Akasaka Combination in a system with memory and a processor as evidenced by admissions in the '035 patent, including admitted prior art Figure 1, which shows a "prior art 'MAP™'

---

Fig. 13 (same). Therefore, by definition, "said die elements [of claim 1] are thinned to a point at which said contact points traverse said thickness of said die elements."

40

element . . . taught to 'comprise a field programmable gate array "FPGA" [and] read only memory.'" *Id.* at 37–38 (quoting Ex. 1001, 3:22–24; citing *id.* at Fig. 1). Petitioner points out that admitted prior art Figure 1 is one example that evidences the general knowledge of an artisan of ordinary skill, and "[t]he general knowledge of the POSITA would have other examples of reconfigurable computer systems with a processor, memory, and processor module." *Id.* at 38 (citing Ex. 1002 ¶¶ 267–73, 289; 1026).[17]

Petitioner contends that prior art Figure 1 shows microprocessor 12 and system memory 16 coupled electrically with the MAP™ (which includes an FPGA). Pet. 38 (annotating Ex. 1001, Fig. 1). Petitioner asserts that it would have been obvious to employ the Zavracky-Chiricescu-Akasaka 3-D stack in a system with processor and memory in order to configure the FPGA using off-chip resources during start-up with a reasonable expectation of success where such systems were well-known. *See id.* at 38–39 (citing Ex. 1003, 12:37; Ex. 1002 ¶¶ 272–73; Ex. 1004, II-234 (describing "during the initiation phase of the application . . . loading configuration data . . . from memory off-chip")).

Independent claim 17 is materially similar to claim 1 but includes at least a third integrated circuit die element in addition to the at least first and second integrated circuit die elements, with the three die elements electrically coupled by contact points distributed throughout the surfaces of

---

[17] In other words, the admitted prior art here evidences the knowledge of the ordinary artisan and does not form the "basis" of the rejection. *Cf. Apple Inc.*, 2022 WL 288013, slip op. at *5 (holding that that applicant admitted prior art (AAPA) may not form the "basis of a ground in an *inter partes* review because it is not contained in a document that is a prior art patent or prior art printed publication.").

the die elements and extending through a thickness thereof. To address claim 17, Petitioner primarily relies on its analysis of claims 1, supplemented by its analysis of claims 3, 5, and 6, which we address below. *See* Pet. 41–43.

Independent claim 36 is similar to claim 17 but broader in that the at least third integrated circuit die element electrically couples only to at least one of the other two die elements. To address claim 36, Petitioner relies on its analysis of claims 1 and 23. Pet. 53.

Dependent claims 10–16 and 18–22 recite limitations that track the limitations addressed above in claims 1–6, 8, and 9. Petitioner refers to its showing with respect to claims 2–6, 8 and 9 to address these claims. *See* Pet. 36–40, 43–44. As such, the Petition relies on the combined teachings of Zavracky, Chiricescu, and Akasaka, as teaching or suggesting these added well-known circuit or die elements and their functionality by relying on specific teachings in the references, supported by the knowledge of an artisan of ordinary skill (evidenced partly by admissions in the '035 patent) and the testimony of Dr. Franzon, and setting forth rationale and reasons to combine, where appropriate. *See id.* at 36–40, 43–44.

Dependent claim 38 recites "[t]he programmable array module of claim 36 wherein said third integrated circuit die element includes an I/O controller." Petitioner relies on Zavracky's "'controller' as controlling connections 'to and from the common data bus' and containing 'arbitration logic, hosted in the controller [run] in accordance with [a] bus arbitration protocol.'" Pet. 54 (quoting Ex. 1003, 5:54–60). According further to Petitioner, Zavracky's Figures 1 and 13 illustrate the same or similar controller, and Zavracky discloses a bus controller that arbitrates logic under

a bus arbitration protocol to communicate with off-chip resources as "a third IC die element." *See id.* at 54–55 (citing Ex. 1002 ¶¶ 324–325; Ex. 1003, 6:58–60). Petitioner alternatively relies on another controller in Zavracky that provides communication protocols between microprocessor and peripheral devices, and contends that "Zavracky teaches that such a programmable I/O controller 'can be formed in any of the layers of a multilayer structure as described elsewhere herein.'" *Id.* at 55 (quoting Ex. 1003, 12:28–38; citing Ex. 1002 ¶¶ 325–326).

We adopt and incorporate Petitioner's showing as to claims 1–22, 36, and 38, as set forth in the Petition and summarized above, as our own. *See* Pet. 7–44, 53–55.

*5.    Arguments with Respect to Alleged Obviousness Based on Zavracky, Chiricescu, and Akasaka*

Patent Owner does not argue any of claims 1–22, 36, and 38 individually, but groups various claims together in separate arguments, as discussed below. Sections below address claims 23–35 and 37, although Patent Owner groups some of these claims together with claims 1–22, 36, and 38 in generic arguments or more specific arguments, so we address some of the more generic arguments in this section and other more specific arguments below. *See infra* §§ II.D.6–8; II.E–G.

Patent Owner argues generally that Petitioner misrepresents the teachings, relies on hindsight to combine the references, and "fails to explain how a POSITA would have combined the references and had a reasonable expectation of success in doing so." PO Resp. 27 (citing Ex. 2011 ¶ 67). Patent Owner also argues that "Petitioner asserts that 'Chiricescu employs Zavracky's principles to solve a known problem with FPGAs—"high configuration time,"' that is simply not true." *Id.* at 28 (quoting Pet. 17).

Rather, Patent Owner explains that "*Chiricescu* teaches the use of '**on-chip**' memory to mitigate the time it takes to transfer configuration data from 'off-chip,' rather than making any use of Zavracky's die-area vertical interconnections to transfer configuration data from the 'on-chip' memory into the FPGA." PO Resp. 28 (citing Ex. 1004, 1, 3).

Patent Owner's arguments are unavailing. Both Chiricescu and Zavracky teach memory layers in a 3-D stack to transfer data to FPGAs, as Petitioner persuasively shows as summarized above. *See, e.g.*, Ex. 1003, Fig. 13 (depicting FPGA/PLD 802 in communication by bus with RAM 808); Ex. 1004, Fig. 21 (depicting memory layer in communication with FPGA RLB layer, connected by "vias" "placed anywhere on the chip" according to Zavracky's teachings (i.e., the "Northeastern University") technology)); *supra* § II.D.1–2). Patent Owner attempts to divorce the numerous advantages of using multiple vias in Zavracky's modified 3–D stack as Petitioner outlines as summarized above, from what Patent Owner implies is separate from the same advantages gained from an "on-chip" memory. There is no support for this line of argument. *See infra* note 20 (discussing the same issue).

In other words, Patent Owner's arguments do not address Petitioner's persuasive reliance on multiple vertical vias in the stacked memory chip structure of Zavracky, as modified by the teachings of Chiricescu and Akasaka, in order to, for example, "improve Zavracky's stacks in applications requiring parallel processing," and "increase bandwidth and processing speed through better parallelism and increased connectivity." Pet. 19 (citing Ex. 1002 ¶ 233; Ex. 1003, 6:43–47; Ex. 1005, 1705;

IPR2020-01570
Patent RE42,035 E

Ex. 1021; Ex. 1048); *see also id.* at 7–12, 16–28 (similar showing). For

example, Petitioner persuasively notes that "[t]he POSITA would have

known [about] many references teaching stacked dies with thousands of

distributed connections. *Id.* at 20 (citing Ex. 1002 ¶¶ 238–239; Ex. 1020;

Ex. 1021). Discussing Akasaka, Petitioner persuasively contends that

Akasaka teaches that "tens of thousands of via holes" permit parallel

processing by utilizing the many interconnections. *Id.* at 16 (citing

Ex. 1005, 1705). Petitioner adds that

> [a]s a result of this parallel processing, "the signal processing
> speed of the system will be greatly improved." Due to "shorter
> interconnection delay time" arising from stacking and "parallel
> processing" made possible from the area-wide interconnects,
> Akasaka states that "twice the operating speed is possible in the
> best case of 3D ICs" as compared to conventional designs.

*Id.* (quoting Ex. 1005, 1705; citing Ex. 1005, Fig. 4).

With respect to all challenged claims, Patent Owner also argues that

"Petitioner and Dr. Franzon fail to explain how a POSITA would have

integrated Akasaka's thousands of distributed contact points with Zavracky-

Chiricescu's design to achieve the claimed 3-D processor modules and

would have had a reasonable expectation of success in doing so." PO Resp.

38 (citing Ex. 2011 ¶ 79). According to Patent Owner, "Petitioner and Dr.

Franzon concede that *Zavracky* and *Chiricescu* both disclose only a small

number of interconnect paths (e.g., the address and data buses) that provide

for vertical communications between functional blocks (such as memory

elements, logic unit, etc.) of the multi-layer microprocessor." *Id.* (citing Ex.

1003, 11:62–12:39; Ex. 1004, 1–2). According further to Patent Owner,

"Dr. Franzon's analysis, like Petitioner's analysis, seems to say no more

than that a POSITA would have understood that the references ***could be***

45

IPR2020-01570
Patent RE42,035 E

combined." *Id.* at 40 (citing Ex. 1002 ¶ 239). Patent Owner also asserts that "[a]t the time of the invention, a POSITA was aware of numerous []TSV interconnection issues, such as routing congestion, TSV placement, granularity, hardware description language ('HDL') algorithms, which must be considered." *Id.* at 41 (citing Ex. 2011 ¶ 82; Ex. 2014, 85, 87, 89).

Patent Owner's arguments are unavailing. As discussed above, Petitioner persuasively relies on the knowledge of the artisan of ordinary skill and the combined teachings of Zavracky, Chiricescu, and Alexander supported by specific reasons and rational underpinning to show how and why the combination teaches or suggests increasing the number of contact points or via holes for electrically coupling FPGA, memory, and processors together to allow for parallel data transfers with a reasonable expectation of success.

As indicated above, Zavracky already specifically describes connecting several bus lines (depicting 4 in Fig. 13) from the FPGA/PLD to other circuits, including memory and a processor. *See* Pet. 13. Zavracky indicates that 32 bit microprocessors were routine in 1993, years before the effective date of the invention, indicating that Zavracky's microprocessor buses at least handled 32 bits in parallel. Viewed through the lens of an artisan of ordinary skill at the time of the invention of the '035 patent, Zavracky's disclosure indicates the ability to handle known microprocessors, memories, and FPGAs, whatever the capabilities of those devices and bus widths were. *See* Ex. 1003, 1:6–8 (continuity date of 1993), 31–40 (discussing prior art microprocessors). Moreover, Petitioner shows a number of other stacked dies or layers with multiple connections, including Akasaka (Ex. 1005, Fig. 4), Franzon (Ex. 1020, Fig. 4), Koyanagi (Ex. 1021,

46

IPR2020-01570
Patent RE42,035 E

Fig. 1(a)), and Alexander (Ex. 1028, Fig. 2(g).  *See* Pet. 26–27.  As discussed further below, Trimberger (Ex. 1006) shows parallel loading by "*flash reconfiguring* all [100,000] bits in logic and interconnect array [i.e., an FPGA] . . . simultaneously from one memory plane," further evidencing a reasonable expectation of success.  *See infra* § II.E.1 (quoting Ex. 1006, 22).[18]

And also as noted above, Patent Owner concedes Zavracky and Chiricescu each show how to connect "memory, logic, etc." using "address and data buses," albeit on what Patent Owner describes as "only a small number of interconnect paths."  PO Resp. 38  ("*Zavracky* and *Chiricescu* both disclose only a small number of interconnect paths (e.g., the address and data buses) that provide for vertical communications between functional blocks (such as memory elements, logic unit, etc.) of the multi-layer microprocessor.")  But Patent Owner also agrees that the number of interconnects is not critical to the claimed invention.  *See supra* § II.C (discussing Oral Hearing arguments); Tr. 49:1–9 (answering "yes, . . . if you have a very, . . . small FPGA, the number of bits can be . . . relatively smaller, but what's critical is not the number of bits and . . . . [i]t's not necessarily the number of bits that's in the configuration data port, but how they're arranged").

Notwithstanding Patent Owner's allegation of a lack of a reasonable expectation of success, Patent Owner acknowledges that "[a]t the time of the

---

[18] Petitioner employs Trimberger to address challenged claims 31, 32, and 34 as discussed further below, but it is further evidence of a reasonable expectation of success as it relates to connecting several thousands of bit lines in parallel.

47

IPR2020-01570
Patent RE42,035 E

invention, *a POSITA was aware* of numerous []TSV interconnection issues, such as routing congestion, TSV placement, granularity, hardware description language ('HDL') algorithms." PO Resp. 41 (emphasis added) (citing Ex. 2011 ¶ 82; Ex. 2014, 85, 87, 89). Here, the challenged claims are broad and do not specify a minimal number of interconnections, FPGA size, or chip size that would even raise TSV congestion or other issues. The '035 patent says nothing about interconnection issues or congestion issues. Even if such issues were a consideration and relevant to a reasonable expectation of success given the breadth of the challenged claims, as Petitioner persuasively argues, "[t]he supposed 'TSV interconnection issues' that [Patent Owner] cursorily identifies were at most normal engineering issues, not problems preventing a combination." Reply 20 (citing Ex. 1070 ¶¶ 13–28 (Dr. Franzon addressing Dr. Souri's testimony as to the purported TSV issues)).

> For example, as Dr. Franzon credibly testifies,

> even if routing congestion or TSV placement were an issue, Kim gives several solutions that would have been known to POSITA, such as to change the TSV "coarseness" or to "increase the chip area to address the placement and routing congestion caused by TSV insertion." [Ex. 2014 (Kim), 85]. But again, the ['035] patent[] and claims are silent on any of these issues; Kim is at worst irrelevant, and at best would have actually encouraged the combination.

Ex. 1070 ¶ 26. With respect to alleged HDL (hardware description language) issues, Dr. Franzon also credibly testifies that

> Alexander (Ex. 1009) has a whole section titled "Placement and Routing in 3D" (Ex. 1009, p. 256). Alexander names then-existing CAD tools that performed these functions, includingDAGmap and Mondrian. Designing distributed 3D interconnects was a routine engineering problem by the time of the Huppenthal Patents, and not an impediment to reasonable

48

IPR2020-01570
Patent RE42,035 E

> expectation of success in making the Zavracky, Chiricescu, Akasaka combination.

Ex. 1070 ¶ 27.

Petitioner provides other evidence that at the time of the invention, an artisan of ordinary skill would have had a reasonable expectation of success in combining the references to arrive at numerous vias connecting circuits (including memory arrays) on stacked chips or circuit layers and to allow for parallel processing or data transfers. *See, e.g.*, Pet. 12 (discussing known wafer processing technology by artisans of ordinary skill (citing Ex. 1002 ¶¶ 262–266; Ex. 1001, 2:29–35; 5:13–18)), 24–25 (pointing to Zavracky's memory as an example vertical integrated circuit on stacked dies connected via connections including vertical buses placed anywhere on the die and providing evidence that "each of the programmable array, microprocessor, and memory are pairwise stacked with and electrically coupled with each other" (citing Ex. 1003, 2:7–8, 2:18–22, 2:27–35, 6:43–63, 10:8–21, 11:63–12:2, 12:13–39, 14:51–63, Fig. 13; Ex. 1002 ¶¶ 278–280)), 25–26 (further relying on Akasaka as teaching thousands of via holes to connect upper and lower circuit layers (citing Ex. 1005, 1705, 1707; Ex. 1002 ¶¶ 327–332)). Furthermore, the '035 patent describes "recently available wafer processing techniques" including those developed by "Tru-Si Technologies," indicating, for purposes of institution, that artisans of ordinary skill would have been aware of any such wafer processing techniques for forming vias at the time of the invention. Ex. 1001, 2:20–30. Therefore, Petitioner persuasively shows ample evidence of a reasonable expectation of success.

In addition, as noted above, Patent Owner argued during the Oral Hearing that the number of vias is not important, depending on the size of the FPGA, provided that the contacts allow for parallel processing. *See*

49

IPR2020-01570
Patent RE42,035 E

*supra* § II.C (discussing Tr. 49:1–9 (Patent Owner arguing that the number of vias "could be as small as 32 bits . . . if you have a small FPGA, . . . . [and] [i]f you want to update something in parallel, you could update 32-bit with 32 bits," further stating that "if you have a very . . . small FPGA, the number of bits can be . . . relatively smaller, but what's critical is not the number of bits").

As summarized above, Petitioner provides persuasive motivation with a reasonable expectation of success to explain why a person of ordinary skill would have increased the number of vias using known techniques, relying on teachings that providing multiple vias in stacked chips using conventional via and metallization processing allowed for better processing speeds and reconfiguration times, shorter latency, higher bandwidth, and parallel processing. *See* Pet. 7–12, 16–20; Ex. 1002 ¶¶ 212–239. Dr. Franzon also reasonably shows that the combined teachings of Zavracky and Chiricescu suggest differing "processing tasks . . . [in] co-stacked microprocessors and memories . . . . as good applications for 3-D stacked chips that required parallel computation." Ex. 1002 ¶ 229.

As Petitioner also persuasively notes, Zavracky does not limit the number of connections, contrary to Patent Owner's arguments. For example, Petitioner quotes Zavracky as describing "**inter-layer connections** [that] provide for vertical communication. . . . [and] [s]uch connections can be placed **anywhere on the die** and therefore are not limited to placement on the outer periphery." Reply 5 (citing Ex. 1003, 6:43–47) (emphasis by Petitioner). Petitioner quotes Zavracky as teaching "buses run vertically through the stack by the use of inter-layer connectors" in describing Figures 12 and 13. *Id.* (quoting Ex. 1003, 12:24–26). Petitioner persuasively

explains that "Zavracky visually shows a number of vertical contacts that traverse the memory die in the internal periphery of the die and provide contacts on the surface of the memory die, just as the Board's construction requires." *Id.* at 5–6 (annotating Ex. 1003, Figs. 12, 13).

Patent Owner contends that "Zavracky proposes using these vertical connections 'for the same reasons any lines otherwise restricted to a single layer are used.'" PO Resp. 10 (quoting Ex. 1003, 6:48–49). This argument supports Petitioner, because it shows that an artisan of ordinary skill easily would and could have re-routed planar connections for known circuitry using vias in a stack of chips or layers.

Patent Owner argues that "in *Akasaka*, the 3-D chip design that uses vertical interconnections is only mentioned for a flip-chip design and a monolithic design, which means it is fabricated as a single piece of silicon with multiple layers." PO Resp. 16. Patent Owner argues that "Akasaka explains that among the expected improvements are the use of '[s]everal thousands or tens of thousands of via holes' in monolithic chips to take advantage of parallel processing." *Id.* at 17 (quoting Ex. 1005, 1705). According to Patent Owner, Akasaka's "flip-chip design is limited . . . in that 'the number of connections are restricted by reliability and bump size constraints.'" *Id.* at 16 (quoting Ex. 1005, 1704).

Contrary to these arguments, Akasaka states that with respect to flip chips, "the number of connections will be greatly increased by this technology." Ex. 1005, 1704. Moreover, Akasaka refers to the flip chip structures in a section titled "3-D IC Structure." *Id.* And contrary to Patent Owner's arguments, Akasaka generally indicates that for all "3-D structures" "[s]everal thousands or several tens of thousands of via holes are present in

51

these devices, and many information signal scan be transferred from higher to lower layers or vice versa through them." *Id.* at 1705; *see also* Reply 20 n.6 (showing that 3-D die stacking with numerous chips was well-known (citing Ex. 1002 ¶¶ 328, 332); *id.* at 21 n. 8 (persuasively showing that Patent Owner "describes Akasaka's teachings inaccurately" (citing Ex. 1002 ¶¶ 233–239; Ex. 1070 ¶¶ 59–66); Ex. 1070 ¶¶ 60–61 (disputing Dr. Souri's testimony and stating that Akasaka shows "vertical interconnections between multiple chips and other chip attachment mechanisms," and testifying that "Akasaka does not limit its via fabrication teachings to two layers or a monolithic chip"); Ex. 1002 ¶ 238 (testifying that chip stacking was known and "[t]here were many references teaching stacked dies with thousands of distributed connections, including those discussed in my technology backgrounder above, Section V, and the papers in Section IX"). Akasaka also indicates that even in 1986, about five years before the 2001 date of the invention, artisans of ordinary skill would have mixed flip chip technology and monolithic technology to provide stacked layers. "Mixing of assembly technology with monolithic chip technology can also provide 4 layers or 6 layers from 2-layer or 3-layer stacked monolithic ICs, respectively." Ex. 1005, 1713.

Even though claim 1 does not recite the "functional to accelerate" clauses (which claims 23, 24, 30, 32, and 33 recite), as motivation for all claims, as summarized above, Petitioner persuasively relies on Zavracky's teaching that "this approach **accelerates** communication between the dies in the chip by way of '**smaller delays** and **higher speed** circuit performance.'" *See* Reply 6 (emphasis by Petitioner) (quoting Ex. 1003, 3:4–14). Petitioner persuasively notes that Chiricescu describes Zavracky's teachings as

IPR2020-01570
Patent RE42,035 E

"allow[ing] us" to build stacked circuit layers on a chip "with vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip." *See id.* (quoting Ex. 1004, 232). Petitioner also persuasively argues that Chiricescu teaches the recited "functional to accelerate" clauses, with "significantly **improved[d FPGA] reconfiguration time**" through its "interconnected layers, including a memory layer configured as a cache for fast access to 'configuration data . . . from memory off-chip.'" *Id.* at 6–7 (quoting Ex. 1004, 232) (emphasis by Petitioner). Other than disclosing an 8-bit configuration port as prior art with respect to Figure 3, the '035 patent does not specify how many via interconnections the claimed "accelerate" functionality requires. *See* Ex. 1001 2:55–61 (describing stacking an FPGA with a "memory die" "for the purpose of accelerating FPGA reconfiguration" and "for the purpose of accelerating external memory references" and stacking "a microprocessor, memory and FPGA . . . for the purpose of accelerating the sharing of data"), 4:31–35 (describing cache memory purpose of serving "its traditional role of fast access memory").

Patent Owner limits Chiricescu as teaching only "the use of 'on-chip' memory to mitigate the time it takes to transfer configuration data from 'off-chip,' rather than making any use of Zavracky's die-area vertical interconnections to transfer configuration data from the 'on-chip' memory into the FPGA." *See* PO Resp. 28 (citing Ex. 1004, 1, 3). Patent Owner also argues that "[n]either *Zavracky* nor *Chiricescu* even contemplate using die-area inter-layer vertical interconnections to move data between a programmable array and a memory, such as is recited in Claims 4, 9, 14, 20, and 23–28." *Id.* (citing Ex. 2011 ¶ 66). The record does not support this line of argument. As discussed above, Zavracky's Figure 13 shows that

53

Zavracky contemplates moving data on vertical buses between RAM memory 808 (and RAM memory on processor layer 806) and programmable array 802 (Ex. 1003, 12:29–39), and Chiricescu's Figure 2 shows that Chiricescu contemplates moving data on "vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip" (based on Chiricescu's characterization of Zavracky) between memory layer and the "sea of gates FPGA" RLB layer (Ex. 1004, II-232); *see also* Ex. 1004, II-232 § 1 ("Another feature of our architecture is that a layer of on-chip random access memory is provided to store configuration information.").

Also, Petitioner shows persuasively an artisan of ordinary skill would have recognized that speed improvement emanates partly from shorter interconnection distances and/or parallel processing using a larger number of vias (as compared to connections on the same plane).  *See* Reply 6 (arguing Zavracky's "approach **accelerates** communication between the dies in the chip by way of '**smaller delays** and **higher speed** circuit performance'" (emphasis by Petitioner (quoting Ex. 1003, 3:4–14)), and arguing that "Zavracky's short interior 'inter-layer connectors' to stacked 'random access memory . . . results in **reduced** memory access **time**, **increasing the speed** of the entire system.'" (emphasis by Petitioner (quoting 11:63–12:2)). Patent Owner concedes that the "[t]he '951 Patent provides accelerated external memory references due to its technique of stacking a programmable array with a memory die using through-silicon vias (TSVs)," and Patent Owner quotes the '951 patent as providing "increased" "bandwidth" and providing the "traditional role of fast access memory."  *See* PO Resp. 19–20 (quoting Ex. 1001, 4:31–44).  These arguments support Petitioner's showing, because the combined Zavracky-Chircescu-Akasaka stack includes

the same structure, including numerous vias, as the short via connections as disclosed in the '035 patent.

Patent Owner agrees that "*Chiricescu* says . . . [that] '[t]he elimination of loading configuration data on an as needed basis from memory off-chip significantly improves the reconfiguration time for an on-going application.'" Sur-reply 5 (quoting Ex. 1004, 234). However, Patent Owner argues that "Petitioner concocts its hypothetical structure based on its demonstrably false claim that *Chiricescu's* improved FPGA reconfiguration time 'is achieved by its interconnected layers, including a memory layer configured as a cache for fast access to "configuration data . . . from memory off-chip."'" *Id.* at 4 (quoting Reply 6–7; last internal quote quoting Ex. 1004, 234). Patent Owner contends that "*Chiricescu* says just the opposite." *Id.* at 5 (citing Ex. 1004, 234).

Contrary to this line of argument, Patent Owner mischaracterizes Petitioner's showing. Petitioner shows that Chiricescu improves FPGA reconfiguration time because Chiricescu's cache pre-stores and holds configuration data on-chip that it obtains from an external source (i.e., off-chip memory)—so that the FPGA (in Zavracky and Chiricescu) need not access that external (off-chip memory) source to load the FPGA through a "typical narrow configuration data port" (Sur-reply 5) during FPGA reconfiguration. *See* Reply 6–8; Ex. 1004, II-234 ("The elimination of loading configuration data on an as needed basis from memory off-chip significantly improves the reconfiguration time for an on-going

IPR2020-01570
Patent RE42,035 E

application."); *infra* § II.D.6 (discussing Petitioner's reliance on Chiricescu's cache memory teachings).[19]

---

[19] Throughout its briefing, Patent Owner limits all "on-chip" advantages to a *single die* and confuses issues by arguing that even chips in the same stack are "off-chip" relative to each other, such that all "off-chip" vias are part of a "narrow" data port—even with thousands of vias connecting chips in the same stack as proposed by Petitioner. On the other hand, Petitioner, like Zavracky, generally refers to "off-chip resources" to include a resource outside of a *chip stack*. *See e.g.*, Pet. 34 ("[T]he POSITA would have understood, the programmable array [of Zavracky] processes data received from the microprocessor or 'off-chip resources' into and out of the user-defined protocol."); Ex. 1003, 5:53–54 ("Paths which connect off-chip are routed to bonding pads 226 [Fig. 1], which are bonded to the chip carrier pins."); Ex. 1070 ¶ 44 (Dr. Franzon noting that "Dr. Souri apparently means 'chip' here as limited to a single die."). Patent Owner exploits this difference of use in the terminology to confound issues, characterizing, for example, Dr. Franzon's testimony as follows: "Dr. Franzon's testi[ies] that '*off-chip* access [*e.g.*, *off-chip* memory *separate from the FPGA die*] can't be, for example, 100,000 bits wide." Sur-reply 9 (emphasis added) (second bracketed information by Patent Owner). As another example, Patent Owner argues that Petitioner "rel[ies] on Dr. Franzon's discussion that thousands of interconnections for *off-chip* access of a 3D stacked structure is not feasible." *Id.* (emphasis added (citing Reply 18)). This conflation represents the opposite of Dr. Franzon's testimony and Petitioner's showing. The thrust of Dr. Franzon's testimony and Petitioner's showing is that numerous stacked via connections in a stack of chips (dies) or layers of a single chip are better (faster) than connections on the same plane. *See, e.g.*, Reply 17–18 (characterizing Dr. Franzon's testimony as "noting the routine use of on-chip area-wide connections in 3D stacks, including his prior work." (citing Ex. 1020; Ex. 1002 ¶¶ 47–51; Ex. 1070 ¶¶ 65, 68)); Ex. 1070 ¶ 44 ("But a POSITA would have recognized that [a] 3D chip that consists of multiple dies would do a better job than the 2D chip and provid[e] fast large connectivity. . . . The point here is that a shorter vertical interconnect allows for a shorter 'longest path' and a faster chip. This was commonly understood in the other art as well. . . . [such as] Akasaka's . . . 3-D 'high speed performance'" (citing Ex. 1005, 1705)).

56

Addressing claims 4, 9, 14, 20, and 23–38 as a group, Patent Owner argues that "neither Zavracky nor Chiricescu even contemplate using die-area inter-layer vertical interconnections to move data between a programmable array and a memory, such as is recited in Claims 4, 9, 14, 20, and 23–38." PO Resp. 28. As noted in summarizing Petitioner's analysis of claim 4 above, claim 4 recites "[t]he processor module of claim 1 wherein said second integrated circuit die element comprises a memory." *See* Pet. 32. Claim 4 does not specifically require moving data between a programmable array and a memory or even the capability to do so. Claim 9 does not specifically recite a connection between the programmable array (FPGA) and memory—it recites a "system" in the preamble that includes those components. Claims 23, 24, and 28 also do not specifically require moving data between a programmable array and memory. *See* Pet. 44–47, 50 (addressing these claims); *infra* § II.D.6–8 (summarizing and addressing Petitioner's showing and Patent Owner's arguments for claims 23, 24, and 28). Rather, claim 23 and dependent claims 24 and 28 recite "a memory array stacked with and electrically coupled to said field programmable gate array." Instead of a data transfer to or from memory, claim 25 recites "whereby *said processor* and said programmable array are operational to share data therebetween" (emphasis added). *See* Pet. 48–50; *infra* II.D.8. Although claim 25 recites a "reconfigurable processor" in the preamble, this is broad enough to include the capability for reconfiguration from an external memory source (i.e., external to Zavracky's stack). Dependent claim 26 recites "[t]he reconfigurable processor module of claim 25 wherein said memory is operational to at least temporarily store said data," so it may imply some ability to move shared data to memory as discussed above. *See*

*infra* § II.D.8.  Claims 36 and 38 recite electrical coupling between an FPGA and memory array, which also implicitly requires the ability to "move data between a programmable array and a memory."

In any event, even assuming a requirement to move data as argued, Patent Owner's arguments are unavailing.  As summarized above in connection with claim 1, Petitioner shows that Zavracky's Figure 13 specifically shows via bus connections (i.e., electrical coupling) from PLD 802 to microprocessor 804/806, RAM memory 808, and also RAM memory associated with microprocessor 806.  Ex. 1003, Fig. 13, 12:29–39; *supra* § II.4.

Chiricescu also shows electrical coupling between a memory layer and FPGA layer for configuring the FPGA, as Petitioner also shows.  *See, e.g.*, Pet. 15–16 (showing that "Chiricescu . . . describes configuring the FPGA as a processing element ('multiplication of a 4-bit variable,' . . . and accelerating the reconfiguration of the FPGA as a processing element by utilizing the on-3D-chip memory to 'significantly improve[] the reconfiguration time'" (quoting Ex. 1004, II-234)).  Moreover, Petitioner relies on the combined teachings of the references and shows persuasively that moving data using numerous inter-layer vias was well-known to produce distinct increased speed advantages, as noted above and below in connection with claims 1 and 23–29.  *See supra* II.D.4; *infra* §§ II.D.6–8.  Also, with respect to independent claim 9, as summarized above (§ II.D.4), Petitioner shows that it would have been obvious and well-known by artisans of ordinary skill for systems to move or transfer data between an FPGA and memory.  *See* Pet. 38 (showing data bus lines between the recited claim elements in admitted prior art Figure 1 of the '035 patent as

IPR2020-01570
Patent RE42,035 E

evidencing the knowledge of the skilled artisan and relying on Zavracky's teachings for its similar showing).

Patent Owner addresses claims 3, 11, 19, and 28 as a group. These dependent claims recite "wherein said second integrated circuit die element comprises a microprocessor" or "wherein said processor of said second integrated circuit die element comprises a microprocessor." Patent Owner argues that because Chiricescu discloses storing configuration data in on-chip memory, removing data "from the microprocessor cache and plac[ing it] in the FPGA's on-chip memory," per "the approach of *Zavracky-Chircescu*," "mak[es] it **much harder** for the microprocessor, as recited in Claims 3, 11, 19, and 28." PO Resp. 28–29 (citing Ex. 2011 ¶ 67). Patent Owner contends that this approach "result[s] in significantly **decreased** processing speeds for any data that might be shared between *Chiricescu's* FPGA and *Zavracky's* microprocessor, thus not leading to an improvement in the reconfiguration time." *Id.* at 29.

These arguments do not address Petitioner's showing and the scope of claims 3, 11, 19, and 28. None of the claims require, and Petitioner does not propose, removing data from a microprocessor cache, or removing it and placing it in another on-chip memory. *See* Pet. 31–32, 40, 43, 50. Here, Patent Owner explains that Chiricescu's FPGA and Zavracky's microprocessor and FPGA "might" share data by using Zavracky's microprocessor cache memory. *See infra* § II.D.8.[20] Assuming this is

---

[20] This argument contradicts Patent Owner's arguments advanced with respect to claims 25–29 that sharing data between a microprocessor and FPGA from an "on-chip" memory would not have been obvious. *See infra* § II.D.8.

59

correct, Petitioner relies generally on a Akasaka's teachings as motivation to provide a separate memory layer to provide cache coherence. Pet. 19–20 (arguing that "the POSITA knew of the need for replicated 'common data memory' in stacked designs, including as taught in Akasaka, to enable, e.g., multi-processor cache coherence" (citing Ex. 1002 ¶ 236; Ex. 1034, 466–469; Ex. 1005, 1713, Fig. 25). Patent Owner's arguments do not address this persuasive rationale, but support it. Petitioner also relies on Chiricescu's cache memory teachings to suggest a separate memory layer in addressing claims 23, 24, 30, 32, and 33. *Infra* § II.D.6, E.2

With respect to Patent Owner's argument that Petitioner does not relate "arbitrary logic functions" to the claimed invention (*see* PO Resp. 29), Petitioner persuasively points out that Dr. Franzon testifies that a "POSITA would appreciate that Chiricescu teaches and praises as one of its 'key features' that its FPGA can be 'quickly reconfigured' to implement 'arbitrary logic.'" *See* Reply 17 (quoting Ex. 1002 ¶¶ 215–217). In other words, in context, Petitioner persuasively shows that changing logic functions by reconfiguring (i.e., on the fly) an FPGA in stacked dies or layers using numerous distributed via connections to memory increases reconfiguration speed and produces other benefits, including the ability to perform different logic functions quickly. *See* Pet. 17–18. As another example, Petitioner argues persuasively that "[i]mproved reconfiguration times through this integration would predictably mitigate undesirable packet flow interruption when reconfiguring." *Id.* Petitioner also persuasively argues that "a POSITA would have taken Chiricescu's suggestion of a[n] FPGA to perform 'arbitrary logic functions,' Ex. 1004, 233, as a cue to enhance and expand upon the packet processing task performed by the

IPR2020-01570
Patent RE42,035 E

programmable logic device in Zavracky, e.g., to perform image and signal processing tasks that would have taken advantage of co-stacked microprocessors and memories as taught in Zavracky." *Id.* at 19 (citing Ex. 1002 ¶¶ 229–30; Ex. 1005, 1705; Ex. 1003, 12:25–30; Ex. 1004, II-232; Ex. 1058, 41; Ex. 1048)).

Addressing claims 1–38 as a group, Patent Owner argues that Petitioner fails to show the obviousness of connecting "large numbers of vertical interconnections between an IC die with a programmable array and any other type of die." PO Resp. 41. Contrary to this argument, which repackages arguments addressed above, Petitioner shows it would have been obvious for the reasons noted and well within the skill of an ordinary artisan. *See* Reply 16–19; Pet.19–20 (citing, *inter alia*, Ex. 1002 ¶¶ 237–38, 41–51 (citing and describing additional successful prior art including art with programmable arrays)); *supra* § II.D.4; *infra* § II.D.6, 8.

Patent Owner contends that "merely disclosing the availability of large numbers of vertical interconnections between IC dies (as Akasaka does), does not demonstrate that a POSITA would or could have employed those interconnections between a programmable array and any other type of IC die with a reasonable expectation of success." PO Resp. 41–42. To support this argument, Patent Owner argues that "the '035 Patent itself does not purport to have invented TSVs (or any other types of 'contact points distributed throughout the surfaces of said die elements . . . [which] traverse said die elements through a thickness thereof')." *Id.* at 42 (citing Ex. 1001, 2:19–23). Advancing this point, Patent Owner admits that the '035 patent "disclos[es] that the various embodiments of the '035 Patent were enabled by Tru-Sci Technologies' process." Patent Owner similarly argues that it

61

invented "use cases for such contact points (e.g., interconnecting a programmable array with a different type of IC)." *Id.* at 42.

The record does not support this line of argument. The '035 patent also states "the use of the through-die area array contacts 70 . . . . *is not known to be possible* with any other currently available stacking techniques *since they all require the stacking contacts to be located on the periphery of the die*." Ex. 1001, 5:13–20 (emphasis added). This disclosure and others (including the disclosure of speed and bandwidth gains, reduced power and signal strength based on short via connections (*id.* at 4:62–67)) suggests that through-vias throughout the dies (as opposed to merely on the periphery) is a concept central to the disclosed and claimed invention. Moreover, the '035 patent provides a low level of detail in block form relating to connecting some contact points together for these alleged "use cases," further supporting the finding that the central focus of the invention was the large number of vias throughout the dies and implying that artisans of ordinary skill already knew how to connect circuits together (in parallel or otherwise) regardless of the types of circuits number of contacts involved. *See, e.g.*, Ex. 1001, Fig. 4, Fig. 5; Ex. 1002 ¶ 98 (discussing Figures 4 and 5), ¶¶ 235–236 (describing known implementations of parallel processing using stacked dies and testifying that "[b]eing able to do that in one massive shot over the image or set of frames in parallel would have been recognized as an advantageous way to apply Akasaka's teaching to the Zavracky-Chiricescu combination" (citing Ex. 1048 (Villasenor); Ex. 1021 (Koyanagi)), ¶ 332 (describing stacked structures with numerous vias throughout the dies as "ubiquitous in the prior art" (citing Ex. 1020, 9–10; Ex. 1021, Fig. 4, 17; Ex. 1028, Fig. 9).

And as Petitioner persuasively explains, bus connections between a programmable array, memory, and a processor in these "use cases" were

> already taught in at least Zavracky (programmable array interconnected to memory and processor) and Chiricescu (programmable array interconnected to memory), and the teaching and advantages of a large number of interconnections between dies was well known. *See, e.g.,* Ex. 1009 (Alexander with large number of vertical interconnections between programmable array dies), Ex. 1021 (Koyanagi with large number of vertical interconnections between processor and memory dies), Ex. 1020, 2–10 (survey paper by Dr. Franzon describing general applicability and advantages of "area interconnection" with table listing "companies which provide area interconnection between stacked [chips]").

Reply 21.

Also, based on the above discussion, Petitioner does not rely on "merely disclosing the availability of large numbers of vertical interconnections between IC dies," as set forth above. *See* PO Resp. 41. As another example, Petitioner relies on Zavracky's teaching of "interconnection pads [for signals to] run in a vertical direction (the third dimension) between functional blocks" (Ex. 1003, 2:43–52) and descriptions involving Figures 12 and 13, which show similar buses connecting memory, FPGA, and a microprocessor. *See* Reply Br. 10; *supra* § II.D.4.

> Patent Owner also argues that

> Petitioner provides no argument, let alone evidence, demonstrating that modifying the combination of Zavracky and Chiricescu to provide the type of wide configuration data port responsible for the accelerating features of the challenged claims (or to arrange a microprocessor and programmable array such that the two components share data) was either known in the art or within the skill of a POSITA.

IPR2020-01570
Patent RE42,035 E

PO Resp. 32. This argument repackages arguments, including unavailing claim construction arguments, addressed above in connection with claim 1 and below in connection with 23–25. *See supra* § II.D.4; *infra* §§ 6, 8. Other than numerous via connections, none of the challenged claims here recite or require other structure of a WCDP. Sharing data between a microprocessor and programmable array was well within the knowledge of an artisan of ordinary skill (as, for example, admitted for in connection with prior art Figure 1 of the '035 patent as discussed in connection with claims 9 and 25 above and as disclosed in Zavracky's Figure 13). Petitioner shows that implementing a WCDP in the context of the challenged claims, which Figure 5 of the '035 simply depicts as a black box, at most involves connecting large numbers of vias to connect circuits on stacked dies, and that such a scheme provides for parallel processing for different types of well-known circuits, all of which also was well-known and taught by the prior art of record. *See supra* § II.D.4, *infra* §§ 6, 8; Reply 9 (discussing a WCDP versus a narrow configuration port).

Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections below that tend to overlap to a certain extent with issues in the instant section due to the format of the Response, Petitioner persuasively shows that claims 1–22, 36, and 38 would have been obvious.

6. *Claims 23 and 33*

Claims 23 and 33 are similar to claim 1, with the added limitations, "wherein said memory array is functional to accelerate external memory references to said processing element." Similar to the "programmable array" of claim 1, the "processing element" of claims 23 and 33, is a "field

IPR2020-01570
Patent RE42,035 E

programmable gate array" (FPGA). Petitioner relies on its showing with respect to claim 23 to address claim 33. *See* Pet. 52–53.

Petitioner relies its showing with respect to claim 1, including relying on Zavracky's programmable logic array 802 as the claimed FPGA and random access memory 808 as the claimed memory array. *See* Pet. 44–47, 52–53. Petitioner also relies on the combined teachings of Zavracky and Chiricescu: "Chiricescu describes a system where the focus of the 3D module is on a FPGA layer and a memory layer designed to accelerate external references (and specifically, the reconfiguration data) to the FPGA layer (a programmable array), again providing a programmable array module." *Id.* at 45 (citing Ex. 1004 at II-234; Ex. 1002 ¶¶ 282–288). Petitioner also relies partly on its showings above with respect to the second integrated circuit in limitations [1.2] and [1.4], to include Zavracky's memory array stacked and electrically coupled to the first IC programmable array, connected via multiple connection points. *See id.* at 24–25 (addressing limitation [1.2] relying on vertical buses, stacking, via holes, etc.), 28 (addressing limitation [1.4], which refers to limitation [1.3], collectively relying on multiple via connections including an array of contacts to provide vertical connections), 45 (referring to the analyses of limitation [1.2] and claim 2). For example, with respect to claim 2, Petitioner contends that "Chiricescu literally describes Zavracky as teaching technology 'to build 3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip.'" *Id.* at 30 (quoting Ex. 1004, II-232; reproducing Ex. 1003, Fig. 13, which shows multiple via bus layers).

In addition to the multiple short through-vias, Petitioner also relies on Chiricescu's RAM "cache memory" array teachings to show that on-chip memory (chips or layers in the same 3-D stack) accelerates configuration times relative to off-chip (chips or layers not in the same stack):

> The Zavracky-Chiricescu-Akasaka Combination provides this element. Chiricescu observes that "[t]he main bottleneck in the implementation of a high performance configurable computing machine is the high configuration time of an FPGA." Ex. 1004 at II-232; Ex. 1002, ¶¶304–07. This bottlenecking problem is caused in part by having to load configuration data from off-chip memory. Chiricescu's proposed solution used a "memory layer" where the "random access memory is provided to store configuration information." Ex. 1004 at II-232. Rather than having to go "off-chip" each time new FPGA reconfiguration data is referenced, Chiricescu's random access memory (i.e., a memory array) acts as a "cache memory" for that reconfiguration data, accelerating the FPGA (processing element)'s access to those external memory references. Ex. 1004, II-234. Therefore, the Zavracky-Chiricescu-Akasaka Combination, which includes Chiricescu's FPGA and memory layers, provides this claim element. Ex. 1002 ¶¶304–07.

Pet. 46–47. Petitioner also relies on "the Zavracky-Chiricescu-Akasaka Combination, which includes Chiricescu's FPGA and memory layers." *Id.* at 47 (citing Ex. 1002 ¶¶ 304–307). As summarized above in connection with claim 1, Petitioner relies on the knowledge of the artisan of ordinary skill and provides several reasons for combining the references to arrive at stacked chips with short via connections, for example, to increase processing speed based on shorter connections (decreasing propagation delays), increase bandwidth, and to increase processing based on parallel processing––thereby meeting the "functional to accelerate" limitation. Pet. 7–12, 16–20.

Addressing claims 23 and 33 as a group, Patent Owner contends that "[t]he Zavracky-Chiricescu-Akasaka combination fails to teach or suggest a

IPR2020-01570
Patent RE42,035 E

3-D processor module that includes a second integrated die element, separate from a first integrated die element having a programmable array, including a 'memory array is functional to accelerate external memory references to said processing element.'" PO Resp. 19. According to Patent Owner, "*Chiricescu* suffers precisely the same problems as the prior art distinguished in the '035 Patent," because Chiricescu's' "narrow configuration data port still loads configuration data 'in a byte serial fashion and must configure the cells sequentially.'" *Id.* at 21 (quoting Ex. 1001, 3:66–4:1; citing Ex. 2011 ¶ 57). Patent Owner also argues that the "claims require" a "wide configuration data port." *Id.* at 20. Patent Owner also asserts that "as Dr. Franzon acknowledges, Chiricescu describes only a narrow configuration data port between the RLB [routing logic block] and memory layers." *Id.* at 21 (citing Ex. 2012, 80:10–22). Patent Owner also argues that "because Petitioner has not demonstrated that its combination of references 'accelerates external memory references to said processing element' over the baseline of the relatively narrow configuration port distinguished in the '035 Patent (and taught in Chiricescu), Petitioner's argument fails." *Id.* at 22 (citing Ex. 1001, 1:44–49, 4:42–47; Ex. 2011 ¶ 58). Patent Owner also indicates the claims require "utilizing a portion of the memory array as a wide configuration data port including buffer cells." *Id.* (citing Ex. 1001, 4:47–52).

These arguments do not undermine or address Petitioner's specific showing. Regarding separate wafers or dies, the Petition quotes Zavracky as disclosing "dies" and "individual dies," and persuasively argues that "[b]y the references to interconnected circuit elements or dies, the POSITA would

IPR2020-01570
Patent RE42,035 E

have understood Zavracky to be describing stacked layers of integrated circuit die elements and depicting these in Fig. 13 and other figures." Pet. 22 (quoting Ex. 1003, 4:63–65; citing *id.* at Fig. 6, Ex. 1002 ¶¶ 278–280).

Regarding the WCDP claim construction arguments, apart from numerous via connections as set forth in our claim construction (*supra* § II.C), the challenged claims do not require other structure of a WCDP or buffer cells under our claim construction, and the specification does not describe the WCDP (depicted as black box) in Figure 5 as part of a memory array. *See supra* § II.C; Ex. 1001, Fig. 5. As Petitioner persuasively argues and as summarized above, the Petition relies on the combined teachings of Zavracky, Chiricescu, and Akasaka to teach the "functional to accelerate clause," and this combination is wider than a narrow port or any baseline. *See* Reply 4–9. As Petitioner also persuasively argues, even if the claims require a WCDP, according to Patent Owner's expert in the IPR2020-01020, IPR2020-01021, and IPR2020-01022, a "**configuration data port** . . . is . . . just a **data port used for configuration** . . . And **data port is just an interface to send data** from one place to another." *Id.* at 9 (quoting Ex. 1075, 163:8–163:21). "And 'the reason it's a very wide configuration data port is because it has a **lot of connections** through these TSVs between the memory die and the FPGA die.'" *Id.* (quoting Ex. 1075, 157:23–158:3). In other words, under Petitioner's persuasive showing, even if the claims require a WCDP, the combined teachings meet the challenged claims for the reasons noted.

Petitioner also persuasively shows that Patent Owner "misrepresents Dr. Franzon's testimony" regarding an alleged narrow port in Chiricescu.

68

*See* Reply 11. As Petitioner persuasively argues, "Dr. Franzon's cited testimony: (1) has nothing to do with Chiricescu; (2) was given in response to a question about Trimberger; and (3) was discussing the connection to "an **off-chip** memory" *Id.* (citing Ex. 2012, 80:10–22).

Dr. Franzon's cited deposition testimony supports Petitioner. Dr. Franzon's cited deposition testimony refers to Trimberger in the context of "off-chip memory that loads in through the data port," and Dr. Franzon testifies "a POSITA would interpret figure 5 [of the '035 patent] as [including an undepicted] similar narrow structure on the left of the very wide configuration data port" to load data from an external source. *See* Ex. 2012, 80:3–22. In other words, Dr. Franzon's testimony does not describe Chiricescu's stacked memory layer as using a *narrow* port to transfer reconfiguration data to the RLB (with FPGA gates) layer from an "on-chip" memory within the 3-D stack. *See* Ex. 1004, Fig. 2; *supra* § II.D.2.

Even if claims 23 and 33 require the capability to process data in parallel through the "functional to accelerate" limitations, as it shows for claim 1 (§ II.D.4), Petitioner persuasively shows that the Zavracky-Chiricescu-Akasaka 3-D module uses numerous vias throughout the dies to transfer data *between* the dies—i.e., acting to accelerate all manner of data and signals in parallel. *See, e.g.*, Pet. 16 (showing that Akasaka teaches that "'tens of thousands of via holes' permit parallel processing by utilizing the many interconnections,"; "as a result of this parallel processing, 'the signal processing speed of the system will be greatly improved'"; and "[d]ue to 'shorter interconnection delay time' arising from stacking and 'parallel processing' made possible from the area-wide interconnects, Akasaka states

that 'twice the operating speed is possible in the best case of 3D ICs' as
compared to conventional designs" (quoting Ex. 1005, 1705)), 19 (arguing
that "it was a predictable advantage and also suggested by Akasaka itself
that applying Akasaka's distributed contact points, e.g., in the 3D stacks of
Zavracky or Chiricescu, would increase bandwidth and processing speed
through better parallelism and increased connectivity" (citing
Ex. 1002 ¶ 233; Ex. 1005, 1705)).

As Petitioner also argues, Patent Owner's "'narrow data port'
arguments are contrary to Chiricescu's teachings" and do not address the
combined teachings of Chiricescu, Zavracky, and Akasaka. Reply 12 (citing
PO Resp. 20–21). Petitioner notes that Zavracky, which Chiricescu
references, describes "interconnects as being '*placed anywhere on the chip*'
without restriction." *Id.* (quoting Ex. 1004, 232 (emphasis added). In
addition, Petitioner notes that Chiricescu "discloses 'three separate layers
with metal interconnects [including a "memory layer"] between them.'" *Id.*
(quoting Ex. 1004, 232) (addition by Petitioner) (emphasis omitted). Vias
running everywhere throughout the different stacked layers or dies as
Zavracky, Chiricescu, and Akasaka individually and collectively teach
distinguish over any alleged narrow port, and Petitioner provides well-
known reasons for employing wide data ports, such as allowing for
increased bandwidth and parallelism. *See* Pet. 7–12, 16–20; Ex. 1001, 5:16–
21 (describing "through-die array contacts 70 . . . routed up and down the
stack in three dimensions" as "not known to be possible with any other
currently available stacking techniques *since they all require the stacking
contacts to be located on the periphery of the die*," so that by placing

IPR2020-01570
Patent RE42,035 E

contacts throughout, "*cells that may be accessed within a specified time period is increased*").

Patent Owner also argues that "[b]ecause Petitioner does not allege that any 'external memory references' occur in *Chiricescu* (let alone that such references are accelerated), Petitioner cannot have met its burden to establish that Claims 23, 24, and 33 are obvious." PO Resp. 23.[21] According to Patent Owner, "Petitioner misinterprets the term 'external memory references,' suggesting that this term too can be satisfied simply by storing a certain type of data in Chiricescu's memory." *Id.* (citing Pet. 47; Ex. 1002 ¶ 47). Patent Owner also argues that "memory references are not data, but are instructions directed to a particular place memory address [sic] in memory." *Id.* (citing Ex. 2011 ¶ 60; Ex. 2015, 181; Ex. 2012, 49:11–50:1). Dr. Souri's cited declaration testimony does not tie his opinion that "[a] skilled artisan understands that memory references are not data" to claims 1, 5, 10, 16, and 23 as viewed in light of the '035 patent specification. *See* Ex. 2011 ¶ 60.

In addition to citing Dr. Franzon's deposition testimony, which does not support Dr. Souri as indicated above, Dr. Souri cites "Ex. 2015 at 181." This particular extrinsic evidence, which includes a single page out of what appears to be a text book, is not helpful because it does not have anything to do with accelerating memory references, and it describes types of "operands," which are not at issue in the '035 patent. Ex. 2015, 181 ("The third type of operand is a memory reference."). In other words, Dr. Souri's testimony is conclusory as it does not address how this extrinsic evidence

---

[21] Claim 24 depends from independent claim 23. We address claim 24 below. *See infra* § III.D.7.

relates to the recited "functional to accelerate external memory references" clause as recited in claim 23 and in the context of the cache memory or reconfiguration scheme as set forth in the '035 patent specification. *See* Ex. 2011 ¶ 60 (citing Ex. 2015, 181). Patent Owner and Dr. Souri also do not explain clearly how the cited deposition of Dr. Franzon supports Patent Owner. *See* PO Resp. 23 (citing Ex. 2012, 49:11–50:1; Ex. 2011 ¶ 60); Ex. 2012, 49:11–50:1 (generally testifying that "Chiricescu's FPGA processing element" is "agnostic" as "to what actually is stored in it").

Petitioner persuasively shows that caching external memory references in a stacked cache memory satisfies the "functional to accelerate" limitations relative to loading them from off-chip (outside of the stack), at least because of "caching" *and* "the use of short electrical paths, or significantly increased number of connections" including "Akasaka's area-wide distributed interconnects." *See* Reply 8 (citing Pet. 13–31, 44–47); *see also id.* at 13 (discussing hitting the cache with external memory references (citing Ex. 1002 ¶¶ 215–216; Ex. 2012, 42:9:14, 48:6–50:1).

Petitioner also persuasively explains that even under Patent Owner's narrow reading of "external memory references," as related to memory addresses, Chiricescu teaches it because the memory address references will "hit" the cache. *See* Reply 12–13 (citing Ex. 1002 ¶¶ 215–216). Supporting Petitioner, Dr. Franzon persuasively testifies at the cited paragraphs of his declaration as follows:

> 215. . . . . The POSITA would recognize that what Chiricescu is teaching is to use that memory as a "cache" . . . . By doing so, the FPGA's external memory references . . . will be accelerated because [they] will "hit" in the "cache" and be returned from the on-chip memory without having to go off-chip.

IPR2020-01570
Patent RE42,035 E

216.    Chiricescu is thus teaching to the POSITA to accelerate memory lookups that are directed to the external chip by sending them instead to the on-chip memory, perhaps keeping a relevant set of data to the application.  This is what Chiricescu means when it says that "a management scheme similar to one used to manage cache memory can be used to administer the configuration data."

Ex. 1002 ¶¶ 215–216; Reply 13 (quoting part of the same two paragraphs).

As Petitioner also persuasively argues, the '035 patent does not limit "external memory references" in particular, but it does refer to cache memory and enhancing reconfiguration speed with such memory.  *See* Reply 13 (citing Ex. 1001, 2:11, 2:25, 4:31, 4:57–58); Ex. 1001, 4:31–36 (referring to "cache memory 66" as serving its "traditional role of fast access memory," and also including accessing by "both the microprocessor 64 and FPGA 68 with equal speed," in the context of "reconfigurable computing systems").

Patent Owner also argues that "[b]ecause the claims require a '**memory array** is functional to accelerate external memory references to said processing element,' Petitioner's focus on the type of data stored in the array misses the mark."  PO Resp. 22.  Contrary to this argument, as discussed above, Petitioner relies on a cache memory array as combined in a 3-D stack with short via connections, not the type of data.  As discussed throughout this Final Written Decision, the Petition persuasively relies on such short and numerous distributed vias as structure for the "functional to accelerate" clauses, because such structure provides shorter path delays and allows for increased bandwidth and parallel data transfer.  *See supra* §§ II.D.3 (Akasaka's parallel processing and multiple via teachings), II.D.4–5 (analyzing claim 1 motivation (which applies here) as Petitioner shows as

73

including, *inter alia*, increased bandwidth, parallel processing, and decreasing path delays); Pet. 8–12 (background knowledge of an artisan of ordinary skill includes stacking chips with multiple distributed vias to minimize latency and maximize bandwidth), 16–20 (similar, listing multiple reasons to combine Zavracky, Chiricescu, Akasaka, including to accelerate data via shorter interconnection delay times, parallel processing, increased operating speed, etc.). Essentially, the cache memory relied upon by Petitioner carries all of these advantages, because it is within the 3-D stack instead of "off-chip."

In the Sur-reply, Patent Owner argues that "[t]he entire point of Chiricescu is that it achieves accelerated FPGA configuration by storing configuration data 'on-chip' so that it does not need to load configuration data from off-chip." Sur-reply 5. Patent Owner also argues that "all off-chip connections are carried out through a typical narrow configuration data port, that suffers the same problems as the prior art distinguished in the '035 Patent." *Id.* Patent Owner then argues that "moving *Chiricescu's* cache memory off-chip (i.e., into *Zavracky's* 3D stacked memory die) eliminates the benefit gained from moving the memory on-chip, [so] a POSITA would not have contradicted *Chiricescu's* fundamental teachings to arrive at Petitioner's proposed combination." *Id.* at 5–6.

These arguments mischaracterize Petitioner's showing and confuse the issues as discussed in the previous section. *See supra* § II.D.5; note 19. Patent Owner essentially conflates narrow ports having large signal delays over long electrical planar paths with "all off-chip connections" as applying to Zavracky's 3-D stack (by referring to each separate chip in Zavracky's modified 3-D stack as "off-chip" and ignoring the central fact that each chip

IPR2020-01570
Patent RE42,035 E

connects to the other chips by numerous short vias). There is no support for this line of argument. Moreover, "Dr Franzon not[ed] the routine use of on-chip area-wide connections in 3D stacks, including his prior work." Reply 18 (citing Ex. 1002 ¶¶47–51; Ex. 1070 ¶¶ 65; Ex. 1020; *see also* Ex. 1004, Fig. 2, II-232 § 1 (describing "on chip random access memory . . . provided to store configuration memory"—i.e., the memory layer of Figure 2); *supra* note 19. Patent Owner agrees that Chiricescu discloses "on-chip cache memory" as a separate layer in a chip, which further suggests a separate memory layer in a stack of dies. *See* Sur-reply 5.

Nevertheless, Patent Owner contends that "the movement of *Chiricescu's* on-chip cache memory to *Zavracky's* off-chip memory would throttle" speed gains. Sur-reply 5. For the reasons explained above, this line of argument confuses issues and mischaracterizes Petitioner's showing. *See supra* note 19. Chiricescu's teachings bolster Zavracky's FPGA teachings, and Petitioner shows that in this context, Zavracky describes a memory layer, microprocessor layer, and FPGA layer in a 3-D stack with each layer or chip connected by numerous short vias to increase speed. *See, e.g.*, Pet. 14–15; Ex. 1003, Fig. 13. Patent Owner's attempt to conflate all "off-chip" narrow port disadvantages to Zavracky's modified stack of chips by calling that stack "off-chip" is unsupported. *See* Sur-reply 5. As Petitioner persuasively shows throughout its briefing, Zavracky's stack of chips, connected by numerous vias, and bolstered by Akasaka's numerous via and Chiricescu's FPGA teachings, operates just like Chiricescu's "on-chip" circuit layers in a single chip connected by numerous vias in terms of speed and acceleration. *See* Reply 6–7 ("Zavracky's short interior 'inter-layer connectors' to stacked 'random access memory . . . results in **reduced**

memory access **time**, **increasing the speed** of the entire system,'" and
"Chiricescu also teaches the **acceleration** advantages and 'significantly
**improve[d FPGA] reconfiguration time'** achieved by its interconnected
layers, including a memory layer configured as a cache for fast access to
'configuration data . . . from memory off-chip.'" (quoting Ex. 1003, 11:63–
12:2; Ex. 1004, 23[4])), 7 (noting Akasaka's "**acceleration** advantages"
based on "teaching, e.g., that '[h]igh-speed performance is associated with
shorter interconnection delay time and parallel processing' and that
'shortening of interconnections and signal transfer through vertical via holes
in the 3-D configuration provides advantages for the design of large-scale
systems.'" (quoting Ex. 1005, 1705)).  In other words, as Petitioner shows,
in addition to "stacking techniques," "[t]he Zavracky-Chiricescu-Akasaka
Combination also discloses the other ways that the '035 patent even
arguably implies increases speed—i.e., through caching, the use of short
electrical paths, or significantly increased number of connections." *Id.* at 8
(citing Pet. 13–31, 44–47); Ex. 1070 ¶ 44 ("[A] POSITA would have
recognized that [a] 3D chip that consists of multiple dies would do a better
job than the 2D chip and provid[e] fast large connectivity. . . .  The point
here is that a shorter vertical interconnect allows for a shorter 'longest path'
and a faster chip.).

Petitioner also persuasively addresses Patent Owner's argument that
the claims require acceleration over a "baseline" and other related
arguments.  *See* PO Resp. 20–21; Reply 12 (persuasively arguing that the
combined teachings contribute to acceleration, the combination does not
include a "narrow port," and "Dr. Franzon testified in both his declaration
and deposition that the Zavracky-Chiricescu-Akasaka combination provides

IPR2020-01570
Patent RE42,035 E

acceleration compared to the baseline of other prior art with different structural characteristics." (citing Ex. 1002 ¶¶ 212, 215–17, 304–05; Ex. 2012, 28:9–21, 28:9–21, 29:15–33:15)); *see also supra* §§ II.C (claim construction); II.D.1 (discussing claim construction and analysis of claim 1 in relation to prior art Figure 3's 8-bit narrow port—i.e., one type of baseline). Zavracky indicates that 32 bit microprocessors were routine in 1993, years before the effective date of the invention, indicating that Zavracky's microprocessor buses at least handled 32 bits in parallel. *See* Ex. 1003, 1:6–8 (continuity date of 1993), 1:31–40 (discussing prior art microprocessors). As noted above, Patent Owner indicated during the Oral Hearing that the challenged claims embrace devices transfer data over a port that "could be as small as 32 bits . . . if you have a small FPGA, right? If you want to update something in parallel, you could update 32-bit with 32 bits?" Tr. 49:1–9; *supra* § II.C (claim construction).

Addressing claims 23, 30, and 33 together, Patent Owner argues that "major modifications would need to be made to the combination of *Zavracky* and *Chiricescu* in order to configure a stacked module to meet the acceleration limitations of Independent Claims 23, 30, and 33." PO Resp. 31. Patent Owner explains that this major modification requires a "wide configuration data port (or other similar structure) between the memory and the FPGA." *Id.* Patent Owner also argues that such a modification would "alter *Chiricescu's* principle operation, which relies on an entirely different strategy for routing data throughout the FPGA, namely its narrow RLB Bus and its 'routing layer,' which *Chiricescu* declares '*is of critical importance* since it is used for the implementation of the interconnection of the non-

IPR2020-01570
Patent RE42,035 E

neighboring RLBs.'" *Id.* at 31–32 (quoting Ex. 1004, 2) (emphasis by Patent Owner).

Here, Patent Owner concedes that "the '035 Patent discloses a memory array that achieves the claimed acceleration (*i.e.*, utilizing a *portion of the wide configuration data port*), which significantly reduces the amount of time it takes to move data from a memory die into a programmable array." PO Resp. 32 (emphasis added). Patent Owner does not describe what "portion" of the WCDP (which Figure 5 of the '035 patent depicts as a black box) that the claimed "functional to accelerate" limitations require. In any event, as Petitioner argues and as adopted as our claim construction above, the '035 patent shows that "functional to accelerate" limitations include "a number of vertical contacts distributed throughout the surface of and traversing the memory die in a vertical direction (vias) to allow multiple short paths for data transfer between the memory array and processing element." *See supra* § II.C (claim construction). For the reasons explained above in connection with claim 1 and within this section, the combined teachings of Zavracky, Chiricescu, and Akasaka satisfy the "functional to accelerate" limitation of claim 23. *See supra* II.D.4–5.

With respect to Chiricescu's principle of operation, as Petitioner also persuasively argues, no "'modifications' are required to Chiricescu at all because the Petition's combination involves 'fold[ing] in Chiricescu's teachings (including using stacked memory to reconfigure[] the FPGA) with Zavracky's 3D stacks." Reply 17–18 (quoting Pet. 17). Even if employing Chiricescu's FPGA structure also suggests implementing its routing layer on a separate layer, contrary to Patent Owner's arguments, Chiricescu does not describe its routing layer as a narrow port, as also explained within the

78

IPR2020-01570
Patent RE42,035 E

instant section above. *See id.* at 18 (noting that Dr. Franzon did not admit Chiricescu includes a narrow port and citing Dr. Franzon's testimony that on-chip area-wide connections in 3-D stacks were well-known (citing Ex. 1002 ¶¶ 47–51; Ex. 1070 ¶¶ 65, 68)). Also, Chiricescu's Figure 2 depicts connections between the memory layer, routing layer, and RLB layer (a "sea-of-gates FGPA structure") with connections that are distinct from the RLB bus. Ex. 1004, II-232 § 2.1, Fig. 2. Chiricescu notes that "routing congestion will also be improved by the separation of layers," further suggesting that vias connected throughout including to the routing layer is not a narrow port. *Id.* at II-232.

As Petitioner persuasively argues, "Chiricescu describes 'vertical metal interconnections (i.e., interlayer vias),' and '**three separate layers with metal interconnects between them**.'" Reply 16 (citing Ex. 1004, II-232). Also, Chiricescu's "express 'architecture is based on' technology developed by Zavracky at Northeastern University." *Id.* (quoting Ex. 1004, II-232). And Chiricescu states that Zavracky's architecture provides "3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) *placed anywhere* on the chip." Ex. 1004, II-232 (emphasis added). Therefore, contrary to Patent Owner's arguments, Chiricescu's principle of operation does not require a narrow port. *See also* Reply 16 ("The combination involves 'fold[ing] in Chiricescu's teachings (including using stacked memory to reconfigure the FPGA) with Zavracky's 3D stacks.'" (citing Pet. 17)). Moreover, increasing via connections based further on Akasaka's teachings would have been obvious by facilitating more connections between well-known available circuits such as memory,

79

IPR2020-01570
Patent RE42,035 E

FPGA, and processors. *See, e.g.*, Reply 19 ("Zavracky and Chiricescu envision connections 'anywhere on the die.'" (citing Pet. 14–15; Ex. 1002 ¶¶ 41–51, 237–238)); Pet. 20 ("Akasaka's distributed contact points would have been the logical extension to Zavracky and Chiricescu's teaching of connections anywhere, especially in view of the POSITA's background knowledge." (citing Ex. 1002 ¶ 239)).

Accordingly, Patent Owner's arguments alleging "major modifications . . . in the combination of *Zavracky* and *Chiricescu* in order to configure a stacked module to meet the acceleration limitations of Independent Claims 23, 30, and 33," related arguments including the "principle [of] operation" of Chiricescu, and claim construction arguments, as summarized above, are unavailing.

We adopt and incorporate Petitioner's showing as to claims 23 and 33, as set forth by the Petition and summarized above, as our own. *See* Pet. 7–20, 44–47, 52–53. Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that may overlap with issues in the instant section due to the format of the Response, Petitioner persuasively shows that claims 23 and 33 would have been obvious.

### 7. *Claims 24 and 30*

Claim 24 depends from claim 23 and recites "[t]he programmable array module of claim 23 wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element." Petitioner contends that "[t]he 'external memory references' analyzed in [23] comprise reconfiguration data, thereby providing this claim. Chiricescu describes that the accelerated

80

reconfiguration data is used to reconfigure the FPGA as a processing element." Pet. 47 (citing Ex. 1004, II-234 (describing "when the FPGA is reconfigured from performing A x B to A x C or vice versa."); Ex. 1002 ¶¶ 304–07). Independent claim 30 is materially similar to dependent claim 24 (both reciting, *inter alia*, "wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element"). Petitioner refers to its showing of independent claims 1 and 23 and dependent claim 24 to address claim 30. *Id.* at 51–52.

In other words, as discussed in the previous section addressing claims 23 and 33, Petitioner persuasively shows that the combined teachings accelerate external memory references (which include reconfiguration data) to the FPGA processing element, showing that the "memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element."

Addressing claims 24, 30, and 32 as a group, Patent Owner argues that "[t]he *Zavracky-Chiricescu-Akasaka* combination fails to teach or suggest a 3-D processor module that includes a second integrated die element, separate from a first integrated die element having a programmable array, wherein the 'memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element.'" PO Resp. 23–24.[22] Patent Owner recites the "functional to accelerate memory references" and "functional to accelerate reconfiguration" clauses, points to

---

[22] The analysis of claim 32 is below. Claim 32 depends from claim 31, and Petitioner contends that the combination of Zavracky, Chiricescu, Akasaka, and Trimberger would have rendered claims 31, 32, and 34 above. *See infra* § II.E.2.

Petitioner's "same rationale" with respect to claims 23 and 33 discussed in the previous section (§ II.D.5), and concludes that claims 24, 30, and 32 "are therefore patentable." *Id.* at 24 (noting that "Petitioner relies on the same rationale for this claim element as it did for the element discussed directly above, i.e. 'memory array is functional to accelerate external memory references to said processing element'"). Patent Owner's arguments with respect to claims 24, 30, and 32 as outlined herein do not undermine Petitioner's persuasive showing as summarized above including for the reasons discussed above in connection with claims 23 and 33. *See* Pet. 46–47, 51–52; *supra* § II.D.6.

We adopt and incorporate Petitioner's showing as to claims 24 and 30, as set forth by the Petition and summarized above, as our own. *See* Pet. 7–20, 47, 51. Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that tend to overlap to a certain extent with issues in the instant section due to the format of the Response, Petitioner persuasively shows that claims 24 and 30 would have been obvious.

> 8. *Claims 25–29*

Like independent claim 17, independent claim 25 tracks the limitations of claim 1, and recites at least three die elements (instead of at least two as in claim 1), with the three die elements including a programmable array, processor, and memory electrically coupled together as in claim 17. *See supra* § II.D.4 (analyzing claims 1 and 17). Claim 25 also recites "whereby said processor and said programmable array are operational to share data therebetween."

Addressing claim 25, Petitioner relies on its showing for claims 1 and 17, including Zavracky's disclosure of programmable logic array 802 in a stacked 3-D processor module with microprocessor layers 804 and 806 as Figure 13 depicts, and Chiricescu's teaching of a 3-D chip comprising FPGA, memory, and routing layers. *See* Pet. 21–29, 41–43, 47–50. Petitioner also asserts that with respect to Zavracky's Figure 13, "each of the programmable array, microprocessor, and memory are pair-wise stacked with and electrically coupled with each other." *Id.* at 25. Petitioner also relies Akasaka's teachings and on similar motivation as for claims 1 and 17. *See id.* at 17–20, 49–50 ("As discussed, §VII.A.4, a POSITA would have been motivated to employ Akasaka's thousands of via holes in the context of Zavracky." (citing Ex. 1002 ¶¶ 233–39, 347–48; Pet. § VII.A.4)).

Addressing the claim 25 limitation "whereby said processor and said programmable array are operational to share data therebetween," Petitioner relies partly on Akasaka's disclosure of 3-D chips wherein "memory data are kept common by the interlayer (vertical) signal [so that] **each processor can use the common memory data**." Pet. 49 (emphasis by Petitioner) (quoting Ex. 1005, 1713). In addition, Petitioner argues that "the POSITA knew of the need for replicated 'common data memory' in stacked designs, including as taught in Akasaka, to enable, e.g., multi-processor cache coherence." *Id.* at 19–20 (citing Ex. 1002 ¶ 236; Ex. 1034, 466–469; Ex. 1005, 1713, Fig. 25). Petitioner further explains that "[t]hat structure would be more difficult to accomplish with a limited number of interconnections as in Zavracky," further motivating "[a] POSITA . . . to seek out Akasaka's distributed contact points in order to build a 'common data memory.'" *Id.* at 20 (citing Ex. 1002 ¶ 237).

IPR2020-01570
Patent RE42,035 E

Petitioner also relies on Akasaka's teaching that that "information signals can be transferred" through "several thousands or tens of thousands of via holes . . . present in these devices" to further suggest employing Akasaka's "thousands of via holes in the context of Zavracky" as further suggesting the claimed data sharing feature. Pet. 49–50 (first two quotes quoting Ex. 1005, 1705; citing Ex. 1002 ¶¶ 233–239, 347–348). As noted throughout this Final Written Decision, Petitioner also relies on known benefits of increased speed, bandwidth, and capability for parallel processing based on well-known teachings, to suggest stacking layers, including memory layers, using numerous vias, to combine the teachings of Zavracky, Chiricescu, and Akasaka. *See id.* at 8–9, 16–20.

Petitioner explains that Zavracky also teaches that its programmable logic 802 is an FPGA and serves as "an intermediary between 'the microprocessor and any off-chip resources.'" Pet. 48–49 (citing Ex. 1003, 12:28–36). Petitioner also relies on Zavracky's "[i]nterconnect lines" operating as a "data bus." *Id.* at 49 (quoting Ex. 1003, 6:39–42). According to Petitioner, a "POSITA would have recognized that communication between 'the microprocessor and any off-chip resources' via the FPGA (under the Zavracky-Chiricescu-Akasaka Combination as explained in [1.1], [1.2] and [2]) means that data is shared between the microprocessor and the FPGA." *Id.* (citing Ex. 1002 ¶ 342).

Claims 26–29 depend from independent claim 25. Claim 26 recites "wherein said memory is operational to at least temporarily store said data." *See* Pet. 50. Petitioner argues that "[t]he POSITA would have understood that memory is—by definition—operational to at least temporarily store data." *Id.* (citing Ex. 1002 ¶ 308 (citing Ex. 1039 (trade dictionary defining

IPR2020-01570
Patent RE42,035 E

memory)). Petitioner also relies on Akasaka's shared memory as discussed above and further below in connection with claim 25. *See id.* at 47–50 (citing Ex. 1005, 1713). Petitioner asserts that the added claim limitations of claims 27–29, which recite an "FPGA," a "microprocessor," and a "memory array," respectively, read on Zavracky's stack as depicted in Figure 13. *See id.* at 50–51 (relying on the analysis for claims 18–20, which in turn rely on the analysis for claims 1 and 3–6 (*see id.* at 43)).

Patent Owner groups claims 25–29 together and argues that "[t]he *Zavracky* microprocessor and programmable logic are not operational to *share* data, such as might be stored in a stacked memory die, for example." PO Resp. 25 (citing Ex. 2011 ¶ 63). Patent Owner reproduces the following diagram from Dr. Souri's declaration to illustrate its point:



Ex. 1012 ¶ 63. According to Patent Owner, Zavracky's microprocessor on the left does not share data with the FPGA (PLD) on the right, because "it is the output of Zavracky's microprocessor that is sent to the FPGA." PO Resp. 25 (citing Ex. 1012 ¶ 63).

Patent Owner attempts to distinguish "sharing" data and "transferring" data by arguing that "[t]he claims require more than a processor transferring data to a field programmable." *See* PO Resp. 24–25. Neither the '035 patent specification nor claims 25–29 requires this distinction. Nevertheless, Patent Owner argues that shared data "might be stored in *a stacked memory*

IPR2020-01570
Patent RE42,035 E

*die*, for example." PO Resp. 25 (emphasis added). Patent Owner similarly argues in its Sur-reply that "[a] POSITA would recognize that this data *on the stacked memory die* is literally 'data shared between a microprocessor and an FPGA.'" Sur-reply 12 (citing Ex. 2011 ¶ 64; Ex. 1001, 1:59–67, 2:47–51, 4:31–36) (emphasis added).

Contrary to this line of argument, claims 25–29 do not require a "stacked memory die" to hold data to support the recited shared data functionality. Although claim 26 recites "wherein said memory is operational to at least temporarily store said data," claim 26 is broad enough to read on Zavracky's modified memory (which is operational to store the shared data) *after* the microprocessor and FPGA (are operational to) share it per claim 25. *See* Pet. 50 (arguing that "[t]he POSITA would have understood that memory is—by definition—operational to at least temporarily store data" (citing Ex. 1002 ¶ 308 (citing Ex. 1039 (trade dictionary defining memory)).[23]

Moreover, even under Dr. Souri's diagram of Zavracky's process, Zavracky's microprocessor processes the input data to create the shared output data, and then transfers that shared output data onto the data bus and then to the FPGA. *See* Reply 13–14 (citing Ex. 1070 ¶¶ 73–74; Ex. 1083); Ex. 1070 ¶ 73 (quoting Ex. 1083, 1:26–34 (describing computers "shar[ing] data" by "transfer[ing] data")); Pet. 49 (citing Ex. 1002 ¶¶ 342, 349). As discussed further below, Petitioner also persuasively explains how

---

[23] As indicated herein, Patent Owner does not address Petitioner's persuasive showing for claim 26 separately from claim 25. Petitioner also persuasively relies on Akasaka's shared memory for claims 25–29 as discussed further below. *See* Pet. 47–50 (citing Ex. 1005, 1713).

Zavracky's microprocessor and FPGA share and process the same data from off-chip resources to implement a user-defined protocol. *See* Pet. 48–49.

Patent Owner also argues that Petitioner's alternative theory based on Akasaka's teaching and suggestion to share "'common memory data' does not cure this fundamental deficiency in Zavracky because it also does not involve any processing of data shared between a microprocessor and an FPGA (or any other type of chip)." PO Resp. 26. Claims 18–22 do not require "processing of [shared] data," but even if the claims imply that interpretation, the combined teachings suggest it, as Petitioner persuasively shows as discussed next.

To support its point, Patent Owner reproduces Zavracky's Figure 25 as follows:



(c)

**Fig. 25.** New concept of 3-D IC. (a) 3-D PLA model (by Prof. T. Nanya of the Tokyo Institute of Technology). (b) Integration of CAM RAM in the same chip (by T. Ogura of NTT). (c) Common memory data system for 3-D memory chip (by Prof. M. Hirose of Hiroshima University).

PO Resp. 26. Figure 25(c) above depicts a "[c]ommon memory data system for a '3-D memory chip' wherein processors 1, 2, n (on the left) share data on memory layers 1, 2, n (on the right)." Ex. 1005, 1713. Akasaka states

that "memory in each chip belongs to corresponding independent microprocessors in the same layer, *and the memory data are kept common by the interlayer (vertical signal) transfer.*" *Id.* (emphasis added).

Patent Owner argues that "although *Akasaka* proposes that memory data is 'kept common by the interlayer (vertical) signal transfer,' the individual microprocessors do not process any shared data because each only processes the data in its corresponding memory." PO Resp. 26–27. This argument misses the mark, because Akasaka's system transfers the same data between the memories so that each processor is operational to process the same data. Stated differently, Akasaka contradicts Patent Owner's argument that transferring the same data at one memory location (the "common" data in Akasaka) to another memory location shows a lack of data sharing—i.e., Akasaka describes the data as "common." *See* Ex. 1005, 1713.

As to sharing data between a processor and an FPGA, Petitioner relies on Akasaka's teaching as suggesting the sharing of common data through vertical data transfers in the combined 3-D structure of Zavracky, Chiricescu, and Akasaka, instead of relying on a bodily incorporation of the processor memory layer scheme of Akasaka. *See* Pet. 49–50; Reply 15 (arguing that Patent Owner "attacks the physical die-stacking technique in Akasaka—but Akasaka is not relied upon to teach die-stacking" and "Zavracky already teaches stacked memories that are interconnected to other dies in the stack, and also teaches memories can be at any layer" (citing Ex. 1003, 11:63–12:2, Figs. 10, 12)). Claims 25–29 are agnostic as to how the FPGA and microprocessor share data—i.e., with or without a separate memory in each layer—i.e., claim 25 recites "whereby said processor and

said programmable array are operational to share data therebetween" without reference to the "memory" recited earlier in the claim.

As proposed by Petitioner, it would have been obvious for the FPGA and microprocessor of Zavracky-Chiricescu, based on Akasaka's teachings, to share data using numerous (e.g., thousands) of vertical vias to implement the data transfer and thereby increase processing speeds and bandwidth. *See* Pet. 49–50 (citing Pet. § VII.A.4 (reasons to combine the references); Ex. 1002 ¶¶ 233–239; 347–348). For example, as Petitioner shows, using Akasaka's teaching to share data using thousands of vertical vias would have "increase[d] bandwidth and processing speed through better parallelism and increased connectivity." *See* Pet. 19 (§ VII.A.4), 49–50; Ex. 1005, 1705; Reply 6–7 (citing known advantages of numerous vertical vias). Petitioner persuasively shows that artisans of ordinary skill would have recognized that sharing common data by an FPGA and processor using the dense via structure of Akasaka increases processing speed and ensures cache coherency. *See* Pet. 19–20 (Ex. 1002 ¶¶ 236–237; Ex. 1005, 1705).

Patent Owner's arguments do not address Petitioner's more general showing that a "POSITA would have recognized that communication between 'the microprocessor and any off-chip resources' via the FPGA (under the Zavracky-Chiricescu-Akasaka Combination as explained in [1.1], [1.2] and [2]) means that data is shared between [and processed by] the microprocessor and the FPGA." Pet. 49 (citing Ex. 1002 ¶¶ 342–44, 349). In other words, Dr. Souri's diagram above only refers to data *from* the PLD (FPGA) as "DATA SENT TO THE OUTSIDE WORLD," but this analysis does not address Petitioner's persuasive showing that data from the outside world (off-chip) sources passes through the FPGA as an intermediary to the

microprocessor. *See* Pet. 48–49 (citing Ex. 1003, 12:28–36). At the cited passage, prior to describing Figure 13, Zavracky states that "[p]rogrammable logic arrays can be used to provide communication between a multi-layered microprocessor and the outside world." Ex. 1003, 12:29–31. Zavracky also states that "programmable logic array 802 [an FPGA in Figure 13] can be programmed to provide for user-defined communications protocol between the microprocessor and any off-chip resources." *Id.* at 12:36–37. Figure 13 shows bus connections on the PLD 802 (FPGA) to the outside world, with bus connections from PLD 802 to microprocessor 804/806 and memory 808. *See* Ex. 1003, Fig. 13, 12:29–39. Therefore, as Petitioner argues, Zavracky shows that communication occurs between the microprocessor and the FPGA, thereby teaching the sharing of data between the two (in at least one of the two directions). *See* Pet. 48–49.

In addition, in advancing another argument, Patent Owner admits that the combination teaches data sharing: "[T[he approach of Zavracky-Chiricescu would result in a structure in which *data is removed from the microprocessor cache and placed in the FPGA's on-chip memory*," and "*data . . . might be shared* between *Chiricescu's* FPGA and *Zavracky's* microprocessor." PO Resp. 28–29 (emphasis added).

Further addressing claims 25–29 as a group, Patent Owner argues that "to modify the *Zavracky-Chiricescu* system with *Akasaka*, . . . the ***stacked*** memory layer of *Chiricescu* would need to be moved into its RLB layer because *Akasaka* requires each memory layer to be located on the same layer as its associated processor," thereby requiring a "major modification" of Chiricescu. PO Resp. 36–37. Patent Owner similarly argues that implementing the combination requires "adding ***more*** structure to

90

IPR2020-01570
Patent RE42,035 E

*Chiricescu's* RLB layer, in the form of *Akasaka's* memory, destroys *Chiricescu's* principle of operation, which relies on moving as much structure ***out of*** the RLB layer as possible." *Id.* at 37.

This line of argument incorrectly assumes that Petitioner must show how to bodily incorporate the common memory teachings of Akasaka into Chiricescu's structure as part of its obviousness showing. This argument is unavailing, because Petitioner relies on Zavracky's 3-D stack structure, including its memory as a separate layer, as modified by the common memory teachings of Akasaka, without any modification to Chiricescu's FPGA teachings required. The common memory teachings of Akasaka are agnostic as to the memory location.

That is, Akasaka does not "require[] each memory layer to be located on the same layer as its associated processor." *See* PO Resp. 36. Even though Figure 25 of Akasaka shows a stack of processors and memory, with a processor and memory on the same layer, nothing in Akasaka states that the memory cannot be elsewhere in the stack on a separate layer. Rather, Figure 25 shows all memories connected together electrically with each memory connected electrically to its respective processor. *See* Ex. 1005, Fig. 25. These electrical connections suggest to an artisan of ordinary skill that the memory layer's location is less important than the electrical connections. *See id.* Moreover, Petitioner relies on Zavracky's separate layer for each memory in a stack with via connections to enhance speed, as the combination suggests. *See* Reply 15 ("Zavracky already teaches stacked memories that are interconnected to other dies in the stack, and also teaches memories can be at any layer" (citing Ex. 1003, Figs. 10, 12, 11:63–12:2 ("[A]n additional layer or several layers of random access memory may be

91

stacked . . . . This configuration results in reduced memory access time, increasing the speed of the whole system")).

Addressing 23–30 and 33–35 as a group, Patent Owner contends that "Petitioner's arguments for combining *Zavracky* and *Chiricescu* (*see* Petition at 18) also fail because they are untethered from the Challenged Claims and do not establish that it would have been obvious to 'combine[] these particular references to ***produce the claimed invention***.'" PO Resp. 29 (quoting *Metalcraft of Mayville, Inc. v. The Toro Co*., 848 F.3d 1358, 1367 (Fed. Cir. 2017) (emphasis by Patent Owner).).

> Patent Owner argues that
>
> is insufficient to "accelerate external memory references to said processing element" or "accelerate reconfiguration of said field programmable gate array as a processing element," and Petitioner fails to articulate any reason that Chiricescu's alleged teaching of performing "arbitrary logic functions" is related to the claimed invention.

PO Resp. 30.

Contrary to these arguments, Petitioner provides persuasive reasons to provide numerous vias throughout the Zavracky's layers or dies based on the collective teachings of the references, showing that it was well-known that providing such vias allows for speed increases, increased bandwidths, parallel processing, and further allowing for accelerated external memory references and reconfiguration of an FPGA through the additional use of cache memory, as discussed above in connection with claims 1, 23–25, 30, and 33. *See supra* §§ II.D.4–7. Petitioner's Reply also summarizes Dr. Franzon's testimony showing that improving reconfiguration times by using the stacked memory techniques (including the distributed vias) as suggested

IPR2020-01570
Patent RE42,035 E

by the combined references accelerates memory references.  *See* Reply 16–17 (citing Ex. 1002 ¶¶ 215–17, 221–230, 302–303).

Further addressing claims 23–30 and 33 as a group, Patent Owner contends that "Dr. Franzon admitted that a wide configuration data port that accelerates a programmable array's external memory references to a stacked memory die as compared with the slow narrow bus disclosed in Chiricescu was not obvious at the time of the invention."  PO Resp. 33 (citing Ex. 2012, 71:19–72:1).  Based on this characterization, Patent Owner also argues that "the wide configuration data port of the '035 Patent provides precisely the answer to what Dr. Franzon admits was practically impossible at the time of the invention."  *Id.* (citing Ex. 2012, 71:19–72:1, 80:3–22; Ex. 2011 ¶ 73).  Patent Owner adds that this "skepticism of Petitioner's own expert demonstrates that the challenged claims are patentable."  *Id.* (citing Ex. 2011¶ 73).  Contrary to this line of argument, Dr. Franzon does not admit that a wide configuration data port was not obvious, and does not admit that Chiricescu discloses a narrow data bus.  *See* Ex. 2012, 71:19–72:1, 80:3–22.  Rather, at the cited deposition testimony, Dr. Franzon testifies that "*off-chip* access can't be, for example, 100,000 bits wide." *Id.* at 71:21–23 (emphasis added).  Here, in context, Dr. Franzon states that "you can't have that number of IO . . . . in [the] *case of Trimberger and the '226 patent* [which is related to the '951 patent, *see* IPR2020-01571] *memory going form the external to the module*."  *Id.* at 71:23–72:1 (emphasis added).  Here again, Patent Owner conflates a narrow data port from a source "external to the module" (i.e., external to the claimed 3-D stack), with a wide data port from a memory within the stack to other chips in the stack.  *See supra* note 19.

IPR2020-01570
Patent RE42,035 E

Further grouping claims 23–30 and 33 together, Patent Owner argues that

> Petitioner has not produced a single reference or combination of references that teaches or suggests stacking a processor with a programmable array in a manner in which is operational to share data therebetween, or a memory array functional to accelerate external memory references or accelerate reconfiguration of FPGA.

PO Resp. 31.  This line of argument repackages arguments addressed in this section and above in connection with claims 1, 9, 23–25.  *See supra* §§ II.D.5–6, 8.  As noted above, Petitioner relies on a combination of references under obviousness to address the "functional to accelerate" clauses.  As also discussed above, Zavracky's Figure 13 explicitly illustrates a stacked die structure with PLD 802 (FPGA), microprocessor 804/806, RAM memory 808 (memory array), and RAM memory (memory array) associated with microprocessor 806, all connected together with buses so that the circuits are operational to share data therebetween.  Ex. 1003, Fig. 13, 12:29–39.[24]

We adopt and incorporate Petitioner's showing as to claims 25–29, as set forth by the Petition and summarized above, as our own.  *See* Pet. 7–20; 47–51.  Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that may overlap with issues in the instant section due to the format of the

---

[24] As discussed below (§ II.E.1), Trimberger provides another example of the prior art showing the direct connection between a large memory plane (block memory with 100,000 bits) and an FPGA for parallel reconfiguration in one cycle. Ex. 1006, 22–23, Fig. 1.

IPR2020-01570
Patent RE42,035 E

Response, Petitioner persuasively shows that claims 25–29 would have been obvious.

### 9.    Summary

After a full review of the record, including Patent Owner's Response and Sur-reply and evidence, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, and Akasaka would have rendered obvious claims 1–30, 33, 36, and 38.

### E.    Obviousness, Claims 31, 32, and 34

### 1.    Trimberger

Trimberger, titled "A Time-Multiplexed FPGA" (1997), describes an FPGA with on-chip memory distributed around the chip.  Ex. 1006, 22. Trimberger teaches that the memory "can also be read and written by on-chip [FPGA] logic, giving applications access to a single large block of RAM."  *Id.*  Trimberger teaches this "storage [can] be used as a block memory efficiently."  *Id.* at 28.

Trimberger's Figure 1 follows:



Figure 1. Time-Multiplexed FPGA Configuration Model

IPR2020-01570
Patent RE42,035 E

Figure 1 of Trimberger above depicts eight planes of SRAM (static random access memory) for an FPGA. *See* Ex. 1006, 22–23. "The configuration memory is distributed throughout the die . . . . This distributed memory can be viewed as eight *configuration memory planes* (figure 1). Each plane is a very large word of memory (100,000 bits in a 20x20 device)." *Id.* at 22.

Trimberger also teaches accessing each plane of memory as one simultaneous parallel transfer of 100,000 memory data bits to reconfigure the FPGA quickly: "When the device is *flash reconfigured* all bits in logic and interconnect array are updated simultaneously from one memory plane. This process takes about 5ns. After flash reconfiguration, about 24ns is required for signals in the design to settle." Ex. 1006, 22.

### 2.    *Claims 31, 32, and 34*

Petitioner contends claims 31, 32, and 34 would have been obvious over the combination of Zavracky, Chiricescu, Akasaka, and Trimberger. *See* Pet. 55–60. Except for the final limitations in independent claims 31 and 34, claims 31 and 34 recite limitations similar to claims 23 and 33. Petitioner relies on its showing with respect to claims 23 and 33 (addressed *supra* § II.D.6) to address the overlapping limitations of claims 31, 32, and 34. *See id.*

Claim 32 is materially similar to claims 24 and 30, as they each recite the same "functional to accelerate reconfiguration" clause. To address claim 32, Petitioner refers to and relies on its analysis of claim 24 (which relies on the analysis of claim 23). Pet. 47, 59. As indicated above in the analysis of claims 23, 24, 30, and 33, Patent Owner groups claim 32 with claims 24 and 30. *Supra* § II.D.6–7. For the reasons outlined above, Patent Owner's

arguments with respect to claims 24 and 30 are unavailing. *Supra* § II.D.6–

7. The same arguments with respect to claim 32 also are unavailing. *See id.*

Turning back to claims 31 and 34, limitation [31.4] and limitation

[34.5] each recite "wherein said memory array is functional as block

memory for said processing element." Petitioner relies on Trimberger's

block memory teachings to address this limitation. *See* Pet. 58–60.

According to Petitioner,

> Trimberger teaches that its co-located "memory is
> **accessible as block RAM** for applications," that are running in
> the FPGA, i.e., that the memory "can also be read and written by
> on-chip [FPGA] logic, giving applications access to a single
> large block of RAM." Ex. 1006, 22. Trimberger teaches that
> "the configuration storage to be used **as a block memory
> efficiently**." [*Id.* at 28].

Pet. 58 (emphasis by Petitioner) (quoting Ex. 1006, 22, 28). Petitioner

contends that it would have been obvious to employ Trimberger's block

memory to support fast local memory in FPGA applications like that in the

combined teachings of Zavracky, Chiricescu, and Akasaka. *See id.* at 56–57

(citing Ex. 1002 ¶ 247; Ex. 1048). Petitioner also contends that "[t]he

POSITA would have known that FPGAs have limited programmable logic

space, and that for certain tasks it would be more cost-efficient and silicon-

efficient to use the FPGA for reconfigurable processing and to use a separate

task-dedicated memory element for block memory." *Id.* at 57 (citing Ex.

1002 ¶ 247). Petitioner advances other reasons for the combination. *See id.*

at 57–58 (characterizing Trimberger's on-chip block memory as faster

relative to off-chip memory).

Patent Owner argues that "[i]ndependent claims 31 and 34 . . . require

that the 'memory array [that] is functional as block memory' is on a separate

IPR2020-01570
Patent RE42,035 E

chip from the 'first integrated circuit die element including a field programmable gate array.'" PO Resp. 44. According to Patent Owner "*Trimberger* . . . teaches away from having its block memory and FPGA on different chips as it attributes its quick FPGA reconfiguration to the massive connectivity *within* the chip." *Id.* (citing Ex. 1006, 22; Ex. 2011 ¶ 88); *see also id.* at 50 (same argument (citing Ex. 2011 ¶ 97)). Patent Owner primarily relies on this "within the chip" or "on-chip memory" argument as the basis for its allegations of lack of motivation, lack of a reasonable expectation of success, teaching away, requirement for major modifications, and other related arguments. *See id.* at 43–51.

For example, Patent Owner argues that "implementing Trimberger's FPGA structure in Petitioner's combination would result in a complete redesign of the hypothetical 3-D stacked structure of the *Zavracky-Chiricescu-Akasaka* Combination," because "the block memory is no longer stacked with the FPGA, but instead located on *Trimberger's* FPGA die as on-chip memory." Pet. 49 (citing Ex. 2011 ¶ 95). Patent Owner explains that "*Trimberger's* FPGA structure requires that its configuration memory planes are located on the same die as the FPGA's logic cells, so that the FPGA can quickly switch between different configurations." *Id.* at 50 (citing Ex. 2011 ¶ 97). Patent Owner asserts that "Petitioner admits this." *Id.* (characterizing the Petition as stating that Trimberger teaches a time multiplexed FPGA with on-chip memory distributed around the chip) (citing Pet. 56)). Based on these assertions, Patent Owner contends that evidence lacks as to "how or why a POSITA would have had a reasonable expectation of success in making the combination." *Id.* at 45.

98

IPR2020-01570
Patent RE42,035 E

Petitioner persuasively shows that Trimberger does not teach away or support Patent Owner's related arguments based on the single-chip theory, including hypothetical re-designs, and lack of a reasonable expectation of success and motivation.  Petitioner does not admit that Trimberger "requires that its configuration memory planes are located on the same die as the FPGA's logic cells." *See* PO Resp. 50 (citing Pet. 56); Pet. 56 (describing Trimberger's on-chip memory without characterizing it as a requirement).

Petitioner persuasively responds that Trimberger does not "criticize, discredit, or otherwise discourage investigation into the invention claimed," merely because it discloses embodiments having block memory and an FPGA within the same chip.  Reply 22 (quoting *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009)).  Petitioner persuasively argues that Patent Owner's "'massive connectivity' observations about Trimberger confirm that the POSITA would have been further encouraged to make the combination." *Id.* at 23 (citing Ex. 1070 ¶¶ 44–45); *see* PO Resp. 50 (arguing Trimberger's block memory includes "massive connectivity" with the FPGA).

Petitioner's response, supported by Dr. Franzon's testimony, is persuasive.  Trimberger's Figure 1 shows eight different memory planes on a single chip.  Ex. 1006, 22.  Trimberger states that "[t]he entire configuration of the FPGA can be loaded from this on-chip memory in 30ns." *Id.*  Trimberger does not teach, and Dr. Souri does not testify, that Trimberger's "on-chip memory" *requires* each memory plane to be on *the same layer* as the FPGA of a chip, such as a multi-layered chip or stack of chips. *See id.*; Ex. 2011 ¶ 97 (describing Trimberger as employing "massive connectivity *within* the chip").

Dr. Franzon explains credibly that "Trimberger's one-cycle teachings would be **improved** by applying its teaching to a 3D chip." Ex. 1070 ¶ 44. Dr. Franzon explains that Trimberger's reconfiguration clock cycle "(i.e., the delay in Trimberger) is set [by] determin[ing] the length of the longest path after routing." *Id.* (quoting Ex. 1006, 27). Then, Dr. Franzon testifies that "[t]he point here is that a shorter vertical interconnect allows for a shorter 'longest path' and a faster chip" and "[t]his was commonly understood in the other art." *Id.* (noting that "Akasaka taught that 3-D 'high speed performance' was enhanced because '[i]n 2-D ICs, the longest signal interconnection length becomes several to ten millimeters, but in 3-D ICs the length between upper and lower layers is on the order of 1–2 μm.'" (quoting Ex. 1005, 1705); also noting that Zavracky teaches that **"[i]n the proposed approach, shorter busses will result in smaller delays and higher speed circuit performance**" (quoting Ex. 1003, 3:4–14) (emphasis by Dr. Franzon)).

This testimony goes hand-in-hand with Petitioner's showing as summarized above in connection with claims 1, 17, and 23–25. That is, Petitioner shows persuasively that the combined teachings of Zavracky, Chiricescu, and Akasaka suggest short conductor runs using numerous distributed vias of a 3-D multi-layer chip to increase speed and bandwidth, decrease path delays, and facilitate parallel processing. *See supra* §§ II.D.3–6, 8; Pet. 8–12 (background knowledge of an artisan of ordinary skill includes stacking chips with multiple distributed vias to minimize latency and maximize bandwidth), 16–20 (similar, listing multiple reasons to combine Zavracky, Chiricescu, Akasaka, including to accelerate data via shorter interconnection delay times, parallel processing, increased operating

speed, etc.). The Petition also persuasively points to a "concern[] with the speed of access between the FPGA and the block of memory" as a reason to use Trimberger's "block memory . . . combined with Zavracky-Chiricescu-Akasaka's teaching of having the memory stacked and electrically coupled nearby." Pet. 57.

Supported by Dr. Franzon's testimony, Petitioner also persuasively responds that arranging a block memory on a separate layer from an (FPGA) processing element is not a major modification and the evidence shows that how to do it would have been well within the level of ordinary skill. *See* Reply 24; Ex. 1070 ¶ 46 ("Dr. Souri does not understand the combination being made. The Zavracky, Chiricescu, Akasaka combination already has a memory and an FPGA. It is already connected via a wide-area distributed set of interconnections as taught in Akasaka.").

Petitioner persuasively points to the Petition as stating that "[t]he POSITA would have sought Trimberger's teaching of using memory as a block memory and combined that with Zavracky-Chiricescu-Akasaka's teaching of having the memory stacked and electrically coupled nearby." Reply 24 (citing Pet. 57). In other words, Petitioner does not propose "'***moving***' *Trimberger's* on chip memory" to the same layer as the FPGA in Zavracky-Chiricescu-Akasaka's stack, contrary to Patent Owner's argument. *See* PO Resp. 50; *see also* Sur-reply 20. Rather, Petitioner proposes modifying the existing memory of Zavracky's modified 3-D stack to function as a block memory according to Trimberger's teachings. *See* Pet. 57; Reply 24. Moreover, Trimberger's eight plane memory design suggests different layers at least for each plane of memory, and challenged claim 31 does not require more than one of Trimberger's block memory

planes. *See* Pet. 54 (describing "us[ing] a separate task-dedicated memory element for block memory"); Ex. 1006, Fig. 1 (showing eight time multiplexed memory planes); Ex. 1070 ¶ 45 (testifying that in Trimberger's Figure 1 (*see supra* § II.E.1), "the fat arrow with a line in the traditional representation of 'many signals' – i.e., this is suggesting an architecture where different 'planes of memory' (i.e., layers of a die in a 3-D stack) are transferred from the configuration SRAMs to the FPGA").[25]

In any event, claims 31, 32, and 34 do not preclude eight separate memory layers in a stack, or all eight memory planes on the same layer in the stack, or a multiplexor to select the different memory planes. Patent Owner essentially argues that an artisan of ordinary skill could and would have connected eight memory planes to an FPGA on a single layer as Trimberger describes to obtain a single reconfiguration of 100,000 bits, but such an artisan could and would not have connected the same circuits on separate layers together using vias with a reasonable expectation of success. The record shows otherwise, for the reasons outlined above.

Petitioner persuasively points to testimony by Dr. Franzon cited in the Petition, who in turn relies credibly on evidence of record, to show a reasonable expectation of success, showing that implementing block

---

[25] As summarized above, each memory plane in Trimberger contains 100,000 bits of memory. *Supra* § II.E.1. Also, "[w]hen the device is *flash reconfigured* all bits in logic and interconnect array are updated simultaneously *from one memory plane. Id.*; Ex. 1006, 22 (emphasis added). Contrary to Patent Owner's arguments in connection with claims 1 and 23– 25 discussed above, Trimberger provides another example of the prior art showing the connection of a large plane of memory (block memory) directly to an FPGA for reconfiguration in one cycle.

memory with an FPGA was well-known in the prior art. *See* Reply 24 (citing Pet. 57; Ex. 1002 ¶ 145, 248; Ex. 1003, Figs. 12, 13; Ex. 1003, 11:63–12:2; Ex. 1002 ¶ 145); Ex. 1002 ¶ 145 (testifying that "Cooke also discloses that the 'memory planes not being used for configuration may be used as memory,' i.e., an extra memory block for use by the FPGA" (citing Ex. 1032, 2:50–52), Ex. 1002 ¶ 144 (testifying that Casselman shows connecting "memory . . . directly to FPGA . . . through address and data busses." (citing Ex. 1026)).

As discussed above in connection with claims 1 and 23–25, Petitioner persuasively outlines several good reasons to combine related teachings from the references to arrive at a 3-D stack, reasons that apply to Trimberger's block memory. *See* Pet. 8–20, 55–58. For example, Petitioner notes that Trimberger teaches a block memory to provide access to a "single large block of RAM" such that memory "can . . . be read and written by on-chip [FPGA] logic." Pet. 58 (quoting Ex. 1006, 22). Petitioner also states that implementing Trimberger's block memory teachings with the 3-D chip combination as suggested by Zavracky's "stack [of] memories together with processors or the programmable array" addresses "concern[s] with the speed of access between the FPGA and the block memory." *See id.* at 57. Petitioner notes that "FPGAs have limited programmable logic space" suggesting "a separate task-dedicated memory element for block memory." *Id.* Petitioner also persuasively argues that applying Trimberger as a separate layer of memory in the 3-D stack of Zavracky, Chiricescu, and Akasaka "would have merely been a combination of prior art elements according to known methods to yield a predictable result" and "would have been a well-known use of a memory," showing a reasonable expectation of

IPR2020-01570
Patent RE42,035 E

success in "improv[ing] on the memory options of the FPGA." *Id.* As outlined above, the record supports Petitioner.

Patent Owner repeats or repackages its arguments addressed above, by arguing that "Trimberger does not cure any of the aforementioned deficiencies," "*Chiricescu* does not employ *Zavracky's* interconnections to connect a memory die to an FPGA die," and Petitioner does not show why or how "the modification would have been achieved with any reasonable expectation of success." *See* PO Resp. 46. Contrary to these arguments, as outlined above, Petitioner relies on the combined teachings of the references and the knowledge of an artisan of ordinary skill, and Trimberger provides more and persuasive evidence as to how and why an artisan of ordinary skill would have employed block memory as a single plane or several planes as separate layers in a 3-D stack, including to enhance reconfiguration speeds between a large block of memory and FPGA by facilitating a large parallel data transfer of 100,000 bits in one clock cycle.

We adopt and incorporate Petitioner's showing as to claims 31, 32, and 34, as set forth by the Petition and summarized above, as our own. *See* Pet. 7–20, 55–60. Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that tend to overlap to a certain extent with issues in the instant section due to the format of the Response, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, Akasaka, and Trimberger would have rendered obvious claims 31, 32, and 34.

IPR2020-01570
Patent RE42,035 E

*F.    Obviousness, Claims 35*

  *1.  Satoh*

Satoh, titled "Semiconductor Integrated Circuit, Method for Testing the Same, and Method for Manufacturing the Same," describes using an FPGA to generate test stimuli to test memory elements on the same chip. Ex. 1008, code (54).  In one embodiment, Satoh describes

> a method for testing this semiconductor integrated circuit is such that, in a semiconductor integrated circuit incorporating a variable logic circuit (FPGA) for outputting a signal indicating whether or not a circuit is normal [wherein] . . . a memory test circuit is built for testing the memory circuits in accordance with a specified algorithm . . . without using an external high-performance tester.

Ex. 1008, 46.[26]

Satoh also describes a "memory array" and testing DRAMs (dynamic random access memory arrays) such that "a test circuit . . . for testing the DRAMs 150 to 180 is formed in the portion of the FPGA 120 . . . , and the DRAMs 150 to 180 are tested in succession."  *See* Ex. 1008, 15, Fig. 7.

  *2.  Claim 35*

Petitioner contends claim 35 would have been obvious over the combination of Zavracky, Chiricescu, Akasaka, and Satoh.  *See* Pet. 60–63. Claim 35 is similar to claims 23 and 33 (*see supra* § II.D.6), including an FGPA electrically coupled to a memory array stacked therewith by a number of distributed contact points, but unlike claims 23 and 33, claim 35 does not include the "functional to accelerate" "wherein" clause and instead includes the following "functional to provide test stimulus" "wherein" clause: "wherein said contact points are further functional to provide test stimulus

---

[26] Page citations refer to original page numbers.

from said field programmable gate array to said at least second integrated circuit die element."

Petitioner relies on its showing with respect to the "Zavracky-Chiricescu-Akasaka Combination," which includes its showing for claims 23 and 33. *See* Pet. 61 (citing Ex. 1002 ¶¶ 240–245), 62–63 (referring to its analysis of claim 33, which materially tracks its claim 23 analysis). According to Petitioner, "[i]t was well-known to test stacked modules in order to avoid the expense and waste of silicon by creating 'dead' chips, and improve yield." *Id.* (citing Ex. 1002 ¶¶ 240–245; Ex. 1009; Ex. 1043). Petitioner states that "Satoh specifically praised the use of an FPGA to test 'memory circuits' for 'improving yield and productivity of the semiconductor integrated circuit.'" *Id.* (quoting Ex. 1008, 47:23–27).

Addressing the "functional to provide test stimulus" "wherein" clause, Petitioner explains that Satoh describes an FPGA that "generates a specified test signal [and] supplies the test signal to the memory circuit." Pet. 63 (citing Ex. 1002 ¶¶ 350–359; Ex. 1008, 5:1–28, 49:32–37). Petitioner maintains that Satoh's test signal suggests a "test stimulus" to a second integrated circuit memory array to evoke a response therefrom. *See id.* (citing Ex. 1008, 49:32–37; Ex. 1002 ¶ 358). Based on Satoh's teaching, Petitioner explains that "[i]n the Zavracky-Chiricescu-Akasaka-Satoh Combination," it would have been obvious to implement "the test signal . . . through the contact points between the FPGA of the first IC die element and the memory of the second IC die element," because that "is how those elements are stacked and electrically coupled." *See id.* (citing Ex. 1002 ¶ 359).

In addition to avoiding "dead chips," Petitioner cites other reasons to combine Satoh's testing functionality with the 3-D chip of Zavracky-Chiricescu-Akasaka:

> Recognizing the need to test the 3D stack of the Zavracky-Chiricescu-Akasaka Combination, the POSITA would have sought out Satoh's teaching of using a FPGA for testing the co-stacked memory to achieve known predictable benefits: rigorous testing while avoiding a separate testing chip's (1) additional expense, (2) chip real estate, and (3) design complexity. Ex. 1002 ¶242. Moreover, (4) a FPGA is reusable: after being configured for testing in manufacture, the FPGA would then be reconfigured for its normal "in the field" purpose. *Id.* (citing Ex. 1045 ("Another advantage . . . is that after testing is complete, the reconfigurable logic (FPGA 28) can be reconfigured for post-testing adapter card functions."); Ex. 1046).

Pet. 61–62.

Petitioner also relies on the following evidence and rationale to support a reasonable expectation of success:

> It was well known to use a FPGA to test circuitry with 2-D chips as taught by Satoh. Ex. 1002 ¶241 (citing Ex. 1043). The POSITA would have recognized Satoh's teaching would readily apply to the 3-D chip elements in the Zavracky-Chiricescu-Akasaka Combination. This includes because such a combination would have been a routine use of an FPGA, whose testing ability was not dependent on structure. Ex. 1002 ¶¶242–43. The result of this combination would have been predictable, by known FPGA testing to the 3D stack according to known methods to yield a predictable result. Ex. 1002 ¶244.

Pet. 62.

Patent Owner relies on the same unavailing arguments it advances with respect to claims 1 and 23–25 that we address above. *See* PO Resp. 51 ("Because Petitioner does not contend that *Satoh* cures any of the deficiencies of the combination of *Zavracky*, *Chiricescu,* and *Akasaka,* as

discussed above with respect to Ground 1, its reliance on the same rationales for Ground 3 also fail.")

Patent Owner also argues that "Petitioner's contention that a POSITA would be motivated to make the combination because it was well-known to test stacked die and Satoh tested memory elements on the same semiconductor chip (*see* Petition at 60–61) is divorced from the claimed invention." PO Resp. 52. Patent Owner contends that "Petitioner's generic rationale for using FPGAs for testing is wanting in particularity as to why a POSITA would combine the references as recited in the Challenged Claim." *Id.* Patent Owner contends that "[w]hether the use of *Satoh's* FPGA is beneficial for testing does not sufficiently explain why a POSITA would have combined the references to yield the claimed invention." *Id.* at 53. Patent Owner contends that Petitioner's rationale fails "as it lacks sufficient motivation of how or why a POSITA would have been motivated to use Satoh's FPGA for testing with the hypothetical 3-D structure of *Zavracky-Chiricescu-Akasaka* 'in the way the claimed invention does.'" *Id.* (quoting *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012)).

Patent Owner's arguments appear to accept Petitioner's showing that applying Satoh's testing structure and technique in "the hypothetical 3-D structure of *Zavracky-Chiricescu-Akasaka*" would have been "beneficial" and "predictable." *See* PO Resp. 52–53. That is, Patent Owner characterizes the rationale as "generic" without disputing it. *See id.*

In any event, Petitioner provides specific reasons related to specific recitations in the claims as outlined above, including tying Satoh's testing of a memory array using FPGA testing circuitry to the similar claim elements

in claim 35. For example, using Satoh's FPGA test circuitry and memory testing teachings to avoid "dead chips" is a specific "beneficial" reason, and tying these teachings to FPGA contact points in the Zavracky-Chiricescu-Akasaka" stack to test memory in that stack also is specific. *See* Reply 25 (re-listing reasons supplied in the Petition, including, for example, "the known problem of the need to test stacked modules to avoid the expense and waste of silicon by creating 'dead' chips" (citing Ex. 1002 ¶ 241; Ex. 1009; Ex. 1020; Ex. 1043); Pet. 63 (explaining that "[i]n the Zavracky-Chiricescu-Akasaka-Satoh Combination, the test signal is sent through the contact points between the FPGA of the first IC die element and the memory of the second IC die element, which is how those elements are stacked and electrically coupled" (citing Ex. 1002 ¶ 359)). As Dr. Franzon also credibly explains, Satoh's use of generating a test signal "*within* an FPGA" to test a memory array is agnostic "to the particular way in which the FPGA is stacked." *See* Ex. 1002 ¶ 245 ("The POSITA would thus have realized that Satoh could be used to solve the existing need (which was also recognized by Ex.1043, for example) to achieve the benefits discussed above.").

In other words, Petitioner persuasively shows a reasonable expectation of success with specific reasons to combine, all supported by the record, including beneficial testing to avoid dead chips and maintain reliable memory to reconfigure the 3-D stack's FPGA post-manufacture, thereby showing how to apply the teachings to the claimed 3-D stack as suggested by Zavracky, Chiricescu, and Akasaka. Specifically, claim 35 recites "wherein said contact points are further functional to provide test stimulus from said [FPGA] to said at least second integrated circuit die element," and Petitioner persuasively applies Satoh's teachings to these contact points in

order to avoid dead chips. Another set of specific and persuasive reasons to combine is "using a FPGA for testing the co-stacked memory to achieve known predictable benefits: rigorous testing while avoiding a separate testing chip's (1) additional expense, (2) chip real estate, and (3) design complexity." Pet. 61.

As Petitioner also persuasively argues, Petitioner's "evidence-backed assertions are uncontroverted, specific to relevant teachings of the references, and explain why a POSITA would have sought the Zavracky-Chiricescu-Akasaka-Satoh Combination to reach the '035 patent's claims." Reply 25 (citing Ex. 1070 ¶¶ 76–77).

Patent Owner advances a new (unresponsive) argument in its Sur-reply that "[t]he references Petitioner and Dr. Franzon cite do not disclose testing of 3-D stacked processor but instead disclose that individual die are tested independently and prior to any 3D packaging." Sur-reply 22. This argument is not relevant to a claim limitation at issue here. Claim 35 does not require packaging or preclude "provid[ing] test stimulus from said field programmable gate array to said at least second integrated circuit die element" prior to any packaging.

We adopt and incorporate Petitioner's showing as to claim 35, as set forth by the Petition and summarized above, as our own. *See* Pet. 7–20, 60–63. Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above and below that tend to overlap to a certain extent with issues in the instant section due to the format of the Response, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, Akasaka, and Satoh would have rendered obvious claim 35.

IPR2020-01570
Patent RE42,035 E

G.    *Obviousness, Claim 37*

1. *Alexander*

Alexander, titled "Three-Dimensional Field-Programmable Gate Arrays" (1995), describes "stacking together a number of 2D FPGA bare dies" to form a 3-D FPGA.  Ex. 1009, 253.  Alexander explains that "each individual die in our 3D paradigm has vias passing through the die itself, enabling electrical interconnections between the two sides of the die."  *Id.*

Alexander's Figure 2 follows:



Figure 2: (a) The solder bump, pad, and vertical via geometry; and (b) stacked 2D FPGA dies.

Figure 2(a) shows vertical vias traversing a chip with a solder pad and solder bump on top, and Figure 2(b) shows a stack of chips prior to connection by solder bumps.  Ex. 1009, 253.

Alexander explains that stacking dies to form a 3-D FPGA results in a chip with a "significantly smaller physical space," lower "power consumption," and greater "resource utilization" and "versatility" as compared to conventional layouts.  Ex. 1009, 253.

2. *Claim 37*

Claim 37 depends from independent claim 36 and recites "[t]he programmable array module of claim 36 wherein said third integrated circuit die element includes another field programmable gate array."  As noted above, independent claim 36 is similar to independent claims 1, 17, and 23,

111

and Petitioner refers to its showing of claims 1, 5, and 23 to address claim 36. *See supra* §§ II.D.4, 6; Pet. 53.  Through its dependency from claim 36, claim 37 essentially recites three stacked integrated circuit die elements, the first one "including" an FPGA, the second one "including" a memory array, with "said first and second  integrated circuit die elements being coupled by a number of contact points distributed throughout the surfaces of said die elements," and "a third integrated circuit die element includ[ing]" "another" FPGA "stacked with and electrically coupled to at least one of said first or second integrated die elements."  Therefore, the module of claim 37 essentially requires two FPGAs and a memory array, with the circuit that includes one of the FPGAs simply "electrically coupled" to one of the circuits that includes the other FPGA or memory array, and the latter circuits "coupled by a number of contact points distributed throughout the surfaces of said die elements."

Petitioner contends claim 37 would have been obvious over the combination of Zavracky, Chiricescu, Akasaka, and Alexander.  *See* Pet. 63–66.  Addressing the two stacked FPGAs of claim 37, Petitioner relies on Alexander's teaching of stacked FPGAs in a 3-D package, and contends as follows:

> The POSITA would have known (as Zavracky notes) that multiprocessor systems were needed for "parallel processing applications," for example, "signal processing applications." Ex. 1003, 12:13–28, Fig. 12; Ex. 1002 ¶258.  But in this context, the POSTIA would have appreciated Alexander's teaching of stacked FPGAs as preferable over alternatives, such as (1) general purpose microprocessors running software (too slow), or (2) customized parallel hardware (too expensive and inflexible). The POSITA would have sought out Alexander's multiple stacked FPGAs to enhance the Zavracky-Chiricescu-Akasaka

IPR2020-01570
Patent RE42,035 E

Combination by upgrading it for this type of application. 1002 ¶259.

Pet. 65.

Petitioner contends that Alexander's similar structure of multiple stacked FPGAs, as similar to multiple processors stacked with multiple memories of the Zavracky-Chiricescu-Akasaka Combination, evidences a reasonable expectation of success of stacking FPGAs with memories, with multiple dies stacked and vertically interconnected including using thousands of contact point vias (holes)." *See* Pet. 65. Petitioner also asserts that "[t]he result of this combination would have been predictable, simply combining the extra FPGA of Alexander with the existing 3-D stack according to known methods to yield a predictable result." *Id.* (citing Ex. 1002 ¶¶ 260–261).

Patent Owner responds that "[w]hether 3D FPGA dies are preferable over general purpose microprocessors or customized parallel hardware have no bearing on whether a POSITA would have been motivated to combine *Alexander* with *Zavracky-Chiricescu-Akasaka* to reach a 3-D processor module having 'a third integrated circuit die element [that] includes another field programmable gate array.'" PO Resp. 54–55 (citing Ex. 2011 ¶ 100). This argument appears to accept Petitioner's showing that FPGAs are preferable to processors in a 3-D stack. Petitioner's unchallenged showing of faster FPGAs relative to general purpose processors in the 3-D stack of Zavracky-Chiricescu-Akasaka, where Zavracky contemplates multiple layers of processors, memory layers, and an FPGA, is a persuasive reason for the combination. *See* Ex. 1003, Fig. 12 (stacked multiple processor and memory layers/chips), Fig. 13 (stacked processor, memory, and PLA/FPGA layers/chips).

Patent Owner also argues that Petitioner's "conclusory rationale is further discredited by Petitioner's suggestions elsewhere in the Petition that *Chiricescu* discloses a FPGA application that enhances *Zavracky*." PO Resp. 55. In particular, Patent Owner argues that the Petition elsewhere suggest that a "POSITA would have taken Chiricescu's suggestion of a FPGA to perform 'arbitrary logic functions,' . . . as a cue to enhance and expand upon the packet processing task performed by the programmable logic device in Zavracky, e.g., to perform image and signal processing tasks that would have taken advantage of co-stacked microprocessors and memories as taught in Zavracky." *Id.* (quoting Pet. 18). Patent Owner argues that "there is no reason . . . to combine *Alexander* with *Zavracky-Chiricescu-Akasaka*," because "Petitioner acknowledges that, *Chiricescu*, like *Alexander*, offers FPGAs to enhance parallel processing image and signal tasks of *Zavracky's* microprocessor." *Id.* (citing Ex. 2011 ¶ 101).

Patent Owner's arguments are unavailing. For example, Patent Owner concedes that "*Chiricescu*, like *Alexander*, offers FPGAs to enhance parallel processing image and signal tasks of *Zavracky's* microprocessor." PO Resp. 55. Dependent claim 37 does not preclude employing a microprocessor, because it is open-ended and recites "comprising" and "at least" a "first," "second," and "third integrated circuit functional element." To address claim 37, Petitioner specifically and persuasively argues that "[t]he POSITA would have known (as Zavracky notes) that *multiprocessor* systems were needed for 'parallel processing applications,' for example, 'signal processing applications.'" Pet. 65 (citing Ex. 1003, 12:13–28, Fig. 12; Ex. 1002 ¶ 258). Petitioner also repeatedly points to Zavracky's microprocessors 804 and 806 in Figure 13 to address claim 1, reproduces

Figure 13 in addressing claim 23 (which it relies upon to address independent claim 36), and refers to the "Zavracky-Chiricescu-Akasaka Combination." *See id.* at 44–45 (quoting Zavracky as stating that its "invention relates to the structure [of] vertically stacked and interconnected circuit elements for . . . programmable computing." (citing Ex. 1003, 12:28–38, Fig. 13), 53 (referring to its analysis of claims 1, 5, and 23 to address claim 36). Therefore, Patent Owner's characterization that Chiricescu and Alexander "offer[] FPGAs to enhance parallel processing image and signal tasks of *Zavracky's* microprocessor" and Petitioner's argument that Chiricescu suggests FPGAs for performing arbitrary logic functions and expanding packet processing tasks with microprocessors, are specific and persuasive reasons to employ FPGAs in the stack of Zavracky-Chiricescu-Akasaka-Alexander. *See* PO Resp. 55; Pet. 18.

In other words, as Petitioner also persuasively argues, "[a]s to the 'why,' the Petition shows that (i) the POSITA would have been prompted to pursue a 'multiprocessor system' to facilitate 'parallel processing applications'; and (ii) the POSITA would have viewed Alexander's "stacked FPGAs as preferable over alternatives" for achieving such a system." Reply 26 (citing Pet. 65; Ex. 1002 ¶¶ 257–61). "And as to the 'how,' the Petition explains that 'the POSITA would have realized that using multiple FPGA dies in the stack as taught by Alexander would work in a straightforward manner similar manner to stacking multiple memories, or multiple microprocessors, as already taught in the Zavracky-Chiricescu-Akasaka Combination.'" *Id.* (quoting Pet. 65).

Patent Owner also alleges that the Petition fails to explain how to combine the references with a reasonable expectation of success. PO Resp.

IPR2020-01570
Patent RE42,035 E

55–57.  Patent Owner alleges that other sections of *Alexander* . . . [that] Petitioner wholly ignores . . . . do not suggest . . . that using multiple FPGA dies would work in a straightforward manner, let alone in Petitioner's proposed combination, so as to have a reasonable expectation of success." *Id.* Patent Owner provides little support for this argument.  *See id.* Contradicting Patent Owner, Alexander itself states that using multiple FPGAs in a stack results in a chip with "significantly smaller physical space," lower "power consumption," "shorter signal propagation delay," and "greater resource utilization and versatility" due to the "increased number of logic block neighbors" as "compared with a circuit-board-based 2D FPGA implementation."  Ex. 1009, 253.  In other words, Alexander suggests that stacked FPGAs simply implement the same circuitry of well-known single layer FPGAs, albeit with numerous advantages.

Patent Owner also refers to sections in Alexander that describe thermal issues.  PO Resp. 56.  Patent Owner also argues that "Petitioner's threadbare argument that the combination is based on known methods to yield a predictable result (*see* Petition at 65) is . . . untethered to the features of the claimed invention."  *Id.* at 57.

Contrary to these arguments, the Petition tethers the claimed stacking of two FPGAs to several reasons to combine the references.  As discussed above, Patent Owner itself cites these reasons offered by Petitioner, including "offer[ing] FPGAs to enhance parallel processing image and signal tasks of *Zavracky's* microprocessor," and similarly "perform[ing] 'arbitrary logic functions,' . . . as a cue to enhance and expand upon the packet processing task performed by the programmable logic device in *Zavracky*," as noted above.  *See* PO Resp. 55 (citing Pet. 19).

As Petitioner also argues, Patent Owner does not dispute that "Zavracky already taught combining an FPGA with a memory and microprocessor." Reply 27 (citing Ex. 1003, 12:29–39, Fig. 13). Adding another FPGA layer in place of one of the microprocessor layers in Zavracky (Ex. 1003, Figs. 12, 13) therefore would have reduced thermal problems, "because FPGAs were more energy-efficient than microprocessors for the same size die, reducing heat." *Id.* at 28 (citing Ex. 1070 ¶¶ 37–41; Ex. 1058; Ex. 1082). Dr. Franzon's testimony includes an excerpt from DeHon (Ex. 1058) and Scrofano (Ex. 1082), which support Dr. Franzon's testimony that "FPGAs needed less power to get the same level of computing capability" as a processor. *See* Ex. 1070 ¶¶ 37–38 (citing Ex. 1058, 43). Similar to Alexander's teaching that "3D FPGAs have good implications with respect to power consumption" (Ex. 1009, 263), the '035 patent also evidences that 3-D stacks "overall reduced power requirements" (Ex. 1001, 4:63). Reduced power translates to less heat, as was well-known and as Petitioner shows. *See infra* note 27.

Describing dual layer FPGA stacks, the '035 patent states as follows:

> It should be noted that although a single FPGA die 68 has been illustrated, *two or more FPGA die 68 may be included in the reconfigurable module 60. Through the use of the through-die area array contacts 70*, inter-cell connections *currently limited to two dimensions of a single die*, may be routed up and down the stack in three dimensions. *This is not known to be possible with any other currently available stacking techniques since they all require the stacking contacts to be located on the periphery of the die.* In this fashion, the number of FPGA die 68 cells that may be accessed within a specified time period is increased by up to 4 VT/3, where "V" is the propagation velocity of the wafer and "T" is the specified time of propagation.

117

IPR2020-01570
Patent RE42,035 E

Ex. 1001, 5:11–24 (emphasis added). Here, the '035 patent offers no description of any specific connection scheme between the two FPGA dies. It simply describes vias throughout the periphery of each die (instead of just at the periphery thereof) as a new technique (which is not correct), without any mention of heat problems associated with stacking two FPGAs. The '035 patent's lack of description and focus on vias throughout the whole die as a solution (providing speed gains) further evidences a reasonable expectation of success and supports Petitioner's showing.

As Petitioner also argues, thermal issues were a routine consideration, with known viable options to address the issues. Reply 28 (citing Ex. 1020, 11; Ex. 1070 ¶¶ 29–41; Ex. 1020; Ex. 1012; Ex. 1009; Ex. 1058; Ex. 1082). Dr. Franzon credibly lists known ways to dissipate heat, including use of low thermal resistance substrates, forced fluid coolants, thermal vias, and thermally conductive adhesives. Ex. 1070 ¶ 32.

The record also supports Dr. Franzon's testimony that "Alexander itself noted that thermal concerns were standard in any multi-chip design."[27] In addition to mitigating heat concerns by eliminating I/O buffers (or "restrict[ing] I/O to one layer and plac[ing] it close to the heat sink," Ex. 1009, 256 § 5), in the same section, Alexander further supports Dr. Franzon's testimony, stating that "[a] number of . . . thermal-reduction techniques (i.e., thermal bumps and pillars . . ., thermal gels . . ., etc.) may also be applicable for 3D FPGAs." Ex. 1009, 255 § 5 ("Thermal Issues").

---

[27] Testimony from footnote 2 of Dr. Franzon's declaration follows: "It would have been well known to the POSITA that in a chip, an increase in power usage generally translated to an increase in heat. For example, a processor using more power to perform computations will put off more heat than when the processor is using less power."

Alexander also states that "[a]s the power-to-area/volume ratio increases, so does the operating temperature unless heat can be effectively dissipated." *Id.*

As Petitioner also persuasively reasons, Patent Owner's arguments about heat dissipation concerns here do not undermine Petitioner's showing of a reasonable expectation of success, because a reasonable expectation of success "does not require a certainty of success." Reply 28 (quoting *Medichem v. Rolabo S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006)). As found above, Alexander promotes using multiple FPGAs in a module stack, and myriad additional evidence further supports a reasonable expectation of success. *See id.* (citing Ex. 1002 ¶¶ 44–45 (listing prior art showing FPGA stacks or FPGA stacks with microprocessors and memory), ¶¶ 260–261; Ex. 1009, 1).

Finally, none of the challenged claims, including claim 37, specifies the size of the claimed 3-D modules or corresponding amount of computing power. Therefore, the breadth of claim 37 encompasses a 3-D stack operable on a minimal power basis (and without any limit on the area of each die, further dissipating heat as the chip area increases), rendering heat concerns nonexistent or at least well within the bounds of a reasonable expectation of success. *See supra* note 27; Ex. 1009, 255–256 § 5 (discussed above, e.g., as power per unit area decreases, so does temperature).

We adopt and incorporate Petitioner's showing as to claim 37, as set forth by the Petition and summarized above, as our own. *See* Pet. 7–20; 63–66. Based on the foregoing discussion and a review of the full record, including evidence and arguments addressed in sections above that tend to

overlap to a certain extent with issues in the instant section due to the format of the Response, Petitioner shows by a preponderance of evidence that the combined teachings of Zavracky, Chiricescu, Akasaka, and Alexander would have rendered obvious claim 37.

H.    *Exhibit 1070*

Patent Owner argues that "[p]aragraphs 5–9, 13–28, 29–41, 44, 45, 59–66, 68, 73, 74, 76, 77, and 94–103 from Dr. Franzon's [Reply D]eclaration (Ex. 1070) addressing Petitioner's alleged obviousness grounds are not sufficiently discussed in the Reply" at pages 10, 14, 20, 21, 25, 27, and 28 of the Reply.  Sur-reply 25.  Patent Owner contends that the noted paragraphs are "not discussed in the Reply, but instead incorporated by citation or a cursorily parenthetical."  *Id.*  Patent Owner further contends that "the Board should not and cannot play archeologist with the record to search for the arguments" and "should not . . . consider[] Dr. Franzon's arguments." *Id.* (citing 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document.").

Patent Owner also cites *General Access Solutions, Ltd. v. Sprint Spectrum L.P.*, 811 F. App'x 654, 658 (Fed. Cir. 2020) as "upholding the Board's finding of improper incorporation by reference because, *inter alia*" (Sur-reply 25), "'playing archaeologist with the record' is precisely what the rule against incorporation by references was intended to prevent," (*id.* (quoting *Spring Spectrum*, 811 F. App'x at 658, internal citation omitted)). The situation here is different than in *Sprint Spectrum*, because there, the court noted a problem with identifying a party's substantive arguments *prior to turning to the declaration at issue*:  *"To identify GAS's substantive arguments*, the Board was forced to turn to a declaration by Struhsaker, *and*

120

*further to delve into a twenty-nine-page claim chart attached as an exhibit*." *Id.* (emphasis added).

Here, Patent Owner does not describe or allege any problem with identifying Petitioner's substantive arguments. In context, except as discussed below, the cited paragraphs of Dr. Franzon's Reply Declaration (Ex. 1070) properly support Petitioner's substantive arguments at the pages of the Reply identified by Patent Owner.

Regarding the first citation, page 10 of the Reply cites paragraphs 94–103 of Dr. Franzon's Reply Declaration, and discusses how, even if the "functional to accelerate" clauses require "a wide configuration data port," the combination of Zavracky, Chiricescu, and Akasaka teaches it. *See* Reply 9–10 (citing Ex. 1070 ¶¶ 94–103). This citation is a misprint or oversight by Petitioner, because Dr. Franzon's Reply Declaration does not include paragraphs 96–102. Therefore, any issue with respect to those paragraphs is moot. The remaining cited paragraphs of Dr. Franzon's Reply Declaration on page 10 of the Reply directly relate to what a "wide configuration data port" constitutes. Also, paragraph 95 reproduces some of the same testimony by Dr. Chakrabarty (Patent Owner's expert in IPR2020-01021) that the Reply discusses and reproduces on page 10 of the Reply.

Regarding the second citation, page 14 of the Reply cites two paragraphs with a parenthetical as follows: "Ex. 1070 ¶¶ 73–74 (citing Ex. 1083, an example of common usage of 'share data' as 'transfer data')." Prior to the citation, the Reply addresses the plain meaning of "share," tracking the parenthetical. *See* Reply 14. Notwithstanding that Patent Owner generally implies that citation is one of several examples of "a

IPR2020-01570
Patent RE42,035 E

cursorily parenthetical" (Sur-reply 25), the parenthetical is clear as to how Dr. Franzon's cited testimony supports Petitioner's Reply argument.

Regarding the third citation, page 20 of the Reply (citing Ex. 1070 ¶¶ 13–28), Petitioner's argument merely responds to a summary argument by Patent Owner about four different "TSV interconnection issues." *See* PO Resp. 41 ("At the time of the invention, a POSITA was aware of numerous []TSV interconnection issues, such as routing congestion, TSV placement, granularity, hardware description language ('HDL') algorithms, which must be considered." (citing Ex. 2011 ¶ 82; Ex. 2014, 85, 87, 89); Reply 20 ("The supposed 'TSV interconnection issues' that [Patent Owner] cursorily identifies were at most normal engineering issues, not problems preventing a combination. Ex. 1070 ¶¶ 13–28 (Dr. Franzon rebutting Dr. Souri's testimony as to every purported issue with citations to evidence).") Here, Petitioner's parenthetical generally informs the reader that Dr. Franzon's testimony responds to Dr. Souri's "cursor[y]" summary alleging "TSV interconnection issues." *See* Reply 20; PO Resp. 41.

Paragraphs 13–20 of Dr. Franzon's Reply Declaration provide background context leading to thrust of paragraphs 21–28, which directly support Petitioner's Reply argument that TSV issues were normal engineering issues in the context of combining the references. Therefore, we consider cited paragraphs 13–20 only as background information and context.

In comparison, providing his testimony about the TSV issues, Dr. Souri's support for TSV issues is a citation to "Ex. 2014 at 85, 97, 90." Ex. 2011 ¶ 82. Patent Owner provides the same citation without any explanation of the citation. PO Resp. 41. This amounts to the same type of

122

incorporation-by-reference of pages of evidence that Patent Owner attributes to Petitioner. Also, the cited three pages of Exhibit 2014 are in the middle of an industry article, and the pages are densely packed two-column pages that facially appear to have at least the same number of words in some of the complained-about citations to multiple paragraphs that Petitioner provides to Dr. Souri's Reply Declaration. Here, Patent Owner leaves it to the Board to dig into the cited pages of Exhibit 2014 to find the alleged TSV interconnection issues and place it in context to the background information in the whole article. In reaching our decision, we exercised judgment as to all the evidence cited by the parties for its relevance, context, and substance, and weighed it accordingly.

Finally, an examination of the other citations identified by Patent Owner in full context, reveals (like the citations addressed above) that Petitioner's use of and citation to Dr. Souri's testimony is not improper. In summary, the remaining pages of the Reply identified by Patent Owner include citations with a clear sentence preceding the citation and/or clear parenthetical informing the reader clearly how the cited testimony supports the sentence. *See* Reply 21 n.7 (clear parenthetical and preceding sentence (citing Ex. 1070 ¶¶ 59–66)), 25 (clear preceding sentence (citing Ex. 1070 ¶¶ 76–77), 27 (no citation), 28 (clear parentheticals and preceding sentences about thermal issues (citing Ex. 1070 ¶¶ 37–41; Ex. 1070 ¶¶ 29–41)).[28]

---

[28] As noted above, Patent Owner cites to page 27 of the Reply, but page 27 does not have a citation to Exhibit 1070. It appears that Patent Owner intended to refer to the two citations to Exhibit 1070 on page 28 of the Reply. *See* PO Resp. 25; Reply 28.

IPR2020-01570
Patent RE42,035 E

## III. CONCLUSION

The outcome for the challenged claims of this Final Written

Decision follows.[29]   In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatent-able | Claims Not shown Unpatent-able |
|---|---|---|---|---|
| 1–30, 33, 36, 38 | 103(a) | Zavracky, Chiricescu, Akasaka | 1–30, 33, 36, 38 | |
| 31, 32, 34 | 103(a) | Zavracky, Chiricescu, Akasaka, Trimberger | 31, 32, 34 | |

[29] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01570
Patent RE42,035 E

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatent-able | Claims Not shown Unpatent-able |
|---|---|---|---|---|
| 35 | 103(a) | Zavracky, Chiricescu, Akasaka, Satoh | 35 | |
| 37 | 103(a) | Zavracky, Chiricescu, Akasaka, Alexander | 37 | |
| **Overall Outcome** | | | 1–38 | |

## IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–38 the '035 patent are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision,

parties to the proceeding seeking judicial review of the Decision must

comply with the notice and service requirements of 37 C.F.R. § 90.2

125

IPR2020-01570
Patent RE42,035 E

PETITIONER:
David M. Hoffman
Kenneth W. Darby Jr.
Jeffrey Shneidman
FISH & RICHARDSON P.C.
PTABInbound@fr.com
IPR42653-0031IP1@fr.com
hoffman@fr.com
kdarby@fr.com
shneidman@fr.com


PATENT OWNER:
Jonathan S. Caplan
James Hannah
Jeffrey H. Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jcaplan@kramerlevin.com
jhannah@kramerlevin.com
jprice@kramerlevin.com

Trials@uspto.gov                                                    Paper 39
571-272-7822                                        Date: March 2, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

XILINX, INC. and
TAIWAN SEMICONDUCTOR MANUFACTURING CO. LTD.,
Petitioner,

v.

ARBOR GLOBAL STRATEGIES LLC,
Patent Owner.

————————

IPR2020-01571[1]
Patent 6,781,226 B2

————————

Before KARL D. EASTHOM, BARBARA A. BENOIT, and
SHARON FENICK, *Administrative Patent Judges*.

FENICK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

---

[1] Taiwan Semiconductor Manufacturing Co. Ltd. filed a petition in
IPR2021-00738 and has been joined as a party to IPR2020-01571. *See also*
Paper 38 (order dismissing-in-part Taiwan Semiconductor Manufacturing
Co. Ltd. as a party with respect to claims 13, 14, 16–23, and 25–30).

IPR2020-01571
Patent 6,781,226 B2

Xilinx, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–30 (the "challenged claims") of U.S. Patent No. 6,781,226 B2 (Ex. 1001, "the '226 patent"). Petitioner filed a declaration of Dr. Paul Franzon (Ex. 1002) with its Petition. Arbor Global Strategies LLC ("Patent Owner"), filed a Preliminary Response (Paper 7). We determined that the information presented in the Petition established that there was a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims and we instituted this proceeding on March 5, 2021, as to all challenged claims and all grounds of unpatentability. Paper 12 ("Dec. on Inst.").

After institution, Patent Owner filed a Patent Owner Response (Paper 18, "PO Resp.") and a declaration of Dr. Shukri J. Souri in support (Ex. 2006); Petitioner filed a Reply (Paper 22, "Pet. Reply") and a second declaration of Dr. Franzon in support (Ex. 1070); and Patent Owner filed a Sur-reply (Paper 26, "PO Sur-reply"). Thereafter, the parties presented oral arguments, and the Board entered a transcript into the record. Paper 32 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4). For the reasons set forth in this Final Written Decision pursuant to 35 U.S.C. § 318(a), we determine that Petitioner demonstrates by a preponderance of evidence that the challenged claims are unpatentable.


I.   BACKGROUND

A.   *Real Parties-in-Interest*

As the real parties-in-interest, Petitioner identifies only itself. Pet. 69. Taiwan Semiconductor Manufacturing Co. Ltd. identifies itself and TSMC

IPR2020-01571
Patent 6,781,226 B2

North America as real parties-in-interest.  *See* IPR2021-00393, Paper 1, 69.

Patent Owner identifies only itself as a real party-in-interest.  Paper 4, 1.

*B.*     *Related Proceedings*

The parties identify *Arbor Global Strategies LLC v. Xilinx, Inc.*, No.
19-CV-1986-MN (D. Del.) (filed Oct. 18, 2019) as a related infringement
action involving the '226 and three related patents, U.S. Patent No.
RE42,035 E (the "'035 patent"), U.S. Patent No. 7,282,951 B2 (the "'951
patent") and U.S. Patent No. 7,126,214 B2 (the "'214 patent").  *See* Pet.
69; Paper 4, 1.  Petitioner "contemporaneously fil[ed] [*inter partes* review]
petitions challenging claims in each of these patents," namely IPR2020-
01567 (challenging the '214 patent), IPR2020-01568 (challenging the '951
patent), and IPR2020-01570 (challenging the '035 patent).  Pet. 69.

The parties also identify *Arbor Global Strategies LLC* v. *Samsung
Electronics Co., Ltd.*, 2:19-cv-00333-JRG-RSP (E.D. Tex.) (filed October
11, 2019) ("the Samsung action") as a related infringement action involving
the '035, '951, and '226 patents.  Pet. 69; Paper 4, 1.  Subsequent to the
complaint in the Samsung action, Samsung Electronics Co., Ltd.
("Samsung") filed petitions challenging the three patents, and the Board
instituted on all challenged claims, in IPR2020-01020, IPR2020-01021, and
IPR2020-01022 ("the 1022IPR").  *See* IPR2020-01020, Paper 11 (decision
instituting on claims 1, 3, 5–9, 11, 13–17, 19– 22, 25, 26, 28, and 29 of the
'035 patent)); IPR2020-01020, Paper 30 (final written decision finding all
challenged claims unpatentable); IPR2020-01021, Paper 11 (decision
instituting on challenged claims 1, 4, 5, 8, 10, and 13–15 the '951 patent);
IPR2020-01021, Paper 30 (final written decision finding all challenged
claims unpatentable); IPR2020-01022, Paper 12 (decision instituting on

3

IPR2020-01571
Patent 6,781,226 B2

challenged claims 13, 14, 16–23, and 25–30 of the '226 patent) (Ex. 2004);
IPR2020-01022, Paper 34 (final written decision finding all challenged
claims unpatentable).

C.    *The '226 Patent*

The '226 patent describes a stack of integrated circuit (IC) die
elements including a field programmable gate array (FPGA) on a die, a
memory on a die, and a microprocessor on a die.  Ex. 1001, code (57),
Fig. 4.  Multiple contacts traverse the thickness of the die elements of the
stack to connect the gate array, memory, and microprocessor.  *Id.*
According to the '226 patent, this arrangement "allows for a significant
acceleration in the sharing of data between the microprocessor and the
FPGA element while advantageously increasing final assembly yield and
concomitantly reducing final assembly cost."  *Id.*

Figure 4 follows:



*Fig. 4*

4

IPR2020-01571
Patent 6,781,226 B2

Figure 4 above depicts a stack of dies including FPGA die 66, memory die 66, and microprocessor die 64, interconnected using contact holes 70. *Id.* at 4:9–33.

The '226 patent explains that an FPGA provides known advantages as part of a "reconfigurable processor." *See* Ex. 1001, 1:19–35. Reconfiguring the FPGA gates alters the "hardware" of the combined "reconfigurable processor" (e.g., the processor and FPGA), making the processor faster than one that simply accesses memory (i.e., "the conventional 'load/store' paradigm") to run applications. *See id.* A "reconfigurable processor" provides a known benefit of flexibly providing the specific functional units needed for applications to be executed. *See id.*

D.    *Illustrative Claims 1 and 10*

The Petition challenges claims 1–30. Of these claims, 1, 7, 13, and 22 are independent and claims 2–6, 8–12, 14–21, and 23–30 depend from one of the challenged independent claims either directly or indirectly. Claims 1, 7, 13 and 22, reproduced below with bracketed numbering added for reference, illustrate the challenged claims at issue:

1. A processor module comprising:

[1.1] at least one field programmable gate array integrated circuit die element including a programmable array; and

[1.2] at least one microprocessor integrated circuit die element stacked with and electrically coupled to said programmable array of said at least one field programmable gate array integrated circuit die element,

[1.3] such that processing of data shared between the microprocessor and the field programmable gate array is accelerated.

Ex. 1001, 6:16–26.

IPR2020-01571
Patent 6,781,226 B2

7. A processor module comprising:

at least one field programmable gate array integrated circuit die element including a programmable array; and

at least one microprocessor integrated circuit die element stacked with and electrically coupled to said programmable array of said at least one field programmable gate array integrated circuit die element,

[7.3] the at least one field programmable gate array integrated circuit die element being configured to provide test stimulus to the at least one microprocessor integrated circuit die element during manufacture and prior to completion of the module packaging.

Ex. 1001, 6:45–57, Cert. of Corr.

13. A processor module comprising:

at least a first integrated circuit die element including a programmable array;

at least a second integrated circuit die element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit die element;

at least a third integrated circuit die element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit die elements respectively; and

[13.4] means for reconfiguring the programmable array within one clock cycle.

Ex. 1001, 7:9–22.

22.  A processor module comprising:

at least a first integrated circuit die element including a programmable array and a plurality of configuration logic cells;

at least a second integrated circuit die element including a processor stacked with and electrically coupled to said

6

IPR2020-01571
Patent 6,781,226 B2

> programmable array of said first integrated circuit die element;

> at least a third integrated circuit die element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit die elements respectively; and

> [22.4] means for updating the plurality of configuration logic cells within one clock cycle.

Ex. 1001, 8:4–17.

E.    *The Asserted Grounds*

Petitioner challenges claims 1–30 of the '226 patent on the following grounds (Pet. 1):

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| 1–6 | 103[2] | Zavracky,[3] Chiricescu,[4] Akasaka[5] |
| 7–12 | 103 | Zavracky, Chiricescu, |

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103.  Petitioner and Patent Owner each use December 5, 2001 in their analysis.  Pet. 3, 5; Ex. 1002 ¶¶ 27–29; PO Resp. 10; Ex. 2006 ¶ 25.  We assume that the '226 patent contains a claim with an effective filing date before March 16, 2013 (the effective date of the relevant amendment) and that the pre-AIA version of § 103 applies.

[3] Zavracky et al., US 5,656,548, issued Aug. 12, 1997.  Ex. 1003.

[4] Silviu M. S. A. Chiricescu and M. Michael Vai, *A Three-Dimensional FPGA with an Integrated Memory for In-Application Reconfiguration Data*, Proceedings of the 1998 IEEE International Symposium on Circuits and Systems, May 1998, ISBN 0-7803-4455-3/98.  Ex. 1004.

[5] Yoichi Akasaka, *Three-Dimensional IC Trends*, Proceedings of the IEEE, Vol. 74, Iss. 12, pp. 1703–1714, Dec. 1986, ISSN 0018-9219. Ex. 1005.

IPR2020-01571
Patent 6,781,226 B2

| Claims Challenged | 35 U.S.C. § | References |
|---|---|---|
| | | Akasaka, Satoh[6] |
| 13–30 | 103 | Zavracky, Chiricescu, Akasaka, Trimberger[7] |

II. ANALYSIS

Petitioner challenges claims 1–30 as obvious based on the grounds listed above. Patent Owner disagrees.

A. *Legal Standards*

35 U.S.C. § 103(a) renders a claim unpatentable if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Tribunals resolve obviousness on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Prior art references must be "considered together with the knowledge of one

---

[6] Satoh, PCT App. Pub. No. WO00/62339, published Oct. 10, 2000. Ex. 1008 (English translation).

[7] Steve Trimberger, Dean Carberry, Anders Johnson, and Jennifer Wong, *A Time-Multiplexed FPGA*, Proceedings of the 1997 IEEE International Symposium on Field-Programmable Custom Computing Machines, April 1997, ISBN 0-8186-8159-4. Ex. 1006.

8

IPR2020-01571
Patent 6,781,226 B2

of ordinary skill in the pertinent art." *In re Paulsen*, 30 F.3d 1475, 1480

(Fed. Cir. 1994) (citing *In re Samour*, 571 F.2d 559, 562 (CCPA 1978)).

B.    *Level of Ordinary Skill in the Art*

Relying on the testimony of Dr. Franzon, Petitioner contends that

[t]he person of ordinary skill in the art ("POSITA") at the time
of the alleged invention of the '226 patent would have been a
person with a Bachelor's Degree in Electrical Engineering or
Computer Engineering, with at least two years of industry
experience in integrated circuit design, packaging, or
fabrication.

Pet. 5 (citing Ex. 1002 ¶¶ 58–60).

Patent Owner asserts that

[a] person of ordinary skill in the art ("POSITA") around
December 5, 2001 (the earliest effective filing date of the '226
Patent) would have had a Bachelor's degree in Electrical
Engineering or a related field, and either (1) two or more years
of industry experience; and/or (2) an advanced degree in
Electrical Engineering or related field.

PO Resp. 10 (citing Ex. 2006 ¶ 25).

As we did in the Decision on Institution, we adopt Petitioner's

proposed level of ordinary skill in the art, which comports with the teachings

of the '226 patent and the asserted prior art. *See* Dec. on Inst. 21.  Patent

Owner's proposed level overlaps substantially with Petitioner's proposed

level.  Even if we adopted Patent Owner's proposed level, the outcome

would remain the same.

C.    *Claim Construction*

In an *inter partes* review, the Board construes each claim "in

accordance with the ordinary and customary meaning of such claim as

understood by one of ordinary skill in the art and the prosecution history

pertaining to the patent."  37 C.F.R. § 42.100(b).  Under the same standard

IPR2020-01571
Patent 6,781,226 B2

applied by district courts, claim terms take their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Petitioner and Patent Owner each agree that both "means for reconfiguring the programmable array within one clock cycle" (limitation 13.4 in claim 13) and "means for updating the plurality of configuration logic cells within one clock cycle" (limitation 22.4 in claim 22) are means-plus-function limitations and should be construed as per 35 U.S.C. § 112, ¶ 6.  Pet. 10–13; PO Resp. 11.

Both of these limitations listed above recite "means" and further recite a function, thus creating a presumption that 35 U.S.C. § 112, ¶ 6 applies. *See* 35 U.S.C. § 112, ¶ 6 ("An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."); *see also Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc in relevant part) (quoting *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998)) (holding that "use of the word 'means' creates a presumption that § 112, ¶ 6 applies").  We agree with the parties

IPR2020-01571
Patent 6,781,226 B2

that these limitations are means-plus-function limitations subject to 35 U.S.C. § 112, ¶ 6.  Pet. 11, 13; PO Resp. 11.

Patent Owner additionally argues that we should construe "wide configuration data port," which appears in challenged claims 14 and 23, and which additionally appears in each party's proposals for the structure of the means-plus-function limitations described above.  Pet. 11–13; PO Resp. 19–25; Pet. Reply 2–6; PO Sur-reply 1–5.  Because of this, we begin with this construction and then discuss construction of the means-plus-function terms.

### 1.  "wide configuration data port"

While neither party proposed construction of this term in pre-institution briefing, Patent Owner did propose its construction in its Response, and the parties each briefed the construction before the oral hearing.  PO Resp. 14–20; Pet. Reply 3–6; PO Sur-reply 1–5.

### a.  Patent Owner's Position

Patent Owner argues that the term "wide configuration data port" should be construed as "a configuration data port that allows the parallel updating of logic cells in a programmable array through use of buffer cells." PO Resp. 15–19 (citing Ex. 1001, 4:45–59, Fig. 5; Ex. 2006 ¶¶ 32, 40–44); In support of this construction, Patent Owner cites as intrinsic evidence the '226 patent's disclosure that the wide configuration data port "is included to update the various logic cells 84 through an associated configuration memory 86 and buffer cells 88."  Ex. 1001, 4:51–54 (quoted at PO Resp. 15).  Patent Owner argues that the '226 patent describes, as background and in contrast to the use of a wide configuration data port, the use of a "relatively narrow" serial data port that accesses configuration memory serially.  *Id.* at 17–19 (citing Ex. 1001, 3:63–4:9, Fig. 5; Ex. 2006 ¶¶ 42–44).

11

IPR2020-01571
Patent 6,781,226 B2

Patent Owner contends that the '226 patent disclosure distinguishes the wide configuration data port because it allows the updating of logic cells in parallel through use of buffer cells, which Patent Owner argues is "a key distinguishing feature of the wide configuration data port." *Id.* at 18–19. Patent Owner argues that its experts "have been consistent that the word 'wide' in this term requires a sufficient number, and appropriate arrangement, of connections between the memory die and the programmable array to permit parallel updating of the array." PO Sur-reply 2 (citing Ex. 2006 ¶ 38; Ex. 1076, 42:3–20).

Patent Owner argues that the buffer cells must be part of a proper construction. Patent Owner contends that "the wide configuration data port 82 achieves single cycle reconfiguration of the programmable array *by loading reconfiguration data into buffer cells 88 in parallel*, even while the programmable array is operational." PO Resp. 16 (emphasis added). In the Sur-reply, however, Patent Owner contends that it is not the parallel loading of reconfiguration data into buffer cells that allows single cycle reconfiguration, but rather the updating of the logic cells in parallel, using the data in the buffer cells. PO Sur-reply 4–5. Patent Owner further supports its contention that the buffer cells must be included with the die-area connections in the construction of "wide configuration data port" because "Petitioner fails to point to any embodiment in the '226 Patent in which the vertical die-area connections and the buffer cells are not used in conjunction and therefore cannot credibly claim that Arbor's construction excludes such an embodiment." *Id.* at 3.

IPR2020-01571
Patent 6,781,226 B2

### b. Petitioner's Position

Petitioner, in its Reply, argues that the term should have its plain and ordinary meaning. Pet. Reply 3–4. Petitioner argues that the plain and ordinary meaning of a configuration data port is "a port for configuration data, i.e., a connection or place through which configuration data is transferred." *Id.* (citing Ex. 1002 ¶¶ 96–97; also citing Ex. 1075, 163:8–163:21 (deposition of Patent Owner's expert Dr. Krishnendu Chakrabarty in the 1022IPR)). Petitioner argues that the '226 patent shows a configuration data port that is wide because it includes direct connections / paths for configuration data to be loaded, contrasting this with the Figure 3 prior art embodiment of the '226 patent, which is not "wide." *Id.* at 3–4 (citing Ex. 1002 ¶¶ 96–97).

With respect to Patent Owner's proposed construction, Petitioner argues that Arbor's proposal improperly includes the buffer cells, which are shown and described in the '226 patent as separate elements from the wide configuration data port. *Id.* at 4 (citing Ex. 1001, 4:50–54, Fig. 5). Petitioner argues that the construction is contradicted by testimony presented by Patent Owner's expert Dr. Chakrabarty in the 1022IPR, and that Dr. Souri did not read this testimony. *Id.* at 5 (citing Ex. 1076, 73:22–74:7). Petitioner argues Patent Owner's construction, in its use of the term "allows," is ill-defined, and that Patent Owner describes elements such as logic cells, configuration memory, and a large number of die-area contacts as required, but that these elements are not included in the proposed construction. *Id.* at 4–5. Lastly, Petitioner argues that Patent Owner incorrectly asserts that the loading of reconfiguration data into buffer cells occurs in one clock cycle, but that it is the updating of the logic cells that

13

IPR2020-01571
Patent 6,781,226 B2

occurs in one clock cycle in the '226 patent. *Id.* at 6 (citing PO Resp. 16; Ex. 1001, 4:55–59; Ex. 1070 ¶ 111).

### c. *Analysis and Conclusion*

We determine that one of ordinary skill in the art would not understand the ordinary and customary meaning of "wide configuration data port" to include buffer cells or configuration memory cells, and construction in accordance with the prosecution history would likewise not require the inclusion of buffer cells or configuration memory cells. We also note that Patent Owner's proposed construction ("a configuration data port that allows the parallel updating of logic cells in a programmable array through use of buffer cells") contains some ambiguity in not making clear how buffer cells *allow* parallel updating, and we decline to provide a construction including this ambiguity.

The '226 patent does not make extensive use of the term "wide configuration data port." With the exception of the claims, which do not provide additional context, the references in the '226 patent are the labelling of element 82 of Figure 5 as "very wide configuration data port" and the paragraph referencing this figure, cited extensively by both parties, in which the specification describes the following:

> With reference additionally now to FIG. 5, a corresponding functional block diagram of the configuration cells 80 of the reconfigurable processor module 60 of the preceding figure is shown wherein the FPGA 70 may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel. As opposed to the conventional implementation of FIG. 3, a wide configuration data port 82 is included to update the various logic cells 84 through an associated configuration memory 86 and buffer cell 88. The buffer cells 88 are preferably a portion of the memory die 66 (FIG. 4). In this manner, they can be loaded while the FPGA 68

14

IPR2020-01571
Patent 6,781,226 B2

comprising the logic cells 84 are in operation. This then enables
the FPGA 68 to be totally reconfigured in one clock cycle with
all of it configuration logic cells 84 updated in parallel. Other
methods for taking advantage of the significantly increased
number of connections to the cache memory die 66 (FIG. 4)
may include its use to totally replace the configuration bit
storage on the FPGA die 68 as well as to provide larger block
random access memory ("RAM") than can be offered within
the FPGA die 68 itself.

Ex. 1001, 4:45–65 (cited or quoted in whole or part at PO Resp. 15–16; Pet.

Reply 4, 6; PO Sur-reply 3–5).

Patent Owner, in focusing on this portion of the '226 patent

disclosure, does not adequately explain why buffer cells and configuration

memory cells must be included in the proper construction of "wide

configuration data port," and seeks to import a functional description of the

use of a wide configuration data port ("that *allows parallel updating* of logic

cells in a programmable array through use of buffer cells") into the claim

construction.  PO Resp. 15–17; PO Sur-reply 2–4.  While the discussion in

the '226 patent describes an example of a wide configuration data port used

in a specific way that aligns with Patent Owner's proposal (Ex. 1001, 4:45–

59), other examples of the use of a wide configuration data port are included

(*id.* at 4:59–65), and therefore we do not agree that one of ordinary skill

would understand this use to be part of the construction of the term.

We agree with Petitioner that the proper construction of the term does

not require buffer cells.  *See* Pet. Reply 4–6.  Rather, we note that the

specification of the '226 patent contrasts loading of data to an FPGA in a

byte serial fashion through a narrow port, which "results in [] long

reconfiguration times," with the use of a wide configuration data port, and

therefore we determine that one of ordinary skill would understand the wide

15

IPR2020-01571
Patent 6,781,226 B2

configuration data port, in contrast to the byte serial "relatively narrow" port, to include parallel connections between cells in the dies. *See* Ex. 1001, 4:3–9. This additionally is consistent with certain arguments by Patent Owner, for example in the Patent Owner's Response, which opens with a discussion of the "innovative" processor's arrangement of die-area contacts, such as through-silicon vias, "into a wide configuration data port" and we find that description more consistent with the proper construction of this term. PO Resp. 1–2; *see also* PO Sur-reply 2–3 ("Arbor's experts have been consistent that the word 'wide' in this term requires a sufficient number, and appropriate arrangement, of connections between the memory die and the programmable array to permit parallel updating of the array.")

In the Final Written Decision issued in the 1022IPR, we construed "wide configuration data port" to be "a configuration data port connecting in parallel cells on one die element to cells on another die element." IPR2020-01022, Paper 34 at 13–16 (PTAB Nov. 24, 2021). During the hearing, we referred to that decision, indicated our interest in the Petitioner's and Patent Owner's positions on its claim constructions, and the parties discussed our constructions in that proceeding to some degree in their arguments. Tr. 6:1–6, 25:12–30:6, 43:6–23, 61:18–63:10.

The '226 patent describes updating the logic cells of an FPGA in one clock cycle to reconfigure the FPGA by loading associated configuration memory from buffer cells, preferably located on a different die element. Ex. 1001, 4:45–59. Additionally, the '226 patent describes that doing this "takes advantage of the significantly increased number of connections to the cache memory die." *Id.* at 4:59–65. This construction is supported by Petitioner's expert's description of the plain and ordinary meaning of "configuration data

16

IPR2020-01571
Patent 6,781,226 B2

port" as "a connection or place through which configuration data is transferred" and that in the prior art wide buses were made possible by 3-D stacking. *See, e.g.*, Ex. 1002 ¶¶ 54, 96–97. This construction additionally is supported by Patent Owner's expert's description that "the inventors of the '226 Patent arranged die-area contacts of the SDH [(stacked die hybrid)] processor, such as through-silicon vias ('TSVs'), into a wide configuration data port that reconfigures them in a parallel scheme." Ex. 2006 ¶ 32; *see also* PO Resp. 1–2; PO Sur-reply 4–5 ("the wide configuration data port . . . includes a large number of die-area interconnections (*e.g.*, TSVs) that interconnect stacked chips"); Ex. 1075, 157:23–158:3, 163:8–163:21 (Patent Owner's expert in the 1022 IPR). The specification supports a construction of the wide configuration data port as a configuration data port that makes connections between die elements in parallel. Ex. 1001, 3:33–37, 4:45–65; *see also id.* at code (57) ("significant acceleration in the sharing of data between the microprocessor and the FPGA element").

The '226 patent describes the loading of buffer cells, preferably on the memory die, while the programmable array is in operation, with the configuration logic cells then updated in parallel from the buffer cells through the significantly increased number of connections for reconfiguration in one clock cycle. Ex. 1001, 4:45–59. But none of the challenged claims requires configuring or updating while the programmable array/FPGA is in operation. And the specification shows that the buffer cells are not part of the wide configuration data port. *See id.* at Fig. 5. They are described, rather, as preferably part of the memory die. *Id.* at 4:54–55. We determine that the specification supports a construction that the parallel connection between die elements are between cells on each die element.

17

IPR2020-01571
Patent 6,781,226 B2

This parallel connection implies that cells on one die are connected in parallel to cells on another die, for example, buffer cells or configuration memory cells. *Id.* at 4:50–55, Fig. 5.

For these reasons, we construe "wide configuration data port" as "a configuration data port connecting in parallel cells on one die element to cells on another die element."

### 2. Limitation 13.4 – "means for reconfiguring the programmable array within one clock cycle"

The first step in construing a means-plus-function claim element is to identify the recited function in the claim element. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). The second step is to look to the specification and identify the corresponding structure for that recited function. *Id.*

Petitioner argues that the recited function for limitation [13.4] is "reconfiguring the programmable array within one clock cycle." Pet. 11. Patent Owner agrees. PO Resp. 11. We also agree. *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("[35 U.S.C. § 112, ¶ 6] does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim.")

We next review the '226 patent to determine the corresponding structure for the identified function. Our preliminary determination in the Decision on Institution was that the correct corresponding structure would be "a wide configuration data port interconnecting a memory and the programmable array using contact points distributed through the first integrated circuit die element and the third integrated circuit die element." Dec. on Inst. 23–29. In the Final Written Decision in the 1022 IPR, we determined that the correct corresponding structure is "a wide configuration

IPR2020-01571
Patent 6,781,226 B2

data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element." IPR2020-01022, Paper 34 at 17–21; *see* Tr. 6:1–6, 25:12–30:6, 43:6–23, 61:18–63:10 (raising and/or discussing constructions from the Final Written Decision in the 1022 IPR).

In the Petition, Petitioner proposed two structures from the '226 specification as the corresponding structure: "a wide configuration data port [used] to update the various logic cells through an associated configuration memory and buffer cell" and "a stacked FPGA die and memory die interconnected by a wide configuration data port using contact points distributed throughout the dies." Pet. 11–13. In Reply, Petitioner agrees with our preliminary determination, but in the alternative refers to the two structures discussed in the Petition. Pet. Reply 2.

Patent Owner proposes that the structure is simply a "wide configuration data port," according to its construction of that term, which includes buffer cells. PO Resp. 11–20; PO Sur-reply 5 ("[T]he buffer cells connected in parallel (using die-area interconnections) with the memory configuration cells allow for FPGA to be totally reconfigured in one clock cycle."). Patent Owner contends that what allows for the reconfiguration in one clock cycle is "buffer cells connected in parallel . . . with the memory configuration cells" "using die-area connections." PO Sur-reply 5.

"While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). Conversely, structural features that do not actually perform the recited

IPR2020-01571
Patent 6,781,226 B2

function do not constitute corresponding structure and thus do not serve as claim limitations. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308–09, (Fed. Cir. 1998); *see B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.").

Patent Owner's arguments regarding buffer cells connected with memory configuration cells using die-area interconnections requires that the buffer cells be located on a different die than the memory configuration cells, but the '226 patent discloses only that "[t]he buffer cells 88 are preferably a portion of the memory die 66" and not that they always are on the memory die, and also that the significantly increased number of connections to the cache memory die may allow the cache memory die to replace configuration bit storage on the FPGA die. Ex. 1001, 4:50–54, 4:59–63. Thus, we decline to require in the corresponding structure that buffer cells or configuration memory are included on any die element.

Rather, we find that what is disclosed as actually performing the recited function of "reconfiguring the programmable array within one clock cycle" is "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element." The support for this is found in the '226 patent's comparison of the long reconfiguration times through a narrow port (Ex. 1001, 4:3–9) with the time to reconfigure through a wide configuration data port with a significantly increased number of connections (*id.* at 4:45–65), and the implementation of this in a module that has multiple dies

20

IPR2020-01571
Patent 6,781,226 B2

"which have a number of corresponding contact points, or holes, 70 formed throughout the area of the [die] package" (*id.* at 4:9–20). The use of a wide configuration data port, as per our construction, implicates two die elements. This was reflected in our preliminary claim construction, for which the corresponding structure described "contact points distributed through the first integrated circuit die element and the third integrated circuit die element." Dec. on Inst. 29. As the function is "reconfiguring the programmable array within one clock cycle," one of the die elements is the first integrated circuit die element, which includes the programmable array.

We acknowledge that, in the Samsung litigation, the District Court for the Eastern District of Texas has construed this limitation (and limitation 22.4). Ex. 2005.[8] The District Court construed the function for this limitation identically, and the corresponding structure as "wide configuration data port 82, and contact points formed throughout the area of each die element; and equivalents thereof." *Id.* at 8–18. The chief distinction between this construction and the one that we adopt is the inclusion of all die elements in the District Court claim construction, rather than only the first die element (including the programmable array) and one additional die element in ours. Our patentability determination here would be the same

---

[8] We additionally acknowledge the construction for certain additional limitations in the challenged claims, which the parties do not address construction of, and which we do not herein construe. Ex. 1036, 18–25 ("processor module"), 25–37 ("programmable array"), 38–44 ('stacked with and electrically coupled to'), 44–49 ("contact points distributed throughout the surfaces of said die elements"). However, the patentability determination here would be the same were we to explicitly adopt the construction provided by the District Court for those terms.

IPR2020-01571
Patent 6,781,226 B2

were we to adopt the construction provided by the District Court for the corresponding structure of the means-plus-function limitations.

For the reasons discussed above, we determine that, for means-plus-function limitation 13.4 of claim 13, the function is "reconfiguring the programmable array within one clock cycle," and the corresponding structure is "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element."

### 3. Limitation 22.4 – "means for updating the plurality of configuration logic cells within one clock cycle"

Petitioner and Patent Owner refer back to or recapitulate their arguments with respect to limitation 13.4 in their arguments for the function and structure of means-plus-function claim limitation 22.4. Pet. 13; PO Resp. 11–20; Pet. Reply 2; PO Sur-reply 5. To support arguments regarding this claim term, the parties cite no additional disclosure other than that previously discussed, and we agree that the previously discussed disclosure supports the construction of claim limitation 22.4. Claim 22 differs from claim 13 in several respects, including the inclusion of a plurality of configuration logic cells in the first integrated circuit die element. Limitation 22.4 differs from limitation 13.4 in its statement of function ("updating the plurality of configuration logic cells" rather than "reconfiguring the programmable array"). The configuration logic cells referenced are included in the first integrated circuit die element, and thus here too, the corresponding structure specifies the first integrated circuit die element is included in the description of the structure. Ex. 1001, 8:4–17.

For the reasons presented above, we find that, for means-plus-function limitation 22.4 of claim 22, the function is "updating the plurality of

22

configuration logic cells within one clock cycle," and the corresponding structure is "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element."

> 4. *Limitation 1.3 – "such that processing of data shared between the microprocessor and the field programmable gate array is accelerated"*

While neither party explicitly requests construction of this claim limitation, certain of the arguments presented by the parties relate to their different understandings of this limitation.

Patent Owner presents arguments indicating that it interprets "data shared between the microprocessor and the field programmable gate array" in limitation 1.3 to require more than data being transferred from the microprocessor to the FPGA. PO Resp. 30–36; PO Sur-reply 7–8. Patent Owner argues that a showing by Petitioner that the output data of a microprocessor is sent to the FPGA would not satisfy this limitation, because no data is described as being processed by both the microprocessor and the FPGA. PO Resp. at 31–32 (citing Ex. 2006 ¶ 65); PO Sur-reply 7–8. Patent Owner argues that the '226 patent explicitly describes memory that is equally accessible by both a microprocessor and an FPGA with equal speed, asserting that this too is required. PO Resp. 34–36 (citing Ex. 1001, 4:34–44; Ex. 2006 ¶ 69); PO Sur-reply 7–8 (citing Ex. 1001, 1:62–2:3, 2:50–54, 4:34–44; Ex. 2006 ¶ 69). Patent Owner's expert quotes the description of the embodiment in Figures 4 and 5 of the '226 patent as including a memory "accessible by both the microprocessor 64 and the FPGA 68 with equal speed" and indicates that the "references fail" because they do not provide

IPR2020-01571
Patent 6,781,226 B2

data shared between an FPGA and a microprocessor and accessible to each with "anything approximating 'equal speed.'"  Ex. 2006 ¶¶ 69–70.

Petitioner argues that "there is no reasonable argument that data transferred back and forth between the processor and the programmable array is not being shared between them" and that Patent Owner's arguments improperly exclude direct sharing of data between the microprocessor and the FPGA.  Pet. Reply 7–8 (citing Ex. 1001, code (57), 2:50–54; Ex. 1070 ¶¶ 73–74).

We agree with Petitioner that this limitation does not require a memory accessible by both a microprocessor and FPGA with equal speed, or that the same data be processed by both the microprocessor and the FPGA. While Patent Owner is correct that the '226 patent describes the stacking of a memory die in between a processor die and an FPGA die in the embodiment of Figures 4 and 5, no memory die is claimed or mentioned in claim 1.  Additionally, claim 2, which depends from claim 1 and further requires a memory IC die element, requires only that that memory IC die element be connected to one or the other of the FPGA IC die element or the microprocessor IC die element of claim 1.  Ex. 1001, 6:27–32.  The '226 patent specification describes one embodiment in which memory on a cache memory die is accessible by a microprocessor and FPGA with equal speed; however, we do not read this requirement into claim 1, which does not require a memory IC die element.  *See id.* at 4:34–39.

Additionally, the '226 patent specification provides no support for Patent Owner's contention that the same data must be processed by the microprocessor and the FPGA or any description of this occurring.  The specification describes "accelerating the sharing of data between the

IPR2020-01571
Patent 6,781,226 B2

microprocessor and the FPGA." Ex. 1001, code (57), 2:50–57. The specification additionally presents instances in which data is transferred from one element to the other and processed/used by the recipient after the transfer, for example, the use of transferred data to reconfigure the FPGA, and the FPGA providing test stimulus for the microprocessor during manufacturing. *Id.* at 4:34–65, 5:5–15. Each of these describes only sharing of data from one die component to another, and not equal accessibility or any mutual processing of the same data.

Therefore, while we do not provide an explicit construction of "such that processing of data shared between the microprocessor and the field programmable gate array is accelerated," we determine that the correct construction does not require a memory that is equally accessible by the microprocessor and the field programmable gate array, that the correct construction does not require that some data be processed by both the microprocessor and the field programmable gate array, and that the correct construction does not require data to be accessed at equal or approximately equal speed by the microprocessor and the field programmable gate array.

### 5. No additional constructions

No other terms require explicit construction. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'. . . ." (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

IPR2020-01571
Patent 6,781,226 B2

D.    *Obviousness, Claims 1–6*

Petitioner contends the subject matter of claims 1–6 would have been obvious over the combination of Zavracky, Chiricescu, and Akasaka.  Pet. 14–41.  Patent Owner disputes Petitioner's contentions.  PO Resp. 30–44.

1.    *Zavracky*

Zavracky describes "a multi-layered structure" including a "microprocessor . . . configured in different layers and interconnected vertically through insulating layers which separate each circuit layer of the structure."  Ex. 1003, code (57).  Zavracky's "invention relates to the structure and fabrication of very large scale integrated circuits, and in particular, to vertically stacked and interconnected circuit elements for data processing, control systems, and programmable computing." *Id.* at 2:5–10.  Zavracky includes numerous types of stacked elements, including "programmable logic devices" (PLDs) stacked with "memory" and "microprocessors." *See id.* at 5:19–23.

26

IPR2020-01571
Patent 6,781,226 B2

Zavracky's Figure 12 follows:



FIG. 12

Figure 12 above illustrates a stack of functional circuit elements, including microprocessor and RAM (random access memory) elements wherein "buses run vertically through the stack by the use of inter-layer connectors." Ex. 1003, 12:24–26.

IPR2020-01571
Patent 6,781,226 B2

> 2.     *Chiricescu*

Chiricescu describes a three-dimensional chip, comprising an FPGA, memory, and routing layers.  Ex. 1004, 1.  Chiricescu's FPGA includes a "layer of on-chip random access memory . . . to store configuration information."  *Id.*  Chiricescu describes and cites the published patent application that corresponds to Zavracky as follows:

> At Northeastern University, the 3-D Microelectronics group has developed a unique technology which allows us to design individual CMOS circuits and stack them to build 3-D layered FPGAs which can have vertical metal interconnections (i.e., interlayer vias) placed anywhere on the chip.

*See id.* at 1, 4 (citing "M. P. Zavracky, Zavracky, D-P Vu and B. Dingle, '*Three Dimensional Processor using Transferred Thin Film Circuits*,' US Patent Application # 08-531-177, allowed January 8, 1997").[9]

Chiricescu describes "[a]nother feature of architecture [as] a layer of on-chip random access memory . . . to store configuration information."  Ex. 1004, 1.  Chiricescu also describes using memory on-chip to "significantly improve[] the reconfiguration time," explaining as follows:

> The elimination of loading configuration data on an as needed basis from memory off-chip significantly improves the reconfiguration time for an on-going application.  Furthermore, a management scheme similar to one used to manage cache memory can be used to administer the configuration data.

*Id.* at 3.

---

[9] Zavracky lists the same four inventors and "Appl. No. 531,177," which corresponds to the application number cited by Chiricescu.  Ex. 1003, codes (75), (21).

IPR2020-01571
Patent 6,781,226 B2

Figure 2 of Chiricescu follows:



**Figure 2.** The layers of our 3-D FPGA architecture.

Figure 2 illustrates three layers in the 3D-FPGA architecture, with the RLB layer including routing and logic blocks in in a "sea-of-gates FPGA architecture," a routing layer, and the aforementioned memory layer (to program the FPGA). *See* Ex. 1004, 1–2.

### 3. Akasaka

Akasaka, a December 1986 paper published in the Proceedings of the IEEE, generally describes trends in three-dimensional integrated stacked active layers. Ex. 1005, 1. Akasaka states that "tens of thousands of via holes" allow for parallel processing in stacked 3-D chips, and the "via holes in 3-D ICs" decrease the interconnection length between IC die elements so that "the signal processing speed of the system will be greatly improved." *Id.* at 3. Akasaka further explains that "high-speed performance is associated with shorter interconnection delay time and parallel processing" so that "twice the operating speed is possible in the best case of 3-D ICs." *Id.*

Also, "input and output circuits . . . consume high electrical power." Ex. 1005, 3. However, "a 10-layer 3-D IC needs only one set of I/O

29

IPR2020-01571
Patent 6,781,226 B2

circuits," so "power dissipation per circuit function is extremely small in 3-D ICs compared to 2-D ICs." *Id.*

Figure 4 of Akasaka follows:



**Fig. 4.** Wiring for parallel processing in 2-D and 3-D ICs.

Figure 4 compares short via-hole connections in 3-D stacked chips with longer connections in 2-D side-by-side chips.

4.    *Claim 1*

For its arguments that claim 1 is unpatentable, Petitioner relies on a combination of Zavracky, Chiricescu, and Akasaka, "integrat[ing]" Zavracky's "stacked interconnected programmable 3-D module," Chiricescu's "accelerated FPGA reconfiguration using stacked memory," and Akasaka's "thousands of distributed interconnections." Pet. 18.

a. *Combination of Zavracky, Chiricescu, and Akasaka*

With respect to the combination of Zavracky and Chiricescu, Petitioner argues that Chiricescu explicitly references and uses the interconnections of Zavracky. Pet. 18 (citing Ex. 1002 ¶¶ 218–232); *see* Pet. 16 & n.3; *supra* § II.D.2 (noting the explicit citation to and description of Zavracky in Chiricescu). Petitioner further argues that one of ordinary skill would have used Chiricescu's teachings with Zavracky's 3-D stacks to achieve improvements in reconfiguration time. *Id.* at 18–19 (citing Ex. 1002 ¶¶ 221–228 (citing Ex. 1004, 2; Ex. 1003, 5:65–66)). Additionally, Petitioner argues that the combination would have been motivated by

30

IPR2020-01571
Patent 6,781,226 B2

Chiricescu's suggestion of using an FPGA for "arbitrary logic functions" to "expand" on the limited task performed by the programmable logic device in Zavracky, to combine prior art elements according to known methods to yield a predictable result, and as a routine modification. Pet. 19–20 (citing Ex. 1003, 2:29–39; Ex. 1004, 1; Ex. 1002 ¶¶ 229–232).

Petitioner argues that the further combination of Akasaka with Zavracky and Chiricescu would have been motivated by a desire to increase bandwidth and processing speed through better parallelism and increased connectivity. Pet. 20 (citing Ex. 1005, 3; Ex. 1002 ¶ 233). Petitioner contends that Zavracky and Chiricescu each teach or suggest that connections could be placed anywhere on the die. *Id.* (quoting Ex. 1003, 6:43–47; citing Ex. 1004, 1). To improve Zavracky's stacks, according to Petitioner, one of ordinary skill would have sought out Akasaka's teachings to increase bandwidth and processing speed and expected success. *Id.* (citing Ex. 1002 ¶ 235). Petitioner also argues that Akasaka's communication structure would have enabled desirable uses of the Zavracky-Chiricescu combination. *Id.* at 20–21 (citing Ex. 1005, 11, Fig. 25; Ex. 1002 ¶¶ 236–237). Petitioner also argues that one of ordinary skill would have been motivated to make a combination with Akasaka, and that such a combination "would have been a logical extension" to the Zavracky-Chiricescu combination, in light of "many references teaching stacked dies with thousands of distributed connections." *Id.* at 21 (citing Ex. 1009; Ex. 1030; Ex. 1021; Ex. 1002 ¶¶ 238–239).

Patent Owner argues that one of ordinary skill in the art would not have combined Zavracky, Chiricescu, and Akasaka as Petitioner argues. PO Resp. 36–44.

31

IPR2020-01571
Patent 6,781,226 B2

Patent Owner argues that, because Chiricescu discloses configuration data stored in on-chip memory, the combination of Chiricescu and Zavracky would result in a structure in which data is removed from the microprocessor's cache to be stored in the FPGA's on-chip memory, which would make the data harder for the microprocessor to access. PO Resp. 37–38. This is based on Patent Owner's argument that Zavracky and Chiricescu both include only a small number of vertical interconnections between the layers. *Id.*; *see id.* at 20 (describing Zavracky as disclosing a small number of vertical interconnections between layers), 26 (describing Chiricescu as having only a small number of interconnects between memory and RLB layers).

Patent Owner additionally argues that the combination of Zavracky and Chiricescu would not have resulted in the acceleration of data shared between a microprocessor and an FPGA. *Id.* at 38–39. Patent Owner calls the motivation to combine "untethered to the accelerating processing claims," in an argument relating to its interpretation of limitation 1.3, discussed above at Section II.C.4. *Id.* at 38–39 (citing Ex. 2006 ¶ 75 (Dr. Souri's testimony describing the reasons for combining as flawed because "none of the cited references disclose the processing of shared data" or acceleration of such processing)). Lastly, Patent Owner argues that major modifications would need to be made to the combination of Zavracky and Chiricescu to allow for the accelerated processing of shared data, again, relating to Patent Owner's interpretation of limitation 1.3 of claim 1. *Id.* at 38–41.

With respect to the combination of Zavracky, Chiricescu, and Akasaka, Patent Owner argues, again with reference to its interpretation of

limitation 1.3 of claim 1, that Akasaka does not remedy the issues it argues are present with a combination of Zavracky and Chiricescu with respect to accelerating the processing of shared data. *Id.* at 41–42. Citing Figure 25 of Akasaka, Patent Owner argues that Akasaka teaches each processor in a stack only accessing memory in its own layer. *Id.* at 41–42. Again referencing Figure 25 of Akasaka, Patent Owner argues that Petitioner "does not attempt to adequately explain ***how*** a POSITA would incorporate Akasaka's common memory data system into the combined Zavracky-Chiricescu system to achieve accelerated processing of data shared between a microprocessor and an FPGA." *Id.* at 42. Patent Owner argues that Akasaka's Figure 25 teaches that "each individual processor disclosed in Akasaka only has direct access to its own memory and not any other processor's memory." PO Sur-reply 9.

Patent Owner argues that the modification of Zavracky-Chiricescu with Akasaka would require the stacked memory from Chiricescu to be moved to its FPGA layer, which would be contrary to Chiricescu's principle of operation that moves memory out of the FPGA layer. *Id.* at 43–44.

Patent Owner's arguments are unavailing. To the extent that they rely on Patent Owner's construction of limitation 1.3, the arguments fail as we have not adopted this construction. *See supra* § II.C.4. Additionally, Petitioner's arguments regarding a "common data memory" and citations to Akasaka's Figure 25 relate to the knowledge of one of ordinary skill for "common data memory" and not to any indication that the specific configuration of Figure 25 would be used in the combination. *See* Pet. 20–21, 30–31. As Petitioner discusses, Zavracky specifically describes a stacked configuration of integrated circuit elements, and connecting bus

IPR2020-01571
Patent 6,781,226 B2

lines between an FPGA/PLD element and other integrated circuit elements, including memory and a processor. *See* Pet. 14–15, 23–24 (citing Ex. 1003, 2:5–10, 3:62–4:4, 4:7–9, 5:19–23, 6:43–47, 12:12–38, 14:56–58, Figs. 12, 13). Petitioner shows a number of other stacked dies or layers with multiple via connections – in addition to Akasaka (Ex. 1005, Fig. 4), Petitioner cites Franzon (Ex. 1020, Fig. 4), Koyanagi (Ex. 1021, Fig. 1(a)), and Alexander (Ex. 1028, Fig. 2(g)). *See id.* at 21, 37. As discussed further below, Trimberger (Ex. 1006) also shows parallel loading by "*flash reconfiguring* all [100,000] bits in logic and interconnect array [i.e., an FPGA] . . . simultaneously from one memory plane." Ex. 1006, 22.[10] Patent Owner concedes Zavracky and Chiricescu each show how to connect layers with a small number of vertical interconnections. PO Resp. 20 (Zavracky), 26 (Chiricescu), 38. Petitioner shows that a large number of vias would have been obvious in view of the combined teachings, to enhance speed, allow parallel processing and data transfer, minimize latency, and maximize bandwidth.

   Thus, Petitioner persuasively relies on the knowledge of the artisan of ordinary skill and the combined teachings of Zavracky, Chiricescu, and Akasaka supported by specific reasons and rational underpinning to show how the combination teaches or suggests increasing the number of contact points or via holes for electrically coupling FPGA, memory, and processors together. Petitioner also shows the "why"—to allow for parallel data

---

[10] Petitioner employs Trimberger to address challenged claims 13–30 as discussed further below (§ II.F), but it is also further evidence of a reasonable expectation of success as it relates to connecting several thousands of bit lines in parallel.

IPR2020-01571
Patent 6,781,226 B2

transfers, speed increases, larger bandwidth, etc., all with a reasonable expectation of success.

### b. Preamble, Limitation 1.1, and Limitation 1.2

Claim 1's preamble recites "[a] processor module comprising." Petitioner relies on the combined teachings of Zavracky, Chiricescu, and Akasaka, as discussed further below, and provides evidence that Zavracky discloses a processor module, including a programmable array, memory (RAM), and microprocessor as part of a stack of dies forming a 3-D device. *See* Pet. 22 (reproducing Ex. 1003, Figs. 12–13; citing Ex. 1003, 2:1–7, 5:19–23, 9:42–45, 12:12–38, Figs. 12–13; Ex. 1002 ¶¶ 282–288).

Claim 1 recites limitation 1.1, "at least one field programmable gate array integrated circuit die element including a programmable array." Petitioner contends that the combined teachings of Zavracky and Chiricescu render the limitation obvious. Pet. 23–24. Petitioner relies on Zavracky's layers as teaching dies, citing Zavracky's description of interlayer connections as "placed anywhere on the die" and thereby "achieved with a minimal loss of die space." *Id.* (quoting Ex. 1003, 6:43-7:9; citing Ex. 1003 4:63–65, 10:61–65, Figs. 1 (element 140), 6, 7; Ex. 1002 ¶¶ 278–280). Thus, Petitioner argues that Zavracky describes stacked layers of integrated circuit die elements. *Id.* at 24. Petitioner further argues, with reference to PLD 802 in Figure 13 of Zavracky and its described programming to provide a user-defined communication protocol, that one of ordinary skill in the art would have understand that an FPGA was an example of such a programmable logic device. *Id.* at 24–25 (citing Ex. 1003, 5:21–23, 12:33–36, Fig. 13; Ex. 1002 ¶¶ 293–295). Petitioner adds that, Chiricescu describes Zavracky as teaching technology "to build 3-D layered FPGAs"

35

IPR2020-01571
Patent 6,781,226 B2

and thus confirms the understanding of Zavracky as teaching an FPGA. *Id.*
at 25 (citing Ex. 1004, 1; Ex. 1002 ¶ 296). Additionally, in a combination of
Chiricescu and Zavracky, Petitioner contends that Chiricescu's "sea-of-gates
FPGA" would teach or suggest an FPGA as the PLD layer of Zavracky. *Id.*
(citing Ex. 1004, 1, 3).

With respect to the "programmable gate array" of limitation 1.1,
Petitioner first refers to its arguments with respect to an FPGA as the PLD,
asserting that the FPGA includes a programmable array. *Id.* at 25–26 (citing
Ex. 1002 ¶ 288). Next, Petitioner argues that in the combination of
Chiricescu and Zavracky, the configurable routing and logic blocks in the
FPGA layer teaches a programmable gate array. *Id.* at 26 (citing Ex. 1004,
1; Ex. 1002 ¶ 299).

Petitioner argues that the "microprocessor integrated circuit die
element" of limitation 1.2 is taught in Zavracky's layered multi-processor
system (Figure 12) or multi-layer microprocessor (Figure 13), citing the
multiple multiprocessors, each on one die element in the Figure 12
embodiment, and the multi-layer microprocessor in the Figure 13
embodiment. Pet. 27–28 (citing Ex. 1003, Fig. 12 (elements 700, 704, 705),
Fig. 13 (elements 804, 806); Ex. 1002 ¶¶ 310–312). Limitation 1.2 further
requires that this die element be "stacked with an electrically coupled" to the
programmable array of the die element from limitation 1.1. Petitioner cites
Zavracky's teaching of vertically stacked and interconnected circuit element
layers, electrically coupled to each other. *Id.* at 28 (citing Ex. 1003, 2:7–8,
11:63–12:2, 12:13–39, 14:51–63).

Other than addressing motivation as discussed herein, Patent Owner
does not make any specific arguments with respect to these limitations.

36

IPR2020-01571
Patent 6,781,226 B2

### c. Limitation 1.3 of Claim 1

With respect to the final limitation 1.3 of claim 1, "such that the processing of data shared between the microprocessor and the field programmable gate array is accelerated," Petitioner argues that Zavracky's programmable logic acting as an intermediary to the microprocessor means that data is shared between the microprocessor and programmable logic. Pet. 29 (citing Ex. 1003, 12:28–38; Ex. 1002 ¶ 342). Petitioner further argues that Akasaka's thousands of via holes would have been used to allow information to be transferred between die layers. *Id.* at 30 (citing Ex. 1005, 3; Ex. 1002 ¶¶ 233–239, 347–348).

To teach or suggest "that processing . . . is accelerated" as per limitation 1.3, Petitioner argues that Zavracky's approach offers higher speed from "reduction in the length of the busses." Pet. 30 (quoting Ex. 1003, 3:1–11; citing Ex. 1002 ¶ 346). Petitioner additionally cites Akasaka's teaching of "thousands of via holes" to permit parallel processing, and that "twice the operating speed is possible in the best case of 3-D ICs." *Id.* at 17, 31 (quoting Ex. 1005, 3 (emphasis omitted); citing Ex. 1002 ¶ 347). Additionally, Petitioner cites similar teachings of Chiricescu with respect to benefits from a stacked arrangement with vertical interconnects and the background knowledge of one of ordinary skill in the art. *Id.* at 5–10, 17 (citing Ex. 1004, 3; Ex. 1002 ¶ 348).

Patent Owner contends that the Zavracky-Chiricescu-Akasaka combination does not teach or suggest limitation 1.3's feature of accelerating processing of data. PO Resp. 30–36. Patent Owner argues that Petitioner only describes data being transferred from a microprocessor to an FPGA, and not shared. *Id.* at 31–32. Patent Owner contends that "***data processed***

37

IPR2020-01571
Patent 6,781,226 B2

by *Zavracky's* microprocessor is not even shared with the FPGA" but rather that "it is the **output** of *Zavracky's* microprocessor that is sent to the FPGA." *Id.* (citing Ex. 2006 ¶ 65). Patent Owner additionally argues that Akasaka's teachings regarding common memory data does not involve processing of data shared between a microprocessor and an FPGA. *Id.* at 32–33 (citing Ex. 1005, 11, Fig. 25(c); Ex. 2006 ¶¶ 66–67). Patent Owner additionally argues that, because the combination does not teach or suggest the processing of shared data, it also does not teach or suggest accelerating such processing. *Id.* at 34. Lastly, Patent Owner suggests that the combination does not teach or suggest limitation 1.3 of claim 1 because it does not disclose memory accessible to a microprocessor and FPGA with approximately equal speed. *Id.* at 35–36 (citing Ex. 2006 ¶ 70).

Each of these arguments is based on Patent Owner's interpretation of limitation 1.3, which we do not agree with and have addressed above, in Section II.C.4. Considering the record and arguments made, Petitioner has shown that the combination of Zavracky, Chiricescu, and Akasaka teaches both data shared between the FPGA and the microprocessor, and also how a three-dimensional approach as in Zavracky (with shorter busses), the distributed contact points and shorter interconnects of Akasaka, and the stacked arrangement of Chiricescu combine to teach or suggest accelerated processing of data shared between the microprocessor and the FPGA, for example, for reconfiguring the FPGA. *See* Pet. 28–31 (citing Ex. 1003, 3:1–11, 6:1–12, 12:28–38; Ex. 1004, 3; Ex. 1005, 3, 11; Ex. 1002 ¶¶ 342–348).

### d. Conclusion – Claim 1

Based on the foregoing discussion and a review of the full record, Petitioner persuasively shows that claim 1 would have been obvious.

IPR2020-01571
Patent 6,781,226 B2

    5. *Claims 2–6*

Claim 2 depends from claim 1 and further recites that the processor module further comprises "at least one memory integrated circuit die element stacked with and electrically coupled to" either the field programmable gate array IC die element (of limitation 1.1) or the microprocessor IC die element (limitation 1.2) of claim 1. Ex. 1001, 6:27–31. Petitioner argues that Zavracky's figures 12 and 13 describe a layer including random access memory. Pet. 32 (citing Ex. 1003, 11:63–65, 12:33–35, Figs. 10, 12, 13). Petitioner further argues that this layer is, in the combination of Zavracky, Chiricescu, and Akasaka, stacked with and electrically coupled to the other die elements as explained with reference to the die elements of claim 1. *Id.* at 32–33 (citing Ex. 1003, 11:63–65, 12:15–28, 12:33–35, Figs. 10, 12; Ex. 1004, 1; Ex. 1002 ¶ 319).

Claim 3 depends from claim 1 and further recites that "said programmable array is configurable as a processing element." Ex. 1001, 6:32–33. Petitioner argues that Zavracky's programmable array functions as a processing element. Pet. 34 (citing Ex. 1003, 12:28–38; Ex. 1002 ¶ 302). Petitioner further contends that Chiricescu's FPGA can be reconfigured as a processing element. *Id.* (citing Ex. 1004, 2, 3; Ex. 1002 ¶ 302).

Claim 4 depends from claim 1 and further recites that "at least one field programmable gate array and said at least one microprocessor integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements." Ex. 1001, 6:34–38. Claim 5 depends from claim 4 and further requires that "said contact points traverse said die elements through a thickness thereof." Ex. 1001, 6:39–40. Claim 6 depends from claim 5 and further requires that

39

IPR2020-01571
Patent 6,781,226 B2

"said contact points traverse said die elements through a thickness thereof." Ex. 1001, 6:41–43.  Patent Owner argues that the limitations of claims 4 and 5 are taught by Zavracky's "openings or via holes" providing inter-layer connections placed anywhere on the die, and Akasaka's layers connected through via holes.  Pet. 36–39 (citing Ex. 1003, 6:43–7, 13:43–46. 14:56–63; 1005, 2–5; Ex. 1002 ¶¶ 313–316, 327–334).

With respect to Claim 6, Petitioner argues that the general knowledge of one of ordinary skill in the art would have been that die elements are thinned to a point at which contact points traverse the thickness of the elements, and that one of ordinary skill would have known to employ this thinning, including because of Zavracky's suggestion of a need for thin stacks and contact point traversal.  *Id.* at 39–41 (citing Ex. 1003, 13:54–57; Ex. 1002 ¶¶ 262–266, 335–341).

Except for arguments with respect to claim 1, addressed above, Patent Owner presents no arguments relating to these dependent claims.

Based on the foregoing discussion and a review of the full record, Petitioner persuasively shows that claims 2–6 would have been obvious.

E.    *Obviousness, Claims 7–12*

Claim 7 largely tracks the limitations recited in claim 1, but additionally includes a limitation, 7.3, that "at least one field programmable gate array integrated circuit die element being configured to provide test stimulus to the at least one microprocessor integrated circuit die element during manufacture and prior to completion of the module packaging." Ex. 1001, 6:44–57.  Claims 8, 9, 10, 11, and 12 duplicate the additional limitations of claims 2, 3, 4, 5, 6, 7, and 8, respectively.  Petitioner argues

IPR2020-01571
Patent 6,781,226 B2

that claims 7–12 are unpatentable in view of a combination of Zavracky, Chiricescu, Akasaka, and Satoh.  Pet. 41–46.

### 1. Satoh

Satoh, titled "Semiconductor Integrated Circuit, Method for Testing the Same, and Method for Manufacturing the Same," describes using an FPGA to generate test stimuli to test elements on the same chip.  Ex. 1008, code (54).  Satoh describes a test circuit formed in a portion of the FPGA and used to test a CPU.  *See* Ex. 1008, 14, Fig. 7.

### 2. Claim 7

Petitioner proposes one of ordinary skill would have combined Satoh with Zavracky, Chiricescu, and Akasaka, to teach or suggest the requirements of limitation 7.3, with the other limitations taught as discussed with respect to claim 1.  Pet. 42, 44–45 (citing Ex. 1008, 5:16–22, 7:36-8:1, 45:4–36, 47:6–14; Ex. 1002 ¶¶ 350–56).  Petitioner argues that one of ordinary skill would have used Satoh's teachings with respect to using an FPGA to test circuitry to achieve known predictable benefits in testing, chip real estate, and design complexity, and would have had a reasonable expectation of success in the combination.  *Id.* at 43–44 (citing Ex. 1002 ¶¶ 241–244).  Petitioner argues that Satoh's teaching of an FPGA providing a test signal and an expected value signal to test a CPU teaches "at least one field programmable gate array integrated circuit die element being configured to provide test stimulus to the at least one microprocessor integrated circuit die element during manufacturing."  *Id.* at 44–45 (citing Ex. 1008, 3:5–8, 5:16–22, 7:36-8:1, 45:4–36, 46:4–36, 47:6–14; Ex. 1002 ¶¶ 350–356).  Petitioner further contends that one of ordinary skill would have understood this to occur "prior to completion of the module

IPR2020-01571
Patent 6,781,226 B2

packaging," because Satoh teaches the testing occurs to ensure high yield, and one of ordinary skill would have recognized that testing prior to packaging would avoid the expense and waste of packaging a module that would not be part of the hoped-for yield. *Id.* at 45 (citing Ex. 1008, 2:32–35, 3:22–23; Ex. 1043 ("Mess"); Ex. 1002 ¶¶ 355–356); Pet. Reply 16–17 (citing Ex. 1009; Ex. 1020; Ex. 1043 ¶ 37; Ex. 1002 ¶ 241).

Patent Owner argues that Satoh does not teach or suggest an FPGA used to test the CPU prior to completion of the module packaging. PO Resp. 45–46. Patent Owner contends that Satoh's teaching is that testing could improve yield by detecting defective parts of the FPGA and avoiding those parts. *Id.* (citing Ex. 1008, 4–5; Ex. 2006 ¶ 83). Dr. Souri testifies that this teaching of Satoh "demonstrates that Satoh describes a process of improving yield by avoiding defective parts of an FPGA when using the FPGA to test other internal circuits, not by ensuring that the testing is conducted 'prior to packaging being finished,' as asserted in the Petition." Ex. 2006 ¶ 83. Thus, Dr. Souri testifies, Satoh teaches a technique to improve yield for integrated circuit dies even if portions of dies are defective. *Id.* ¶ 84.

Patent Owner argues that Satoh does not teach testing a stacked microprocessor, and that this is why Petitioner relies on Mess. PO Resp. 47. Patent Owner contends that Mess, cited by Petitioner, describes testing individual dies prior to stacking. PO Resp. 47–49 (citing Ex. 1043 ¶¶ 6, 36, 38; Ex. 2006 ¶¶ 86–87); PO Sur-reply 16. Patent Owner argues that, while another embodiment of Mess teaches that a stacked die package that passes testing optionally may be encapsulated, because Mess describes the encapsulating layer is optional and the only step left after testing the stacked

42

IPR2020-01571
Patent 6,781,226 B2

die package, Mess does not support Petitioner's arguments with respect to limitation 7.3.  PO Resp. 48–49 (citing Ex. 1043 ¶ 46, Fig. 8; Ex. 2006 ¶ 88).

We agree with Petitioner that these arguments do not address the combined teaching of the asserted references, with respect to what one would understand about testing the stacked die package taught by Zavracky, Chiricescu, and Akasaka.  Pet. Reply 14.  Thus, Patent Owner's argument that Petitioner must rely on Mess to bolster the contentions regarding the teachings of Satoh is rendered moot.  Furthermore, given Patent Owner's acknowledgment that Mess teaches a stacked die package being encapsulated only if it passes testing, we agree with Petitioner that this shows, as Petitioner argues, that one of ordinary skill would have recognized that this testing should occur before packaging.  *See* Pet. 45.  While the encapsulation is optional, Mess teaches that it occurs (if it occurs) only if the stacked die package passes testing.  Ex. 1043 ¶ 46; Ex. 2006 ¶ 8.

Based on the foregoing discussion and a review of the full record, Petitioner persuasively shows that claim 7 would have been obvious.

### 3.  Claims 8–12

Claims 8–12 are argued by Petitioner with respect to the arguments relating to claim 7 and claims 2–6.  Pet. 45–46.  Patent Owner presents no additional arguments relating to these dependent claims.  For the same reasons given with respect to those claims, Petitioner persuasively shows that claims 8–12 would have been obvious.

### F.    *Obviousness, Claims 13–30*

Petitioner contends claims 13–30 would have been obvious over the combination of Zavracky, Chiricescu, Akasaka, and Trimberger.  *See* Pet. 46–62.  Patent Owner contests the showing with respect to limitations

43

IPR2020-01571
Patent 6,781,226 B2

13.4 and 22.4, and with respect to the combination of art proposed by Patent Owner.  PO Resp. 52–73; PO Sur-reply 17–26.

### 1. Trimberger

Trimberger, titled "A Time-Multiplexed FPGA" (1997), teaches an FPGA with on-chip memory distributed around the chip.  Ex. 1006, 1. Trimberger teaches that the memory "can also be read and written by on-chip [FPGA] logic, giving applications access to a single large block of RAM."  *Id.*  Trimberger teaches that "the entire configuration of the FPGA can be changed in a single cycle of the memory" and that "[w]hen the device is *flash reconfigured*, all bits in the logic and interconnect array are updated simultaneously from one memory plane."  *Id.*  Trimberger teaches 100,000 bit lines that may be involved in reconfiguration.  *Id.* at 27.

### 2. Claim 13

Petitioner contends claims 13 would have been obvious over the combination of Zavracky, Chiricescu, Akasaka, and Trimberger.  *See* Pet. 47–57.

With the exception of limitation 13.4, the Petition relies on the teachings or suggestions of Zavracky, Chiricescu, and Akasaka to teach or suggest the limitations of claim 13, as described with respect to claim 1 or claim 2.  Pet. 50–51.  We have addressed these in Sections II.D.4 and II.D.5. With respect to limitation 13.4, "means for reconfiguring the programmable array within one clock cycle," we have concluded that the corresponding structure is "a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element."  *See supra* § II.C.2.  We have additionally concluded that a wide configuration port should be construed as "a

44

configuration data port connecting in parallel cells on one die element to cells on another die element." *See supra* § II.C.1.

### a. Petitioner's Showing

Our constructions correspond most closely to Petitioner's arguments with respect to the second structure it proposed for means-plus-function limitation 13.4, "a stacked FPGA die and memory die interconnected by a wide configuration data port using contact points distributed throughout the dies." *See* Pet. 11–13. Petitioner contends that the combination of Zavracky, Chiricescu, Akasaka, and Trimberger teaches or suggests this second structure, including in the die elements connected by contact points distributed throughout the dies. Pet. 56–57 (referencing *id.* at 35–37). Petitioner argues that Akasaka describes that its active layers are interconnected through "several thousands or tens of thousands of via holes" distributed throughout the surfaces of the die elements. *Id.* at 36–37 (citing Ex. 1005, 3, 5; Ex. 1002 ¶¶ 327–332). Petitioner additionally presents Dr. Franzon's declaration to the effect that this configuration was "ubiquitous" in the prior art. *Id.* at 37 (citing Ex. 1020, Fig. 4; Ex. 1021, Fig. 1(a); Ex. 1028, Fig. 2(b); Ex. 1002 ¶ 332). Petitioner argues that these interconnections and Trimberger's memory access port teach or suggest the wide configuration data port. *Id.* at 56–57. Petitioner references its discussion of Trimberger with reference to its first proposed structure for 13.4, in which Petitioner argues that Trimberger includes a wide configuration data port in the single access memory access port that "has a direct connection to each of the buffer memory cells around the chip" using "massive connectivity within the chip." *Id.* at 51–54 (citing Ex. 1006, 22, 26, 27; Ex. 1002 ¶ 367).

45

IPR2020-01571
Patent 6,781,226 B2

Petitioner argues that one of ordinary skill would have combined Trimberger with Zavracky, Chiricescu, and Akasaka to obtain the benefits of the one-cycle FPGA reconfiguration of Trimberger. Pet. 48–49. Petitioner argues that the motivation would have been to address Chiricescu's stated issue with high configuration time for an FPGA; to prevent data from being dropped during reconfiguration; and to address the delays arising from a shared bus as in Zavracky. *Id.* at 48–49 (citing Ex. 1004, 1; Ex. 1003, 5:55–56; Ex. 1002 ¶¶ 252–254). Petitioner further argues that one of ordinary skill would have expected success in using a memory and area-wide interconnections as in Trimberger for reprogramming an FPGA in one clock cycle, given the state of the art at the time of the invention. *Id.* at 49 (citing Ex. 1020; Ex. 1021; Ex. 1041; Ex. 1047; Ex. 1002 ¶ 256).

### b. *Patent Owner's Contentions and Our Analysis*

Patent Owner contends that the Petition mapped Trimberger's "single memory access port" to the wide configuration data port, and that the single memory access port is a narrow port. PO Resp. 53–54; PO Sur-reply 17–19. Patent Owner additionally contends that Petitioner has impermissibly shifted its theory in its Reply. PO Sur-reply 18–19. Patent Owner additionally contends that the Petition's contentions are deficient because they involve the single memory access port of Trimberger which, Patent Owner argues, is not involved in the reconfiguration of the FPGA. PO Resp. 55–58 (citing Ex. 2006 ¶¶ 96–101). Thus, Patent Owner argues, Petitioner has improperly relied on the functionality from one portion of Trimberger (one-cycle reconfiguration) and the structure from another portion of Trimberger (memory access port). *Id.*

IPR2020-01571
Patent 6,781,226 B2

While our final constructions are not identical to those in the Decision on Institution, here and in that Decision we focused on the second corresponding structure proposed by Petitioner, and in Petitioner's arguments relating to that, Petitioner contends that

> [t]he wide configuration data port (i.e., the place through which the configuration data is transferred to each of the configuration logic cells in the FPGA) using the contact points, is provided by Zavracky in combination with Chiricescu and Akasaka (and in particular, the "thousands or several tens of thousands of via holes are present in these devices" taught by Akasaka), and Trimberger (for the "memory access port" that connects to the configuration data "memory plane"). As discussed, integration of Trimberger's teachings yields the claimed function of "reconfiguring the programmable array within one clock cycle."

Pet. 56–57. We consider this argument, which was clearly stated in the Petition, and find it persuasive. Patent Owner's arguments relate to constructions including buffer cells, which we have not adopted, or to the teachings of Trimberger in isolation, rather than in combination with the teachings of the art in combination. The Petition persuasively shows that limitation 13.4 is taught, not by Trimberger's teachings regarding the "single memory access port" that provides access to configuration memory (Pet. 51, 57; Ex. 1006, 26) alone, but rather in combination with the description in Trimberger of instantly switching to a new configuration with bit lines for a memory plane read simultaneously from configuration memory (Pet. 53–55; Ex. 1006, 27) and with Akasaka's teaching of thousands or tens of thousands of via holes (Pet. 56–57; Ex. 1005, 3, 5). This argument, which after considering the record we find persuasive, was present in the Petition. We agree with Petitioner that the combination of Zavracky, Chiricescu, and Akasaka with Trimberger yields a structure corresponding to the claimed

47

IPR2020-01571
Patent 6,781,226 B2

structure (a wide configuration data port and contact points formed throughout the area of the first integrated circuit die element and another integrated circuit die element) and the function of reconfiguring the programmable array within one clock cycle.

We recognize Patent Owner's argument that "a petitioner cannot rely on one reference for the structure and turn to another reference for the function to demonstrate that the prior art is present in both the function and corresponding structure." PO Sur-reply 20–21 (citing *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1299 (Fed. Cir. 2009); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1361 (Fed. Cir. 2001) (Michel, J. dissenting)). The relevant portion of *Fresenius* involved a dispute regarding whether claims with means-plus-function limitations were shown to be invalid. *Fresenius*, 582 F.3d at 1293–94. Our reviewing court found that there was no evidence of what the correct corresponding structure was for certain means-plus-function limitations, and no comparison of structure in the specification to those present in the prior art. *Id.* at 1299–1300. While the Federal Circuit took the opportunity to stress that, for showing invalidity of a claim with a means-plus-function limitation, both the function and the corresponding structure must be found to be present in the prior art, we do not see any indication in this case relating to Patent Owner's assertion of impropriety in finding structure and function in an asserted combination based on the combined teachings of references. And Judge Michel, in the *McGinley* dissent, was discussing a single-reference obviousness analysis, thus structure and function would necessarily be in the same reference, and no inference can be made regarding Judge Michel's opinion regarding

IPR2020-01571
Patent 6,781,226 B2

invalidity arguments for means-plus-function claims based on a combination of multiple references. *See McGinley*, 262 F.3d at 1361.

Patent Owner argues that Petitioner "rel[ies] on one reference for the structure and turn[s] to another reference for the function." PO Sur-reply 20. But this is not the case here. Rather, Petitioner presents the structure in a combination of Zavracky, Chiricescu, Akasaka, and Trimberger and the function from relevant portions of Trimberger, with specific reference to the function attributed by Trimberger to the structure included from Trimberger in the asserted combination. We find no error in such an analysis.

Patent Owner also argues that the references do not teach buffer cells, and that Trimberger's configuration memory would not correspond to buffer cells as the data is not transiently stored in configuration memory. PO Resp. 59–64. These arguments are moot in view of our constructions, which do not require buffer cells.

Lastly, Patent Owner argues that one of ordinary skill in the art would not have been motivated to combine Zavracky, Chiricescu, Akasaka, and Trimberger. First, Patent Owner reiterates the contentions previously addressed with respect to the combination of Zavracky, Chiricescu, and Akasaka relating to claim 1. PO Resp. 65–66. Patent Owner also argues that, because Trimberger provides on-chip memory, a combination with Zavracky, Chiricescu, and Akasaka would require a change in that combination, with the memory no longer stacked in a separate die with the FPGA and microprocessor dies. *Id.* at 67–69. Patent Owner additionally argues that because of the requirement that Trimberger's configuration memory must be on the same chip as the FPGA, one of ordinary skill would not have been motivated to or capable of making the combination. These

IPR2020-01571
Patent 6,781,226 B2

arguments, however, do not consider what the combination of the art would have suggested to one of ordinary skill or relate to the proposed combination, in which a memory die would be used in place of the on-chip memory of Trimberger. Pet. 47–49, 56–57; *see* Pet. Reply 28. No evidence or rationale cited by Patent Owner shows that the location of Trimberger's on-chip memory is necessary in some way to Trimberger's teachings. As detailed above, Petitioner presents a discussion of the use of a separate memory plane and a wide configuration data port and describes the motivation that one of ordinary skill would have had for the combination of Trimberger's teachings with those of Zavracky, Chiricescu, and Akasaka. Pet. 48–49.

### c. Conclusion – Claim 13

Based on the foregoing discussion and a review of the full record, Petitioner persuasively shows that claim 13 would have been obvious.

### 3. Claims 14–21

Claims 14–21 are argued by Petitioner largely with respect to the arguments relating to claims 1, 4–7, and 13. Pet. 57–60. Patent Owner presents no additional arguments relating to these dependent claims. For the same reasons given with respect to those claims, Petitioner persuasively shows that claims 14–21 would have been obvious.

### 4. Claims 22–30

Claim 22 is argued by Petitioner with respect to the arguments made relating to claim 13, with the exception of limitation 22.1's inclusion of "a plurality of configuration logic cells" on the integrated circuit die element that includes a programmable array. For this limitation, Petitioner contends that Trimberger describes an FPGA with a plurality of configurable logic

IPR2020-01571
Patent 6,781,226 B2

block configuration cells.  Pet. 60–61 (citing Ex. 1006, 26; Ex. 1044; Ex. 1002 ¶¶ 300–301).

Claims 23–30 are argued with respect to arguments presented for claims 6, 14, 15, 16, 17, 18, 19, 20, and 22.  Pet. 61–62.

Patent Owner presents no additional arguments relating to claim 22 or dependent claims 23–30.

For the same reasons given with respect to those claims, Petitioner persuasively shows that claims 22–30 would have been obvious.

G.    *Exhibit 1070*

Patent Owner argues that "[p]aragraphs 5–9, 23–28, 42–56, 59–65, 73–74, 76–77, 95–105, and 110–118 from Dr. Franzon's [Reply D]eclaration (Ex. 1070) addressing Petitioner's alleged obviousness grounds are not sufficiently discussed in the Reply" at pages 13, 22, and 27–29 of the Reply.  Sur-reply 27.  Patent Owner contends that the noted paragraphs are "not discussed in the Reply, but instead incorporated by citation or a cursorily parenthetical."  *Id.*  Patent Owner further contends that "the Board should not and cannot play archeologist with the record to search for the arguments" and "should not . . . consider[] Dr. Franzon's arguments."  *Id.* (citing 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document.").

Patent Owner also cites *Gen. Access Sols., Ltd. v. Sprint Spectrum L.P.*, 811 F. App'x 654, 658 (Fed. Cir. 2020) as "upholding the Board's finding of improper incorporation by reference because, *inter alia*" (Sur-reply 25), "'playing archaeologist with the record' is precisely what the rule against incorporation by references was intended to prevent," (*id.* (quoting *Gen. Access Sols.*, 811 F. App'x at 658, internal citation omitted)).  The

IPR2020-01571
Patent 6,781,226 B2

situation here is different than in the cited case in which the court noted a problem with identifying a party's substantive arguments *prior to turning to the declaration at issue*: "*To identify GAS's substantive arguments*, the Board was forced to turn to a declaration by Struhsaker, *and further to delve into a twenty-nine-page claim chart attached as an exhibit*." *Id.* (emphasis added).

Here, Patent Owner does not describe or allege any problem with identifying Petitioner's substantive arguments. In context, the paragraphs of Dr. Franzon's Reply Declaration (Ex. 1070) cited by Petitioner properly support Petitioner's substantive arguments at the pages of the Reply identified by Patent Owner.

## III. CONCLUSION

The outcome for the challenged claims of this Final Written Decision follows.[11] In summary:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatent- able | Claims Not shown Unpatent- able |
|--------|-------------|-------------------|------------------------------|----------------------------------|
| 1–6 | 103 | Zavracky, Chiricescu, Akasaka | 1–6 | |

---

[11] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01571
Patent 6,781,226 B2

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatent- able | Claims Not shown Unpatent- able |
|---|---|---|---|---|
| 7–12 | 103 | Zavracky, Chiricescu, Akasaka, Satoh | 7–12 | |
| 13–30 | 103 | Zavracky, Chiricescu, Akasaka, Trimberger | 13–30 | |
| **Overall Outcome** | | | 1–30 | |

## IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1–30 of the '226 patent are unpatentable; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

53

IPR2020-01571
Patent 6,781,226 B2


For PETITIONER:

David M. Hoffman
Kenneth W. Darby
FISH & RICHARDSON P.C.
hoffman@fr.com
kdarby@fr.com

James M. Glass
Zyong Li
QUINN EMANUEL URQUHART & SULLIVAN LLP
jimglass@quinnemanuel.com
seanli@quinnemanuel.com

For PATENT OWNER:

Jonathan Caplan
James Hannah
Jeffrey H. Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jcaplan@kramerlevin.com
jhannah@kramerlevin.com
jprice@kramerlevin.com

US00RE42035E

(19) **United States**

(12) **Reissued Patent**
Huppenthal et al.

(10) Patent Number: **US RE42,035 E**
(45) Date of Reissued Patent: **Jan. 18, 2011**

(54) **RECONFIGURABLE PROCESSOR MODULE COMPRISING HYBRID STACKED INTEGRATED CIRCUIT DIE ELEMENTS**

(75) Inventors: **Jon M. Huppenthal**, Colorado Springs, CO (US); **D. James Guzy**, Glenbrook, NV (US)

(73) Assignee: **Arbor Company LLP**, Glenbrook, NV (US)

(21) Appl. No.: **12/178,511**

(22) Filed: **Jul. 23, 2008**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **6,627,985**
    Issued: **Sep. 30, 2003**
    Appl. No.: **10/012,057**
    Filed: **Dec. 5, 2001**

(51) **Int. Cl.**
    *H01L 23/02*    (2006.01)
    *H05K 7/06*    (2006.01)

(52) **U.S. Cl.** ........................ **257/686**; 257/685; 257/209; 257/529; 257/700; 257/530; 922, 724, 778; 361/783; 361/778; 326/51

(58) **Field of Classification Search** ................. 257/686, 257/685, 209, 529, 700, 530, 922, 724, 778; 326/38–41, 51; 361/778, 767, 783, 719, 744, 361/760, 784, 792, 803
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,585,675 A | 12/1996 | Knopf | |
| 5,652,904 A | 7/1997 | Trimberger | |
| 5,793,115 A * | 8/1998 | Zavracky et al. | 257/777 |
| 5,838,060 A * | 11/1998 | Comer | 257/685 |
| 5,953,588 A * | 9/1999 | Camien et al. | 438/106 |
| 6,051,887 A * | 4/2000 | Hubbard | 257/777 |
| 6,072,234 A * | 6/2000 | Camien et al. | 257/686 |
| 6,092,174 A | 7/2000 | Roussakov | |
| 6,313,522 B1 * | 11/2001 | Akram et al. | 257/686 |
| 6,337,579 B1 | 1/2002 | Mochida | |
| 6,449,170 B1 * | 9/2002 | Nguyen et al. | 361/778 |
| 6,452,259 B2 | 9/2002 | Akiyama | |
| 6,781,226 B2 * | 8/2004 | Huppenthal et al. | 257/686 |
| 6,991,947 B1 * | 1/2006 | Gheewala | 438/15 |
| 7,082,591 B2 * | 7/2006 | Carlson | 716/16 |
| 7,126,214 B2 * | 10/2006 | Huppenthal et al. | 257/686 |
| 7,183,643 B2 * | 2/2007 | Gibson et al. | 257/723 |
| 7,282,951 B2 * | 10/2007 | Huppenthal et al. | 326/41 |

FOREIGN PATENT DOCUMENTS

| JP | 08-268189 | 4/1998 |
|---|---|---|

OTHER PUBLICATIONS

English Translation of Office Action received in JP 551682/2003 which claims priority to U.S. patent no. 6,627,985, which is the reissue U.S. Appl. No. 12/178,511.

(Continued)

*Primary Examiner*—Vibol Tan
(74) *Attorney, Agent, or Firm*—William J. Kubida; Peter J. Meza; Hogan Lovells US LLP

(57) **ABSTRACT**

A reconfigurable processor module comprising hybrid stacked integrated circuit ("IC") die elements. In a particular embodiment disclosed herein, a processor module with reconfigurable capability may be constructed by stacking one or more thinned microprocessor, memory and/or field programmable gate array ("FPGA") die elements and interconnecting the same utilizing contacts that traverse the thickness of the die. The processor module disclosed allows for a significant acceleration in the sharing of data between the microprocessor and the FPGA element while advantageously increasing final assembly yield and concomitantly reducing final assembly cost.

**38 Claims, 4 Drawing Sheets**



Samsung Exhibit 1001
1 of 11

## US RE42,035 E

Page 2

OTHER PUBLICATIONS

Hintzke, Jeff, Probing Thin Wafers Requires Dedicated Measures, http://eletroglas.www.com/products/White%20-Paper/Hintzke Thin Paper,html, Eletroglas, Inc. Aug. 21, 2001, pp. 1–6.*

Lammers, David, AMD, LSI Logic will put processor, flash in single package, http://www.csdmag.com/story/OEG20001023S0039, EE Times, Aug. 21, 2001, pp. 1–2.*

Multi–Adaptive Processing (MAP™), http://www.srccomp.com/products map.htm, SRC Computers, Inc. Aug. 22, 2001, pp. 1–2.*

System Architecture, http://www.srccomp.com/products.htm, SRC Computers, Inc., Aug. 22, 2001, pp. 1–2.*

Configurations, SRC Expandable Node, http://www.src-comp.com/products configs.htm, SRC Computers, Inc. Aug. 22, 2001, p. 1.*

Young, Jedediah J., Malshe, Ajay P., Brown, W.D., Lenihan, Timothy, Albert, Douglas, Ozguz, Volkan, Thermal Modeling and Mechanical Analysis of Very Thin Silicon Chips for Conformal Electronic Systems, University of Arkansas, Fayetteville, AR, pp. 1–8., No date.*

New Process Forms Die Interconnects by Vertical Wafer Stacking, http://www.chipscalereview.com/0001/tech-news8.html, ChipScale Review, Jan.–Feb. 2000, Oct. 18, 2001, pp. 1–3.*

Savastiouk, Sergey, Siniaguine, Oleg, Francis, David, Thinning Wafers for Flip Chip Applications, http://www.iii1.com/hdiarticle.html, International Interconnection Intelligence, Oct. 18, 2001, pp. 1–13.*

Savastiouk, Sergey, Siniaguine, Oleg, Korczynski, Ed, Ultra–thin Bumped and Stacked WLP using Thru–Silicon Vias, http://www.ectc.net/advance program/abstracts2000/s15p1.html, Tru–Si Technologies, Inc., Oct. 18, 2001, p. 1.*

Savastiouk, Sergey, New Process Forms Die Interconnects by Vertical Wafer Stacking, http://www.trusi.com/article9.htm, ChipScale Review, Oct. 18, 2001, pp. 1–2.*

Savastiouk, Sergey, Moore's Law–the Z dimension, http://www.trusi.com/article7.htm, SolidState Technology, Oct. 18, 2001, pp. 1–2.*

Through–Silicon Vias, http://www.trusi.com/throughsili-convias.htm., Tru–Si Technologies, Oct. 18, 2001, p. 1.*

* cited by examiner

Samsung Exhibit 1001
2 of 11



**Fig. 1**
*Prior Art*

**Fig. 2**
*Prior Art*

Samsung Exhibit 1001
3 of 11



*Fig. 3*
*Prior Art*

50

Samsung Exhibit 1001
4 of 11



*Fig. 4*

**Samsung Exhibit 1001**
**5 of 11**



Fig. 5

Samsung Exhibit 1001
6 of 11

US RE42,035 E

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# RECONFIGURABLE PROCESSOR MODULE COMPRISING HYBRID STACKED INTEGRATED CIRCUIT DIE ELEMENTS

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

## BACKGROUND OF THE INVENTION

The present invention relates, in general, to the field of systems and methods for reconfigurable, or adaptive, data processing. More particularly, the present invention relates to an extremely compact reconfigurable processor module comprising hybrid stacked integrated circuit ("IC") die elements.

In addition to current commodity IC microprocessors, another type of processing element is commonly referred to as a reconfigurable, or adaptive, processor. These reconfigurable processors exhibit a number of advantages over commodity microprocessors in many applications. Rather than using the conventional "load/store" paradigm to execute an application using a set of limited functional resources as a microprocessor does, the reconfigurable processor actually creates the number of functional units it needs for each application in hardware. This results in greater parallelism and, thus, higher throughput for many applications. Conventionally, the ability for a reconfigurable processor to alter its hardware compliment is typically accomplished through the use of some form of field programmable gate array ("FPGA") such as those produced by Altera Corporation, Xilinx, Inc., Lucent Technologies, Inc. and others.

In practice however, the application space over which such reconfigurable processors, (as well as hybrids combining both microprocessors and FPGAs) can be practically employed is limited by several factors.

Firstly, since FPGAs are less dense than microprocessors in terms of gate count, those packaged FPGAs having sufficient gates and pins to be employed as a general purpose reconfigurable processor ("GPRP"), are of necessity very large devices. This size factor alone may essentially prohibit their use in many portable applications.

Secondly, the time required to actually reconfigure the chips is on the order of many hundreds of milliseconds, and when used in conjunction with current microprocessor technologies, this amounts to a requirement of millions of processor clock cycles in order to complete the reconfiguration. As such, a high percentage of the GPRP's time is spent loading its configuration, which means the task it is performing must be relatively long-lived to maximize the time that it spends computing. This again limits its usefulness to applications that require the job not be context-switched. Context-switching is a process wherein the operating system will temporarily terminate a job that is currently running in order to process a job of higher priority. For the GPRP this would mean it would have to again reconfigure itself thereby wasting even more time.

Thirdly, since microprocessors derive much of their effective operational speed by operating on data in their cache, transferring a portion of a particular job to an attached GPRP would require moving data from the cache over the microprocessor's front side bus to the FPGA. Since this bus runs at about 25% of the cache bus speed, significant time is then consumed in moving data. This again effectively limits the reconfigurable processor to applications that have their data stored elsewhere in the system.

These three known limiting factors will only become increasingly significant as microprocessor speeds continue to increase. As a result, the throughput benefits that reconfigurable computing can offer to a hybrid system made up of existing, discrete microprocessors and FPGAs may be obviated or otherwise limited in its potential usefulness.

## SUMMARY OF THE INVENTION

In accordance with the disclosure of a representative embodiment of the present invention, FPGAs, microprocessors and cache memory may be combined through the use of recently available wafer processing techniques to create a particularly advantageous form of hybrid, reconfigurable processor module that overcomes the limitations of present discrete, integrated circuit device implementations of GPRP systems. As disclosed herein, this new processor module may be conveniently denominated as a Stacked Die Hybrid ("SDH") Processor.

Tru-Si Technologies of Sunnyvale, Calif, (http://www.trusi.com) has developed a process wherein semiconductor wafers may be thinned to a point where metal contacts can traverse the thickness of the wafer creating small bumps on the back side much like those of a BGA package. By using a technique of this type in the manufacture of microprocessor, cache memory and FPGA wafers, all three die, or combinations of two or more of them, may be advantageously assembled into a single very compact structure thus eliminating or ameliorating each of the enumerated known difficulties encountered with existing reconfigurable technology discussed above.

Moreover, since these differing die do not require wire bonding to interconnect, it is now also possible to place interconnect pads throughout the total area of the various die rather than just around their periphery. This then allows for many more connections between the die than could be achieved with any other known technique.

Particularly disclosed herein is a processor module with reconfigurable capability constructed by stacking and interconnecting bare die elements. In a particular embodiment disclosed herein, a processor module with reconfigurable capability may be constructed by stacking thinned die elements and interconnecting the same utilizing contacts that traverse the thickness of the die. As disclosed, such a processor module may comprise a microprocessor, memory and FPGA die stacked into a single block.

Also disclosed herein is a processor module with reconfigurable capability that may include, for example, a microprocessor, memory and FPGA die stacked into a single block for the purpose of accelerating the sharing of data between the microprocessor and FPGA. Such a processor module block configuration advantageously increases final assembly yield while concomitantly reducing final assembly cast.

Further disclosed herein is an FPGA module that uses stacking techniques to combine it with a memory die for the purpose of accelerating FPGA reconfiguration. In a particular embodiment disclosed herein, the FPGA module may employ stacking techniques to combine it with a memory die for the purpose of accelerating external memory references as well as to expand its on chip block memory.

Also further disclosed is an FPGA module that uses stacking techniques to combine it with other die for the purpose of providing test stimulus during manufacturing as well as expanding the FPGA's capacity and performance. The technique of the present invention may also be used to advantageously provide a memory or input/out ("I/O") module with

Samsung Exhibit 1001
7 of 11

US RE42,035 E

3

reconfigurable capability that includes a memory or I/O controller and FPGA die stacked into a single block.

### BRIEF DESCRIPTION OF THE DRAWINGS

The aforementioned and other features and objects of the present invention and the manner of attaining them will become more apparent and the invention itself will be best understood by reference to the following description of a preferred embodiment taken in conjunction with the accompanying drawings, wherein:

FIG. 1 is a simplified functional block diagram of a portion of a prior art computer system incorporating one or more multi-adaptive processing (MAP™ is a trademark of SRC Computers, Inc., Colorado Springs, Colo.) elements;

FIG. 2 is a more detailed, simplified functional block diagram of the multi-adaptive processing element illustrated in FIG. 1 illustrating the user logic block (which may comprise a field programmable gate array "FPGA") with its associated configuration read only memory ("ROM");

FIG. 3 is a functional block diagram of a representative configuration data bus comprising a number of static random access memory ("SRAM") cells distributed throughout the FPGA comprising the user logic lock of FIG. 2;

FIG. 4 is a simplified, exploded isometric view of a reconfigurable processor module in accordance with the present invention comprising a hybrid device incorporating a number of stacked integrated circuit die elements; and

FIG. 5 is a corresponding functional block diagram of the configuration cells of the reconfigurable processor module of FIG. 4 wherein the FPGA may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel.

### DESCRIPTION OF A REPRESENTATIVE EMBODIMENT

With reference now to FIG. 1, a simplified functional block diagram of a portion of a prior art reconfigurable computer system 10 is shown. The computer system 10 incorporates, in pertinent part, one or more microprocessors 12, one or more multi-adaptive processing (MAP™) elements 14 and an associated system memory 16. A system bus 18 bidirectionally couples a MAP element 14 to the microprocessor 12 by means of a bridge 22 as well as to the system memory 16 by means of a crossbar switch 24. Each MAP element 14 may also include one or more bidirectional connections 20 to other adjacent MAP elements 14 as shown

With reference now to FIG. 2, a more detailed, simplified functional block diagram of the multi-adaptive processing element 14 illustrated in the preceding figure is shown. The multi-adaptive processing element 14 comprises, in pertinent part, a user logic block 32, which may comprise an FPGA together with its associated configuration ROM 34. A MAP control block 36 and associated direct memory access ("DMA") engine 38 as well as an on-board memory array 40 is coupled to the user logic block 32 as well as the system bus 18.

With reference additionally now to FIG. 3, a functional block diagram of a representative configuration data bus 50 is shown comprising a number of SRAM cells distributed throughout an FPGA comprising the user logic block 32 of the preceding figure. In a conventional implementation, the configuration information that programs the functionality of the chip is held in SRAM cells distributed throughout the FPGA as shown. Configuration data is loaded through a configuration data port 52 in a byte serial fashion and must

4

configure the cells sequentially progressing through the entire array of logic cells 54 and associated configuration memory 56. It is the loading of this data through a relatively narrow, for example, 8 bit port that results in the long reconfiguration times.

With reference additionally now to FIG. 4, a simplified, exploded isometric view of a reconfigurable processor module 60 in accordance with a representative embodiment of the present invention is shown comprising a hybrid device incorporating a number of stacked integrated circuit die elements. In this particular implementation, the module 60 comprises a die package 62 to which is coupled a microprocessor die 64, memory die 66 and FPGA die 68, all of which have a number of corresponding contact points, or holes, 70 formed throughout the area of the package 62 and various die 64, 66 and 68. It should be noted that a module 60 in accordance with the present invention may also comprise any combination of one or more of the microprocessor die 64, memory die 66 or FPGA 68 with any other of a microprocessor die 64, memory die 66 or FPGA die 68.

During manufacture, the contact holes 70 are formed in the front side of the wafer and an insulating layer of oxide is added to separate the silicon from the metal. Upon completion of all front side processing, the wafer is thinned to expose the through-silicon contacts. Using an atmospheric downstream plasma ("ADP") etching process developed by Tru-Si Technologies, the oxide is etched to expose the metal. Given that this etching process etches the silicon faster, the silicon remains insulated from the contacts.

By stacking die 64, 66 and 68 with through-silicon contacts as shown, the cache memory die 66 actually serves two purposes. The first of these is its traditional role of fast access memory. However in this new assembly it is accessible by both the microprocessor 64 and the FPGA 68 with equal speed. In those applications wherein the memory 66 is tri-ported, the bandwidth for the system can be further increased. This feature clearly solves a number of the problems inherent in existing reconfigurable computing systems and the capability of utilizing the memory die 66 for other functions is potentially very important.

With reference additionally now to FIG. 5, a corresponding functional block diagram of the configuration cells 80 of the reconfigurable processor module 60 of the preceding figure is shown wherein the FPGA 70 may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel. As opposed to the conventional implementation of FIG. 3, a wide configuration data port 82 is included to update the various logic cells 84 through an associated configuration memory 86 and buffer cell 88. The buffer cells 88 are preferably a portion of the memory die 66 (FIG. 4). In this manner, they can be loaded while the FPGA 68 comprising the logic cells 84 are in operation. This then enables the FPGA 68 to be totally reconfigured in one clock cycle with all of it configuration logic cells 84 updated in parallel. Other methods for taking advantage of the significantly increased number of connections to the cache memory die 66 (FIG. 4) may include its use to totally replace the configuration bit storage on the FPGA die 68 as well as to provide larger block random access memory ("RAM") than can be offered within the FPGA die 68 itself.

In addition to these benefits, there is an added benefit of overall reduced power requirements and increased operational bandwidth. Because the various die 64, 66 and 68 (FIG. 4) have very short electrical paths between them, the signal levels can be reduced while at the same time the interconnect clock speeds can be increased.

Samsung Exhibit 1001
8 of 11

US RE42,035 E

5

Another feature of a system incorporating a reconfigurable processor module **60** is that the FPGA die **60** can be configured in such a way as to provide test stimulus to the microprocessor **64**, or other chips in the stack of the die package **62** during manufacture and prior to the completion of the module packaging. After test, the FPGA **68** can then be reconfigured for whatever function is desired. This then allows more thorough testing of the assembly earlier in the manufacturing process than could be otherwise achieved with traditional packaged part test systems thus reducing the costs of manufacturing.

It should be noted that although a single FPGA die **68** has been illustrated, two or more FPGA die **68** may be included in the reconfigurable module **60**. Through the use of the through-die area array contacts **70**, inter-cell connections currently limited to two dimensions of a single die, may be routed up and down the stack in three dimensions. This is not known to be possible with any other currently available stacking techniques since they all require the stacking contacts to be located on the periphery of the die. In this fashion, the number of FPGA die **68** cells that may be accessed within a specified time period is increased by up to 4 VT/3, where "V" is the propagation velocity of the wafer and "T" is the specified time of propagation.

Obviously these techniques are similarly applicable if other die types are added or substituted into the stack. These may include input/output ("I/O") application specific integrated circuits ("ASICs") or memory controllers and the like.

The disclosed technique for die interconnection used in forming the module of the present invention is superior to other available alternatives for several reasons. First, while it would be possible to stack pre-packaged components instead, the I/O connectivity between such parts would be much lower and limited to the parts' periphery, thereby obviating several of the advantages of the stacked die system disclosed. Collocating multiple die on a planar substrate is another possible technique, but that too suffers from limited I/O connectivity and again does not allow for area connections between dies. Another option would be to fabricate a single die containing microprocessor, memory and FPGA. Such a die could use metalization layers to interconnect the three functions and achieve much of the benefits of die stacking. However such a die would be extremely large resulting in a much lower production yield than the three separate die used in a stacked configuration. In addition, stacking allows for a ready mix of technology families on different die as well as offering a mix of processor and FPGA numbers and types. Attempting to effectuate this with a single large die would require differing mask sets for each combination, which would be very costly to implement.

While there have been described above the principles of the present invention in conjunction with specific integrated circuit die elements and configurations for a specific application, it is to be clearly understood that the foregoing description is made only by way of example and not as a limitation to the scope of the invention. Particularly, it is recognised that the teachings of the foregoing disclosure will suggest other modifications to those persons skilled in the relevant art. Such modifications may involve other features which are already known per se and which may be used instead of or in addition to features already described herein. Although claims have been formulated in this application to particular combinations of features, it should be understood that the scope of the disclosure herein also includes any novel feature or any novel combination of features disclosed either explicitly or implicitly or any generalization or modi-

6

fication thereof which would be apparent to persons skilled in the relevant art, whether or not such relates to the same invention as presently claimed in any claim and whether or not it mitigates any or all of the same technical problems as confronted by the present invention. The applicants hereby reserve the right to formulate new claims to such features and/or combinations of such features during the prosecution of the present application or of any further application derived therefrom.

What is claimed is:

**1**. A processor module comprising:

at least a first integrated circuit die element including a programmable array;

at least a second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element; and

wherein said first and second integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements, and wherein said contact points traverse said die elements through a thickness thereof.

**2**. The processor module of claim **1** wherein said programmable array of said first integrated circuit die element comprises an FPGA.

**3**. The processor module of claim **1** wherein [said processor of] said second integrated circuit die element comprises a microprocessor.

**4**. The processor module of claim **1** wherein said second integrated circuit die element comprises a memory.

**5**. The processor module of claim **1** further comprising:

at least a third integrated circuit die element stacked with and electrically coupled to at least one of said first or second integrated circuit die elements.

**6**. The processor module of claim **5** wherein said third integrated circuit die element comprises a memory.

**7**. The processor module of claim **1** wherein said programmable array is reconfigurable as a processing element.

**8**. The processor module of claim **1** wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements.

**9**. A reconfigurable computer system comprising:

a processor;

a memory;

at least one processor module including at least a first integrated circuit die element having a programmable array and at least a second integrated circuit die element stacked with and electrically coupled to said programmable array of said first integrated circuit die element; and

wherein said first and second integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements, and wherein said contact points traverse said die elements through a thickness thereof.

**10**. The computer system of claim **9** wherein said programmable array of said first integrated circuit die element comprises an FPGA.

**11**. The computer system of claim **9**, wherein [said processor of] said second integrated circuit die element comprises a microprocessor.

**12**. The computer system of claim **9** wherein said second integrated circuit die element comprises a memory.

**13**. The computer system of claim **9** further comprising:

at least a third integrated circuit die element stacked with and electrically coupled to at least one of said first or second integrated circuit die elements.

Samsung Exhibit 1001
9 of 11

US RE42,035 E

7

**14**. The computer system of claim **13** wherein said third integrated circuit die element comprises a memory.

**15**. The computer system of claim **9** wherein said programmable array is reconfigurable as a processing element.

**16**. The computer system of claim **9** wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements.

**17**. A processor module comprising:

at least a first integrated circuit die element including a programmable array;

at least a second integrated circuit die element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit die element;

at least a third integrated circuit die element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit die elements respectively; and

wherein said first, second and third integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements, and wherein said contact points traverse said die elements through a thickness thereof.

**18**. The processor module of claim **17** wherein said programmable array of said first integrated circuit die element comprises an FPGA.

**19**. The processor module of claim **17** wherein said processor of said second integrated circuit die element comprises a microprocessor.

**20**. The processor module of claim **17** wherein said memory of said third integrated circuit die element comprises a memory array.

**21**. The processor module of claim **17** wherein said programmable array is reconfigurable as a processing element.

**22**. The processor module of claim **17** wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements.

**23**. A programmable array module comprising:

at least a first integrated circuit die element including a field programmable gate array;

at least a second integrated circuit die element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit die element; and

wherein said field programmable gate array is programmable as a processing element, and wherein said memory array is functional to accelerate external memory references to said processing element.

**24**. The programmable array module of claim **23** wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element.

**25**. A reconfigurable processor module comprising:

at least a first integrated circuit die element including a programmable array;

at least a second integrated circuit die element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit die element; and

at least a third integrated circuit die element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit die elements respectively

whereby said processor and said programmable array are operational to share data therebetween.

8

**26**. The reconfigurable processor module of claim **25** wherein said memory is operational to at least temporarily store said data.

**27**. The reconfigurable processor module of claim **25** wherein said programmable array of said first integrated circuit die element comprises an FPGA.

**28**. The reconfigurable processor module of claim **25** wherein said processor of said second integrated circuit die element comprises a microprocessor.

**29**. The reconfigurable processor module of claim **25** wherein said memory of said third integrated circuit die element comprises a memory array.

**30**. A programmable array module comprising:

at least a first integrated circuit die element including a field programmable gate array;

at least a second integrated circuit die element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit die element, said first and second integrated circuit die elements being coupled by a number of contact points distributed throughout the surfaces of said die elements; and

wherein said field programmable gate array is programmable as a processing element, and wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element.

**31**. A programmable array module comprising:

at least a first integrated circuit die element including a field programmable gate array; and

at least a second integrated circuit die element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit die element,

wherein said field programmable gate array is programmable as a processing element, and wherein said memory array is functional as block memory for said processing element.

**32**. The programmable array module of claim **31** wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element.

**33**. A programmable array module comprising:

at least a first integrated circuit die element including a field programmable gate array; and

at least a second integrated circuit die element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit die element, said first and second integrated circuit die elements being coupled by a number of contact points distributed throughout the surfaces of said die elements,

wherein said field programmable gate array is programmable as a processing element and wherein said memory array is functional to accelerate external memory references to said processing element.

**34**. A programmable array module comprising:

at least a first integrated circuit die element including a field programmable gate array; and

at least a second integrated circuit die element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit die element, said first and second integrated circuit die elements being coupled by a number of contact points distributed throughout the surfaces of said die elements,

Samsung Exhibit 1001
10 of 11

US RE42,035 E

<table>
<tr><td>9</td><td>10</td></tr>
</table>

wherein said field programmable gate array is programmable as a processing element and wherein said memory array is functional as block memory for said processing element.

35. A programmable array module comprising:

at least a first integrated circuit die element including a field programmable gate array; and

at least a second integrated circuit die element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit die element, said first and second integrated circuit die elements being coupled by a number of contact points distributed throughout the surfaces of said die elements,

wherein said contact points are further functional to provide test stimulus from said field programmable gate array to said at least second integrated circuit die element.

36. A programmable array module comprising:

at least a first integrated circuit die element including a field programmable gate array;

at least a second integrated circuit die element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit die element, said first and second integrated circuit die elements being coupled by a number of contact points distributed throughout the surfaces of said die elements; and

at least a third integrated circuit die element stacked with and electrically coupled to at least one of said first or second integrated circuit die elements.

37. The programmable array module of claim 36 wherein said third integrated circuit die element includes another field programmable gate array.

38. The programmable array module of claim 36 wherein said third integrated circuit die element includes an I/O controller.

* * * * *

Samsung Exhibit 1001
11 of 11

US006781226B2

(12) **United States Patent**   (10) **Patent No.:**    **US 6,781,226 B2**
Huppenthal et al.   (45) **Date of Patent:**    **Aug. 24, 2004**

(54) **RECONFIGURABLE PROCESSOR MODULE COMPRISING HYBRID STACKED INTEGRATED CIRCUIT DIE ELEMENTS**

(75) Inventors: **Jon M. Huppenthal**, Colorado Springs, CO (US); **D. James Guzy**, Glenbrook, NV (US)

(73) Assignee: **Arbor Company LLP**, Glenbrook, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/452,113**

(22) Filed: **Jun. 2, 2003**

(65) **Prior Publication Data**

US 2004/0000705 A1 Jan. 1, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 10/012,057, filed on Dec. 5, 2001, now Pat. No. 6,627,985.

(51) **Int. Cl.**[7] ............................................... **H01L 23/02**
(52) **U.S. Cl.** ......................... **257/686**; 326/41; 712/15; 257/723; 257/777
(58) **Field of Search** ........................... 326/41; 712/15; 257/686, 723, 777

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,585,675 A | 12/1996 | Knopf | |
| 5,652,904 A | 6/1997 | Trimberger | |
| 5,838,060 A | 11/1998 | Comer | |
| 6,051,887 A * | 4/2000 | Hubbard | 257/777 |
| 6,072,233 A | 6/2000 | Corisis et al. | |
| 6,092,174 A | 7/2000 | Roussakov | |
| 6,313,522 B1 * | 11/2001 | Akram et al. | 257/686 |
| 6,449,170 B1 | 9/2002 | Nguyen et al. | |
| 6,451,626 B1 | 9/2002 | Lin | |

OTHER PUBLICATIONS

Hintzke, Jeff, Probing Thin Wafers: Requires Dedicated Measures, http://www.electroglas.com/products/White%20

Paper/Hintzke. Thin Paper.html. Electroglas, Inc. Aug. 21, 2001, pp. 1–6.

Lammers, David, AMD, LSI Logic will put processor, flash In single package,http://www.csdmaq.com/story/DEG2001023S0039. EE Times, Aug. 21, 2001, pp. 1–2.

Multi–Adaptive Processing (MAP™), http://www.srccomp.com/products map.htm. SRC Computers, Inc. Aug. 22, 2001, pp. 1–2.

System Architecture, http://www.srccomp.com/products.htm. SRC Computers, Inc, Aug. 22, 2001, pp.1–2.

Configurations, SRC Expandable Node, http://www.srccomp.com/products configs.htm, SRC Computers.Inc. Aug. 22, 2001, p.1.

Young, Jedediah J., Malshe, Ajay P., Brown, W.D., Lenihan, Timothy, Albert, Douglas, Ozguz, Volkan, Thermal Modeling and Mechanical Analysis of Very Thin Silicon Chips for Conformal Electronic Systems, University of Arkansas, Fayetteville, AR, pp.1–8, 2001.

Now Process Forms Die Interconnects by Vertical Wafer Stacking, http://www.chipscalereview.com/0001/technaws8.html. ChipScale Review, Jan.–Feb. 2000, Oct. 18, 2001, pp. 1–3.

(List continued on next page.)

*Primary Examiner*—Daniel D. Chang
(74) *Attorney, Agent, or Firm*—William J. Kubida; Peter J. Meza; Hogan & Hartson LLP

(57) **ABSTRACT**

A reconfigurable processor module comprising hybrid stacked integrated circuit ("IC") die elements. In a particular embodiment disclosed herein, a processor module with reconfigurable capability may be constructed by stacking one or more thinned microprocessor, memory and/or field programmable gate array ("FPGA") die elements and interconnecting the same utilizing contacts that traverse the thickness of the die. The processor module disclosed allows for a significant acceleration in the sharing of data between the microprocessor and the FPGA element while advantageously increasing final assembly yield and concomitantly reducing final assembly cost.

**30 Claims, 4 Drawing Sheets**



Samsung Exhibit 1001
1 of 11

## US 6,781,226 B2
Page 2

### OTHER PUBLICATIONS

Savastiouk, Sergey, Siniaguine, Oleg, Francis, David, Thinning Wafers for Flip Chip Applications, http://www.iii1.com/hdlarticle.html. International Interconnection Intelligence, Oct. 18, 2001, pp. 1–13.

Savastiouk, Sergey, Siniaguine, Oleg, Korczynski, ED, Ultra–thin Bumped and Stacked WLP Using Thru–Silicon Vias, http://www.ectc.net/advance program/abstracts2000/s15p1.html. Tru–Si Technologies, Inc., Oct. 18, 2001, p. 1.

Savastiouk, Sergey, New Process Forms Die Interconnects by Vertical Wafer Stacking, http://www.trusi.com/article9.htm. ChipScale Review, Oct. 18, 2001, pp. 1–2.

Savastiouk, Sergey, Moore's Law–the z dimension, http://www.trusi.com/article7.htm. SolidState Technology, Oct. 18, 2001, pp. 1–2.

Through–Silicon Vias, http://www.trusi.com/throughsiliconvias.html. Tru–Si Technologies, Oct. 18, 2001, p. 1.

* cited by examiner

Samsung Exhibit 1001
2 of 11



CONNECTION TO
ADJACENT MAP ELEMENTS

CONNECTION TO
ADJACENT MAP ELEMENTS

20

20

MULTI-
ADAPTIVE
PROCESSING
ELEMENT

*Fig. 1*
*Prior Art*

10

14

MICROPROCESSOR

BRIDGE

CROSSBAR

SYSTEM
MEMORY

12

22

18

24

16

32

USER
LOGIC

20

20

34

36

CONFIGURATION
ROMs

MAP
CONTROL

ON-BOARD
MEMORY

DMA ENGINE

38

40

14

18

*Fig. 2*
*Prior Art*

Samsung Exhibit 1001
3 of 11



**Fig. 3**
*Prior Art*

50

Appx694

Samsung Exhibit 1001
4 of 11



*Fig. 4*

Samsung Exhibit 1001
5 of 11



Fig. 5

Samsung Exhibit 1001
6 of 11

US 6,781,226 B2

# RECONFIGURABLE PROCESSOR MODULE COMPRISING HYBRID STACKED INTEGRATED CIRCUIT DIE ELEMENTS

### RELATED APPLICATION

The present application is a continuation of U.S. patent application Ser. No. 10/012,057 filed Dec. 5, 2001, now U.S. Pat. No. 6,627,985 incorporated herein by reference in its entirety.

### BACKGROUND OF THE INVENTION

The present invention relates, in general, to the field of systems and methods for reconfigurable, or adaptive, data processing. More particularly, the present invention relates to an extremely compact reconfigurable processor module comprising hybrid stacked integrated circuit ("IC") die elements.

In addition to current commodity IC microprocessors, another type of processing element is commonly referred to as a reconfigurable, or adaptive, processor. These reconfigurable processors exhibit a number of advantages over commodity microprocessors in many applications. Rather than using the conventional "load/store" paradigm to execute an application using a set of limited functional resources as a microprocessor does, the reconfigurable processor actually creates the number of functional units it needs for each application in hardware. This results in greater parallelism and, thus, higher throughput for many applications. Conventionally, the ability for a reconfigurable processor to alter its hardware compliment is typically accomplished through the use of some form of field programmable gate array ("FPGA") such as those produced by Altera Corporation, Xilinx, Inc., Lucent Technologies, Inc. and others.

In practice however, the application space over which such reconfigurable processors, (as well as hybrids combining both microprocessors and FPGAs) can be practically employed is limited by several factors.

Firstly, since FPGAs are less dense than microprocessors in terms of gate count, those packaged FPGAs having sufficient gates and pins to be employed as a general purpose reconfigurable processor ("GPRP"), are of necessity very large devices. This size factor alone may essentially prohibit their use in many portable applications.

Secondly, the time required to actually reconfigure the chips is on the order of many hundreds of milliseconds, and when used in conjunction with current microprocessor technologies, this amounts to a requirement of millions of processor clock cycles in order to complete the reconfiguration. As such, a high percentage of the GPRP's time is spent loading its configuration, which means the task it is performing must be relatively long-lived to maximize the time that it spends computing. This again limits its usefulness to applications that require the job not be context-switched. Context-switching is a process wherein the operating system will temporarily terminate a job that is currently running in order to process a job of higher priority. For the GPRP this would mean it would have to again reconfigure itself thereby wasting even more time.

Thirdly, since microprocessors derive much of their effective operational speed by operating on data in their cache, transferring a portion of a particular job to an attached GPRP would require moving data from the cache over the microprocessor's front side bus to the FPGA. Since this bus runs at about 25% of the cache bus speed, significant time is then consumed in moving data. This again effectively limits the reconfigurable processor to applications that have their data stored elsewhere in the system.

These three known limiting factors will only become increasingly significant as microprocessor speeds continue to increase. As a result, the throughput benefits that reconfigurable computing can offer to a hybrid system made up of existing, discrete microprocessors and FPGAs may be obviated or otherwise limited in its potential usefulness.

### SUMMARY OF THE INVENTION

In accordance with the disclosure of a representative embodiment of the present invention, FPGAs, microprocessors and cache memory may be combined through the use of recently available wafer processing techniques to create a particularly advantageous form of hybrid, reconfigurable processor module that overcomes the limitations of present discrete, integrated circuit device implementations of GPRP systems. As disclosed herein, this new processor module may be conveniently denominated as a Stacked Die Hybrid ("SDH") Processor.

Tru-Si Technologies of Sunnyvale, Calif. (http://www.trusi.com) has developed a process wherein semiconductor wafers may be thinned to a point where metal contacts can traverse the thickness of the wafer creating small bumps on the back side much like those of a BGA package. By using a technique of this type in the manufacture of microprocessor, cache memory and FPGA wafers, all three die, or combinations of two or more of them, may be advantageously assembled into a single very compact structure thus eliminating or ameliorating each of the enumerated known difficulties encountered with existing reconfigurable technology discussed above.

Moreover, since these differing die do not require wire bonding to interconnect, it is now also possible to place interconnect pads throughout the total area of the various die rather than just around their periphery. This then allows for many more connections between the die than could be achieved with any other known technique.

Particularly disclosed herein is a processor module with reconfigurable capability constructed by stacking and interconnecting bare die elements. In a particular embodiment disclosed herein, a processor module with reconfigurable capability may be constructed by stacking thinned die elements and interconnecting the same utilizing contacts that traverse the thickness of the die. As disclosed, such a processor module may comprise a microprocessor, memory and FPGA die stacked into a single block.

Also disclosed herein is a processor module with reconfigurable capability that may include, for example, a microprocessor, memory and FPGA die stacked into a single block for the purpose of accelerating the sharing of data between the microprocessor and FPGA. Such a processor module block configuration advantageously increases final assembly yield while concomitantly reducing final assembly cost.

Further disclosed herein is an FPGA module that uses stacking techniques to combine it with a memory die for the purpose of accelerating FPGA reconfiguration. In a particular embodiment disclosed herein, the FPGA module may employ stacking techniques to combine it with a memory die for the purpose of accelerating external memory references as well as to expand its on chip block memory.

Also further disclosed is an FPGA module that uses stacking techniques to combine it with other die for the purpose of providing test stimulus during manufacturing as

Samsung Exhibit 1001
7 of 11

US 6,781,226 B2

**3**

well as expanding the FPGA's capacity and performance. The technique of the present invention may also be used to advantageously provide a memory or input/output ("I/O") module with reconfigurable capability that includes a memory or I/O controller and FPGA die stacked into a single block.

BRIEF DESCRIPTION OF THE DRAWINGS

The aforementioned and other features and objects of the present invention and the manner of attaining them will become more apparent and the invention itself will be best understood by reference to the following description of a preferred embodiment taken in conjunction with the accompanying drawings, wherein:

FIG. **1** is a simplified functional block diagram of a portion of a prior art computer system incorporating one or more multi-adaptive processing (MAP™ is a trademark of SRC Computers, Inc., Colorado Springs, Colo.) elements;

FIG. **2** is a more detailed, simplified functional block diagram of the multi-adaptive processing element illustrated in FIG. **1** illustrating the user logic block (which may comprise a field programmable gate array "FPGA") with its associated configuration read only memory ("ROM");

FIG. **3** is a functional block diagram of a representative configuration data bus comprising a number of static random access memory ("SRAM") cells distributed throughout the FPGA comprising the user logic lock of FIG. **2**;

FIG. **4** is a simplified, exploded isometric view of a reconfigurable processor module in accordance with the present invention comprising a hybrid device incorporating a number of stacked integrated circuit die elements; and

FIG. **5** is a corresponding functional block diagram of the configuration cells of the reconfigurable processor module of FIG. **4** wherein the FPGA may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel.

DESCRIPTION OF A REPRESENTATIVE EMBODIMENT

With reference now to FIG. **1**, a simplified functional block diagram of a portion of a prior art reconfigurable computer system **10** is shown. The computer system **10** incorporates, in pertinent part, one or more microprocessors **12**, one or more multi-adaptive processing (MAP™) elements **14** and an associated system memory **16**. A system bus **18** bidirectionally couples a MAP element **14** to the microprocessor **12** by means of a bridge **22** as well as to the system memory **16** by means of a crossbar switch **24**. Each MAP element **14** may also include one or more bidirectional connections **20** to other adjacent MAP elements **14** as shown

With reference additionally now to FIG. **2**, a more detailed, simplified functional block diagram of the multi-adaptive processing element **14** illustrated in the preceding figure is shown. The multi-adaptive processing element **14** comprises, in pertinent part, a user logic block **32**, which may comprise an FPGA together with its associated configuration ROM **34**. A MAP control block **36** and associated direct memory access ("DMA") engine **38** as well as an on-board memory array **40** is coupled to the user logic block **32** as well as the system bus **18**.

With reference additionally now to FIG. **3**, a functional block diagram of a representative configuration data bus **50** is shown comprising a number of SRAM cells distributed throughout an FPGA comprising the user logic block **32** of the preceding figure. In a conventional implementation, the

**4**

configuration information that programs the functionality of the chip is held in SRAM cells distributed throughout the FPGA as shown. Configuration data is loaded through a configuration data port **52** in a byte serial fashion and must configure the cells sequentially progressing through the entire array of logic cells **54** and associated configuration memory **56**. It is the loading of this data through a relatively narrow, for example, 8 bit port that results in the long reconfiguration times.

With reference additionally now to FIG. **4**, a simplified, exploded isometric view of a reconfigurable processor module **60** in accordance with a representative embodiment of the present invention is shown comprising a hybrid device incorporating a number of stacked integrated circuit die elements. In this particular implementation, the module **60** comprises a die package **62** to which is coupled a microprocessor die **64**, memory die **66** and FPGA die **68**, all of which have a number of corresponding contact points, or holes, **70** formed throughout the area of the package **62** and various die **64**, **66** and **68**. It should be noted that although module **60** in accordance with the present invention may also comprise any combination of one or more of the microprocessor die **64**, memory die **66** or FPGA **68** with any other of a microprocessor die **64**, memory die **66** or FPGA die **68**.

During manufacture, the contact holes **70** are formed in the front side of the wafer and an insulating layer of oxide is added to separate the silicon from the metal. Upon completion of all front side processing, the wafer is thinned to expose the through-silicon contacts. Using an atmospheric downstream plasma ("ADP") etching process developed by Tru-Si Technologies, the oxide is etched to expose the metal. Given that this etching process etches the silicon faster, the silicon remains insulated from the contacts.

By stacking die **64**, **66** and **68** with through-silicon contacts as shown, the cache memory die **66** actually serves two purposes. The first of these is its traditional role of fast access memory. However in this new assembly it is accessible by both the microprocessor **64** and the FPGA **68** with equal speed. In those applications wherein the memory **66** is tri-ported, the bandwidth for the system can be further increased. This feature clearly solves a number of the problems inherent in existing reconfigurable computing systems and the capability of utilizing the memory die **66** for other functions is potentially very important.

With reference additionally now to FIG. **5**, a corresponding functional block diagram of the configuration cells **80** of the reconfigurable processor module **60** of the preceding figure is shown wherein the FPGA **70** may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel. As opposed to the conventional implementation of FIG. **3**, a wide configuration data port **82** is included to update the various logic cells **84** through an associated configuration memory **86** and buffer cell **88**. The buffer cells **88** are preferably a portion of the memory die **66** (FIG. **4**). In this manner, they can be loaded while the FPGA **68** comprising the logic cells **84** are in operation. This then enables the FPGA **68** to be totally reconfigured in one clock cycle with all of it configuration logic cells **84** updated in parallel. Other methods for taking advantage of the significantly increased number of connections to the cache memory die **66** (FIG. **4**) may include its use to totally replace the configuration bit storage on the FPGA die **68** as well as to provide larger block random access memory ("RAM") than can be offered within the FPGA die **68** itself.

In addition to these benefits, there is an added benefit of overall reduced power requirements and increased opera-

Samsung Exhibit 1001
8 of 11

US 6,781,226 B2

**5**

tional bandwidth. Because the various die **64, 66** and **68** (FIG. 4) have very short electrical paths between them, the signal levels can be reduced while at the same time the interconnect clock speeds can be increased.

Another feature of a system incorporating a reconfigurable processor module **60** is that the FPGA **68** can be configured in such a way as to provide test stimulus to the microprocessor **64**, or other chips in the stack of the die package **62** during manufacture and prior to the completion of the module packaging. After test, the FPGA **68** can then be reconfigured for whatever function is desired. This then allows more thorough testing of the assembly earlier in the manufacturing process than could be otherwise achieved with traditional packaged part test systems thus reducing the costs of manufacturing.

It should be noted that although a single FPGA die **68** has been illustrated, two or more FPGA die **68** may be included in the reconfigurable module **60**. Through the use of the through-die area array contacts **70**, inter-cell connections currently limited to two dimensions of a single die, may be routed up and down the stack in three dimensions. This is not known to be possible with any other currently available stacking techniques since they all require the stacking contacts to be located on the periphery of the die. In this fashion, the number of FPGA die **68** cells that may be accessed within a specified time period is increased by up to 4VT/3, where "V" is the propagation velocity of the wafer and "T" is the specified time of propagation.

Obviously these techniques are similarly applicable if other die types are added or substituted into the stack. These may include input/output ("I/O") application specific integrated circuits ("ASICs") or memory controllers and the like.

The disclosed technique for die interconnection used in forming the module of the present invention is superior to other available alternatives for several reasons. First, while it would be possible to stack pre-packaged components instead, the I/O connectivity between such parts would be much lower and limited to the parts' periphery, thereby obviating several of the advantages of the stacked die system disclosed. Collocating multiple die on a planar substrate is another possible technique, but that too suffers from limited I/O connectivity and again does not allow for area connections between parts. Another option would be to fabricate a single die containing microprocessor, memory and FPGA. Such a die could use metalization layers to interconnect the three functions and achieve much of the benefits of die stacking. However such a die would be extremely large resulting in a much lower production yield than the three separate die used in a stacked configuration. In addition, stacking allows for a ready mix of technology families on different die as well as offering a mix of processor and FPGA numbers on different die. Attempting to effectuate this with a single large die would require differing mask sets for each combination, which would be very costly to implement.

While there have been described above the principles of the present invention in conjunction with specific integrated circuit die elements and configurations for a specific application, it is to be clearly understood that the foregoing description is made only by way of example and not as a limitation to the scope of the invention. Particularly, it is recognized that the teachings of the foregoing disclosure will suggest other modifications to those persons skilled in the relevant art. Such modifications may involve other features which are already known per se and which may be used instead of or in addition to features already described

**6**

herein. Although claims have been formulated in this application to particular combinations of features, it should be understood that the scope of the disclosure herein also includes any novel feature or any novel combination of features disclosed either explicitly or implicitly or any generalization or modification thereof which would be apparent to persons skilled in the relevant art, whether or not such relates to the same invention as presently claimed in any claim and whether or not it mitigates any or all of the same technical problems as confronted by the present invention. The applicants hereby reserve the right to formulate new claims to such features and/or combinations of such features during the prosecution of the present application or of any further application derived therefrom.

What is claimed is:

**1**. A processor module comprising:

at least one field programmable gate array integrated circuit die element including a programmable array; and

at least one microprocessor integrated circuit die element stacked with and electrically coupled to said programmable array of said at least one field programmable gate array integrated circuit die element,

such that processing of data shared between the microprocessor and the field programmable gate array is accelerated.

**2**. The processor module of claim **1** further comprising:

at least one memory integrated circuit die element stacked with and electrically coupled to either said at least one of field programmable gate array or said at least one microprocessor integrated circuit die elements.

**3**. The processor module of claim **1** wherein said programmable array is configurable as a processing element.

**4**. The processor module of claim **1** wherein said at least one field programmable gate array and said at least one microprocessor integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements.

**5**. The processor module of claim **4** wherein said contact points traverse said die elements through a thickness thereof.

**6**. The processor module of claim **5** wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements.

**7**. A processor module comprising:

at least one field programmable gate array integrated circuit die element including a programmable array; and,

at least one microprocessor integrated circuit die element stacked with and electrically coupled to said programmable array of said at least one field programmable gate array integrated circuit die element,

the at least one field programmable gate array integrated circuit die element being configured to provide test stimulus to the at least one microprocessor integrated circuit die element during manufacture and prior to completion of the module packaging.

**8**. The processor module of claim **7** further comprising:

at least one memory integrated circuit die element stacked with and electrically coupled to either said at least one field programmable gate array or microprocessor integrated circuit die elements.

**9**. The processor module of claim **7** wherein said programmable array is configurable as a processing element.

**10**. The processor module of claim **7** wherein said at least one field programmable gate array and said at least one microprocessor integrated circuit die elements are electri-

Samsung Exhibit 1001
9 of 11

US 6,781,226 B2

7

cally coupled by a number of contact points distributed throughout the surfaces of said die elements.

**11**. The processor module of claim **10** wherein said contact points traverse said die elements through a thickness thereof.

**12**. The processor module of claim **11** wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements.

**13**. A processor module comprising:

at least a first integrated circuit die element including a programmable array;

at least a second integrated circuit die element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit die element;

at least a third integrated circuit die element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit die elements respectively; and

means for reconfiguring the programmable array within one clock cycle.

**14**. The processor module of claim **13** wherein the reconfiguring means comprises a wide configuration data port.

**15**. The processor module of claim **13** wherein said programmable array of said first integrated circuit die element comprises a field programmable gate array.

**16**. The processor module of claim **13** wherein said processor of said second integrated circuit die element comprises a microprocessor.

**17**. The processor module of claim **13** wherein said memory of said third integrated circuit die element comprises a memory array.

**18**. The processor module of claim **13** wherein said programmable array is configurable as a processing element.

**19**. The processor module of claim **13** wherein said first, second and third integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements.

**20**. The processor module of claim **19** wherein said contact points traverse said die elements through a thickness thereof.

8

**21**. The processor module of claim **20** wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements.

**22**. A processor module comprising:

at least a first integrated circuit die element including a programmable array and a plurality of configuration logic cells;

at least a second integrated circuit die element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit die element;

at least a third integrated circuit die element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit die elements respectively; and

means for updating the plurality of configuration logic cells within one clock cycle.

**23**. The processor module of claim **22** wherein the updating means comprises a wide configuration data port.

**24**. The processor module of claim **22** wherein said programmable array of said first integrated circuit die element comprises a field programmable gate array.

**25**. The processor module of claim **22** wherein said processor of said second integrated circuit die element comprises a microprocessor.

**26**. The processor module of claim **22** wherein said memory of said third integrated circuit die element comprises a memory array.

**27**. The processor module of claim **22** wherein said programmable array is configurable as a processing element.

**28**. The processor module of claim **22** wherein said first, second and third integrated circuit die elements are electrically coupled by a number of contact points distributed throughout the surfaces of said die elements.

**29**. The processor module of claim **28** wherein said contact points traverse said die elements through a thickness thereof.

**30**. The processor module of claim **29** wherein said die elements are thinned to a point at which said contact points traverse said thickness of said die elements.

* * * * *

Samsung Exhibit 1001
10 of 11

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,781,226 B2                                              Page 1 of 1
DATED          : August 24, 2004
INVENTOR(S)  : Jon M. Huppenthal and D. James Guzy

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 6,
Line 47, delete ","

Signed and Sealed this

Thirtieth Day of November, 2004

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

Samsung Exhibit 1001
11 of 11



US007126214B2

(12) **United States Patent**
Huppenthal et al.

(10) **Patent No.:** **US 7,126,214 B2**
(45) **Date of Patent:** *Oct. 24, 2006

(54) **RECONFIGURABLE PROCESSOR MODULE COMPRISING HYBRID STACKED INTEGRATED CIRCUIT DIE ELEMENTS**

(75) Inventors: **Jon M. Huppenthal**, Colorado Springs, CO (US); **D. James Guzy**, Glenbrook, NV (US)

(73) Assignee: **Arbor Company LLP**, Glenbrook, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 294 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/802,067**

(22) Filed: **Mar. 16, 2004**

(65) **Prior Publication Data**

US 2004/0177237 A1     Sep. 9, 2004

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/452,113, filed on Jun. 2, 2003, now Pat. No. 6,781,226, which is a continuation of application No. 10/012,057, filed on Dec. 5, 2001, now Pat. No. 6,627,985.

(51) **Int. Cl.**
*H01L 23/02* (2006.01)

(52) **U.S. Cl.** ........................ **257/686**; 326/41; 257/723; 257/777; 712/15

(58) **Field of Classification Search** ............... 257/686, 257/777, 778, E21.614; 438/108, 109
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,585,675 A | 12/1996 | Knopf | |
| 5,652,904 A | 7/1997 | Trimberger | |
| 5,838,060 A | 11/1998 | Comer | |
| 6,051,887 A | 4/2000 | Hubbard | |
| 6,072,233 A * | 6/2000 | Corisis et al. | ............... 257/686 |
| 6,092,174 A | 7/2000 | Roussakov | |
| 6,313,522 B1 | 11/2001 | Akram et al. | |
| 6,449,170 B1 | 9/2002 | Nguyen et al. | |
| 6,451,626 B1 * | 9/2002 | Lin | ............................. 438/108 |

OTHER PUBLICATIONS

Hintzke, Jeff, Probing Thin Wafers Requires Dedicated Measures, http://www.eletroglas.com/products/White%20Paper/ Hintzke_Thin_Paper.html, Electroglas, Inc. Aug. 21, 2001, pp. 1-6.

Lammers, David, AMD, LSI Logic will put processor, flash in single package, http://www.csdmag.com/story/ OEG20001023S0039, EE Times, Aug. 21, 2001, pp. 1-2.

Multi-Adaptive Processing (MAP™ ), http://www.srccomp.com/ products_map.htm, SRC Computers, Inc. Aug. 22, 2001, pp. 1-2.

(Continued)

*Primary Examiner*—Daniel D. Chang
(74) *Attorney, Agent, or Firm*—William J. Kubida; Peter J. Meza; Hogan & Hartson LLP

(57) **ABSTRACT**

A reconfigurable processor module comprising hybrid stacked integrated circuit ("IC") die elements. In a particular embodiment disclosed herein, a processor module with reconfigurable capability may be constructed by stacking one or more thinned microprocessor, memory and/or field programmable gate array ("FPGA") die elements and interconnecting the same utilizing contacts that traverse the thickness of the die. The processor module disclosed allows for a significant acceleration in the sharing of data between the microprocessor and the FPGA element while advantageously increasing final assembly yield and concomitantly reducing final assembly cost.

**39 Claims, 5 Drawing Sheets**



XILINX 1001

US 7,126,214 B2
Page 2

OTHER PUBLICATIONS

System Architecture, http://www.srccomp.com/products.htm, SRC Computers, Inc., Aug. 22, 2001, pp. 1-2.
Configurations, SRC Expandable Node, http://www.srccomp.com/products_configs.htm, SRC Computers, Inc. Aug. 22, 2001, p. 1.
Young, Jedediah J., Malshe, Ajay P., Brown, W.D., Lenihan, Timothy, Albert, Douglas, Ozguz, Volkan, Thermal Modeling and Mechanical Analysis of Very Thin Silicon Chips for Conformal Electronic Systems, University of Arkansas, Fayetteville, AR, pp. 1-8, 2001 No month.
New Process Forms Die Interconnects by Vertical Wafer Stacking, http://www.chipscalereview.com/0001/technews8.html, ChipScale Review, Jan.-Feb. 2000, Oct. 18, 2001, pp. 1-3.
Savastiouk, Sergey, Siniaguine, Oleg, Francis, David, Thinning Wafersa for FL.ip Chip Applications, http://www.iii1.com/hdiarticle.html, International Interconnection Intelligence, Oct. 18, 2001, pp. 1-13.

Savastiouk, Sergey, Siniaguine, Oleg, Korczynski, Ed, Ultra-thin Bumped and Stacked WLP using Thru-Silicon Vias, http://www.eetc.net/advance_program/abstracts2000/s15p1.html, Tru-Si Technologies, Inc., Oct. 18, 2001, p. 1.
Savastiouk, Sergey, New Process Forms Die Interconnects by Vertical Wafer Stacking, http://www.trusi.com/article9.htm, ChipScale Review, Oct. 18, 2001, pp. 1-2.
Savastiouk, Sergey, Moore's Law-the z dimension, http://www.trusi.com/article7.htm, SolidState Technology, Oct. 18, 2001, pp. 1-2.
Through-Silicon Vias, http://www.trusi.com/throughsiliconvias.html, Tru-Si Technologies, Oct. 18, 2001, p. 1.
Savastiouk, Sergey, Siniaguine, Oleg, Reche, John, Korczynski, "Thru-Silicon Interconnect Technology" Tru-Si Technologies, IEEE.CPMT Int'l Electronics Manufacturing Technology Symposium, 2000, pp. 122-128.

* cited by examiner



Fig. 1
Prior Art

Fig. 2
Prior Art



*Fig. 3*
*Prior Art*



*Fig. 4*



*Fig. 5*



*Fig. 6*



*Fig. 7*



*Fig. 8*



*Fig. 9*

*Fig. 10*

*Fig. 11*

US 7,126,214 B2

<div style="text-align:center">1</div>

## RECONFIGURABLE PROCESSOR MODULE COMPRISING HYBRID STACKED INTEGRATED CIRCUIT DIE ELEMENTS

### RELATED APPLICATION

The present application is a Continuation-In-Part of U.S. patent application Ser. No. 10/452,113 filed Jun. 2, 2003, now issued U.S. Pat. No. 6,781,226, which is a Continuation of U.S. patent application Ser. No. 10/012,057, now issued U.S. Pat. No. 6,627,985 filed Dec. 5, 2001, both of which are incorporated herein by reference in their entirety and are assigned to the assignee of the present application.

### BACKGROUND OF THE INVENTION

The present invention relates, in general, to the field of systems and methods for reconfigurable, or adaptive, data processing. More particularly, the present invention relates to an extremely compact reconfigurable processor module comprising hybrid stacked integrated circuit ("IC") die elements.

In addition to current commodity IC microprocessors, another type of processing element is commonly referred to as a reconfigurable, or adaptive, processor. These reconfigurable processors exhibit a number of advantages over commodity microprocessors in many applications. Rather than using the conventional "load/store" paradigm to execute an application using a set of limited functional resources as a microprocessor does, the reconfigurable processor actually creates the number of functional units it needs for each application in hardware. This results in greater parallelism and, thus, higher throughput for many applications. Conventionally, the ability for a reconfigurable processor to alter its hardware compliment is typically accomplished through the use of some form of field programmable gate array ("FPGA") such as those produced by Altera Corporation, Xilinx, Inc., Lucent Technologies, Inc. and others.

In practice however, the application space over which such reconfigurable processors, (as well as hybrids combining both microprocessors and FPGAs) can be practically employed is limited by several factors.

Firstly, since FPGAs are less dense than microprocessors in terms of gate count, those packaged FPGAs having sufficient gates and pins to be employed as a general purpose reconfigurable processor ("GPRP"), are of necessity very large devices. This size factor alone may essentially prohibit their use in many portable applications.

Secondly, the time required to actually reconfigure the chips is on the order of many hundreds of milliseconds; and when used in conjunction with current microprocessor technologies, this amounts to a requirement of millions of processor clock cycles in order to complete the reconfiguration. As such, a high percentage of the GPRP's time is spent loading its configuration, which means the task it is performing must be relatively long-lived to maximize the time that it spends computing. This again limits its usefulness to applications that require the job not be context-switched. Context-switching is a process wherein the operating system will temporarily terminate a job that is currently running in order to process a job of higher priority. For the GPRP this would mean it would have to again reconfigure itself thereby wasting even more time.

Thirdly, since microprocessors derive much of their effective operational speed by operating on data in their cache, transferring a portion of a particular job to an attached GPRP

<div style="text-align:center">2</div>

would require moving data from the cache over the microprocessor's front side bus to the FPGA. Since this bus runs at about 25% of the cache bus speed, significant time is then consumed in moving data. This again effectively limits the reconfigurable processor to applications that have their data stored elsewhere in the system.

These three known limiting factors will only become increasingly significant as microprocessor speeds continue to increase. As a result, the throughput benefits that reconfigurable computing can offer to a hybrid system made up of existing, discrete microprocessors and FPGAs may be obviated or otherwise limited in its potential usefulness.

### SUMMARY OF THE INVENTION

In accordance with the disclosure of a representative embodiment of the present invention, FPGAs, microprocessors and cache memory may be combined through the use of recently available wafer processing techniques to create a particularly advantageous form of hybrid, reconfigurable processor module that overcomes the limitations of present discrete, integrated circuit device implementations of GPRP systems. As disclosed herein, this new processor module may be conveniently denominated as a Stacked Die Hybrid ("SDH") Processor.

Tru-Si Technologies of Sunnyvale, Calif. (http://www.tru-si.com) has developed a process wherein semiconductor wafers may be thinned to a point where metal contacts can traverse the thickness of the wafer creating small bumps on the back side much like those of a BGA package. By using a technique of this type in the manufacture of microprocessor, cache memory and FPGA wafers, all three die, or combinations of two or more of them, may be advantageously assembled into a single very compact structure thus eliminating or ameliorating each of the enumerated known difficulties encountered with existing reconfigurable technology discussed above.

Moreover, since these differing die do not require wire bonding to interconnect, it is now also possible to place interconnect pads throughout the total area of the various die rather than just around their periphery. This then allows for many more connections between the die than could be achieved with any other known technique.

Particularly disclosed herein is a processor module with reconfigurable capability constructed by stacking and interconnecting bare die elements. In a particular embodiment disclosed herein, a processor module with reconfigurable capability may be constructed by stacking thinned die elements and interconnecting the same utilizing contacts that traverse the thickness of the die. As disclosed, such a processor module may comprise a microprocessor, memory and FPGA die stacked into a single block.

Also disclosed herein is a processor module with reconfigurable capability that may include, for example, a microprocessor, memory and FPGA die stacked into a single block for the purpose of accelerating the sharing of data between the microprocessor and FPGA. Such a processor module block configuration advantageously increases final assembly yield while concomitantly reducing final assembly cost.

Further disclosed herein is an FPGA module that uses stacking techniques to combine it with a memory die for the purpose of accelerating FPGA reconfiguration. In a particular embodiment disclosed herein, the FPGA module may employ stacking techniques to combine it with a memory die for the purpose of accelerating external memory references as well as to expand its on chip block memory.

US 7,126,214 B2

3

Also further disclosed is an FPGA module that uses stacking techniques to combine it with other die for the purpose of providing test stimulus during manufacturing as well as expanding the FPGA's capacity and performance. The technique of the present invention may also be used to advantageously provide a memory or input/ouput ("I/O") module with reconfigurable capability that includes a memory or I/O controller and FPGA die stacked into a single block.

According to yet another embodiment of the invention, an alternative method eliminates any grinding or further mechanical steps and accomplishes the "stacking" of integrated circuit elements during the actual wafer fabrication process. As disclosed herein, this new processor module according to the alternative method of the present invention may be conveniently designated as a Stacked Integrated Circuit Function ("SICF") Processor.

Firstly, a base wafer is completely processed just as it would have been for any other conventional use to make, for example, a microprocessor. Contacts are distributed throughout the surface of the die. After the processing of the microprocessor die on the base wafer, the surface of the wafer is left in a state that will allow for the further processing of other semiconductor elements having other functions.

Secondly, the base wafer is processed through all of the steps required to create an FPGA. The FPGA I/O metal layers connect to the surface contacts of the microprocessor just as if the die were physically thinned and stacked as previously described. The end result is that two die functions are stacked and interconnected as previously described, but done so by using wafer fabrication steps instead of mechanical discrete die thinning and stacking.

This alternative process according to a further embodiment of the invention allows for many different die functions to be stacked. In addition, functions that use different types of wafer processing steps can also be stacked since one die fabrication process is completed before the next process is started. Because wafer functions are completed before the next process is started, it is also possible to perform wafer level testing of one finished function before starting processing of the stacked function. This is beneficial for reducing test time of die after stacking subsequent functions since die failing and early stage could then be rejected. This also benefits in process optimization since failures are easily associated with a particular process step.

BRIEF DESCRIPTION OF THE DRAWINGS

The aforementioned and other features and objects of the present invention and the manner of attaining them will become more apparent and the invention itself will be best understood by reference to the following description of a preferred embodiment taken in conjunction with the accompanying drawings, wherein:

FIG. **1** is a simplified functional block diagram of a portion of a prior art computer system incorporating one or more multi-adaptive processing (MAP™ is a trademark of SRC Computers, Inc., Colorado Springs, Colo.) elements;

FIG. **2** is a more detailed, simplified functional block diagram of the multi-adaptive processing element illustrated in FIG. **1** illustrating the user logic block (which may comprise a field programmable gate array "FPGA") with its associated configuration read only memory ("ROM");

FIG. **3** is a functional block diagram of a representative configuration data bus comprising a number of static random

4

access memory ("SRAM") cells distributed throughout the FPGA comprising the user logic lock of FIG. **2**;

FIG. **4** is a simplified, exploded isometric view of a reconfigurable processor module in accordance with the present invention comprising a hybrid device incorporating a number of stacked integrated circuit die elements;

FIG. **5** is a corresponding functional block diagram of the configuration cells of the reconfigurable processor module of FIG. **4** wherein the FPGA may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel;

FIGS. **6**–**10** are sequential cross-sectional process flow diagrams in which two functional elements are fabricated on a single base wafer according to an alternative processing method of the present invention; and

FIG. **11** is a cross-sectional process flow diagram in which three functional elements are fabricated on a single base wafer according to an alternative processing method of the present invention.

DESCRIPTION OF A REPRESENTATIVE
EMBODIMENT

With reference now to FIG. **1**, a simplified functional block diagram of a portion of a prior art reconfigurable computer system **10** is shown. The computer system **10** incorporates, in pertinent part, one or more microprocessors **12**, one or more multi-adaptive processing (MAP™) elements **14** and an associated system memory **16**. A system bus **18** bidirectionally couples a MAP element **14** to the microprocessor **12** by means of a bridge **22** as well as to the system memory **16** by means of a crossbar switch **24**. Each MAP element **14** may also include one or more bidirectional connections **20** to other adjacent MAP elements **14** as shown

With reference additionally now to FIG. **2**, a more detailed, simplified functional block diagram of the multi-adaptive processing element **14** illustrated in the preceding figure is shown. The multi-adaptive processing element **14** comprises, in pertinent part, a user logic block **32**, which may comprise an FPGA together with its associated configuration ROM **34**. A MAP control block **36** and associated direct memory access ("DMA") engine **38** as well as an on-board memory array **40** is coupled to the user logic block **32** as well as the system bus **18**.

With reference additionally now to FIG. **3**, a functional block diagram of a representative configuration data bus **50** is shown comprising a number of SRAM cells distributed throughout an FPGA comprising the user logic block **32** of the preceding figure. In a conventional implementation, the configuration information that programs the functionality of the chip is held in SRAM cells distributed throughout the FPGA as shown. Configuration data is loaded through a configuration data port **52** in a byte serial fashion and must configure the cells sequentially progressing through the entire array of logic cells **54** and associated configuration memory **56**. It is the loading of this data through a relatively narrow, for example, 8 bit port that results in the long reconfiguration times.

With reference additionally now to FIG. **4**, a simplified, exploded isometric view of a reconfigurable processor module **60** in accordance with a representative embodiment of the present invention is shown comprising a hybrid device incorporating a number of stacked integrated circuit die elements. In this particular implementation, the module **60** comprises a die package **62** to which is coupled a microprocessor die **64**, memory die **66** and FPGA die **68**, all of which have a number of corresponding contact points, or

US 7,126,214 B2

5

holes, **70** formed throughout the area of the package **62** and various die **64**, **66** and **68**. It should be noted that a module **60** in accordance with the present invention may also comprise any combination of one or more of the microprocessor die **64**, memory die **66** or FPGA die **68** with any other of a microprocessor die **64**, memory die **66** or FPGA die **68**.

During manufacture, the contact holes **70** are formed in the front side of the wafer and an insulating layer of oxide is added to separate the silicon from the metal. Upon completion of all front side processing, the wafer is thinned to expose the through-silicon contacts. Using an atmospheric downstream plasma ("ADP") etching process developed by Tru-Si Technologies, the oxide is etched to expose the metal. Given that this etching process etches the silicon faster, the silicon remains insulated from the contacts.

By stacking die **64**, **66** and **68** with through-silicon contacts as shown, the cache memory die **66** actually serves two purposes. The first of these is its traditional role of fast access memory. However in this new assembly it is accessible by both the microprocessor **64** and the FPGA **68** with equal speed. In those applications wherein the memory **66** is tri-ported, the bandwidth for the system can be further increased. This feature clearly solves a number of the problems inherent in existing reconfigurable computing systems and the capability of utilizing the memory die **66** for other functions is potentially very important.

With reference additionally now to FIG. **5**, a corresponding functional block diagram of the configuration cells **80** of the reconfigurable processor module **60** of the preceding figure is shown wherein the FPGA **70** may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel. As opposed to the conventional implementation of FIG. **3**, a wide configuration data port **82** is included to update the various logic cells **84** through an associated configuration memory **86** and buffer cell **88**. The buffer cells **88** are preferably a portion of the memory die **66** (FIG. **4**). In this manner, they can be loaded while the FPGA **68** comprising the logic cells **84** are in operation. This then enables the FPGA **68** to be totally reconfigured in one clock cycle with all of it configuration logic cells **84** updated in parallel. Other methods for taking advantage of the significantly increased number of connections to the cache memory die **66** (FIG. **4**) may include its use to totally replace the configuration bit storage on the FPGA die **68** as well as to provide larger block random access memory ("RAM") than can be offered within the FPGA die **68** itself.

In addition to these benefits, there is an added benefit of overall reduced power requirements and increased operational bandwidth. Because the various die **64**, **66** and **68** (FIG. **4**) have very short electrical paths between them, the signal levels can be reduced while at the same time the interconnect clock speeds can be increased.

Another feature of a system incorporating a reconfigurable processor module **60** is that the FPGA **68** can be configured in such a way as to provide test stimulus to the microprocessor **64**, or other chips in the stack of the die package **62** during manufacture and prior to the completion of the module packaging. After test, the FPGA **68** can then be reconfigured for whatever function is desired. This then allows more thorough testing of the assembly earlier in the manufacturing process than could be otherwise achieved with traditional packaged part test systems thus reducing the costs of manufacturing.

It should be noted that although a single FPGA die **68** has been illustrated, two or more FPGA die **68** may be included in the reconfigurable module **60**. Through the use of the

6

through-die area array contacts **70**, inter-cell connections currently limited to two dimensions of a single die, may be routed up and down the stack in three dimensions. This is not known to be possible with any other currently available stacking techniques since they all require the stacking contacts to be located on the periphery of the die. In this fashion, the number of FPGA die **68** cells that may be accessed within a specified time period is increased by up to 4VT/3, where "V" is the propagation velocity of the wafer and "T" is the specified time of propagation.

Obviously these techniques are similarly applicable if other die types are added or substituted into the stack. These may include input/output ("I/O") application specific integrated circuits ("ASICs") or memory controllers and the like.

The disclosed technique for die interconnection used in forming the module of the present invention is superior to other available alternatives for several reasons. First, while it would be possible to stack pre-packaged components instead, the I/O connectivity between such parts would be much lower and limited to the parts' periphery, thereby obviating several of the advantages of the stacked die system disclosed. Collocating multiple die on a planar substrate is another possible technique, but that too suffers from limited I/O connectivity and again does not allow for area connections between parts. Another option would be to fabricate a single die containing microprocessor, memory and FPGA. Such a die could use metalization layers to interconnect the three functions and achieve much of the benefits of die stacking. However such a die would be extremely large resulting in a much lower production yield than the three separate die used in a stacked configuration. In addition, stacking allows for a ready mix of technology families on different die as well as offering a mix of processor and FPGA numbers and types. Attempting to effectuate this with a single large die would require differing mask sets for each combination, which would be very costly to implement.

According to an alternative method of the present invention, stacking of differing "functional elements" may be accomplished at wafer fabrication without any intervening grinding or other mechanical steps. While a particular method according to an embodiment of the present invention is shown and described, it will be apparent to those skilled in the art that many other variations of the described method are possible that will result in the stacking of different functional elements on top of and interconnected to each other as claimed.

As an example, it is desired to have a Field Programable Gate Array (FPGA) function stacked on top of and interconnected to a microprocessor functional element. The first step in this sequence is to process a wafer in the normal fashion to create a microprocessor as shown in FIG. **6**. The top surface of wafer **100** is a silicon dioxide surface **102** with metal pads **104** exposed to make electrical connections to the microprocessor circuits. The location of pads **104** can be anywhere on the surface of wafer **100**. The wafer **100** is then ready for the second phase of the process.

In this phase, standard lithography and wafer processing techniques are used to mask off the metal contacts **104** and to grow an epitaxial layer of silicon on top of the existing oxide surface. A silicon dioxide layer **102** is shown in FIG. **7** that is formed after the metal contacts **104** are masked off. The epitaxial layer **106** grown on the silicon dioxide surface is shown in FIG. **8**. Since epitaxial layer **106** is being grown on oxide layer **102**, the resulting epitaxial layer **106** is polycrystalline in nature. However, it is now possible to fabricate an FPGA function using polysilicon transistors in

US 7,126,214 B2

<table>
<tr><td>7</td><td>8</td></tr>
</table>

this epitaxial layer **106** using standard polysilicon processing techniques. During this process, the metal interconnects **108** of the FPGA are allowed to make electrical connection to at least one of the metal pads of the original microprocessor top surface as shown in FIG. **9**. This can be done by etching vias through the polysilicon epitaxial layer **106** and underlying silicon dioxide layer **102** where an interconnection between functional elements is required, and forming the interconnect in the etched vias. In this fashion the microprocessor and the FPGA are physically coupled to create the desired stacked processor according to an embodiment of the present invention. When all of the FPGA process steps are complete, the top surface will again result in exposed metal pads **108** on a silicon oxide surface **110** as shown in FIG. **10**. These pads **108** can then be used to interconnect to package bonding wires or flip chip solder balls using standard techniques for creating packaged integrated circuits.

Alternatively, pads **108** can be masked off and a further epitaxial layer can be formed so that a third functional element such as an I/O controller, memory, FPGA, microprocessor or the like, can be integrated with the first two functional elements. Referring now to FIG. **11**, a module is shown wherein three functional elements are fabricated on a single base wafer, including functional elements **100**, **106**, and **112**, separated by oxide layers **102** and **110**. A surface oxide layer **114** is also shown. Metal pads **108** are shown interconnecting all three functional elements.

While there have been described above the principles of the present invention in conjunction with specific integrated circuit die elements and configurations for a specific application, it is to be clearly understood that the foregoing description is made only by way of example and not as a limitation to the scope of the invention. Particularly, it is recognized that the teachings of the foregoing disclosure will suggest other modifications to those persons skilled in the relevant art. Such modifications may involve other features which are already known per se and which may be used instead of or in addition to features already described herein. Although claims have been formulated in this application to particular combinations of features, it should be understood that the scope of the disclosure herein also includes any novel feature or any novel combination of features disclosed either explicitly or implicitly or any generalization or modification thereof which would be apparent to persons skilled in the relevant art, whether or not such relates to the same invention as presently claimed in any claim and whether or not it mitigates any or all of the same technical problems as confronted by the present invention. The applicants hereby reserve the right to formulate new claims to such features and/or combinations of such features during the prosecution of the present application or of any further application derived therefrom.

What is claimed is:

**1**. A programmable array module comprising:

at least a first integrated circuit functional element including a field programmable gate array; and

at least a second integrated circuit functional element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element,

wherein said field programmable gate array is programmable as a processing element, and wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element.

**2**. A programmable array module comprising:

at least a first integrated circuit functional element including a field programmable gate array; and

at least a second integrated circuit functional element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element, said first and second integrated circuit functional elements being coupled by a number of contact points distributed throughout the surfaces of said functional elements,

wherein said field programmable gate array is programmable as a processing element, and wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as a processing element.

**3**. The programmable array module of claim **2** wherein said contact points are further functional to provide test stimulus from said field programmable gate array to said at least second integrated circuit functional element.

**4**. The programmable array module of claim **2** further comprising:

at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements.

**5**. The programmable array module of claim **4** wherein said third integrated circuit functional element includes another field programmable gate array.

**6**. The programmable array module of claim **4** wherein said third integrated circuit functional element includes an I/O controller.

**7**. A method of fabricating a programmable array module comprising:

forming at least a first integrated circuit functional element including a field programmable gate array and a plurality of metal pads on a base wafer;

forming a first epitaxial layer over the first integrated circuit functional element; and

forming at least a second integrated circuit functional element including a memory array in the first epitaxial layer, the second integrated circuit functional element having a plurality of metal pads, at least one of which is in electrical contact with the metal pads of the first integrated circuit functional element.

**8**. The method of claim **7** further comprising forming a first layer of silicon dioxide on the surface of the first integrated circuit functional element.

**9**. The method of claim **8** further comprising forming the first epitaxial layer on the surface of the first silicon dioxide layer.

**10**. The method of claim **7** wherein forming the first epitaxial layer comprises forming a polysilicon layer.

**11**. The method of claim **7** further comprising etching through the first epitaxial layer so that an interconnection between the metal pads of the first and second integrated circuit functional elements is subsequently formed.

**12**. The method of claim **11** further comprising etching through a first silicon dioxide layer on the surface of the first integrated circuit functional element.

**13**. The method of claim **7** further comprising forming a second epitaxial layer over the first epitaxial layer such that a third functional element is integrated with the first two functional elements.

**14**. The method of claim **13** wherein forming the third functional element comprises forming an I/O controller, memory, FPGA, or microprocessor.

US 7,126,214 B2

9

**15.** The method of claim **13** further comprising forming a second silicon dioxide layer on the surface of the second epitaxial layer.

**16.** The method of claim **13** wherein forming the second epitaxial layer comprises forming a polysilicon layer.

**17.** A method of fabricating a processor module comprising:

forming at least a first integrated circuit functional element including a microprocessor on a base wafer; and

using wafer processing techniques, forming at least a second integrated circuit functional element such as a field programmable gate array on the first integrated circuit functional element,

wherein forming the second integrated circuit functional element comprises forming an epitaxial layer.

**18.** The method of claim **17** further comprising forming an electrical contact between at least one of a plurality of metal pads associated with the first integrated circuit functional element and at least one of a plurality of metal pads associated with the second integrated circuit functional element.

**19.** The method of claim **17** wherein forming the epitaxial layer comprises forming a polysilicon layer.

**20.** The method of claim **17** further comprising forming a silicon dioxide layer on a top surface of the first integrated circuit functional element.

**21.** The method of claim **17** further comprising etching through the second integrated circuit functional element so that an electrical interconnection can be established between the first and second integrated circuit functional elements.

**22.** The method of claim **17** further comprising forming a third functional element integrated with the first two functional elements using wafer processing techniques.

**23.** The method of claim **22** wherein forming the third functional element comprises forming an epitaxial layer.

**24.** The method of claim **23** wherein forming the epitaxial layer comprises forming a polysilicon layer.

**25.** The method of claim **22** wherein forming the third functional element comprises forming an I/O controller, memory, FPGA, or microprocessor.

**26.** A programmable array module comprising:

at least a first integrated circuit functional element including a field programmable gate array; and

at least a second integrated circuit functional element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element,

wherein said field programmable gate array is programmable as a processing element, and wherein said memory array is functional to accelerate external memory references to said processing element.

**27.** A programmable array module comprising:

at least a first integrated circuit functional element including a field programmable gate array; and

at least a second integrated circuit functional element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element, said first and second integrated circuit functional elements being coupled by a number of contact points distributed throughout the surfaces of said functional elements,

10

wherein said field programmable gate array is programmable as a processing element, and wherein said memory array is functional to accelerate external memory references to said processing element.

**28.** The programmable array module of claim **27** wherein said contact points are further functional to provide test stimulus from said field programmable gate array to said at least second integrated circuit functional element.

**29.** The programmable array module of claim **27** further comprising:

at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements.

**30.** The programmable array module of claim **29** wherein said third integrated circuit functional element includes another field programmable gate array.

**31.** The programmable array module of claim **29** wherein said third integrated circuit functional element includes an I/O controller.

**32.** A method of fabricating a processor module comprising:

forming at least a first integrated circuit functional element including a microprocessor on a base wafer;

using wafer processing techniques, forming at least a second integrated circuit functional element including a field programmable gate array on the first integrated circuit functional element; and

forming a third functional element integrated with the first two functional elements using wafer processing techniques,

wherein forming the third functional element comprises forming an epitaxial layer.

**33.** The method of claim **32** further comprising forming an electrical contact between at least one of a plurality of metal pads associated with the first integrated circuit functional element and at least one of a plurality of metal pads associated with the second integrated circuit functional element.

**34.** The method of claim **32** wherein forming the second integrated circuit functional element comprises forming an epitaxial layer.

**35.** The method of claim **34** wherein forming the epitaxial layer comprises forming a polysilicon layer.

**36.** The method of claim **32** further comprising forming a silicon dioxide layer on a top surface of the first integrated circuit functional element.

**37.** The method of claim **32** further comprising etching through the second integrated circuit functional element so that an electrical interconnection is established between the first and second integrated circuit functional elements.

**38.** The method of claim **32** wherein forming the epitaxial layer comprises forming a polysilicon layer.

**39.** The method of claim **32** wherein forming the third functional element comprises forming an I/O controller, memory, FPGA, or microprocessor.

\*  \*  \*  \*  \*

US007282951B2

(12) **United States Patent**
Huppenthal et al.

(10) **Patent No.:** US 7,282,951 B2
(45) **Date of Patent:** *Oct. 16, 2007

(54) **RECONFIGURABLE PROCESSOR MODULE COMPRISING HYBRID STACKED INTEGRATED CIRCUIT DIE ELEMENTS**

(75) Inventors: **Jon M. Huppenthal**, Colorado Springs, CO (US); **D. James Guzy**, Glenbrook, NV (US)

(73) Assignee: **Arbor Company LLP**, Glenbrook, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/383,149**

(22) Filed: **May 12, 2006**

(65) **Prior Publication Data**

US 2006/0195729 A1    Aug. 31, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/802,067, filed on Mar. 16, 2004, now Pat. No. 7,126,214, which is a continuation-in-part of application No. 10/452,113, filed on Jun. 2, 2003, now Pat. No. 6,781,226, which is a continuation-in-part of application No. 10/012, 057, filed on Dec. 5, 2001, now Pat. No. 6,627,985.

(51) **Int. Cl.**
*H03K 19/173* (2006.01)
*H01L 23/02* (2006.01)

(52) **U.S. Cl.** .......................... 326/41; 326/38; 257/686; 257/723; 257/777

(58) **Field of Classification Search** ............... 257/686, 257/777, 778, E21.614, 723; 438/108, 109; 326/38, 41

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,585,675 | A | 12/1996 | Knopf |
| 5,652,904 | A | 7/1997 | Trimberger |
| 5,793,115 | A | 8/1998 | Zavracky et al. |
| 5,838,060 | A | 11/1998 | Comer |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 11168185 | 6/1999 |

OTHER PUBLICATIONS

Hintzke, Jeff, Probing Thin Wafers Requires Dedicated Measures, http://www.eletroglas.com/products/While%20Paper/Hintzke_Thin_Paper.html, Electroglas, Inc. Aug. 21, 2001, pp. 1-6.

(Continued)

*Primary Examiner*—Daniel Chang
(74) *Attorney, Agent, or Firm*—William J. Kubida; Peter J. Meza; Hogan & Hartson LLP

(57) **ABSTRACT**

A reconfigurable processor module comprising hybrid stacked integrated circuit ("IC") die elements. In a particular embodiment disclosed herein, a processor module with reconfigurable capability may be constructed by stacking one or more thinned microprocessor, memory and/or field programmable gate array ("FPGA") die elements and interconnecting the same utilizing contacts that traverse the thickness of the die. The processor module disclosed allows for a significant acceleration in the sharing of data between the microprocessor and the FPGA element while advantageously increasing final assembly yield and concomitantly reducing final assembly cost.

**29 Claims, 5 Drawing Sheets**



Samsung Exhibit 1001
1 of 12

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,051,887 | A | 4/2000 | Hubbard |
| 6,072,233 | A | 6/2000 | Corisis et al. |
| 6,092,174 | A | 7/2000 | Roussakov |
| 6,313,522 | B1 | 11/2001 | Akram et al. |
| 6,449,170 | B1 | 9/2002 | Nguyen et al. |
| 6,451,626 | B1 * | 9/2002 | Lin ........................... 438/108 |
| 2002/0008309 | A1 | 1/2002 | Akiyama |

## OTHER PUBLICATIONS

Lammers, David, AMD, LSI, Logic will put processor, flash in single package, http://www.csdmag.com/story/OEG20001023S0039, EE Times, Aug. 21, 2001, pp. 1-2.

Multi-Adaptive Processing (MAP™), http://www.srccomp.com/products_map.htm, SRC Computers, Inc. Aug. 22, 2001, pp. 1-2.

System Architecture, http://www.srccomp.com/products.htm, SRC Computers, Inc., Aug. 22, 2001, pp. 1-2.

Configurations, SRC Expandable Node, http://www.srccomp.com/products_configs.htm, SRC Computers, Inc. Aug. 22, 2001, p. 1.

Young, Jedediah J., Malshe, Ajay P., Brown, W.D., Lenihan, Timothy, Albert, Douglas, Ozguz, Volkan, Thermal Modeling and Mechanical Analysis of Very Thin Silicon Chips for Conformal Electronic Systems, University of Arkansas, Fayetteville, AR, pp. 1-8, 2001, no month.

New Process Forms Die Interconnects by Vertical Wafer Stacking, http://www.chipscalereview.com/0001/technews8.html, ChipScale Review, Jan.-Feb. 2000, Oct. 18, 2001, pp. 1-3.

Savastiouk, Sergey, Siniaguine, Oleg, Francis, David, Thinning Wafers for Flip Chip Applications, http://www.iii1.com/hdiarticle.html, International Interconnection Intelligence, Oct. 18, 2001, pp. 1-13.

Savastiouk, Sergey, Siniaguine, Oleg, Korczynski, Ed, Ultra-thin Bumped and Stacked WLP using Thru-Silicon Vias, http://www.ectc.net/advance_program/abstracts2000/s15p1.html, Tru-Si Technologies, Inc., Oct. 18, 2001, p. 1.

Savastiouk, Sergey, New Process Forms Die Interconnects by Vertical Wafer Stacking, http://www.trusi.com/article9.htm, ChipScale Review, Oct. 18, 2001, pp. 1-2.

Savastiouk, Sergey, Moore's Law- the z dimension, http://www.trusi.com/article7.htm, SolidState Technology, Oct. 18, 2001, pp. 1-2.

Through-Silicon Vias, http://www.trusi.com/throughsiliconvias.html, Tru-Si Technologies, Oct. 18, 2001, p. 1.

Savastiouk, Sergey, Siniaguine, Oleg, Reche, John, Korcezynski, "Thru-Silicon Interconnect Technology" Tru-Si Technologies, IEEE.CPMT Int'l Electronics Manufacturing Technology Symposium, 2000, pp. 122-128.

* cited by examiner

Samsung Exhibit 1001
2 of 12



*Fig. 1*
*Prior Art*

*Fig. 2*
*Prior Art*

Samsung Exhibit 1001
3 of 12



**Fig. 3**
*Prior Art*

50

Samsung Exhibit 1001
4 of 12



*Fig. 4*

**Samsung Exhibit 1001**
**5 of 12**



VERY WIDE CONFIGURATION DATA PORT
LOGIC CELL
CONFIG MEMORY
BUFFER CELL
84₀₀
86₀₀
88₀₀
84₀₁
86₀₁
88₀₁
84₀N
86₀N
88₀N
84₁₀
86₁₀
88₁₀
84₁₁
86₁₁
88₁₁
84₁N
86₁N
88₁N
84M0
86M0
88M0
84M1
86M1
88M1
84MN
86MN
88MN
82
80

Fig. 5



102  104  102  104  102  104  102

100

*Fig. 6*



102
104  104  104
100

*Fig. 7*



106
102
104  104  104
100

*Fig. 8*

108  108  108
106  106  106  106
102  102  102  102
100

*Fig. 9*

110  108  110  108  110  108  110
106  106  106  106
102  102  102  102
100

*Fig. 10*

114  108  114  108  114  108  114
112  112  112  112
110  110  110  110
106  106  106  106
102  102  102  102
100

*Fig. 11*

Samsung Exhibit 1001
7 of 12

US 7,282,951 B2

| 1 | 2 |

**RECONFIGURABLE PROCESSOR MODULE COMPRISING HYBRID STACKED INTEGRATED CIRCUIT DIE ELEMENTS**

RELATED APPLICATION

The present application is a Continuation of U.S. patent application Ser. No. 10/802,067, now issued U.S. Pat. No. 7,126,214, filed Mar. 16, 2004 which is a Continuation-In-Part of U.S. patent application Ser. No. 10/452,113, now issued U.S. Pat. No. 6,781,226 filed Jun. 2, 2003, which is a Continuation of U.S. patent application Ser. No. 10/012, 057, now issued Pat. No. 6,627,985 filed Dec. 5, 2001, all of which are incorporated herein by reference in their entirety and are assigned to the assignee of the present application.

BACKGROUND OF THE INVENTION

The present invention relates, in general, to the field of systems and methods for reconfigurable, or adaptive, data processing. More particularly, the present invention relates to an extremely compact reconfigurable processor module comprising hybrid stacked integrated circuit ("IC") die elements.

In addition to current commodity IC microprocessors, another type of processing element is commonly referred to as a reconfigurable, or adaptive, processor. These reconfigurable processors exhibit a number of advantages over commodity microprocessors in many applications. Rather than using the conventional "load/store" paradigm to execute an application using a set of limited functional resources as a microprocessor does, the reconfigurable processor actually creates the number of functional units it needs for each application in hardware. This results in greater parallelism and, thus, higher throughput for many applications. Conventionally, the ability for a reconfigurable processor to alter its hardware compliment is typically accomplished through the use of some form of field programmable gate array ("FPGA") such as those produced by Altera Corporation, Xilinx, Inc., Lucent Technologies, Inc. and others.

In practice however, the application space over which such reconfigurable processors, (as well as hybrids combining both microprocessors and FPGAs) can be practically employed is limited by several factors.

Firstly, since FPGAs are less dense than microprocessors in terms of gate count, those packaged FPGAs having sufficient gates and pins to be employed as a general purpose reconfigurable processor ("GPRP"), are of necessity very large devices. This size factor alone may essentially prohibit their use in many portable applications.

Secondly, the time required to actually reconfigure the chips is on the order of many hundreds of milliseconds, and when used in conjunction with current microprocessor technologies, this amounts to a requirement of millions of processor clock cycles in order to complete the reconfiguration. As such, a high percentage of the GPRP's time is spent loading its configuration, which means the task it is performing must be relatively long-lived to maximize the time that it spends computing. This again limits its usefulness to applications that require the job not be context-switched. Context-switching is a process wherein the operating system will temporarily terminate a job that is currently running in order to process a job of higher priority. For the GPRP this would mean it would have to again reconfigure itself thereby wasting even more time.

Thirdly, since microprocessors derive much of their effective operational speed by operating on data in their cache, transferring a portion of a particular job to an attached GPRP would require moving data from the cache over the microprocessor's front side bus to the FPGA. Since this bus runs at about 25% of the cache bus speed, significant time is then consumed in moving data. This again effectively limits the reconfigurable processor to applications that have their data stored elsewhere in the system.

These three known limiting factors will only become increasingly significant as microprocessor speeds continue to increase. As a result, the throughput benefits that reconfigurable computing can offer to a hybrid system made up of existing, discrete microprocessors and FPGAs may be obviated or otherwise limited in its potential usefulness.

SUMMARY OF THE INVENTION

In accordance with the disclosure of a representative embodiment of the present invention, FPGAs, microprocessors and cache memory may be combined through the use of recently available wafer processing techniques to create a particularly advantageous form of hybrid, reconfigurable processor module that overcomes the limitations of present discrete, integrated circuit device implementations of GPRP systems. As disclosed herein, this new processor module may be conveniently denominated as a Stacked Die Hybrid ("SDH") Processor.

Tru-Si Technologies of Sunnyvale, Calif. (http://www.tru-si.com) has developed a process wherein semiconductor wafers may be thinned to a point where metal contacts can traverse the thickness of the wafer creating small bumps on the back side much like those of a BGA package. By using a technique of this type in the manufacture of microprocessor, cache memory and FPGA wafers, all three die, or combinations of two or more of them, may be advantageously assembled into a single very compact structure thus eliminating or ameliorating each of the enumerated known difficulties encountered with existing reconfigurable technology discussed above.

Moreover, since these differing die do not require wire bonding to interconnect, it is now also possible to place interconnect pads throughout the total area of the various die rather than just around their periphery. This then allows for many more connections between the die than could be achieved with any other known technique.

Particularly disclosed herein is a processor module with reconfigurable capability constructed by stacking and interconnecting bare die elements. In a particular embodiment disclosed herein, a processor module with reconfigurable capability may be constructed by stacking thinned die elements and interconnecting the same utilizing contacts that traverse the thickness of the die. As disclosed, such a processor module may comprise a microprocessor, memory and FPGA die stacked into a single block.

Also disclosed herein is a processor module with reconfigurable capability that may include, for example, a microprocessor, memory and FPGA die stacked into a single block for the purpose of accelerating the sharing of data between the microprocessor and FPGA. Such a processor module block configuration advantageously increases final assembly yield while concomitantly reducing final assembly cost.

Further disclosed herein is an FPGA module that uses stacking techniques to combine it with a memory die for the purpose of accelerating FPGA reconfiguration. In a particular embodiment disclosed herein, the FPGA module may employ stacking techniques to combine it with a memory die

Samsung Exhibit 1001
8 of 12

US 7,282,951 B2

3

for the purpose of accelerating external memory references as well as to expand its on chip block memory.

Also further disclosed is an FPGA module that uses stacking techniques to combine it with other die for the purpose of providing test stimulus during manufacturing as well as expanding the FPGA's capacity and performance. The technique of the present invention may also be used to advantageously provide a memory or input/ouput ("I/O") module with reconfigurable capability that includes a memory or I/O controller and FPGA die stacked into a single block.

According to yet another embodiment of the invention, an alternative method eliminates any grinding or further mechanical steps and accomplishes the "stacking" of integrated circuit elements during the actual wafer fabrication process. As disclosed herein, this new processor module according to the alternative method of the present invention may be conveniently designated as a Stacked Integrated Circuit Function ("SICF") Processor.

Firstly, a base wafer is completely processed just as it would have been for any other conventional use to make, for example, a microprocessor. Contacts are distributed throughout the surface of the die. After the processing of the microprocessor die on the base wafer, the surface of the wafer is left in a state that will allow for the further processing of other semiconductor elements having other functions.

Secondly, the base wafer is processed through all of the steps required to create an FPGA. The FPGA I/O metal layers connect to the surface contacts of the microprocessor just as if the die were physically thinned and stacked as previously described. The end result is that two die functions are stacked and interconnected as previously described, but done so by using wafer fabrication steps instead of mechanical discrete die thinning and stacking.

This alternative process according to a further embodiment of the invention allows for many different die functions to be stacked. In addition, functions that use different types of wafer processing steps can also be stacked since one die fabrication process is completed before the next process is started. Because wafer functions are completed before the next process is started, it is also possible to perform wafer level testing of one finished function before starting processing of the stacked function. This is beneficial for reducing test time of die after stacking subsequent functions since die failing and early stage could then be rejected. This also benefits in process optimization since failures are easily associated with a particular process step.

BRIEF DESCRIPTION OF THE DRAWINGS

The aforementioned and other features and objects of the present invention and the manner of attaining them will become more apparent and the invention itself will be best understood by reference to the following description of a preferred embodiment taken in conjunction with the accompanying drawings, wherein:

FIG. **1** is a simplified functional block diagram of a portion of a prior art computer system incorporating one or more multi-adaptive processing (MAP™ is a trademark of SRC Computers, Inc., Colorado Springs, Colo.) elements;

FIG. **2** is a more detailed, simplified functional block diagram of the multi-adaptive processing element illustrated in FIG. **1** illustrating the user logic block (which may comprise a field programmable gate array "FPGA") with its associated configuration read only memory ("ROM");

4

FIG. **3** is a functional block diagram of a representative configuration data bus comprising a number of static random access memory ("SRAM") cells distributed throughout the FPGA comprising the user logic lock of FIG. **2**;

FIG. **4** is a simplified, exploded isometric view of a reconfigurable processor module in accordance with the present invention comprising a hybrid device incorporating a number of stacked integrated circuit die elements;

FIG. **5** is a corresponding functional block diagram of the configuration cells of the reconfigurable processor module of FIG. **4** wherein the FPGA may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel;

FIGS. **6-10** are sequential cross-sectional process flow diagrams in which two functional elements are fabricated on a single base wafer according to an alternative processing method of the present invention; and

FIG. **11** is a cross-sectional process flow diagram in which three functional elements are fabricated on a single base wafer according to an alternative processing method of the present invention.

DESCRIPTION OF A REPRESENTATIVE EMBODIMENT

With reference now to FIG. **1**, a simplified functional block diagram of a portion of a prior art reconfigurable computer system **10** is shown. The computer system **10** incorporates, in pertinent part, one or more microprocessors **12**, one or more multi-adaptive processing (MAP™) elements **14** and an associated system memory **16**. A system bus **18** bidirectionally couples a MAP element **14** to the microprocessor **12** by means of a bridge **22** as well as to the system memory **16** by means of a crossbar switch **24**. Each MAP element **14** may also include one or more bidirectional connections **20** to other adjacent MAP elements **14** as shown

With reference additionally now to FIG. **2**, a more detailed, simplified functional block diagram of the multi-adaptive processing element **14** illustrated in the preceding figure is shown. The multi-adaptive processing element **14** comprises, in pertinent part, a user logic block **32**, which may comprise an FPGA together with its associated configuration ROM **34**. A MAP control block **36** and associated direct memory access ("DMA") engine **38** as well as an on-board memory array **40** is coupled to the user logic block **32** as well as the system bus **18**.

With reference additionally now to FIG. **3**, a functional block diagram of a representative configuration data bus **50** is shown comprising a number of SRAM cells distributed throughout an FPGA comprising the user logic block **32** of the preceding figure. In a conventional implementation, the configuration information that programs the functionality of the chip is held in SRAM cells distributed throughout the FPGA as shown. Configuration data is loaded through a configuration data port **52** in a byte serial fashion and must configure the cells sequentially progressing through the entire array of logic cells **54** and associated configuration memory **56**. It is the loading of this data through a relatively narrow, for example, 8 bit port that results in the long reconfiguration times.

With reference additionally now to FIG. **4**, a simplified, exploded isometric view of a reconfigurable processor module **60** in accordance with a representative embodiment of the present invention is shown comprising a hybrid device incorporating a number of stacked integrated circuit die elements. In this particular implementation, the module **60** comprises a die package **62** to which is coupled a micro-

Samsung Exhibit 1001
9 of 12

US 7,282,951 B2

5

processor die **64**, memory die **66** and FPGA die **68**, all of which have a number of corresponding contact points, or holes, **70** formed throughout the area of the package **62** and various die **64**, **66** and **68**. It should be noted that a module **60** in accordance with the present invention may also comprise any combination of one or more of the microprocessor die **64**, memory die **66** or FPGA **68** with any other of a microprocessor die **64**, memory die **66** or FPGA die **68**.

During manufacture, the contact holes **70** are formed in the front side of the wafer and an insulating layer of oxide is added to separate the silicon from the metal. Upon completion of all front side processing, the wafer is thinned to expose the through-silicon contacts. Using an atmospheric downstream plasma ("ADP") etching process developed by Tru-Si Technologies, the oxide is etched to expose the metal. Given that this etching process etches the silicon faster, the silicon remains insulated from the contacts.

By stacking die **64**, **66** and **68** with through-silicon contacts as shown, the cache memory die **66** actually serves two purposes. The first of these is its traditional role of fast access memory. However in this new assembly it is accessible by both the microprocessor **64** and the FPGA **68** with equal speed. In those applications wherein the memory **66** is tri-ported, the bandwidth for the system can be further increased. This feature clearly solves a number of the problems inherent in existing reconfigurable computing systems and the capability of utilizing the memory die **66** for other functions is potentially very important.

With reference additionally now to FIG. **5**, a corresponding functional block diagram of the configuration cells **80** of the reconfigurable processor module **60** of the preceding figure is shown wherein the FPGA **70** may be totally reconfigured in one clock cycle by updating all of the configuration cells in parallel. As opposed to the conventional implementation of FIG. **3**, a wide configuration data port **82** is included to update the various logic cells **84** through an associated configuration memory **86** and buffer cell **88**. The buffer cells **88** are preferably a portion of the memory die **66** (FIG. **4**). In this manner, they can be loaded while the FPGA **68** comprising the logic cells **84** are in operation. This then enables the FPGA **68** to be totally reconfigured in one clock cycle with all of it configuration logic cells **84** updated in parallel. Other methods for taking advantage of the significantly increased number of connections to the cache memory die **66** (FIG. **4**) may include its use to totally replace the configuration bit storage on the FPGA die **68** as well as to provide larger block random access memory ("RAM") than can be offered within the FPGA die **68** itself.

In addition to these benefits, there is an added benefit of overall reduced power requirements and increased operational bandwidth. Because the various die **64**, **66** and **68** (FIG. **4**) have very short electrical paths between them, the signal levels can be reduced while at the same time the interconnect clock speeds can be increased.

Another feature of a system incorporating a reconfigurable processor module **60** is that the FPGA **68** can be configured in such a way as to provide test stimulus to the microprocessor **64**, or other chips in the stack of the die package **62** during manufacture and prior to the completion of the module packaging. After test, the FPGA **68** can then be reconfigured for whatever function is desired. This then allows more thorough testing of the assembly earlier in the manufacturing process than could be otherwise achieved with traditional packaged part test systems thus reducing the costs of manufacturing.

6

It should be noted that although a single FPGA die **68** has been illustrated, two or more FPGA die **68** may be included in the reconfigurable module **60**. Through the use of the through-die area array contacts **70**, inter-cell connections currently limited to two dimensions of a single die, may be routed up and down the stack in three dimensions. This is not known to be possible with any other currently available stacking techniques since they all require the stacking contacts to be located on the periphery of the die. In this fashion, the number of FPGA die **68** cells that may be accessed within a specified time period is increased by up to 4VT/3, where "V" is the propagation velocity of the wafer and "T" is the specified time of propagation.

Obviously these techniques are similarly applicable if other die types are added or substituted into the stack. These may include input/output ("I/O") application specific integrated circuits ("ASICs") or memory controllers and the like.

The disclosed technique for die interconnection used in forming the module of the present invention is superior to other available alternatives for several reasons. First, while it would be possible to stack pre-packaged components instead, the I/O connectivity between such parts would be much lower and limited to the parts' periphery, thereby obviating several of the advantages of the stacked die system disclosed. Collocating multiple die on a planar substrate is another possible technique, but that too suffers from limited I/O connectivity and again does not allow for area connections between parts. Another option would be to fabricate a single die containing microprocessor, memory and FPGA. Such a die could use metalization layers to interconnect the three functions and achieve much of the benefits of die stacking. However such a die would be extremely large resulting in a much lower production yield than the three separate die used in a stacked configuration. In addition, stacking allows for a ready mix of technology families on different die as well as offering a mix of processor and FPGA numbers and types. Attempting to effectuate this with a single large die would require differing mask sets for each combination, which would be very costly to implement.

According to an alternative method of the present invention, stacking of differing "functional elements" may be accomplished at wafer fabrication without any intervening grinding or other mechanical steps. While a particular method according to an embodiment of the present invention is shown and described, it will be apparent to those skilled in the art that many other variations of the described method are possible that will result in the stacking of different functional elements on top of and interconnected to each other as claimed.

As an example, it is desired to have a Field Programable Gate Array (FPGA) function stacked on top of and interconnected to a microprocessor functional element. The first step in this sequence is to process a wafer in the normal fashion to create a microprocessor as shown in FIG. **6**. The top surface of wafer **100** is a silicon dioxide surface **102** with metal pads **104** exposed to make electrical connections to the microprocessor circuits. The location of pads **104** can be anywhere on the surface of wafer **100**. The wafer **100** is then ready for the second phase of the process.

In this phase, standard lithography and wafer processing techniques are used to mask off the metal contacts **104** and to grow an epitaxial layer of silicon on top of the existing oxide surface. A silicon dioxide layer **102** is shown in FIG. **7** that is formed after the metal contacts **104** are masked off. The epitaxial layer **106** grown on the silicon dioxide surface is shown in FIG. **8**. Since epitaxial layer **106** is being grown

Samsung Exhibit 1001
10 of 12

US 7,282,951 B2

7

on oxide layer **102**, the resulting epitaxial layer **106** is polycrystalline in nature. However, it is now possible to fabricate an FPGA function using polysilicon transistors in this epitaxial layer **106** using standard polysilicon processing techniques. During this process, the metal interconnects **108** of the FPGA are allowed to make electrical connection to at least one of the metal pads of the original microprocessor top surface as shown in FIG. **9**. This can be done by etching vias through the polysilicon epitaxial layer **106** and underlying silicon dioxide layer **102** where an interconnection between functional elements is required, and forming the interconnect in the etched vias. In this fashion the microprocessor and the FPGA are physically coupled to create the desired stacked processor according to an embodiment of the present invention. When all of the FPGA process steps are complete, the top surface will again result in exposed metal pads **108** on a silicon oxide surface **110** as shown in FIG. **10**. These pads **108** can then be used to interconnect to package bonding wires or flip chip solder balls using standard techniques for creating packaged integrated circuits.

Alternatively, pads **108** can be masked off and a further epitaxial layer can be formed so that a third functional element such as an I/O controller, memory, FPGA, microprocessor or the like, can be integrated with the first two functional elements. Referring now to FIG. **11**, a module is shown wherein three functional elements are fabricated on a single base wafer, including functional elements **100**, **106**, and **112**, separated by oxide layers **102** and **110**. A surface oxide layer **114** is also shown. Metal pads **108** are shown interconnecting all three functional elements.

While there have been described above the principles of the present invention in conjunction with specific integrated circuit die elements and configurations for a specific application, it is to be clearly understood that the foregoing description is made only by way of example and not as a limitation to the scope of the invention. Particularly, it is recognized that the teachings of the foregoing disclosure will suggest other modifications to those persons skilled in the relevant art. Such modifications may involve other features which are already known per se and which may be used instead of or in addition to features already described herein. Although claims have been formulated in this application to particular combinations of features, it should be understood that the scope of the disclosure herein also includes any novel feature or any novel combination of features disclosed either explicitly or implicitly or any generalization or modification thereof which would be apparent to persons skilled in the relevant art, whether or not such relates to the same invention as presently claimed in any claim and whether or not it mitigates any or all of the same technical problems as confronted by the present invention. The applicants hereby reserve the right to formulate new claims to such features and/or combinations of such features during the prosecution of the present application or of any further application derived therefrom.

What is claimed is:

**1**. A processor module comprising:

at least a first integrated circuit functional element including a programmable array that is programmable as a processing element; and

at least a second integrated circuit functional element stacked with and electrically coupled to said programmable array of said first integrated circuit functional element wherein said first and second integrated circuit functional elements are electrically coupled by a number of contact points distributed throughout the surfaces

8

of said functional elements and wherein said second integrated circuit includes a memory array functional to accelerate external memory references to the processing element.

**2**. The processor module of claim **1** wherein said programmable array of said first integrated circuit functional element comprises an FPGA.

**3**. The processor module of claim **1** wherein said processor of said second integrated circuit functional element comprises a microprocessor.

**4**. The processor module of claim **1** further comprising:

at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements.

**5**. A reconfigurable computer system comprising:

a processor;

a memory; and

at least one processor module including at least a first integrated circuit functional element having a programmable array that is programmable as a processing element and at least a second integrated circuit functional element that includes a memory array stacked with and electrically coupled to said programmable array of said first integrated circuit functional element wherein said memory array is functional to accelerate external memory references to the processing element.

**6**. The computer system of claim **5** wherein said programmable array of said first integrated circuit functional element comprises an FPGA.

**7**. The computer system of claim **5** wherein said processor of said second integrated circuit functional element comprises a microprocessor.

**8**. The computer system of claim **5** further comprising:

at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements.

**9**. The computer system of claim **8** wherein said third integrated circuit functional element comprises a memory.

**10**. A processor module comprising:

at least a first integrated circuit functional element including a programmable array;

at least a second integrated circuit functional element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit functional element; and

at least a third integrated circuit functional element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit functional elements respectively wherein said memory is functional to accelerate external memory references to said programmable array.

**11**. The processor module of claim **10** wherein said programmable array of said first integrated circuit functional element comprises an FPGA.

**12**. The processor module of claim **10** wherein said processor of said second integrated circuit functional element comprises a microprocessor.

**13**. The processor module of claim **10** wherein said memory of said third integrated circuit functional element comprises a memory array.

**14**. The processor module of claim **10** wherein said programmable array is reconfigurable as a processing element.

**Samsung Exhibit 1001**
**11 of 12**

US 7,282,951 B2

9

**15**. The processor module of claim **10** wherein said first, second and third integrated circuit functional elements are electrically coupled by a number of contact points distributed throughout the surfaces of said functional elements.

**16**. A programmable array module comprising:

at least a first integrated circuit functional element including a field programmable gate array that is programmable to include a processing element; and

at least a second integrated circuit functional element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element wherein said memory array is functional to accelerate external memory references to the processing element.

**17**. The programmable array module of claim **16** wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as said processing element.

**18**. A reconfigurable processor module comprising:

at least a first integrated circuit functional element including a programmable array, said programmable array including a processing element;

at least a second integrated circuit functional element including a processor stacked with and electrically coupled to said programmable array of said first integrated circuit functional element; and

at least a third integrated circuit functional element including a memory stacked with and electrically coupled to said programmable array and said processor of said first and second integrated circuit functional elements respectively

whereby said processor and said programmable array are operational to share data therebetween and wherein said memory is functional to accelerate external memory references to the processing element.

**19**. The reconfigurable processor module of claim **18** wherein said memory is operational to at least temporarily store said data.

**20**. The reconfigurable processor module of claim **18** wherein said programmable array of said first integrated circuit functional element comprises an FPGA.

**21**. The reconfigurable processor module of claim **18** wherein said processor of said second integrated circuit functional element comprises a microprocessor.

10

**22**. The reconfigurable processor module of claim **18** wherein said memory of said third integrated circuit functional element comprises a memory array.

**23**. A programmable array module comprising:

at least a first integrated circuit functional element including a field programmable gate array wherein said field programmable gate array is programmable as a processing element; and

at least a second integrated circuit functional element including a memory array stacked with and electrically coupled to said field programmable gate array of said first integrated circuit functional element wherein said memory array is functional to accelerate external memory references to said processing element, said first and second integrated circuit functional elements being coupled by a number of contact points distributed throughout the surfaces of said functional elements.

**24**. The programmable array module of claim **23** wherein said memory array is functional to accelerate reconfiguration of said field programmable gate array as said processing element.

**25**. The programmable array module of claim **23** wherein said memory array is functional as block memory for said processing element.

**26**. The programmable array module of claim **23** wherein said contact points are further functional to provide test stimulus from said field programmable gate array to said at least second integrated circuit functional element.

**27**. The programmable array module of claim **23** further comprising:

at least a third integrated circuit functional element stacked with and electrically coupled to at least one of said first or second integrated circuit functional elements.

**28**. The programmable array module of claim **27** wherein said third integrated circuit functional element includes another field programmable gate array.

**29**. The programmable array module of claim **27** wherein said third integrated circuit functional element includes an I/O controller.

\*    \*    \*    \*    \*

**Samsung Exhibit 1001**
**12 of 12**

## <u>CERTIFICATE OF COMPLIANCE WITH FED. CIR. R. 32</u>

1.     The foregoing filing complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 13,869 words exclusive of the parts of the filing as exempted by Fed. Cir. R. 32(b)(2).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in Times New Roman 14 point font.

Dated: October 21, 2022              */s/ Paul J. Andre*
                                     Paul J. Andre